## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, 1615 H Street, NW Washington, D.C.  20062 | ) ) ) ) ) | |
| and | ) ) | |
| COALITION FOR A DEMOCRATIC WORKPLACE, 901 7th Street NW, 2nd Floor Washington, D.C.  20001 | ) ) ) ) ) | Case No. 1:15-cv-9  **COMPLAINT** |
| and | ) ) | |
| NATIONAL ASSOCIATION OF MANUFACTURERS, 733 10th Street NW, Suite 700 Washington, D.C.  20001 | ) ) ) ) ) | |
| and | ) ) | |
| NATIONAL RETAIL FEDERATION 1101 New York Ave NW Washington, D.C.  20005 | ) ) ) ) | |
| and | ) ) | |
| SOCIETY FOR HUMAN RESOURCE MANAGEMENT 1800 Duke Street Alexandria, VA  22314 | ) ) ) ) ) | |
| Plaintiffs, v. | ) ) ) | |
| NATIONAL LABOR RELATIONS BOARD 1099 14th Street NW Washington, D.C.  20570 | ) ) ) ) ) | |
| Defendant. | ) ) | |

_____)

**INTRODUCTION**

1.      For nearly 80 years, the National Labor Relations Board ("NLRB" or "Board")
has conducted workplace elections so that workers can decide if they want to be represented by a
union for purposes of collective bargaining.  Like political elections, representation elections
offer all participants in the process—the union, the employer, and the employees—a critical
opportunity to engage in protected, lawful speech about how workers should vote in the election.

2.      Congress's overarching "policy judgment . . . favoring uninhibited, robust, and
wide-open debate in labor disputes"—including the "freewheeling use of the written and spoken
word" (*Chamber of Commerce v. Brown*, 554 U.S. 60, 67–68 (2008))—is so central to the
representation election process that Congress expressly guaranteed an employer's right to engage
in speech concerning unionization (so long as that speech, of course, "contains no threat of
reprisal or force or promise of benefit").  29 U.S.C. § 158(c).

3.      The Board's recently issued "ambush" election rule (the "Final Rule")
implements sweeping changes to the NLRB's representation election process that, as the
dissenting Board Members explained, impermissibly "limits the right of all parties to engage in
protected speech at precisely the time when their free speech rights are most important."   79
Fed. Reg. 74,308, 74,439 (Dec. 15, 2014).  By rapidly (and needlessly) accelerating the election
process, the Final Rule "improperly shortens the time needed for employees to understand
relevant issues, compelling them to 'vote now, understand later.'"  *Id.* at 74,430.

4.      In doing so, the Final Rule is "contrary to common sense, contrary to the
[National Labor Relations] Act and its legislative history, and contrary to other legal
requirements directed to the preservation of employee free choice, all of which focus on
guaranteeing enough time for making important decisions."  *Id.* at 74,430-31.  And the Final

Rule is "fundamentally unfair and will predictably deny parties due process by unreasonably altering long established Board norms for adequate notice and opportunity to introduce relevant evidence and address election-related issues." *Id.* at 74,431.

5.      Although the Final Rule does not provide any guidelines about the time frame in which elections will be conducted, the changes implemented in the Final Rule would allow elections to be held in as little as 14 days after the employer is first notified of the election petition.  Under the NLRB's current procedures, the Board expects that elections will be held within a median of 42 days from the filing of a petition, and that 90 percent of elections will be held within 56 days of the filing of a petition.

6.      Among other dramatic changes to the representation election process, the Final Rule:

a.      Postpones evidence taking and litigation over critical issues of voter eligibility until *after* an election takes place;

b.      Sharply limits the opportunity for employers to seek pre-election Board review, and a stay of the election, by eliminating a 25-day automatic waiting period for such review;

c.      Eliminates employers' automatic right to post-election Board review (post-election review would now be discretionary); and

d.      Requires employers to turn over employees' highly personal information such as home and cell phone numbers and e-mail addresses to labor organizations to aid unions in their election campaign efforts.

7.      Moreover, as the dissenting Board Members point out, the Final Rule "leaves unanswered the most fundamental question regarding any agency rulemaking, which is whether

and why rulemaking is necessary." 79 Fed. Reg. at 74,431.  The Board already handles election requests quickly, with over 95 percent of elections occurring in less than two months (and with over 90 percent of elections generating no pre-election litigation, above the Board's stated goal of 85 percent).  Indeed, for several years, the Board has surpassed its own internal time target for handling elections—a feat its prior General Counsel has described as "outstanding."  And unions already win more than two-thirds of all representation elections—so the Board's massive modifications to the election process cannot be justified or explained by any legitimate concern about employer "coercion" during the current pre-election period.

8.    Because the Final Rule offends the First and Fifth Amendments to the Constitution of the United States, contravenes clear congressional requirements, and is arbitrary and capricious, it should be held unlawful and set aside.

<strong><u>JURISDICTION AND VENUE</u></strong>

9.    This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under and concerns provisions of the National Labor Relations Act ("NLRA"), the Administrative Procedure Act ("APA"), and the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

10.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because (i) the NLRB resides in the District of Columbia; (ii) a substantial part of the events giving rise to this claim—including hearings and other actions taken by the Board in promulgating the Final Rule—occurred in the District of Columbia; and (iii) the Chamber, CDW, NAM, and NRF are headquartered or maintain offices in the District of Columbia, and SHRM does business in the District of Columbia.

<strong><u>PARTIES</u></strong>

11.    Plaintiff Chamber of Commerce of the United States of America ("Chamber") is a

non-profit organization created and existing under the laws of the District of Columbia. The Chamber's headquarters are located at 1615 H Street, NW, Washington, D.C. The Chamber is the world's largest federation of businesses and associations, directly representing 300,000 members and indirectly representing more than three million U.S. businesses and professional organizations of every size and in every industry sector and geographic region of the country. Of particular relevance here, the Chamber represents the interests of its member-employers in employment and labor-relations matters—including matters arising under the NLRA—before courts, Congress, the Executive Branch, and regulatory agencies of the federal government. The Chamber is authorized to bring this action on behalf of its member companies.

12.    Plaintiff Coalition for a Democratic Workplace ("CDW") represents millions of businesses of all sizes. CDW's membership includes hundreds of employer associations, individual employers, and other organizations that together employ tens of millions of individuals working in every industry and every region of the country. CDW is authorized to bring this action on behalf of itself, its members, and its member companies.

13.    Plaintiff National Association of Manufacturers ("NAM") is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs nearly 12 million men and women, contributes more than $1.8 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for two-thirds of private-sector research and development. NAM is authorized to bring this action on behalf of itself, its members, and its member companies.

14.    Plaintiff National Retail Federation ("NRF") is the world's largest retail trade association, representing discount and department stores, home goods and specialty stores, Main

Street merchants, grocers, wholesalers, chain restaurants, and Internet retailers from the United

States and more than 45 countries.  Retail is the nation's largest private sector employer,

supporting one in four U.S. jobs—a total of 42 million working Americans.  NRF is authorized

to bring this action on behalf of itself, its members, and its member companies.

15.     Plaintiff Society for Human Resource Management ("SHRM") is the world's

largest membership organization devoted to human resource management.  Representing more

than 275,000 members in over 90,000 companies, SHRM is the leading provider of resources to

serve the needs of human resource professionals and advance the professional practice of human

resource management.  SHRM members represent their employer companies on a myriad of

human resource issues, including labor relations matters.  SHRM is authorized to bring this

action on behalf of itself and its members.

16.     Plaintiffs collectively represent millions of employers and human resource

professionals in companies covered by the NLRA and subject to the Final Rule.  These

employers, in turn, employ millions of employees who are covered by the NLRA and entitled to

organize and petition the NLRB to hold a representation election pursuant to the Final Rule's

expedited procedures.  The vast majority of these employees are not currently represented by a

union.  There are, however, active union organizing campaigns involving employees of many of

the businesses represented by Plaintiffs.  The Plaintiffs' members expect that these employees, or

the unions that seek to represent them, will file election petitions soon after the Final Rule

becomes effective on April 14, 2015, and all subsequent elections will be governed by the Final

Rule's expedited procedures.

17.     These injuries that the Plaintiffs' members will incur as a result of the Final Rule

include less time for employers to communicate with workers about the election, in derogation of

employers' free speech rights under Section 8(c) of the NLRA, the First Amendment, and the clear congressional intent for a full and informed debate before workers cast their votes; less time for employers to investigate whether it is even appropriate for the NLRB to hold an election in the petitioned-for bargaining unit; less time for employers to determine whether other employees should be included or excluded from the petitioned-for bargaining unit; less time for employers to determine whether individuals encompassed by the petition are actually eligible to vote in the election; less time to prepare for a pre-election hearing and file a binding position statement under penalty of issue waiver; and less time for employers to negotiate an election agreement that would obviate the need for a pre-election hearing. Many of Plaintiffs' members will incur additional costs in order to prepare for the shortened, and inadequate, time to respond to an election petition under the Final Rule.

18.     In addition, the Final Rule will restrict employers' ability to litigate issues of eligibility and inclusion at the pre-election hearing, even if those issues are timely raised; sharply limit employers' opportunity to seek Board review of a Regional Director's decision before the election; and eliminates mandatory Board review of post-election disputes, making such review discretionary only. In these circumstances, if the union wins the election, the employer may be denied any Board review of the Regional Director's decision and the employer's only recourse for judicial review will be to subject itself to an unfair labor practice proceeding by refusing to bargain with the union.

19.     Therefore, in the absence of relief from this Court, many of the Plaintiffs' members will suffer concrete and particularized injuries as a result of the Final Rule soon after it becomes effective.

20.     Defendant NLRB is an independent federal agency in the Executive Branch and is

subject to the APA.  The NLRB's headquarters are located at 1099 14th Street, NW,

Washington, D.C.

21.     The Board consists of a Chairman and four Members.

22.     Mark G. Pearce, in his official capacity, is Chairman of the Board.

23.     Kent Y. Hirozawa, in his official capacity, is a Member of the Board.

24.     Philip A. Miscimarra, in his official capacity, is a Member of the Board.

25.     Harry I. Johnson III, in his official capacity, is a Member of the Board.

26.     Nancy Schiffer, in her previous official capacity, was a Member of the Board

until her term expired on December 16, 2014.

27.     Richard F. Griffin, Jr., in his official capacity, is the NLRB's General Counsel.

## FACTS

28.     For nearly 80 years, the Board has conducted workplace elections so that workers

can decide whether they want to be represented by a union for purposes of collective bargaining.

29.     In the last ten years, the Board has conducted elections within a median of 38

days from the filing of the petition—well below the Board's time target of 42 days.

30.     By comparison, in 1960 the median time from petition to the Board's *direction* of

an election was 82 days, with even more time elapsing before the election actually occurred.  76

Fed. Reg. at 36,814, n.16.

31.     By 1975, however, the Board had succeeded in reducing the time between petition

and election.  That year, only 20.1 percent of all elections occurred more than 60 days after a

petition was filed—and this percentage later decreased to 16.5 percent by 1985.  *Id.* at 36,814,

n.19.

32.     In the past two years, the Board has beat its own time targets for conducting

representation elections, deciding pre-election issues at the regional level, and closing pending

representation cases:

    a. In 2013, 94.3 percent of all elections occurred within a 56-day period after the filing of the petition, which was better than the Board's stated goal of 90 percent. That rate improved to 95.7 percent in 2014, again well above the 90 percent goal.

    b. In 2013, regional directors issued 159 pre-election decisions in a median of 32 days after the petition, below the 45-day target.

    c. In 2014, 88.1 percent of all NLRB representation cases were "closed" within 100 days of the petition being filed. That rate exceeded the agency's stated goal of 85.3 percent for 2014.

33. The speed with which the Board conducted elections in 2013 and 2014 under its existing procedures is consistent with the trend over the past five decades of reducing the time period between the filing of the petition and the election.

34. The number of representation cases processed by the Board has also dropped substantially:

    a. In 1959, there were 9,347 representation case filings, 8,840 case closings, and 2,230 cases pending at the end of the year. The Board itself decided 1,880 cases. 79 Fed. Reg. at 74,450.

    b. In fiscal year 2013, only 1,986 representation petitions were filed, almost the same number as the year before, and reflecting a decline of about 80 percent over the last 50 years. *Id.*

35. As of October 1, 2014, there were only 48 representation cases pending at the Board—well below the caseload 50 years ago. *Id.*

36. In fiscal year 2014, the Board itself decided only 43 representation cases, down

from 1,880 cases in 1959.

37.     Under the Board's current election procedures, there is no pre-election litigation in more than 90 percent of representation cases because the parties negotiate and enter into an election agreement.  79 Fed Reg. at 74,387.

38.     In 2013, labor organizations won 64.1 percent of the representation elections conducted by the Board.

39.     Nonetheless, in June 2011, the Board proposed unprecedented and sweeping changes to its procedures for conducting representation elections designed to further reduce the time between an election petition being filed and the holding of an election.  76 Fed. Reg. 36,812 (June 22, 2011) (Notice of Proposed Rulemaking) ("the Proposed Rule").

40.     Less than 30 days after publishing the Proposed Rule, the Board held a two-day hearing at which nearly 70 witnesses testified, with each witness having approximately 5 minutes to speak.  Many witnesses testified against the Proposed Rule.

41.     When the comment period for the Proposed Rule closed, the Board had received more than 65,000 comments—many of them, like Plaintiffs' comments, opposed to the Proposed Rule.

42.     About two months after the comment period closed, the Board announced that it would hold a public meeting less than two weeks later during which the Board's Members would vote on a resolution concerning a modified rule.

43.     At the meeting, the Board adopted the resolution it had released only the day before, including certain changes that differed from those set forth in the 2011 Proposed Rule.

44.     Sometime the next month—in December 2011—Board Chairman Mark Pearce and then-Member Craig Becker voted to approve the rule as modified.  The final rule issued on

December 22, 2011 ("2011 Final Rule").  Then-Member Hayes did not participate in the vote, but subsequently published a dissent.

45.     Plaintiffs Chamber and CDW filed a complaint asking this Court to invalidate the 2011 Final Rule.

46.     In May 2012, this Court did so on the ground that the Board, with only two Members voting, lacked a statutory quorum when it approved the 2011 Final Rule.  *Chamber of Commerce of the U.S. v. NLRB*, 879 F. Supp. 2d 18, 28-30 (D.D.C. 2012).  The Court did not "reach—and expresse[d] no opinion on—Plaintiffs' other procedural and substantive challenges to the rule."  *Id.* at 30.

47.     The Board appealed the Court's decision to the U.S. Court of Appeals for the District of Columbia Circuit, but later voluntarily sought and obtained dismissal of its own appeal.  2013 WL 6801164 (D.C. Cir. 2013).

48.     The Board issued a second Notice of Proposed Rulemaking ("2014 Proposed Rule") on February 6, 2014, under the same docket number as the 2011 Proposed Rule and containing the same proposals on workplace elections.  79 Fed. Reg. 7,318.

49.     In doing so, the Board remarked that the 2014 Proposed Rule was "in essence, a reissuance of the proposed rule of June 22, 2011."  *Id.*

50.     Except for Chairman Pearce, none of the Members on the Board when it issued the 2014 Proposed Rule served on the Board or otherwise participated in the 2011 rulemaking process.

51.     The Board provided for a 60-day comment period for the 2014 Proposed Rule. The Board told commentators that it was not necessary to "resubmit any comment or repeat any argument that has already been made."  *Id.* at 7,319.

52.     Plaintiffs all filed comments on the 2014 Proposed Rule.

53.     On April 10-11, 2014, the Board held a public hearing on the 2014 Proposed Rule.

54.     Plaintiffs CDW, NAM, SHRM, and the Chamber participated, through their respective representatives, at the public hearing.

55.     On December 12, 2014, the Board announced that a majority of its Members had voted to adopt a final rule, which would be published in the Federal Register on December 15, 2014 and take effect on April 14, 2015.  Members Phillip A. Miscimarra and Harry I. Johnson III dissented.

56.     The Final Rule was published in the Federal Register on December 15, 2014.  79 Fed. Reg. 74,308.

57.     The Final Rule largely adopted the changes outlined in the 2014 Proposed Rule, with some modifications.  Nonetheless, as the dissenting Board members remarked, "the Rule's primary purpose and effect remain the same:  Initial representation elections must occur as soon as possible."  79 Fed. Reg. at 74,430.

58.     The dissenting Board Members expressed concern that "[w]e still do not understand the reason for embarking on the path our colleagues have taken."  79 Fed. Reg. at 74,434.  They wrote that "the Final Rule manifest[s] a relentless zeal for slashing time from every stage of the current pre-election procedure in fulfillment of the requirement that an election be scheduled 'at the earliest date practicable,' but the Final Rule's keystone device to achieve this objective is to have elections occur *before* addressing important election-related issues."  *Id.* at 74,432.

59.     "Unfortunately," the dissenting Board Members explained, "the inescapable

impression created by the Final Rule's overriding emphasis on speed is to require employees to

vote as quickly as possible—at the time determined exclusively by the petitioning union—at the

expense of employees and employers who predictably will have insufficient time to understand

and address relevant issues."  *Id.* at 74,460.

## CLAIMS FOR RELIEF

### COUNT I
### (The Final Rule Is Not in Accordance With the NLRA, Exceeds the Board's Statutory Authority, and Violates the First and Fifth Amendments of the Constitution of the United States)

60.     Plaintiffs incorporate by reference each allegation in the above paragraphs as

though fully set forth herein and further allege as follows:

61.     Section 7 of the NLRA gives employees the right to "form, join, or assist" unions;

to bargain collectively with their employer; or to refrain from engaging in such activities.

62.     Section 6 of the NLRA authorizes the Board to promulgate "rules and regulations

as may be necessary to carry out the provisions of this Act."  29 U.S.C. § 156.

63.     Section 9(b) of the NLRA provides that "in order to assure to employees the

fullest freedom in exercising the rights guaranteed by" the NLRA, the Board "shall decide in

each case" the unit that is appropriate for the purposes of collective bargaining.  29 U.S.C.

§ 159(b).

64.     Section 9(c) of the NLRA provides that, when a petition for a representation

election is filed, the Board must investigate that petition and "shall provide for an appropriate

hearing upon due notice" before the election is held.  29 U.S.C. § 159(c)(1).  The same provision

provides that "[s]uch hearing may be conducted by an officer or employee of the regional office,

who shall not make any recommendations with respect thereto."

65.     The Final Rule violates the Act's requirement of an "appropriate" pre-election

hearing by restricting the employer's ability to present evidence and litigate issues of voter eligibility or inclusion in the putative bargaining unit.

66.     The Final Rule also conflicts with Section 9(c)(1)'s requirement that the Board's hearing officers "shall not make any recommendations with respect" to the hearings they conduct.  The Final Rule effectively vests hearing officers with decision-making authority regarding the evidence that will be admitted and the issues that will be litigated at the pre-election hearing.

67.     By authorizing hearing officers to prevent employers from litigating issues as to the eligibility of certain employees to vote in the election, and by limiting the available time for the employer to communicate about the election and for employees to decide whether to vote for or against union representation, the Final Rule fails to assure employees the "fullest freedom" in exercising their rights under Section 7 of the NLRA and is otherwise contrary to Section 9(b) of the NLRA.

68.     Section 8(c) of the NLRA protects an employer's freedom of speech:  "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisals or force or promise of benefit."  29 U.S.C. § 158(c).  Section 8(c) "merely implements the First Amendment" to the United States Constitution and "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the National Labor Relations Board."  *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969).

69.     By these provisions, Congress directed that employers would be given sufficient opportunity to meaningfully express their views in the election process.  Specifically, Congress

determined that employers must have the opportunity to effectively communicate with their employees on the subjects of union organizing and collective bargaining. *See Chamber of Commerce v. Brown,* 554 U.S. 60, 67–68 (2008) (Section 8(c) reflects a "policy judgment, which suffuses the NLRA as a whole, as favoring uninhibited, robust, and wide open debate in labor disputes." (internal quotation omitted)); *Nat'l Ass'n of Manufacturers v. NLRB*, 717 F.3d 947, 955 (D.C. Cir. 2013) (Section 8(c) "serves a labor law function of allowing employers to present an alternative view and information that a union would not present." (citation omitted)).

70.     The Final Rule impermissibly curtails an employer's right to communicate with its employees by substantially shortening the period between an election petition and the holding of an election, and the Final Rule impermissibly limits employers' ability to exercise their rights under Section 8(c) and the First Amendment.

71.     The Final Rule further violates the Free Speech Clause of the First Amendment by compelling employers to engage in certain speech during the election process, specifically a new mandatory workplace notice to be posted after the filing of a representation petition.

72.     The Final Rule also deprives employers of due process in NLRB representation case proceedings, in violation of the Fifth Amendment, by preventing employers from litigating issues of voter eligibility and inclusion at the pre-election hearing, and then denying the employer the right to seek any Board review of those issues, whether pre- or post-election, by making all Board review discretionary.

73.     The Board's actions are not in accordance with law, contrary to constitutional rights, and in excess of the Board's statutory jurisdiction and authority and in violation of 5 U.S.C. § 706(2)(A)-(C).

74.     Unless vacated, held unlawful, and set aside, the Final Rule will adversely affect

the rights of Plaintiffs and their members.

### COUNT II
#### (The Board's Actions Are Arbitrary and Capricious)

75.     Plaintiffs incorporate by reference each allegation in the above paragraphs as

though fully set forth herein and further allege as follows:

76.     "The APA commands reviewing courts to 'hold unlawful and set aside' agency

action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law.'" *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (citing 5 U.S.C. §

706(2)(A)).

77.     The APA also requires courts to hold unlawful and set aside agency action that is

not in accordance with procedure required by law.  5 U.S.C. § 706(2)(D).

78.     The Final Rule is overly broad in changing election procedures in a manner

impacting all cases, as the alleged "problems" identified by the Board to justify the Final Rule

exist only in a small fraction of cases.

79.     The Final Rule seeks to arbitrarily expedite the election process, even though the

data show that the Board already conducts elections below its established time targets in more

than 90 percent of cases.

80.     The Final Rule introduces no new time targets for representation elections, further

undermining the rational basis for radically altering procedures that have met the agency's

established time targets for many years.

81.     The Final Rule promotes speed in holding elections at the expense of all other

statutory goals and requirements, including but not limited to employer free speech rights and the

opportunity for a full and informed debate before an election.

82.     The Final Rule also mandates, for the first time in the Board's history, that

employers give their employees' personal phone numbers and email addresses to labor organizations.  The Board acknowledged that "the privacy, identity theft, and other risks may be greater than the Board has estimated," but nonetheless concluded, without adequate justification and concern for employee rights, that these "risks are worth taking."  79 Fed. Reg. at 74,342.

83.     The Final Rule's elimination of mandatory Board review of post-election disputes, during a period of dramatically reduced case loads, is arbitrary and capricious given the Board's statutory obligation to oversee the election process.

84.     The Final Rule concludes that it will reduce election-related litigation, despite available evidence that the Final Rule's sweeping changes will reduce the high rate of election agreements, and will result in more, not less, litigation overall, including more litigation in federal court.  As the dissenting Board Members explained:  "An employer will now be forced to litigate in an unfair labor practice case, before the Board and in Federal court, issues that are currently reviewed by the Board in a post-election appeal as a matter of right. Given the process an employer must go through to have a Federal court of appeals review any disputed issue regarding an election, there is often substantial delay in the final resolution of the representation case."  79 Fed. Reg. at 74,451.

85.     Based on the above, the Board failed to meaningfully consider numerous legal, policy, and economic factors, or to articulate a rational basis for rejecting them.

86.     The Board's actions in adopting the Final Rule are arbitrary and capricious, and the Final Rule was enacted without observance of procedure required by law.  5 U.S.C. § 706(2)(A)-(D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in their favor

and:

1.    Vacate and set aside the Final Rule;

2.    Declare that the Final Rule is contrary to the First and Fifth Amendments to the

Constitution of the United States and to the NLRA, and in excess of the Board's

statutory jurisdiction and authority;

3.    Declare that Defendant violated the APA in issuing the Final Rule;

4.    Declare that the Final Rule is arbitrary, capricious, an abuse of discretion and

otherwise not in accordance with law;

5.    Enjoin and restrain Defendant, its agents, employees, successors, and all persons

acting in concert or participating with Defendant from enforcing, applying, or

implementing (or requiring others to enforce, apply, or implement) the Final Rule;

6.    Award Plaintiffs their costs of litigation, including reasonable attorney's fees; and

7.    Grant Plaintiffs such other relief as may be necessary and appropriate or as the

Court deems just and proper.

Dated:  January 5, 2015                          Respectfully submitted,

/s/ Jonathan C. Fritts
Allyson N. Ho (D.C. Bar No. 477589)
Charles I. Cohen (D.C. Bar No. 284893)
Kathryn Comerford Todd (D.C. Bar No. 477745)     Michael W. Steinberg (D.C. Bar No. 964502)
Warren Postman (D.C. Bar No. 995083)             Jonathan C. Fritts (D.C. Bar No. 464011)
U.S. CHAMBER LITIGATION CENTER, INC.             David R. Broderdorf (D.C. Bar No. 984847)
1615 H Street, N.W.                              MORGAN, LEWIS & BOCKIUS LLP
Washington, D.C. 20062                           1111 Pennsylvania Avenue, NW
202.463.5337                                     Washington, D.C. 20004
                                                 202.739.3000

*Counsel for Plaintiff Chamber of Commerce of the*
*United States of America*                       *Counsel for the Plaintiffs*

Patrick N. Forrest (D.C. Bar No. 489950)
MANUFACTURERS' CENTER FOR LEGAL
ACTION
733 10th Street NW, Suite 700
Washington, D.C. 20001
202.637.3061

*Counsel for Plaintiff National Association of*
*Manufacturers*