**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————————

|  |  |  |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:15-cv-00009-ABJ Judge Amy Berman Jackson |
| v. | ) ) | |
| NATIONAL LABOR RELATIONS BOARD | ) ) ) | |
| Defendant. | ) ) | |

———————————————————————

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Chamber of Commerce of the United States of America, Coalition for a Democratic Workplace, National Association of Manufacturers, National Retail Federation, and Society for Human Resource Management, by and through undersigned counsel, respectfully move this Court to enter summary judgment in Plaintiffs' favor. The grounds for this motion are set forth in the accompanying memorandum of points and authorities. In accordance with Local Civil Rule 7(c), a Proposed Order is attached as Exhibit 1. Plaintiffs also respectfully request oral argument.

Dated:  February 4, 2015

Kathryn Comerford Todd (D.C. Bar No. 477745)
Tyler Green (D.C. Bar No. 982312)*
Steven P. Lehotsky (D.C. Bar No. 992725)
Warren Postman (D.C. Bar No. 995083)
U.S. CHAMBER LITIGATION CENTER, INC.
1615 H Street, N.W.
Washington, D.C. 20062
202.463.5337

*Counsel for Plaintiff Chamber of Commerce
of the United States of America*

Respectfully submitted,

/s/ Allyson N. Ho
————————————————————
Allyson N. Ho (D.C. Bar No. 477589)
Charles I. Cohen (D.C. Bar No. 284893)
Michael W. Steinberg (D.C. Bar No. 964502)
Jonathan C. Fritts (D.C. Bar No. 464011)
David R. Broderdorf (D.C. Bar No. 984847)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202.739.3000

*Counsel for the Plaintiffs*

Linda Kelly (D.C. Bar No. 477635)
Patrick N. Forrest (D.C. Bar No. 489950)
MANUFACTURERS' CENTER FOR LEGAL ACTION
733 10th Street, N.W., Suite 700
Washington, D.C. 20001
202.637.3061

*Counsel for Plaintiff National Association of
Manufacturers*

*Application for admission to the U.S. District Court for the District of Columbia pending

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| CHAMBER OF COMMERCE OF THE | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | Case No. 1:15-cv-00009-ABJ |
| Plaintiffs, | ) | Judge Amy Berman Jackson |
| v. | ) | |
| | ) | |
| NATIONAL LABOR RELATIONS | ) | |
| BOARD | ) | |
| | ) | |
| Defendant. | ) | |

_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Kathryn Comerford Todd (D.C. Bar No. 477745)
Tyler Green (D.C. Bar No. 982312)*
Steven P. Lehotsky (D.C. Bar No. 992725)
Warren Postman (D.C. Bar No. 995083)
U.S. CHAMBER LITIGATION CENTER, INC.
1615 H Street, N.W.
Washington, D.C. 20062
202.463.5337

*Counsel for Plaintiff Chamber of Commerce*
*of the United States of America*

Linda Kelly (D.C. Bar No. 477635)
Patrick N. Forrest (D.C. Bar No. 489950)
MANUFACTURERS' CENTER FOR LEGAL ACTION
733 10th Street NW, Suite 700
Washington, D.C. 20001
202.637.3061

*Counsel for Plaintiff National Association of*
*Manufacturers*

Allyson N. Ho (D.C. Bar No. 477589)
Charles I. Cohen (D.C. Bar No. 284893)
Michael W. Steinberg (D.C. Bar No. 964502)
Jonathan C. Fritts (D.C. Bar No. 464011)
David R. Broderdorf (D.C. Bar No. 984847)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.739.3000

*Counsel for the Plaintiffs*

*Application for admission to the U.S. District Court for the District of Columbia pending

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

    I.     Plaintiffs ................................................................................................ 3

    II.    Representation Election Procedures ..................................................... 5

    III.   In 2011, The Board Made Changes To The Election Rules, Which Were Set Aside By This Court ......................................................................... 8

    IV.   In 2014, The Board Issued The Final Election Rule Challenged Here................ 10

STANDARD OF REVIEW ............................................................................... 13

ARGUMENT .................................................................................................... 13

    I.     The Final Rule Is Contrary To §§ 3, 8, And 9 Of The NLRA ............................ 13

        A.    The Final Rule Violates The NLRA By Undermining The Statutorily Guaranteed "Appropriate Hearing." ..................................... 16

            1.    Congress has already spoken to the issue of an "appropriate" pre-election hearing............................................... 17

            2.    The Final Rule deprives employers of an appropriate hearing, as the Board has previously recognized......................... 23

        B.    The Final Rule Conflicts With The NLRA By Impermissibly Limiting Robust Debate And Depriving Employees Of An Informed Election ................................................................................. 26

    II.    The Final Rule Is Arbitrary And Capricious In Violation Of The APA.............. 31

        A.    The Final Rule Unnecessarily Abandons Established Procedures For Unexplained Reasons, Despite The Board's Undisputed Success In Timely Conducting Elections ................................................. 32

        B.    Contrary To The Board's Stated Goals, The Final Rule Will Trigger More Election-Related Litigation ................................................. 33

            1.    The Final Rule undermines the incentive for the parties to negotiate election agreements, a critical litigation-reducing component of representation elections......................................... 34

            2.    The Final Rule will increase federal-court litigation ................... 36

            3.    The potential to moot litigation involving some voter eligibility issues cannot justify increasing litigation concerning the validity of the election itself................................ 38

        C.    The Final Rule's Mandatory Disclosures of Employees' Personal Information Is Arbitrary and Disregards Substantial Privacy Concerns ............................................................................................... 40

# TABLE OF CONTENTS
(continued)

**Page**

III.    The Final Rule Unconstitutionally Compels Employer Speech .......................... 42

CONCLUSION................................................................................................................... 44

# TABLE OF AUTHORITIES

Page(s)

CASES

*44 Liquormart v. Rhode Island*,
  517 U.S. 484 (1996).............................................................................................43

*AFL v. NLRB*,
  308 U.S. 401 (1940)...........................................................................................36

*AFL-CIO v. FEC*,
  333 F.3d 168 (D.C. Cir. 2003)...........................................................................31

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001).........................................................................13

*Am. Meat Inst. v. United States, Dep't of Agric.*,
  760 F.3d 18 (D.C. Cir. 2014) (en banc)..................................................27, 43, 44

*Am. Ship Bldg. Co. v. NLRB*,
  380 U.S. 300 (1965)...........................................................................................30

*Armstrong v. Manzo*,
  380 U.S. 545 (1965)...........................................................................................25

*Ashland Facility Operations, LLC v. NLRB*,
  701 F.3d 983 (4th Cir. 2012) .............................................................................29

*\*Barre-Nat'l, Inc.*,
  316 NLRB 877 (1995) .............................................................................18, 24, 39

*Barton Nelson, Inc.*,
  318 NLRB 712 (1995) ........................................................................................38

*Bell Atl. Tel. Cos. v. FCC*,
  131 F.3d 1044 (D.C. Cir. 1997)..........................................................................14

*Brodie v. U.S. Dep't of Health & Human Servs.*,
  796 F. Supp. 2d 145 (D.D.C. 2011)...................................................................13

*Buckley v. Valeo*,
  424 U.S. 1 (1976)...............................................................................................27

*Chamber of Commerce of the United States. v. NLRB*,
  879 F. Supp. 2d 18 (D.D.C. 2012).......................................................................9

*Chamber of Commerce of the United States  v. NLRB*,
  No. 12-5250, 2013 WL 6801164 (D.C. Cir. Dec. 9, 2013) ....................................9

*Chamber of Commerce v. Brown,*
    554 U.S. 60 (2008)................................................................................................1, 15, 26

*Chamber of Commerce v. SEC*,
    412 F.3d 133 (D.C. Cir. 2005)......................................................................................37

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)................................................................................................14, 32

*Cmty. Action Comm'n of Fayette Cnty., Inc.*,
    338 NLRB 664 (2002)..................................................................................................38

*Comcast Corp. v. FCC*,
    579 F.3d 1 (D.C. Cir. 2009)..........................................................................................41

*Commodity Futures Trading Comm'n v. Schor*,
    478 U.S. 833 (1986)......................................................................................................22

*Curry v. Prince George's Cnty., Md.*,
    33 F. Supp. 2d 447 (D. Md. 1999)................................................................................28

*Edward J. DeBartolo Corp. v. Fl. Gulf Coast Build. & Constr. Trades Council*,
    485 U.S. 568 (1988)......................................................................................................15

*E.L.C. Elec., Inc.*,
    344 NLRB 1200 (2005).................................................................................................29

*Emineth v. Jaeger*,
    901 F. Supp. 2d 1138 (D. N.D. 2012)...........................................................................28

*Excelsior Underwear, Inc.*,
    156 NLRB 1236 (1966).................................................................................................40

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)......................................................................................................23

*Goodyear Tire & Rubber Co.*,
    138 NLRB 453 (1962)...................................................................................................29

*Greater Yellowstone Coal. v. Bosworth*,
    209 F. Supp. 2d 156 (D.D.C. 2002)..............................................................................13

*Hamilton Test Sys., New York, Inc. v. NLRB*,
    743 F.2d 136 (2d Cir. 1984)..........................................................................................39

*Hammontree v. NLRB*,
    894 F.2d 438 (D.C. Cir. 1990)................................................................................14, 30

*Harborside Healthcare, Inc.*,
  343 NLRB 906 (2004) ...........................................................................................38

*Inland Empire Dist. Council v. Millis*,
  325 U.S. 697 (1945)..........................................................................................20, 23

*Int'l Hod Carriers Bldg. & Common Laborers Union of Am.*,
  135 NLRB 1153 (1962) ........................................................................................19

*Martini v. Fed. Nat'l Mortg. Ass'n*,
  178 F.3d 1336 (D.C. Cir. 1999) ...........................................................................14

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)..............................................................................................25

*McConnell v. FEC*,
  540 U.S. 93 (2003)................................................................................................27

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
  59 U.S. 229 (2010)................................................................................................43

*Mills v. Alabama*,
  384 U.S. 214 (1966)..............................................................................................28

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).........................................................................31, 32, 33, 40

*N. Manchester Foundry, Inc.*,
  328 NLRB 372 (1999) ..........................................................................................24

*Nat'l Ass'n of Mfrs. v. NLRB*,
  717 F.3d 947 (D.C. Cir. 2013) ................................................................26, 27, 44

*Nat'l Cable & Telecomm. Ass'n v. FCC*,
  567 F.3d 659 (D.C. Cir. 2009) .......................................................................13, 14

*Ne. Hosp. Corp. v. Sebelius*,
  657 F.3d 1 (D.C. Cir. 2011) .................................................................................14

*NLRB v. Arkema, Inc.*,
  710 F.3d 308 (5th Cir. 2013) ...............................................................................29

*NLRB v. Beverly Health & Rehab. Servs., Inc.*,
  120 F.3d 262, 1997 WL 457524 (4th Cir. Aug. 12, 1997) ...................................39

*NLRB v. Curwood Inc.*,
  397 F.3d 548 (7th Cir. 2005) ...............................................................................29

*NLRB v. Catholic Bishop of Chicago*,
  440 U.S. 490 (1979)..........................................................................25

*NLRB v. Gissel Packing Co.*,
  395 U.S. 575 (1969)......................................................................26, 27

*NLRB v. Ky. River Cmty. Care, Inc.*,
  532 U.S. 706 (2001)..........................................................................36

*NLRB v. Lorimar Prods., Inc.*,
  771 F.2d 1294 (9th Cir. 1985) ...........................................................39

*NLRB v. Parsons Sch. of Design*,
  793 F.2d 503 (2d Cir. 1986).............................................................39

*NLRB v. S. W. Evans & Son*,
  181 F.2d 427 (3d Cir. 1950)..........................................................20, 23

*Office of Commc'n, Inc. of United Church of Christ v. FCC*,
  327 F.3d 1222 (D.C. Cir. 2003) .........................................................14

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Ca.*,
  475 U.S. 1 (1986)..................................................................42, 43, 44

*Public Citizen v. FMCSA*,
  374 F.3d 1209 (D.C. Cir. 2004) .....................................................37, 41

*Shays v. FEC*,
  414 F.3d 76 (D.C. Cir. 2005) ............................................................14

*SNE Enters.*,
  348 NLRB 1041 (2006) .....................................................................38

*Sorenson Commc'ns Inc. v. FCC*,
  755 F.3d 702 (D.C. Cir. 2014) ............................................... *passim*

*Teamsters Local Union No. 115 (Vila-Barr Co.)*,
  157 NLRB 588 (1966) .......................................................................19

*Thomas Jefferson Univ. v. Shalala*,
  512 U.S. 504 (1994)..........................................................................13

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994)..........................................................................44

*Utica Mut. Ins. Co. v. Vincent*,
  375 F.2d 129 (2d Cir. 1967)...........................................................20, 21

*Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)............................................................................43

*Wooley v. Maynard*,
    430 U.S. 705 (1977)....................................................................42, 44

*Zauderer v. Office of Disciplinary Council for Sup. Ct. of Ohio*,
    471 U.S. 626 (1985)....................................................................43, 44

## CONSTITUTIONAL PROVISIONS

U.S. Const. First Amendment ............................................................ *passim*

U.S. Const. Fifth Amendment............................................................25

## STATUTES

5 U.S.C. § 706 (Administrative Procedure Act ("APA")).....................13, 23

29 U.S.C. §§ 151-169 (National Labor Relations Act ("NLRA")) ...................... *passim*

Labor Management Relations Act, 1947 ("LMRA") .................................21

Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA") ........................... *passim*

## OTHER AUTHORITIES

29 C.F.R. § 101.17 ........................................................................5

29 C.F.R. § 101.18(a).....................................................................5

29 C.F.R. § 101.20(c).....................................................................6

29 C.F.R. § 101.21(b).....................................................................6

29 C.F.R. § 101.21(d) ....................................................................7

29 C.F.R. § 101.23(b) ...................................................................19

29 C.F.R. § 102 ...........................................................................3

29 C.F.R. § 102.62(d) ...................................................................40

29 C.F.R. § 102.64(a)............................................................6, 16, 23

29 C.F.R. § 102.66(a)................................................................6, 16

29 C.F.R. § 102.67(l) ...................................................................40

29 C.F.R. § 102.69(b)-(h) ................................................................................7

76 Fed. Reg. 36,812 (June 22, 2011) ...............................................................8

76 Fed. Reg. 80,142 (Dec. 22, 2011) ...........................................8, 9, 21, 30

77 Fed. Reg. 25,548 (Apr. 30, 2012) ..............................................................9

79 Fed. Reg. 7318 (Feb. 6, 2014) ............................................................10, 20

79 Fed. Reg. 74,308 (Dec. 15, 2014) ................................................... *passim*

105 Cong. Rec. 16,629 (1959) ...............................................................22, 30

105 Cong. Rec. 5361 (1959) ..........................................................................29

105 Cong. Rec. A8062 (1959) ................................................................21, 22

H.R. Rep. No. 74-1147 (1935) ......................................................................20

H.R. Rep. No. 86-1147 (1959) ................................................................22

H.R. Rep. No. 86-741 (1959) .........................................................20, 21, 29, 30

NLRB, Board Chairman Releases Details of Election Proposal for Wednesday Vote
    (Nov. 29, 2011), http://www.nlrb.gov/news-outreach/news-story/board-chairman-
    releases-details-election-proposal-wednesday-vote .................................................9

NLRB, Election Reports, http://www.nlrb.gov/reports-guidance/reports/election-reports .........4, 8

NLRB, FY 2013 Performance & Accountability Report,
    http://www.nlrb.gov/sites/default/files/attachments/basic-page/node-
    1674/NLRB2013par.pdf ...........................................................................7

NLRB, NLRB Issues Final Rule to Modernize Representation-Case Procedures (Dec. 12,
    2014), http://www.nlrb.gov/news-outreach/news-story/nlrb-issues-final-rule-
    modernize-representation-case-procedures ...........................................................11

NLRB, NLRB Sets Vote on Portions of Proposed Election Rule (Nov. 18, 2011),
    http://www.nlrb.gov/news-outreach/news-story/nlrb-sets-vote-portions-proposed-
    election-rule ...............................................................................................9

NLRB, Summary of Operations, 2002-2012 Reports, http://www.nlrb.gov/reports-
    guidance/reports/summary-operations ....................................................................7

NLRB, Summary of Operations, FY2014 Performance and Accountability Report,
    http://www.nlrb.gov/sites/default/files/attachments/basic-page/node-
    1674/13682%20NLRB%202014%20PAR%20v5%20-%20508.pdf .......................7

S. Rep. No. 74-573 (1935) ................................................................................................................... 20, 21

S. Rep. No. 86-187 (1959) ................................................................................................................... 20

### INTRODUCTION

For nearly 80 years, the National Labor Relations Board has conducted workplace elections for union representation.  Union elections provide all participants in the process—the union, the employer, and the employees—a critical opportunity to engage in protected speech. Congress's overarching "policy judgment . . . favoring uninhibited, robust, and wide-open debate in labor disputes"—including the "freewheeling use of the written and spoken word," *Chamber of Commerce v. Brown*, 554 U.S. 60, 67-68 (2008)—is so central to the union election process that Congress expressly guaranteed an employer's right to engage in speech concerning unionization, 29 U.S.C. § 158(c) (so long as that speech, of course, "contains no threat of reprisal or force or promise of benefit").

The Board's "ambush" or "quickie" election rule (the "Final Rule") makes sweeping changes to the election process that, as the dissenting Board Members put it, impermissibly "limit[ ] the right of all parties to engage in protected speech at precisely the time when their free speech rights are most important."  Representation—Case Procedures, 79 Fed. Reg. 74,308, 74,439 (Dec. 15, 2014) (Members Miscimarra & Johnson, dissenting ("dissent")).  It "improperly shortens the time needed for employees to understand relevant issues, compelling them to 'vote now, understand later.'"  *Id.* at 74,430.

It also sharply curtails the statutorily mandated pre-election review of issues critical to the election process—as well as limits the taking of evidence necessary for meaningful post-election review.  In these ways and others, the Final Rule is "contrary to the [National Labor Relations] Act and its legislative history, and contrary to other legal requirements directed to the preservation of employee free choice, all of which focus on guaranteeing enough time for making important decisions."  *Id.* at 74,430-31.

Even if the Board's choices were permissible under the National Labor Relations Act ("NLRA"), which they are not, they are invalid under the Administrative Procedure Act ("APA").  The administrative record demonstrates a gaping disconnect between the problem the Board purported to address and the solution it adopted.  The vast majority of elections go forward with no "delay" at all—and the Final Rule "does not even identify, much less eliminate, the reasons responsible for those few cases that have excessive delays."  *Id.* at 74,431.  Although the Board's goal of eliminating "unnecessary" litigation may be laudable, the available evidence demonstrates that the Final Rule will have the opposite effect.  *Id.* at 74,449-50.  And the Board declined to adopt—without a reasoned explanation—common-sense protections against the invasion of employee privacy threatened by new mandatory disclosures of personal information.

In addition to violating the NLRA and the APA, the Final Rule also runs afoul of the First Amendment's prohibition against compelled speech by impermissibly co-opting employers to deliver the government's own preferred message.  The Board's mandatory disclosures on behalf of those filing petitions do not involve commercial speech but, instead, serve the interests of those seeking union representation.  Such compulsion is unconstitutional.

For all these reasons, summary judgment should be granted to plaintiffs and the Final Rule vacated and set aside.

## BACKGROUND

Congress has authorized the Board to conduct workplace elections regarding union representation provided certain conditions are satisfied.  Section 6 of the NLRA authorizes the Board to promulgate "rules and regulations as may be necessary to carry out the provisions of this Act."  29 U.S.C. § 156.  The Board's regulations setting forth the election procedures at

issue in this case—the Final Rule—consume, in total, almost 200 pages in the Federal Register and are codified at 29 C.F.R. part 102, subpart C.[1]

## I.    Plaintiffs

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest federation of businesses and associations, directly representing 300,000 members and indirectly representing more than three million U.S. businesses and professional organizations of every size and in every industry sector and geographic region of the country.

The Coalition for a Democratic Workplace ("CDW") represents millions of businesses of all sizes.  Its membership includes hundreds of employer associations, individual employers, and other organizations that together employ tens of millions of individuals working in every industry and every region of the country.

The National Association of Manufacturers ("NAM") is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states.  Manufacturing employs nearly 12 million men and women throughout the country.

The National Retail Federation ("NRF") is the world's largest retail trade association, representing discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and Internet retailers from the United States and more than 45 countries.  Retail is the nation's largest private sector employer, supporting one in four U.S. jobs—a total of 42 million working Americans.

---

[1]    Because this case is governed by Local Civil Rule 7(h)(2), such that any facts will be derived solely from the administrative record (and from judicial notice), Plaintiffs are not required to submit a Rule 7(h)(1) Statement of Material Facts As To Which There Is No Genuine Dispute.  Because the Board has not yet filed the administrative record, Plaintiffs have attached for the Court's convenience, as Exhibits 2-11, their comments, which are part of the administrative record.

The Society for Human Resource Management ("SHRM") is the world's largest membership organization devoted to human resource management, representing more than 275,000 members in over 90,000 companies.

Plaintiffs collectively represent millions of employers and human resource professionals in companies covered by the NLRA and subject to the Final Rule.  *See* Exhibit 2 (Chamber 2011 comments) at 1; Exhibit 3 (CDW 2011 comments) at 2; Exhibit 4 (NAM 2011 comments) at 1-2; Exhibit 5 (NRF 2011 comments) at 1; Exhibit 6 (SHRM 2011 comments) at 13-14.   These employers, in turn, employ millions of employees who are not currently represented by a union but are covered by the NLRA and thus entitled to petition the Board to hold a representation election in accordance with the Final Rule's expedited procedures.  *Id.*   Unions have, in recent years, filed petitions for elections involving employees at many of the businesses represented by plaintiffs.[2]  Particularly given the recent history of union election petitions involving many of the plaintiffs' member companies, it is likely that election petitions will be filed involving employees at many of these companies once the Final Rule becomes effective on April 14, 2015.

As a result of the forthcoming application of the Board's Final Rule to these petitions and elections, Plaintiffs' members will suffer the following injuries, among others:

- Less time for employers to communicate with workers about the election, in derogation of employers' free speech rights under § 8(c) of the NLRA, the First Amendment, and the clear congressional intent for a full and informed debate before workers cast their votes, 79 Fed. Reg. at 74,318-19 (citing Chamber, NAM, NRF, and SHRM comments);

- Less time for employers to investigate whether it is even appropriate for the NLRB to hold an election in the petitioned-for bargaining unit, *id.* at 74,369-73;

---

[2]      Monthly reports of elections are publicly available on the NLRB's website.  *See* NLRB, Election Reports, http://www.nlrb.gov/reports-guidance/reports/election-reports (last visited Feb. 4, 2015).

- Less time for employers to determine whether other employees should be included or excluded from the petitioned-for bargaining unit, and whether they are even eligible to vote, *id.*;

- Less time to prepare for a pre-election hearing and file a binding position statement under penalty of issue waiver, *id.*; and

- Less time for employers to negotiate a stipulated election agreement that would obviate the need for a pre-election hearing.  *Id.* at 74,375 (citing CDW comments).

Plaintiffs' members also will incur economic costs before election petitions are filed because of the shortened, and inadequate, time to respond once an election petition is filed under the Final Rule.  *See* Exhibit 2 (Chamber 2011 comments) at 56-57 (noting economic costs); Exhibit 4 (NAM 2011 Comments) at 24 (same); Exhibit 5 (NRF 2011 Comments) at 1-2 (same). The Board, in the Final Rule, recognized and estimated that employers will incur additional post-petition costs as well, including the new notice of petition, statement of position, voter lists, and costs related to the expedited timeline for the election process.  79 Fed. Reg. at 74,461-66.

## II.    Representation Election Procedures

Under long-established procedures—outlined by Board rules and regulations in 29 C.F.R. Parts 101, 102, and 103—the election process begins when an employee, union, or employer files a petition for an election with the Board.  29 C.F.R. § 101.17.  The petition is filed with one of the Board's many regional offices throughout the country.  *Id.*  To conduct an election (and certify the results thereof), the Board, through its regional offices, initially assigns the petition to a regional staff member for a preliminary investigation.  *Id.* § 101.18(a).  If the petition presents reasonable cause to believe that a "question of representation" exists—that is, the regional director finds a sufficient basis to spend taxpayer resources to consider holding an election—the

regional office will proceed to hold an "appropriate" hearing concerning the petition.  29 U.S.C. § 159(c)(1).  The hearing provides an opportunity for the parties to present evidence on issues that will affect the election, such as whether the employees are covered by the NLRA, whether the collective bargaining unit defined in the petition is an appropriate one, and whether certain individuals or groups of individuals would be eligible to vote in the election, or be included in the putative bargaining unit, or both.  29 C.F.R. §§ 102.64(a) & 102.66(a).

This pre-election hearing, which usually occurs within 7 to 14 days after the petition is filed, is conducted "before a hearing officer who normally is an attorney or field examiner attached to the Regional Office."  *Id.* § 101.20(c).  The hearing officer does not have authority to make "any recommendations" with respect to the issues presented in the hearing.  29 U.S.C. § 159(c)(1).  The hearing officer only "insure[s] that the record contains a full statement of the pertinent facts as may be necessary for determination of the case."  29 C.F.R. § 101.20(c).  All parties "are afforded full opportunity to present their respective positions and to produce the significant facts in support of their contentions."  *Id.*  The record developed at the hearing is the basis for all subsequent decision-making on these issues.  *Id.* § 101.21(b).

When the hearing concludes, the hearing officer does not render any decision or make any recommendations.  The evidentiary record is presented to the regional director, who decides the issues in dispute before the election occurs.  *Id.*  The parties may file post-hearing briefs with the regional director on these issues.  *Id.*

Although § 3(b) of the Act authorizes the Board "to delegate to its regional directors its powers" to "investigate and provide for hearings," to "determine whether a question of representation exists," and to "direct an election" and "certify the results thereof," it also provides an opportunity to request Board review (before the election is held) of any action taken

by regional directors.  29 U.S.C. § 153(b).  Therefore, if the regional director decides to hold an election based on the evidence introduced at the pre-election hearing, the election is set for a date at least 25 to 30 days after the regional director's decision, to allow the Board sufficient time to consider a party's request to review that decision.  29 C.F.R. § 101.21(d).

After the election is held as scheduled by the regional director, the election results will be certified only after any post-election hearing and resolution of challenges and objections.  *Id.* § 102.69(b)-(h).  The parties are entitled to seek post-election Board review of the resolution of challenges and objections, unless restricted in some manner by an election agreement.  *Id.* § 102.69(c), (e), (f).  If the union wins the majority of valid votes cast in the election, the employer is obligated to engage in collective bargaining with the union over wages, hours, and other terms and conditions of employment for the employees in the bargaining unit.  *See* 29 U.S.C. § 158(a)(5).

Over the last ten years, under the procedures described above, elections have occurred within a median of 38 days from the filing of the petition—below the Board's internal target of 42 days.[3]  In 2013, nearly 95 percent of all elections occurred within 56 days from the filing of the petition—better than the Board's internal target of 90 percent.[4]  That rate improved to 95.7 percent in 2014.[5]  And the vast majority of elections—90 percent—go forward without any pre-election litigation at all because the parties negotiate some form of election agreement.  79 Fed. Reg. at 74,375.

---

[3]     NLRB, Summary of Operations, 2002-2012 Reports,  http://www.nlrb.gov/reports-guidance/ reports/summary-operations (last visited Feb. 4, 2015).

[4]     NLRB, FY 2013 Performance & Accountability Report,  http://www.nlrb.gov/sites/ default/files/attachments/basic-page/node-1674/NLRB2013par.pdf, at 38 (lasted visited Feb. 4, 2015).

[5]     NLRB, Summary of Operations, FY2014 Performance and Accountability Report, http://www.nlrb.gov/sites/default/files/attachments/basic-page/node-1674/13682%20NLRB%202014%20PAR%20 v5%20-%20508.pdf, at 41 (last visited Feb. 4, 2015).

Historically, a majority of elections result in union representation.  For example, unions won 71 percent of about 1,600 elections in 2011, 59 percent of about 1,550 elections in 2012, 60 percent of about 1,450 elections in 2013, and 63 percent of about 1,450 elections in 2014.[6]

### III.   In 2011, The Board Made Changes To The Election Rules, Which Were Set Aside By This Court

In 2011, the Board proposed sweeping changes to the election process intended to drastically reduce the time between petition and election.  Representation—Case Procedures, 76 Fed. Reg. 36,812, 36,812-47 (June 22, 2011).  Dissenting Member Hayes criticized the changes as not rationally related to any systemic problem of procedural delay, and criticized the Board for engaging in an illicit attempt to enshrine by "administrative fiat in lieu of Congressional action . . . organized labor's much sought-after 'quickie election,' a procedure under which elections will be held in 10 to 21 days from the filing of the petition."  *Id.* at 36,831 (Member Hayes, dissenting).  In the dissent's view, "the principal purpose for this radical manipulation of our election process [wa]s to minimize, or rather, to effectively eviscerate an employer's legitimate opportunity to express its views about collective bargaining.'"  *Id.*

Less than a month after publishing the proposed rule, the Board held a two-day hearing at which nearly 70 witnesses testified (with each witness having about 5 minutes to speak).  Representation—Case Procedures, 76 Fed. Reg. 80,142 (Dec. 22, 2011).  Many witnesses testified against the proposed rule.  *Id.*  When the comment period closed, the Board had received more than 65,000 comments—many of them, like those submitted by plaintiffs here, opposed the proposed rule and offered alternatives for the Board to consider.  *Id.* at 80,140.

On November 18, 2011, the Board announced that it would hold a public meeting on November 30, 2011, during which the Board would vote on a resolution concerning a modified

---

[6]     NLRB, Election Reports, http://www.nlrb.gov/reports-guidance/reports/election-reports (last visited Feb. 4, 2015).

rule.[7]   The Board issued the resolution the day before the hearing.   Board Resolution No. 2011-1.[8]   At the meeting, the Board adopted the resolution, including changes (immaterial to the instant litigation) to the proposed rule.  *Chamber of Commerce of the United States v. NLRB*, 879 F. Supp. 2d 18, 22-23 (D.D.C. 2012).   At some point within the next month, Board Chairman Pearce and then-Member Becker voted to approve the rule as modified.  *Id.* at 23-24. The final rule issued on December 22, 2011 ("2011 Final Rule").  76 Fed. Reg. at 80,138.  Then-Member Hayes did not participate in the vote, but subsequently published a dissent.  *Chamber of Commerce*, 879 F. Supp. 2d at 23-24; *see also* Representation, Case Procedures, 77 Fed. Reg. 25,548-75 (Apr. 30, 2012) (Member Hayes, dissenting).

Two of the plaintiffs in the instant litigation, Chamber and CDW, challenged the 2011 Final Rule in this Court.  *Chamber of Commerce*, 879 F. Supp. 2d at 21.  In May 2012, the Court set aside the 2011 Final Rule on the ground that the Board lacked a statutory quorum when it approved the rule.  *Id.* at 28-30.  The Court did not "reach—and expresse[d] no opinion on—Plaintiffs' other procedural and substantive challenges to the rule."  *Id.* at 30.  The Board appealed the decision, but subsequently sought and obtained voluntary dismissal of its own appeal.  *Chamber of Commerce of the United States v. NLRB*, No. 12-5250, 2013 WL 6801164, at *1 (D.C. Cir. Dec. 9, 2013).

## IV.   In 2014, The Board Issued The Final Election Rule Challenged Here

In February 2014, the Board issued a second Notice of Proposed Rulemaking ("2014 Proposed Rule") under the same docket number as the 2011 Proposed Rule and containing the same proposals on elections.  Representation—Case Procedures, 79 Fed. Reg. 7318 (Feb. 6,

---

[7]   NLRB, NLRB Sets Vote on Portions of Proposed Election Rule (Nov. 18, 2011), http://www.nlrb.gov/news-outreach/news-story/nlrb-sets-vote-portions-proposed-election-rule (last visited Feb. 4, 2015).

[8]   NLRB, Board Chairman Releases Details of Election Proposal for Wednesday Vote (Nov. 29, 2011), http://www.nlrb.gov/news-outreach/news-story/board-chairman-releases-details-election-proposal-wednesday-vote (last visited Feb. 4, 2015).

2014).   In doing so, the Board remarked that the 2014 Proposed Rule was "in essence, a reissuance of the proposed rule of June 22, 2011."  *Id.*

Among other changes, the Board proposed:

- To require employers to post a workplace notice immediately after a petition is filed;

- To require employers to disclose to unions the personal information of employees including personal telephone numbers and email addresses;

- To severely limit the scope of pre-election hearings to focus solely on whether there is a "question of representation," meaning:

  o Hearing officers could exclude evidence unrelated to the basic question of whether the Board should hold an election; and

  o The parties would not have the right to present evidence on important issues affecting the election, such as whether certain employees or groups of employees are eligible to vote in the election;

- To eliminate the mandatory 25-30 day period between the regional director's decision to hold an election and the election itself; and

- To eliminate post-election Board review as a matter of right and make it solely at the Board's discretion.

*Id.* at 7318-37.

The Board provided for a 60-day comment period and informed commenters that it was not necessary to "resubmit any comment or repeat any argument that has already been made." *Id.* at 7319.  To ensure that the Board understood the ramifications of its proposed actions, however, many commenters who previously submitted comments (like plaintiffs) did so again, highlighting the disconnect between the proposed changes and the Board's election-handling

performance in recent years, and recommending that the Board focus instead on the small subset of cases actually delayed under current procedures.  *See*, *e.g.*, 79 Fed. Reg. at 74,315-17, 74,419; *see also* Exhibits 2-11 (copies of plaintiffs' 2011 & 2014 comments).  Commenters asserted that the proposed changes conflict with the NLRA, particularly with §§ 3, 8(c), and 9.  *Id.* at 74,318-19, 74,385-86, 74,395.   Commenters expressed further concern that the proposed changes, contrary to the Board's stated goal of reducing election-related litigation, would actually increase it by reducing the time and incentives to enter election agreements.  *Id.* at 74,324, 74,334, 74,388, 74,408-09.  Under the Board's current procedures, there is no pre-election litigation in more than 90 percent of cases because the parties enter into an election agreement.  *Id.* at 74,375.

Commenters offered various alternatives to the changes proposed by the Board.  To address privacy concerns raised by the mandatory release of employee personal information, commenters proposed offering employees an opt-out procedure (an "unsubscribe" option for election-related texts and emails), imposing penalties for misuse of the information, and requiring the lists containing the information to be destroyed after the election.  *Id.* at 74,341-42, 74,346, 74,358-60.

The Board announced its adoption of the Final Rule on December 12, 2014, and published it in the Federal Register three days later.[9]  Members Miscimarra and Johnson submitted a lengthy dissent highlighting the numerous, serious flaws they perceived in the Final Rule.  *Id.* at 74,430 (dissent).  Expressing regret that the Board declined to pursue a more targeted approach that could have garnered broad, bipartisan support without creating a conflict with the Board's statutory mandate, the dissent argued that the Rule's "election now, hearing later" and "vote now, understand later" approach violates both the NLRA and the APA.  *Id.*

---

[9]     NLRB, NLRB Issues Final Rule to Modernize Representation-Case Procedures (Dec. 12, 2014), http://www.nlrb.gov/news-outreach/news-story/nlrb-issues-final-rule-modernize-representation-case-procedures (last visited Feb. 4, 2015).

Specifically, the dissent identified conflicts with the NLRA that are created by the Final Rule's quest for "quickie elections"; curtailment of robust debate and free speech; limitations on the scope of pre-election hearings and the type of evidence that may be taken in those hearings; allowance of *ultra vires* decision-making and recommendations by hearing officers; and imposition of unequal burdens on employers.  The dissent further argued that even if the Final Rule did not conflict with the NLRA, it was still arbitrary and capricious under the APA given the lack of a coherent rationale; the conflict between the Board's determinations and the actual evidence before it; and the Board's failure to meaningfully address evidence that reducing the opportunity for pre-election and post-election Board review would result in more litigation, not less, and jeopardize the stipulated-election agreements that govern 90 percent of Board-conducted elections.  *Id.* at 74,434-52.

The dissent further argued that the Final Rule implicates serious constitutional concerns by infringing on protected speech and raising due process concerns.  *Id.* at 74,431-36.  The dissent noted the "great care" the Board has taken in the past "to avoid interpreting and applying [NLRA § 8(c)] in a manner that raises serious constitutional concerns regarding free speech infringement."  *Id.* at 74,440 (citing *Carpenters Local 1506 (Eliason & Knuth of Arizona, Inc.)*, 355 NLRB 797, 807-11 (2010)).  The dissent echoed the employee-privacy concerns raised by the commenters, *id.* at 74,452-55, and lamented that the Board's insistence on pursuing the course adopted in the Final Rule made consensus impossible on reforms the dissenting members might also have embraced.  *Id.* at 74,431.  In the dissent's view, the Final Rule was so flawed in so many respects that they "must dissent from the Final Rule including all its parts."  *Id.*

The Rule is set to take effect on April 14, 2015.  *Id.* at 74,308.

STANDARD OF REVIEW

The Final Rule is agency action subject to judicial review under the APA, 5 U.S.C. § 706. Under § 706, a reviewing court must "'hold unlawful and set aside' agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting 5 U.S.C. § 706(2)(A)). A court must also invalidate any agency action that is "contrary to constitutional right," 5 U.S.C. § 706(2)(B), "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C), or that fails to "observ[e] … procedures required by law," *id.* § 706(2)(D).

"[W]hen a party seeks review of agency action under the APA . . . [t]he 'entire case' on review is a question of law" and may be resolved on a motion for summary judgment. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). The Court's review is generally confined to the administrative record before the Board when it issued the Final Rule. *See, e.g.*, *Brodie v. U.S. Dep't of Health & Human Servs.*, 796 F. Supp. 2d 145, 150 (D.D.C. 2011). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* Where a plaintiff prevails on its APA challenge, vacating the agency action and remanding to the agency is the standard remedy. *See, e.g.*, *Am. Bioscience, Inc.*, 269 F.3d at 1084; *Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 163 (D.D.C. 2002) ("As a general matter, an agency action that violates the APA must be set aside.").

ARGUMENT

## I.      The Final Rule Is Contrary To §§ 3, 8, And 9 Of The NLRA.

Where, as here, an APA challenge "involves an agency's interpretation of its governing statute, *Chevron*'s familiar framework applies." *Nat'l Cable & Telecomm. Ass'n v. FCC*, 567

13

F.3d 659, 663 (D.C. Cir. 2009) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)).   Under that framework a reviewing court first asks if the statute itself resolves the issue—and if so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."   *Chevron*, 467 U.S. at 842-43 (footnote omitted).   An agency interpretation fails that standard if it "runs counter to the unambiguously expressed intent of Congress" as expressed through the Act's "text, legislative history, and structure as well as its purpose."   *Shays v. FEC*, 414 F.3d 76, 96, 105 (D.C. Cir. 2005).   If the statute is ambiguous—that is, if the congressional mandate is susceptible of more than one interpretation—then a reviewing court considers whether the agency's interpretation of the statute is a reasonable one.   *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1049 (D.C. Cir. 1997).

Under *Chevron*, a reviewing court has "a duty to conduct an 'independent examination' of the statute in question looking not only 'to the particular statutory language at issue,' but also to 'the language and design of the statute as a whole.'"   *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 9 n.4 (D.C. Cir. 2011) (quoting *Martini v. Fed. Nat'l Mortg. Ass'n*, 178 F.3d 1336, 1345-46 (D.C. Cir. 1999)).   "For this purpose the court 'must first exhaust the traditional tools of statutory construction.'"   *Office of Commc'n, Inc. of United Church of Christ v. FCC*, 327 F.3d 1222, 1224 (D.C. Cir. 2003) (quoting *Bell Atl.*, 131 F.3d at 1047).   "The traditional tools include examination of the statute's text, legislative history, and structure, as well as its purpose."   *Bell Atl.*, 131 F.3d at 1047 (internal citations omitted); *see also Hammontree v. NLRB*, 894 F.2d 438, 444 (D.C. Cir. 1990).   It is a cardinal principle of statutory interpretation that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly

contrary to the intent of Congress."  *Edward J. DeBartolo Corp. v. Fl. Gulf Coast Build. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

In this case, the Final Rule fails the *Chevron* analysis because it creates a process for handing representation elections that is irreconcilable with §§ 3, 8, and 9 of the Act.  First, the Final Rule improperly limits pre-election hearings by allowing hearing officers to exclude evidence regarding fundamental issues affecting the election, such as whether certain employees or groups of employees are eligible to vote in the election.  The exclusion of this evidence prevents effective pre-election consideration of those issues by the regional director or the Board in violation of §§ 3(b) and 9(c)(1) of the NLRA, and undermines effective post-election review of any sort as well.

Most fundamentally, the Final Rule violates § 9(c)(1)'s requirement of an "appropriate" pre-election hearing by creating a "quickie election" process that resembles legislative proposals Congress considered and rejected in amending the Act in 1947 and 1959.  The Rule's operative premise—speed at all costs—is squarely contradicted by legislative history indicating that Congress believed that there should be a period of at least 30 days between the petition and the election in order to ensure that employees are adequately informed before they cast their votes.  In all events, an "appropriate hearing" must be one that conforms with the Fifth Amendment's guarantee of due process, and the system left in place by the Final Rule fails on that score.

Second, the Final Rule improperly truncates informed debate regarding union representation, contrary to §§ 8(c) and 9(b) of the Act—statutory text that reflects a "policy judgment, which suffuses the NLRA as a whole, as favoring uninhibited, robust, and wide-open debate in labor disputes."  *Brown*, 554 U.S. at 67-68 (internal quotation marks and citation omitted).  Depriving the parties of adequate time for that debate, the new Rule rushes them into

an uninformed election.  Indeed, the Final Rule subverts the Act's primary purpose—to permit sufficient time and information to "assure . . . the *fullest* freedom in exercising the rights guaranteed by [the] Act," 29 U.S.C. § 159(b) (emphasis added)—and improperly interferes with the free speech rights protected under § 8(c) of the Act, 29 U.S.C. § 158(c), and guaranteed by the First Amendment.  At a minimum, the agency's interpretation of its statutory mandate is constitutionally suspect and should thus be avoided.

### A.    The Final Rule Violates The NLRA By Undermining The Statutorily Guaranteed "Appropriate Hearing."

The Final Rule severely restricts the scope of the pre-election hearing required by the NLRA.  Under the Final Rule, the hearing officers who preside over pre-election hearings are advised to exclude evidence on fundamental issues affecting the election, including supervisory status and other issues of voter eligibility or inclusion.  *See* 29 C.F.R. § 102.64(a) ("Disputes concerning individuals' eligibility to vote or inclusion in an appropriate unit ordinarily need not be litigated or resolved before an election is conducted."); *id.* § 102.66(a) (a party's indisputable right to introduce at the pre-election hearing is now limited to "the existence of a question of representation").  This contradicts the fundamental understanding—recognized by the Supreme Court, Congress, and the Board itself—that Congress required an "appropriate hearing" to give interested parties a full and adequate opportunity to present their evidence on *all* substantial issues.  By allowing the exclusion of evidence on important election issues of voter eligibility, inclusion, and supervisory status, the Final Rule fails to provide an "appropriate" pre-election hearing for all employers as required under § 9(c)(1) of the NLRA, thus precluding the creation of an adequate record for decision-making or subsequent review.

**1.      Congress has already spoken to the issue of an "appropriate" pre-election hearing.**

Section 9(c)(1) establishes the process that must be followed after a representation petition is filed, including the requirement of an "appropriate" pre-election hearing and an adequate "record of such hearing" to permit resolution by the Board of election-related issues:

> Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board . . . the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for *an appropriate hearing* upon due notice.  Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto.  If the Board finds *upon the record of such hearing* that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereto.

29 U.S.C. § 159(c)(1) (emphases added).  Section 9(c)(1) necessarily requires "an appropriate hearing upon due notice" *before* an election, because the hearing provides the basis for the Board to determine whether and how an election shall occur.  *Id.*  The right to a pre-election hearing is reinforced by § 9(c)(4), which only permits "the waiving of hearings by stipulation*." Id.* § 159(c)(4).

Congress further intended that hearing officers who preside over pre-election hearings perform only an evidence-gathering function, not a decision-making function.  Under §§ 4(a) and 9(c)(1) of the NLRA, Board members (or, under the delegation authority set forth in § 3(b), regional directors) are exclusively responsible for all decision-making in representation cases. Indeed, § 9(c)(1) prohibits hearing officers from having *any* decision-making authority—they cannot even make "any recommendations." *Id.* § 159(c)(1).  Moreover, "[t]he Board may not employ any attorneys for the purpose of reviewing transcripts of hearings or preparing drafts of opinions except that any attorney employed for assignment as a legal assistant to any Board member may for such Board member review such transcripts and prepare such drafts."

29 U.S.C. § 154(a).  The Act thus vests all decision-making authority on election-related issues exclusively in Board members (or regional directors by delegation).

What is more, the pre-election hearing record provides the sole basis for the following key decisions (among others):

- Whether the Board's jurisdictional standards and other prerequisites for an election are satisfied;

- What constitutes the "appropriate bargaining unit" for purposes of the election; and

- Whether particular individuals are eligible to vote, whether such issues require resolution before any election, and if so how they should be resolved.

29 U.S.C. §§ 153(b), 159(c)(1).

And the NLRA requires that "any interested person" have a *pre-election* opportunity to seek Board review of "*any action* of a regional director" delegated under § 3(b).  29 U.S.C. § 153(b) (emphasis added).  This pre-election review is the only mechanism for the Board to order a "stay of *any action* taken by the regional director."  *Id.*  For the Board to review "any action" of a regional director and decide whether to issue a stay of the election, there necessarily must be record evidence on the issues that are subject to review—in particular, issues of voter eligibility, inclusion, and supervisory status.  Even if the regional director decides to defer a decision on voter eligibility issues until after the election, there still must be an evidentiary record concerning those issues for the Board to consider in reviewing the propriety of the regional director's decision to defer resolution of those issues—a decision that may well affect the validity of the entire election.  *See Barre-Nat'l, Inc.*, 316 NLRB 877, 878 n.9 (1995) (noting that the right to present evidence at a pre-election hearing is distinct from the issue whether the regional director or Board makes a pre-election decision based on that evidence).

The statutory conflict between the NLRA and the Final Rule is further evidenced by the Rule rendering superfluous a provision of the statute that authorizes an expedited election procedure. *See* 29 U.S.C. § 158(b)(7)(C). The § 8(b)(7) exception applies when a union engages in so-called "recognitional picketing"—picketing intended to force the employer to recognize a union as the bargaining representative of its employees—and an employer files an unfair labor practice charge as a result. *Id.* Under the Board's implementing regulations for that statutory provision, where there is recognitional picketing "the Director may, *without a prior hearing*, direct that an election be held in an appropriate unit of employees" and "fix[] the basis of eligibility of voters . . . ." 29 C.F.R. § 101.23(b) (emphasis added). Section 8(b)(7)(C) was "designed to shield employers and employees from the adverse effects of prolonged recognitional or organizational picketing and to provide a procedure whereby the representation issue that gave rise to the picketing could be resolved as quickly as possible." *Teamsters Local Union No. 115 (Vila-Barr Co.)*, 157 NLRB 588, 589 (1966).

But as the Board has explained, when Congress created that expedited election procedure, it also "rejected efforts . . . to dispense generally with preelection hearings" in all other representation cases. *Int'l Hod Carriers Bldg. & Common Laborers Union of Am.*, 135 NLRB 1153, 1154, 1157 (1962) ("The expedited election procedure is applicable, of course, only in a Section 8(b)(7)(C) proceeding."). The Final Rule would effectively implement an expedited procedure for *all* § 9(c) cases—rendering superfluous the statutorily provided expedited process in cases of recognitional picketing.

The history of amendments to the NLRA's text further confirms the importance, and required scope, of the pre-election hearing. From the beginning, Congress attached importance to the development of an adequate record in election hearings, including evidence pertaining to

election issues generally. *See, e.g.*, 79 Fed. Reg. at 7343 n.100 (citing S. Rep. No. 74-573, at 14 (1935), reprinted in 2 NLRB, Legislative History of the NLRA, 1935, at 2314 (hereinafter "NLRA Hist.")) (in representation cases the "entire election procedure becomes part of the record," providing a "guarantee against arbitrary action by the Board" (internal quotation marks omitted)); H.R. Rep. No. 74-1147, at 23 (1935), reprinted in 2 NLRA Hist. at 3073 ("The hearing required to be held in any [representation] investigation provides an appropriate safeguard and opportunity to be heard."). But as the Supreme Court explained, the NLRA as originally enacted in 1935 did not require the Board to hold elections at all, much less to hold pre-election hearings. *Inland Empire Dist. Council v. Millis*, 325 U.S. 697, 707 (1945). The Board thus held a number of "prehearing elections"—*i.e.*, elections conducted before a hearing was held to determine the scope of the bargaining unit and the eligibility of certain employees to vote in the election.[10] The Board's rules and regulations in effect at the time entitled parties to a pre-election hearing only if "substantial issues" were raised. *See NLRB v. S. W. Evans & Son*, 181 F.2d 427, 430 (3d Cir. 1950). Such issues concerned the "[bargaining] unit, eligibility to vote, and timeliness of the election." *Id.* at 430.

In 1947, Congress amended the Act to make pre-election hearings mandatory by adding §§ 9(c)(1) and (4) to the Act. 29 U.S.C. §§ 159(c)(1) & (4). These require the Board to conduct the "appropriate hearing" *before* any election, and permit "the waiving of hearings" *only* "by stipulation" of all parties. *Id.*; *see also S. W. Evans*, 181 F.2d at 429 (noting that the amended Act now makes mandatory a pre-election hearing"); *Utica Mut. Ins. Co. v. Vincent*, 375 F.2d

---

[10]    *See, e.g.*, H.R. Rep. No. 86-741, at 24 (1959), *reprinted in* 1 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 782 (1974) (hereinafter "LMRDA Hist.") ("During the last 19 months of the Wagner Act . . . a form of prehearing election was used by the NLRB."); S. Rep. No. 86-187, at 30 (1959), *reprinted in* 1 LMRDA Hist. 426 (the practice of holding prehearing elections "was tried in the last year and a half prior to passage of the Taft-Hartley Act, but it was eliminated in that [A]ct").

129, 133-34 (2d Cir. 1967) (noting that "under the amendment the hearing must invariably precede the election").

The purpose of pre-election hearings, as reflected in the legislative history of the 1947 amendments, is to collect evidence concerning all of the issues relevant to the election— including the eligibility of employees to vote in the election:

> Obviously, *there can be no choice of representatives and no bargaining unless units for such purposes are first determined.* And employees themselves cannot choose these units, because *the units must be determined before it can be known what employees are eligible to participate in a choice of any kind.*

> This provision is similar to section 2 of 1934 amendments to the Railway Labor Act (48 Stat. 1185), which states that—In the conduct of any election for the purpose herein indicated the Board shall designate *who may participate in the election* and establish the rules to govern the election.

S. Rep. No. 74-573, at 14 (1935), *reprinted in* 2 NLRA Hist. 2313 (emphases added); *see also* 76 Fed. Reg. at 80,165 n.116 (citing 93 Cong. Rec. 7002 (1947), *reprinted in* 2 NLRB, Legislative History of the Labor Management Relations Act, 1947, at 1625 (supplemental analysis of LMRA by Senator Taft—the principal sponsor of the 1947 amendments)) (noting that the House rejected a provision authorizing pre-election hearings).   Congress thus intended that issues of voter eligibility and inclusion would *not* be litigated separately (and post-election) from issues concerning the appropriateness of the bargaining unit.

When it amended the Act again in 1959, Congress once more rejected proposals to permit the Board to conduct elections with no pre-election hearing.  *See* H.R. Rep. No. 86-741, at 24-25 (1959), *reprinted in* 1 LMRDA Hist. 782-83.  Conference Committee members who opposed the proposals for pre-hearing elections regarded them as improperly effectuating "quickie elections," and insisted on leaving unchanged the conventional role played by pre-election hearings. 105 Cong. Rec. A8062 (1959) (conf. report), *reprinted in* 2 LMRDA Hist. 1813 (opposing "pre-

hearing or so-called quickie election" and stating that the "right to a hearing is a sacred right").

As an alternative to scaling back pre-election hearings, Congress adopted the language in § 3(b)

of the Act authorizing the Board to delegate its election responsibilities to regional directors,

subject to each party's right to seek pre-election Board review regarding "any action" by regional

directors, including the right to seek a Board-ordered "stay" of any election.  29 U.S.C. § 153(b).

The ranking House conferee, Chairman Barden, described the approach as follows:

> The conferees adopted a provision that there should be some consideration given
> to expediting the handling of some of the representation cases.  Therefore, the
> Board is authorized, but not commanded, to delegate to the regional directors
> certain powers which it has under section 9 of the act.
>
> Upon an appeal to the Board by any interested party the Board would have the
> authority to review and stay any action of a regional director, delegated to him
> under section 9.  But the hearings have not been dispensed with.  *There is not any
> such thing as reinstating authority or procedure for a quicky election.  Some were
> disturbed over that and the possibility of that is out*.  The right to a formal hearing
> before an election can be directed is preserved without limitation or qualification.

105 Cong. Rec. 16,629 (1959), *reprinted in* 2 LMRDA Hist. 1714 (emphasis added), *describing*

H.R. Rep. No. 86-1147, at 1 (1959) (conf. report), *reprinted in* 1 LMRDA Hist. 934.  Chairman

Barden expressed opposition to any "so-called quicky election," again stating that "[t]he right to

a hearing is a sacred right . . . ."  105 Cong. Rec. A8062 (1959) (conf. report), *reprinted in*

2 LMRDA Hist. 1813.

The failure of the proposed reform underscores the conflict between the Final Rule and

congressional intent concerning the election process.  *Commodity Futures Trading Comm'n v.

Schor*, 478 U.S. 833, 846 (1986) ("It is well established that when Congress revisits a statute

giving rise to a longstanding administrative interpretation without pertinent change, the

'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that

the interpretation is the one intended by Congress.'" (quoting *NLRB v. Bell Aerospace Co.*, 416

U.S. 267, 275 (1974))).  The Board is attempting to implement, through rulemaking, the very type of expedited election process that Congress rejected.  *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 137-39 (2000).  This attempt cannot survive *Chevron* scrutiny.

> **2.      The Final Rule deprives employers of an appropriate hearing, as the Board has previously recognized.**

The Final Rule should be set aside because it eviscerates the pre-election hearing and takes numerous steps to slash the time between the petition and election—thereby adopting the very type of expedited election system that Congress has repeatedly rejected.  By authorizing regional directors and hearing officers to reject evidence on the scope of the bargaining unit for voter eligibility and inclusion purposes, the Final Rule makes the taking of evidence useless for all of the decision-making required under §§ 3 and 9 (except on the narrow issue whether an election of some kind is required under the Act).  Significantly, the Final Rule suggests that evidence pertaining to voter eligibility should be excluded from the pre-election hearing even if the relevant issues affect a substantial portion of the bargaining unit.  29 C.F.R. § 102.64(a).

This approach is "not in accordance" with the Act, 5 U.S.C. § 706(2)(A), since it is contrary to the requirement in § 9(c)(1) that in all cases, absent stipulation otherwise, an "appropriate hearing" must be conducted before the election.  Congress provided that an "appropriate hearing" must include the "full and adequate opportunity" to present evidence on *all* issues related to the election and disputed by the parties: "We think the statutory purpose . . . is to provide for a hearing in which interested parties shall have full and adequate opportunity to present their objections."  *Inland Empire*, 325 U.S. at 708; *see also S. W. Evans*, 181 F.2d at 430 (parties entitled to pre-election hearing to present substantial issues related to the election).  And when the pre-election hearing is bypassed, the foreseeable result will be more post-election

litigation and more elections set aside after the fact.  *See* 79 Fed. Reg. at 74,445 (dissent); *see also infra* 33-40.

The Final Rule's shortcoming here is confirmed by its rejection of over 60 years of agency practice under the § 9(c)(1) framework adopted by Congress in 1947.  The Board reaffirmed, during the Clinton Administration and with all members agreeing, that § 9(c) limits its authority to narrow the scope of pre-election hearings.  Specifically, the Board recognized that § 9(c) provides a *statutory* right to introduce evidence on issues of voter eligibility and inclusion at the pre-election hearing.  *See Barre-Nat'l, Inc.*, 316 NLRB 877; *see also N. Manchester Foundry, Inc.*, 328 NLRB 372 (1999) (affirming requirement to allow evidence-taking at pre-election hearing).  All of the participating Board members held that § 9(c) of the Act itself—not just the Board's then-existing regulations—require the Board to permit parties to present evidence in support of their positions at a pre-election hearing.

For example, in *Barre-National*, the regional director instructed the hearing officer to refuse to allow the employer to present evidence at a hearing regarding the supervisory status of a group of employees that constituted eight to nine percent of the potential bargaining unit.  316 NLRB at 877.  Instead, the regional director permitted only an offer of proof by the employer and—similar to what the Final Rule would accomplish—permitted the employees to vote subject to challenge, leaving the evidence gathering and resolution of the supervisory issue to the post-election challenge procedure.

The Board held that the regional director erred by refusing to allow the employer to present this evidence.  According to the Board, the pre-election hearing "did not meet the requirements *of the Act* and the Board's Rules and Statements of Procedure."  *Id*. at 878 (emphasis added); *see also N. Manchester Foundry*, 328 NLRB at 372-73 (holding that pre-

election hearing "did not meet the requirements *of the Act*, or of the Board's Rules" because the hearing officer "precluded the employer from presenting witnesses and introducing evidence in support of its contention that certain individuals were not eligible voters" (emphasis added)).

The Board cannot discharge its § 3(b) authority over all representation cases—to effectively decide whether issues of voter eligibility require pre-election resolution, how they should be resolved, or whether there should be a stay of the election pending resolution of such matters—without an adequate hearing record at the regional office level, including all evidence that reasonably bears on those issues.  And if the Board's delegate admits evidence only on, for example, *whether* an appropriate bargaining unit exists, but excludes evidence of *who* may be in the bargaining unit or eligible to vote in the election, the review promised by statute becomes illusory and the election results themselves suspect.

Even if Congress left the definition of an "appropriate hearing" to the Board's unfettered discretion—which it did not—avoiding due process concerns would supply an additional reason to reject the Board's interpretation of the NLRA to permit the evisceration of the pre-election hearing that must take place absent an election agreement.  *Cf. NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 507 (1979) ("[I]n the absence of a clear expression of Congress' intent . . . we decline to construe the [NLRA] in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses.").

The Fifth Amendment precludes government decisions that would otherwise deprive a party of liberty or property and "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  Here,  as the dissent

explains, the "private interests affected by this extraordinary government action are substantial" and include "the potential deprivation in every election proceeding of the statutorily assured right of parties to full pre-hearing litigation [and] the fundamental right of an employer . . . to ensure that a certified union truly represents a majority of employees in an appropriate bargaining unit." 79 Fed. Reg. at 74,451 (dissent).  At the least, the hearing left in place by the Final Rule—a hearing that allows exclusion of evidence on important questions before an election—raises serious constitutional questions and should therefore be rejected.

For these reasons, the Final Rule is irreconcilable with the statutory scheme established by Congress and should be vacated.

**B.   The Final Rule Conflicts With The NLRA By Impermissibly Limiting Robust Debate And Depriving Employees Of An Informed Election.**

The Final Rule also conflicts with § 8(c) of the NLRA, a critical piece of the NLRA's election scheme.  Section 8(c) protects the "expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form," provided there is no "threat of reprisal or force or promise of benefit."  29 U.S.C. § 158(c).  The § 8(c) free-speech guarantee reflects a "policy judgment, which suffuses the NLRA as a whole, as favoring uninhibited, robust, and wide-open debate in labor disputes." *Brown*, 554 U.S. at 67-68 (internal quotation marks and citation omitted).  Robust debate is thus indispensable to the procedure for free and fair elections established by the NLRA.

Consistent with § 8(c), "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969).  The time during the critical pre-election "campaign" period is when employers can provide information to their employees regarding the election and the consequences of unionization. *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 955

(D.C. Cir. 2013) (hereinafter "*NAM*"), *overrruled on other ground by Am. Meat Inst. v. United States, Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) (en banc) (noting that § 8(c) "serves a labor law function of allowing employers to present an alternative view and information that a union would not present." (internal quotation marks and citation omitted)).

The Act does not just protect the free speech rights of employers.  The NLRA also gives employees the right "to bargain collectively through representatives of their own choosing . . . and to refrain from . . . such activit[y] . . . ."  29 U.S.C. § 157.  Section 9(b) provides that "[t]he Board shall decide in each case whether, in order to assure *to employees* the *fullest freedom* in exercising the rights guaranteed by [the Act], the unit appropriate for the purposes of collective bargaining."  29 U.S.C. § 159(b) (emphases added).  The "fullest freedom" requirement is reinforced by the protection of free speech rights in § 8(c).  *Gissel Packing Co.*, 395 U.S. at 617.

But these rights are meaningful only if the parties have sufficient time to engage in free speech *before* an election.  *See* 79 Fed. Reg. at 74,438 (dissent) ("[The right to engage in protected speech before an election] only has meaning if there is sufficient time for the parties to communicate with employees about the choice of representation."); *cf. Buckley v. Valeo*, 424 U.S. 1, 52-53 (1976), *superseded by statute on other ground as stated in McConnell v. FEC*, 124 S. Ct. 619 (2003) ("Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day.").  An election can affect workers for years to come.  This is exactly why Congress and the courts guarantee, and protect, employer free speech rights in the labor relations setting.  *NAM*, 717 F.3d at 955.

27

It is impossible to square Congress's policy judgment in favor of *robust* debate with the Board's directive that regional directors schedule elections *as quickly as possible*, regardless of other statutory objectives and requirements that do not support the fastest possible NLRA elections.  When elections can take place in as little as two weeks from the filing of the petition, parties "will have too little time[,] measured by any reasonable standard," for robust debate to occur.  79 Fed. Reg. at 74,439 (dissent).

The Board's curtailment of debate mirrors the sort that courts have routinely rejected when applied to political electioneering.  *Id.* at 74,439 n.588 (dissent) (citing *Mills v. Alabama*, 384 U.S. 214 (1966) (invalidating state ban on election-day newspaper editorials); *Emineth v. Jaeger*, 901 F. Supp. 2d 1138 (D. N.D. 2012) (enjoining state ban on all electioneering on election day); *Curry v. Prince George's Cnty., Md.*, 33 F. Supp. 2d 447, 454-55 (D. Md. 1999) (invalidating county ban on display of political signage for all but 45 days before and 10 days after a political election)).  This is especially true where, as (regrettably) here, the government seeks to privilege some speech based on its content.  *See* 79 Fed. Reg. at 74,440 (dissent) ("It is apparent from the statements of numerous commentators supporting the Rule that . . . the Final Rule will specifically disadvantage anti-union speech more than pro-union speech," by depriving employers of sufficient time to express their views against unionization, "and will correspondingly enhance a petitioning union's chances of electoral success.").  The Board was never meant to have the power to suppress debate, much less to the advantage of one side.

The Board's stated justification for impinging on § 8(c) rights revolves around the idea that employers still have time to speak, either before an election petition is filed or during the limited time between the filing of the petition and the election.  *Id.* at 74,319.  This explanation does not withstand scrutiny.  An employer's ability to make general, pre-petition observations

about unions is no substitute for post-petition speech.  It is the filing of the petition that "initiates what the Board and the courts consider the 'critical period' prior to the election, a period during which the representation choice is imminent and speech bearing on that choice takes on heightened importance." *Id.* at 74,439-40 & n.591 (dissent) (citing *Goodyear Tire & Rubber Co.*, 138 NLRB 453 (1962); *E.L.C. Elec., Inc.*, 344 NLRB 1200, 1201 n.6 (2005); *NLRB v. Arkema, Inc.*, 710 F.3d 308, 323 n.16 (5th Cir. 2013); *Ashland Facility Operations, LLC v. NLRB*, 701 F.3d 983, 987 (4th Cir. 2012); *NLRB v. Curwood Inc.*, 397 F.3d 548, 553 (7th Cir. 2005)).

Moreover, the legislative history of the 1959 amendments demonstrates that Congress believed that at least 30 days between petition and election was necessary to adequately assure employees the statutorily guaranteed "fullest freedom" in choosing whether to be represented by a union.  As explained by then Senator John F. Kennedy, Jr., who chaired the Conference Committee, a 30-day period before an election is a necessary "safeguard against rushing employees into an election where they are unfamiliar with the issues." 105 Cong. Rec. 5361 (1959), *reprinted in* 2 LMRDA Hist. 1024 (emphasis added).  Senator Kennedy stated "there should be at least a 30-day interval between the request for an election and the holding of the election," and he opposed an amendment that failed to provide "at least 30 days in which both parties can present their viewpoints."  *Id.* at 5770, *reprinted in* 2 LMRDA Hist. 1085; *see also* H.R. Rep. No. 86-741, at 25 (1959), *reprinted in* 1 LMRDA Hist. 783 (30-day period was designed to "guard[] against 'quickie' elections").

Notably, until now, the Board's own procedures, consistent with congressional intent, have required the interval between petition and election to be longer than 30 days (absent stipulation by the parties).  Under those procedures, at least 7 days were required before the pre-

election hearing, 76 Fed. Reg. at 80,139; an additional 7 days elapsed before the filing of post-hearing briefs, *id*. at 80,140; and regional directors were instructed not to schedule an election sooner than 25-30 days after directing an election.  *Id*.  These rules resulted in a pre-election period of at least 39 days from the filing of a petition (again, excluding situations where the parties voluntarily agreed to a shorter pre-election period).

Congress's rejection of pre-hearing election proposals based on opposition to "quickie elections" demonstrates that Congress believed a minimum period of 30 days after the filing of a petition was necessary for employers and employees to enjoy the "fullest freedom" in connection with representation elections.  Indeed, Congress specifically rejected proposals to expedite the Board's pre-election procedures based on concerns that elections would take place *too quickly* to satisfy the Act's objective of giving employees (and employers) "the fullest freedom in exercising the rights guaranteed by [the] Act."  29 U.S.C. § 159(b); *see* 105 Cong. Rec. 16,629 (1959), *reprinted in* 2 LMRDA Hist. 1714, *describing* H.R. Rep. No. 86-741, at 1 (1959), *reprinted in* 1 LMRDA Hist. 934 ("There is not any such thing as reinstating authority or procedure for a quicky election.  Some were disturbed over that and the possibility of that is out.").  The Final Rule's deliberate attempt to reduce the time for free speech and debate to much less than 30 days—potentially cutting that minimum time in half—thus contravenes clear congressional intent.  The Board does not have "general authority to define national labor policy by balancing the competing interests of labor and management."  *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 316 (1965); *see Hammontree*, 894 F.2d at 441 (rejecting the Board's argument that in light of "competing" objectives it has discretion to disregard one of Congress' goals).

As the dissent explains, the Board's rationale for limiting the opportunity for free speech is "the hallmark characteristic associated with *every* infringement on free speech: the government

simply determines the speech is not necessary." 79 Fed. Reg. at 74,440 (dissent). But Congress

has already made a specific, contrary policy judgment in favor of robust debate. The Final Rule

cannot be reconciled with—and, indeed, thwarts—that legislative judgment. Furthermore, the

Rule's impingement on free speech unacceptably creates "serious constitutional difficulties" with

the First Amendment that cannot stand. *See AFL-CIO v. FEC*, 333 F.3d 168, 175-79 (D.C. Cir.

2003). For these reasons, too, the Final Rule conflicts with the NLRA and should be set aside.

## II.     **The Final Rule Is Arbitrary And Capricious In Violation Of The APA.**

Even if the Final Rule were consistent with the NLRA, which it is not, it would still

violate the APA because it is arbitrary and capricious. Agency action is arbitrary and capricious

when the agency has not engaged in "reasoned decision-making"—that is, the agency "has relied

on factors which Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to . . . the product of agency

expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983). Moreover, the "agency must examine the relevant data and articulate a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014).

The hundreds of pages in the Board's Final Rule contain remarkably little logic or sound

explanation for the sweeping changes made by the Final Rule—which "leaves unanswered the

most fundamental question regarding any agency rulemaking, which is whether and why

rulemaking is necessary." 79 Fed. Reg. at 74,431 (dissent).

All available evidence indicates that the vast majority of election cases go forward with

no "delay" at all—and the Final Rule "does not even identify, much less eliminate, the reasons

responsible for those few cases that have excessive delays." *Id.* As for the Board's goal of

31

eliminating "unnecessary" litigation in the representation-election process, the available evidence demonstrates instead that the Final Rule will have the opposite effect. *Id.* at 74,449-50 (dissent). As the dissent sums up, "the available data do not provide a rational basis for the Final Rule's wholesale reformulation of election procedures." *Id.* at 74,434. Indeed, the record squarely contradicts the purported reasons for the Final Rule. Because the Board has thus "offered an explanation for its decision that runs counter to the evidence," *State Farm*, 463 U.S. at 43, the Final Rule must be set aside. *See Chevron*, 467 U.S. at 842-43; *Sorenson*, 755 F.3d at 709-10.

**A.    The Final Rule Unnecessarily Abandons Established Procedures For Unexplained Reasons, Despite The Board's Undisputed Success In Timely Conducting Elections.**

In light of all available objective data regarding the Board's election-related performance measures, the Final Rule is best characterized as a "solution in search of a problem." 79 Fed. Reg. at 74,449 (dissent). Most glaringly, the Board did not find the "problem"—significant delays, characterized as more than 56 days from petition to election—in more than a fraction of all cases. To the contrary, the evidence shows that significant delays occur in less than 6 percent of elections. *Id.* at 74,434. And only about one-tenth of those elections, or 0.6 percent of all elections, involve delays related to the procedures the Rule eviscerates: the pre-election hearing or regional director decision-making before the election. 79 Fed. Reg. at 7349 (Members Miscimarra & Johnson, dissenting from Notice of Proposed Rulemaking). As the dissent from the Final Rule put it, "[t]hese relatively few cases do not provide a rational basis for rewriting the procedures governing *all* elections." 79 Fed. Reg. at 74,456 (dissent).

Recent D.C. Circuit precedent demonstrates why the Board acted arbitrarily and capriciously here. In *Sorenson*, the FCC sought to implement a new rule mandating sales charges on phones manufactured for the hearing impaired. 755 F.3d at 707. According to the FCC, the new rule was intended to deter fraudulent acquisition and use of the equipment—fraud

32

that could artificially drain the fund created to finance use of the devices.  *Id.*  The problem was that "the agency offer[ed] no evidence suggesting there [wa]s fraud to deter."  *Id.*  Insofar as the agency could point only to a speculative problem it sought to resolve, actions taken to remedy that problem were arbitrary and capricious.  *Id.* at 709.  So too here, the Final Rule is a solution in search of problem that cannot withstand even deferential reasonableness review.  In the D.C. Circuit's words, the Board cannot create a rule to "defeat a bogeyman whose existence was never verified."  *Id.* at 710.

There is simply no rational connection between the Board's massive overhaul of the entire election process for *all* cases and the narrow subset of election cases in which a significant delay occurs.  The Final Rule thus epitomizes arbitrary and capricious agency action.  This Court should vacate it.

### B.   Contrary To The Board's Stated Goals, The Final Rule Will Trigger *More* Election-Related Litigation.

Worse still, the available evidence here actually contradicts the Board's stated rationale for its action.  *See State Farm*, 463 U.S. at 43 ("Normally, the agency rule would be arbitrary and capricious if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency.").  The lone tangible goal articulated by the Final Rule is that "[d]uplicative and unnecessary litigation is eliminated."  79 Fed. Reg. at 74,308.  But even if *some* litigation is eliminated, the Board failed to consider that the *total amount* of election-related litigation will only increase under the Final Rule.  *See id.* at 74,435 (dissent) ("our colleagues do not adequately address the likelihood that the *overall* time needed to resolve post-election issues *will increase*, as will the number of rerun elections").  That is because (1) the Final Rule sharply reduces the ability of and incentives for parties to enter into stipulated or consent election agreements, and (2) the Final Rule's elimination of the 25 to 30-day waiting

period for the Board to grant pre-election review of a regional director's decision, together with the elimination of mandatory post-election review and the exclusion of relevant evidence necessary for any meaningful review, will lead to an increase federal-court litigation that can take years to resolve.

### 1. The Final Rule undermines the incentive for the parties to negotiate election agreements, a critical litigation-reducing component of representation elections.

Under the election procedures that the Final Rule would displace, there is no pre-election litigation in 90 percent of cases because the parties negotiate an election agreement.  *Id.* at 74,375.  The high number of stipulated elections, in turn, has enabled the Board to conduct elections within a median of 38 days after the petition.  *Id.* at 74,341 (dissent).  That is likely why the Board's own Casehandling Manual directs Board agents to make every effort to secure an election agreement as early as possible in the process.[11]

The Board admits that existing procedures lead to election agreements in an overwhelming majority of cases.  *Id.* at 74,318.  And the Board acknowledges that "the bargaining units and election details agreed upon in the more than 90 percent of representation elections that are currently conducted without pre-election litigation are unquestionably influenced by the parties' expectations concerning what would transpire if either side insisted upon pre-election litigation."  *Id.* at 74,387.  But the Final Rule eliminates the very incentives and expectations that drive the parties toward election agreements.

---

[11]        *See, e.g.*, Casehandling Manual, Part Two, § 11008 (Noting, as part of the Board's initial communication, "it should be emphasized that it is the Agency's policy to make every effort to secure an election agreement . . . ."); *id.* § 11084.2 ("[E]fforts to dispose of a case by agreement should begin during the first contacts with the parties, and continue at all stages thereafter . . . ."); *see also* Report of Best Practices Committee: Representation Cases (December 1997) at 8 ("[T]he Committee concludes that the best practice is to keep the lines of communication open with the parties . . . and be tenacious in pursuing an agreement, as well as in narrowing the issues in the event a hearing is necessary . . . .").

For example, the Final Rule provides no guidance on when an election will be scheduled if an employer enters into an election agreement with the union, despite many calls from commenters for the Board to provide this guidance.  *Id.* at 74,324.  This information is essential in negotiating an election agreement.  Under existing procedures, the time target for an election is well known and clearly communicated to all parties and the general public.[12]  Employers are well aware of the 42-day target for holding an election and are routinely told that, if they enter into an election agreement, there is discretion to negotiate an election date anywhere within that 42-day period.  The ability to negotiate a mutually acceptable date, within that known time target, is a significant incentive to enter into an election agreement.

Furthermore, without the failsafe of mandatory post-election review, employers will be more reluctant to enter into binding election agreements.  *See id.* at 74,450 ("[M]aking Board review of post-election disputes discretionary is likely to discourage parties from entering into stipulated election agreements, *the principal mechanism for shortening the pre-election timeline*, thereby resulting in an increase in pre- and post-election litigation." (emphasis added)).

The Board acknowledges as much, but speculates that "[a]ny short term difficulties in reaching election agreements[ ] should dissipate quickly, as they have in the past when prior time targets have been adjusted."  *Id.* at 74,324.  Changes effected by the Final Rule, however, are so sweeping and unprecedented that the Board's reliance on the "past" rings hollow.  *See id.* at 74,450 (dissent) ("It [is] natural that the elimination of the right to agree to mandatory post-election Board review will adversely affect the parties' willingness to compromise on pre-election issues.").  The Board is introducing a scheme that fundamentally changes the hearing process envisioned by Congress.  And whatever deference may be due to some predictive

---

[12]     *See, e.g.*, GC Mem. 11-09, at 18-19 (Mar. 16, 2011); GC Mem. 07-04, at 10 (Apr. 4, 2007); GC Mem. 06-04, at 8 (Mar. 21, 2006); GC Mem. 04-02, at 2 (Apr. 22, 2004).

judgments of agencies, courts are required to step in when those predictions defy logic and the available evidence. *Sorenson*, 755 F.3d at 710 ("But unlike its counterpart, the [agency's new] Rule did not want for evidence; instead, there was contrary evidence questioning its efficacy and necessity. The Commission left these serious concerns unaddressed. Accordingly, its decision to implement the [new] Rule was arbitrary and capricious."). Removing an essential litigation-reducing tool will necessarily cause pre- and post-election litigation increases in these cases—an arbitrary and capricious result that this Court should refuse to countenance. *Id.*

The Board's failure to adequately address these concerns, especially given the contradictions between the stated objectives of the Final Rule and the actual evidence before the Board, underscores the conflict between the agency's action and the outcome.

### 2.  The Final Rule will increase federal-court litigation.

In severely curtailing the opportunity for Board review—*i.e.*, by removing the 25-30 day waiting period (thus shrinking the time for pre-election review) and by making mandatory post-election review discretionary—the Final Rule will force more employers to turn to the federal courts for the review that is denied by the Board. To be clear, the NLRA does not permit direct judicial review of representation decisions. *AFL v. NLRB*, 308 U.S. 401, 405, 409-11 (1940). As a consequence, an employer may seek judicial review only indirectly—after an election has been held and the results certified—by refusing to bargain with the union, at which point the Board can prosecute an unfair labor practice complaint that will result in a final, appealable Board order. *See, e.g., NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 709 (2001). In seeking review of that order in a court of appeals, the employer can then challenge the Board's (or regional director's) determinations in the underlying representation case.

Under the Board's current election system, "in only very few cases do employers refuse to bargain in order to test the validity of the certification. From FY 2008 to FY 2013, between 8

and 13 test of certification cases were filed each year in the U.S. Circuit Courts of Appeals."
79 Fed. Reg. at 74,344 n.176.  That is not surprising, given the opportunities for Board review
under the current system.  But the Final Rule's severe curtailment of those opportunities likely
will lead to an increase in "test of certification" cases in federal court—and even a slight increase
in these cases will necessarily trigger more litigation, as the dissent explains.  *Id.* at 74,451
(dissent) ("The elimination of mandatory post-election Board review is also likely to cause an
increase in 'test of certification' cases where employers engage in post-certification refusals to
bargain as the only means of obtaining review of the Board's certification.").

        In *Public Citizen v. FMCSA*, 374 F.3d 1209 (D.C. Cir. 2004), the D.C. Circuit made clear
that an agency acts arbitrarily and capriciously if it counts the benefits of a rule without
accounting for the offsetting costs.  *Id.* at 1217-19 ("That analysis, then, assumes away the exact
effect that the agency attempted to use it to justify.  The agency's reliance on the cost-benefit
analysis to justify this increase is therefore circular, and the rationality of that explanation is
correspondingly doubtful.").  The D.C. Circuit reaffirmed that same precept in *Chamber of
Commerce v. SEC*, 412 F.3d 133, 142-44 (D.C. Cir. 2005) ("And, as we have just seen,
uncertainty may limit what the Commission can do, but it does not excuse the Commission from
its statutory obligation to do what it can to apprise itself—and hence the public and the
Congress—of the economic consequences of a proposed regulation before it decides whether to
adopt the measure.").  Here, the Final Rule pursues quicker elections at all costs, including the
likelihood of increased post-election litigation that will delay the resolution of the ultimate
question in an election: whether the union properly represents a particular group of employees.
That selective focus on purported benefits while ignoring offsetting costs is arbitrary and
capricious.  *See Pub. Citizen*, 374 F.3d at 1217-19.

      **3.**    **The potential to moot litigation involving some voter eligibility issues cannot justify increasing litigation concerning the validity of the election itself.**

According to the Board, a party that, under the current system, would have litigated a supervisory status issue before an election may decide not to litigate that issue post-election under the Final Rule if the margin of victory for the union makes those voters irrelevant to the outcome.  79 Fed. Reg. at 74,387.  In this light, the Board advocates that under its "vote now, hearing later" model for voter eligibility and inclusion disputes—including supervisory status— only 15 percent of deferred issues "will ever have to be addressed."  *Id.* at 74,387 n.370.  But that proposition fails to consider that deferring voter eligibility and inclusion issues can taint the entire election, no matter how the vote tally comes out.

For example, as commenters explained, employees whose supervisory status is in doubt may engage in conduct that will later require overturning the election.[13]  *Id.* at 74,388, 74,408. There is no shortage of cases in which the Board has ruled that objectionable conduct by low-level or first-line supervisors materially affected an election.[14]  Thus, deferring resolution of issues of supervisory status will not serve to reduce litigation, as the Final Rule purportedly seeks to do.  It will result in the Board having to set aside more elections.  And there is little point to reducing pre-election litigation if the results of the election must ultimately be set aside.

---

[13]     *See SNE Enters.*, 348 NLRB 1041, 1043-44 (2006) (setting aside election result even though supervisors who engaged in pro-union conduct had been eligible voters in three prior Board elections, stating that it does not matter "that the supervisors here engaged in the conduct prior to the time when they were adjudicated to be supervisors"); *Harborside Healthcare, Inc.*, 343 NLRB 906, 911(2004) ("The essential point . . . is that employees should be free from coercive or interfering tactics by individuals who are supervisors, even if the employer or union believes that the individual is not a supervisor.").

[14]     *See Harborside Healthcare*, 343 NLRB at 911-14 (comments by first-level supervisor encouraging nursing assistants to vote for the union and solicitation of union authorization cards interfered with the nursing assistants' free choice and materially affected the outcome of the election); *Barton Nelson, Inc.*, 318 NLRB 712, 712-13 (1995) (personal distribution of anti-union hats by shift supervisors directly to large number of employees in the petitioned-for unit was objectionable conduct requiring setting aside an election); *Cmty. Action Comm'n of Fayette Cnty., Inc.*, 338 NLRB 664, 667 (2002) (setting aside an election where a supervisor responded to an employee's question about rumors that she would not get her job back after the annual summer layoff by stating that if the union won she might not have a job).

Indeed, the Final Rule would put employers "on the horns of a difficult dilemma." *See Barre-Nat'l, Inc.*, 316 NLRB at 880 (Member Cohen, dissenting).  As the dissent here points out, "[m]any employers will be placed in an untenable situation regarding such individuals based on uncertainty about whether they could speak as agents of the employer or whether their individual actions—though not directed by the employer—could later become grounds for overturning the election."  79 Fed. Reg. at 74,438 n.581 (dissent).  Furthermore, "[w]here employees are led to believe that they are voting on a particular bargaining unit and that bargaining unit is subsequently modified post-election, such that the bargaining unit, as modified, is fundamentally different in scope or character from the proposed bargaining unit, the employees have effectively been denied the right to make an informed choice in the representation election."  *NLRB v. Beverly Health & Rehab. Servs., Inc.*, 120 F.3d 262, 1997 WL 457524, at *4 (4th Cir. Aug. 12, 1997) (unpublished table decision).[15]

Thus, the Final Rule would not only shift litigation from the pre-election phase to the post-election phase, it also would transfer the litigation from the Board to the federal courts, by making the circuitous path of a "certification test" case the only guaranteed opportunity for review of a regional director's decision.  Worse still, the chances that a new election will need to be held, months or years after the first, will also increase if crucial issues of eligibility and inclusion are deferred until after the election.  For these reasons, the Final Rule is entirely counter-productive.  The Board's elaborate efforts to shirk its statutory obligations to conduct an "appropriate" pre-election hearing and to review the decisions of its regional directors will not

---

[15]    *See also NLRB v. Parsons Sch. of Design*, 793 F.2d 503, 507-08 (2d Cir. 1986) (finding a post-election change in unit size of about 10 percent denied employees the right to an informed vote); *NLRB v. Lorimar Prods., Inc.*, 771 F.2d 1294, 1302 (9th Cir. 1985) (holding that a unit reduction from 17 employees in two classifications to 11 employees in one classification required a new election); *Hamilton Test Sys., New York, Inc. v. NLRB*, 743 F.2d 136, 140-41 (2d Cir. 1984) (ruling that reduction of unit by 50 percent and removal of two classifications rendered election results void).

reduce litigation; it will only move it to federal court and delay the ultimate resolution of the representation case.  Where, as here, an agency's explanation of facts runs counter to the actual evidence before it and cannot answer the comments raised during the rulemaking process, the agency's action should be set aside.  *See State Farm*, 463 U.S. at 43; *Sorenson*, 755 F.3d at 710.

### C.    The Final Rule's Mandatory Disclosures of Employees' Personal Information Is Arbitrary and Disregards Substantial Privacy Concerns.

The Final Rule mandates disclosure of all potential voters' personal telephone numbers and email addresses.  The Rule accomplishes that result by requiring employers to provide labor organizations "a list of full names, work locations, shifts, job classifications, and contact information (including home addresses, available personal email addresses, and available home and personal cellular ('cell') telephone numbers) of all eligible voters."  29 C.F.R. §§ 102.62(d) & 102.67(l).  Not only has the Board imposed these new and intrusive disclosure obligations, it has also failed to provide any "opt-out" procedure for employees, 79 Fed. Reg. at 74,346, 74,453 (dissent), and failed to provide any meaningful penalty for misuse of the personal information.

Under the existing system, employers are required to provide unions only with employees' home addresses per the Board's 1966 decision in *Excelsior Underwear, Inc.*, 156 NLRB 1236, 1939-40 (1966).  The Board points to technological developments in support of its expanded disclosure requirements, but does not explain why those requirements are necessary.  Though commenters pointed out the privacy danger of disclosing email addresses, 79 Fed. Reg. at 74,341-42, the Board's only response was that disclosing home addresses is even more dangerous.[16]  But no one can reasonably question that technology brings greater risks when employees' personal data is compromised.

---

[16]    The Board also discounted the point that home phone numbers are not required under *Excelsior* even though they existed at the time of that decision.  79 Fed. Reg. at 74,338-39.

Even worse, while acknowledging that "the privacy, identity theft, and other risks may be greater than the Board has estimated," the Board nonetheless asserted—without any reasoning or analysis—that those "risks are worth taking." 79 Fed. Reg. at 74,341-42.  That conclusory statement is insufficient to satisfy the reasoned decision-making requirement of the APA.  *See Pub. Citizen*, 374 F.3d at 1217 ("The agency may of course think that [the] effects [of its Rule] are not problematic (or are outweighed by other considerations, like cost), but if so it was incumbent on it to say so in the rule *and to explain why*." (emphasis added)); *cf. Comcast Corp. v. FCC*, 579 F.3d 1, 7 (D.C. Cir. 2009) ("That a problem is difficult may indicate a need to make some simplifying assumptions, but it does not justify ignoring altogether a variable so clearly relevant and likely to affect" the agency's rule. (citation omitted)).  At the same time, the Board inexplicably declined to put in place common-sense privacy protections—like those suggested by the National Association of Manufacturers and the Chamber—that would require unions to destroy the personal contact information after a period of time.  79 Fed. Reg. at 74,360.

The Board gave those concerns even shorter shrift by declining to announce penalties for misusing the information.  Although the Final Rule provides that "[p]arties shall not use the list for purposes other than the representation proceeding, Board proceedings arising from it, and related matters," the Rule stops short of announcing a penalty, saying only that "should such misuse of the list occur, the Board will provide an appropriate remedy."  *Id.* at 74,344.  The APA's reasoned-analysis standard—though a deferential one—requires more than an agency's *ipse dixit* assurances that its decision is for the best, especially in the face of serious privacy and safety concerns.  *See Sorenson*, 755 F.3d at 709; *Pub. Citizen*, 374 F.3d at 1217.  The Rule should be set aside for that reason, too.

**III.**   **The Final Rule Unconstitutionally Compels Employer Speech.**

Quite apart from the conflict discussed above with § 8(c)'s free-speech guarantees, the Final Rule also violates the First Amendment by compelling employer speech through a mandatory post-petition notice that must be posted in the employer's workplace within two business days after the employer receives notice that a petition has been filed.  79 Fed. Reg. at 74,309 (dissent).  In essence, the Board is commandeering employers to disseminate a message the employer may not support or agree with, simply because someone filed a petition with the government—a petition that may not even provide a valid basis to proceed to an election.

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  This principle applies to individuals and corporations alike; thus, "[f]or corporations as for individuals, the choice to speak includes within it the choice of what not to say."  *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Ca.*, 475 U.S. 1, 16 (1986) (plurality opinion).  A regulation compelling speech is therefore generally subject to strict scrutiny, and can survive only if it is a "narrowly tailored means of serving a compelling state interest."  *Id.* at 19.

Here, the Rule compels employers to post workplace notices after a petition is filed with the Board, but before the Board has even determined that an election should occur.  79 Fed. Reg. at 74,309 ("When a petition is filed, the employer must post and distribute to employees a Board notice about the petition and the potential for an election to follow.").  By forcing employers to post a notice that facilitates a union's organizing campaign, the Rule conscripts employers in speech that they may not want to make.  That compelled speech implicates employers' First Amendment rights just as surely as a law requiring the employer to post notices of political campaign meetings.

Nor can it be argued that the government may compel employers' speech as a form of commercial speech regulation. Under the commercial speech doctrine, the government's "power to regulate commercial transactions justifies its concomitant power to regulate commercial speech that is 'linked inextricably' to those transactions." *44 Liquormart v. Rhode Island*, 517 U.S. 484, 499 (1996) (citation omitted). The Supreme Court has thus held that the government can require commercial speech to "appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive." *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976). And under Supreme Court precedent, it can include compelled disclosures about the efficacy, safety, and quality of the advertiser's product. *See, e.g.*, *Zauderer v. Office of Disciplinary Council for Supreme Court of Ohio*, 471 U.S. 626, 637-40 (1985); *Am. Meat Inst.*, 760 F.3d at 22.

But the Final Rule's mandate that employers must post workplace notices after a petition is filed with the Board has nothing to do with regulating a commercial transaction. Under *Zauderer* and its progeny, compelled disclosure may be permissible to convey "purely factual and uncontroversial" information—but such disclosures may be required only if they regulate commercial messages. *See Zauderer*, 471 U.S. at 651; *Milavetz, Gallop & Milavetz, P.A. v. United States*, 59 U.S. 229, 249-50 (2010).

Where, as here, the government seeks to co-opt a speaker's message not to regulate a commercial transaction but, rather, to assist a union in its campaign to organize employees, the regulation is presumptively unconstitutional. Indeed, this case is all but controlled by *Pacific Gas & Elec. Co.* In that case, the challenged law required a commercial actor (a power company), in a commercial setting (the posting of its bills to consumers), to disseminate the message of other groups with competing policy goals. *Pac. Gas & Elec. Co.*, 475 U.S. at 4-7.

The Supreme Court held that the law could not survive strict scrutiny without once suggesting that a different standard should apply merely because the speech of a commercial actor was being regulated.  *Id.* at 19-21; *see also Wooley*, 430 U.S. at 714-16 (prohibiting government from compelling speech when the message favored another party).  The *Zauderer* exception is thus just as inapplicable here as it would be in other First Amendment contexts.  *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641-42 (1994).

Indeed, while the D.C. Circuit did not have occasion to address directly the validity of the Final Rule's election-notice requirement in *NAM*, 717 F.3d at 959 n.19, it did hold in that case that *Zauderer* was inapplicable in a materially indistinguishable context.  Specifically, the Board in *NAM* argued that it could compel employers to post a notice of employee rights, notwithstanding NLRA § 8(c), because the notice was a compelled commercial disclosure, subject to less scrutiny under *Zauderer*.  *Id.* at n.18.  The D.C. Circuit rejected that argument, however, because there was no suggestion that the notice was intended or needed to regulate a commercial transaction.  *Id.*[17]

Because the Final Rule's notice requirement is not a regulation of a commercial transaction, and instead compels speech in support of a union's organizing campaign, it is subject to strict scrutiny—a burden it cannot satisfy.

### CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to plaintiffs and vacate the Final Rule.

---

[17]     Although the en banc D.C. Circuit recently abrogated *NAM* to the extent that it held that *Zauderer* applied only to disclosure requirements intended to prevent customer deception, the Court did not attempt to expand *Zauderer* beyond the context of commercial transactions.  *See Am. Meat Inst.*, 760 F.3d at 20-22 (noting that the Court was addressing "commercial speech" and merely holding *Zauderer* is not limited to cases where the government is seeking to prevent deception in commercial transactions).

Dated:  February 4, 2015

Respectfully submitted,

/s/ Allyson N. Ho

Kathryn Comerford Todd (D.C. Bar No. 477745)
Tyler Green (D.C. Bar No. 982312)*
Steven P. Lehotsky (D.C. Bar No. 992725)
Warren Postman (D.C. Bar No. 995083)
U.S. CHAMBER LITIGATION CENTER, INC.
1615 H Street, N.W.
Washington, D.C. 20062
202.463.5337

*Counsel for Plaintiff Chamber of Commerce
of the United States of America*

Linda Kelly (D.C. Bar No. 477635)
Patrick N. Forrest (D.C. Bar No. 489950)
MANUFACTURERS' CENTER FOR LEGAL ACTION
733 10th Street, N.W., Suite 700
Washington, D.C. 20001
202.637.3061

*Counsel for Plaintiff National Association of
Manufacturers*

Allyson N. Ho (D.C. Bar No. 477589)
Charles I. Cohen (D.C. Bar No. 284893)
Michael W. Steinberg (D.C. Bar No. 964502)
Jonathan C. Fritts (D.C. Bar No. 464011)
David R. Broderdorf (D.C. Bar No. 984847)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202.739.3000

*Counsel for the Plaintiffs*

*Application for admission to the U.S. District Court for the District of Columbia pending

45