**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, et al., | ) ) ) | |
| | ) | Case No. 1:15-cv-00009-ABJ |
| Plaintiffs, | ) | Judge Amy Berman Jackson |
| v. | ) | |
| | ) | |
| NATIONAL LABOR RELATIONS BOARD | ) ) | |
| | ) | |
| Defendant. | ) | |

_____)

**EXHIBIT 2 IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# Chamber of Commerce
### of the
## United States of America
1615 H Street, N.W.
Washington, D.C. 20062
202/463-5522

**Randel K. Johnson**
Senior Vice President
Labor, Immigration & Employee
Benefits

**Michael J. Eastman**
Executive Director
Labor Law Policy

August 22, 2011

Lester A. Heltzer, Executive Secretary
National Labor Relations Board
1099 14th Street NW
Washington, DC 20570

**RE:    RIN 3142—AA08; Representation—Case Procedures; Notice of Proposed
Rulemaking**

Dear Mr. Heltzer:

On behalf of the U.S. Chamber of Commerce ("Chamber"), we are pleased to

submit these comments[1] in response to the National Labor Relations Board's ("Board" or

"NLRB") Notice of Proposed Rule Making ("NPRM") published at 76 Fed. Reg. 36812

(June 22, 2010). The proposed rules would amend the Board's representation case

procedures under the National Labor Relations Act ("Act").

The Chamber is the world's largest business federation, representing the interests

of more than three million businesses and organizations of every size, sector, and region.

The overwhelming majority of the Chamber's members are "employers" as defined by

the Act and consequently would be affected by the Board's proposal, should it be

finalized.

---

[1] These comments represent the views of the U.S. Chamber of Commerce. The Chamber has also endorsed
the views expressed by the Coalition for a Democratic Workplace, of which the Chamber is a member.

### Summary of Comments

The following summarizes the Chamber's comments on the proposed rules:

1. ***The Chamber has serious concerns about the process followed by the Board in this rulemaking.*** The opportunity for notice and comment has been insufficient and rushed for a rulemaking of this complexity and magnitude. This is contrary to spirit if not the letter of President Obama's Executive Order 13563, which mandates that 60 days for comments is the *minimum* that an agency should allow. Further, the Executive Order provides that an agency should seek the views of affected parties *before* initiating rulemaking, which is contrary to what the Board has done here. Had the Board engaged in the more open and deliberate process in accordance with the Executive Order, it could have resulted in a rule making in which affected parties reached broad agreement. Instead, the Board has chosen to ignore the Executive Order and take an aggressive approach that has generated significant controversy.

2. ***The Board has failed to demonstrate the need for such sweeping changes in the current procedures for processing representation cases.*** The proposed rules purport to fix a system that is not broken. To the contrary, the current system – described as "outstanding" by the Board's Acting General Counsel -- processes representation cases fairly and efficiently, holding elections in a median of 38 days from the filing of an election petition, holding 95 per cent of all elections within 56 days, holding 92 per cent of elections pursuant to voluntary agreement of the parties, and meeting all of the Board's internal and external time targets. To the extent that there is delay in some cases, the Board has not focused on the

causes for such delay or proposed any solution to it, but instead has adopted a broad brush approach targeting a system that is performing very well.

3. ***The Board has proposed to virtually eliminate any meaningful pre-election investigatory hearing, as required by statute, and replace it with a highly adversarial process, purportedly patterned on court litigation.*** The Board's proposal discards the current investigative hearing format and replaces it with a litigation like model. An employer will now be required to file a position statement in *seven days or less* after the union has filed a petition. The position statement imposes burdensome information requirements, requires waiver of legal rights with respect to any issue not properly raised, forecloses the right to resolve unit composition and eligible voter issues before the election, and eliminates the longstanding opportunity to appeal decisions of regional employees to the Board. The Board has proposed these draconian solutions for problems that do not exist, at the cost of the due process and free speech rights of employees and employers, and increasing legal and compliance costs, particularly on small employers. We submit that the Board's proposals will likely increase representation case-related litigation and attendant delays as time-pressed and due-process denied employers turn to the federal courts for redress.

4. ***The Board's proposal also raises significant privacy and compliance concerns with respect to private information of employees.*** For the first time, the Board would require employers to furnish unions with telephone numbers and email addresses, along with the names and addresses, of employees whom the union wants to organize. These so-called "voter lists" must be produced in only two

days following direction of an election, less than a third of the time currently allowed (7 days). The requirement that telephone numbers and email addresses be provided to the union raises substantial privacy concerns, a point at least partially recognized by the Board, since it has asked for suggestions on how to prevent misuse of this personal information. Further, the unwarranted increase in private information that must be produced, and the dramatic decrease in the time within which to produce it, is based on the Board's faulty assumption that employers maintain such information in the electronic format required by the Board. The record demonstrates that this is not the case.

5. ***The Board's shortening of the election process will deny employers and employees their free speech rights to communicate about union representation and collective bargaining.*** The Board has stated that its rules are designed to reduce the time for the scheduling of an election to as little as 10 to 21 days following the filing a petition, roughly cutting more than in half the median time of 38 days for holding elections under the current system. This is grossly unfair and threatens to deny the due process and free speech rights of employers and employees. Unions already win two-thirds of elections, and have months or even years of time to plan and organize the workforce before the employer may ever be aware of the campaign. Further, unions file election petitions at the time of their choosing, catching many if not most employers off guard and ill-prepared to immediately respond to the arguments and promises made by the union in the preceding months. The Board's proposal threatens to seriously undermine the rights of employers and employees – recognized under §8(c) of the Act and by the

Supreme Court – to engage in a free and open discussion on the issue of union representation and collective bargaining.

6. ***The Board's proposal to eliminate post-election review by the Board as a matter of right is based on a faulty premise.*** The Board's proposal is based on the supposition that elimination of the post-election appeal as of right will shorten the time between the tally of ballots and the final certification of representative or election results. But this supposition ignores the likelihood that employers who desire review of regional office decisions will not simply give up. To the contrary, it is likely that denial of post-election review as a matter of right will simply increase the instance of employer refusal to bargain charges – so-called "technical 8(a)(5)" cases. An employer will now be forced to litigate in an unfair labor practice case before the Board and in federal court, those matters which can now be reviewed before the Board in a palliative post-election appeal as a matter of right. As such, the elimination of post-election review as a matter of right will likely result in less, not more, efficiency in the representation case process.

7. ***The so-called academic research and other studies upon which the Board's proposal is based are flawed and do not support the Board's approach.*** They are an attempt to provide cover for what we believe, along with dissenting Board Member Hayes, is a naked attempt to "effectively eviscerate an employer's legitimate opportunity to express its views about collective bargaining." 76 Fed. Reg. at 36831. The so-called academic studies were conceived and carried out with the object of supporting unions in achieving this very result. In doing so they seek, among other things, to kill both the employer's message and messenger by

wrongfully and sharply demonizing employer counsel and other advisers; and rely on shopworn polling data purporting to show that demand for union representation is at an historic high rather than as it is, at an historic low.

8. ***The Board has undertaken the regulations without sufficient analysis under the Regulator Flexibility Act ("RFA").*** Under the RFA the Board was required to analyze both the number of small businesses affected by its proposal and the economic impact of the proposal on those small employers. We submit that the Board failed to properly account for either the number of small employers affected or the economic impact of the proposal on them. The Board blithely assumes that only a relatively small number of businesses are involved in Board representation proceedings. But the Board fails to account for the fact that nearly all businesses – including small ones – are subject to the Board's jurisdiction and are, therefore, impacted by the need to commit time and resources to keep abreast of and comply with the Act's legal requirements. Further – as is illustrated by the wholly inadequate time frames imposed under the proposal – the Board grossly underestimates the cost and economic impact of compliance.

## Preliminary Issues

Before addressing the substance of the proposed rules, we are constrained to address two preliminary issues. One involves the process adopted by the Board in developing and publishing the proposed rules for comment; the other involves the Board's failure to demonstrate any need to change the current rules.

**Process of Developing the Proposed Rules:** The Chamber has serious concerns about the process that the Board has chosen to develop the proposed rule. The Board had an opportunity to explore whether a consensus could have been reached by reaching out to all stakeholders and asking them to identify any areas of the Board's processes that could use updating or reform. However, rather than engage in a process more likely to result in broad agreement, the Board has instead chosen to take an aggressive, narrow approach that has generated significant controversy.

### The Decision to Issue a Notice of Proposed Rulemaking

At the hearing on July 18, 2011, the Chamber was asked whether it thought the Board should have engaged in pre-proposal communications with its stakeholders in an effort to develop a rule responsive to their concerns, rather than – for the most part – develop a detailed rule and only seek input after the fact through the notice and comment procedure and a single public meeting. A corollary to that question is whether the notice and comment procedure adopted is adequate. The Chamber has taken a position on both of these matters.[2]

At the hearing, the Chamber responded to the pre-proposal question, stating that while it did not have all the facts relied upon by the Board in not engaging in some pre-proposal procedure, it believed the idea "had merit," particularly in view of the fact that the Board has ready made sources of input such as the American Bar Association's Labor and Employment Law Section and its NLRA focused committees. See July 18-19 Transcript at pp. 153-154. Later during the meeting, Chairman Liebman raised the

---

[2] At the July 18-19 hearing, numerous parties commented that the Board's process for promulgating the proposed rules was inadequate and rushed, or could otherwise have been more focused on the cohort of cases where significant delay had occurred and the causes of that delay. *See* July 18-19 Transcript at pp. 88, 153-154, 196-197, 240, 257,271 and 275.

question as to whether conferring with the ABA's Practice and Procedure Committee in advance of issuing the proposal would have violated the Advisory Committee Act, suggesting that it would have. See July 19 Transcript at p. 428.

This was not, however, the only approach the Board could have taken. The Board could have issued an Advanced Notice of Proposed Rulemaking or engaged in other stakeholder outreach before developing its proposed rule. While various stakeholders have widely divergent views about many of the Board's processes, there are possibly numerous potential changes on which consensus could have been reached. Had the Chamber been consulted at an earlier stage, we would readily acknowledged that while the majority of the time the process works fairly well, there are some cases that take too long. We would have encouraged the Board to take a hard look at these outlier cases and see what processes might be changed to improve the process without jeopardizing the processes that work so well for the vast majority of cases.

Nevertheless, the Board chose not to engage in a process that might yield a consensus and instead chose to propose this rule. Given the overwhelming amount of interest and sharply expressed differences at the hearings about the purpose and effect of the proposed rules, the Chamber submits that the Board should seriously consider withdrawing the NPRM and instead publish an Advanced Notice of Proposed Rulemaking and invite comment in order to develop a less contentious, more broadly based rule that fairly addresses the views of all the labor-management community.

***Inadequate Time to Respond to NPRM***

The Board has allowed for 60 days of public comment on its proposal, followed by a 14-day reply period. This time frame is wholly inadequate. Our views on this point should come as no surprise to the Board. On July 6, 2011, the Chamber, joined by National Association of Manufacturers, the Atlantic Legal Foundation, the HR Policy Association, the Society for Human Resource Management, the Coalition for a Democratic Workplace, the Council on Labor Law Equality, and the Associated Builders and Contractors, requested an extension of time for filing of comments and responsive comments through November 21 and December 5, 2011, respectively; and that the Board postpone the July 18-19 hearing until a date at least 30 after the extended close of comments, and schedule at least four additional hearings after that date as well. The Board denied each of these requests (Member Hayes dissenting in part). The Chamber believes that this has led to an unnecessarily truncated and inadequate process for deliberation and comment upon the proposed rules.

In the NPRM, the Board repeatedly states its interest in maximizing public participation and an interest in receiving specific and useful comments. See 76 Fed. Reg. at 36828. However, the time period provided is simply too short. If more time were available the Chamber and others would have been able to carefully study Board data and cases to discern what scenarios were most likely to lead to unacceptably long procedural delays. As described more fully below, in order to provide comment on the Board's Regulatory Flexibility Act analysis, we and others could have conducted rigorous studies of the proposal's impact on employers, if it were implemented.

In response to criticism from the dissent, the majority states that the short comment period "violates no statutory or other requirement that applies to the rulemaking process."[3] The Board then cites to Executive Order 13563 for support that a 60-day comment period has become a benchmark.[4] The citation to Executive Order 13563 for this proposition is curious, since the Executive Order in fact provides that a 60-day comment period is the *minimum* that an agency should generally use. Specifically, § 2(b) of the Executive Order 13563 provides (emphasis added):

> [E]ach agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be *at least* 60 days.

Further, §2(c) of the Executive Order provides (emphasis added):

> *Before* issuing a proposed regulation, each agency, where feasible and appropriate, shall seek the views of those who are likely to be affected, including those who are likely to benefit from and those who are potentially subject to such rulemaking.

The Board acknowledges that it did not comply with section 2(c) in a footnote in the NPRM, instead stating that "public participation would be more orderly and meaningful if it was based on the specific proposals described herein."[5] We question whether this process has been more orderly or meaningful – what is certain is that it is needlessly contentious.

In an effort to partially address this deficiency in the process, we urge the Board to at least schedule the additional hearings requested following receipt of all comments and responsive comments, and allow for additional comment following such hearings.

---

[3] 76 Fed. Reg. at 36829.
[4] *Id.*
[5] *Id*. at 36817 n.34.

***Necessity for a Three Member Majority***

Finally, as to process, we note that given the current schedule for comments and the upcoming end of Chairman Liebman's term, it is entirely possible, if not likely, that the Board will be functioning with only three members for some period of time. We further note that the proposed rules – if adopted – will change or overturn longstanding practices and established rights in the representation case process, including some that have been adopted in cases. *E.g., Excelsior Underwear,* 156 NLRB 1236 (1966). We believe that in doing so, the Board must adhere to its longstanding policy of requiring three affirmative votes to make such changes. *See, e.g., Tradesmen Int'l,* 338 NLRB at 460 (explaining that the Board was bound to apply its extant precedent absent three votes to overrule it); *accord DaimlerChrysler Corp.,* 344 NLRB at 1324, n.1. *See generally Progressive Electric, Inc. v. NLRB,* 453 F.3d 538, 552 (D.C. Cir. 2006) (recognizing the Board's practice of adhering to its precedent absent a three-vote majority to overrule it, and enforcing on other grounds a Board decision that followed the practice).

*Hacienda Resort Hotel & Casino*, 355 NLRB No. 154 (August 27, 2010), exemplifies the adherence to this longstanding practice by the current Board members. In *Hacienda Resort Hotel & Casino*, Chairman Liebman and Member Pearce concurred in the dismissal of a complaint alleging an unlawful, post-contract expiration, unilateral discontinuance of a dues-check-off provision. Their concurrence stated that they questioned the reasoning of the precedent excluding dues-check-offs from the unilateral change doctrine and would consider overruling the precedent in an appropriate case. They declined to overrule the precedent absent a third vote to do so, however, because "it is the tradition of the Board that the power to overrule precedent will be exercised only

by a three-member majority of the Board." *Id* at *5-*6, *citing  Chicago Truck Drivers Local 101 (Bake-Line Products)*, 329 NLRB 247, 254 (1999) ("it is not the Board's usual practice to overrule prior cases by the votes of two of a three-member panel").

Thus, in addition to our substantive objections discussed below, the Chamber submits that the rules should not be adopted unless and until there are three affirmative votes of the Board to do so.

**No Demonstrated Need for the Proposed Rules**: The Board states that its proposal is necessary "to better insure that employees' votes may be recorded accurately, efficiently, and speedily and further the Act's policy of expeditiously resolving questions concerning representation" and that "[t]he proposed amendments would remove unnecessary barriers to the fair and expeditious resolution of questions concerning representation."[6]

The Chamber fully supports the goal of removing unnecessary barriers to the fair and expeditious resolution of questions concerning representation. See July 18-19 Transcript at 152. However, the substance of the Board's proposal is at odds with its stated purpose.

First of all, the Board has made no effort to articulate why it believes that its current system is not expeditiously resolving questions concerning representation. As the Chamber and many others pointed out at the hearings held on July 18-19, and as Member Hayes noted in his dissent in the NPRM, there has been no need demonstrated for the Board's embarking on this revision of the Board's existing representation case

---

[6] 76 Fed. Reg. at 36816-17 (citations and internal quotation marks omitted).

procedures.[7] We need not dwell on the well known statistics published by the Board demonstrating that under the current procedures 92% of all elections are held pursuant to an election agreement; that the median time between the filing of a petition and the election is 38 days, with 95% of all elections being conducted in 56 days; that the Board is meeting all of its representation case handling goals under the overarching standards adopted in consultation with the Office of Management and Budget and the Office of Personnel Management; and that unions, despite their complaints, currently win over two-thirds of the representation elections held.[8]

At the July 18 hearing the Chamber was asked about the question of petitions withdrawn and how this affects the statistic showing the substantial union win rate. Of course, there is no election held on a withdrawn petition. However, in the absence of Board statistics on the reasons why they have been withdrawn, it is unreasonable and unfair to simply assume they were all withdrawn due to unfair labor practices committed by employers. It makes more sense to assume that a variety of factors – including imminent dismissal by the region for substantive or procedural reasons, worker disinterest, desire to re-file the petition seeking a different unit, being close to having substantial support but not wanting to risk a one year election bar, importuning by

---

[7] At the July 18-19 hearing, numerous parties testified that there was no demonstrated need for the Board to change its current representation procedures, which were fair, reasonable, efficiently administered and – importantly – provided the minimum time necessary to ensure employer free speech and due process rights to communicate with employees, which in turn are afforded full exercise of their rights of freedom of association and free choice guaranteed by Sections 1 and 7 of the Act. *See* July 18-19 Transcript at pp. 63, 149,152, 161-163, 185,188, 197-198, 201,211,276, 279, 303, 305, 316, 323, 325, 361, 364, 396-399 and 408.

[8] It should also be noted that the 38 day median time between the filing of the petition and the election includes the 8% or less of cases in which a hearing is actually conducted. Member Pearce asserted that the average amount of time between petition and election in cases involving a pre-election hearing is between 82 and 123 days. ( July 18-19 Transcript at 89). Given that 95% of all initial elections are conducted within 56 days of the filing of the petition, and that 92% of all elections are conducted pursuant to an election agreement without the necessity of a hearing, it would appear that the number of cases to which fall into the 82-123 day period referred to by Member Pearce is extremely small, constituting something less than 5% of all initial representation elections.

another union because of jurisdictional issues or other strategic issues – can and do motivate unions to withdraw petitions. Indeed, it is entirely possible that some of the withdrawn petitions were re-filed and resulted in an election contributing to the high percentage win rate enjoyed by unions.

To the extent that any petitions are withdrawn because of unfair labor practices, it is the province of the General Counsel to prosecute and seek remedies for them – and the current and prior General Counsels have pursued initiatives which are aimed directly at the right of employees to organize free from coercion or intimidation by any party. *See, e.g.,* Memorandum GC 11-01, *Effective Remedies in Organizing Campaigns* (December 20, 2010); Memorandum GC 10-07, *Effective Section 10(j) Remedies for Unlawful Discharges in Organizing Campaigns* (September 30, 2010); Memorandum GC 07-01, *Submission of §10(j) Cases to the Division of Advice* (December 15, 2006); Memorandum GC 06-05, *First Contract Bargaining Cases* (April 19, 2006).

In any event, the great majority of petitions are not withdrawn, but are handled fairly and efficiently under the current system. The minority of petitions that are withdrawn – for whatever reasons – present no justification for changing that system which deals efficiently and fairly with the great majority of petitions that are not withdrawn but result in elections won two-thirds of the time by the union.

Finally, again, the process by which the Board has gone about this NPRM leaves much to be desired. Instead of the broad brush approach taken, it would have made much more sense – as suggested by Member Hayes and by testimony at the hearing – for the Board to have identified which cases have been delayed, what were the causes of the delay, and how the delay could be addressed without imposing a one size fits all approach

on everyone, an approach that – as described below and at the July 18-19 hearing – sacrifices the established due process rights of employers and employees. Had the Board taken such an approach – one that examined those cases in which questions concerning representation had not been expeditiously resolved, and then examined what factors had created barriers to expeditious resolution, it is much more likely that the Board would be receiving far greater – perhaps consensus – support for proposed changes.

## <u>Elements of the Proposed Rules</u>

**<u>Electronic Filing</u>:** The proposed amendments would expand electronic filing. In general, the Chamber has no objection to this. However, we are concerned about the proposal that the petitioner file with the petition evidence of a showing of interest.

Traditionally, the showing of interest is in the form of the actual cards or some other document signed by the individual employees. The Chamber would not support the electronic filing of showing of interest evidence unless the evidence would (1) indicate when each individual signature was obtained; (2) indicate exactly what was printed on the card or other document (in its original font, size and formatting) containing the signature; and (3) show a true copy of the signature actually on the physical card or other document.

The Chamber agrees that such filing should be followed within 48 hours by the filing with the Region of the actual physical cards or other document on which the signatures were obtained, as contemplated by the proposal at §102.61(f). We submit that the regional director should not serve any party with the notice until the actual physical cards are received by the region.

In that regard, there appears to be a conflict or inconsistency between the proposed §102.61(f) requirement noted above, and §102.60(a). The latter section states that failure to file the original of the petition "shall not affect the validity of the filing by facsimile or electronically, if otherwise proper." This portion of §102.60(a) (with the exception of the words "or electronically") is existing regulatory language that was perhaps overlooked in adding the new requirement under §102.61(f) that original documents be filed with the region within 48 hours of the petition being filed electronically or by facsimile. The Chamber submits that if the proposed rules are adopted, the language quoted from §102.60(a) should be stricken or amended so that it conforms to §102.61(f).

The Chamber understands that a showing of interest is not a matter that may be litigated before the Board, but we also believe that the Board – and all the parties involved – are best served by requirements which will help ensure that the electronically filed petitions rely on cards or other documents which are timely, authentic and not obtained under any false pretenses.[9]

**Required Additional Documents:** The Chamber has no objection in principle to the electronic service of the two additional forms proposed by the Board, one of which will inform interested parties of their rights and obligations ("Rights and Obligations Form") and the other which would be a Statement of Position of the other interested party(ies). However, the Chamber has serious concerns regarding the *content, timing and legal effect* of these forms.

---

[9] The Board requested the parties to address whether the proposed rules should expressly permit or proscribe the use of electronic signatures do demonstrate a showing of interest. 76 Fed.Reg. at 36819. The Chamber addresses this issue below.

**Rights and Obligations Form Content:** The NPRM states that the Rights and
Obligations Form will be available on the Board's web site, and will be served by the
petitioner on the other interested parties. Because there is no proposed Rights and
Obligations Form published with the NPRM, however, neither the Chamber nor any other
affected party is able to comment on the content and substance of the Rights and
Obligations Form.

When the Board last year announced its Proposed Rules Governing Notification
of Employee Rights Under the National Labor Relations Act, 75 Fed. Reg. 80410
(December 22, 2010) ("NLRA Rights Notice"), it generated enormous interest and
thousands of comments. Here, the Rights and Obligations Form will apparently contain
similar information. We submit that there is a similar amount of interest and desire to
comment.

The Chamber strongly urges the Board to amend this NPRM, or publish a new
one, in order to provide notice of the content of the Rights and Obligations Form and an
opportunity to comment on it. This is especially important since it appears that the Board
takes the position that the Paperwork Reduction Act does not apply to these forms and
consequently, there will be no other opportunity to solicit public comment on the contents
of the forms.

This is the procedure that was followed by the Board in proposing the NLRA
Rights Notice. We see no reason for the Board to depart from that practice with respect to
the Rights and Obligations Form.

**Statement of Position Form:** The Chamber has a number of objections to the
content, the effect of, and the time for filing the Statement of Position Form. Our

objections include that the information required is burdensome and unnecessary; the preclusive effect of failure to raise issues or otherwise complete the form is a denial of due process and will likely cause more, not less, litigation; and the wholly inadequate time for filing the Statement of Position Form is unfair and also a denial of due process to employers.

Initially, however, we are concerned with the contents of the form itself, which the NPRM says will be available on the Board's web site, and will be served by the petitioner on the other interested party(ies). There is no Statement of Position Form published with the NPRM. Only the substantive information to be supplied by the employer for the Statement of Position Form is described in the proposed amendments to §102.63(b)(1). The Chamber strongly urges the Board to amend this NPRM, or publish a new one, for the same reasons as stated above with respect to the Rights and Obligations Form, so that affected parties may see and comment on the Statement of Position Form.

**Statement of Position Form Content Supplied by an Employer:** The substantive content and information to be supplied by the employer on the Statement of Position Form is described in the proposed amendments to § 102.63(b)(1). Under that proposed amendment, the employer is required to provide information or take positions with respect to the following:

*Whether the employer agrees that the Board has jurisdiction.* In general the Chamber does not object to this except as discussed below with respect to the timing and legal effect of the Statement of Position Form.

***Employer's relation to interstate commerce.*** In general the Chamber does not object to this except as discussed below with respect to the timing and legal effect of the Statement of Position Form.

***Whether the employer agrees with the proposed unit.*** In general the Chamber does not object to this except as discussed below with respect to the timing and legal effect of the Statement of Position Form.

***The basis for the employer's contention that the unit is not appropriate.*** In general the Chamber does not object to this except as discussed below with respect to the timing and legal effect the Statement of Position Form.

***Description of the most similar unit that the employer concedes is appropriate.*** The Chamber objects to this requirement. In addition to the timing and legal effect discussed below, the Chamber believes that it is inappropriate to require an employer, on pain of forfeiture or preclusion, to identify – much less concede the appropriateness of – any unit, before a question has been asked or a word of testimony spoken at the hearing, or the employer (and other parties) have had any opportunity to probe the rationale for the proposed unit and any possible alternatives thereto. The requirement that the employer not only agree or disagree with the union's proposal, but to go further and make a proposal itself, amounts to a forced pleading and raises serious due process and free speech concerns. It is the union that seeks to organize employees, not the employer, and it is the union's responsibility to propose a unit appropriate for collective bargaining. Section 9(b) of the Act states that "[t]he Board shall decide in each case . . . the unit appropriate for the purposes of collective bargaining . . . ." The rules should not attempt to absolve the Board of its responsibility, on a case by case basis, to make an appropriate

unit finding in proceedings under Section 9 of the Act. The Chamber also objects below with respect to the timing and legal effect of this requirement.

*Identify any individuals occupying classifications in the petitioned for unit whose eligibility to vote the employer intends to contest, and the basis for each such contention.* The Chamber objects to this requirement on much the same basis. Unless and until the petitioned for unit has been subject to examination at a hearing, and a unit has either been agreed upon by the parties or deemed appropriate by the Board, requiring an employer to identify who is in the unit and who it believes is not eligible to vote, is a significant burden and a possible waste of time and resources for the employer and other involved parties. In the hearing process any unqualified voters and employees not sharing a community of interests may be excluded from the unit and other employees sharing a community of interests may be added, thus obviating any employer objections that may have existed to the unit as originally requested. In any event, the employer should not be put to the burden of identifying who it plans to contest until the unit is identified. The Chamber also objects below with respect to the legal effect of this requirement.

*Raise any election bar.* In general the Chamber does not object to this requirement except as discussed below with respect to the timing and legal effect of the Statement of Position Form.

*State the employer's position concerning the type, dates, times and location of the election and the eligibility period.* The Chamber objects to this requirement. Unless and until a putative appropriate unit has been identified, it would be virtually impossible for the employer to develop a reasoned position regarding the type, dates, times and

location of the election, and the eligibility period. The Chamber also objects below with respect to the legal effect of this requirement.

*Describe all other issues the employer intends to raise at the hearing.* The Chamber objects to this requirement. While in general the Chamber does not object in principle to the identification of issues at the earliest practical time, it would not always be possible to identify all legal issues at this very early stage of the process. The preclusive effect of failure to do so (as discussed below with respect to other aspects of the Statement of Position Form) makes this requirement unjust and a denial of due process.

*Name, title, address, telephone number, fax number and email address of the individual who will serve as the representative of the employer and accept service of all papers for purposes of the representation proceeding.* In general the Chamber does not object to this requirement except as discussed below with respect to the timing and legal effect of the Statement of Position Form.

*Full names, work locations, shifts, and job classifications of all individuals in the proposed unit.* The Chamber objects to this requirement to the extent that an employer is required, under §102.63(b)(iv), to provide employee telephone numbers, available email addresses and home addresses to the regional director. At this point in the process the region has no arguable need for such information, given the fact that the employer is required to post any election notice. Further, we object to providing such information for the reasons as discussed below with respect to the voter list. The Chamber also objects below with respect to the timing and legal effect of this requirement.

***Full names, work locations, shifts, and job classifications of all individuals in the most similar unit the employer concedes is appropriate.*** The Chamber objects to this requirement. We submit that it is inappropriate to require an employer, on pain of forfeiture or preclusion, to identify – much less concede the appropriateness of – a unit, as discussed above. Consistent with that, it is inappropriate to burden the employer with providing information with respect to an employer identified unit. The Chamber also objects below with respect to the timing and legal effect of this requirement.

***The list of names shall be alphabetized and in an electronic format approved by the Board's Executive Director unless the employer certifies that it does not possess the capacity to produce the list in the required form.*** Generally the Chamber does not object to the production of documents in electronic format, except as stated herein. But as discussed above, it objects to the requirement that the employer provide any list of names with respect to a unit it concedes is appropriate, and objects to any provision of telephone numbers and email addresses with any employee list required with the Statement of Position.

**<u>Statement of Position Form – timing and legal effect</u>:** In addition to the contents of the form discussed above (some of which are based in part on timing), the Chamber has an overall objection to the timing and legal effect of the Position Statement Form.

The proposed revision to §102.63(b)(1) states that after a petition has been filed and the regional director has issued a notice of hearing, "the employer shall file and serve on the parties named in the petition its Statement of Position *by the date and in the manner specified in the notice unless that date is the same date as the hearing date.* If the

Statement of Position is due on the date of the hearing, its completion shall be the first order of business at the hearing before any further evidence is received, and its completion may be accomplished with the *assistance of the hearing officer*." (Emphasis added.) This proposed revision raises several serious concerns.

In the absence of undefined "special circumstances" – i.e., routinely – the hearing must be scheduled seven days from the date of the regional director's service of the notice of hearing ("Notice") on the employer. Thus, the employer's Statement of Position must be filed (in the absence of unusual circumstances) within a maximum of seven days. But the time could be less than that, and as little as one day, if the regional director were to so specify in the Notice.

The Chamber submits that even the maximum allowed time of seven days – much less the as little as one day permitted by the proposed regulation – is wholly insufficient for the employer to file its Statement of Position. As the Board itself stated in the Supplementary Information in the NPRM, "Given the variation in the number and complexity of issues that may arise in a representation proceeding, the amendments do not establish inflexible time deadlines . . . ." 76 Fed. Reg. at 36187. But here in fact the proposed amendments do establish deadlines that are both inflexible and inadequate to address the "variation in number and complexity of issues that may arise".[10]

The inadequacy of the time allowed for the filing of the Statement of Position is most dramatically demonstrated in the case of small employers who, the Board's statistics suggest, make up at very large percentage of the employers involved in

---

[10] At the July 18-19 hearing, there was a great deal of testimony regarding the general inadequacy of the time frames in the proposed rules, including the unfairness of, and due process concerns raised by, the 7 day or less requirement for filing a position statement. *See* July 18-19 Transcript at pp. 69, 97, 120-122, 148, 160-163, 182, 195, 197, 210, 252, 253-254, 256, 258-259, 272-274, 277-278, 304, 306-308, 315, 319-321, 324-325, 363, 407, 409, 412 and 414.

representation proceedings. The median number of employees involved in Board elections during the past decade has ranged between 23 and 26 per voting unit. Of course, this means that half of the units were smaller than this median.

The likelihood is that these elections involve small employers who do not routinely employ labor counsel. The necessity of filing a Statement of Position in seven or less days is especially unfair to those employers because of the necessity of locating and identifying labor counsel who can assist the employer in identifying the numerous and complex issues which the Board itself understands are presented in representation proceedings.

Simply put, given an employer's other obligations, it cannot simply drop everything and tend to responding to a petition in such a short time frame, particularly without the assistance of counsel. Seven or less days is insufficient time on its face to locate and retain counsel, evaluate the issues and gather the information necessary to prepare and submit the Statement of Position. It amounts to a denial of due process for all employers, particularly small ones.

The prospect that the Statement of Position will be completed on the fly with the assistance of the hearing officer as the first order of business at the hearing does nothing to cure the due process problems created by the seven day or less deadline. The Chamber submits that it an NLRB hearing officer, who will create the record upon which disputed issues are decided, is hardly in a position to offer counsel to an employer that is anywhere near adequate and what the employer is entitled to – which is an attorney or other representative of its choice whose only interest is to advise the employer as to its legal rights and interests. Rather than solve the due process problem, the assistance of a

hearing officer merely verifies the need for the assistance without providing the proper assistant – counsel or other adviser chosen by the employer.

The denial of due process inherent in the seven day or less deadline is exacerbated by the fact that failure to comply with the deadline and furnish all the information called for in the Statement of Position will preclude the employer "from contesting the appropriateness of the petitioned for unit at any time and from contesting the eligibility or inclusion of any individuals at the pre-election hearing." §102.63(b)(v). Obviously, this preclusive effect makes it all the more necessary that employers be given sufficient time to identify and retain counsel or other advisers and devote the time necessary to properly understand and prepare the Statement of Position.

Under §102.66(c) of the proposed rules, the Statement of Position has another preclusive effect, *viz.*, preclusion of taking any position not articulated in the Statement of Position (with limited exceptions for Board jurisdiction and voter challenges). In this regard, the requirement that the Statement of Position contain the employer's position on a variety of issues noted above, including "all other issues the employer intends to raise at the hearing", heightens the importance of the Statement of Position and emphasizes the complete inadequacy of the seven day or less deadline, rising to the level of a denial of due process.

In addition, the preclusive effect of the Statement of Position is unfair to the extent that it will preclude the litigation of issues that were not apparent or reasonably foreseeable but which became so based on facts disclosed at the hearing or disclosed or occurring during the election process.

The net of the foregoing is this: the Statement of Position requires much information that is unnecessary and burdensome, requires that it be furnished in an inadequate amount of time with inadequate counsel, and has a harsh preclusive effect both for failure to file as well as failure to raise issues that may not be foreseeable or apparent. While the notion of defining what is genuinely at issue between the parties may not be a bad one, the method and timing of doing so under the proposed rules amounts to a denial of due process. It may very well cause employers to assert "kitchen sink" issues and defenses for fear of waiving any, and result in increased litigation and be the cause of delay, not efficiency.[11]

Nevertheless, if the Board goes forward with the promulgation of these rules, the Chamber submits that at a minimum the time for the submission of the Statement of Position should be lengthened, the information required be made less burdensome, and the preclusive effect substantially narrowed or eliminated.

**Voter List:** The proposed rule in part codifies the existing requirement that the employer provide a list of eligible voters. The Chamber would not generally object to the codification of existing requirements as developed with respect to the provision of so-called "Excelsior lists", pursuant to *Excelsior Underwear, Inc., supra,* 156 NLRB 1236 (1966) and its progeny. However, the Chamber does have objections to the changes made to existing law in the proposed rules with regard to various process issues (timing, format and service) and the content of voter lists.

---

[11] At the July 18-19 hearing a number of comments raised the concern that the unfairness of issue preclusion and the refusal to allow challenges of less than 20% of voters amounts to a lack of due process and will force parties to raise every possible issue, reduce election agreements and increase the number of hearings, attempted appeals to the Board, technical 8(a)(5) cases and re-run elections. *See* July 18-19 Transcript at 22, 66-67, 69-70, 76,98-99,107-108, 123, 182-185, 195-196, 201, 244-245, 306, 320, 413.

**Voter list process issues:**

*The Board's premise is faulty.* The Board asserts that "[t]oday, many, if not most, employers maintain electronic records," and that in order to comply with current legal requirements, and employer need only "print out a copy of their electronic records and provide a paper list to the regional office which, in turn, mails or faxes a copy to the other parties." 76 Fed. Reg. at 36820. In the Board's view, given today's technology, it would be simpler and faster for the employer to take the "print out" of its list and, rather than give it to the regional director for distribution to the other parties, have the employer send it electronically to the other parties. The Chamber submits that the Board's view of the process is overly-simplistic and is therefore a faulty premise upon which to base the proposed changes in existing law with respect to the provision of voter lists.

*Not all employers maintain electronic records.* While many employers may have access to the latest technology and keep extensive human resource records electronically, it is also true that many smaller employers do not routinely keep such records electronically.[12] Just as a digital divide exists between different age and socio-economic groups, so does it exist among employers of many different sizes and types. The Board itself recognizes this in two ways. First, the Board's assertion is that electronic records are kept by "many, if not most" – a measure which allows that a majority or a large minority of employers do not keep electronic records. Second, the Board allows an employer to certify that it does not possess the capacity to produce the voter list in the required form. We submit that this constitutes recognition of the fact that many if not most employers do not maintain personnel records in electronic form, or in a form

---

[12] *See* July 18-19 Transcript at pp. 183-184, 250-252; *see also* p. 406.

convenient for creating a list with the information in the electronic format required by the Board.

  ***Even employers who maintain electronic personnel records may not maintain them in a form containing the information required by the proposed rule.*** Even if an employer does maintain electronic personnel records, it is possible – we believe likely – that they are not maintained in such a manner as would allow the employer to simply "print out a copy." There may be some information, such as social security numbers and medical information, that would have to be manually redacted, while other information, such as email addresses, would have to be manually added.

  ***Two days is insufficient time for the creation and provision of the voter list.*** Many if not most employers will not have their personnel information stored electronically, or – even if they do – have it in a proper format for simply printing it out. Therefore, many if not most employers will have to create the voter list manually, not just "print out a copy". We believe it is self-evident that two days is simply an insufficient amount of time in all but the most unusual cases.[13]

  ***Smaller median unit sizes do not justify the two day requirement.*** The Board points to the fact that the median size of a voting unit for the last decade has been between 23 and 26 employees. However, this smaller size unit does not necessarily suggest that two days is sufficient time to collect and provide all of the information required in the usual case. It is the smaller employers whose are likely the very ones who do not have the personnel information electronically stored, or who will have to either manually revise electronically stored information or manually create the voter list from

---

[13] In addition to general objections regarding the time limits under the proposed rule, problems in complying with the proposed two day deadline for producing the voter list were voiced by a number of commenters at the July 18-19 hearing. *See* July 18-19 Transcript at pp. 183-184, 194, 274, 363, 366, 406.

non-electronic records. And it is the smaller employers who likely have the least available assistance in doing so and can least afford to drop everything else in order to create voter list on the fly. This in turn does not promote efficiency in the election process but may force errors and anomalies in the lists rendering them of less use to the union.[14]

*The restriction on use of the voter list is not served by making them electronically available.* The Board is undoubtedly aware of the ease with which electronic documents may be sent on a moment's notice to virtually anyone with very little control over their further disbursal or distribution. While no system is completely safe from this, certainly documents distributed by email, which do not require any scanning, photocopying or other steps to distribute them further, invite abuse of the system and unauthorized use of the information contained on the voter list. Thus, the Chamber submits that the current requirement in §102.114(i), that electronically filed documents be served by email "if possible", should not be applied to the voter list.[15]

**Voter List content issues:**

*Government action must be cognizant of personal privacy rights.* Personal privacy rights are of great concern to employees, probably more now than when voter lists were first required in the Board's *Excelsior* decision. Indeed, this was acknowledged at the July 18 session of the Board's hearing on this matter, in which the Chairman noted that the additional contact information that would be mandated under the proposed rule

---

[14] *See* July 18-19 Transcript at pp. 66-67, 147-148,195, 209-211, 250-252, 272-273, 277-278, 307-308, 319, 323-325, 412.

[15] The Board requested the parties to address what, if any, the appropriate sanction should be for a party's noncompliance with the restriction. 76 Fed. Reg. at 36821. The Chamber addresses this issue below.

was thought to be a preferable alternative to a personal visit at an employee's home. *See* July 18-19 Transcript at pp 76-77.

**The proposed rule exacerbates privacy concerns by requiring the provision of employees available email addresses and telephone numbers in addition to their home addresses.** All of us who use email know that unwanted email can be an irritant and sometimes, in the case of "phishing," a danger to privacy. Similarly, the unwanted solicitation call on the telephone has interrupted many a family dinner or evening of relaxation. We believe that these additional requirements will further subject unwilling employees to intrusions into their privacy.[16] Indeed, the "right to be let alone" is "the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment." *Olmstead v. United States,* 277 U.S. 438, 478 (1928) (dissenting opinion of Justice Brandeis).

**The balance between an employee's privacy and the employees' right to organize is not difficult to strike.** There need not be a struggle to balance the rights of employee privacy and employee organizing rights. Employees are entitled both to choose privacy and entitled to choose to know about the petitioning union and its programs. If they wish to have that information it should not be denied to them. But neither should it be forced on them. The Chamber submits that in modernizing the Board's election rules, the employees should be allowed to choose in what manner they wish to be contacted. This could be accomplished by two simple expedients.

---

[16] Privacy concerns were raised at the July 18-19 hearing. *See* July 18 -19 Transcript at pp. 62, 74-75, 77, 107-109, 112-114, 122, 344-348.

First, at the same time the voter list is due from the employer, after the region directs the election, the petitioning union could designate a web site that employees could visit on their own time to read and/or download union material, view union videos, engage in on-line chats with union representatives, and – if they wish – provide the union with personal contact information.[17] This puts the choice of actually showing interest and sharing personal and private information in the hands of the employees, where it belongs.

Second, the voter list should continue to provide only home addresses. This allows the union to communicate by mail in order to apprise the employees of the internet site as well as communicate with employees who do not have access to an internet connection. However, because of the privacy issues expressed above, home visits should be either eliminated or restricted to a single visit, on pain of having the election set aside. The final rule should also make clear that the employees may not choose to be contacted at, and the employer is not required to furnish, work email addresses and work telephone numbers.

The net of the foregoing is: There should be no change in the existing seven days given for the provision of the voter list with the information required, in the absence of an agreement by the employer to do so. There should be no change in the existing information provided on the voter list, other than to make it clear that home visits are either forbidden or restricted to a single visit, and that work emails and telephone numbers may not and need not be provided.

---

[17] Member Hayes queried whether there was a "mechanism that we might want to consider that would balance the interests of individuals' privacy" against the union's desire to communicate with them. July 18-19 Transcript at p. 359. We submit that the suggestion we have put forth is a viable one that addresses his query and the privacy concerns raised at the hearing. Indeed, one commenter at the July 19 hearing indicated that his bargaining unit was organized almost exclusively through a campaign web site that was identified to the employees, who visited the web site, downloaded their authorization cards and had access to information from the union. July 18-19 Transcript at pp. 384, 388.

**Voter eligibility issues:** The proposed rule would not permit a pre-hearing challenge to unit composition and voter eligibility unless the number of challenged voters exceeded 20% of the proposed unit. Indeed, if the only challenge asserted is to voters not constituting 20% of the unit, the hearing officer is directed to adjourn the hearing. The Chamber has serious concerns about this limitation.

Where it is unclear whether up to 20% of the voters will be in the bargaining unit, the voters are denied knowledge of the scope and make-up of the bargaining unit. This knowledge is important, particularly if the individuals are interested in knowing, for example, whether certain job classifications, certain individuals, or even they themselves will be included in the unit.

Unlike a civic election where the voters are electing another individual to hold an office for a term, a representation election binds the voters together – for better or for worse – in an exclusively represented bargaining unit. The Board should not change existing law. Employers (and unions) should be able to litigate their challenges in full at the pre-election hearing.[18]

Further, certain classifications of workers may not be combined in the same unit for Board certification. The Board is completely prohibited from certifying units of guards and non-guard employees; and professionals may only be combined with non-professionals if the professional agree in a secret ballot election to be so combined. It is unclear from the Board's proposed rules how such concerns will be addressed where the

---

[18] The importance of being able to litigate the challenges at the pre-election hearing was made clear by a number of commenters. Employers were concerned both about being able to fully litigate prospective challenges at the pre-election hearing, both to add clarity (if not certainty) to who would is considered a supervisor; so such issues will not be forced into what might already be contentious first contract bargaining; and also so the employees would know the unit in which they were to make a choice about union representation. *See* July 18-19 Transcript at pp. 26, 99-100, 110-111,123-131, 140-141, 239, 284, 364.

number of purported guards/professional workers amount to less than 20% of the proposed unit. We submit that an employer who objects on the basis that guard or professional employees are included in the unit should be permitted to assert such a challenge even if the number of professionals and/or guards does not constitute 20% of the unit. The proposed rules, if adopted, should be clarified to assure this.

**Timing of elections:** The avowed purpose of the proposed rules is to reduce the time between the date of the petition and the date of the election. In his dissent, Member Hayes stated that elections under the proposed regulations could be scheduled anywhere from 10 to 21 days following the filing of the petition. 76 Fed. Reg. at 36831. No witness or other Board member has refuted this estimate.

Many commenters at the July 18-19 hearing indicated that such a short time between the petition and the election would be wholly inadequate for employers to present their views and information to their employees concerning union representation, as contemplated by §8(c) of the Act, and would undermine the due process and free speech rights of both employers and employees.[19] The Chamber agrees with this. The shortening of the time between petition and the election contemplated by the proposed rules would undermine the free speech rights of employers guaranteed under section 8(c) of the Act; deny both employers and employees the free speech and due process to which they are entitled; and violate the recognized policy of the Act of promoting vigorous discussion and debate over the issues involved in union representation and collective bargaining. *See, e.g., Chamber of Commerce v. Brown,* 554 U.S. 60, 68 (Section 8 (c) of

---

[19] *See* July 18-19 Transcript at pp. 63, 160-162,194-195, 208-212, 253-254, 272, 285, 307, 315-316, 318, 323-324, 343-344, 390-392, 395, 424-426.

the Act manifests congressional intent to encourage free and robust debate on labor-management issues).[20]

**Limiting Board review:** The proposed rules virtually eliminate the rarely granted discretionary review procedures for pre-election regional office rulings by the Board, essentially as a by-product of the elimination or minimization of issues that are addressed at the pre-election hearing. The Chamber has set forth above its objections to the new proposed pre-hearing procedures. In addition to this back-loading of key representation issues to the post-election period, the Board also proposes eliminating review as a matter of right from such post-election decisions.

As justification for this proposal, the Board states that elimination of review as a matter of right will eliminate "the most significant source of administrative delay in the finality of election results."[21] This strongly suggests that the Board anticipates granting review in few if any cases. This amounts to no more than achieving so-called efficiency in the representation case process through the denial of due process rights of would-be petitioners and abdication of one of the Board's most important functions under the Act.

It is of little comfort that, as the Board notes, this proposed change "would leave a higher percentage of final decisions concerning disputes arising out of representation proceedings with the Board's regional directors who are members of the career civil service."[22] Will all due respect to the professionalism, experience and integrity of the Board's regional directors and their staffs – which we freely acknowledge and greatly appreciate – it is those very decisions of which the parties heretofore have had the right to

---

[20] On the other hand, there is general agreement among practitioners that the current representation procedures constitute a fair and reasonable balance between among the competing interests of the parties and that there is no justification or need for the proposed rules. *See* footnote 5, *supra*.
[21] 76 Fed. Reg. at 36827, footnote 56.
[22] 76 Fed. Reg. at 36827.

seek review. Saying employers should be happy with the diminution of the inability to have the decisions reviewed because, now, they will have to live with the decisions of which they previously could seek review, makes no sense.

But of course, employers have another course open to them to ensure review, and that is to refuse to bargain, commit a technical §8(a)(5) violation and litigate the regional office decisions in unfair labor practice proceedings. Having been denied the palliative of Board review as a matter of right, we submit that the strong likelihood is that employers will avail themselves of this process. To do so they must risk being found in violation of the law and further extend the period of uncertainty with respect to their legal obligations and interference with the normal operation of their business while they navigate the time consuming and expensive process of taking a case to the Board through the unfair labor practice process, and then possibly to federal court. Currently there are only a handful of such tests each year, but in agreement with a number of commenters at the July 18-19 hearing, the Chamber submits that there is a great likelihood that the number of cases will markedly increase, along with post-litigation Board proceedings, such as re-run elections.[23]

For these reasons, the Chamber objects to the elimination of review as a matter of right before the Board.

### **Specific Questions Raised by Board**

Below the Chamber states its position on each of the issues upon which the Board has specifically requested comments.

***Misuse of voter lists:*** As noted above, the Chamber does not believe that the voter list should contain anything more than it does now, *i.e.,* employee names and mailing

---

[23] *See* July 18-19 Transcript at pp. 76, 108, 195-96, 201, 244-245.

addresses. As an alternative the Chamber supports affording employees the opportunity to visit a union campaign web site for information and other purposes, including the possibility of disclosing any additional contact information the employee desires to disclose.

The Chamber has also stated above that because of privacy concerns and the possible abuse of personal information, which we believe the Board's inquiry recognizes, the transmission of voter lists by email should not be encouraged. Further, as noted above, the Chamber has suggested that union home visits be prohibited or restricted to a single visit.

Assuming the Board adopts a rule requiring prospective voter email addresses and telephone numbers (which we oppose), the Chamber submits that in order to give teeth to the restrictions on misuse of the voter list by the union, the possible following sanctions should be employed: (1) election set aside (if the union misused the list in the campaign and won the election); (2) an additional year ban on organizing in the unit affected (if the union misused the list in the campaign but lost the election); (3) six month ban on organizing generally (for misuse of the voter list in any other manner).

Member Becker suggested a sanction – baring voting list disclosure to the union in a subsequent petition. July 19 Transcript at p. 351. We believe some ban on organizing is a fairer and more effective sanction. This is because the ban on the disclosure of information in a subsequent petition will likely not be a great disincentive to a union – the fact of a subsequent petition suggests that the union will have found another way to obtain the information in needs to contact employees; otherwise the subsequent petition would not have been filed. Alternatively, the union could file a petition in a unit where it

was easy to obtain a 30% showing (e.g., in a unit of three persons) but not difficult or expensive to mount a campaign without the voter information, and thereby escape the sanction in a more important election. A ban on organizing or the setting aside of an election, on the other hand, gives maximum incentive for union vigilance and compliance with restrictions.

Additionally, we believe such sanctions should be "no fault." The union, having been given the information, would be liable for any subsequent misuse of the information. This gives the union maximum incentive to safeguard the information and limit distribution only to those who have a need to know and can be trusted with the information.  We also submit that consideration should be given to the union being required to destroy the voter lists and all copies it has made immediately following the election and certify to the Board that it has done so.

There remains the question of what constitutes misuse.  The Board had framed it as "barring parties from using [the voter list] for any purposes other than the representation proceeding and related proceedings."  76 Fed. Reg. at 36821. We submit that the Board should bar misuse along these lines, but have the following comments.

First, it seems possible that the voter list could be misused in the context of an election – e.g., for harassment or intimidation – such that all use of the voter list during an election should not be automatically given a pass.

Second, as discussed above, we believe that the union's liability should be "no fault", to give it maximum incentive to not distribute the voter list information except to those in whom it has the highest confidence.

Third, we are not certain what "related proceedings" the Board refers to, but would assume it means post-election proceedings at the region, the Board and the courts. Would "related proceedings" include any re-run election, and if so, under what circumstances?  What other related proceedings did the Board have in mind? How would this be squared with a union obligation to destroy the list and all copies immediately following the election?

Fourth, how would any ban on misuse be enforced?  How would a claim of misuse be brought to the Board's attention?

Because of these (and perhaps other) questions related to the meaning of "misuse" and the whole question of restrictions and the enforcement of restrictions on the use of the voter list, we urge the Board to issue a separate NBRM on this issue, beginning with an *advanced* notice of proposed rulemaking, following consultation with Board stake-holders.

***Feasibility and Fairness of Holding Hearing on Seven Days of Notice:*** The Chamber has noted above the impropriety of requiring the statement of position in seven or less days prior to the hearing. We believe that the scheduling of the hearing in seven days, particularly in conjunction with the statement of position, but even without it, is not feasible and not fair. This is particularly true for small employers, who appear to be involved in the majority of the Board's representation cases. We base this position on the significant feedback the Chamber has heard from our membership, which is buttressed by the testimony of the individuals who appeared and testified at the July 18-19 hearing.[24]

***The Impact that Blocking Charges Have on Alleged Election Delays:*** The Board's blocking charge policy holds in abeyance the processing of a petition "where a

---

[24] *See* footnote 7, *supra.*

concurrent unfair labor practice charge is filed by a party to the petition and the charge alleges conduct that, if proven, would interfere with employee free choice in an election, were one to be conducted." *NLRB Casehandling Manual* § 11730 *et seq*. In other words, the Board will refuse to conduct an election while union unfair labor practice charges against are pending. The rationale is that the charges, if true, would destroy the "laboratory conditions" necessary to permit employees to cast their ballots freely and without restraint or coercion. *See Master Slack Corp.*, 271 NLRB 78, 79 (1984).

This "blocking charge" practice is not governed by statute or even by formal rules or regulations. 76 *Fed Reg*. 36827. Instead, its adoption and use lies within the Board's discretion to effectuate the policies of the Act. *See American Metal Prods. Co.*, 139 NLRB 601, 604 (1962); *see also NLRB Casehandling Manual* § 11730 *et seq*. Unfortunately, labor unions often take advantage of the Board's "blocking charge" policy in order to delay or frustrate employees' decertification or deauthorization efforts, or employers' RM petitions. *See, e.g., Shaw's Supermarkets, Inc.*, 350 NLRB 585, 589 (2007)(noting that with regard to decertification petitions, "in many cases, blocking charges are filed and delay the election until the charges are resolved"); *Levitz Furniture Company*, 333 NLRB 717, 732 (2001)(Hurtgen concurring)(stating that "[f]aced with an RM petition, unions can file charges to forstall [sic] or delay the election"). This is despite the fact that the Board's Casehandling Manual specifically states that the blocking charge policy "is not intended to be misused by a party as a tactic to delay the resolution of a question concerning representation raised by a petition. Rather, the blocking charge policy is premised solely on the Agency's intention to protect the free choice of employees in the election process." *See* CHM § 11730.

Although the NPRM does not expressly blame employers for any alleged election delays, many union representatives raised such allegations during the Board's hearing on July 18 and July 19. *See, e.g.*, Elizabeth Bunn, Organizing Director of AFL-CIO, July 19, pg. 290, 8-9. ("The truth is that employers are able to exercise too much control over the timing of the election"); Margaret McCann, AFSCME,  July 18-19, pg. 166, 9-10 ("The Board processes as they exist today have become hijacked by the employers"). However, because the blocking charge policy is inherently and specifically intended to delay representation elections, it is incumbent upon the Board to examine the extent to which its blocking charge policy creates "unnecessary barriers to the fair and expeditious resolution of questions concerning representation." 76 Fed Reg. 36812. The Board has not done so.

This lack of analysis is unfortunate. We conducted a quick review of existing case data for one year.[25] This review revealed that, of the 72 representation cases in which there were at least 100 days between the filing of the petition and the actual election, 31 of those cases – almost half – involved decertification, deauthorization or RM elections. These types of elections, in contrast to RC elections, are likely to be accompanied by blocking charges. Indeed, in 26 of these 31 cases, at least one unfair labor practice charge was filed by a union against an employer at some time between the filing of the petition and the election.

A closer analysis of this very limited data reveals many examples of cases in which union blocking charges were at least partly responsible for a delay in the scheduling of an election. For example, in *Pioneer Plastics* (1-RD-02134), employees

---

[25] To perform this analysis we downloaded, from www.data.gov, the 2009 CATS data for R cases. That data revealed 1145 separate election cases.

filed a decertification petition on August 24, 2009. The union filed an unfair labor practice just one day later, and the Board spent months investigating the charges. On October 28, 2009, the Board approved the union's withdrawal of the charges. The election was held 37 days later – 102 days after the filing of the decertification petition. Thus, the union's blocking charges (which did not result in a complaint) played a significant role in delaying the employees' secret ballot election.

Similarly, in *Alan Ritchey* (19-UD-00605), employees filed a deauthorization election petition on November 23, 2009. Unfair labor practices were filed against the employer just a few days later on December 4, 2009. The Regional Director investigated the charges for about two months and dismissed the case on January 28, 2010. The election was then held 34 days after dismissal of the unfair labor practice charges, which was 100 days after the petition was initially filed. Additionally, in *Training & Rehabilitation Development Institute* (28-RD-0099), 133 days passed between employees filing of a decertification petition and the eventual election. It is probable that unfair labor practices – which were filed four days after the decertification petition was filed – played a role in the delay. Indeed, upon withdrawal of the unfair labor practice charges, the election was held within 41 days.

Obviously, this is a limited analysis. If the Board allowed more time for the filing of comments, and provided the public with sufficient data, a more comprehensive examination of the impact of blocking charges on election delays could be performed. However, while the Chamber and other interested stakeholders are constrained by these time and information limitations, no such restrictions applied to the Board when it drafted

the NPRM. The Board's lack of analysis on this vital issue is not only a concern, but also calls into question the entire basis for the rulemaking proposal.

To press forward in this hurried rulemaking, without truly investigating what is the likely cause of much if not most of any R-case delay, is simply bad policy. Accordingly, the Chamber submits that while it believes blocking charges are the cause of much if not most of any significant election delay in representation cases, the Board should have focused on this and other identifiable delay factors rather that proceed with the broad brush approach it has initiated. Rather than continue with the NPRM, the Board should withdraw it and start anew, focusing its study and resources on the real causes of such delay as there is, including blocking charges, in conjunction with a new, *advanced* notice of proposed rulemaking, following consultation with Board stake-holders.

***Electronic Signatures****:* The Board has asked the parties to address whether electronic signatures should be allowed to support a showing of interest. It is difficult to comment positively about this suggestion, given the lack of detail about just what is meant by the use electronic signatures. Would the electronic signature consist of a simple (and anonymous) click in a "yes" or "accept" box on an electronic organizing card, or a more complex electronic "key" identifiable and useable only by the particular user, or some other type of electronic signature format? Would target employees likely have the necessary technological expertise, hardware and software? If all do not, would the showing of interest be an amalgam of electronic and physical signatures? If so, would that diminish rather than enhance efficiency? What types of controls would exist to ensure that a showing was based on real rather than fraudulent "signatures," such that the agency would utilize its resources to respond only to bona fide showings of interest?

Given these myriad unanswered questions (and there are probably more), the Chamber would oppose allowing the electronic signatures unless and until the Board publishes a separate, specific and detailed proposal on them, including the circumstances under which any use of electronic signatures would be justified and details on how the integrity of electronic signatures would be ensured and insulated from fraud, intimidation and coercion.[26] It is strongly urged that if the Board does so, it should first publish an advanced notice of proposed rulemaking based on prior consultations with all stakeholders.

**Studies Relied on by Rule Supporters Suffer From Serious Flaws**

Supporters of the Board's proposal have relied on numerous studies and reports that, unfortunately, suffer from very serious flaws. It is important that the Board recognize these flaws before it considers relying on the conclusions that some have drawn from these studies. Before reviewing the individual studies and reports, it is important to note that the arguments by rule supporters appear to be following a familiar script. With private sector union density now below 7 percent, organized labor has pushed for policy changes that will make union organizing easier, regardless of whether American workers desire union representation or not. A principal part of their campaign is demonizing employers as well as the National Labor Relations Act.

In support of their policy agenda, allies of organized labor frequently cite various studies to support the claim that employer coercion, flawed labor law, and flawed Board processes stifle a considerable but unrealized demand for union representation. In this section of our comments we examine several of the studies most often relied upon to support the proposed rule and other policy changes organized labor seeks, such as

---

[26] *See* July 18-19 Transcript at 184, 361-362.

effectively doing away with Board supervised elections through the Employee Free Choice Act. The conclusion that we draw is that these studies lack sufficient credibility and analytical rigor to justify any labor policy changes.[27]

**Bronfenbrenner-Warren**

Among the most frequently cited papers are those produced by Cornell professor Kate Bronfenbrenner, including the 2000 report *Uneasy Terrain: The Impact of Capital Mobility on Workers, Wages, and Union Organizing*, the 2009 report *No Holds Barred-The Intensification of Employer Opposition to Organizing*, and the most recent report co-authored with Professor Dorian Warren, *The Empirical Case for Streamlining the NLRB Certification Process: The Role of Date of Unfair Labor Practice Occurrence*.

*No Holds Barred* concludes that a "coercive and punitive climate for organizing" undermines employee free choice in choosing union representation and necessarily dictates "serious labor law reform."[28] According to Bronfenbrenner:

> Our findings suggest that the aspirations for representation are being thwarted by a coercive and punitive climate for organizing that goes unrestrained due to a fundamentally flawed regulatory regime that neither protects [workers'] rights nor provides any disincentives for employers to continue disregarding the law. Moreover, many of the employer tactics that create a punitive and coercive atmosphere are, in fact, legal. Unless serious labor law reform with real penalties is enacted, only a fraction of the workers who seek representation under the National Labor Relations Act will be successful. If recent trends continue, then there will no longer be a functioning legal mechanism to effectively protect the right of private-sector workers to organize and collectively bargain.[[29]]

---

[27] For a more detailed analysis, see *Union Studies of Employer Coercion Lack Credibility and Integrity*, a white paper produced as part of the U.S. Chamber's series *Responding to Union Rhetoric: The Reality of the American Workplace*, published in 2009 during the debate over the Employee Free Choice Act and available at: http://www.uschamber.com/reports/responding-union-rhetoric-reality-american-workplace.

[28] Kate Bronfenbrenner, *No Holds Barred-The Intensification of Employer Opposition to Organizing*, May 20, 2009 at 1, Economic Policy Institute Briefing Paper #235, *available at* http://www.epi.org/publications/entry/bp235/.

[29] *Id.* at 3.

Although *No Holds Barred* claims to be a "comprehensive analysis" based on "unique and highly credible information," the methodologies and analytical framework of Bronfenbrenner's piece are inherently flawed. For example, the primary source of the anecdotal "evidence" Bronfenbrenner used to support her conclusions comes from "in depth surveys with the lead organizers" involved in the organizing campaigns included in the "NLRB election sample" of approximately 1000 NLRB elections conducted between 1999 and 2003.[30] Using the lead union organizers involved in these campaigns can hardly be considered using unbiased sources. To the contrary, the lead organizers would have every incentive to exaggerate and falsify the data provided to Bronfenbrenner in order either to provide excuses for their failure to win the underlying election or to promote the goals of organized labor to secure labor law reforms designed to make organizing easier. Yet, Bronfenbrenner fails to even consider the possible bias of lead union organizers as a primary source.

Although she relies without reservation on union organizers as a primary source, Bronfenbrenner abruptly dismisses employers as a countervailing source—claiming employers would likely falsify any information provided because "the overwhelming majority of employers are engaging in at least one or more illegal behaviors."[31]

According to Bronfenbrenner:

> Not only would it be next to impossible to get employers to complete surveys in which they honestly reported on illegal activity, but that kind of question would not be permitted by university institutional review boards since it might put the subjects at risk of legal action.[32]

---

[30] *Id*. at tbl. 1.
[31] *Id.* at 5-6.
[32] *Id.* at 6.

Bronfenbrenner immediately ascribes dilatory motives to employers and conveniently dismisses any information employers could provide to contradict the presumptions and anecdotal evidence provided by the supposedly unbiased union organizers. Such open and unfounded hostility and bias discredits any analysis and conclusions that flow from the data.

Nevertheless, in response to critics who question the reliability of using union organizers as a data source, Bronfenbrenner claims the data they provide is supported by "NLRB decisions and transcripts, primary campaign documents, first contracts, and newspaper reports"—the likely sources of which are the very union organizers themselves.[33] Such circular reasoning hardly rehabilitates her study's credibility.

The latest study, *The Empirical Case for Streamlining the NLRB Certification Process*, appears to suffer from the same flaws. In addition to the flaws above, it is important to note that the study does not focus on actual unlawful conduct, but instead on allegations of unlawful conduct. Perhaps to account for this, Bronfenbrenner and Warren attempt to classify "serious allegations won." However, "won" appears to be defined to include not only cases where the Board or a court has ruled against the employer, but all settlements. As the Board well knows, a settlement does not indicate an admission of guilt, as many employers decide to enter into settlement agreements not because they believe they have engaged in wrongdoing, but because they would prefer not to invest the time and resources in litigating the particular issue. Given the very high number of Board cases that settle, this data appears to tell little.

---

[33] *Id.* at 5.

***Schmitt and Zipperer***

Many of the prominent pro-union studies purporting to find widespread employer coercion are at direct odds with NLRB data. One such study is *Dropping the Ax: Illegal Firings During Union Election Campaigns, 1951-2007*, written by John Schmitt and Ben Zipperer.[34] Like Bronfenbrenner, Schmitt and Zipperer conclude that nearly a quarter of union campaigns include an illegal firing.[35] Moreover, Schmitt and Zipperer conclude that individual pro-union workers run a 1.4 to 1.8 percent risk of being unlawfully fired by their employers.[36]

In examining these inflated claims, the devil is indeed in the details. As discussed in an analysis by David L. Christlieb and Allan G. King, published in June 2007, the startling conclusions found in *Dropping the Ax* are drawn from a fundamentally flawed methodology.[37] To calculate the "crude probability" that a pro-union employee will be illegally terminated during a campaign, Schmitt and Zipperer use a complex mathematical formula:

> They begin with the total number of cases closed by the NLRB in a given year in which employees were offered reinstatement… and assume… that (1) every offer of reinstatement remedies an unlawful firing. They next assume (2) that 51 percent of these cases arose during election campaigns and (3) that, on average, 2.2 workers were reinstated in each case closed by an offer of reinstatement. Thus, they multiply these three numbers to estimate the total number of workers illegally fired in connection with a union election campaign in a given year. Schmitt and Zipperer then divide this by the total number of workers who voted in favor of a union in a union election that year.[38]

---

[34] John Schmitt & Ben Zipperer, *Dropping the Ax: Illegal Firings During Union Election Campaigns, 1951-2007*, Center for Economic Policy Research (2009), *available at* http://www.cepr.net/documents/publications/dropping-the-ax-update-2009-03.pdf.

[35] *Id.* at 1.

[36] *Id.*

[37] David L. Christlieb and Allan G. King, *The Perils of Union Activism Have Been Greatly Exaggerated*, Littler Mendelson (2007), *available at* http://www.littler.com/PressPublications/Documents/16586.pdf.

[38] *Id.* at 2.

The most glaring flaw in the above methodology is the assumption that an offer of reinstatement is tantamount to an admission by the employer of an unlawful termination. According to the NLRB statistics reported for 2005 (the year analyzed in *Dropping the Ax*), nearly 90 percent of the offers of reinstatement were settled with no determination by the Board, or any judicial or administrative body, regarding the merits of the charged unfair labor practice.[39] Schmitt and Zipperer simply ignore the (admittedly unknowable) number of settlements prompted by an employer's desire to avoid legal expenses, reputational damage, or workplace unrest. Furthermore, their methodology gives no weight to the non-admission clauses that are often part of informal settlements. Had the authors only counted the reinstatement cases where a neutral found that an employer had made an illegal firing, the key statistic (the chance of a given union supporter being illegally terminated) drops to around one-tenth of the reported 1.4 – 1.8 percent statistic (itself not even an alarming level).

The second assumption on which *Dropping the Ax* rests, that 51 percent of reinstatements remedy unlawful firing occurring in the context of a union campaign, is also clearly flawed for several reasons.[40] Relying on 52-year-old and 27-year-old samplings of NLRB adjudications, Schmitt and Zipperer develop the 51 percent statistic from cases that were adjudicated by the Board. They then go on to apply that factor to every unfair labor practice charge, adjudicated or settled.

More telling is the fact that current NLRB statistics render the old and misapplied statistics used by Schmitt and Zipperer unnecessary. The NLRB maintains a database

---

[39] *See Seventieth Annual Report of the National Labor Relations Board*, tbl. 4–*Remedial Actions Taken in Unfair Labor Practice Cases Closed, Fiscal Year 2005* (2005), *available at* http://www.nlrb.gov/sites/default/files/documents/119/nlrb2005.pdf.
[40] *See* Schmitt and Zipperer, *supra* note 33, at 5.

called the Case Activity Tracking System (CATS) that records which unfair labor practice charges are associated with union election campaigns. In 2005, CATS data showed that only 62 of the reinstatement cases were campaign-related.[41] By comparison, Schmitt and Zipperer assumed that 521 of the same cases were campaign-related.[42] Obviously, this disparity has a significant impact on the bottom line conclusions found in *Dropping the Ax*. Had the authors chosen to plug the current and available NLRB data into their methodology, their conclusion that a given union supporter has a 1.4–1.8 percent chance of being terminated would have plummeted to 0.16–0.2 percent.

To complete the analysis, if voluntary settlements were excluded from the equation and the CATS statistics were used to replace the outdated and misapplied sampling of NLRB adjudications, *Dropping the Ax* would draw a very different conclusion, replacing 1.4–1.8 percent with a 0.13 percent probability that a pro-union worker will be terminated during a union campaign.

### Union Attacks on Employer Consultants

The pro-union reform drumbeat has often focused on the supposed disparity between the pro-union workers attempting to secure union representation and management who hire consultants to assist them in responding to union organizing.[43]

Most critics of employers' use of consultants cite to the work of John Logan, currently affiliated with San Francisco State University and the University of California-Berkeley Labor Center and previous affiliated with the London School of Economics,

---

[41] J. Justin Wilson, *An Analysis of Current NLRB Data on Unlawful Terminations During Union Organization Campaigns, 2007 to 2008*, Center for Union Facts (Feb. 26, 2009).

[42] *Id.*

[43] For example, the AFL-CIO's Elizabeth Bunn, during the July 19 public meeting, referenced employers hiring "unscrupulous consultants." Transcript at p. 290. *See generally,* Gordon Lafer, *Neither Free Nor Fair: The Subversion of Democracy Under NLRB Elections,* American Rights at Work (2007), *available at* http://www.americanrightsatwork.org/dmdocuments/ARAWReports/NeitherFreeNorFair.pdf.

who has written extensively on this issue. Representative of his writings are two papers, *Consultants, lawyers, and the 'union free' movement in the USA since the 1970s*[44] and *The Union Avoidance Industry in the United States*.[45] Logan's work describes the growth of the use of consultants by employers faced with organizing campaigns and describes numerous tactics that these consultants have reportedly used over the last four decades.

To be sure, Logan describes some tactics that are illegal and reprehensible. For example, he claims that "[s]ome consultants tell employers to fire a few union activists … and teach them how to make these terminations appear legitimate."[46] However, many of the tactics Logan describes are perfectly legal and are tactics that most neutral observes would likely agree are perfectly legitimate. For example, he describes as consultant "propaganda" information about what is in a union's constitution and information related to union dues requirements.[47] Likewise, he is critical of employers informing employees about some of the basic legal consequences of unionization, such as surrendering the right to deal directly with management.[48]

The credibility of Logan's, and similar work, is significantly damaged by its failure to distinguish between legal and illegal conduct, perhaps because many within

---

[44] John Logan, *Consultants, lawyers, and the 'union free' movement in the USA since the 1970s,* 33 INDUS. REL. J. 197 (2002), *available at* http://www.americanrightsatwork.org/dmdocuments/OtherResources/Logan-Consultants.pdf.
[45] John Logan, *The Union Avoidance Industry in the United States*, 44 BRIT. J. INDUS. REL. 651 (2006), *available at* http://www.americanrightsatwork.org/dmdocuments/OtherResources/JohnLogan12_2006UnionAvoidance.pdf.
[46] Logan, *supra* note 43, at 207.
[47] *Id.* at 203.
[48] *Id.*

organized labor believe employers should have no role in union organizing campaigns[49] and that employer free speech should be abolished.[50]

### The Claim of Unrealized Demand

One of the most common refrains repeated throughout the pro-"reform" studies is that an overwhelming number of American workers would join a union today, if not for significant employer coercion and intimidation and a desperately flawed NLRB election process that combine to preclude employees from exercising their rights and desire to join a labor union.[51] This theory rests on two premises. First, it assumes that a substantial percentage of nonunion workers would prefer to be represented by a union. Second, it assumes that union density should necessarily be higher to reflect this unrealized demand. As explained below, both of these premises are flawed.

The first fundamental premise is an alleged unrealized demand for unionization. According to the Bureau of Labor Statistics, in 2010 the union density in the private sector was 6.9 percent.[52] Advocates of reform, however, argue that significantly more nonunion workers would prefer to be represented by a union. As support for this premise, pro-"reform" advocates most frequently cite to polling data from Peter D. Hart and Associates. For example, this data is central to the 2005 AFL-CIO Issue Brief *The Silent War: The Assault on Workers' Freedom to Choose a Union and Bargain Collectively in*

---

[49] *See, e.g.,* Craig Becker, *Democracy in the Workplace: Union Representation Elections and Federal Labor Law,* 77 MINN. L.REV. 495, 585-87 (1993).

[50] For example, the AFL-CIO's International Union Department included repeal of section 8(c) of the NLRA in its recommendations to the Commission on the Future of Worker-Management Relations. *See IUD Sets Bold Agenda for Workplace Rights: Economic Empowerment and 'Democracy on the Job'*, at 2 (1994), *available at* http://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?article=1412&context=key_workplace.

[51] *See, e.g.,* statement by Ross Eisenbrey at the July 18 meeting, transcript, p. 102.

[52] *Union Members in 2010,* Bureau of Labor Statistics, U.S. Department of Labor (Jan. 21, 2010), *available at* http://www.bls.gov/news.release/union2.nr0.htm

*the United States.*[53] As characterized by the AFL-CIO, the Hart polling found that "53 percent of nonunion workers—in other words, 57 million workers—want a union in their workplace."[54]

However, Peter D. Hart and Associates are hardly the only pollsters examining employee attitudes toward organized labor. When examining polling results conducted by organizations without such close ties to organized labor, it is clear that Hart's results are outliers. According to a September 2006 random nationwide survey conducted by Zogby International,[55] when non-union members were asked to decide if they would vote for a union if an election were held at their workplace tomorrow, 40 percent stated they would definitely vote against a union and 18 percent would probably vote against a union.[56] Only 13 percent would definitely vote for a union and only 22 percent would probably vote for a union.[57] That is, 58 percent of respondents expressed some level of opposition to having a union in their workplace, while only 35 percent indicated some level of support for a union.

A July 2005 Zogby poll reached similar findings.[58] In that poll, 38 percent stated they would definitely vote against a union if an election were held at their workplace tomorrow and 18 percent would probably vote against a union, while only 16 percent of workers surveyed would definitely join a union, and only 19 percent would probably join

---

[53]  AFL-CIO Issue Brief, Sept. 2005, *available at*
http://www.aflcio.org/joinaunion/how/upload/vatw_issuebrief.pdf
[54] *Id.* at 14 (citing Peter D. Hart Research Associates, Study No. 7518, AFL-CIO Union Message Survey, Feb. 2005 (unpublished)).
[55] *Employees' Perceptions of Labor Unions*, Zogby International (Sept. 2006), *available at*
http://www.psrf.org/info/Nationwide_Attitudes_Toward_Unions_2006.pdf.
[56] *Id.* at 9.
[57] *Id.*
[58] *The Attitudes and Opinions of Unionized and Non-Unionized Workers Employed in Various Sectors of the Economy Toward Organized Labor*, Zogby International (Aug. 2005), *available at*
http://www.psrf.org/info/Nationwide_Attitudes_Toward_Unions_2005.pdf.

a union – a clear majority of 56 percent opposed to having a union against only 35 percent wanting one.[59]

A March 2009 Rasmussen poll found that only nine percent of non-union workers would like to join a union and that 81 percent would not.[60] Finally, on the opposite end of the spectrum from the Hart poll is a 2009 poll conducted by the Opinion Research Corporation for the Center for Union Facts, which revealed that 82 percent of surveyed employees, who were not in a union and did not have an immediate family member in a union, would not want their own job unionized.[61]

These independent polling numbers are consistent with polling data regarding worker job satisfaction. Karlyn Bowman, a senior fellow at the American Enterprise Institute, annually compiles a comprehensive report on workers' attitudes towards their employers, which tracks polling data from multiple sources.[62] Five separate polls (Gallup 2008, National Opinion Research Center (NORC) 2006, CBS/NYT 2005, Harris 2002, and Center for Survey Research 2001) all revealed overall job satisfaction numbers ranging from 87 percent to 90 percent.[63]

In addition to the polls being remarkably consistent in their job satisfaction findings, the polls have reached consistent findings over time. For instance, the Gallup poll first began its poll in 1989 and, at that time, found a job satisfaction number of 89

---

[59] *Id.* at 6.

[60] *Just 9% of Non-Union Workers Want to Join Union*, Rasmussen Reports (March 16, 2009), *available at* http://www.rasmussenreports.com/public_content/business/jobs_employment/march_2009/just_9_of_no n_union_workers_want_to_join_union.

[61] *Americans Overwhelmingly Reject Unionization*, Opinion Research Corporation (Feb. 4, 2009), *available at* http://server1.laborpains.org/wp-content/uploads/2009/02/pensionunionfactspolltopline.pdf.

[62] Karlyn Bowman, *The State of the American Worker* at 3, American Enterprise Institute (2008), *available at* http://www.aei.org/docLib/200408301_work14886.pdf. *See also*, U.S. Chamber of Commerce White Paper *The Truth about American Workers: They are Satisfied, Respected, and Benefiting from Productivity Gains* (2008), *available at* http://www.uschamber.com/assets/labor/unionrhetoric_workers.pdf (discussing Bowman's findings).

[63] Bowman, *supra* note 61, at 3-5.

percent.[64] The NORC poll began in 1972 and found a job satisfaction number of 86 percent.[65]

A 2008 Gallup Poll also found high satisfaction rates among workers as to specific key aspects of their jobs – relations with co-workers (96 percent), amount of required work (87 percent), flexibility of hours (87 percent), boss or immediate supervisor (79 percent), amount of vacation time (78 percent), money earned (73 percent), on-the-job stress (69 percent), chances of promotion (68 percent).[66]

In addition to relying selectively on polls that fit their needs, union advocates frequently draw unwarranted inferences from these polls regarding what the union density rate should be. A 2007 paper produced by American Rights at Work stated:

> [O]pinion polls have consistently shown that roughly one-third of non-union workers wish they had a union in their workplace. If creating a union simply followed the will of workers, an additional 40 million Americans would have union representation.[67]

In testimony during the Board's meeting on July 18th, the Economic Policy Institute's Ross Eisenbrey made a similar comment. Mr. Eisenbrey stated:

> Union representation in the private sector has fallen from about 30 percent of workers in 1970 to 7 percent today. This decline didn't reflect the preferences of the employees. Polling over that time reveals that 30 to 50 percent of non-union workers wanted a union but didn't get one.[68]

Of course, even assuming these numbers are accurate, the flaw in their conclusion – that if one-third of non-union workers wish to join a union, this should equate to an increase of the union-density rate equal to one-third of the workforce – is obvious; it

---

[64] *Id*. at 3.
[65] *Id*. at 5.
[66] *Id*.; *see also* Lydia Saad, *U.S. Workers' Job Satisfaction is Relatively High*, The Gallup Poll (2008).
[67] Lafer, *supra* note 42, at 39.
[68] July 18-19 Transcript at 102.

ignores the fact that under the NLRA, a majority of employees must vote in favor of unionization for a bargaining unit to be certified.

Therefore, if only one in three workers across the U.S. wish to join a union, the proposed bargaining unit would have to be comprised of a disproportionate number of pro-union workers for the union to be certified. Further, not all of the non-unionized workers who may wish to join a union would be able to do so, because the majority of the workers at their workplace may not share their desire. Accordingly, the fact that 7 percent of the American workforce is currently unionized is appropriate and consistent with other polling data that shows a strong majority of workers are not supportive of having a union.

### National Employment Law Project

During testimony at the Board's July 18th meeting, Christine Owens testified that "low wage workers experience high rates of workplace violations." She further noted "among workers who did complain or try to form a union, 43 percent were subjected to retaliation."[69] These comments appear to be based on the National Law Employment Project's 2009 report, *Broken Laws, Unprotected Workers: Violations of Employment Laws in Americas Cities*.[70] However, because the report comingles retaliation under antidiscrimination and other employment laws with anti-union retaliation, no conclusion may be drawn about employer conduct during organizing campaigns.

In sum, the research and studies being used by supporters of the NPRM suffer from serious methodological and other flaws. There reports simply do not support the significant changes in policy proposed here by the Board.

---

[69] July 18-19 Transcript at 94-95.
[70] Available at: http://www.nelp.org/page/-/brokenlaws/BrokenLawsReport2009.pdf?nocdn=1.

## Inadequate Regulatory Flexibility Act Analysis

The Board has asserted that the proposed rule, if promulgated, would not have a significant economic impact on a substantial number of small entities. In its analysis, the Board first concludes that the rule would not affect a substantial number of small entities. It also concludes that the rule would not have a substantial economic impact on those small entities that it does impact. The Board's analysis is wrong on both counts and suffers because the assumptions it has made appear to be arbitrary and not based on any empirical evidence, studies, surveys or similar research.

### *The Rule Will Impact A Substantial Number of Small Entities*

In concluding that the rule changes contemplated by the proposal would not impact a substantial number of small entities, the Board concedes that "there are approximately six million private employers in the United States, the vast majority of which are classified as small entities" and that "nearly all those employers are subject to the Board's jurisdiction."[71] However, the Board then states that no significant number of small entities would be affected because the Board assumes that the only affected entities would be only those that are the subject of a petition for a representation election each year. This is quite an assumption.

Clearly, many employers will familiarize themselves with the Board's new rules, should they be promulgated, regardless of whether they will be subject to a representation proceeding. Many employers take the time to train supervisors and staff on the law and how they should respond to situations that may arise. While the limited time permitted to respond to the proposed rule changes has not permitted us to calculate a statistically valid survey, from surveying a handful of major law firms that provide seminars to clients

---

[71] 76 Fed. Reg. 36833.

regarding NLRA representation issues, it appears that in fact a majority of those that take time to attend these seminars and become educated about representation proceedings are unlikely to work at a facility that will be the subject of a representation proceeding in any particular year.

Indeed, if the proposal is adopted it is likely that even more employers would train their staff on NLRB processes regardless of union campaign activity because they would have less time to respond once they received a petition. We do not know how many employers would undertake such efforts, but the Board has assumed that none would. Indeed, the Board assumes that no employer would even read the rules unless it is subject to a petition (as no estimates are made for the time employers would need to read and familiarize themselves with the rules).

In order to properly satisfy the requirements of the Regulatory Flexibility Act, it is incumbent upon the Board to estimate the costs that the rule would have on employers even if they are not subject to a petition, including education and training costs. The Board has not undertaken any efforts to identify any such costs and has simply assumed they are nonexistent.

***The Proposal Does Not Adequately Account for Costs Small Entities Would Bear***

In addition to entirely ignoring the costs that the proposed rule would have on the majority of employers in the United States, the Board significantly underestimates the costs that the proposal would have on those employers that the Board acknowledges would be impacted. Magically, the Board concludes such costs will be "de minimus" even though it has engaged in absolutely no effort to calculate those costs. For example, the Board observes that the proposed rule would require the "mere" posting of paper

copies of notices and "taking the few minutes to electronically distribute electronic versions of those notices . . . ."[72] These burden estimates appear out of thin air.

This lack of consideration and study is simply not sufficient for conducting an analysis under the Regulatory Flexibility Act. Instead, it is incumbent upon the Board to develop data regarding the actual time that an employer would consume understanding its legal obligations and complying with them, including understanding when are where such notices must be posted, the staff time spent organizing the materials and physically posting them, the average pay level of the type of employees that would typically post such notices or supervise their placement, and so forth. The Board has made absolutely no effort to calculate actual burden estimates.

Perhaps most egregious are the Board's assumptions about the new Statement of Position. The Board dismissed the burdens imposed by this new requirement by (1) suggesting employers might avoid costs by foregoing their right to a hearing and entering into an agreement for a stipulated election, (2) stating that the form merely "reduces to writing the positions on several issues that it would need to formulate, in any event, to effectively prepare for a pre-election hearing," and (3) arguing that the additional information that is to be supplied should already be contained in employers' records. Again, nowhere has the Board attempted to identify the burden costs to employers that would be imposed by these new mandates.

Further, the Regulatory Flexibility Act analysis totally ignores the new legal importance attached to the Statement of Position by the proposed rule. The Board cannot now radically alter the legal significance of the initial positions taken by the employer (for example, by precluding the employer from raising issues not raised in the Statement

---

[72] 76 Fed. Reg. 36834.

of Position) and then assert that the new burdens are merely reducing current tasks to writing. Such an analysis fails on its face. It should be obvious that employers are likely to spend significantly more resources developing their Statement of Position under the new rules given the legal significance of that document. In considering the burden hours the new mandate would impose, the Board must also consider costs incurred because the employer will need to take time away from other priorities in order to create the Statement of Position. Again, the short time limits imposed by the Board for responding to its proposal have not permitted us to craft appropriate cost estimates, but if the Board is to complete a satisfactory analysis under the Regulatory Flexibility Act, then it must do so.

Finally, based on the compressed time frames, the possibility of issue preclusion, and the likelihood of additional litigation and other proceedings resulting from the proposed rules, the Board has failed to take into account the additional legal costs that will almost certainly be incurred by employers in order to protect their interests and achieve some modicum of due process through the courts, if not from the Board.

It is clear that the Board has failed to comply with the Regulatory Flexibility Act by its assumption that employers not subject to an election in any one year would bear absolutely no costs and by dramatically underestimating costs for the employers that the Board acknowledges are affected. Further, the fact that the Board did not include any actual burden estimates, and instead based its entire analysis on assumptions, means the analysis must fail. It is incumbent upon the Board to complete an initial regulatory flexibility analysis and publish the analysis for notice and comment before it can proceed with the rulemaking.

## Conclusion

The Board's NPRM is unwarranted. It has been pursued through a flawed administrative process. It proceeds not because of any evidence the current Board procedures are not working fairly and efficiently, but because union adherents and their allies in academia want it to proceed. To the extent there is delay in a small minority of representation cases, the Board has neither identified its cause nor proposed a solution. Instead, the Board has undertaken a wholesale revision of procedures which have served the Board and its stakeholders well. The revision the Board has undertaken entails severe time limits and crabbed administrative processes, forfeitures and waivers for failure to adhere to them, limits on the review of administrative action, uncertainty on important substantive and procedural matters, and a likelihood of increased, not decreased, litigation and delay in the resolution of questions concerning representation.

The U.S. Chamber of Commerce objects to the proposed rules and submits that the NPRM should be withdrawn.

Respectfully submitted,

Randel K. Johnson
Senior Vice President
Labor, Immigration & Employee Benefits

Michael J. Eastman
Executive Director
Labor Law Policy

Of Counsel:

Ronald Meisburg
**Proskauer Rose LLP**
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 20004-2533