**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, et al.,

              Plaintiffs,

   v.

NATIONAL LABOR RELATIONS
BOARD

            Defendant.
_____

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:15-cv-00009-ABJ
Judge Amy Berman Jackson

**EXHIBIT 3 IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# COMMENTS ON NLRB'S PROPOSED RULE REGARDING UNION ELECTIONS
## (RIN 3142–AA08)

*Submitted by*

## THE COALITION FOR A DEMOCRATIC WORKPLACE

*Of Counsel*

CHARLES I. COHEN
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
202-739-3000

PHILIP A. MISCIMARRA
ROSS H. FRIEDMAN
LAUREN E. MARZULLO
MORGAN LEWIS & BOCKIUS LLP
77 West Wacker Drive, 5th Floor
Chicago, Illinois 60601
312-324-1000

*Submitted to*

NATIONAL LABOR RELATIONS BOARD

August 22, 2011

# COMMENTS ON NLRB'S PROPOSED RULE REGARDING UNION ELECTIONS

*Submitted by*

## THE COALITION FOR A DEMOCRATIC WORKPLACE

### INTRODUCTION

The following comments are submitted regarding the Board's Proposed Rule on the filing and processing of petitions relating to union representation of employees for purposes of collective bargaining ("Proposed Rule"). The Proposed Rule was published in the Federal Register on June 22, 2011. *See* 76 Fed. Reg. 36,812-36,847 (2011).

### COALITION FOR A DEMOCRATIC WORKPLACE

These comments are submitted on behalf of the Coalition for a Democratic Workplace ("CDW" or the "Coalition"). CDW encompasses hundreds of employer associations, individual employers and other organizations that collectively represent millions of businesses of all sizes. They employ tens of millions of individuals working in every industry and every region of the United States. These employers and employees have a profound interest in the Board's Proposed Rule, which the Coalition believes is contrary to many provisions, policies and purposes of the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.* ("NLRA" or "Act") and inconsistent with the free speech protection afforded by the United States Constitution.

Appendix 1 identifies the CDW member organizations which join in the filing of these comments.[1]

### SUMMARY OF COMMENTS

1. **Flawed Premise Regarding Shorter Elections.** The policies and purposes of the NLRA are subverted by making the target period for conducting representation elections shorter than 42 days, and the Proposed Rule rests on a flawed premise about the need to accelerate the election process. *See* pages 4-14.

   (a) **The Board's Current Timetable for Elections is Effective.** The Board's current standard for conducting a post-petition election, focusing on a target of 42 days, has resulted in free and fair elections, and has been achieved by the Board in the great majority of cases. *See* pages 5-8.

   (b) **Denial of Free Speech.** The Proposed Rule's shortening of the timetable for holding elections improperly eradicates the employer's right to engage in free speech, contrary to the First Amendment and NLRA Section 8(c). *See* pages 8-9.

---

[1] Some of the CDW members identified in Appendix 1 have filed separate comments. All of the listed organizations support the positions expressed in these comments and join in their submission.

*The Coalition for a Democratic Workplace*
*Comments on NLRB Proposed Election Rule*



(c) **Employee Rights Undermined.**  The Proposed Rule's shortening of the timetable for holding elections improperly denies employees the time and information necessary to make a fair and informed decision regarding union representation, especially in conjunction with the deferral of important unit determinations until after the election. *See* pages 9-11.

(d) **Distorting the Board's Neutral Role.**  The Proposed Rule fundamentally alters the neutral role of the Board regarding union elections, contrary to the balancing of interests reflected in NLRA Section 7, and especially the Taft-Hartley amendments to the Act.  *See* pages 11-14.

2. **Disclosure of Email Addresses and Phone Numbers on Voter Eligibility Lists Should Not be Required**.  There is no good reason to expand *Excelsior* disclosures to include email addresses and phone numbers.  Required disclosure of business email addresses and phone numbers would cause severe hardship and impose significant costs on employers.  Required disclosure of personal email addresses and phone numbers would be an unprecedented, improper intrusion on employee privacy rights.  *See* pages 14-21.

(a) **Inadequate Basis for Expanding *Excelsior* Disclosures.**  The Proposed Rule articulates no statutory or other basis sufficient to warrant mandated disclosure of email addresses and phone numbers.  *See* pages 14-16.

(b) **Business Email Addresses and Phone Numbers.**  The Board should not require disclosure of business email addresses or work phone numbers because such mandated disclosures would discard years of Board precedent, create intractable surveillance and security issues, cause business disruptions, impose significant costs, and require the *de facto* elimination of lawful, widely adopted computer systems policies.  *See* pages 16-19.

(c) **Personal Email Addresses and Phone Numbers.**  The Board should not require disclosure of personal email addresses or work phone numbers because mandating disclosure of this information would not advance legitimate *Excelsior* objectives, and would constitute an extraordinary intrusion on individual privacy rights.  *See* pages 19-21.

3. **Post-Hearing Deferral of Unit Issues is Improper.**  The Proposed Rule improperly disregards the statutory purpose responsible for the pre-election hearing, and it undermines the statutory scheme by deferring the resolution of many unit issues until after the election. *See* pages 21-28.

(a) **Section 9(c) Requires a Pre-Election Hearing**.  The requirements of Section 9(c) are mandatory and constrain the Board from changing pre-election hearings as would be accomplished by the Proposed Rule. *See* pages 22-26.

(b) **Prompt Elections Occur Even Though Pre-Election Hearings Are Available.**  The Board has a successful track record of promptly holding elections, and the curtailment of pre-election hearings is not necessary for elections to be conducted in a timely manner. *See* page 26.

*The Coalition for a Democratic Workplace*
*Comments on NLRB Proposed Election Rule*



**(c) The Proposed Rule Is Likely to Lengthen the Overall Representation Process**. Curtailing pre-election hearings will result in more litigation, and is likely to increase the time required for resolving representation issues. *See* pages 26-27.

**(d) The Proposed Rule Will Promote Uncertainty.** Eliminating the Pre-Election Hearing "Casts a Cloud of Uncertainty" Over the Election Process. *See* pages 27-28.

4. **Board Review of Regional Director Decisions Should Not Be Discretionary.** It constitutes an improper delegation of authority for the Board to exercise only discretionary review of Regional Director decisions, contrary to the Act and the legislative scheme underlying the Act. *See* pages 28-29.

5. **The Proposed Rule's "Statement of Position" Requirement Would Be Unfair and Punitive to Employers.** The Proposed Rule's requirement of a binding pre-hearing written statement of position constitutes an improper denial of due process, which will severely prejudice most employers and inappropriately favor union representation. *See* pages 29-35.

6. **Deficiencies in the Rulemaking Process.** The way the Board's Proposed Rule is being considered unnecessarily departs from the handling of the Board's prior rulemaking regarding health care bargaining units, and a much more deliberative and inclusive process is needed for these issues to be constructively addressed. *See* pages 35-38.

7. **The Board's "Blocking Charge" Policy.** The Board's current blocking charge doctrine is unnecessary, has been subject to abuse and should be eliminated. Alternatively, this aspect of the Board's Proposed Rule should be held in abeyance. *See* pages 38-39.

8. **Other Areas in Which the Board has Solicited Comments**. CDW also responds as follows to the other requests for comments contained in the Board's Proposed Rule. *See* page 39.

    **(a) Electronic Signatures and Showing of Interest**. The Board should not permit electronic signatures in support of a showing of interest. Permitting electronic signatures would effectively nullify the showing of interest requirement in a context that provides no transparency or opportunities for verification by the Region or by affected employees, employers, and unions. *See* page 39.

    **(b) Sanctions for Unauthorized Use of Voter Eligibility List**. As noted previously, CDW opposes the Proposed Rule's expansion of the voter eligibility (*Excelsior*) list to disclose employee email addresses and telephone numbers because, among other things, it will be impossible to enforce a prohibition against the use of such a list outside of representation proceedings. If any unauthorized use of the eligibility list can be established (however unlikely that may be), the Board should set aside any election in which the offending union has prevailed, without affecting the one-year election bar, with substantial monetary penalties and the referral of offenders to law enforcement authorities regarding any criminal violations implicated in such misconduct. *See* page 39.



(c) **Feasibility and Fairness of Seven-Day Period for Pre-Election Hearing and Other Time Periods**.  The Board should not implement any accelerated time periods set forth in the Proposed Rule, including (among others) the requirement of a pre-election hearing seven days after a petition is filed.  These time periods are unreasonable and unfair, especially when considered in combination with the Proposed Rule's mandatory pre-election Statement of Position submission, the waiver of all positions not identified in the Statement of Position, the post-hearing resolution of unit issues, the expanded voter eligibility list requirements, the requirement of electronic transmittal, and eliminating the right of Board review regarding post-election Regional Director decisions.  *See* page 39.

<u>D</u>ISCUSSION AND <u>A</u>NALYSIS

1. **Flawed Premise Regarding Shorter Elections**.  *The policies and purposes of the NLRA are subverted by making the target period for conducting representation elections shorter than 42 days, and the Proposed Rule rests on a flawed premise about the need to accelerate the election process.*

CDW believes that the Proposed Rule improperly focuses on a single-minded objective of shortening the period between a representation petition's filing and the holding of an election.  However, this objective disregards the careful balancing of *multiple* objectives that has been emphasized by the Board and the courts when questions concerning representation require resolution in Board-conducted elections.  These multiple objectives correspond to the important array of *competing* rights and obligations that are implicated whenever employees exercise their collective self-determination regarding whether they support or oppose union representation and other concerted activities.

The selective emphasis of "speed" is pervasive throughout the Proposed Rule.[2]  However, this focus on "speed" constitutes a fundamental distortion of the Act's primary

---

[2] The Proposed Rule refers to the "expeditious resolution of questions concerning representation" (76 Fed. Reg. at 36,812); allowing the Board "to more promptly determine if there is a question concerning representation and, if so, to resolve it by conducting a secret ballot election" (*id.*); "Expeditious resolution of questions concerning representation is central to the statutory design" (*id.* at 36,813); "expeditious processing of representation petitions" (*id.*); "delays in the regional offices' transmission of the eligibility list to the parties" (*id.* at 36,816); "expeditious resolution of questions concerning representation" (*id.* at 36,817); "The proposed amendments would also shorten the time for production of the eligibility list" (*id.* at 36,821); "progression of reforms to reduce the amount of time required to ultimately resolve questions concerning representation" (*id.* at 36,829).

It is true that various cases refer to the desirability of prompt or efficient elections – *e.g.*, having "employees' votes . . . recorded accurately, efficiently and speedily." *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330 (1946).  *See also AFL v. NLRB*, 308 U.S. 401, 409 (1940) (the Wagner Act was designed in part to avoid "long delays in the procedure . . . for review of orders for elections"); *Northeastern Univ.*, 261 NLRB 1001, 1002 (1982) (referring to "expeditiously resolving questions concerning representation"); *Tropicana Prods., Inc.*, 122 NLRB 121, 123 (1958) ("time is of the essence if Board processes are to be effective").  Yet, nothing in these cases suggests that elections must take place at breakneck speed after a petition is filed,



election objective stated in Sections 1 and 7, which is protecting "the exercise by workers of *full freedom* of association" encompassing employee rights to "*self-organization*" by having "representatives *of their own choosing*," with an equivalent right "*to refrain from any or all of such activities*."[3]  Employers and unions have important rights and obligations including those set forth in Sections 8(a) and 8(b), which enumerate employer and union unfair labor practices; plus the employer's right of free speech set forth in Section 8(c).  And there is a complex assortment of employee, union and employer rights incorporated into the Act's statutory provisions regarding elections, set forth in Section 9.  Most significantly, Section 9(b) states that the "Board *shall* decide *in each case*" what constitutes the appropriate bargaining unit which is designed "to *assure* to employees *the fullest freedom in exercising the rights guaranteed by this [Act]*."[4]

In short, the Act states the Board "in each case" should "assure . . . the fullest freedom" of employees to "choos[e]" whether to have *or* refrain from union representation, and it allocates equally important rights and obligations to unions and employers, including the employer's right of free speech – *i.e.*, to express its own "views, argument, or opinion" regarding union-related issues.[5]  Merely reciting these requirements demonstrates that *the Act's focus is more varied and complex than having representation elections take place as quickly as possible*.[6]

The false objective of having an election take place as quickly as possible is an infirmity that ravages the Proposed Rule.  This aspect of the Proposed Rule is a solution in search of a problem, and does violence to other objectives and rights that have repeatedly been recognized by the Board and the courts.

    **(a)  The Board's Current Timetable for Elections is Effective**.  *The Board's current standard for conducting a post-petition election, focusing on a target of 42 days, has resulted in free and fair elections, and has been achieved by the Board in the great majority of cases*.

The Proposed Rule's Supplementary Information chronicles the Board's successful history conducting timely elections.  *See* 76 Fed. Reg. at 36,813-36,814.  This history demonstrates that the Board has consistently improved on its longstanding target to achieve elections within 42 days after the filing of a petition.[7]  Thus, as the Proposed Rule explains:

---

which is the thrust and effect of the Proposed Rule.  Nor do any of these cases eradicate the Act's other policies and objectives that have equal or greater importance than speed in the conduct of representation elections.

    [3]  NLRA §§ 1, 7, 29 U.S.C. §§ 151, 157 (emphasis added).

    [4]  *Id*. § 159(b) (emphasis added).

    [5] *Id*. §§ 151, 157, 158(c), 159(b).

    [6]  *See, e.g.*, *Hammontree v. NLRB*, 925 F.2d 1486, 1499 n.33 (D.C. Cir. 1991) ("Congress has expressed *multiple* intentions and issued *numerous* mandates to the Board," and the courts assess "whether the Board's policy constitutes a reasonable accommodation among these demands") (emphasis added).

    [7]  Gen. Counsel Mem. 11-09, at 19 (March 16, 2011).



- The median average number of days from petition to a decision and direction of election was 82 days in 1960, and 43 days in 1962, and an even longer time period obviously elapsed before elections occurred (*id*. at 36,814 n.16);

- In 1975, only 20.1 percent of elections occurred more than 60 days after the filing of a petition, and this percentage decreased to 16.5 percent by 1985 (*id*. at 36,814 n.19); likewise, the percentage of total elections conducted more than 90 days after a petition's filing was only 11 percent in 1975, and this percentage decreased to 4.1 percent by 1985 (*id*.);

- By 1975, the Board was conducting elections within a median of 50 days after petitions were filed (*id*. at 36,814);

- Over the past decade, *more than 90 percent of elections* were conducted within *56 days* after a petition was filed (*id*.); and

- Over the past decade, elections have occurred *within a median time of 38 days* after the filing of a petition, which means *large numbers of elections occur even more quickly* (*id*.).

- In fiscal year 2010, the *average time* from petition to an election was *31 days*.[8]

Considering the Act's objective of "assuring" employees the "fullest freedom" to decide whether or not they desire union representation (29 U.S.C. § 159(b)), multiple considerations weigh heavily against any further reduction from the Board's historical 42-day target or from the current median election time period of 38 days.

First, nothing in the Proposed Rule or in existing case law suggests that a need exists to further shorten the time period for conducting elections.  Nor has any shortening of the election time period been mandated by Congress.

Second, the Act is not designed to guarantee that unions will win representation elections, nor should the Board exercise its own hand to increase the number of elections won by unions.[9]  However, even if the Act required that the Board arrange for unions to win a minimum threshold number of representation elections (contrary to the neutrality that Congress actually intended), the Board's fiscal year election summaries show that unions are successful in a disproportionately high percentage of elections.  Although union members

---

[8]  *Id*. at 18, *cited in* 76 Fed. Reg. at 36,831 n.75 (Member Hayes, dissenting).

[9]  As noted previously, the Act's primary purpose is to safeguard employee freedom of choice regarding union representation – *i.e.*, to permit employees to choose whether they wish to have union representation or to refrain from union representation and collective bargaining.  By comparison, the Proposed Rule plainly operates to promote a greater number of union victories in representation cases. This improper conversion of the Board's role from a neutral process-protector to a union-representation advocate does violence to the Act – especially in view of the Taft-Hartley amendments adopted in 1947 – and is another significant reason the Proposed Rule should not be adopted.  *See* text accompanying notes 33-44, *infra*.



currently comprise only 6.9 percent of private sector employees,[10] unions have prevailed in a *majority* of elections (where there was no incumbent union) *every year from fiscal year 1997 to the present*.  And the margin by which unions prevailed in these elections has increased from 50.4 percent (in fiscal 1997) to 64.8 percent (in fiscal year 2010).[11]

Third, the Proposed Rule's false premise (that the Act requires that representation elections take place as quickly as possible) disregards the array of NLRB principles and doctrines – all left unaffected by the Proposed Rule – which delay representation elections much more than a median of 38 days and, in many cases, prevent elections from occurring altogether. To cite just a few examples:

- Under the Board's longstanding *contract bar* rule, the Board refrains from conducting any election for up to *three years* while a collective bargaining agreement is in effect (during which a petition will be processed only during a 30-day open period occurring between 60 and 90 days prior to contract expiration or the three-year anniversary date of the contract).[12]

- The Act imposes a *statutory election bar* that prevents any election from being directed for a *12-month period* following any other valid election.[13]

- The Board's *voluntary recognition bar* doctrine, under *Dana/Metaldyne*,[14] bars an election for a "reasonable time" after an employer extends voluntary union recognition, where the employer has provided a notice of recognition, and where no election petition has been filed within 45 days thereafter.

- The Board in *accretion cases* can add unrepresented employees to an existing bargaining unit, without *any* election, based on the extent of employee interchange, working conditions, common management, functional integration, bargaining history, and other factors.[15]  In the event of an accretion, a preexisting contract will further bar any future representation election for up to three years pursuant to the contract bar doctrine described above.[16]

---

[10] *See* note 128, *infra*, and accompanying text.

[11]  *See* NLRB Election Report (Oct. 19, 2010) at 10.  Member Hayes indicates unions prevailed in 68.7 and 67.6 percent of all elections held in calendar years 2009 and 2010, respectively.  *See* 76 Fed. Reg. at 36,832 (Member Hayes, dissenting).

[12]  *Absorbent Cotton Co.*, 137 NLRB 908, 909 (1962); *Gen. Cable Corp.*, 139 NLRB 1123, 1128 (1962).

[13]  NLRA § 9(c)(3), 29 U.S.C. § 159(c)(3).

[14]  351 NLRB 434 (2007).  *See also R.L. Lee Lumber & Bldg. Material Corp.*, 322 NLRB 175, 179 (1997), *enforced in part*, 117 F.3d 1454 (D.C. Cir. 1997).

[15]  *See, e.g., Safeway Stores, Inc.*, 256 NLRB 918 (1981); *United Parcel Service*, 325 NLRB 37 (1997); *NLRB v. Sweet Lumber Co.*, 515 F.2d 785, 794 (10th Cir. 1975), *cert. denied*, 423 U.S. 986 (1975).

[16]  *G.L. Milliken Plastering*, 340 NLRB 1169, 1170 n.4 (2004); *Firestone Synthetic Fibers Co.*, 171 NLRB 1121, 1123 (1968); *The Arrow Co.*, 147 NLRB 829, 831 (1964).



**(b) Denial of Free Speech**.  *The Proposed Rule's shortening of the timetable for holding elections improperly eradicates the employer's right to engage in free speech, contrary to the First Amendment and NLRA Section 8(c).*

The Proposed Rule's shortening of the election time period inevitably will undermine the ability of employers – after a petition is filed – to engage in speech protected by Section 8(c) of the Act.  Section 8(c) states:

> *The expressing of any views, argument, or opinion*, or the dissemination thereof, whether in written, printed, graphic, or visual form, *shall not constitute or be evidence of an unfair labor practice under any of the provisions of this [Act]*, if such expression contains no threat of reprisal or force or promise of benefit.[17]

Several aspects of the Proposed Rule's restrictions on employer speech operate to the detriment of employer speech and, thus, undermine full and free employee decision-making regarding union representation.

Most important are the serious free speech concerns arising from the Proposed Rule's eradication of rights afforded to employers and others under the First Amendment to the U.S. Constitution.  As the Supreme Court has recognized, Section 8(c) "merely implements the First Amendment" and "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board."[18]  Ironically, the Board has emphasized the importance of First Amendment guarantees in cases involving "bannering" and "inflatable rats" notwithstanding the Act's express *prohibition* of secondary coercion, restraint and interference.[19]  By comparison, the Proposed Rule improperly disregards First Amendment considerations in representation elections where, even in addition to Constitutional guarantees, the employer's free speech rights are explicitly *protected* in Section 8(c).

Also significant is the fact that unions exercise near-complete control over all pre-petition activities.  There are no restrictions on the pre-petition time that a union can devote to organizing efforts, which may take place for months or years before a petition is filed. The union also chooses, in the first instance, what departments, locations or employee groups will be targeted for organizing.  The union (or employees who advocate union representation) select

---

[17] NLRA § 8(c), 29 U.S.C. § 158(c) (emphasis added).

[18] *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969).

[19] In part based on what the Board has characterized as substantial First Amendment concerns, the Board has held it does not constitute "coercion" of neutral employers under NLRA § 8(b)(4)(B) for employees to display large banners (3 or 4 feet high and from 15 to 20 feet long) or a similarly oversized inflatable "rat" in front of the neutral businesses.  *See, e.g., Sheet Metal Workers Int'l Ass'n, Local 15 (Brandon Regional Med. Ctr.)*, 356 NLRB No. 162 (May 26, 2011); *Carpenters Local 1506 (Eliason & Knuth of Arizona, Inc.)*, 355 NLRB No. 159 (Aug. 27, 2010).  In both of these cases there were dissenting opinions by Members Schaumber and/or Hayes.  *Cf. Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988).



the individuals within any targeted group who will be informed of organizing efforts, and up to 70 percent of the targeted workforce may be uninvolved or uninformed even when a petition is filed. Of course, the union also controls when the filing of a petition will take place. Thus, the Proposed Rule's shortening of the election period imposes virtually no burdens or restrictions on unions, since they have complete knowledge regarding pre-petition union activities and can offset the Proposed Rule's acceleration in the election time period by waiting longer to file the petition.

Conversely, because employers exercise no control over pre-petition union activities – and often have no knowledge of union organizing – employers *exclusively* bear the burdens resulting from a shorter election period. This renders disingenuous the Proposed Rule's statement that its changes "would apply equally to all parties" and "do not impose any limitations on the election-related speech of any party."[20]

Invariably, the Proposed Rule's impact on the timing of elections will diminish the employer's right to express views under Section 8(c). As noted by Member Hayes, shortening the election period "broadly limits all employer speech and thereby impermissibly trenches upon protections that Congress specifically affirmed for the debate of labor issues when it enacted Section 8(c) in 1947."[21]

**(c) Employee Rights Undermined**. *The Proposed Rule's shortening of the timetable for holding elections improperly denies employees the time and information necessary to make a fair and informed decision regarding union representation, especially in conjunction with the deferral of important unit determinations until after the election.*

Congress has already decided that employees in a "group" setting must be given *45 days* to make an informed decision about whether to sign release agreements encompassing age discrimination claims. This requirement is part of the Older Workers Benefit Protection Act ("OWBPA"),[22] which also indicates employees must be given relevant written information at the 45-day period's commencement, including the "class, unit, or group of individuals covered,"

---

[20] 76 Fed. Reg. at 36,829.

[21] *Id.* at 36,832 (Member Hayes, dissenting), *citing Chamber of Commerce v. Brown*, 554 U.S. 60, 67-68 (2008) (other citations omitted). In *Brown*, the Supreme Court stated that Section 8(c)'s enactment "manifested a 'congressional intent to encourage free debate on issues dividing labor and management'" and reflects a "policy judgment, which suffuses the NLRA as a whole, as 'favoring uninhibited, robust, and wide-open debate in labor disputes'" because "freewheeling use of the written and spoken word . . . has been expressly fostered by Congress and approved by the NLRB. *Id., quoting Linn v. Plant Guard Workers*, 383 U.S. 53, 62 (1966) and *Letter Carriers v. Austin*, 418 U.S. 264, 272-73 (1974).

[22] Pub. L. No. 101-433, 104 Stat. 978 (1990). OWBPA added Section 7(f) to the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626(f), which articulates the minimum requirements for a waiver of ADEA rights to be considered enforceable as a "knowing and voluntary" agreement. The 45-day period is a prerequisite to enforceability of any age discrimination waiver requested in connection with "an exit incentive or other employment termination program offered to a group or class of employees." ADEA § 7(f)(1)(F)(ii), 29 U.S.C. § 626(f)(1)(F)(ii).



which must be communicated "in a manner calculated to be understood by [the] individual, or by the average individual eligible to participate."[23]  Given that OWBPA imposes a mandatory *45-day* period for employees to make a discrete one-time decision (about signing a backward-looking release in exchange for identifiable benefits offered as part of a "group" program), it makes no sense for the Board to adopt a Proposed Rule forcing employees to make a poorly-informed choice about a more far-reaching decision like union representation in as few as *10 days*.[24]

Indeed, the Board's current timeframe for conducting elections is *already* shorter than 45 days in the great majority of cases.  As noted previously, NLRB elections currently involve a median election time period of 38 days, and an average time period of 31 days.[25]  There is no reasonable justification for reducing this period further, given that the NLRA states employees "in each case" should be "assure[d] . . . the *fullest freedom*" to make their own choice about union representation.[26]  Nor is there any doubt that employee decision-making about union representation involves a multiplicity of more significant complex rights and obligations than an employee's relatively straightforward decision about signing a release agreement.  Regardless of whether or not a particular employee group favors or opposes union representation, such a decision unquestionably produces substantial long-term and day-to-day consequences, including:

- the potential conferral of "exclusive representative" status on a third party organization and its agents and representatives regarding wages, benefits, hours and terms and conditions of employment,[27]

- the loss of individual rights to deal with the employer in relation to the same subjects,[28]

- uncertainty associated with the consequences of collective bargaining,[29]

---

[23] ADEA § 7(f)(1)(A), 29 U.S.C. § 626(f)(1)(A).  In an exit incentive or group employment termination program requiring a release of ADEA rights, the employee must be informed of the job titles and ages of all employees selected and not selected for the program, the particular "class, unit, or group of individuals covered by [the] program," and the "time limits applicable to [the] program," which must all be explained "in writing in a manner calculated to be understood by the average individual eligible to participate."  *Id. See also* S. Rep. No. 263, 101st Cong., 2d Sess. (April 5, 1990) ("detailed, written information  – at the start of the 45 day period  – describing the group termination program" is required to permit "more informed decisions").

[24] 76 Fed. Reg. at 36,831 (Member Hayes, dissenting).

[25] *Id*. at 36,814; Gen. Counsel Mem. 11-09, at 18-19 (March 16, 2011).

[26] NLRA § 9(b), 29 U.S.C. § 159(b) (emphasis added).

[27] NLRA § 9(a), 29 U.S.C. § 159(a).

[28] An employer's obligation to bargain under Section 8(a)(5) makes it unlawful for the employer to engage in individual bargaining or direct dealing with employees regarding wages, hours, and other terms and conditions of employment and to implement unilateral changes in mandatory bargaining subjects.  *See, e.g., Gen. Elec. Co.*, 150 NLRB 192, 194 (1964), *enforced*, 418 F.2d 736 (2d Cir. 1969), *cert. denied*, 397 U.S. 965 (1970); *NLRB v. Katz*, 369 U.S. 736, 743 (1962).



- possible resort by the union or employer to economic weapons like strikes, slowdowns, lockouts and possible temporary or permanent replacements,[30]

- financial and other obligations and restrictions – including fees, dues, fines and assessments – that unions may lawfully impose on employees, consistent with union constitutions and by-laws (which are rarely provided to employees during union organizing campaigns),[31] and

- complex rules regarding how collective bargaining works, and significant restrictions on union decertification if employees later become dissatisfied with union representation and the outcome of bargaining.[32]

The Proposed Rule's adverse impact on informed employee decision-making is made worse by the Rule's additional provisions which, among other things, would curtail pre-election hearings and defer the resolution of many unit issues, including basic eligibility and scope questions, until after the election takes place.  Consequently, not only would the Proposed Rule impair employee free choice by requiring an election much more quickly, the Proposed Rule would deprive employees of important information, substantially increasing the number of employees who may cast votes based on incorrect assumptions.  This subverts employee free choice, and creates a risk that employees will be disillusioned with subsequent union representation and collective bargaining, with a corresponding erosion of confidence in the NLRA and the Board generally.  This should be avoided by preserving the present timetable for conducting elections, and by refraining from implementing the Proposed Rule's other provisions pertaining to pre-election hearings and post-hearing Board review.

**(d) Distorting the Board's Neutral Role**.  *The Proposed Rule fundamentally alters the neutral role of the Board regarding union elections, contrary to the balancing of interests reflected in* <u>*NLRA Section 7, and especially the Taft-Hartley amendments to the Act.*</u>

The most troubling aspect of the Proposed Rule is its conversion of the Board from an agency that oversees elections from a neutral vantage point into an advocate for union representation.  The Board is entitled to deference when it exercises its "informed judgment on matters within its special competence."[33]  Yet, federal labor policy does not permit the Board to

---

[29] *See, e.g., Midwestern Instruments, Inc.*, 133 NLRB 1132 (1961).

[30] *See, e.g., NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333 (1938); *The Laidlaw Corp.*, 171 NLRB 1366 (1968), *enforced*, 414 F.2d 99 (7th Cir. 1969), *cert. denied*, 397 U.S. 920 (1970).

[31] *See, e.g., Scofield v. NLRB*, 394 U.S. 423 (1969) (union could lawfully maintain and enforce rule providing for fines, suspensions or expulsion of union members who exceed work production ceilings established by the union).

[32] *See* notes 12-16, *supra*, and accompanying text.

[33] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490 (1951).  *See also NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236 (1963) ("we must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life").  *Cf.* NLRA § 10(f), 29 U.S.C. § 160(f); *Universal Camera*, 340 U.S. at 478-79, 488.  *See also* NLRA § 10(e), 29 U.S.C. § 160(e).



create a "standard of properly 'balanced' bargaining power"[34] nor does it "contain a charter for the [NLRB] to act at large in equalizing disparities of bargaining power between employer and union."[35]  This is especially clear from the Taft-Hartley amendments to the NLRA, which reflected a Congressional concern "that the Wagner Act had pushed the labor relations balance too far in favor of unions."[36]

Not only does the Proposed Rule's shortening of the election period represent policy unsupported by the Act, the Proposed Rule's assortment of other reforms renders inescapable the perception that the Board majority's intention, by proposing the Rule, is to foster increased union representation at the expense of informed employee free choice.  Such a perception is bolstered by the Proposed Rule's formulation when the Board does not have a full complement of members,[37] and the Rule's issuance in the immediate aftermath of organized labor's unsuccessful effort to enact the Employee Free Choice Act (which would have effectively *eliminated* elections whenever a union claimed majority support based on a showing of authorization cards).[38]  Nor is it a secret that organized labor's advocates have long campaigned for shorter elections as a means of reversing the dramatic decline in union membership that has taken place since the 1950s.[39]

---

[34] *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 497 (1960).

[35] *Id*. at 490.

[36] *Chamber of Commerce of the United States v. Brown*, 554 U.S. 60, 67 (2008).

[37] The Board at present has one vacancy, a single Republican, Member Brian Hayes, and three Democrats (Chairman Wilma Liebman and Members Craig Becker and Mark Pearce), with Chairman Liebman's term and Member Becker's recess appointment scheduled to expire by year-end 2011.

[38] The Employee Free Choice Act ("EFCA") introduced during the 111th Congress would have substantially changed the NLRA's treatment of representation elections, the bargaining of initial contracts, and damages available under the Act, but was not adopted.  *See* S. 560, 111th Cong., 1st Sess. (2009); H.R. 1409, 111th Cong., 1st Sess. (2009).  The failure to adopt proposed amendments is sometimes regarded as validating prior interpretations of the Act.  *See NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 275 (1974) ("congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress").

[39] The Bureau of Labor Statistics indicates that, in 2010, the union membership rate was 11.9 percent counting all employers, and 6.9 percent counting private sector employers.  *See* U.S. Dep't of Labor Bureau of Labor Statistics, Economic News Release, Union Members Summary (2011), http://www.bls.gov/news.release/union2. nr0.htm.  Although the Board majority disclaims being motivated by a desire to increase union election victories, it is difficult to ignore the fact that two academic studies released almost immediately after publication of the Board's Proposed Election Rule argue that shorter elections are needed to reduce alleged unlawful employer conduct which, they argue, would increase the number of elections in which the union prevails.  *See* Kate Bronfenbrenner and Dorian Warren, *The Empirical Case for Streamlining the NLRB Certification Process: The Role of Date of Unfair Labor Practice Occurrence*, ISERP Working Paper Series 2011.01 (2011); John Logan, Erin Johansson, and Ryan Lamare, *New Data: NLRB Process Fails to Ensure a Fair Vote*, Univ. of Cal., Berkeley Res. Brief (June 2011).  Both of these studies are deeply flawed and dramatically oversimplify the reasons for the current low percentage of American private sector employees who have chosen to have union representation.  *Cf. U.S.*



These factors detract heavily from the Proposed Rule's statement that it is "unwarranted" to characterize the Proposed Rule as an attempt to "increase the election success rate of unions."[40]  As Member Hayes observed, the Proposed Rule, "by administrative fiat in lieu of Congressional action, . . . will impose organized labor's much sought-after 'quickie election' option."[41]

In *Wolfrich Corp.*,[42] Member Jenkins accused the majority of jeopardizing "the integrity of the electoral process under the Act,"[43] and his further admonition applies with equal force to the changes contemplated by the Proposed Rule:

> The present case suggests that reliance on this doctrine *may all too often result in the disregard of the right of employees to have an opportunity to make free and informed decisions at the polls*. . . .  A representation election is the threshold event from which substantial rights and obligations flow. *The designation of a labor organization as the exclusive collective-bargaining representative thus endows it with significant power to shape the present and future livelihood of the employees it represents.* Once this designation has been made, the Act seeks to encourage its permanency with a view toward preserving industrial peace through the promotion of stable collective-bargaining relationships. Thus, the Board's electoral process, unlike the electoral process in the political realm, does not require collective-bargaining representatives to run for reelection periodically, and to this extent collective-bargaining representatives are not held directly accountable for misrepresentations which may have carried the day for them in their initial representation election. In view of these considerations, I do not think that the electoral processes under the Act should be taken so lightly. . . .
>
> The failure to hold a hearing in this case to resolve the issues raised by the Employer's objections *erodes confidence in the Board's ability to protect the right to an opportunity for free and informed participation in our electoral processes*.[44]

---

*Chamber of Commerce, Responding to Union Rhetoric: The Reality of the American Workplace – Union Studies on Employer Coercion Lack Credibility and Integrity (*U.S. Chamber of Commerce White Paper 2009).

[40] 76 Fed. Reg. at 36,829.  Equally unconvincing is the Proposed Rule's statement that "[w]hat effect the proposed changes would have on the outcome of elections is both unpredictable and immaterial."  *Id.*

[41] *Id.* at 36,831 (Member Hayes, dissenting).

[42] 234 NLRB 525 (1978).

[43] *Id.* at 528 (Member Jenkins, dissenting).

[44] *Id.*



2. **Disclosure of Email Addresses and Phone Numbers on Voter Eligibility Lists Should Not be Required**.  *There is no good reason to expand Excelsior disclosures to include email addresses and phone numbers.  Required disclosure of business email addresses and phone numbers would cause severe hardship and impose significant costs on employers.  Required disclosure of personal email addresses and phone numbers would be an unprecedented, improper intrusion on employee privacy rights.*

The Proposed Rule changes several aspects of existing law relating to the voter eligibility list (or "*Excelsior* list")[45] by calling for a reduction (from seven days to two days) in the amount of time employers have to submit the list, and a requirement that the list be submitted in electronic form (unless the employer certifies that it does not possess the capacity to produce the list in this form).[46]

The Proposed Rule also would impose a new requirement on employers to disclose "available email addresses" and "available telephone numbers" of bargaining unit employees on every voter eligibility list.[47]  CDW strenuously opposes – as would many if not most individuals employed by CDW members – any required disclosure of "email addresses" and "telephone numbers" as part of the voter eligibility list.

CDW urges the Board to reconsider and abandon these new disclosure requirements because they are excessive, improper and predictably ineffective in several respects.

(a) **Inadequate Basis for Expanding *Excelsior* Disclosures.**  *The Proposed Rule articulates no statutory or other basis sufficient to warrant mandated disclosure of email addresses and phone numbers.*

National uprisings have taken place based on the availability of Twitter, Facebook and Youtube, *without* anything resembling an *Excelsior* list.[48]   The Proposed Rule improperly

---

[45] The phrase "*Excelsior* list" relates to the case in which the voter eligibility list requirement was first articulated by the Board.  *See Excelsior Underwear Inc.*, 156 NLRB 1236 (1966).  *See also NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 768 (1969).

[46] *See* 76 Fed. Reg. at 36,820-21, 36,837-38, 36,842-43, describing Proposed § 102.62(d) (voter lists in cases involving election agreements) and § 102.67(j) (voter lists in non-agreement cases involving direction of election).  In addition to opposing the requirement of email addresses and phone numbers on the voter eligibility list, CDW opposes the reduction (from seven to two days) of the time period for making the list available, and likewise opposes the Proposed Rule's other abbreviated deadlines.  *See* point 8(c) on page 39.

[47] *Id.*  The Proposed Rule would impose a similar "available email addresses" and "available telephone numbers" disclosure requirement on the "lists filed with the regional director" (but "not served on any other party") as part of the new Statement of Position that the Board would require from employers.  76 Fed. Reg. at 36,838, Proposed § 102.63(b)(1)(iv).  CDW opposes these disclosures for the same reasons described in the text regarding the proposed new *Excelsior* list disclosures.

[48] *See, e.g., Social media, cellphone video fuel Arab protests,* THE INDEPENDENT, Feb. 27, 2011 (www.independent.co.uk/life-style/gadgets-and-tech/social-media-cellphone-video-fuel-arab-protests-



presumes a "need" to expand the *Excelsior* disclosure requirements while disregarding the fact that the premise of *Excelsior* has been unalterably changed: person-to-person addresses are no longer essential to collective action.  The communications evolution referenced in the Proposed Rule[49] has, if anything, reduced the need for unions to be given person-to-person addresses (and certainly email addresses and phone numbers), because employees have widespread access to union-sponsored web sites, Twitter, and social media sites such as Facebook and Youtube, for example, none of which require the *involuntary* disclosure of sensitive and personal employee contact information.

The Proposed Rule identifies no statutory mandate warranting an expansion beyond existing *Excelsior* list requirements, and Congress has never sought to change or expand the *Excelsior* list disclosures.  Nor is any other reason provided in the Proposed Rule except for the Board's observation that an "evolution" towards electronic communications is taking place in "pre-election campaign communication."[50]  The existence of various avenues for employer-employee communication has never been interpreted by Congress or the Board to require equal access by union organizers to the same vehicles for communication.  This aspect of the Proposed Rule would constitute a significant intrusion into privacy rights and cause unwarranted hardship to employers, employees and their families.[51]

It is insufficient to require such new disclosures merely by asserting they would "better advance" the objectives articulated by the Board in *Excelsior*.  Indeed, as to those objectives, the disclosure of email addresses and phone numbers does nothing to help the union "identify issues concerning eligibility and, if possible, to resolve them without the necessity of a challenge."[52]  Nor are email addresses and phone numbers essential to "an informed employee choice for or against representation"[53] given that the existing *Excelsior* requirements provide for disclosure of every eligible employee-voter's most reliable and near-universal points of contact, which are home addresses.

In *Excelsior*, the Board acknowledged there were *other* "various means by which a party *might* be able to communicate with a substantial portion of the electorate."[54]  For example, the Board in *Excelsior* did not require disclosure of home telephone numbers even though the United States, in the late 1960s, led the world in telephone use, which provided the most

---

2227088.html); Amir Hatem Ali, *The Power of Social Media in Developing Nations: New Tools for Closing the Global Digital Divide and Beyond*, 24 HARVARD HUM. RTS. J. 185 (2011) (http://harvardhrj.com/wp-content/uploads/2009/09/185-220.pdf).

[49] *See* 76 Fed. Reg. at 36,820 (referring to the "evolution . . . in pre-election campaign communication").

[50] *Id.*

[51] *See* subparts (b) and (c) below.

[52] 76 Fed. Reg. at 36,820.  *See also Excelsior*, *supra* note 45, 156 NLRB at 1242-43.

[53] *Excelsior*, *supra* note 45, 156 NLRB at 1241-42.

[54] *Id.* at 1241 (emphasis in original).

*The Coalition for a Democratic Workplace*
*Comments on NLRB Proposed Election Rule*



widespread rapid means of communication.[55]  The Board still *consciously* limited disclosures in *Excelsior* to names and home addresses, and the *Excelsior* requirements were never intended to place employers and unions on equal footing regarding access to employees.[56]

> **(b) Business Email Addresses and Phone Numbers.**  *The Board should not require disclosure of business email addresses or work phone numbers because such mandated disclosures would discard years of Board precedent, create intractable surveillance and security issues, cause business disruptions, impose significant costs, and require the de facto elimination of lawful, widely adopted computer systems policies.*

The Proposed Rule is unclear as to whether it would require disclosure of *business* email addresses and phone numbers, but these types of disclosures should not be required.  If business email addresses and phone numbers had to be disclosed, the Proposed Rule would cause significant disruptions in the operations of employers involved in representation elections.  Far from promoting the Act's policies and purposes – *i.e.*, which include eliminating "substantial obstructions to the free flow of commerce"[57] – required disclosure of business email addresses and phone numbers to union representatives would produce an array of adverse consequences that are not warranted:

- *Lawful No-Solicitation/No-Distribution Policies*.  Required disclosure of work email addresses and work telephone numbers would be irreconcilable with longstanding Board case law providing that employers may lawfully maintain (i) no-solicitation policies prohibiting non-business activities like union solicitations during work time,[58] and (ii) no-distribution policies prohibiting non-business distribution of written material in work areas.[59]  If work email addresses and work phone numbers are disclosed under the Proposed Rule, this necessarily means the recipients would be expected – presumably with the Board's approval – to engage in precisely the type of non-business solicitation and distribution that are lawfully prohibited by most employers.

---

[55] In 1968 – two years after *Excelsior* was decided, and the year before the *Excelsior* requirements were upheld by the Supreme Court (see note 45, *supra*) – "the United States led the world in telephone use, possessing over 109 million telephones . . . and . . . the average person had 701 telephone conversations."  William A. Claerhout, *The Pen Register*, 20 DRAKE L. REV. 108 n.1 (1970), *citing* AT&T Long Lines, *The World's Telephones* 1, 2, 10 (1969).

[56] It is understandable that the employer would have regular access to employees through a variety of means, because employees – by virtue of their decision to work for a particular company – clearly contemplate some pattern of ongoing contact.  The same cannot be said for union representatives whose purpose for communicating with employees would be much more narrow, and which many employees may not desire and predictably would not have anticipated when they accepted employment.

[57] NLRA § 1, 29 U.S.C. § 151.

[58] *See Peyton Packing Co.*, 49 NLRB 828 (1943); *Our Way, Inc.*, 268 NLRB 394 (1983).  *See generally Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945).

[59] *See Stoddard-Quirk Mfg. Co.*, 138 NLRB 615 (1962).



- *Harassment and Corporate Campaigns*.  Supplying work email addresses and work telephone numbers to union representatives would be a powerful weapon, especially because unions now resort so often to corporate campaign activities which have the overt purpose of causing injury to the employer's business and other relationships.[60]  This would create another area where the Board abandons its role as "neutral overseer" in favor of becoming a "union promoter" by giving unions a vehicle for intentionally interfering with the employer's business operations, including the potential harassment directed to employees, while working, if they do not support the union.

- *Lawful Access Restrictions*.  Required disclosure of work email addresses and work phone numbers, and subsequent union use of such contact information, would also usurp the Board's longstanding rules, developed over decades, regarding lawful restrictions against giving non-employees access to an employer's premises and business equipment.[61]

- *Computer Security Risks*.  Computer-related systems are central in virtually every business, and companies engage in extraordinary efforts and expense to limit external risks to those systems.  Requiring the broad-based disclosure of business email addresses for all unit employees would significantly expand these security risks and provide government-mandated opportunities for non-employees to introduce malicious software and viruses, presenting problems for all employers, especially small businesses.  At the same time, in the event of security breaches, the breadth of required disclosures could create insurmountable obstacles in efforts to

---

[60] An SEIU manual reportedly advocates legal and regulatory pressure to "threaten the employer with costly action by government agencies or the courts" and outside pressure "jeopardizing relationships between the employer and lenders, investors, stockholders, customers, clients, patients, tenants, politicians, or others on whom the employer depends for funds." F. Vincent Vernuccio, *Labor's new strategy: Intimidation for dummies*, WASHINGTON TIMES, July 15, 2011 (www.washingtontimes.com/news/2011/jul/15/labors-new-strategy-intimidation-for-dummies/).  To the same effect, the AFL-CIO's Industrial Union Department has indicated a "coordinated corporate campaign applies pressure to many points of vulnerability to convince the company to deal fairly and equitably with the union," "[i]t means seeking vulnerabilities in all of the company's political and economic relationships – with other unions, shareholders, customers, creditors, and government agencies – to achieve union goals," and "the union is looking for ways in which it can use its resources to expand the dispute from the workplace to other arenas. . . ." Ind. Union Dept., AFL-CIO, DEVELOPING NEW TACTICS: WINNING WITH COORDINATED CORPORATE CAMPAIGNS at 1-3 (1985).  To the same effect, see Cynthia L. Estlund, *The Ossification Of American Labor Law*, 102 Columbia L. Rev. 1527 (2002), which refers to "alternative forms of economic pressure" and states: "These tactics target not only the 'primary' employer, who may often be relatively insulated from public pressure, but others who have ties to and leverage over the primary employer. The 'corporate campaign,' for example, seeks concessions from employers by targeting directors, customers, suppliers, lenders, and investors with publicity and other forms of pressure." *Id.* at 1605.

[61] *See Register-Guard*, 351 NLRB 1110 (2007); *GTE Lenkurt Inc.*, 204 NLRB 921 (1973); *Container Corp. of Am.*, 244 NLRB 318 (1979).  *See also Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992).



identify the parties responsible for any resulting damage, especially because the union would predictably disclaim responsibility or involvement.[62]

- *Employer Monitoring, Access and "Surveillance" Disputes*. It is near-universal among companies to have constant access to internal telephone and email systems, which in many cases includes routine supervisor monitoring, tape recording, assembly of information potentially relevant to litigation, and investigations. This access takes place for important business reasons – which in many cases involve regulatory and legal compliance – which accounts for the widespread adoption, by companies, of policies establishing that employees have no expectation of privacy in any electronic communications that involve corporate resources. Against this backdrop, NLRB-compelled disclosure of work email addresses and work telephone numbers predictably will cause an avalanche of "surveillance" claims which, however non-meritorious, will themselves become another Board-sanctioned weapon of choice in organizing campaigns.[63] Required disclosure of work phone numbers and work email addresses predictably will cause the same litigation-related costs and burdens especially in the many workplaces where employers for regulatory and other reasons are required to closely monitor all corporate electronic communications.

- *Premature, Improper Usurping of (Potential) Bargaining*. Especially because questions regarding access and use of equipment are mandatory subjects of bargaining – if and when a union demonstrates majority support by *prevailing* in an election – it would be highly objectionable for the NLRB to compel such access as part of the election process. It is well-established that the Board's authority is limited to policing the

---

[62] For example, in the recent strike against Verizon by the Communications Workers of America (CWA) and the International Brotherhood of Electrical Workers (IBEW), several thousand customers – including hospitals and police departments – reportedly experienced service outages because of sabotage and a marked increase in vandalism in the Washington DC area, with comparable incidents occurring elsewhere on the East Coast. The CWA and IBEW disclaimed any involvement or responsibility for such misconduct, which has been the subject of investigation by the FBI and other law enforcement authorities. *See* Hayley Tsukayama, *Verizon customers see outages as worker strike continues*, WASH. POST, Aug. 12, 2011 (http://www.washingtonpost.com/business/economy/verizon-customers-see-outages-as-worker-strike-continues/2011/08/12/gIQAzSJzBJ_story.html).

[63] Unions in "salting" cases arrange for organizers to seek employment – often in large numbers while publicizing their intention to organize the employer – thereby providing a foundation for litigation under Section 8(a)(3) of the Act where employers are damaged primarily by the costs and burdens of the litigation. One union communication referred to employers who were targets of "salting" and related tactics, and stated: "it is only a matter of time before their foundations begin to crumble. *The NLRB charges, the attorney fees, and the loss of employees can lead to an unprofitable business.*" *See* H. Rep. No. 21, 109th Cong., 1st Sess. 2 (June 21, 2005) (hearing of House Committee on Small Business, Subcommittee on Workforce Empowerment & Government Programs) (emphasis added). *See generally NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85 (1985); *Toering Elec. Co.*, 351 NLRB No. 18 (Sept. 29, 2007); *Oil Capitol Sheet Metal, Inc.*, 349 NLRB No. 118 (May 31, 2007); *Tualatin Elec., Inc.*, 319 NLRB 1237 (1995); *H.B. Zachry Co.*, 319 NLRB 967 (1995); *Hi-Tech Cable Corp.*, 318 NLRB 280 (1995).



process of collective bargaining, and the Board may not "compel either party to agree to a proposal or require the making of a concession."[64]

Considerations like those described above prompted the Board, in *Trustees of Columbia University*,[65] to hold that email addresses are *not* required as part of the *Excelsior* list disclosures. The Board majority's identification of problems and incongruities associated with compelled disclosure of work email addresses remains applicable today:

> We observe that a multitude of unanswered and difficult questions exist regarding the potential ramifications, for both employers and employees, of requiring employers to furnish employee e-mail addresses. For example, *what costs might be imposed on an employer if a union were able to send e-mails to employees' workplace e-mail addresses?* What if electronic mailings were *sufficiently voluminous to impair an employer's ability to conduct business electronically?* What becomes of *an employer's right not to furnish a forum, "on" its (virtual) property, for a third party to express its views?* What would be the interplay, if any, between newly imposed requirements and the Board's current law relative to *union access* to an employer's property? *Could employers continue existing e-mail monitoring programs without engaging in unlawful surveillance? Are employee privacy rights at stake?* Plainly, the Board's expertise does not encompass the rapidly expanding universe of information technology, and persons who know much more than we do about these matters will likely raise additional issues that we cannot even formulate without guidance.[66]

Nothing has changed that would warrant such a dramatic and unprecedented expansion of a union's right to use and disrupt an employer's business systems and equipment, during working time, and in work areas, which would all result from requiring disclosure to unions of work email addresses and business telephone numbers.  This type of information should not be the subject of mandated *Excelsior* list disclosures.

**(c) Personal Email Addresses and Phone Numbers.**  *The Board should not require disclosure of personal email addresses or work phone numbers because mandating disclosure of this information would not advance legitimate Excelsior objectives, and would constitute an <u>extraordinary intrusion on individual privacy rights</u>.*

 Equally objectionable is any requirement that employers disclose employee *personal* phone numbers and email addresses.

---

[64] NLRA § 8(d), 29 U.S.C. § 158(d); *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 102 (1970) ("while the [NLRB] does have power . . . to require employers and employees to negotiate,  it is without power to compel a company or a union to agree to any substantive contractual provision").  *See also NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 45 (1937) ("The Act does not compel agreements between employers and employees. It does not compel any agreement whatever.").

[65] 350 NLRB 574, 576 (2007).

[66] *Id.* (emphasis added).



Preliminarily, as the Board itself apparently understands – based on the caveat that this information must be provided only if "available" – the required disclosure of personal employee phone numbers and email addresses would not accomplish either of the *Excelsior* purposes. This information is not necessary to "to identify issues concerning eligibility."[67] Nor would mandated employer disclosure of personal email addresses and phone numbers give unions effective access to "*all* employees"[68] because employers rarely require the disclosure of this information, and many employees – if asked – refuse to provide it. Even when *Excelsior* was decided, as noted above, the Board refrained from requiring the disclosure of telephone numbers even though telephones were the most widespread rapid means of personal communication.[69]

As noted previously, the evolution in electronic communication has dramatically *reduced* any need for mandated disclosure of person-to-person email addresses and phone numbers, because employees have widespread access to union-sponsored web sites, and web services such as Twitter, Facebook and Youtube, for example, none of which require the involuntary disclosure of employee personal contact information.

The same evolution also makes it likely that the Proposed Rule's mandatory disclosures would be ineffective, because so many employees and family members use online email accounts and social media sites, using user names and passwords to which employers lack access. In this context, requiring disclosure of personal email addresses and phone numbers – to the extent "available" – will produce, at best, information for an unpredictable sampling of bargaining unit employees. The outcome is likely to be more Board litigation because an "availability" standard will be difficult to apply, and the Proposed Rule provides that voter eligibility list "deficiencies" will be "grounds for setting aside the election whenever proper objections are filed."[70]

As a final matter, employee privacy interests constitute a much more fundamental reason not to require disclosure of personal phone numbers and email addresses. If anything has become clear during the explosive growth of electronic and social media, it is the number of people who have become dependent on these vehicles for communication, and the potential for abuse, harassment, malicious security intrusions, and identity theft. These risks add to the legitimate expectation of privacy to which every person is entitled, which warrants protection by federal agencies rather than indiscriminate mandated disclosure.[71]

---

[67] 76 Fed. Reg. at 36,820. *See also Excelsior*, *supra* note 45, 156 NLRB at 1242-43.

[68] *Excelsior*, *supra* note 45, 156 NLRB at 1242-43 (emphasis in original).

[69] *See* note 55, *supra*, and accompanying text.

[70] *See* Proposed §§ 102.62(d), 102.67(j), 76 Fed. Reg. at 36,837-38, 36,842-43.

[71] Any requirement that employers disclose employee personal email addresses and phone numbers would stand in sharp contrast to other government efforts to protect consumer privacy and eliminate unwanted intrusions into the home. The Federal Communications Commission has reported the receipt of "complaints in increasing numbers from consumers throughout the nation about unwanted



The Proposed Rule's expansion of *Excelsior* disclosure requirements will also predictably impose significant unwelcome costs on employees who receive unwanted phone calls and texts which exceed mobile device data limitations and time-based charges.  Such unexpected mobile device costs have already been identified by the Federal Communications Commission ("FCC") and the Government Accountability Office ("GAO") as a significant problem affecting 30 million Americans or approximately 34 percent of mobile device users in the United States.[72]

The Board should adhere to the reasoning expressed in *United States Department of Defense v. FLRA*,[73] where the Supreme Court – though acknowledging the right of private sector unions to obtain home address information – stated that the "individual privacy interest . . . is far from insignificant."[74]  In the Court's words:

> *Many people simply do not want to be disturbed at home by work-related matters*. Employees can lessen the chance of such unwanted contacts by not revealing their addresses to their exclusive representative. Even if the direct union/employee communication facilitated by the disclosure of home addresses were limited to mailings, this does not lessen the interest that individuals have in preventing at least some unsolicited, unwanted mail from reaching them at their homes. *We are reluctant to disparage the privacy of the home, which is accorded special consideration in our Constitution, laws, and traditions*.[75]

**3.   Post-Hearing Deferral of Unit Issues is Improper.**  *The Proposed Rule improperly disregards the statutory purpose responsible for the pre-election hearing, and it undermines the statutory scheme by deferring the resolution of many unit issues until after the election.*

The Proposed Rule would give Regional Directors and Hearing Officers the authority to deny employers the right to a pre-hearing election where a dispute over the appropriate scope of the petitioned-for unit concerns less than 20 percent of the bargaining unit (if the disputed individuals were found eligible to vote).  This portion of the Proposed Rule violates Section 9(c) of the Act and is misguided as a matter of policy.

---

and uninvited calls to their homes from telemarketers," which has resulted, among other things, in the Telephone Consumer Protection Act and the national Do-Not-Call Registry.  *See* "Do Not Call List," FCC Encyclopedia (www.fcc.gov/encyclopedia/do-not-call-list).

[72] FCC, Consumer & Government Affairs Bureau, *White Paper on Bill Shock*, at 3 (Oct. 13, 2010) (http://transition.fcc.gov/stage/Bill-Shock-White-Paper.pdf) ("in a survey done in April-May 2010, the FCC found that 17 percent of all Americans with cell phones – a total of 30 million people – had experienced a sudden increase in their bill that occurred even when they had not changed their calling or texting plan"); GAO, *FCC Needs to Improve Oversight of Wireless Phone Service*, at 11 (GAO-10-34 Nov. 2009) (www.gao.gov/new.items/d1034.pdf) (reporting that 34 percent of wireless phone users responsible for paying for their services received unexpected charges in 2008 and early 2009).

[73] 510 U.S. 487 (1994).

[74] *Id*. at 501.

[75] *Id*., citing *Rowan v. United States Post Office Dept*., 397 U.S. 728, 737 (1970); *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting).



The Board and the courts have long held that Section 9(c) "makes mandatory a pre-election hearing."[76]  Additionally, for the reasons discussed more fully below, it constitutes misguided policy for the Proposed Rule to eliminate or dramatically reduce the role played by the pre-election hearing.

> (a) **Section 9(c) Requires a Pre-Election Hearing**. *The requirements of Section 9(c) are mandatory and constrain the Board from changing pre-election hearings as would be accomplished by the Proposed Rule.*

Section 9(c) of the Act provides that:

> Whenever a petition shall have been filed . . . the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice . . .  If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof.

29 U.S.C. § 159(c)(1)(B).

At various times in the past, there have been calls for more rapid elections and to change the Board's procedures.  However, both the Board and the courts have concluded that the requirement of a pre-election hearing prevented the Board from having an unfettered right to accelerate the election process.  In *NLRB v. S.W. Evans & Son*,[77] decided shortly after the Taft-Hartley amendments were enacted – which amended Section 9(c) of the Act – a Regional Director ordered a pre-hearing election, despite the employer's contentions that a number of employees were ineligible to vote.  Although a post-election hearing was held, and the number of correctly challenged ballots was ultimately not sufficient to affect the election results, the court of appeals denied enforcement of the Board's order.[78]  The Court held that "the instant problem is hardly apt to recur, *since the amended Act now makes mandatory a pre-election hearing*."[79]  At least one other court has also held that, as a result of the Taft-Hartley amendments to Section 9(c), "the hearing must invariably precede the election" and the pre-election hearing requirement is "mandatory."[80]

Contrary to statements in the Proposed Rule, the Board itself has definitively – and unanimously – held that Section 9(c) requires a pre-election evidentiary hearing.  In the Proposed Rule, the Board states, incorrectly, that "there has been continuing uncertainty concerning the circumstances under which an evidentiary hearing is necessary."[81]  Any such

---

[76] *NLRB v. S.W. Evans & Son*, 181 F.2d 427, 429 (3d Cir. 1950).

[77] 181 F.2d 427 (3d Cir. 1950).

[78] *Id*. at 430-31.

[79] *Id*. at 429 (emphasis added).

[80] *Utica Mutual Ins. Co. v. Vincent*, 375 F.2d 129, 133-34 (2d Cir. 1967).

[81] 76 Fed. Reg. at 36,815.

*The Coalition for a Democratic Workplace*
*Comments on NLRB Proposed Election Rule*



uncertainty was clearly dispensed with many years ago in *Angelica Healthcare Services,*[82] *Barre National, Inc.,*[83] and *North Manchester Foundry, Inc.*[84]  In these three cases, all of the participating Board members – including four Republicans *and* three Democrats – held that Section 9(c) of the Act requires the Board to permit employers to present evidence in support of their positions at a pre-election hearing.[85]

In *Angelica Healthcare Services*, an employee filed a decertification petition and the Regional Director issued an order to show cause why an election should not be directed.  The union argued that the petition should be dismissed on contract bar grounds or, alternatively, that a full hearing should be held.  The Regional Director directed an election without addressing the request for a hearing.  Citing the plain language of Section 9(c), the Board held that the Regional Director *must* provide the "appropriate hearing" referenced in Section 9(c) of the Act "prior to finding that a question concerning representation existed and directing an election."[86]

In *Barre National*, the Regional Director instructed the hearing officer to refuse to allow the employer to present evidence at a hearing regarding the supervisory status of a group of employees that constituted 8 to 9 percent of the potential unit.[87]  Instead, the Regional Director permitted only an offer of proof by the employer and – similar to what the Proposed Rule would accomplish – permitted the employees to vote subject to challenge, leaving resolution of the supervisory issue to the post-election challenge procedure.  The Board held that the Regional Director erred by refusing to allow the employer to present this evidence, stating that the pre-election hearing "did not meet the requirements of the Act and the Board's Rules and Statements of Procedure."[88]

The decision in *North Manchester Foundry* involved similar facts.  The union sought to represent a unit of production and maintenance employees.  The employer argued that a group of the employees did not have a sufficient community of interest with the stipulated unit.  After

---

[82] 315 NLRB 1320 (1995).

[83] 316 NLRB 877 (1995).  In both *Angelica Healthcare Services* and *Barre Nat'l, Inc.,* the Board scheduled oral argument and accepted *amicus curiae* briefs on the issue of whether Section 9(c) required a pre-election hearing.  Numerous parties filed *amici* briefs.

[84] 328 NLRB 372 (1999).

[85] In *Angelica Healthcare* and *Barre Nat'l*, all five Board Members – at the time Chairman Gould, and Members Stephens, Browning, Cohen, and Truesdale – participated in the decision.  In *North Manchester Foundry*, Chairman Truesdale and Members Hurtgen and Brame participated.  All seven Board Members held that Section 9(c) requires a pre-election hearing.  Chairman Gould and Members Browning and Truesdale were Democratic Board Members.  Chairman Stephens and Members Cohen, Hurtgen, and Brame were Republican Board Members.

[86] 315 NLRB at 1321.

[87] At the hearing, the parties agreed on jurisdiction, labor organization status, the appropriate unit, and the absence of a contract bar.  316 NLRB at 877.

[88] *Id.* at 878



the union amended its petition to exclude some of the relevant employees, the hearing officer closed the hearing on the grounds that the remaining disputed employees constituted only 10 percent of the unit, and thus could be permitted to vote subject to challenge.  The Board granted the employer's request for review, holding that – just as in *Barre National* – the hearing officer "did not provide the employer with a sufficient opportunity to present its evidence at the preelection hearing, as required under Section 9(c) of the Act and the Board's Rules and Regulations."[89]

The explanation in the Proposed Rule obscures what, in actuality, is a very clear path set forth in *Angelica Healthcare*, *Barre National* and *North Manchester Foundry*.   These cases are plainly ignored by the Proposed Rule's suggestion that there has been "continuing uncertainty concerning the circumstances under which an evidentiary hearing is necessary."[90]  The Proposed Rule states that, in *Angelica Healthcare*, the Board held that an "appropriate hearing" prior to the election is required, while noting that it was "unnecessary to decide in this case the type of hearing that would be necessary to satisfy the Act's 'appropriate hearing' requirement."[91]  But *Angelica Healthcare Services* very clearly stands for the proposition that where there are contested issues, the Board may not dispense with the hearing requirement altogether.  And even if *Angelica Healthcare* did not define the type of hearing that would satisfy the requirements of Section 9(c), *Barre National* and *North Manchester Foundry* very clearly hold that the employer – at a minimum – must be permitted to submit testimonial evidence at a pre-election hearing.

The Proposed Rule's attempt to distinguish *Barre National* is, at best, disingenuous.  The Proposed Rule states:

> Quoting both Section 102.66(a) and 101.20(c) of the existing regulations, the Board [in *Barre National*] held that the two sections "entitle parties at [pre-election] hearings to present witnesses and documentary evidence in support of their positions."  For that reason, the Board held that the regional director had erred by deferring the taking of the employer's testimony until after the election.  But the Board did not hold in *Barre-National* that the disputed issue had to be resolved before the regional director directed an election.  In fact, the Board expressly noted, "our ruling concerns only the entitlement to a preelection hearing, which is distinct from any claim of entitlement to a final Agency decision on any issue raised in such a hearing."  The Board further noted that "reviewing courts have held that there is no general requirement that the Board decide all voter eligibility issues prior to an election."[92]

The Proposed Rule goes on to state that the revision of Section 102.66(a) and the elimination of Section 101.20(c) "removes the basis for the Board's holding in *Barre-National* that

---

[89] 329 NLRB at 373.

[90] 76 Fed. Reg. at 36,815.

[91] 315 NLRB at 1321 n.6.

[92] 76 Fed. Reg. at 36,815 (internal citations omitted).



the hearing officer must permit full litigation of all eligibility issues in dispute prior to the direction of an election, absent consent of all parties to defer litigation of the issues."[93]

The premise of the above quotations from the Proposed Rule is flawed.  Despite the very clear invocation of Section 9(c) in *Angelica Healthcare*, *Barre National*, and *North Manchester Foundry*, the Proposed Rule attempts to discount those decisions as based solely on the Board's own regulations.  This is a clear misstatement of the holdings in each of these cases.  Although the decisions in *Angelica Healthcare*, *Barre National*, and *North Manchester Foundry* rested in part on analysis of Sections 102.66(a) and 101.20(c) in the Board's regulations, all three cases explicitly held that *Section 9(c) in the Act* required a pre-election evidentiary hearing.  To this effect, for example, in *North Manchester* the Board stated:

> In *Barre-National*, the Board held that the preelection hearing *did not meet the requirements of the Act or* of the Board's Rules and Statements of Procedure, where, as here, the hearing officer at the preelection hearing precluded the employer from presenting witnesses and introducing evidence in support of its contention that certain individuals were not eligible voters, and instead directed that resolution of that issue be deferred to the postelection challenge process.[94]

Nor is Section 9(c)'s requirement of a pre-election hearing diminished by statements in *Barre National* that (i) "our ruling concerns only the *entitlement to a preelection hearing*, which is a matter distinct from any claim of entitlement to a *final agency decision* on any issue raised in such a hearing," or (ii) "reviewing courts have held that there is no general requirement that the Board *decide all voter eligibility issues* prior to an election"[95]  It is well established that parties are not entitled to a "final agency decision" on every issue raised in a pre-election hearing, and the Board is not required to decide "all voter eligibility issues" prior to an election.[96]  However, the right to present evidence in a pre-election hearing under Section 9(c) is different from what must be the subject of final Board decisions prior to the election.

Based on Taft-Hartley's enactment, *parties have the right under Section 9(c) to present evidence in a pre-election hearing*.  The Proposed Rule's limitation on pre-election hearings violates Section 9(c) of the Act, and this limitation should not be adopted by the Board.

---

[93] *Id*. at 36,824 (internal citations omitted).

[94] 328 NRLB at 372-73 (emphasis added, internal citation omitted).  *See also Barre-National*, 316 NRLB at 880 (Member Stephens, concurring) ("[I]n my view, the statute – even apart from our implementing rules and regulations – entitles parties to preelection testimonial hearings"); *Id*. at 880 (Member Cohen, dissenting) ("My colleagues concede, as they must, that the Regional Director violated the procedures of the Act, as well as the Rules of the Board, by not permitting the Employer to adduce evidence on the issue of supervisory status").

[95] 76 Fed. Reg. at 36,824 (internal citations omitted; emphasis added).

[96] 316 NLRB at 878.



**(b) Prompt Elections Occur Even Though Pre-Election Hearings Are Available.** *The Board has a successful track record of promptly holding elections, and the curtailment of pre-election hearings is not necessary for elections to be conducted in a timely manner.*

As already explained above, the selective emphasis of "speed" is pervasive throughout the Proposed Rule.[97] Yet, nothing in the Proposed Rule or existing case law suggests a need exists to further shorten the time period for conducting elections, even in the small number of cases in which hearings have taken place.

Over the past decade, as noted in the Proposed Rule, elections have occurred within a median time of 38 days after the filing of a petition. And in fiscal year 2010, the average time from petition to an election was 31 days.[98] Those numbers include cases in which a pre-election hearing is held. In Fiscal Year 2010, NLRB Regions conducted 1,790 representation elections. Of those, 1,648 cases or 92.1 percent were held without either party exercising their right to a hearing.[99] And even among the small number of cases in which a hearing was held (142 cases or 7.9 percent), the median number of days from the filing of a petition to a Regional Director decision was 37 days in 2010, significantly *shorter* the Agency's "ambitious" target of 45 days.[100] This time frame has been consistent for the last several years, with the median number of days from petition to Regional Director decision in contested cases at 34 days in 2009, 36 days in 2008, and 36 days in 2007.[101]

Even in cases in which a hearing is held, the Board is far exceeding its "ambitious" timing goals, and elections are being held within a short time frame after the filing of a petition. Significant delays in processing of cases are plainly the exception, not the rule. Thus, even if it were permissible under the Act, the Proposed Rule's limitation on the role of pre-election hearings is unnecessary and would not further the Act's policies and purposes.

**(c)  The Proposed Rule Is Likely to Lengthen the Overall Representation Process.** *Curtailing pre-election hearings will result in more litigation, and is likely to increase the time required for resolving representation issues.*

The Proposed Rule states "resolution of individual eligibility issues prior to elections . . . often results in unnecessary litigation and a waste of administrative resources" and, according to the Proposed Rule, reducing or eliminating the right to a pre-election hearing would

---

[97] *See* note 2, *supra*.

[98]  *See* Gen. Counsel Mem. 11-09, at 18 (March 16, 2011), *cited in* 76 Fed. Reg. at 36,831 n.75 (Member Hayes, dissenting).

[99] See Gen. Counsel Mem. 11-03, at 5 (Jan. 10, 2011).

[100] *Id*.

[101] *Id*.; Gen. Counsel Mem. 09-03, at 6 (Oct. 29, 2008).



"eliminate unnecessary litigation."[102]   Yet for several reasons, dispensing with a pre-election hearing will more likely have the opposite effect, and would *increase* the amount of litigation:

- If the parties cannot agree on the unit status of the challenged individuals, the Proposed Rule states that "either party may file a unit clarification petition to bring the issue back before the Board."[103]  Thus, even the Proposed Rule concedes that eliminating the pre-election hearing will, in many cases, simply substitute one mode of litigation for another.  Moreover, while pre-election hearings are in almost all cases completed and adjudicated within a short period of time, unit clarification petitions invariably take much longer to decide, they often require a hearing, and they are often subject to review by the Board.  Accordingly, even if eliminating pre-election hearings would speed up the time frame in which an election is held, the hearing elimination is unlikely to reduce total litigation nor will it shorten the time period for the representation process to be completed.

- Eliminating pre-election hearings, combined with the Proposed Rule's newly required "Statement of Position," will likewise cause additional litigation while lengthening the overall representation process.  Because positions not asserted in Statements of Position would be irrevocably waived, employers will raise far more potential legal issues in their Statements of Position than would have been raised in pre-election hearings under the current rules.  In the absence of a pre-election hearing to narrow or adjudicate these issues, these issues will require resolution, even if they are deferred from the pre-election timeframe to the post-election timeframe.

- The consequence of the Proposed Rule is likely to be a larger number of legal issues requiring resolution in a post-election hearing, with a substantial decrease in the number of stipulated or consent elections agreed upon by employers.  Again, this will produce more litigation and delays for the representation process to be completed, contrary to the policies and purposes underlying the Act.

**(d)  The Proposed Rule Will Promote Uncertainty.** *Eliminating the Pre-Election Hearing* *"Casts a Cloud of Uncertainty" Over the Election Process.*

Under the Proposed Rule, if the eligibility of less than 20 percent of the unit is contested (and no jurisdictional or other bargaining unit scope issues are present), then no pre-election hearing will be held.[104]  CDW agrees with the observation by Member Hayes that permitting elections to go forward – where a substantial number of the voting employees may ultimately

---

[102] 76 Fed. Reg. at 36,824, 36,826.

[103] *Id.*

[104] *Id.* at 36,841.



not be eligible for inclusion in the unit – "casts a cloud of uncertainty over the election process," and raises serious questions about whether employees can make an informed choice.[105]

The Board has long held that, even if not statutorily required, it is preferable to decide eligibility issues – particularly eligibility issues regarding supervisory status – prior to an election.  In *Barre National*, the Board noted that leaving supervisory issues unresolved because of the denial of a pre-election hearing puts an employer "on the horns of a difficult dilemma" because while employers can demand the loyalty of statutory supervisors during a campaign (*i.e.*, demand that they not engage in union activity), if those individuals are found not to be statutory supervisors, the employer has then clearly run afoul of Section 7.[106]  This can severely prejudice an employer during a union campaign, both because of the uncertainty with which it must approach interactions with its employees, and because if it takes the conservative path and does not order its supervisors to cease union activity, it often will lose some of its most effective and credible individuals that would otherwise advocate its position against union representation.

4. **Board Review of Regional Director Decisions Should Not Be Discretionary.**  *It constitutes an improper delegation of authority for the Board to exercise only discretionary review of Regional <u>Director decisions, contrary to the Act and the legislative scheme underlying the Act.</u>*

Although the Board has traditionally operated under a system whereby most pre-election Regional Director decisions are subject to discretionary review by the Board, and post-election disputes are generally subject to mandatory Board review, which effectively gives either party a right to appeal most post-election decisions by a Regional Director.  Under the Proposed Rule, the post-election appeal right would be eliminated, and many or most disputed Regional Director decisions would never have the benefit of immediate substantive review by the Board.  For at least two reasons, elimination of this appeal right is improper.

First, Congress designated the Board as the agency responsible for national labor policy – not the Board's hearing officers or Regional Directors – which operates "to obtain uniform application of its substantive rules and to avoid [the] diversities and conflicts likely to result from a variety of local procedures and attitudes towards labor controversies."[107]  The Board has successfully served as the ultimate authority for deciding post-election disputes, which has been central in the maintenance of consistency and uniformity across the Board's 34 Regional Offices.  Delegating national labor policy to hearing officers and Regional Directors in all but a handful of cases undoubtedly will contribute to fragmentation of labor policy into a "variety of local procedures and attitudes," contrary to the consistency and uniformity that Congress sought to maintain by enacting the NLRA.

---

[105]  *Id*. at 36,831 (Member Hayes, dissenting).

[106]  316 NLRB at 880 (Member Cohen, dissenting).

[107]  *Garner v. Teamsters Local 776*, 346 U.S. 485, 490-491 (1953).



Second, making Board review of post-election disputes discretionary is very likely to cause a dramatic rise in enforcement litigation for the Board, especially in "test of certification" cases where employers engage in post-certification refusals to bargain as the only means of obtaining court review of the Board's certification.[108] If the Board itself exercises only discretionary review over post-election disputes – as the Proposed Rule would require – it is highly likely that certification disputes would be pursued by employers in much larger numbers in the courts of appeals.

Thus, the Proposed Rule will not only constitute an improper delegation of authority to hearing officers and Regional Directors, it would also effectively delegate much of the same authority to the federal courts of appeals (in the form of cases challenging certification).  In turn, if the courts of appeals assume *de facto* responsibility for resolving all cases in which parties wish to exercise a post-certification right of appeal, this will promote further dissimilarities and conflicts across the different federal Circuits.  In this event, discretionary Supreme Court review would be the only means by which national uniformity could be restored, with most differences remaining unreconciled based on the very small number of cases in which the Supreme Court grants review.

Obviously, Congress charged the Board itself with the development and maintenance of consistency in our national labor policies, and not hearing officers, Regional Directors, the courts of appeals, or the Supreme Court.  This represents another area in which the Proposed Rule is deficient, and there should be no change from the Board's current approach, which confers a right to have Board review from all post-election Regional Director decisions.

5.  **The Proposed Rule's "Statement of Position" Requirement Would Be Unfair and Punitive to Employers.**  *The Proposed Rule's requirement of a binding pre-hearing written statement of position constitutes an improper denial of due process, which will severely prejudice <u>most employers and inappropriately favor union representation.</u>*

The Proposed Rule provides that a new mandatory submission, called a "Statement of Position," would replace the existing Questionnaire on Commerce that is sent to all non-petitioning parties.  The Statement of Position would be due "no later than the date of the

---

[108] The Board's Office of General Counsel has described "test of certification" cases as follows: "In the absence of any other avenue to gain review by the courts of the Board's certification of a labor organization as the collective-bargaining representative of its employees, these cases involve the refusals of an employer to recognize and bargain with the union in order to 'test' or challenge the certification. Because the employer acknowledges the refusal to recognize and bargain, the only defense customarily offered in answer to a complaint is that the Board's certification was improper or invalid. Accordingly, these cases are usually resolved at the Board level on General Counsel's motion for summary judgment with the issuance of a decision and order finding a violation and ordering bargaining. The employer then secures court review by filing a petition for review with the court of appeals." Gen. Counsel Mem. OM 04-25 at 1 (Feb. 12, 2004).



hearing," which under the Proposed Rule would mean no later than seven days after service of the Notice of Hearing (absent special circumstances).[109]

Significantly, the Proposed Rule provides for a broad waiver regarding any potential argument or position omitted from the Statement of Position.  The Proposed Rule states:

> The employer shall be precluded from contesting the appropriateness of the petitioned-for unit at any time and from contesting the eligibility or inclusion of any individuals at the pre-election hearing, including by presenting evidence or argument, or by cross-examination of witnesses, if the employer fails to timely furnish the information [required].[110]

The Statement of Position ostensibly is modeled on the mandatory disclosures described in Federal Rule of Civil Procedure 26(a)(1) as well as contention interrogatories in civil litigation.[111]  The Statement of Position would require information regarding the parties' position on: jurisdiction; the appropriateness of the petitioned-for unit; proposed exclusions from the petitioned-for unit; the existence of any bar to an election; the type, dates, times, and location of the election; and all other issues a party would raise at the hearing.[112]

If a party takes the position that a proposed unit is not an appropriate unit, it must also state the basis for its contention, and "identify the most similar unit it concedes is appropriate."[113]  If a party intends to challenge the eligibility of individuals in a proposed unit, the party is required to identify the individuals in question and state the basis for the objection.[114]  The Proposed Rule also mandates that the employer include in its Statement of Position "the full names, work locations, shifts, and job classifications of all individuals in the proposed unit," and prepare for the regional office a list of employee "telephone numbers, available e-mail addresses, and home addresses."[115]

For several reasons, the Proposed Rule's "Statement of Position" requirement would impose unfair, punitive burdens on employers, and would undermine the Act's policies and objectives pertaining to representation elections.

First, the assumptions underlying the rationale for the Statement of Position are flawed. For example, the Proposed Rule suggests the Statement of Position requirement "is modeled on the mandatory disclosures described in Fed. R. Civ. P. 26(a)(1) as well as on contention

---

[109] 76 Fed. Reg. at 36,821.

[110] *Id.* at 36,839.

[111] *Id.* at 36,821.

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.* at 36,838.



interrogatories commonly propounded in civil litigation."[116]  This analogy is clearly misplaced because the proposed "Statement of Position" requirement is much more expansive and punitive than the federal Rule 26 disclosures (and interrogatories), which are typically issued well after a lawsuit is filed, and in most cases long after the underlying dispute is known to the employer.  Indeed, Rule 26 disclosures and discovery are limited to federal court litigation, and federal employment statutes require – as a jurisdictional prerequisite – the *prior* filing of agency charges followed by extensive agency investigations.[117]  This usually gives the employer months or years to investigate and formulate its own arguments and legal positions before the employer is subject to any federal court disclosure or discovery requirements.  By comparison, the proposed Statement of Position would be required within seven days (or probably less) of the employer *first learning* of a petition for representation.

Second, Rule 26 disclosures can be updated and supplemented as the litigation moves forward, the parties are permitted to undertake subsequent discovery, and Rule 26(a)(1) does not constitute an inflexible waiver of all unstated or unformulated legal and factual positions.  To the contrary, the Statement of Position imposes inflexible requirements in an extremely short time frame, with a simultaneous broad waiver of positions and arguments not set forth in the Statement of Position.

Third, requiring an employer's comprehensive written Statement of Position regarding all of the items listed in the Proposed Rule are impractical and inherently unfair, especially given that the overwhelming majority of employers have no unionized employees and are predictably unfamiliar with the many technical legal issues associated with a petition for representation.  Again, it warrants emphasis that unions exercise near-complete control over the timing of any representation petition's filing, and thus will have the opportunity to engage in hearing preparation for as long as the union might desire in advance of the hearing.  To the contrary, employers have no control over when an employee petition is filed (and frequently will be unaware that union organizing activity is taking place).  This constitutes yet another area in which the Proposed Rule imposes dramatically different and more severe burdens and requirements on employers rather than unions.

Fourth, equally unfair and contrary to the Act are the proposed requirement, concerning any union-proposed bargaining unit, that the employer's Statement of Position describe "*the most similar unit* that the employer concedes is appropriate,"[118] and the proposed penalty that

---

[116] *Id*. at 36,821.

[117] Federal court cases alleging sex, race, national origin or religious discrimination pursuant to Title VII of the Civil Rights Act of 1964, for example, require the prior filing of a charge with the Equal Employment Opportunity Commission ("EEOC") and other EEOC actions.  *See* 42 U.S.C. §§ 2000e-5(e), (f) (EEOC charge-filing requirement under Title VII).  Similar charge-filing requirements exist in cases involving alleged age discrimination and disability discrimination.  *See* 29 U.S.C. §§ 621(c), (d) (Age Discrimination in Employment Act); 42 U.S.C. § 12117(a) (Americans with Disabilities Act).

[118] Proposed § 102.63(b)(1)(i), 76 Fed. Reg. at 36,838.



would result from any failure to make this "most similar unit" concession.  The penalty is described in the Proposed Rule as follows:

> If a party contends that the petitioned-for unit is not appropriate in its Statement of Position but fails to state the most similar unit that it concedes is appropriate, the party shall also *be precluded from raising any issue as to the appropriateness of the unit, presenting any evidence relating to the appropriateness of the unit, cross-examining any witness concerning the appropriateness of the unit, and presenting argument concerning the appropriateness of the unit*.[119]

The Act requires *the Board* to "decide in each case" whether the "unit appropriate for the purposes of collective bargaining" should be "the employer unit, craft unit, plant unit, of subdivision thereof."[120] Because the statute imposes this inflexible obligation on the NLRB, there are multiple infirmities in the proposed Statement of Position's "most similar unit" concession and waiver penalty:

- The Proposed Rule's "most similar unit" requirement appears to mean that, when the employer fails to successfully identify the "most similar" alternative to a union-proposed unit, the Board will direct an election as to the union-proposed bargaining unit, even though it is *not* "appropriate." Such an outcome would plainly violate Section 9's requirement that bargaining units be appropriate.

- When the union-proposed unit is *not* appropriate, it makes no sense for the union-proposed *inappropriate* unit to dictate the Board's subsequent determination regarding what is an "appropriate" unit.  The Act itself *prohibits* the Board from reflexively imposing on the parties the bargaining unit "most similar" to whatever inappropriate bargaining unit has been proposed by the union.  To this effect, Section 9(c)(5) states that "[i]n determining whether a unit is appropriate . . . the extent to which the employees have organized *shall not be controlling*."[121]  It violates Section 9(c)(5) to impose the Proposed Rule's take-it-or-leave-it requirement on employers – forcing them to concede the appropriateness of the unit "most similar" to what the union has identified – because such a requirement precludes employers from even arguing for a dissimilar "appropriate" unit.

---

[119] Proposed § 102.66(c), 76 Fed. Reg. at 36,841 (emphasis added).

[120] NLRA § 9(b), 29 U.S.C. § 159(b).

[121] 29 U.S.C. § 159(c)(5).  *See also Local 1325, Retail Clerks Int'l Ass'n v. NLRB*, 414 F.2d 1194, 1202, 1205 (D.C. Cir. 1969) (court rejects Board's state-wide bargaining unit determination, stating: "Apart from the fact that the Union requested it," the Board's choice was "without substantial justification," there were "several units other than the one the Board selected [that] would seem appropriate," and the Board "by-passed several appropriate alternatives" and "ignored the criteria developed in its own prior . . . unit determinations"); *Allied Stores of New York, Inc.*, 150 NLRB 799, 807 (1965) (Board cannot give controlling weight to extent of organization as reflected in the bargaining unit sought by the petitioner).

- This is another area in which the Proposed Rule also inappropriately favors unions, because multiple "appropriate" bargaining units exist in many if not most cases, and the Act does not require elections to occur within the "most appropriate" unit.[122]  In addition to controlling the timing of any representation petition's filing, unions also have unlimited discretion, when deciding what unit definition will be included in the petition, to choose among the complete array of potential "appropriate" units. Regardless of whether or not the union-proposed unit is appropriate – which employers have a statutory right to challenge, and which the Board is statutorily required to evaluate "in each case"[123] – it is improper to limit employers to a *single* potential unit that is "most similar" to what the union has proposed.

- It often takes the Board and the courts *years* to resolve complex questions regarding appropriate bargaining units, and it took *nearly two years* for the Board to develop its health care bargaining unit rules.[124]  Given the complexity of bargaining unit determinations, it is plainly unfair and unrealistic to require employers, in a *single week* after a petition's filing, to retain counsel, to satisfy the Proposed Rule's other accelerated disclosure requirements, to evaluate whether the union-proposed bargaining unit is inappropriate, and – if so – to evaluate *all other* potential alternative units so the employer can prepare a binding written stipulation conceding the appropriateness of a different unit "most similar" to unit definition contained in the petition.

Finally, the Proposed Rule mischaracterizes existing practice where it states the Statement of Position "would ask parties to do no more than they currently do in preparing for a pre-election hearing."[125]  Under the current rules, parties have no obligation whatsoever to take a position on many of the legal issues that the Statement of Position would require.  There also is no current requirement that an employer assert a binding irrevocable position regarding what constitutes the appropriate bargaining unit if the employer contests the petitioned-for unit.   Moreover, there is no current requirement (or current practice) for the employer to provide names, work locations, shifts, job classifications, telephone numbers, available e-mail addresses, and home addresses of potential unit employees prior to or at the time of a hearing.[126]

---

[122] *Bartlett Collins Co.*, 334 N.L.R.B. 484 (2001), *citing Morand Bros. Beverage Co.*, 91 NLRB 409, 419 (1950), *enforced*, 190 F.2d 576 (7th Cir. 1951).

[123] NLRA § 9(b), 29 U.S.C. § 159(b).

[124] 76 Fed. Reg. at 36,828 and n.60.  *See also* 76 Fed. Reg. at 36,830 (Member Hayes, dissenting).

[125] *Id*. at 36,821.

[126]  Requiring employers to hand over personalized information such as employee telephone numbers, e-mail addresses, and home addresses prior to a hearing – even though there may never be an election – violates the employees' privacy rights and creates a significant potential for misuse of such personal information.

*The Coalition for a Democratic Workplace*
*Comments on NLRB Proposed Election Rule*



There are good reasons that existing law and practice do not impose such requirements on the parties.  As noted in the dissenting views of Member Hayes:

> It may be that employers of a certain size have legal counsel or labor consultants readily available to evaluate the election petition and proposed bargaining unit, identify any issues to be contested, and prepare the required statement in a week or less.  However, the Board conducts many representation elections among employees of small business owners who have no such counsel readily at hand, have no idea how to obtain such counsel in short order, and are themselves unaware of such legal arcania as appropriate unit, contract bar, supervisory status, and voter eligibility.  The Proposed Rule, if implemented, will unconscionably and impermissibly deprive these small business owners of legal representation and due process.[127]

At present, union members constitute a mere 6.9 percent of private sector employees in the United States.[128]  Especially considering the complex nature of issues such as appropriate bargaining units, contract bar issues, and unit eligibility issues, the Board can reasonably expect that more than 90 percent of U.S. employers have no familiarity with the types of highly technical rules governing the topics that must be comprehensively identified in the Statement of Position required under the Proposed Rule.

Given the abbreviated time period for determining these complex legal issues – under penalty of forever waiving every argument and position not identified – even sophisticated employers will face significant problems in complying with the Statement of Position requirement.  For many employers, especially smaller employers, it may take several days to review the petition and notice of hearing, more time may be spent consulting the company's regular counsel who may be unfamiliar with labor and employment law, and additional time predictably would be needed to find experienced labor counsel who, in turn, will obviously require the opportunity to obtain business information sufficient to assess what the Proposed Rule would require in the Statement of Position.

Under the Proposed Rule, it is highly likely that an enormous number of employers will waive many substantive legal arguments and positions based on the highly abbreviated timeframe in which the employers are required to enumerate them.  Conversely, employers will have every incentive and should have every right – when confronted by such an onerous timetable – to exhaustively identify every potential alternative bargaining unit, bar rule, argument and position that could conceivably play any role.  Like so many other areas governed by the Proposed Rule, the predictable outcome would be a proliferation of additional issues, more litigation, and a longer overall timeframe for representation issues to be resolved.

---

[127] *Id*. at 36,832 (Member Hayes, dissenting).

[128] *See* U.S. Dep't of Labor Bureau of Labor Statistics, Economic News Release, Union Members Summary (2011) (http://www.bls.gov/news.release/union2.nr0.htm).



**6. Deficiencies in the Rulemaking Process.**  *The way the Board's Proposed Rule is being considered unnecessarily departs from the handling of the Board's prior rulemaking regarding health care bargaining units, and a much more deliberative and inclusive process is needed for these issues to be constructively addressed.*

The current assortment of rules, regulations and case law regarding the conduct of NLRB elections has been developed over three quarters of a century.  Now, after the existing rules were developed in the course of *75 years*, a four-member NLRB with only a single Republican (who dissents from the Proposed Rule) is devoting *60 days* to the solicitation of comments on sweeping changes in the election process that go to the heart of nearly every other employee right and obligation that derives from the Act.

CDW objects, in particular, to five aspects of the process by which the Proposed Rule was issued and is receiving consideration.

First, CDW believes the Proposed Rule is inconsistent with the Administrative Procedure Act ("APA") and other legal requirements.[129]  In addition to the APA's procedural requirements on rulemaking,[130] the law provides that courts shall set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right,"[131] among other things.   All of these substantive problems are implicated in the Proposed Rule (as described throughout these comments).  However, CDW believes the current process is not adequate for effectuating the types of changes set forth in the Proposed Rule, considering the magnitude and nature of the proposed changes, their timing, the state of the economy, the incomplete composition of the Board, and the complex, diverse ways that the Proposed Rule would affect employees, employers, unions and the general public.

Second, the Proposed Rule imposes too many extraordinary changes at the same time, without any compelling justification other than the broad stated desire to "more effectively administer" and "further the purposes" of the NLRA.[132]  Even without getting into the specific changes, the litany of subsidiary objectives demonstrates the great complexity associated with what the Proposed Rule seeks to accomplish.  Thus, the new changes ostensibly would "remove unnecessary barriers," make the election process more "expeditious," "simplify" the

---

[129] Regulatory requirements relevant to the Proposed Rule are not limited to the NLRA and the APA.  *See, e.g.*, Regulatory Flexibility Act, 5 U.S.C. §§ 601 *et seq.* ("RFA"); Small Business Regulatory Enforcement Fairness Act, 5 U.S.C. §§ 801 *et seq.* ("SBREFA").

[130] *See, e.g.*, 5 U.S.C. § 553.

[131] 5 U.S.C. §§ 706(2)(A), (B), (C).  *See also NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 770 (1969) (Black, J., concurring) (indicating the NLRB "adjudication" decisions and "rulemaking" must comply with "applicable federal statutes such as the National Labor Relations Act . . . and the Administrative Procedure Act").

[132] 76 Fed. Reg. at 36,812.



procedures, render elections "more transparent and uniform," curtail "unnecessary litigation," and "consolidate" requests for Board review.  No agency can realistically expect to successfully accomplish all of these varied objectives in a single set of regulations, preceded with a 60-day review period, concerning a process that has been 75 years in the development.  In this respect, the Proposed Rule is unrealistic especially for an agency like the NLRB which, for all of its virtues, does not have a track record of effectuating rapid and expansive changes.

Third, the breadth and complexity of the proposed changes make it unwise to initiate rulemaking by presenting the business and labor relations community with a comprehensive re-write which involved no advance collaboration or iterative discussion.  Such a process is especially out of character for an agency that devotes so much of its own time to enforcing a statute that requires good faith discussion and which abhors a *fait accompli*.  In this sense, the current rulemaking hardly constitutes a model for employers and unions to emulate.  CDW shares the view expressed by dissenting Member Hayes that the Proposed Rule's implementation, if it occurs, will be regarded as "opaque, exclusionary, and adversarial.  *The sense of fait accompli is inescapable*."[133]

Fourth, the current process departs unnecessarily from the Board's first successful venture into rulemaking, which related to health care bargaining unit standards.[134]  Again, CDW embraces the view expressed by Member Hayes:

> At the very least, the proposals should have been previewed for *comment by the Board's standing Rules Revision Committee*, a group of agency officials specifically identified as responsible for considering and recommending modifications in existing rules and proposed new rules, and *by the Practice and Procedures Committee of the American Bar Association*, a group representative of the broad spectrum of private and public sector labor-management professionals that frequently serves as a sounding board for revisions of our Rules. I believe the Board should also have exercised its discretion to hold an *open meeting under the Government in Sunshine Act* when voting to authorize a rule revision proposal. Alternatively, the Board could have undertaken *negotiated rulemaking*. Any of the suggested processes *could have encouraged consensus in rulemaking,*

---

[133] *Id*. at 36,830 (emphasis added) (Member Hayes, dissenting).

[134] As noted by dissenting Member Hayes, the health care bargaining unit rulemaking was dramatically different and much more inclusive than the Board's present efforts: "The initial July 2, 1987 notice of proposed rulemaking was followed by a series of four public hearings, the last one held over a 7-day period, in October 1987. Thereafter, the written comment period was extended. Another rulemaking notice followed on September 1, 1988. It reviewed the massive amount of oral testimony (3545 pages and 144 witnesses) and written comments (1500 pages filed by 315 individuals and organizations) received during the prior year and announced a revised rule with another 6-week period for written comment. The final rule was published on April 21, 1989, almost 2 years after the initial notice." *Id*.

*The Coalition for a Democratic Workplace*
*Comments on NLRB Proposed Election Rule*



> *rather than the inevitably divisive approach my colleagues have chosen by publishing their*
> *proposed rules with no advance notice or public discussion of their purpose or content.*[135]

Fifth, the Proposed Rule is being promulgated at an exceptionally poor time considering the state of the economy, the Board's incomplete composition, and the uncertain political environment associated with the 2012 presidential and congressional elections. Regardless of whose interests are advanced by the Proposed Rule, it would unquestionably impose costs on businesses which, even in the absence of actual union organizing, would need to invest substantial time and money preparing for the *possibility* of representation hearings which, under the Proposed Rule, would occur on seven days' notice. As noted previously, the Board at present has only four members, with only a single Republican, and with two of the three Democratic members whose appointments are scheduled to end by the end of this year. Next year's presidential and congressional elections may cause a near-immediate reconsideration of any changes, if adopted as part of the Proposed Rule, depending on the outcome of the elections, and any resulting impact on the Board itself. Such variables make this an especially poor time to consider such sweeping changes in a process that is so familiar in its present form, when the changes – if implemented – will further erode whatever confidence remains regarding the Board's objectivity and neutrality.

Finally, the Proposed Rule's changes – taken individually and together – are unfair because they lack balance and disproportionately implement changes that promote unions and disfavor management, especially small businesses. Without reciting all of the changes to which CDW has raised objections, their cumulative effect is to give unions virtually all control regarding the timing of elections, to place employers in a "Catch-22" situation upon receiving a petition based on the need to simultaneously prepare a binding pre-hearing Statement of Position (with the understanding that anything not contained in the Statement of Position is waived), prepare a list of employees, change preexisting commitments (that may conflict with the hearing scheduled with seven days notice), provide a voter list to be submitted to the Regional Director, prepare an *Excelsior* list (to be provided to the Union), while deferring the resolution of many unit issues until after the election, and doing away with any mandatory Board review of Regional Director decisions. These changes as proposed are uniformly favorable to unions, and would uniformly prejudice employers. Even more troubling, as noted above, is the Proposed Rule's adverse impact on employee free choice. Given this lack of balance, it is not credible to regard the Proposed Rule as a mere adaptation to "changing patterns of industrial life."[136]

CDW urges the Board to hold the present Proposed Rule in abeyance, and to revisit a broader reassessment of these issues as part of a process that involves a more thoughtful and constructive interchange with employers, unions, community and government leaders, and nonunion employee advocates throughout the country. Such a process should also be

---

[135] *Id.* (emphasis added; footnotes omitted).

[136] *NLRB v. Weingarten Inc.*, 420 U.S. 251, 266 (1975), *quoted in* 76 Fed. Reg. at 36,816.



undertaken only when the Board has its full complement of confirmed members, which would provide a necessary foundation for these issues to be constructively addressed.

**7.   The Board's "Blocking Charge" Policy**.   *The Board's current blocking charge doctrine is unnecessary, has been subject to abuse and should be eliminated.   Alternatively, this aspect of the <u>Board's Proposed Rule should be held in abeyance</u>.*

It is CDW's experience that the Board's current blocking charge doctrine has been subject to abuse, it is unnecessary, and it should be abandoned by the Board.   Although the existing blocking charge rules have resulted in the deferral of elections based on the filing of unfair labor practice charges where there could be interference with employee free choice, the blocking charge rules, by themselves, resolve nothing.   If objectionable conduct has occurred and the Union files a request to proceed (*i.e.*, notwithstanding a pending blocking charge), the challenged employer conduct, if proven to be unlawful, can still be grounds for overturning the election.   If a blocking charge is filed and there is no union request to proceed, the representation petition remains in abeyance, often for exceptionally long periods of time.   In many of these situations, unions have determined they are likely to lose an upcoming election – for reasons unrelated to alleged employer misconduct – and the unions have filed blocking charges to prevent the employer from prevailing, thus obviating any need for the unions to withdraw their representation petitions.   The prevalence of this practice significantly skews the statistics regarding representation election "delays," and this constitutes yet another reason the Board should not attempt to further shorten the length of elections.

Abandonment of the Board's blocking charge doctrine – while preserving the Board's existing timetable for holding elections – would make the timing of elections more predictable for employees, unions and employers, without diminishing any of the remedies subsequently available if the Board finds that unlawful or objectionable conduct interfered with the employee exercise of free choice during the election itself.[137]

If there is continued adherence to the blocking charge doctrine, CDW requests that the Board hold in abeyance this aspect of the Proposed Rule (in addition to its other provisions), with a subsequent reassessment of these issues as part of a broader process involving a more thoughtful, deliberative and constructive interchange with employers, unions and other parties.

---

[137] CDW opposes the Proposed Rule's substantial curtailment of pre-election hearings, which would result in highly accelerated elections without having any pre-election hearing or resolution of important questions regarding voter eligibility, unit definition, who constitutes statutory supervisors, and comparable issues, all of which significantly affect the *structure* and *scope* of the election.   As noted previously, the statute requires that such structural issues be considered for potential resolution in pre-election hearings.   *See* pages 21-28, *supra*.   By comparison, there is no statutory basis for deferring elections based on the filing of blocking charges, and such charges involve allegations *unrelated* to the basic parameters governing how the election should be conducted.   Thus, the filing of blocking charges should not prevent an election from taking place as scheduled, especially because conducting the election does not have any adverse impact on the available remedies (including a possible re-run election) if unlawful or objectionable conduct were found to have occurred.

*The Coalition for a Democratic Workplace*
*Comments on NLRB Proposed Election Rule*



8. **Other Areas in Which the Board has Solicited Comments.** *CDW also responds as follows to the other requests for comments contained in the Board's Proposed Rule.*

   (a) **Electronic Signatures and Showing of Interest.** The Board should not permit electronic signatures in support of a showing of interest. Permitting electronic signatures would effectively nullify the showing of interest requirement in a context that provides no transparency or opportunities for verification by the Region or by affected employees, employers, and unions.

   (b) **Sanctions for Unauthorized Use of Voter Eligibility List.** As noted previously, CDW opposes the Proposed Rule's expansion of the voter eligibility (*Excelsior*) list to disclose employee email addresses and telephone numbers because, among other things, it will be impossible to enforce a prohibition against the use of such a list outside of representation proceedings. If any unauthorized use of the eligibility list can be established (however unlikely that may be), the Board should set aside any election in which the offending union has prevailed, without affecting the one-year election bar, with substantial monetary penalties and the referral of offenders to law enforcement authorities regarding any criminal violations implicated in such misconduct.

   (c) **Feasibility and Fairness of Seven-Day Period for Pre-Election Hearing and Other Time Periods**. The Board should not implement any accelerated time periods set forth in the Proposed Rule, including (among others) the requirement of a pre-election hearing seven days after a petition is filed. These time periods are unreasonable and unfair, especially when considered in combination with the Proposed Rule's mandatory pre-election Statement of Position submission, the waiver of all positions not identified in the Statement of Position, the post-hearing resolution of unit issues, the expanded voter eligibility list requirements, the requirement of electronic transmittal, and eliminating the right of Board review regarding post-election Regional Director decisions.

## Conclusion

The Board's Proposed Rule, if adopted, would do violence to many of the Board's statutory mandates under the Act, and it would impose unrealistic and inflexible requirements on employers and employees. The Proposed Rule, if adopted, would also lay the foundation for dysfunctional bargaining relationships, and equally dysfunctional union membership arrangements in which much larger numbers of employees – uninformed during the election campaign – become disillusioned with their unions, their employers and the NLRB-mandated process that thrust union membership upon them.

CDW urges the Board to hold the present Proposed Rule in abeyance, and to revisit a broader reassessment of these issues as part of a process that involves a more thoughtful and constructive interchange with employers, unions, community and government leaders, and nonunion employee advocates throughout the country.



Finally, CDW urges the Board to undertake this type of process only when the Board has its full complement of confirmed members, which would provide an important foundation for these issues to be constructively addressed.

Respectfully submitted,

THE COALITION FOR A DEMOCRATIC WORKPLACE

*Of Counsel*

CHARLES I. COHEN
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
ccohen@morganlewis.com
202-739-3000

PHILIP A. MISCIMARRA
ROSS H. FRIEDMAN
LAUREN E. MARZULLO
MORGAN LEWIS & BOCKIUS LLP
77 West Wacker Drive, 5th Floor
Chicago, Illinois 60601
pmiscimarra@morganlewis.com
rfriedman@morganlewis.com
lmarzullo@morganlewis.com
312-324-1000

DATED: August 22, 2011

Morgan Lewis

## **<u>Appendix 1</u>**

*Participants – The Coalition for a Democratic Workplace*



# The Coalition for a Democratic Workplace

The Coalition for a Democratic Workplace encompasses hundreds of employer associations, individual employers and other organizations that collectively represent millions of businesses of all sizes.  They employ tens of millions of individuals working in every industry and every region of the United States.  The following CDW member organizations join in the filing of these comments.[1]

## National Organizations (113)
Aeronautical Repair Station Association
Agricultural Retailers Association
Air Conditioning Contractors of America
Alliance for Worker Freedom
Aluminum Association
American Apparel & Footwear Association (AAFA)
American Bakers Association
American Concrete Pressure Pipe Association
American Council of Engineering Companies
American Fire Sprinkler Association
American Foundry Society
American Health Care Association
American Hospital Association
American Hotel and Lodging Association
American Meat Institute
American Pipeline Contractors Association
American Rental Association
American Seniors Housing Association
American Staffing Association
American Supply Association
American Trucking Associations
AMT-The Association For Manufacturing Technology
Asian American Hotel Owners Association
Assisted Living Federation of America
Associated Builders and Contractors, Inc.
Associated Equipment Distributors
Association of Equipment Manufacturers
Associated General Contractors of America
Automotive Aftermarket Industry Association
Brick Industry Association
Building Owners and Managers Association (BOMA) International

---

[1] Some of the listed CDW members have filed separate comments.  All of the listed organizations support the positions expressed in CDW's comments and join in their submission.

Morgan Lewis

Center for the Defense of Free Enterprise Action Fund
Center for Individual Freedom
Citizen Outreach
Coalition of Franchisee Associations
College and University Professional Association for Human Resources
Consumer Electronics Association
Equipment Marketing & Distribution Association
Fashion Accessories Shippers Association (FASA)
Federation of American Hospitals
Food Marketing Institute
Forging Industry Association
The Franchise Management Advisory Council
Healthcare Distribution Management Association
Heating, Airconditioning & Refrigeration Distributors International (HARDI)
INDA, Association of the Nonwoven Fabrics Industry
Independent Women's Voice
Independent Electrical Contractors, Inc.
Industrial Fasteners Institute
Interlocking Concrete Pavement Institute
International Association of Amusement Parks and Attractions
International Association of Refrigerated Warehouses
International Council of Shopping Centers
International Foodservice Distributors Association
International Sealing Distribution Association
International Sign Association
International Franchise Association
International Warehouse Logistics Association
Kitchen Cabinet Manufacturers Association
Metals Service Center Institute
Motor & Equipment Manufacturers Association
NAHAD - The Association for Hose and Accessories Distribution
National Armored Car Association
National Association of Chemical Distributors
National Association of Home Builders
National Association of Manufacturers
National Association of Theatre Owners
National Association of Wholesaler-Distributors
National Club Association
National Council of Chain Restaurants
National Council of Textile Organizations
National Council of Farmer Cooperatives
National Federation of Independent Business
National Franchisee Association

National Grocers Association
National Lumber and Building Material Dealers Association
National Pest Management Association
National Precast Concrete Association
National Ready Mixed Concrete Association
National Restaurant Association
National Retail Federation
National Roofing Contractors Association
National Small Business Association
National Solid Wastes Management Association
National Stone, Sand and Gravel Association
National Systems Contractors Association
National Tank Truck Carriers
National Tooling and Machining Association
NATSO, Representing America's Travel Plazas and Truckstops
North American Die Casting Association
North American Equipment Dealers Association
NUCA, Representing Utility and Excavation Contractors
Portland Cement Association
Precision Machined Products Association
Precision Metalforming Association
Printing Industries of America
The National School Transportation Association
Security Companies Organized for Legislative Action
Snack Food Association
Society of American Florists.
Society for Human Resource Management
Society of Independent Gasoline Marketers of America (SIGMA)
SPI: The Plastics Industry Trade Association
Steel Manufacturers Association
Retail Industry Leaders Association
Textile Rental Services Association
The Real Estate Roundtable
Travel Goods Association (TGA)
Truck Renting and Leasing Association
United Fresh Produce Association
The United Motorcoach Association
U.S. Chamber of Commerce
Western Growers Association

**State and Local Organizations (165)**
American Rental Association of Connecticut
American Rental Association of Massachusetts

American Society of Employers (Michigan)
Arkansas State Chamber of Commerce/Associated Industries of Arkansas.
Associated Builders and Contractors, Inc. California Chapter
Associated Builders and Contractors, Inc. Central Florida Chapter
Associated Builders and Contractors, Inc. Central Ohio Chapter
Associated Builders and Contractors, Inc. Central Pennsylvania Chapter
Associated Builders and Contractors, Inc. Chesapeake Shores Chapter
Associated Builders and Contractors, Inc. Connecticut Chapter
Associated Builders and Contractors, Inc. Delaware Chapter
Associated Builders and Contractors, Inc. Florida East Coast Chapter
Associated Builders and Contractors, Inc. Florida Gulf Coast Chapter
Associated Builders and Contractors, Inc. Georgia Chapter
Associated Builders and Contractors, Inc. Greater Houston Chapter
Associated Builders and Contractors, Inc. Hawaii Chapter
Associated Builders and Contractors, Inc. Heart of America Chapter
Associated Builders and Contractors, Inc. Inland Pacific Chapter
Associated Builders and Contractors, Inc Iowa, Chapter
Associated Builders and Contractors, Inc. Keystone Chapter
Associated Builders and Contractors, Inc. Los Angeles/Ventura Chapter
Associated Builders and Contractors, Inc. Massachusetts Chapter
Associated Builders and Contractors, Inc. Michigan Chapter
Associated Builders and Contractors, Inc. Mid-Tennessee Chapter
Associated Builders and Contractors, Inc. Mississippi Chapter
Associated Builders and Contractors, Inc. Nevada Chapter
Associated Builders and Contractors, Inc. New Mexico Chapter
Associated Builders and Contractors, Inc. New Orleans/Bayou Chapter
Associated Builders and Contractors, Inc. Northern Alabama Chapter
Associated Builders and Contractors, Inc. Florida Chapter
Associated Builders and Contractors, Inc. Pacific Northwest Chapter
Associated Builders and Contractors, Inc. Pelican Chapter
Associated Builders and Contractors, Inc. Oklahoma Chapter
Associated Builders and Contractors, Inc. Rhode Island Chapter
Associated Builders and Contractors, Inc. Rocky Mountain Chapter
Associated Builders and Contractors, Inc. South East Texas Chapter
Associated Builders and Contractors, Inc. South Texas Chapter
Associated Builders and Contractors, Inc. Western Pennsylvania Chapter
Associated Builders and Contractors, Inc. Western Michigan Chapter
Associated Builders and Contractors, inc. Western Washington Chapter
Associated Industries of Massachusetts
CA/NV/AZ Automotive Wholesalers Association (CAWA)
California Restaurant Association
Capital Associated Industries Inc. (Raleigh and Greensboro, NC)
CenTex Chapter IEC

Central Alabama Chapter IEC
Central Indiana IEC
Central Missouri IEC
Central Ohio AEC/IEC
Central Pennsylvania Chapter IEC
Central Washington IEC
Centre County IEC
Charleston Metro Chamber of Commerce
Chattanooga Area Chamber of Commerce
Colorado Restaurant Association
Columbia Chamber
Eastern Washington Chapter, IEC
El Paso Chapter IEC, Inc.
The Employers Association (Charlotte, NC)
Employers Coalition of North Carolina (Raleigh, NC)
Fairfax County Chamber of Commerce
Florida Independent Concrete and Associated Product, Inc.
Florida Restaurant & Lodging Association
Georgia Restaurant Association
Greater Louisville Inc.
Greater Montana IEC
Greater North Dakota Chamber of Commerce
Greater Reading Chamber of Commerce & Industry
IEC Atlanta Chapter
IEC Chesapeake
IEC Dakotas, Inc.
IEC Dallas Chapter
IEC Florida West Coast
IEC Fort Worth/Tarrant County
IEC Georgia Chapter
IEC Greater St. Louis
IEC Hampton Roads Chapter
IEC Kentucky and Southern Indiana
IEC NCAEC
IEC New England
IEC of Arkansas
IEC of East Texas
IEC of Greater Cincinnati
IEC of Idaho
IEC of Illinois
IEC of Kansas City
IEC of Northwest Pennsylvania
IEC of Oregon

**Morgan Lewis**

IEC of Southeast Missouri
IEC of Texoma
IEC of the Bluegrass
IEC of the Texas Panhandle
IEC of Utah
IEC of Washington ETF
IEC Southern Arizona
IEC Southern Colorado Chapter
IEC Southern Indiana Chapter-Evansville
IEC Texas Gulf Coast Chapter
IEC Western Reserve Chapter
IECA of Arizona
IECA of Nashville
IECA of Southern California, Inc.
IEC-OKC, Inc.
Illinois Chamber of Commerce
Indiana Cast Metals Association
Indiana Restaurant Association
Independent Electrical Contractors Oregon
Kansas Chamber
Kentucky Restaurant Association
Louisiana Restaurant Association
Lubbock Chapter IEC, Inc.
The Management Association of Illinois
Foundry Association of Michigan
MEC IEC of Dayton
Metalcasters of Minnesota
Mid-Oregon Chapter IEC
Mid-South Chapter IEC
Midwest IEC
Minnesota Grocer Association
Minnesota Lodging Association
Minnesota Restaurant Association
Mississippi Hospitality and Restaurant Association
Montana Restaurant Association
Montana Retail Association
Montana IEC
Nebraska Chamber of Commerce & Industry
Nevada Business Coalition
Nevada Manufacturers Assn
Nevada Restaurant Association
New Jersey Food Council
New Jersey Motor Truck Association

New Jersey IEC
New Mexico Restaurant Association
New York State Restaurant Association
The Northern Liberty Alliance
Northern New Mexico IEC
Northern Ohio ECA
NW Washington IEC
Ohio Cast Metals Association
Ohio Restaurant Association
The State Chamber of Oklahoma
Oregon Restaurant & Lodging Association
Pennsylvania Foundry Association
Pennsylvania Restaurant Association
Portland Cement Association
Puget Sound Washington Chapter
Rio Grande Valley IEC, Inc.
Rocky Mountain Chapter IEC
Rogers-Lowell Chamber of Commerce (Arkansas)
San Antonio Chapter IEC, Inc.
South Carolina Hospitality Association
Southern New Mexico IEC
Texas Cast Metals Association
Texas Hospital Association
Texas Restaurant Association
Texas State IEC
Tri State IEC
Virginia Trucking Association
Washington Restaurant Association
West Virginia Chamber of Commerce
Western Carolina Industries
Western Colorado IEC
Western Electrical Contractors Association
Wichita Chapter IEC
Wisconsin Cast Metals Association
Wisconsin Restaurant Association