**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                      )
CHAMBER OF COMMERCE OF THE                            )
UNITED STATES OF AMERICA, et al.,                     )
                                                      )    Case No. 1:15-cv-00009-ABJ
                    Plaintiffs,                       )    Judge Amy Berman Jackson
        v.                                            )
                                                      )
NATIONAL LABOR RELATIONS                              )
BOARD                                                 )
                                                      )
                    Defendant.                        )
_____)


**EXHIBIT 4 IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# UNITED STATES OF AMERICA

# BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | | |
|---|---|---|
| In the Matter of: | ) | RIN 3142-AA08 |
| | ) | |
| | ) | (76 Fed. Reg. 15037 |
| | ) | and 76 Fed. Reg. 37291) |
| NOTICE OF PROPOSED | ) | |
| | ) | |
| RULEMAKING | ) | |
| | ) | |
| Representation Case Procedures | ) | |

## Comments of the National Association of Manufacturers to the Rules Proposed By the National Labor Relations Board Regarding Representation Case Procedures

### I.  INTEREST OF THE NATIONAL ASSOCIATION OF MANUFACTURERS.

The National Association of Manufacturers ("NAM") is the preeminent manufacturing association in the United States, as well as the nation's largest industrial trade association, representing small and large manufacturers in every industrial sector in all fifty states. Manufacturing is the largest driver of economic growth in the nation – contributing $1.6 trillion to the economy.

The more than 12,000 manufacturing companies represented by NAM have a distinct interest in the proposed rulemaking. Most of the members of NAM are employers covered under Section 152 of the National Labor Relations Act ("Act") and respectfully submit that the separate and aggregated affect of the proposed rules would have a significant adverse effect on

manufacturing, the meaningful exercise of employee Section 7 rights, employer rights under Section 8(c) and on the workplace in general. NAM members have a significant interest in the manner in which the Act is administered by the National Labor Relations Board ("Board"), particularly with respect to the conduct of representation elections and the procedural safeguards associated therewith.

## II.     SUMMARY OF COMMENTS.

The Proposed Rules impair the right and ability of employees to make an informed choice regarding their Section 7 rights and denies employers their Section 8(c) rights to communicate vital information to their employees regarding unionization. Furthermore, by deferring determination of important procedural issues until after the representation election and imposing expedited, determinative pleading requirements on employers, the Proposed Rules compromise employers' due process rights.

Although the Supreme Court has stated that "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to ensure the fair and free choice of bargaining representatives by employees," that discretion must be consistent with the essential purposes of the Act. *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330 (1946). NAM submits that the Proposed Rules are not consistent with the considered judgment of Congress to safeguard the employer's ability to communicate its positions to its employees and, in turn, for employees to make an informed decision regarding union representation.

There is no demonstrable need for the Proposed Rules and their promulgation will have a negative effect on employer/employee rights and workplace stability. Moreover, the Proposed Rules will have a significant economic impact on a substantial number of small businesses, yet the Board has failed to comply with the directory requirements of the Regulatory Flexibility Act.

III.   **THE CUMULATIVE EFFECT OF THE PROPOSED RULES WOULD SIGNIFICANTLY IMPAIR THE RIGHTS AND ABILITIES OF EMPLOYERS TO COMMUNICATE THEIR POSITIONS TO EMPLOYEES UNDER SECTION 8(C) OF THE ACT.**

Section 8(c) of the Act provides:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

Section 8(c) protects the employer's right to communicate its position regarding, *inter alia,* union organization to its employees.   As the Supreme Court stated in *Chamber of Commerce v. Brown*, 555 U.S. 60, 67-68 (2008):

> From one vantage, Section 8(c) "merely implements the First Amendment," *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), in that it responded to particular constitutional rulings of the NLRB.  See S. Rep. No. 80-105, Pt. 2, pp. 23-24 (1947).  But its enactment also manifested a "Congressional intent to encourage free debate on issues dividing labor and management." *Linn v. Plant Guard Workers*, 383 U.S. 53, 62, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966).  It is indicative of how important Congress deemed such "free debate" that Congress amended the NLRA rather than leaving to the courts the task of correcting the NLRB's decisions on a case-by-case basis.  We have

characterized this policy judgment, which suffuses the NLRA as a whole, as "favoring uninhibited, robust, and wide-open debate in labor disputes," stressing that "free will use of the written and spoken word has been expressly fostered by Congress and approved by the NLRB." *Letter Carriers v. Austin*, 418 U.S. 264, 272-73, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974).

Section 8(c) provides NAM members the ability to engage their respective employees in robust discussion regarding unions and unionization. Furthermore, Section 8(c) safeguards the employer's abilities to ensure that their employees make an informed choice regarding critical employer-employee relations. See, e.g., *NLRB v. Virginia Electric & Power Co.*, 314 U.S. 469 (1941); *NLRB v. American Tube Vending Co.*, 134 F.2d 993 (2nd Circuit), cert denied, 320 U.S. 768 (1943). See also, H.R. Rep. No. 510 80th Cong. 1st Sess. 15 (1947). This can only be done when an employer has a reasonable amount of time to prepare and communicate the necessary information to employees.

The current median time frame of 38 days between the filing of a representation petition to the conduct of an election is one of the shortest periods in the Board's history. Yet, the present period is itself an insufficient amount of time for employers to effectively communicate information regarding the ramifications of unionization to employees and correct any mischaracterizations or errors union representatives may have made during their organizing campaign.

Consider the typical union organizational scenario: The union spends six to eight months gathering authorization cards from employees. During that time, the union conveys its message regarding the benefits of unionization with few legal constraints. Not all employees will

necessarily be privy to the message and many, if not most, employers are completely oblivious to the fact that a union campaign is underway.

During the union campaign, the employee population, or portions thereof, often hears a one-sided, unrebutted message, and frequently an inaccurate one. Employees will not often hear about any of the potential downsides of unionization or union membership. Employees may not receive information about union dues, fines and assessments imposed by the union. It is also unlikely that employees will hear about how unionized companies fare or whether they are competitive relative to other non-unionized workplaces in a particular industry.

The filing of a representation petition is generally the first time most employers become aware that a union organizational campaign has been underway at their workplace. The employer then has approximately 5-1/2 weeks to formulate and convey its message to its employees – in contrast to the six to eight months that a union has been communicating to the same employees.

Unionization is not a trivial matter for either the employer or the employees. For many employers, unionization will radically alter the manner in which they interact with their employees and conduct their business operations. Section 8(c) provides the employer the ability to communicate important information to employees, provided, however, the employer has a sufficient amount of time to convey the information. This information may include, but is not limited to, the track record of the petitioning labor organization, existing wages, benefits, and terms and conditions of employment, data concerning the profitability of competitors, the potential effects of unionization on operations, etc. Without such information, employees will be selecting a collective bargaining representative with a dearth of crucial information. By truncating the period between the filing of a representation petition and the conduct of an

election, the Proposed Rules reduce an employer's Section 8(c) rights to fiction as well as eviscerate employee Section 7 rights to make an informed choice regarding unionization.

The Proposed Rules would compress the period between the filing of a representation petition to the conduct of an election to a mere 10-14 days. An employer often needs 10-14 days just to determine what information it wishes to provide to employees regarding the union and unionization. Moreover, the compressed time frame deprives employers—particularly small and medium-sized businesses—of a meaningful opportunity to engage and consult with counsel. Smaller businesses do not necessarily have labor counsel on retainer. Therefore, after receiving the petition, the typical employer will need to find competent labor counsel, develop a communications program, and implement such program while simultaneously analyzing all of the issues to be addressed in its Statement of Position and the hearing—all within 10-14 days.

Consequently, were the proposed rules implemented, the election would occur before an employer has even had an opportunity to effectively consult with counsel and/or to determine what information should be conveyed to its employees. This information vacuum is compounded by the fact that the only information that employees will likely have received has come from the petitioning union. Therefore, employees will be making the critical decision as to whether or not to unionize with either incomplete information or biased information. As suggested by Member Hayes, this will deprive employees of the ability to make an informed choice regarding their Section 7 rights. See, Section 1(b) *Short Title and Declarations of Policy, Labor Management Relations Act of 1947*, Pub.L.No. 101, 80th Cong., 29 U.S.C. § 145 (1994).

### IV.   THERE IS NO EVIDENCE THAT THE PROPOSED REPRESENTATION ELECTION RULES ARE NECESSARY.

Absolutely no evidence was adduced during the two days of public hearings on the proposed rulemaking that demonstrates the present timeframe for conducting representation

elections is either too long or otherwise flawed. Indeed, all of the evidence gathered at the hearing, as well as the Board's own data, demonstrate that the current timeframes are not only adequate, but among the most expeditious in the Board's history.

For example, data compiled by the Board for fiscal year 2010 shows that the Board has either met or surpassed its own internal representation election goals and guidelines.

- 95.1% of all initial elections were conducted within 56 days of the filing of a representation petition.

- Initial elections were conducted in a median of 38 days from the filing of the representation petition.

- 86.3% of all representation cases were resolved within 100 days. The Board's target was 85%.

- The average time for an election for all representation petitions filed was 31 days.

- The parties voluntarily entered into election agreements in 92% of all cases.

- Pre-election decisions after hearing were issued in a median of 37 days. The Board's target was 45 days.

Unreasonable delays in the resolution of representation petitions are atypical. Moreover, there is no evidence that the causes of such delays would be remedied by any of the proposed rules changes. As noted by Member Hayes, "without knowing which cases they were, I cannot myself state with certainty what caused delay in each instance, but I can say based on experience during my tenure as Board member that vacancies or partisan shifts in Board membership and the inability of the Board itself to deal promptly with complex legal and factual issues have delayed final resolution far more often than any systemic procedural problems or obstructionist legal tactics. That was the situation in each of the aforementioned extremely delayed cases, and in none of those cases would the majority's current proposals have yielded a different result." Notice of Proposed Rulemaking, Dissent at 46.

There is no demonstrable need for shortening the time between the filing of a representation petition and the conduct of an election and the Board has met or surpassed its internal representation timeframe targets. Therefore, NAM respectfully submits that the Proposed Rules are a solution in search of a problem. Perhaps more accurately, it is a solution that will *create* a myriad of problems for employees and employers by impairing their Section 7 and 8(c) rights, as well as increasing structural costs to all employers, particularly smaller businesses.

### V.   THE PROPOSED RULES' STATEMENT OF POSITION REQUIREMENT PLACES AN UNDUE BURDEN ON EMPLOYERS AND IS INCONSISTENT WITH THE ACT.

The Statement of Position requirement contained in the Proposed Rules places an impermissible and untenable burden on employers by compelling them to set forth certain positions and information in an unreasonably short amount of time, and perhaps without effective input of counsel. The proposed Section 102.63(b)(1) provides as follows:

> After a petition has been filed under Section 102.61(a) and the Regional Director has issued a Notice of Hearing, the employer shall file and serve on the parties named in the petition its Statement of Position by the date and in the manner specified in the Notice unless that date is the same as the hearing date. If the Statement of Position is due on the date of the hearing, its completion shall be the first order of business at the hearing before any further evidence is received, and its completion may be accomplished with the assistance of the Hearing Officer. (1) The employer's Statement of Position shall state whether the employer agrees that the Board has jurisdiction over the petition and provide the requested information concerning the employer's relation to interstate commerce; state *whether the employer agrees that the proposed unit is appropriate, and, if the*

*employer does not so agree, state the basis of the contention that the proposed unit is inappropriate, and describe the most similar unit that the employer concedes is appropriate; identify any individuals occupying classifications in the petitioned-for unit whose eligibility to vote the employer intends to contest at the pre-election hearing and the basis of each such contention; raise any election bar; state the employer's position concerning the type, dates, times, and location of the election and the eligibility period; and describe all other issues the employer intends to raise at the hearing. . . .*

(iii) The Statement of Position shall further state the full names, work locations, shifts, and job classifications of all individuals in the proposed unit as of the payroll period preceding the filing of the petition who remain employed at the time of filing, *and if the employer contends that the proposed unit is inappropriate, the employer shall also state the full names, work locations, shifts, and job classifications of all employees in the most similar unit that the employer concedes is appropriate.*  The list of names shall be alphabetized (overall and by department) and be in an electronic format generally approved by the Board's Executive Secretary unless the employer certifies that it does not possess the capacity to produce the list in the required form.  (Emphasis added)

It is plain from the above that the proposed Section 102.63 will place an unreasonable burden on the employer to not only provide a wealth of information to the Board within five working days of receiving the petition, but posit an alternate appropriate unit as well.  This places the employer, as the *non-petitioning party*, in the extraordinary position of having to

concede the appropriateness of a unit where it may oppose the propriety of the unionization effort and where it is without determinative evidence that its employees wish to be unionized.

Moreover, an employer is required to provide the names, work locations, shifts and job classification of all employees in the most similar unit that it concedes is appropriate. The rule makes no provision for, indeed does not even contemplate, that the non-petitioning party might not otherwise need or want to disclose such information, which information may be of extreme interest to the petitioning union or other unions in subsequent organizational campaigns.

Proposed Section 102.63 clearly presumes that all employers subject to the Act have the capacity to produce the required information in a timely fashion. The presumption may be valid for larger employers with a standing human resources department and, perhaps, in-house legal counsel. The presumption is flawed as it pertains to many if not most employers represented by NAM. A sizeable cohort of employers do not maintain at the ready the information necessary to comply with the Statement of Position requirements in a timely manner. Thus, the effect of the Proposed Rule, whether intentional or not, is to require employers covered by the Act to conform their personnel policies and practices so as to comply with proposed Section 102.63. Employers that fail to so conform may not be able to transmit the necessary information within the Board's timeframes. Moreover, this will add tens of thousands of dollars – in legal fees alone – to NAM members' overhead. This prejudices employers and unfairly disadvantages smaller employers especially.

Prudent small and medium-sized employers will retain advisors and counsel to help them navigate through Section 102.63(b)(1) requirements, whereas there currently is no need to do so. Under the Proposed Rules – particularly the timeframes contained therein – employers that "go it alone" without counsel will be taking a risk that their interests are adequately protected. The

scope and complexity of the required information can not credibly be transmitted by most employers. Thus, their interests will be unduly prejudiced and/or their costs will substantially increase. See, *Direct Press Modern Electro, Inc.*, 328 NLRB 860, 161 LRRM 1193 (1999); *General Cable Corp.*, 191 NLRB 800, 77 LRRM 1600 (1971); *Bob's Big Boy Family Rest. S.*, 259 NLRB 153, 108 LRRM 1371 (1981); *Frank Hager, Inc.*, 230 NLRB 476, 96 LRRM 1117 (1977); see also, *Mego Corp.*, 223 NLRB 279, 92 LRRM 1080 (1976).

### VI. THE PROPOSED RULES WILL DEPRIVE EMPLOYERS OF THEIR DUE PROCESS RIGHTS UNDER SECTION 9(C) OF THE ACT.

The Proposed Rules eviscerate the substance of an employer's Section 9(c) right to present evidence and witnesses in furtherance of, and to protect its interests in, the representation election process. Proposed Rule 102.63(b)(v) provides:

> The employer shall be *precluded* from contesting the appropriateness of the petition-for unit at any time and from contesting the eligibility or inclusion of any individuals at the pre-election hearing, including by presenting evidence or argument, or by cross-examination of witnesses, if the employer fails to timely furnish the information described in paragraphs (b)(1)(iii) and (iv) of this section.

Moreover, proposed Rule 102.66(c) provides:

> A party shall be *precluded* from raising any issue, presenting any evidence related to any issue, cross-examining any witness concerning any issue and presenting argument concerning any issue that the party failed to raise in their timely statement of

position or to place in dispute in response to another party's statement.

The Statement of Position must be filed within 7 days of the employer receiving the petition for the representation election. Accordingly, the Rule requires that an employer retain counsel, analyze multiple, potentially complex issues in consultation with counsel, prepare for a representation hearing, develop a communication strategy for its employees, develop its legal arguments on numerous issues and prepare and file its Statement of Position within 5 working days. Such requirement is manifestly unreasonable and effectively deprives employers of their rights to a hearing under Section 9(c) of the Act.

As set forth in Section V above, compliance with the proposed Statement of Position requirement will be difficult enough for larger employers but will place small employers at a special disadvantage. Indeed, for smaller employers, compliance with the Statement of Position requirements may be extraordinarily burdensome and in many cases impossible. Small employers are not insulated from the panoply of representational issues that confront all employers. Small employers have multi-plant unit issues, employ seasonal employees, utilize a variety of skills and crafts. Sophisticated and complicated issues are not the sole preserve of major corporations. See, *J&L Plate*, 310 NLRB 429, 142 LRRM 1300 (1993); see also, *NLRB v. Broyhill Co.*, 528 F.2d 719 (8th Cir. 1976). Determinations related to supervisory status and voter eligibility cannot and should not be made cavalierly. Yet, the Proposed Rules necessarily require such determinations to be made without due deliberation, and consequently, to the potential prejudice of both the employer and affected employees. That a number of employers will be deprived of effective legal representation and due process rights is not hyperbole, but rather, a certainty.

The deprivation of due process rights is made more egregious by the fact that, as set forth in Section IV hereof the Board has adduced absolutely no evidence that the proposed changes are the result of a demonstrable need.  Thus, the rules are more akin to preferential fiat rather than consistent with the Board's rulemaking authority under Section 156 of the Act.

The Board states that "expeditious resolution of questions concerning representation is central to the statutory design because Congress found that "refusal by some employers to accept the procedure of collective bargaining leads to strikes and other forms of industrial strife and unrest, which have the intent or the necessary effect of burdening and obstructing commerce." Thus, Congress found that the Board's expeditious processing of representation petitions and, when appropriate, conduct of elections would "safeguard commerce from injury, impairment or interruption."  (footnotes omitted).  Notice of Proposed Rules at 7.  (June 22, 2011).  It is respectfully submitted that the instant attempt by the Board to expedite resolution of questions concerning representation would have the opposite effect.

The evidentiary preclusions set forth in proposed rule 102.66(c) are exacerbated by proposed rule 102.63(b)(1)(v) that prevents employers from contesting the appropriateness of the petitioned-for unit and from contesting the eligibility or inclusion of any individuals at the pre-election hearing if such information is not contained in a timely filed Statement of Position.

Not only will such preclusion have a profoundly deleterious effect on the due process rights of employers, it will have the perverse effect of increasing the probability that nearly every petition will be contested—thereby thwarting the Board's ostensible aim of "streamlining" the representation election procedures.

Presently, pre-election hearings are a relative rarity.  Employers and unions generally reach agreement on a variety of issues including unit composition, date, time and place of the

election.   Employers and unions typically enter into one of three types of pre-election agreements:  consent election; stipulated election agreement and full consent-election agreement. Rather than enter into *any* of these agreements, a cautious employer will go to hearing.  Mutually agreed eligibility lists, with agreement on timeframes would necessarily be less likely under the Proposed Rules.  See, *Norris-Thermador Corp.*, 119 NLRB 1301, 41 LRRM 1283 (1958); see also, *NLRB v. Hood Furniture Mfg. Co*., 941 F.2d 235 (5th Cir. 1991).  Since many if not most employers will have had insufficient time to assess the issues that would otherwise be included in a Statement of Position, they will necessarily reserve the right to go to a hearing.

Furthermore, the short timeframe allowed for submitting the Statement of Position will necessarily prompt employers to raise every conceivable issue so that such issue will not be forfeited under the preclusion rule.  Again, as a consequence, relatively few elections will be conducted by stipulation.

This would impair the finality the parties otherwise would have in, for example, an agreement for consent election.  *McMullen Leavens Co.*, 83 NLRB 948, 24 LRRM 1175 (1949); *c f Hampton Inn & Suites*, 331 NLRB 238 (2000).

### VII.    BACKLOADING LITIGATION OF SUPERVISORY ISSUES UNTIL AFTER THE ELECTION INCREASES UNCERTAINTY.

By backloading Section 2(11) litigation, the Proposed Rules merely postpone nettlesome issues more appropriately litigated prior to the election.  Pre-election litigation of supervisory issues clarifies matters related to unit scope and reduces the probability of objectionable conduct by employees whose managerial status is indeterminate.  By permitting a regional director (or hearing officer) to direct an election before resolving unit appropriateness and eligibility issues, the Proposed Rules prejudice employers' due process rights and employee Section 7 rights.

**VIII.  THE PROPOSED "20% RULE" WILL DEPRIVE THE EMPLOYER AND THE ELECTORATE OF CERTAINTY REGARDING UNIT COMPOSITION, FRUSTRATE EMPLOYEE SECTION 7 RIGHTS TO MAKE AN INFORMED CHOICE AND INCREASE LITIGATION.**

The Proposed Rules permitting a regional director or hearing officer to deny the employer a right to a pre-election hearing regarding the appropriateness of the bargaining unit and eligibility of certain individuals purportedly within such unit unless such individuals constitute greater than 20% of the unit is contrary to Section 9(c) of the Act.  The Proposed Rule plainly violates the requirement that a hearing be held where there is a question concerning representation.

Section 102.66(d) provides:

> Disputes concerning less than 20% of the unit.  If at any time during the hearing, the hearing officer determines that the only issues remaining in dispute concern the eligibility or inclusion of individuals who would constitute less than 20% of the unit if they were found to be eligible to vote, *the hearing officer shall close the hearing*.  (Emphasis added)

This proposed rule suffers from several serious infirmities, not the least of which is its stark contravention of Section 9(c) of the Act that:

> The Board shall investigate such petition and if it has a reasonable cause to believe that a question of representation affecting commerce exists *shall provide for an appropriate hearing upon due notice*.  (Emphasis added)

While it is true that a hearing officer has the authority to narrow issues related to a representation hearing, a full operative record on such issues is presumed. *Cf Angelica Health Care Servs. Group, Inc.*, 315 NLRB 1320, 148 LRRM 1130 (1995). This will upset the workplace balance contemplated by Congress and compromises the Act's neutrality between employer and union. See, Section 1(b), *Short Title and Declaration of Policy, Labor-Management Relations Act of 1947*, Pub. L No. 101, 80th Cong., 1st Sess; 29 U.S.C. Section 141 et seq. (1994).

The Proposed Rules place employers in a position not contemplated by the Act: within five working days the employer must engage counsel and submit a Statement of Position regarding a genuine issue of fact regarding the eligibility of 20% or more of the individuals in the putative unit or forfeit its rights under Section 9(c). These are not casual or simple determinations. Employers often spend scores of man hours dissecting voter eligibility issues. It is not uncommon for employers to engage in protracted consultation with counsel regarding these issues, many of which turn on minor issues of fact. See, e.g., *Red Row Freight Lines*, 278 NLRB 965, 121 LRRM 1257 (1986); *Airport-Shuttle Cincinnati,* 257 NLRB 995, 108 LRRM 1044 (1981) *enforced,* 708 F.2d 20 (6th Cir. 1983); *L & B Cooling*, 267 NLRB 1, 113 LRRM 1119 (1983) *enforced,* 757 F.2d 236 (10th Cir. 1985); *Pat's Blue Ribbon*, 286 NLRB 918, 127 LRRM 1034 (1987).

Further, under the Proposed Rules the eligibility determination will be made by a hearing officer, not a regional director. Hearing officers frequently have much less experience than regional directors in matters related to eligibility. Consequently, the Proposed Rule will likely result in more elections being overturned, creating greater uncertainty and disrupting workplace stability.

Where up to 20% of employees may vote under challenge, the number of such ballots may be determinative of the outcome of the election. The 20% rule increases the probability that sustained challenges will so modify the bargaining unit as to make it fundamentally different from the originally proposed unit. This necessarily compromises employees' Section 7 rights:

> When employees are led to believe that they are voting on a particular bargaining unit and the bargaining unit is subsequently modified post-election, such that the bargaining unit, as modified, is fundamentally different in scope or character from the proposed bargaining unit, *the employees have effectively been denied the right to make an informed choice in the representation election.*

*NLRB v. Beverly Health and Rehabilitation Service, Inc.*, No. 96-2195, 1997 WL 457524 at 4 (4th Cir. 1997). See also, *K.C. Knitting Mills*, 320 NLRB 374, 152 LRRM 1083 (1985); *Virginia Mfg. Co.*, 311 NLRB 912, 143 LRRM 1368 (1993); *cf Scolari's Warehouse Mkts.*, 319 NLRB 153, 150 LRRM 1153 (1995).

This defect in the Proposed Rule is not merely speculative. Under the 20% test, 19 employees in a proposed bargaining unit of 100 could vote under challenge. Those individuals could later be adjudged to have no community of interest with the other individuals in the bargaining unit: their compensation structure may be radically different from the remainder of the employees in the unit; their hours may not be consistent with others in the unit; their work assignments and locations may be at odds with that of their co-workers. Yet employees would be voting with the presumption that all of the individuals would be included in the proposed unit, even though such unit may later be substantially modified. This is a prescription for uncertainty inconsistent with employees' Section 7 rights. See *NLRB v. Parsons School of Design*, 793 F.2d

503 (2nd Cir. 1986).  See also, *NLRB v. Lorimar Productions,* 771 F.2d 1294 (9th Cir. 1985);

*Hamilton Test Systems, New York, Inc. v. NLRB,* 745 F.2d 136 (2nd Cir. 1984).

Given the expedited timeframes in the Proposed Rules, small employers likely will make

eligibility determinations and arguments without the benefit of counsel, or at the very least, with

minimal consultation with counsel.  Consequently, many employers will be left to analyze

similarities/differences in wages, hours, benefits, supervision, training skills, job functions,

operational integration, employee interchange and bargaining history on their own.  The

employers will also be left to fashion their assessments of such factors on their own.  See,

*Kalamazoo Paper Box Corp.*, 136 NLRB 134, 49 LRRM 1715 (1962).  This is a clear violation

of employers' due process rights and will serve merely to complicate the representation election

process.

Proposed Rules 102.66(d) and 102.67(a) deprive employees of the ability to determine

whether they have a community of interest with other employees who may be voting in the

representation election.  This will cause considerable uncertainty and has the potential to delay

final resolution of the election.  Failure to resolve unit appropriateness and eligibility issues will

likely result in more—not fewer—elections being overturned as a result of post-election

exclusion of ineligible employees.  Moreover, the Proposed Rules' requirement that an election

be conducted with up to 20% of potential voters subject to challenge will further confound the

employer's ability to assess supervisory determination issues, as well as increase the likelihood

that the number of challenges will be sufficient to affect the outcome of an election.

## IX.     THE PROPOSED RULES PLACE AN UNREASONABLE BURDEN OF PRODUCTION ON EMPLOYERS IN THE REPRESENTATION HEARING.

Regarding the representation hearing, the Board has modeled proposed amendments to

Section 102.64 on Rule 56 of the Federal Rules of Civil Procedure, stating that, "the duty of the

hearing officer is to create an evidentiary record concerning only genuine issues of material facts." This reverses the traditional burden of proof by placing it on the non-moving party (the employer). The Proposed Rule completely reverses the presumptions underlying Federal Rule 56. As opposed to the Federal Rule, the non-petitioning party is required to identify issues, make an offer proof, marshal arguments and introduce evidence in support of the issues so identified. More significantly, the Proposed Rule gets the predicate to Rule 56 absolutely backwards. Rule 56 presumes that parties have had a full and complete opportunity to litigate the salient issues before the court. The parties have typically engaged in all necessary discovery: admissions, interrogatories, requests for production of documents, depositions – all the evidence necessary to credibly determine whether or not there exists a genuine issue of material fact. Furthermore, preliminary matters have been addressed at pretrials and peripheral issues have been dispensed with through motions and amended pleadings. Moreover, parties are afforded an opportunity for oral argument so that the court may test the parties' respective positions. None of these things are available to the employer (again, the non-petitioning party) pursuant to Proposed Amendment to Section 102.64.

### X.   THE EXPEDITED PROCESS FOR COMMENT, REVIEW AND IMPLEMENTATION OF THE PROPOSED RULES PREVENTS NECESSARY DELIBERATION AND A REASONED PROMULGATION OF IMPORTANT CHANGES TO ELECTION PROCEDURES.

The timeframe announced by the Board for review and comment on the Proposed Rules is wholly inadequate given the magnitude of the changes contemplated by the Board. Although it is undisputed that the Board has the authority to promulgate rules and regulations under Section 156 of the Act, such promulgation must be reasonable.

The Proposed Rules were announced on June 22, 2011. Public hearings on the Proposed Rules were conducted on July 18 and 19, 2011—barely three weeks after the hearings were

scheduled and only four weeks after the notice of proposed rulemaking was issued. Comments are due August 22, 2011. The entire period for public consideration of the Proposed Rules is only 74 days.

In contrast, the timeframe for the Board's consideration of the rules governing healthcare bargaining units was considerably longer and the Board's inquiry far more detailed. Though the healthcare rules were arguably far less consequential than the ones presently under consideration, in the former, the Board adduced more than 3,500 pages of testimony from 144 witnesses. Public hearings on the healthcare rules spanned 14 days.

The relative rush to promulgate the current proposed rules is a departure from past Board practice that will result in both an inadequate opportunity for stakeholders to address the merits of the rules and inadequate information and data for the Board to make a prudential judgment regarding the rules. In addition, given that the Board has failed to analyze its own data regarding the necessity for the new rules, serious questions regarding the advisability of the proposed rules will be left unaddressed.

Furthermore, as set forth more fully in Section XIII below, the Board's expedited promulgation of the Proposed Rules violates the Regulatory Flexibility Act, 5 U.S.C. § 601 et seq. (1980), thereby impairing the rights of small businesses without abiding by the procedural safeguards established by Congress to protect small entities from burdensome regulatory requirements.

### XI.   THE PROPOSED RULE REQUIREMENTS THAT EMPLOYERS PROVIDE CERTAIN EMPLOYEE INFORMATION IMPLICATES EMPLOYEE PRIVACY RIGHTS AND EMPLOYER PROPERTY RIGHTS.

Proposed Rule 102.67(j) provides in pertinent part:

> The employer shall, within two days after such direction, provide to the regional director and the parties named in such direction, a

list of the full names, home addresses, available telephone numbers, available e-mail addresses, work locations, shifts, and job classifications of all eligible voters.

Section 102.67(j) also provides that where feasible the foregoing list is to be filed electronically with the regional director and served electronically on all other parties.

The foregoing rules requirement that certain employee information – specifically email addresses – be provided implicates employee privacy rights that may not be compromised by the employer despite the employer's good faith compliance with the Board's rule.  The proposed rule also has the potential to raise issues regarding email solicitation raised in *Register Guard* as well as property rights issues.  See *NLRB v. Babcock and Wilcox Co.*, 351 U.S. 105 (1956).  See also *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759 (1969).

## XII.   THE PROPOSED RULES' NARROWING OF THE STANDARD OF BOARD REVIEW DEPRIVES EMPLOYEES OF THEIR SECTION 7 RIGHTS.

The Proposed Rules change the Board's post election scope of review to a discretionary one.  NAM respectfully submits that this is highly inappropriate and deprives employees of the right to self-organization, to form, join, or assist a labor organization . . . and . . . the right to refrain from any and all such activity by subjecting conduct that could affect the outcome of the election to discretionary review, as opposed to automatic *de novo* review.  It is axiomatic that conduct that could set aside an election goes to the essence of employee free choice.  Matters of such import are the province of the Board.

Outcome-determinative decisions are properly a matter of the Board's quasi-judicial function.  Such functions should not be outsourced to regional directors, however capable those individuals may be.  NAM respectfully submits that "compelling reasons" should not be the basis for a review, rather these issues should be a matter of automatic, *de novo* review by the Board.  Although Section 3(b) of the Act provides for delegation of Board authority regarding

the conduct of elections to regional directors, such delegation is subject to Board review.  This is a critical feature of the statutory construct that is properly left to the presidentially appointed members of the Board.

### XIII.   THE BOARD HAS FAILED TO COMPLY WITH THE REGULATORY FLEXIBILITY ACT IN PROMULGATION OF THE PROPOSED RULES.

The Regulatory Flexibility Act, 5 U.S.C. § 601 et seq. (1980) requires that federal agencies seek less burdensome alternatives to Proposed Rules where the impact of such rules is significant and affects a substantial number of small entities.  Where the impact of Proposed Rules is significant and affects a substantial number of small entities, the agency must:

1.    seek the views of small businesses;

2.    seek input from the Small Business Administration;

3.    publish an initial Regulatory Flexibility analysis in the Federal Register;

4.    certify that the regulations will have no significant impact on small businesses;

5.    seek less burdensome alternatives to the proposed regulations; or

6.    detail why less burdensome alternatives are infeasible.

*Id.*

The Board concluded that the Proposed Rule "will not affect a substantial number of entities.  In any event, the Board further concludes that the proposed amendments will not have a significant economic impact on such small entities.  Accordingly, the Agency Chairman has certified to the Chief Counsel for Advocacy of the Small Business Administration ("SBA") that the proposed amendments will not have a significant economic impact on a substantial number of small entities."  Notice of Proposed Rulemaking at 50.

The Board proffered no analysis in support of its conclusion that the Proposed Rules will not have a significant economic impact on a substantial number of small businesses other than to

note that the vast majority of the six million private employers in the United States are small entities, nearly all of whom are subject to the Board's jurisdiction, yet fewer than 4,000 representation election petitions have been filed with the Board over the last five years. The Board summarily deduces that since only one-tenth of one percent of small employers are involved in representation petitions, the Proposed Rules will not have a significant impact on a substantial number of employers.

NAM respectfully submits that the Board's conclusion is profoundly erroneous. For all of the reasons set forth in Sections II-XII above, the Proposed Rules will, inescapably, have a significant impact on a substantial number of small entities.

Since the compression of the median time frame between the filing of a representation petition until the conduct of the election will necessarily deprive employers of the ability to communicate their message to their employees, the union success rate in organizing small employers will spike upward dramatically. The comparative ease with which unions will be able to successfully organize the workforces of smaller employers undoubtedly will encourage unions to expand organizing activities exponentially. This will necessarily have a significant economic impact on all employers by driving payroll costs up.

| Union v. Non-Union: Median Weekly Earnings in 2004 | | | | |
|---|---|---|---|---|
| | Union | Non-union | Dollar Difference | Percent Difference |
| All | $781 | $612 | $169 | 28% |
| Private | $739 | $604 | $135 | 22% |
| Manufacturing | $694 | $654 | $40 | 6% |
| Transportation and Warehousing | $819 | $619 | $200 | 32% |

| | | | | |
|---|---|---|---|---|
| Utilities | $979 | $948 | $31 | 3% |
| Healthcare and Social Assistance | $656 | $588 | $68 | 12% |
| Wholesale Trade | $722 | $674 | $48 | 7% |
| Retail Trade | $567 | $507 | $60 | 12% |
| Service Occupations | $655 | $389 | $266 | 68% |
| Source: U.S. Bureau of Labor Statistics | | | | |

Therefore, the Board's determination that the Proposed Rules will not have a significant impact on a substantial number of small entities because relatively few employers receive representation petitions in a given year is seriously flawed. The Proposed Rules will inexorably produce a dramatic increase in the number of representation petitions filed, thereby affecting a substantial number of small entities.

Furthermore, the shortened time frames in the Proposed Rules compel any and all prudent small employers to conform their personnel practices and human resources functions (such as they are) to rapidly respond to the informational requirements of the Statement of Position. Small employers—whether unionized or not—who do not regularly engage labor counsel will do so to ensure compliance with the new rules. Further, small employers that did not previously maintain ongoing employee communication programs will certainly develop them in light of the shortened campaign time frames caused by the Proposed Rules. Moreover, the sheer number of comments submitted in response to the Notice of Proposed Rulemaking is an indication that small businesses dispute the Board's conclusion that they will not be significantly affected by the Proposed Rules.

The Agency Chairman's certification to the SBA that the proposed amendments will not have a significant economic impact on a substantial number of small entities is inaccurate and improper. The certification completely ignores the manifest evidence that the Proposed Rules will have one of the most far-reaching effects on the workplace of any rules, statutes, or decisions in the last 50 years. Accordingly, the Board should have undertaken an initial Regulatory Flexibility analysis and developed less burdensome alternatives. This is particularly true given that there is absolutely no evidence that the Board's current representation election time frames are defective. (Indeed, as set forth in Section IV, the Board's own data demonstrate that it has met or surpassed its own representation election goals and targets.) The Board's failure to conduct an initial analysis and then seek comments from affected stakeholders before revising its impact analysis is a clear violation of the Regulatory Flexibility Act. Accordingly, the Proposed Rules should be withdrawn. See *American Trucking Associations, Inc. v. U.S. Environmental Protection Agency*, 175 F.3d 1027 (D.C. Cir. 1999).

### XIV.   CONCLUSION.

For the foregoing reasons the National Association of Manufacturers respectfully submits that issuance of the Proposed Rules must be withdrawn in their entirety.

Respectfully submitted,

_____
Peter N. Kirsanow,
Benesch Friedlander Coplan & Aronoff LLP
200 Public Square, Ste 2300
Cleveland, OH  44114-2378
Tel: 216-363-4500
Fax: 216-363-4588
pkirsanow@beneschlaw.com

*Counsel for National Association of*
*Manufacturers*

_____
Joe Trauger
Vice President, Human Resources Policy
National Association of Manufacturers
1331 Pennsylvania Avenue
Suite 600
Washington, D.C.
Tel:  202-637-3127
jtrauger@NAM.org