IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, et al., </br></br> Plaintiffs, </br></br> v. </br></br> NATIONAL LABOR RELATIONS BOARD </br></br> Defendant. | Case No. 1:15-cv-00009-ABJ </br> Judge Amy Berman Jackson |

**EXHIBIT 5 IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**COMMENTS ON THE NLRB'S PROPOSED RULES
REGARDING REPRESENTATION CASE PROCEDURES**

**(29 CFR Parts 101, 102, and 103, RIN 3142–AA08)**

Submitted by the
**NATIONAL RETAIL FEDERATION**
www.nrf.com

August 22, 2011

As the world's largest retail trade association, the National Retail Federation (NRF) includes retailers of all sizes, formats and channels of distribution, as well as chain restaurants and industry partners. In the United States, NRF represents more than 3.6 million establishments which directly and indirectly account for 42 million jobs—one in four United States jobs. The total domestic GDP impact of retail is $2.5 trillion annually.

Based on decades of experience with labor issues, NRF believes that the NLRB's proposals would harm NRF's members, their employees, and ultimately consumers. The current labor system fairly balances the interests of retailers and employees in a system that has worked efficiently for many decades. The NLRB's proposals, however, would eviscerate that balance. The proposals would raise costs for retailers (and ultimately consumers) and harm employees in a myriad of ways, such as by denying them necessary information and threatening their right to privacy.

As an initial matter, the current system works well for retailers and employees. Elections already occur quickly and fairly. According to the NLRB itself, from the time a petition is filed, the average time for an election is 31 days and the median time is 38 days. Elections occur within 56 days more than 95 percent of the time. The NLRB has failed to provide any evidence, and NRF is aware of none, suggesting any need to further shorten these time periods. For the small minority of matters that linger beyond a few months, the NLRB could take less drastic action to ensure that those elections take place more quickly.

Instead, by shaving off time at the beginning of the election process, the Board proposes "quickie" elections, 10-21 days from the date of the union's filing of the election petition. The proposed rules would defer unit composition and voter eligibility questions until after the election is held, votes are cast and impounded, leaving employees in the dark on critical issues. Thereafter, if the employer is dissatisfied with the decisions of the regional Director, the employer would no longer be assured of review by the full Board.

Although the NLRB's proposals would not redress a pressing need, they would impose substantial costs on retailers and employees during these precarious economic times. By any measure, retailers are predominantly small businesses. More than 95 percent of all retailers have only one store outlet, and more than 98 percent of all retail

Comments of NRF
RIN 3142-AA08

companies employ less than 100 workers.  As in other industries, the economic climate has harmed retailers and their employees.  During the past few years, many retailers have been forced to shutter their doors or downsize, and with consumer confidence sagging, many retailers are still struggling.

      The NLRB's proposals would force these small businesses to waste money and perhaps reduce their hiring of new employees.  For example, the proposals would require extensive, ongoing education to all employees about the value or lack thereof of unionization.  Currently, retailers educate employees after learning of union activity.  In such instances, retailers spend about two weeks educating employees on unions, their organizational structure, the collective bargaining process, and the dues and fee structure of unions.  Under the proposals' expedited procedures, however, retailers would have to preemptively educate their employees on an ongoing basis—in some cases at numerous locations each year.  Such measures take time and money.  This preemptive education could impose new costs in the range of $6 to 9 million annually.  These needless costs would harm retailers and consumers, and ultimately could lead to retailers hiring fewer employees.  Someone has to pay for such training.

      Moreover, the NLRB's proposals would create great confusion and uncertainty regarding who could vote in a union representation campaign.  This uncertainty flows from the unique nature of the retail workforce.  Retailing provides employment opportunities for individuals who prefer to, or must, work part-time.  In 2010, over one-third of total retail employees worked part-time.  This aspect particularly affects women, who account for over 60 percent of the retail industry's part-time workforce.  In addition, many retail workers are seasonal.  During the months of November and December, the traditional holiday shopping season, retail employment peaks.  In 2010, retail employment grew by 483,500 workers over these two months.  Holiday-related employment opportunities are particularly significant in certain segments of retailing.  For example, holiday employment increased 11.9 percent at clothing and clothing accessories stores in 2010; 11.0 percent at department stores; and 9.3 percent at sporting goods, hobby, book, and music stores.  The NLRB's proposals would leave hundreds of thousands of these employees uncertain as to their eligibility to vote in union elections.

      Furthermore, the NLRB's proposals would effectively deny many employees the opportunity to cast a fully-informed vote.  By needlessly compressing the process within 10 to 21 days and, in effect, creating "quickie elections," the NLRB would hinder employees from hearing from their employer, and their fellow employees, regarding the consequences of voting in favor of, or against, unionization.  These proposals would especially harm employees in the retail industry, many of whom are part-time or seasonal.  Because unions control pre-petition activities, including the timing of petitions, a small minority of employees could effectively garner the ability to impose their preferences on their colleagues.

Comments of NRF
RIN 3142-AA08

The shortened time periods would also harm small retailers. The proposed rules require retailers to submit a formal Statement of Position within 7 days from the union petition for election, stating all issues or forever waiving them. Many small retailers are unfamiliar with unions and union elections. A union could spend 6 months trying to influence employees, and then request an election the Wednesday before Thanksgiving. That would start the clock on a potential 10-day time frame for a vote. For retailers, this could be the worst possible time because of the craziness of "Black Friday," which heralds the start of holiday shopping—one of the most crucial times of the year for retailers. In addition, with most other businesses closed the Friday after Thanksgiving, it would be hard to reach a lawyer or consultant.

The rush-to-judgment "quickie" elections would severely undercut the free speech rights guaranteed under Section 8(c) of the National Labor Relations Act at precisely the time when such rights are most needed—following the filing of a union petition for election. Section 8(c) provides:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.

However, in order for free speech to have any meaning, there first must be an adequate opportunity to speak. The United States Supreme Court has characterized the Congressional policy as "favoring uninhibited, robust, and wide-open debate" of matters concerning union representation, so long as that does not include unlawful speech or conduct. *Chamber of Commerce v. Brown*, 554 U.S. 60, 67-68 (2008). Limiting the reasonable *opportunity* for such uninhibited, robust and wide-open speech is the equivalent to denying it altogether.

Thus, the ultimate victim of the new "quickie" election rules will be employees themselves, who will be forced to vote without being fully informed and with unanswered questions concerning the bargaining unit they will be joining.

The unjust burden placed upon retailers by the shortened time frame for elections, particularly smaller retailers, is no better demonstrated than by the proposal to require employers to submit a Statement of Position within 7 days from the date of the union petition for election. In reality, within 5 working days, a retailer, who may have no specific working knowledge of the issues involved in an election campaign, will be required to disclose its complete theory of the case, including the appropriateness of the petitioned-for unit, any proposed exclusions from the petitioned-for unit, and the existence of any bar to the proposed election. While the pressures and expense associated with identifying such issues within such a short time-frame alone would constitute a justified objection, the manifest, unjust burden placed upon employers by the

proposed rules is compounded by the fact that if, in the rush to complete its Statement of Position, a retailer fails to raise a particular issue in its filing, than it would be *precluded from presenting further evidence on this issue during hearing*.

The explanation that accompanies the proposed rules indicates that the Statement of Position provisions are modeled on Rule 26(a) of the Federal Rules of Civil Procedure. However, the fact is that the proposed rules do not allow for amendment of issues or introduction of newly discovered evidence in the same way that is contemplated by the rules governing civil litigation. Instead, the proposed rules bring the concept of "trial by ambush" to a level never previously contemplated. Within civil litigation, the purpose of the Federal Rules of Civil Procedure is to allow for discovery that will enable a party to learn of the other side's position and evidence, and to raise additional issues within the proper context as they are identified. Under the proposed amendments to the Board's rules, a party's statement of position may not be prepared or obtained until the first day of the hearing, leaving the other party or parties unable to clearly identify or appreciate the issues to be presented until it is too late. By the time the Statements of Positions are filed and disclosed, a party has already waived its right to respond accordingly. As such, because they do not sufficiently allow the parties to explore all potential issues that may be associated with a particular election and modify their positions accordingly, the proposed rules constitute a severe deprivation of the fundamental rights to due process normally afforded in adversarial proceedings.

Equally objectionable is the fact that the proposed rules choose to defer most issues concerning unit composition until *after* an election has been held, especially if an issue involves 20 percent or less of the total employees in the unit. This is clearly not a viable solution, and will cause harm not only to retailers, but also to the individuals they employ. With respect to retailers, the 20-percent rule artificially and naively puts numerosity over all other interests and issues. The inclusion or exclusion of a single classification, or in some cases even a single individual, could easily influence the outcome of a representation election. To the extent the unit issues may involve supervisory status, the impact can be even more serious and could easily result in an increase, rather than decrease, in unfair labor practice charges and challenges to the election.

From the employee perspective, with unit issues unresolved before the election, employees will be left to speculate regarding the practical impact of their vote to be or not to be represented by a union, and whose interests will and will not be represented in contract negotiations. As explained earlier, this is particularly so in the retail environment where such a large percentage of the workforce is temporary, part-time or seasonal. Reality dictates that employees often make their choices regarding representation based upon who is and who is not to be included in the proposed unit. Delaying the fundamental question of unit composition until after the election deprives employees of the ability to make an informed decision on the impact of voting for or against representation.

Comments of NRF
RIN 3142-AA08

      Finally, the NRF cannot overstate its objection (and those of its members) to the proposed rules' near evisceration of existing law regarding voter eligibility lists.  The contemplated requirement on employers to disclose available email addresses and telephone numbers of potential bargaining unit employees as part of the voter eligibility lists creates the possibility of abuse and invasion of privacy that cannot be justified under any rationale.  This is particularly so since the proposed rules do not identify any statutory mandate for intrusion into this sensitive area.

      Currently, the proposed rule is unclear as to whether it will require the disclosure of business email addresses and phone numbers, but such disclosures should absolutely be precluded.  Already, the nation's retailers are often subjected to union "shame on you" campaigns and other tactics that are designed to do nothing other than disrupt business operations.  By giving unions almost unlimited access to the electronic communication systems maintained by employers, the ability to disrupt the free flow of commerce is expanded immeasurably:  Unions will be able to harass employees while they are working; they will be able to "flood" and slow down systems that should be dedicated to an employer's business, not to union organizing; and they will be able to circumvent the Board's longstanding rules regarding an employer's ability to place lawful restrictions on non-employee access to an employer's premises and business equipment.

      Even more objectionable is any requirement that employers disclose the *personal* email address and phone numbers of employees.  The proposed rules indicate that the disclosure requirements are somehow necessary given the current "evolution" in electronic communication.  However, that very "evolution" actually cuts against the Board's proposed rules, not in favor of them.  As employee communication by cell phone, emails and texts evolves, so does employee concerns regarding privacy, abuse, harassment and identity theft.  These concerns have led to a bevy of federal and state legislation *protecting* the electronic privacy of individuals, and yet the Board would rather allow for the indiscriminate disclosure of such information.  A very real potential for abuse if personal cell phone numbers are disclosed is the ability of union organizers to be able to send direct text messages to employees, regardless of whether they have a text plan as part of their phone service or not.  If an employee does not have such a plan, then they may be subjected to their own personal expense, all for the "privilege" of being organized.  The mandates of the proposed rules, in reality, constitute a violation of the sanctity of the home, and it subjects employees to potentially harassing communications without their consent or even knowledge.  The Supreme Court has recognized that, even though the disclosure of personal email addresses may facilitate union communications, employees nevertheless enjoy a right not to be bothered in their personal environment with work-related matters.[1]  The Board should also recognize that right rather than discard it.

      In short, the NRF believes that a number of the Board's proposed rules, if adopted, would do serious, irreparable harm to the nation's retailers and to the working

---

[1] *See U.S. Dept. of Defense v. FLRA*, 510 U.S. 487, 501 (1993).

Comments of NRF
RIN 3142-AA08

men and women they employ.  In addition, the proposed rules would severely undermine public confidence in the Board's neutrality in labor relations matters.  In all, the rules disrupt what is otherwise a level playing field.  Unions are given unfettered access to potential unit members; however, employees are effectively denied the opportunity to hear from their employer, and even other employees, regarding the certain and uncertain consequences of voting in favor of, or against, unionization.  Most importantly, the proposed rules will require NRF members to assume additional costs and expenses, and face disruption of their business, at the very time they are striving to recover from this country's recent economic recession and high unemployment.

      As stated earlier, all employers, especially smaller employers, will be victimized as a result of these rules.  But the real victims will be employees whose privacy has been invaded, forced into hasty voting before being fully informed on the issues, and voting in bargaining units where the composition and appropriateness are uncertain.  Quicker is not always better.

      NRF strongly encourages the Board to delay enactment of the proposed rules until a broader assessment of their potential impact can be made.  Such drastic alterations to an effective process that has been in place for decades should only be undertaken following a national conversation that includes input from all sectors of commerce—employers, unions, employees and the like—as was done during the Board's nearly two-year consideration of its health care bargaining unit rulemaking in the late-1980s on much less significant issues affecting only one part of a single industry—rather than rushing through R-case rules which affect every employer covered by the National Labor Relations Act.

ON BEHALF OF THE NATIONAL RETAIL FEDERATION

Hal Coxson
Bernard Jeweler
Asheesh Agarwal
Shaun Haley
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1909 K Street NW, Suite 1000
Washington, DC 20006
202-887-0855 (phone)
202-887-0866 (fax)
*www.ogletreedeakins.com*