**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, et al.,

                  Plaintiffs,

    v.

NATIONAL LABOR RELATIONS
BOARD

                Defendant.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:15-cv-00009-ABJ
Judge Amy Berman Jackson

**EXHIBIT 7 IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# CHAMBER OF COMMERCE
### OF THE
## UNITED STATES OF AMERICA
1615 H STREET, N.W.
WASHINGTON , D.C. 20062
202/463-5522

**RANDEL K. JOHNSON**
SENIOR VICE PRESIDENT
LABOR, IMMIGRATION & EMPLOYEE
BENEFITS

**JAMES PLUNKETT**
DIRECTOR
LABOR LAW POLICY

April 7, 2014

Gary Shinners, Executive Secretary
National Labor Relations Board
1099 14th Street NW
Washington, DC 20570

**RE:    RIN 3142—AA08; Representation—Case Procedures; Notice of Proposed
Rulemaking**

Dear Mr. Shinners:

On behalf of the U.S. Chamber of Commerce ("Chamber"), we are pleased to submit

these comments[1] in response to the National Labor Relations Board's ("Board" or "NLRB")

Notice of Proposed Rule Making ("NPRM") published at 79 Fed. Reg. 7318 (Feb. 6, 2014).  The

proposed rules would amend the Board's representation case procedures under the National

Labor Relations Act ("Act").

The Chamber is the world's largest business federation, representing the interests of more

than three million businesses and organizations of every size, sector, and region.  The

overwhelming majority of the Chamber's members are "employers" as defined by the Act and

consequently would be affected by the Board's proposal, should it be finalized.

The Chamber provided comments on the previous NPRM for this rule, published at 76

Fed. Reg. 36812 (June 22, 2011).  The Chamber also had a representative participate in the

---

[1] These comments represent the views of the U.S. Chamber of Commerce.  The Chamber has also endorsed the
views expressed by the Coalition for a Democratic Workplace, of which the Chamber is a member.

hearing held by the Board regarding these rules on July 18-19, 2011.[2]  While the Chamber

recognizes that the Board considers those previous comments to be part of the record in the

instant rulemaking, the Chamber welcomes the Board's request to augment and refine comments

previously submitted to the Board.  With this submission, therefore, the Chamber re-emphasizes

its previous comments, but updates them to include additional information and observations

based on intervening developments and reflections.


### Summary of Comments

The following summarizes the Chamber's comments on the proposed rules:

1. ***The Chamber has serious concerns about the process followed by the Board in this
   rulemaking.***  The opportunity for notice and comment has been insufficient and rushed
   for a rulemaking of this complexity and magnitude.  The Chamber's concerns about the
   process have only been amplified by the Board essentially reissuing the original 2011
   NPRM instead of reacting to the 60,000 comments received and two days of hearing in
   response to the 2011 NPRM.  The Board has thereby squandered an opportunity to
   engage in meaningful dialogue with various stakeholders about any specific problems
   with the current election procedures and how those problems could be addressed.  Had
   the Board engaged in a more open and deliberate process, it could have potentially
   resulted in a rule making in which affected parties reached broad agreement.

2. ***The Board has failed to demonstrate the need for such sweeping changes in the
   current procedures for processing representation cases.***  The proposed rules purport to
   fix a system that is not broken.  To the contrary, the current system – which has been

---

[2] Throughout this Comment, the Chamber will refer to the July 2011 hearing transcript as "July 18-19 Transcript."

described as "outstanding" by each previous General Counsel from 1991 through 2013 who has a summary of operations posted on the NLRB's web site – processes representation cases fairly and efficiently, holding elections in a median of 38 days from the filing of an election petition, holding 94 per cent of all elections within 56 days, holding 92 per cent of elections pursuant to voluntary agreement of the parties, and meeting all of the Board's internal and external time targets.  To the extent that there is delay in some cases, the Board has not focused on the causes for such delay or proposed any solution to it, but instead has adopted a broad brush approach targeting a system that is performing very well.

3. ***The Board has proposed to virtually eliminate any meaningful pre-election investigatory hearing, as required by statute, and replace it with a highly adversarial process, purportedly patterned on court litigation***.  The Board's proposal discards the current investigative hearing format and replaces it with a litigation-like model.  An employer will now be required to file a position statement in *seven days or less* after the union has filed a petition.  The position statement imposes burdensome information requirements, requires waiver of legal rights with respect to any issue not properly raised, forecloses the right to resolve unit composition and eligible voter issues before the election, and eliminates the longstanding opportunity to appeal decisions of regional employees to the Board.  The Board has proposed these draconian solutions for problems that do not exist, at the cost of the due process and free speech rights of employees and employers, and increasing legal and compliance costs, particularly on small employers. We submit that the Board's proposals will likely increase representation case-related

litigation and attendant delays as time-pressed and due-process denied employers turn to the federal courts for redress.

4. ***The Board's proposal also raises significant privacy and compliance concerns with respect to private information of employees.***  For the first time, the Board would require employers to furnish unions with telephone numbers and email addresses, along with the names and addresses, of employees whom the union wants to organize.  These so-called "voter lists" must be produced in only two days following direction of an election, less than a third of the time currently allowed (7 days).  The requirement that telephone numbers and email addresses be provided to the union raises substantial privacy concerns, a point at least partially recognized by the Board, since it has again asked for suggestions on how to prevent misuse of this personal information.  Further, the unwarranted increase in private information that must be produced, and the dramatic decrease in the time within which to produce it, is based on the Board's faulty assumption that employers maintain such information in the electronic format required by the Board. The record demonstrates that this is not the case.

5. ***The Board's shortening of the election process will deny employers and employees their free speech rights to communicate about union representation and collective bargaining.***  The Board has stated that its rules are designed to reduce the time for the scheduling of an election to as little as 10 to 21 days following the filing a petition, roughly cutting more than in half the median time of 38 days for holding elections under the current system.  This is grossly unfair and threatens to deny the due process and free speech rights of employers and employees.  Unions already win approximately two-thirds of elections, and have months or even years of time to plan and organize the workforce

before the employer may ever be aware of the campaign.  Further, unions file election

petitions at the time of their choosing, catching many if not most employers off guard and

ill-prepared to immediately respond to the arguments and promises made by the union in

the preceding months.  The Board's proposal threatens to seriously undermine the rights

of employers and employees – recognized under §8(c) of the Act and by the Supreme

Court – to engage in a free and open discussion on the issue of union representation and

collective bargaining.

6. ***The Board's proposal to eliminate post-election review by the Board as a matter of
   right is based on a faulty premise.***  The Board's proposal is based on the supposition that

   elimination of the post-election appeal as of right will shorten the time between the tally

   of ballots and the final certification of representative or election results.  But this

   supposition ignores the likelihood that employers who desire review of regional office

   decisions will not simply give up.  To the contrary, it is likely that denial of post-election

   review as a matter of right will simply increase the instances of employer refusal to

   bargain charges – so-called "technical 8(a)(5)" cases.  An employer will now be forced to

   litigate in an unfair labor practice case before the Board and in federal court, those

   matters which can now be reviewed before the Board in a palliative post-election appeal

   as a matter of right.  As such, the elimination of post-election review as a matter of right

   will likely result in less, not more, efficiency in the representation case process.

7. ***The so-called academic research and other studies upon which the Board's proposal is
   based are flawed and do not support the Board's approach.***  The studies underpinning

   the Board's rationale are being used in a naked attempt to "effectively eviscerate an

   employer's legitimate opportunity to express its views about collective bargaining."  76

Fed. Reg. at 36831 (Hayes, dissenting).  The so-called academic studies were conceived and carried out with the object of supporting unions in achieving this very result.  In doing so they seek, among other things, to kill both the employer's message and messenger by wrongfully and sharply demonizing employer counsel and other advisers; and rely on shopworn polling data purporting to show that demand for union representation is at an historic high rather than as it actually is, at an historic low.

8.  ***The Board has undertaken the regulations without sufficient analysis under the Regulator Flexibility Act ("RFA").***  Under the RFA the Board was required to analyze both the number of small businesses affected by its proposal and the economic impact of the proposal on those small employers.  We submit that the Board failed to properly account for either the number of small employers affected or the economic impact of the proposal on them.  The Board blithely assumes that only a relatively small number of businesses are involved in Board representation proceedings.  But the Board fails to account for the fact that nearly all businesses – including small ones – are subject to the Board's jurisdiction and are, therefore, impacted by the need to commit time and resources to keep abreast of and comply with the Act's legal requirements.  Further – as is illustrated by the wholly inadequate time frames imposed under the proposal – the Board grossly underestimates the cost and economic impact of compliance.

### Preliminary Issues

As with our 2011 Comments to the Board, we must first address two preliminary issues.  One involves the process adopted by the Board in developing and publishing the proposed rules for comment; the other involves the Board's failure to demonstrate any need to change the current rules.

I.      __Process of Developing the Proposed Rules__:

The Chamber continues to have serious concerns about the process that the Board has chosen to develop the proposed rule.  The Board had an opportunity to explore whether consensus was possible by reaching out to all stakeholders and asking them to identify any areas of the Board's processes that could use updating or reform.  This was suggested by numerous commenters in 2011.  Again, however, rather than engage in a process more likely to result in broad agreement, the Board has instead chosen to take an aggressive, narrow approach that again promises to generate significant controversy.

In its 2011 Comments and during the July 2011 hearing, the Chamber emphasized that the Board should have engaged with potential stakeholders prior to issuing the 2011 NPRM.[3] For example, the Chamber noted that the Board has ready-made sources of input such as the American Bar Association's Labor and Employment Law Section and its NLRA focused committees for engaging in meaningful discussions about potential changes to election procedures.  See July 18-19 Transcript at pp. 153-154.

The Chamber also noted that the Board could have issued an Advanced Notice of Proposed Rulemaking or engaged in other stakeholder outreach before developing its proposed rule.  While various stakeholders have widely divergent views about many of the Board's processes, there are possibly numerous potential changes on which consensus could have been reached.  Had the Chamber and others interested in this process been consulted at an earlier stage, we believe it would have readily been acknowledged that while the majority of the time

---

[3] At the July 18-19 hearing and in the comments to the 2011 NPRM, numerous parties commented that the Board's process for promulgating the proposed rules was inadequate and rushed, or could otherwise have been more focused on the cohort of cases where significant delay had occurred and the causes of that delay. _See_ July 18-19 Transcript at pp. 88, 153-154, 196-197, 240, 257, 271 and 275.

the process works fairly well, there are some cases that take too long.[4]  We, and we believe

others, would have encouraged the Board to take a hard look at these outlier cases and see what

might be changed to improve the process without jeopardizing the procedures that work so well

for the vast majority of cases.

The Board rejected these options, claiming in the December 2011 Final Rule that it

"continues to believe that it has followed a lawful, fair, and open process that succeeded in

eliciting broad comment and informed public participation to a greater extent than ever before in

connection with the Board's representation (or unfair labor practice) case procedures."  76 Fed.

Reg. at 80,143.  The Board also expressed doubt "about the Chamber's suggestion that a broad

consensus might have been reached through a different process."  76 Fed. Reg. at 80,143.  The

Board offered no explanation, however, for why it did not think a consensus could be reached.

The Chamber submits that, although the Board's actions may have been an open process, it has

been far from an *effective* one, as the Board seems to be no closer to resolution of these issues

than when it first issued the 2011 NPRM.

As a result of a legal challenge brought by the Chamber, the 2011 Final Rule was vacated

on procedural grounds by the District Court for the District of Columbia.  The Board appealed

the District Court's decision to the U.S. Court of Appeals for the District of Columbia Circuit.

But on December 9, 2013, the Board stipulated to a voluntarily dismissed of its appeal and on

January 22, 2014, the Board rescinded the 2011 Final Rule.  This chain of events, while perhaps

disappointing to the Board, gave it another chance to engage in a more effective process to

obtain meaningful progress on election procedures.  But the Board has unfortunately failed to do

---

[4] And while the Chamber was, perhaps, "consulted" by virtue of its participation in the regulatory process that led to the promulgation of the final rule in December 2011, by simply reissuing the 2011 NPRM, the Board has, in effect, ignored any view or input which the Chamber previously provided.

so.  As a result, the Chamber must again express its disappointment with the procedural posture in which the rule currently stands.

The Board originally proposed this rule on June 22, 2011.  It received over 60,000 comments in response to the rule.  After receiving those comments the Board issued a final rule on December 22, 2011, responding to some of the comments submitted.  76 Fed. Reg. 80,138. Despite the extensive commentary by both the public and the Board in response to the 2011 NPRM—and the changes to the composition of the Board itself—the Board has moved back to square one and reissued the 2011 NPRM.  We find this difficult to understand for several reasons.

First, the Board had already responded to some comments in the December 2011 final rule.  While we are not satisfied with a number of those changes, from a procedural posture it would have made far more sense for the Board to have proposed a rule (if any were to be proposed at all) which took account of the thousands of comments that were filed in response to the 2011 NPRM, and to have explained whether it still agreed with the various statements and responses to comments it made in explanatory material accompanying the December 2011 final rule.  As Members Miscimarra and Johnson noted in their dissent, the NPRM "attempts no significant qualitative evaluation of" the comments to the 2011 NPRM.  79 Fed. Reg. at 7338.

Second, there have been significant developments since December 2011 that go unaddressed in this latest NPRM.  The Board received various comments during the 2011 comment period noting that the time within which to file responsive comments with the Board was too short.  The Chamber and other entities, for example, requested information from the Board about various statistical aspects about representation cases and data that could help the Board determine some of the main sources of delay of election cases.  The Board responded to

that request on August 2011, *after* the comment period for the 2011 NPRM had expired.[5]

Knowing that a number of key stakeholders were interested in that information, the Board could

have proactively used that information to inform their opinions and bases for the new rule.

Reference to that additional information, however, is nowhere to be found in the current NPRM.

In addition, the Board does not fully analyze how its decision in *Specialty Healthcare* or the

results of the General Counsel's enforcement initiatives focused on organizing rights, impact

upon or affect the need for or contours of the proposed rule.

      The procedures utilized by the Board in promulgating this rule are a microcosm of the

problems the Chamber anticipates businesses will face should the rule be adopted.  The Board

has the advantage of reviewing the materials and deciding when to promulgate.  The Chamber

and others then have to drop everything and submit comments in 60 days.  There is no warning

or discussion, which limits the opportunity for meaningful comment, leading to a suspect and

dubious result.  Commenters and the businesses that will be strongly affected by the rule deserve

better.

      Given the overwhelming amount of interest and sharply expressed differences at the

hearings about the purpose and effect of the 2011 proposed rules that were issued at that time

(and have been again), the Chamber once again submits that the Board should withdraw the

current NPRM and instead publish an Advanced Notice of Proposed Rulemaking in order to

---

[5] The Chamber and other groups lodged a similar request dated March 18, 2014, and also requested changes in the rulemaking schedule, asking that "the Board [ ] extend the current April 7, 2014 cutoff date for the submission of written comments regarding the proposed rules so that the Requesting Parties will have sufficient time to effectively consider and analyze the information requested herein."  The agency responded to the information request on April 2, 2014, by providing certain information, but stated that any response to the requested schedule changes would be "addressed separately by the Executive Secretary of the Board."  Of course, it is clear that unless the Board grants the extension of the April 7 deadline, the parties will not have sufficient time to properly study or utilize the requested information.

develop a less contentious, more broadly based rule that fairly addresses the views of all the labor-management community.

## II.    No Demonstrated Need for the Proposed Rules

The Board states that its proposal is necessary so that "employees' votes may be recorded accurately, efficiently, and speedily" and that "[t]he proposed amendments would remove unnecessary barriers to the fair and expeditious resolution of questions concerning representation."[6]

The Chamber fully supports the goal of removing unnecessary barriers to the fair and expeditious resolution of questions concerning representation.  See July 18-19 Transcript at 152. However, the substance of the Board's proposal is at odds with its stated purpose.

First of all, the Board has made no effort to articulate why it believes that its current system is not expeditiously resolving questions concerning representation.  As the Chamber and many others have pointed out, and as Members Miscimarra and Johnson noted in their dissent in the NPRM, there has been no need demonstrated for the Board's embarking on this revision of its existing representation case procedures.  In other words, "the NPRM advocates a 'cure' that is not rationally related to the disease."  79 Fed. Reg. at 7338.[7]  We need not dwell on the well-known statistics published by the Board demonstrating that under the current procedures 92% of all elections are held pursuant to an election agreement; that the median time between the filing of a petition and the election is 38 days, with 94% of all elections being conducted in 56 days; that the Board is meeting all of its representation case handling goals under the overarching

---

[6] 79 Fed. Reg. at 7319, 7323 (citations and internal quotation marks omitted).

[7] At the July 18-19 hearing, numerous parties testified that there was no demonstrated need for the Board to change its current representation procedures, which were fair, reasonable, efficiently administered and – importantly – provided the minimum time necessary to ensure employer free speech and due process rights to communicate with employees, which in turn are afforded full exercise of their rights of freedom of association and free choice guaranteed by Sections 1 and 7 of the Act. *See* July 18-19 Transcript at pp. 63, 149,152, 161-163, 185,188, 197-198, 201, 211, 276, 279, 303, 305, 316, 323, 325, 361, 364, 396-399 and 408.

standards adopted in consultation with the Office of Management and Budget and the Office of Personnel Management; and that unions, despite their complaints, currently win over two-thirds of the representation elections held.

Focusing only on cases involving a pre-election hearing does not change the conclusion that the status quo works efficiently.  Members Miscimarra and Johnson emphasized in their dissent that the median amount of time between petition and election in cases involving a pre-election hearing—about 8% of the total number of cases—is between 59 and 65 days.  79 Fed. Reg. at 7341 n.91.  This data suggests that for the added comfort of resolving contested issues regarding an election, the parties have a median wait time of about three to four weeks.  It is difficult to understand how this minimal delay, in which the Board fulfills its responsibilities to fairly resolve labor disputes and questions concerning representation, justifies a wholesale rewrite of the election rules.[8]

We concur with Members Miscimarra and Johnson that "empirical data seem to disprove the existence of a system-wide delay problem, and instead demonstrate that delay is only an issue confined to a discrete minority of cases, possibly for issues unique to those cases."  79 Fed. Reg. at 7346.  With the data showing no need for a wholesale change to election procedures, we are not satisfied with the Board's purported justifications for the proposed rule and request that the Board consider a more targeted approach.

With the Board's own statistics showing the lack of need for the proposed changes, the Board abandons its own goals.  "That the Board seeks to, and does, meet those targets in most instances is irrelevant to whether additional improvements may be made by amending these rules," the Board claimed in 2011.  76 Fed. Reg. at 80148.  If the Board continues to hold to that

---

[8] The shortened time frame advocated in the NPRM stands in stark contrast to other situations where Board rules allow lengthy, year-long delays to elections, such as the contract bar rule, election bar rule, and successor bar rule. *See* 79 Fed. Reg. at 7341 n.92 (Dissent of Members Miscimarra and Johnson).

belief, it is mistaken.  The Board cannot set goals regarding acceptable times for elections and then, without justification, disregard those benchmarks.  Presumably some rational approach has been taken to develop the benchmarks over the years.  Certainly the Board has expended significant resources in meeting them and has proudly announced that they have been met.  To now treat all this as if it were meaningless or did not exist is irrational and is the hallmark of arbitrary and capricious decision making.

In response to this stellar track record of timing for elections, the Board seeks to find justification for the rule in alleged unfair labor practices by employers, and the apparent notion that shortening the time between the filing of the petition and conducting the election will cut down on the time employers have to commit alleged unfair labor practices.  But this approach is mistaken.  While the Board, in the December 2011 Final Rule, noted studies by labor organizations claiming that shorter election periods would result in fewer unfair labor practices, 76 Fed. Reg. at 80138 (2011), the Board mentioned, but did not respond to, the many objections to those studies lodged by the Chamber and others.  *Id.*  Nor has it addressed these objections in the current NPRM.  In any event, as discussed below, the Board has other, more effective means of addressing unfair labor practices, which are after all the principal responsibility of the General Counsel in the first instance.

The Board also seems to attribute withdrawn election petitions to unfair labor practices as well.  At the July 2011 hearing the Chamber was asked about the question of petitions withdrawn and how this affects the statistic showing the substantial union win rate.  Of course, there is no election held on a withdrawn petition.  However, in the absence of Board statistics on the reasons why they have been withdrawn, it is unreasonable and unfair to simply assume they were all withdrawn due to unfair labor practices committed by employers.  It makes more sense to

assume that a variety of factors – including imminent dismissal by the region for substantive or procedural reasons, worker disinterest, desire to re-file the petition seeking a different unit, being close to having substantial support but not wanting to risk a one year election bar, importuning by another union because of jurisdictional issues or other strategic issues – can and do motivate unions to withdraw petitions.  Indeed, it is entirely possible that some of the withdrawn petitions were re-filed and resulted in an election contributing to the high percentage win rate enjoyed by unions.  Whichever of these reasons is behind the withdrawal of any given petition, the fact remains that the great majority of petitions are not withdrawn, but are handled fairly and efficiently under the current system.  The minority of petitions that are withdrawn – for whatever reasons – present no justification for changing the system as a whole which deals efficiently and fairly with the great majority of petitions that are not withdrawn but result in elections won two-thirds of the time by the union.

In any event, if unfair labor practices have occurred, no matter the length of time between filing of the representation petition and the election, it is the province of the General Counsel to prosecute and seek remedies for them – and the current and prior General Counsels have pursued initiatives which are aimed directly at the right of employees to organize free from coercion or intimidation by any party.  *See, e.g.,* Memorandum GC 11-01, *Effective Remedies in Organizing Campaigns* (December 20, 2010); Memorandum GC 10-07, *Effective Section 10(j) Remedies for Unlawful Discharges in Organizing Campaigns* (September 30, 2010); Memorandum GC 07-01, *Submission of §10(j) Cases to the Division of Advice* (December 15, 2006); Memorandum GC 06-05, *First Contract Bargaining Cases* (April 19, 2006).  If the Board's concern is about unfair labor practices, the focus should be on ways to target those types of unfair labor practices, not rewriting the entire election procedure.

The Chamber also thinks the Board has given short shrift to other factors that should affect election procedures. Quick elections are not an end in and of themselves. The NLRA itself requires the Board to consider other important factors. For example, the NLRA was intended to promote full and robust debate amongst employers, employees, and their potential union representatives over the question of union representation. Section 8(c) of the NLRA reflects a "policy judgment, which suffuses the NLRA as a whole, as favoring uninhibited, robust, and wide-open debate in labor disputes." *Chamber of Commerce v. Brown*, 554 U.S. 60, 67-68 (2008); *see also NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969) ("[A]n employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the National Labor Relations Board."). The ability of employees to participate fully in those debates can be limited by their lack of knowledge of the NLRA and election rights and procedures. 79 Fed. Reg. at 7340 (Dissent of Members Miscimarra and Johnson). Indeed, the high prioritization of the speed of elections and the disregard of important election rights of the parties in the NPRM runs afoul of Congress' intent in passing the election hearing requirement. Members Miscimarra and Johnson correctly describe how the pre-hearing election approach embodied in the NPRM was rejected by Congress in 1947 and again in 1959. 79 Fed. Reg. at 7341-42; *see also* 77 Fed. Reg. at 25560-63 (Member Hayes' dissent to 2011 Final Rule). We also agree, as discussed below, that the elimination of the pre-election request for review violates Section 3(b) of the NLRA.

Furthermore, we do not think the proposed rule has fully considered the ways in which it undermines its own goals. If the goal is to have quick elections, the new rules may indeed lessen the time from petition to election. But the proposed rules may very well ***increase*** the time it takes to resolve election disputes. As the Board has previously recognized, "bargaining takes

place in the shadow of the law." 76 Fed. Reg. at 80149. The proposed rules provide employers the incentive of laying out every possible challenge to the election so that their objections may be preserved. The proposed rules also place a disincentive to enter stipulated election agreements.[9] As Member Hayes noted in his dissent in 2012, "[i]f the percentage of election agreements diminishes by even a few points as a result of this changed calculus, the consequent increase in pre- and post- election litigation will almost certainly wipe out what little actual redress of perceived delay is effected by the Rule's implementation." 77 Fed. Reg. at 25566.

In addition, the proposed rules would create a system where a number of elections leave unresolved a myriad of key eligibility issues that will hamper the parties' ability to bargain.[10] The proposed rules also would mean that employers in some circumstances will have to engage in technical 8(a)(5) violations to assert their rights under the election. The Board admitted as much in the December 2011 Final Rule. *See* 76 Fed. Reg. at 80161 ("an employer must refuse to bargain and commit a 'technical' 8(a)(5) violation to secure court review of the Board's representation decisions"). All of these actions would increase the time it takes between the filing of an election petition and a definitive resolution of the election. A slightly longer election period in which more issues are resolved pre-election would logically limit the number of post-election disputes.

---

[9] As Member Hayes explained: "The stipulated agreement resolved all pre-election disputes but preserved the automatic right to Board review of a regional director or hearing officer's disposition of post-election challenges and objections. The Rule now eliminates that right, substituting for mandatory review a discretionary request for review procedure that currently exists for the disposition of pre-election issues. . . . It [ ] seems natural that the willingness for parties to compromise on pre-election issues would be adversely affected by the elimination of the right to agree to mandatory post-election Board review." 77 Fed. Reg. at 25566.

[10] The Chamber agrees with Members Miscimarra and Johnson that "by having elections take place first, with fundamental issues that have not even been the subject of a hearing, employers and unions will not even definitively know what employees are even covered by any bargaining that takes place. This will create greater uncertainty and much less predictability for everyone, not the least of whom will be the employees who have already voted, contrary to another of the Board's primary mandates, which is to foster greater labor relations stability, not less." 79 Fed. Reg. at 7343. The Board also claims that limiting the issues to be resolved pre-hearing is beneficial because many of those issues will be rendered moot by the election. 79 Fed. Reg. at 7331. As Member Hayes noted, however, the Board has not (and has continued not to) provide any empirical support for that premise. 77 Fed. Reg. at 25566.

Furthermore, the dissenting members to the 2011 and 2014 NPRMs have presented significant evidence that the proposed changes will not have a meaningful impact on those cases that are delayed longer than the Board's goals.  Member Hayes' inquiry suggested that "when cases take longer than 100 days to process, much of the 'delay' can be attributed to the effects of post-election case processing, blocking charges, or delays in case deliberations by the Board itself."  77 Fed. Reg. at 25565.  Members Miscimarra and Johnson also presented that the changes in the 2014 NPRM would address very few of the cases experiencing a long delay before election.  79 Fed. Reg. at 7348-49.  Thus, the Chamber has serious concerns that the proposed rules would be counterproductive to the goals espoused in the NPRM:  it would not meaningfully shorten those cases that are being delayed and may very well cause additional cases to experience delays.

Finally, again, the process by which the Board has gone about this NPRM leaves much to be desired.  Instead of the broad brush approach taken, it would have made much more sense – as suggested by Members Miscimarra and Johnson in their dissent and by Member Hayes's dissent to the 2011 NPRM – for the Board to have identified which cases have been delayed, what were the causes of the delay, and how the delay could be addressed without imposing a one-size-fits-all approach on everyone, a method that – as described below and at the July 2011 hearing – sacrifices the established due process rights of employers and employees.  Had the Board pursued such a strategy – one that examined those cases in which questions concerning representation had not been expeditiously resolved, and then examined what factors had created barriers to expeditious resolution, it is much more likely that the Board would be receiving far greater – perhaps consensus – support for its proposed changes.  As it stands, the proposed rule does not "articulate a satisfactory explanation for its action including a 'rational connection

between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see also Business Roundtable et al. v. SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011) (SEC issued arbitrary and capriciously issued proxy access rule regarding Board director elections by failing to consider properly evidence presented about the rule's effects).

### Elements of the Proposed Rules

As noted above, the Chamber is disappointed that the Board has merely reissued its initial 2011 NPRM on changes to its election procedures. Not surprisingly then, the Chamber continues to have the same objections with many of the individual elements of the proposed rules. In order to re-emphasize, clarify and supplement these objections, set forth below are our substantive concerns with the proposed changes.

**I. Electronic Filing**: The proposed amendments would allow for the electronic filing of union representation petitions. In general, the Chamber has no objection to this. However, we remain concerned about the aspect of the proposal that allows the petitioner to file with the petition evidence of a showing of interest.

Traditionally, the showing of interest is in the form of the actual cards or some other document signed by the individual employees. The Chamber would not support the electronic filing of showing of interest evidence unless the evidence would: (1) indicate when each individual signature was obtained; (2) indicate exactly what was printed on the card or other document (in its original font, size and formatting) containing the signature; and (3) show a true copy of the signature actually on the physical card or other document.

The Chamber agrees that such filing should be followed within 48 hours by the filing with the Region of the actual physical cards or other document on which the signatures were obtained, as contemplated by the proposal at § 102.61(f). We submit that the Regional Director

should not serve any party with the notice until the actual physical cards are received by the Region.

In that regard, there still appears to be a potential conflict or inconsistency between the proposed § 102.61(f) requirement noted above, and § 102.60(a).  The latter section states that failure to file the original of the petition "shall not affect the validity of the filing by facsimile or electronically, if otherwise proper."  This portion of § 102.60(a) (with the exception of the words "or electronically") is existing regulatory language that was perhaps overlooked in adding the new requirement under § 102.61(f) that original documents be filed with the region within 48 hours of the petition being filed electronically or by facsimile.  The Chamber submits that if the proposed rules are adopted, the language quoted from § 102.60(a) should be stricken or amended so that it conforms to § 102.61(f).

The Chamber understands that a showing of interest is not a matter that may be litigated before the Board.  However, the cards may be important for more than merely a showing of interest.  For example, where the showing of interest is based on a number purportedly greater than 50% of the proposed unit, the question of a bargaining order under *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969), may hinge both on the validity of the cards (as well as the number of persons in the bargaining unit).  We believe that the Board – and all the parties involved – are best served by requirements which will help ensure that the electronically filed petitions rely on cards or other documents which are timely, authentic and not obtained under any false pretenses.[11]

**II.  <u>Required Additional Documents</u>**:  The Chamber has no objection in principle to the electronic service of the two additional forms proposed by the Board, one of which will inform

---

[11] The Board requested the parties to address whether the proposed rules should expressly permit or proscribe the use of electronic signatures to demonstrate a showing of interest. 79 Fed. Reg. at 7326. The Chamber addresses this issue below.

interested parties of their rights and obligations ("Rights and Obligations Form") and the other which would be a Statement of Position of the other interested party(ies).  However, the Chamber has serious concerns regarding the *content*, *timing and legal effect* of these forms.

**III.**  <u>**Rights and Obligations Form Content**</u>:  The NPRM states that the Rights and Obligations Form will be available on the Board's web site, and will be served by the petitioner on the other interested parties.  In the Chamber's 2011 comments, we noted the problems inherent with Board's failure to publish a proposed Rights and Obligations Form.  Obviously, the Board has ignored this advice.  As before, because there still is no proposed Rights and Obligations Form published with the NPRM, neither the Chamber nor any other affected party is able to comment on the content and substance of such a form.

However, omitting the proposed Rights and Obligations Form from the NPRM is even more unjustified this time due to significant legal developments that have transpired since 2011.  When the Board initially announced its Proposed Rules Governing Notification of Employee Rights Under the National Labor Relations Act, 75 Fed. Reg. 80410 (December 22, 2010) ("NLRA Rights Notice"), it generated enormous interest and thousands of comments.  The rule was also challenged and invalidated by both the D.C. and Fourth Circuits.  *See Chamber of Commerce v. NLRB*, 721 F.3d 152 (4th Cir. 2013); *National Ass'n of Mfrs. V. NLRB*, 717 F.3d 947 (D.C. Cir. 2013).  The D.C. Circuit invalidated the rule because it impinged on employers' free speech rights embodied in Section 8(c).  *National Ass'n of Mfrs.*, 717 F.3d at 959-60.  Here, the Rights and Obligations Form will apparently contain similar information and therefore raises the same types of concerns.

As before, the Chamber strongly urges the Board to amend this NPRM, or publish a new one, in order to provide notice of the content of the Rights and Obligations Form and an

opportunity to comment on it.  In doing so, the Board should explain how its form does not

create the same issues that resulted in the invalidation of the Board's NLRA Rights Notice.  This

is especially important since it appears that the Board has taken the position that the Paperwork

Reduction Act does not apply to these forms and consequently, there will be no other opportunity

to solicit public comment on the contents of the forms.

     **IV.  <u>Statement of Position Form – Content Supplied by an Employer</u>:**  The Chamber

continues to have a number of objections to the content, the effect of, and the time for filing the

Statement of Position Form.  Our objections include, but are not limited to, the following: (1) the

information required is burdensome and unnecessary; (2) the preclusive effect of failure to raise

issues or otherwise complete the form is a denial of due process and will likely cause more, not

less, litigation; and (3) the wholly inadequate time for filing the Statement of Position Form is

unfair and also a denial of due process to employers.

     Initially, however, we remain very concerned with the contents of the form itself, which

the NPRM says will be available on the Board's web site, and will be served by the petitioner on

the other interested party(ies).  Like the proposed Rights and Obligations Form discussed above,

there is no Statement of Position Form published with the NPRM.  Only the substantive

information to be supplied by the employer for the Statement of Position Form is described in the

proposed amendments to §102.63(b)(1).  The Chamber again strongly urges the Board to amend

this NPRM, or publish a new one, for the same reasons as stated above with respect to the Rights

and Obligations Form, so that affected parties may see and comment on the Statement of

Position Form.

     The substantive content and information to be supplied by the employer on the Statement

of Position Form is described in the proposed amendments to § 102.63(b)(1).  Under that

proposed amendment, the employer is required to provide information or take positions with respect to the following:

*1. Whether the employer agrees that the Board has jurisdiction.*  In general the Chamber does not object to this except as discussed below with respect to the timing and legal effect of the Statement of Position Form.

*2. Employer's relation to interstate commerce.*  In general the Chamber does not object to this except as discussed below with respect to the timing and legal effect of the Statement of Position Form.

*3. Whether the employer agrees with the proposed unit.*  In general the Chamber does not object to this except as discussed below with respect to the timing and legal effect of the Statement of Position Form.

*4. The basis for the employer's contention that the unit is not appropriate.*  In general the Chamber does not object to this except as discussed below with respect to the timing and legal effect of the Statement of Position Form.

*5. Description of the most similar unit that the employer concedes is appropriate.*  The Chamber continues to object to this requirement.  In addition to the timing and legal effect discussed below, the Chamber believes that it is inappropriate to require an employer, on pain of forfeiture or preclusion, to identify – much less concede the appropriateness of – any unit, before a question has been asked or a word of testimony spoken at the hearing, or the employer (and other parties) have had any opportunity to probe the rationale for the proposed unit and any possible alternatives thereto.  The requirement that the employer not only agree or disagree with the union's proposal, but to go further and make a proposal itself, amounts to a forced pleading and raises serious due process and free speech concerns.  It is the union that seeks to organize

employees, not the employer, and it is the union's responsibility to propose a unit appropriate for

collective bargaining.  Section 9(b) of the Act states that "[t]he Board shall decide in each

case . . . the unit appropriate for the purposes of collective bargaining . . . ."  The rules should not

attempt to absolve the Board of its responsibility, on a case by case basis, to make an appropriate

unit finding in proceedings under Section 9 of the Act.

Further, under the Board's decision in *Specialty Healthcare & Rehabilitation Center of

Mobile*, 357 NLRB No. 83 (2011), the employer's ability to suggest another appropriate unit

now hinges on showing either that (1) the members of the unit petitioned for by the union do not

share a "community of interest", or (2) that the employees which the employer wishes to add

share an "overwhelming community of interest" with the employees in the unit.  These

additional legal barriers to challenging the unit sought by the union, make it wholly inappropriate

to require an employer – unschooled in the legal and factual bases for making such judgments

(about which trained and experienced labor practitioners may differ) – to identify any

appropriate unit, at least at this stage of the proceedings.[12]

The Chamber also objects below with respect to the timing and legal effect of this

requirement.

***6. Identify any individuals occupying classifications in the petitioned for unit whose***

***eligibility to vote the employer intends to contest, and the basis for each such contention.***  The

Chamber objects to this requirement on much the same basis as stated above with respect to the

identification of an alternate unit.  Unless and until the petitioned for unit has been subject to

examination at a hearing, and a unit has either been agreed upon by the parties or deemed

---

[12] The Chamber is on the record as opposing the test announced in *Specialty Healthcare*, in briefs filed with the Board and in the federal courts.  Our reliance on it as a basis for not requiring an employer to identify an alternate appropriate unit is not intended to endorse the *Specialty Healthcare* test, but only to recognize the difficulties it adds to the requirement in the proposed NPRM, since that case unfortunately reflects the current state of the law.

appropriate by the Board, requiring an employer to identify who is in the unit and who it believes is not eligible to vote, is a significant burden and a possible waste of time and resources for the employer and other involved parties.  In the hearing process, any unqualified voters and employees not sharing a community of interest may be excluded from the unit and other employees sharing an overwhelming community of interest (as now required by *Specialty Healthcare*) may be added, thus obviating any employer objections that may have existed to the unit as originally requested.  In any event, the employer should not be put to the burden of identifying who it plans to contest until the unit is identified.

The Chamber also objects below with respect to the legal effect of this requirement.

*7. Raise any election bar*.  In general the Chamber does not object to this requirement except as discussed below with respect to the timing and legal effect of the Statement of Position Form.

*8. State the employer's position concerning the type, dates, times and location of the election and the eligibility period.*  The Chamber continues to object to this requirement.  Unless and until a putative appropriate unit has been identified, it would be virtually impossible for the employer to develop a reasoned position regarding the type, dates, times and location of the election, and the eligibility period.  The Chamber also objects below with respect to the legal effect of this requirement.

*9. Describe all other issues the employer intends to raise at the hearing.*  The Chamber continues to object to this requirement.  While in general the Chamber does not object in principle to the identification of issues at the earliest practical time, it would not always be possible to identify all legal issues at this very early stage of the process, and the decision in *Specialty Healthcare* only adds to the difficulties of identifying such issues.  The preclusive

effect of failure to do so (as discussed below with respect to other aspects of the Statement of Position Form) makes this requirement unjust and a denial of due process.

*10. Name, title, address, telephone number, fax number and email address of the individual who will serve as the representative of the employer and accept service of all papers for purposes of the representation proceeding.*  In general the Chamber does not object to this requirement except as discussed below with respect to the timing and legal effect of the Statement of Position Form.

*11. Full names, work locations, shifts, and job classifications of all individuals in the proposed unit.*  The Chamber continues to object to this requirement to the extent that an employer is required, under §102.63(b)(iv), to provide employee telephone numbers, available email addresses and home addresses to the Regional Director.  At this point in the process the Region has no arguable need for such information.  Further, we object to providing such information for the reasons discussed below with respect to the voter list.  The Chamber also objects below with respect to the timing and legal effect of this requirement.

*12. Full names, work locations, shifts, and job classifications of all individuals in the most similar unit the employer concedes is appropriate.*  The Chamber continues to object to this requirement.  We submit that it is inappropriate to require an employer, on pain of forfeiture or preclusion, to identify – much less concede the appropriateness of – a unit, as we have already discussed above.  Consistent with that, it is inappropriate to burden the employer with providing information with respect to an employer identified unit.  The Chamber also objects below with respect to the timing and legal effect of this requirement.

*13. The list of names shall be alphabetized and in an electronic format approved by the Board's Executive Director unless the employer certifies that it does not possess the capacity to*

***produce the list in the required form.*** Generally the Chamber does not object to the production of documents in electronic format, except as stated herein. But as discussed above, it objects to the requirement that the employer provide any list of names with respect to a unit it concedes is appropriate, and objects to any provision of telephone numbers and email addresses with any employee list required with the Statement of Position or otherwise.

**V. Statement of Position Form – Timing and Legal Effect**: In addition to the contents of the form discussed above (some of which are based in part on timing), the Chamber continues to have an overall objection to the timing and legal effect of the Position Statement Form.

The proposed revision to §102.63(b)(1) states that after a petition has been filed and the Regional Director has issued a notice of hearing, "the employer shall file and serve on the parties named in the petition its Statement of Position *by the date and in the manner specified in the notice unless that date is the same date as the hearing date.* If the Statement of Position is due on the date of the hearing, its completion shall be the first order of business at the hearing before any further evidence is received, and its completion may be accomplished with the *assistance of the hearing officer*." (Emphasis added.) This proposed revision raises several serious concerns.

Pursuant to the proposed changes, in the absence of undefined "special circumstances" – i.e., routinely – the hearing must be scheduled seven days from the date of the Regional Director's service of the notice of hearing ("Notice") on the employer. Thus, the employer's Statement of Position must be filed (in the absence of special circumstances) within a maximum of seven days. But the time could be less than that, and as little as one day, if the Regional Director were to so specify in the Notice.

The Chamber submits that even the maximum allowed time of seven days – much less the one day permitted by the proposed regulation – is wholly insufficient for the employer to file

its Statement of Position.  As discussed above, the insufficiency is heightened by the requirements of the *Specialty Healthcare* decision that an employer demonstrate an "overwhelming community of interest" if it wishes to add individuals to the unit proposed by the union.  The Board continues to maintain that, "Given the variation in the number and complexity of issues that may arise in a representation proceeding, the amendments do not establish inflexible time deadlines . . . ."  79 Fed. Reg. at 7323.  But here, in fact, the proposed amendments do establish deadlines that are both inflexible and inadequate to address the "variation in number and complexity of issues that may arise."[13]

The inadequacy of the time allowed for the filing of the Statement of Position is most dramatically demonstrated in the case of small employers who, the Board's statistics suggest, make up a very large percentage of the employers involved in representation proceedings.  The median number of employees involved in Board elections from 2004 to 2013 has ranged between 23 and 28 per voting unit.  79 Fed. Reg. at 7327 & n.46.  Of course, this means that half of the units were smaller than this median.

The likelihood is that these elections involve small employers who do not routinely employ labor counsel.  The necessity of filing a Statement of Position in seven or less days is especially unfair to those employers because of the necessity of locating and identifying labor counsel who can assist the employer in identifying the numerous and increasingly complex issues which the Board itself understands are presented in representation proceedings.

Simply put, given an employer's other obligations, it cannot simply drop everything and tend to responding to a petition in such a short time frame, particularly without the assistance of

---

[13] At the July 18-19 hearing, there was a great deal of testimony regarding the general inadequacy of the time frames in the proposed rules, including the unfairness of, and due process concerns raised by, the 7 day or less requirement for filing a position statement.  *See* July 18-19 Transcript at pp. 69, 97, 120-122, 148, 160-163, 182, 195, 197, 210, 252, 253-254, 256, 258-259, 272-274, 277-278, 304, 306-308, 315, 319-321, 324-325, 363, 407, 409, 412 and 414.

counsel.  Seven or less days is insufficient time on its face to locate and retain counsel, evaluate the issues and gather the information necessary to prepare and submit the Statement of Position. It amounts to a denial of due process for all employers, particularly small ones.

Moreover, the prospect that the Statement of Position will be completed on the fly with the assistance of the hearing officer as the first order of business at the hearing does nothing to cure the due process problems created by the seven day or less deadline.  The Chamber submits that an NLRB hearing officer, who will create the record upon which disputed issues are decided, is hardly in a position to offer counsel to an employer that is either anywhere near adequate or what the employer is entitled to – which is an attorney or other representative of its choice whose only interest is to advise the employer as to its legal rights and interests.  Rather than solve the due process problem, the assistance of a hearing officer merely verifies the need for the assistance, but without providing the proper assistant, i.e., counsel or other adviser chosen by the employer.[14]

The denial of due process inherent in the seven day or less deadline is exacerbated by the fact that failure to comply with the deadline and furnish all the information called for in the Statement of Position will preclude the employer "from contesting the appropriateness of the petitioned for unit at any time and from contesting the eligibility or inclusion of any individuals at the pre-election hearing."  §102.63(b)(v).  Obviously, this preclusive effect makes it all the more necessary that employers be given sufficient time to identify and retain counsel or other advisers and devote the time necessary to properly understand and prepare the Statement of Position.

---

[14] As noted above this denial of the employer's own chosen counsel or advisor could place employers in a precarious position with respect to Position Statements.  Dissenting Members Miscimarra and Johnson emphasized that the proposed rule improperly gives hearing officers the ability to exclude evidence on which there would not and could not be further review.  79 Fed. Reg. at 7342 n.98.

Under §102.66(c) of the proposed rules, the Statement of Position has another preclusive effect, *viz.,* preclusion of taking any position not articulated in the Statement of Position (with limited exceptions for Board jurisdiction and voter challenges).  In this regard, the requirement that the Statement of Position contain the employer's position on a variety of issues noted above, including "all other issues the employer intends to raise at the hearing", heightens the importance of the Statement of Position and emphasizes the complete inadequacy of the seven day or less deadline, rising to the level of a denial of due process.

In addition, the preclusive effect of the Statement of Position is unfair to the extent that it will preclude the litigation of issues that were not apparent or reasonably foreseeable but which became so based on facts disclosed at the hearing or disclosed or occurring during the election process.

The net of the foregoing is this:  the Statement of Position requires much information that is unnecessary and burdensome, requires that it be furnished in an inadequate amount of time with inadequate counsel, without full knowledge of its relevance or legal effect, accompanied by a harsh preclusive effect both for failure to file as well as failure to raise issues that may not be foreseeable or apparent.  While the notion of defining what is genuinely at issue between the parties may not be a bad one, the method and timing of doing so under the proposed rules amounts to a denial of due process.  In order to protect their due process rights, employers will be more likely to assert "kitchen sink" issues and defenses for fear of waiving any of them.  This approach will tend to lead to more litigation, not less, and reduce efficiency in the election process.[15]

---

[15] At the July 18-19 hearing a number of comments raised the concern that the unfairness of issue preclusion and the refusal to allow challenges of less than 20% of voters amounts to a lack of due process and will force parties to raise every possible issue, reduce election agreements and increase the number of hearings, attempted appeals to the

Nevertheless, if the Board goes forward with the promulgation of these rules, the

Chamber submits that at a minimum the time for the submission of the Statement of Position

should be substantially lengthened, the information required be made substantially less

burdensome, and the preclusive effect substantially narrowed or eliminated.

**VI.**  **Voter List Process Issues:**  The proposed rule in part codifies the existing

requirement that the employer provide a list of eligible voters.  The Chamber would not

generally object to the codification of existing requirements as developed with respect to the

provision of so-called "Excelsior lists", pursuant to *Excelsior Underwear, Inc., supra,* 156

NLRB 1236 (1966) and its progeny.  The Chamber would also be willing to explore alternative

methods for unions having the ability to contact employees following the direction of an

election. For example, Members Miscimarra and Johnson identified potential options, such as a

website created for purpose of the election or, potentially, giving employees their own Agency-

sponsored and protected email accounts for purposes of the election.  79 Fed. Reg. at 7344 n.110.

If limited to the period following the direction of an election, exploring such potential options

may result in the identification of an alternative to the traditional means afforded unions to

communicate with employees during the pre-election period.

Notwithstanding the possibility of alternative arrangements for informing employees, the

Chamber does have objections to the changes made to existing law in the proposed rules with

regard to various process issues (timing, format and service) and the content of voter lists.

*1. The Board's premise is faulty.*  The Board asserts that "[t]oday, many, if not most,

employers maintain electronic records," and that in order to comply with current legal

requirements, an employer need only "print out a copy of their electronic records and provide a

---

Board, technical 8(a)(5) cases and re-run elections. *See* July 18-19 Transcript at 22, 66-67, 69-70, 76,98-99,107-108,
123, 182-185, 195-196, 201, 244-245, 306, 320, 413.

paper list to the regional office which, in turn, mails or faxes a copy to the other parties."  79

Fed. Reg. at 7327.  In the Board's view, given today's technology, it would be simpler and faster

for the employer to take the "print out" of its list and, rather than give it to the Regional Director

for distribution to the other parties, have the employer send it electronically to the other parties.

The Chamber continues to maintain that the Board's view of the process is overly-simplistic and

is therefore a faulty premise upon which to base the proposed changes in existing law with

respect to the provision of voter lists.

     *2. Not all employers maintain electronic records.*  While many employers may have

access to the latest technology and keep extensive human resource records electronically, it is

also true that many smaller employers do not routinely keep such records electronically.[16]  Just

as a digital divide continues to exist between different age and socio-economic groups, so does it

continue to exist among employers of many different sizes and types.  The Board itself

recognizes this in two ways.  First, the Board's assertion is that electronic records are kept by

"many, if not most" – a measure which allows that a majority or a large minority of employers

do not keep electronic records.  Second, the Board allows an employer to certify that it does not

possess the capacity to produce the voter list in the required form.  Thus, the Board continues to

recognize  the fact that many if not most employers do not maintain personnel records in

electronic form, or in a form convenient for creating a list with the information in the electronic

format required by the Board.

     *3. Even employers who maintain electronic personnel records may not maintain them*

*in a form containing the information required by the proposed rule.*  Even if an employer does

maintain electronic personnel records, it is possible – we believe likely – that they are not

---

[16] *See* July 18-19 Transcript at pp. 183-184, 250-252; *see also* p. 406.

maintained in such a manner as would allow the employer to simply "print out a copy."  There may be some information, such as social security numbers and medical information, that would have to be manually redacted, while other information, such as email addresses, would have to be manually added.

*4. Two days is insufficient time for the creation and provision of the voter list.*  Many, if not most, employers will not have their personnel information stored electronically, or – even if they do – have it in a proper format for simply printing it out.  Therefore, many if not most employers will have to create the voter list manually, not just "print out a copy."

Moreover, most employers do not have large Human Resources staffs.  Often, there is only one individual with the knowledge and expertise to produce accurate voter eligibility lists.  Not surprisingly, these individuals likely have many other HR-related functions to perform on a daily basis, such as making payroll, administering leave policies or answering questions about the employer's retirement policy.  It is also entirely possible that this individual may be sick or out on vacation during the two days in which the voter eligibility list needs to be produced.  For these reasons, we continue to think it is self-evident that two days is simply an insufficient amount of time in all but the most unusual cases.[17]

*5. Smaller median unit sizes do not justify the two day requirement.*  The Board points to the fact that the median size of a voting unit for the last decade has been between 23 and 28 employees.  However, this smaller size unit does not necessarily suggest that two days is sufficient time to collect and provide all of the information required in the usual case.  It is the smaller employers who are likely the very ones who do not have the personnel information electronically stored, or who will have to either manually revise electronically stored information

---

[17] In addition to general objections regarding the time limits under the proposed rule, problems in complying with the proposed two day deadline for producing the voter list were voiced by a number of commenters at the July 18-19 hearing. *See* July 18-19 Transcript at pp. 183-184, 194, 274, 363, 366, 406.

or manually create the voter list from non-electronic records.  And it is the smaller employers who likely have the least available assistance in doing so and can least afford to drop everything else in order to create the voter list on the fly.  This in turn does not promote efficiency in the election process but may force errors and anomalies in the lists rendering them of less use to the union.[18]

**6. The restriction on use of the voter list is not served by making them electronically available.**  The Board is undoubtedly aware of the ease with which electronic documents may be sent on a moment's notice to virtually anyone with very little control over their further disbursal or distribution.  While no system is completely safe from this, certainly documents distributed by email, which do not require any scanning, photocopying or other steps to distribute them further, invite abuse of the system and unauthorized use of the information contained on the voter list.  Thus, the Chamber submits that the current requirement in §102.114(i), that electronically filed documents be served by email "if possible", should not be applied to the voter list.[19]

### VII.  Voter List Content Issues:

**1. Government action must be cognizant of personal privacy rights.**  Personal privacy rights are of great concern to employees, probably more now than when voter lists were first required in the Board's *Excelsior* decision, and perhaps even more than when the Board first issued its previous NPRM in 2011.[20]  Indeed, this was acknowledged at the July 18, 2011 session

---

[18] *See* July 18-19 Transcript at pp. 66-67, 147-148,195, 209-211, 250-252, 272-273, 277-278, 307-308, 319, 323-325, 412.

[19] The Board requested the parties to address what, if any, the appropriate sanction should be for a party's noncompliance with the restriction. 79 Fed. Reg. at 7327.  The Chamber addresses this issue below.

[20] Identity theft, for example, has become a growing problem in the United States.  *See* Treasury Inspector General Report (Sept. 20, 2013) (noting up to $3.6 billion issued due to fraudulent tax returns based on identity theft) available at http://www.treasury.gov/tigta/auditreports/2013reports/201340122_oa_highlights.pdf.  As the GAO's Director of Information Security Issues stated in recent Congressional testimony, the unauthorized disclosure of information collected by federal agencies "can lead to serious consequences and substantial harm to individuals and the nation." Testimony Before the Committee on Homeland Security and Governmental Affairs, Statement of

of the Board's hearing on this matter, in which the then Chairman noted that the additional

contact information that would be mandated under the proposed rule was thought to be a

preferable alternative to a personal visit at an employee's home.  *See* July 18-19 Transcript at pp

76-77.

### 2. The proposed rule exacerbates privacy concerns by requiring the provision of employees available email addresses and telephone numbers in addition to their home addresses.  All of us who use email know that unwanted email can be an irritant and sometimes,

in the case of "phishing," a danger to privacy.  Similarly, the unwanted solicitation call on the

telephone has interrupted many a family dinner or evening of relaxation.  We believe that these

additional requirements will further subject unwilling employees to intrusions into their

privacy.[21]   Indeed, the "right to be let alone" is "the most comprehensive of rights and the right

most valued by civilized men.  To protect that right, every unjustifiable intrusion by the

government upon the privacy of the individual, whatever the means employed, must be deemed a

violation of the Fourth Amendment."  *Olmstead v. United States,* 277 U.S. 438, 478 (1928)

(dissenting opinion of Justice Brandeis).  But the concerns go even deeper today and we believe

that most people are, or should be, highly concerned about the proliferation of identity theft and

the need to minimize the accumulation of personal information – even those seemingly as

mundane as email addresses or telephone numbers – available to third parties, including

agencies of their government.

### 3. The balance between an employee's privacy and the employees' right to organize is not difficult to strike.  There need not be a struggle to balance the rights of employee privacy

---

Gregory C. Wilshusen, Director, Information Security Issues, U.S. Government Accountability Office (April 2, 2014)  at p. 2, available at http://gao.gov/assets/670/662227.pdf.

[21] Privacy concerns were raised at the July 18-19 hearing. *See* July 18 -19 Transcript at pp. 62, 74-75, 77, 107-109, 112-114, 122, 344-348.

and employee organizing rights. Employees are entitled both to choose privacy and entitled to choose to know about the petitioning union and its programs. If they wish to have that information it should not be denied to them. But neither should it be forced on them. The Chamber submits that in modernizing the Board's election rules, the employees should be allowed to choose in what manner they wish to be contacted. As the Chamber previously suggested, this could be accomplished by two simple expedients.

First, at the same time the voter list is due from the employer, after the region directs the election, the petitioning union could designate a web site that employees could visit on their own time to read and/or download union material, view union videos, engage in on-line chats with union representatives, and – if they wish – provide the union with personal contact information.[22] This puts the choice of actually showing interest and sharing personal and private information in the hands of the employees, where it belongs. According to information gathered by the US Census Bureau, by 2011 more than 75 percent of individuals in the United States accessed the internet either from home or with a smartphone.[23] We would not expect this number to be less three years later, either as to the availability of hardware or the availability of internet access.

Second, the voter list should continue to provide only home addresses. This allows the union to communicate by mail in order to apprise the employees of the internet site as well as communicate with employees who do not have access to an internet connection. However, because of the privacy issues expressed above, home visits should be either eliminated or

---

[22] Member Hayes queried whether there was a "mechanism that we might want to consider that would balance the interests of individuals' privacy" against the union's desire to communicate with them. July 18-19 Transcript at p. 359. We submit that the suggestion we have put forth is a viable one that addresses his query and the privacy concerns raised at the hearing. Indeed, one commenter at the July 19 hearing indicated that his bargaining unit was organized almost exclusively through a campaign web site that was identified to the employees, who visited the web site, downloaded their authorization cards and had access to information from the union. July 18-19 Transcript at pp. 384, 388. At a bare minimum, lists should not be required to be provided electronically because that would facilitate the wide distribution of employees' personal information and potentially impinge further on their privacy.

[23] *See* http://www.census.gov/prod/2013pubs/p20-569.pdf.

restricted to a single visit, on pain of having the election set aside.  The final rule should also make clear that the employees may not choose to be contacted at, and the employer is not required to furnish, work email addresses and work telephone numbers.

The net of the foregoing is:  There should be no change in the existing seven days given for the provision of the voter list with the information required, in the absence of an agreement by the employer to do so.  There should be no change in the existing information provided on the voter list, other than to make it clear that home visits are either forbidden or restricted to a single visit, and that work emails and telephone numbers may not and need not be provided.

**VIII.  Voter eligibility issues**:  The proposed rule would not permit a pre-hearing challenge to unit composition and voter eligibility unless the number of challenged voters exceeded 20% of the proposed unit.  Indeed, if the only challenge asserted is to voters not constituting 20% of the unit, the hearing officer is directed to adjourn the hearing.  The Chamber continues to have serious concerns about this limitation.

Under the proposed changes, where it is unclear whether up to 20% of the voters will be in the bargaining unit, the voters will be denied knowledge of the scope and make-up of the bargaining unit for an indefinite period of time.  This knowledge is important, particularly if the individuals are interested in knowing, for example, whether certain job classifications, certain individuals, or even they themselves will be included in the unit.

Employers also have a strong interest in knowing which employees are considered supervisors for the election.  The NPRM could place employers "in an untenable situation regarding [certain] individuals based on uncertainty about whether they could speak as agents of the employer or whether their individual actions—though not directed by the employer—could later become grounds for overturning the election."  79 Fed. Reg. at 7342 and n.99 (Dissent by

Members Miscimarra and Johnson).  Such uncertainty may result in more elections being overturned or unfair labor practices being filed.  That runs counter to the Board's stated goals of efficiency in elections.

Unlike a civic election where the voters are electing another individual to hold an office for a term, a representation election binds the voters together – for better or for worse – in an exclusively represented bargaining unit.  The Board should not change existing law.  Employers (and unions) should be able to litigate their challenges in full at the pre-election hearing.[24]

Further, certain classifications of workers may not be combined in the same unit for Board certification.  The Board is completely prohibited from certifying units of guards and non-guard employees; and professionals may only be combined with non-professionals if the professional agree in a secret ballot election to be so combined.[25]

It is unclear from the Board's proposed rules how such concerns will be addressed where the number of purported guards/professional workers amount to less than 20% of the proposed unit.  We submit that an employer who objects on the basis that guard or professional employees are included in the unit should be permitted to assert such a challenge even if the number of professionals and/or guards does not constitute 20% of the unit.  The proposed rules, if adopted, should be clarified to assure this.

---

[24] The importance of being able to litigate the challenges at the pre-election hearing was made clear by a number of commenters in 2011.  Employers were concerned both about being able to fully litigate prospective challenges at the pre-election hearing, both to add clarity (if not certainty) to who would be considered a supervisor; so such issues will not be forced into what might already be contentious first contract bargaining; and also so the employees would know the unit in which they were to make a choice about union representation. *See* July 18-19 Transcript at pp. 26, 99-100, 110-111,123-131, 140-141, 239, 284, 364.

[25] In addition, under *Specialty Healthcare*, the standard for adding any persons to the petitioned-for unit is now both higher and more highly fact specific and potentially complex.  Resolving such issues is more, not less, difficult than when the Board issued its initial NPRM, as is the ability to resolve them in any bargaining that may result after an election.

**IX. <u>Timing of elections</u>**:  The avowed purpose of the proposed rules is to reduce the time between the date of the petition and the date of the election.  In his dissent to the 2011 NPRM, Member Hayes stated that elections under the proposed regulations could be scheduled anywhere from 10 to 21 days following the filing of the petition.  76 Fed. Reg. at 36831.  No witness or other Board member has refuted this estimate.

Many commenters at the July 2011 hearing indicated that such a short time between the petition and the election would be wholly inadequate for employers to present their views and information to their employees concerning union representation, as contemplated by §8(c) of the Act, and would undermine the due process and free speech rights of both employers and employees.[26]  The Chamber agrees with this.  The shortening of the time between petition and the election contemplated by the proposed rules would undermine the free speech rights of employers guaranteed under section 8(c) of the Act; deny both employers and employees the free speech and due process to which they are entitled under the United States Constitution; and violate the recognized policy of the Act of promoting vigorous discussion and debate over the issues involved in union representation and collective bargaining.  *See, e.g., Chamber of Commerce v. Brown,* 554 U.S. 60, 68 (Section 8(c) of the Act manifests congressional intent to encourage free and robust debate on labor-management issues).[27]

**X. <u>Limiting Board review</u>**:  The proposed rules virtually eliminate Board discretionary review of pre-election regional office rulings.  Review of important rulings such as, for example, whether the Board has jurisdiction over the employer, whether individuals are statutory

---

[26] *See* July 18-19 Transcript at pp. 63, 160-162,194-195, 208-212, 253-254, 272, 285, 307, 315-316, 318, 323-324, 343-344, 390-392, 395, 424-426.

[27] On the other hand, there is general agreement among practitioners that the current representation procedures constitute a fair and reasonable balance between among the competing interests of the parties and that there is no justification or need for the proposed rules. *See* footnote 4, *supra*.

employees, whether the election should be barred under one of the Board's election bar

doctrines, whether one or more employers constitute a single or joint employer, would only be

reviewable pre-election upon the Board's granting of "special permission" to appeal, which will

not be granted except in "extraordinary circumstances where it appears that the issue will

otherwise evade review." 79 Fed. Reg. at 7356-57. Under the proposed rule there would no

longer be any realistic opportunity prior to the election for review of those and other decisions

made in the Region which can have a profound effect on how employees cast their ballot, since

in the absence of a pre-election appeal, employees will not have the Board's answer to such

questions as, for example, who is in the unit, or who is the employer. The Chamber has set forth

above its objections to the new proposed pre-hearing procedures, and this elimination of pre-

election review by the Board only serves to heighten those objections.

  Under the proposed regulations, the only opportunity for review will be *after* the election

is conducted. Moreover, in addition to this back-loading of key representation issues such as

those noted above to the post-election period, the Board also proposes eliminating review as a

matter of right for both pre- and post- election decisions (such as rulings on objections to the

conduct of an election). So, the possibility now exists that elections will be conducted without

the Board ever having reviewed any action or decisions of the personnel in the Region.

  As noted by Members Johnson and Miscimarra in their dissent, this is directly contrary to

Section 3(b) of the Act which permits the Board to delegate to Regional Directors the

responsibility to decide representation election issues, subject to the explicit condition that

parties must have the right to seek Board review of "any action of a Regional Director, including

requests to 'stay' the election." 79 Fed. Reg. at 7343. Further, the dissent notes that the

"extremely limited opportunity to obtain 'special permission' to appeal" a Regional Director's

ruling in an "extraordinary situation" is qualitatively different from what Section 3(b) requires, "which is the right to seek Board review regarding 'any action' take by Regional Directors including every ruling (or refusal to rule) on all issues." *Id.* n. 108.  As justification for this proposal, the Board states that elimination of review as a matter of right will eliminate "the most significant source of administrative delay in the finality of election results."[28]  This strongly suggests that the Board anticipates granting review in few if any cases.  This amounts to no more than achieving so-called efficiency in the representation case process through the denial of due process rights of would-be petitioners and abdication of one of the Board's most important functions under the Act.  *See also* Dissent of Member Hayes to 2011 Final Rule, 77 Fed. Reg. 25563-64.

It is of little comfort that, as the Board notes, this proposed change "would leave a higher percentage of final decisions concerning disputes arising out of representation proceedings with the Board's regional directors who are members of the career civil service."[29]  With all due respect to the professionalism, experience and integrity of the Board's Regional Directors and their staffs – which we freely acknowledge and greatly appreciate – it is those very decisions of which the parties heretofore have had the right to seek review.  Saying employers should be happy with the diminution of the inability to have the decisions reviewed because, now, they will have to live with the decisions of which they previously could seek review, continues to make no sense.

But of course, employers have another course open to them to ensure review, and that is to refuse to bargain, commit a technical §8(a)(5) violation and litigate the regional office decisions in unfair labor practice proceedings.  Having been denied the palliative of Board

---

[28] 79 Fed. Reg. at 7334 & n.57.

[29] 79 Fed. Reg. at 7334.

review as a matter of right, we submit that the strong likelihood is that employers will avail themselves of this process. To do so they must risk being found in violation of the law and further extend the period of uncertainty with respect to their legal obligations and interference with the normal operation of their business while they navigate the time consuming and expensive process of taking a case to the Board through the unfair labor practice process, and then possibly to federal court. Currently there are only a handful of such tests each year, but in agreement with a number of commenters at the July 18-19 hearing, the Chamber again submits that there is a great likelihood that the number of cases will markedly increase, along with post-litigation Board proceedings, such as re-run elections.[30]

For these reasons, the Chamber objects to the elimination of review as a matter of right before the Board.

### Specific Questions Raised by Board

Below the Chamber again states its position on each of the issues upon which the Board has specifically requested comments.

*1. Misuse of voter lists:* As noted above, the Chamber does not believe that the voter list should contain anything more than it does now, *i.e.,* employee names and mailing addresses. As an alternative, the Chamber would consider supporting employees having the opportunity to visit a union campaign web site for information and other purposes, including the possibility of disclosing any additional contact information the employee desires to disclose.[31] The Chamber has also stated above that because of privacy concerns and the possible abuse of personal

---

[30] *See* July 18-19 Transcript at pp. 76, 108, 195-96, 201, 244-245. We submit this is made more likely by the issues injected into the representation process by *Specialty Healthcare*.

[31] See footnote 22 above, and accompanying text.

information, which we believe the Board's inquiry recognizes, the transmission of voter lists by email should be limited at best.  Further, as noted above, the Chamber has suggested that union home visits be prohibited or restricted to a single visit.

Assuming the Board adopts a rule requiring prospective voter email addresses and telephone numbers (which we oppose), the Chamber again submits that in order to give teeth to the restrictions on misuse of the voter list by the union, the possible following sanctions should be employed:  (1) election set aside (if the union misused the list in the campaign and won the election); or (2) an additional year ban on organizing in the unit affected (if the union misused the list in the campaign but lost the election); and (3) six month ban on organizing generally (for misuse of the voter list in any other manner).

At the July 2011 meeting, then Member Becker suggested a sanction for misuse of a voter eligibility list – baring voting list disclosure to the union in a subsequent petition.  July 19 Transcript at p. 351.  We continue to think that some ban on organizing is a fairer and more effective sanction.  This is because the ban on the disclosure of information in a subsequent petition will likely not be a great disincentive to a union – the fact of a subsequent petition suggests that the union will have found another way to obtain the information it needs to contact employees; otherwise the subsequent petition would not have been filed.  Alternatively, the union could file a petition in a unit where it was easy to obtain a 30% showing (e.g., in a unit of three persons) but not difficult or expensive to mount a campaign without the voter information, and thereby escape the sanction in a more important election.  The sanctions we recommend above, on the other hand, give maximum incentive for union vigilance and compliance with restrictions.

Additionally, we continue to believe such sanctions should be "no fault."  The union, having been given the information, would be liable for any subsequent misuse of the information.  This gives the union maximum incentive to safeguard the information and limit distribution only to those who have a need to know and can be trusted with the information.  We also submit that consideration should be given to the union being required to destroy the voter lists and all copies it has made immediately following the election and certify to the Board and the employer that it has done so.

There remains the question of what constitutes misuse.  The Board had framed it as "barring parties from using [the voter list] for any purposes other than the representation proceeding and related proceedings."  79 Fed. Reg. at 7327.  We submit that the Board should bar misuse along these lines, but continue to have the following comments:

- First, it seems possible that the voter list could be misused in the context of an election – e.g., for harassment or intimidation – such that all use of the voter list during an election should not be automatically given a pass.

- Second, as noted above, we believe that the union's liability should be "no fault", to give it maximum incentive to not distribute the voter list information except to those in whom it has the highest confidence.

- Third, we are not certain what "related proceedings" the Board refers to, but would assume it means post-election proceedings at the Region, the Board and the courts.  Would "related proceedings" include any re-run election, and if so, under what circumstances? What other related proceedings did the Board have in mind? How would this be squared with a union obligation to destroy the list and all

> copies immediately following the election and certify such to the Board and to the employer?

- Fourth, how would any ban on misuse be enforced? How would a claim of misuse be brought to the Board's attention?

Because of these (and perhaps other) questions related to the meaning of "misuse" and the whole question of restrictions and the enforcement of restrictions on the use of the voter list, we again urge the Board to issue a separate NBRM on this issue, beginning with an *advanced* notice of proposed rulemaking, following consultation with Board stakeholders.

***2. Feasibility and Fairness of Holding Hearing on Seven Days of Notice***:  The Chamber has noted above the impropriety of requiring the Statement of Position in seven or less days prior to the hearing.  We continue to think  that the scheduling of the hearing in seven days, particularly in conjunction with the Statement of Position (but even without it), is not feasible, not fair, and a violation of an employer's due process and free speech rights, as we have discussed above.  This is particularly true for small employers, who appear to be involved in the majority of the Board's representation cases.  We base this position on the significant feedback the Chamber has heard from our membership about the proposed rule since the 2011 NPRM, which is buttressed by the testimony of the individuals who appeared and testified at the July 18-19 hearing.[32]

***3. The Impact that Blocking Charges Have on Alleged Election Delays***:  The Board's blocking charge policy holds in abeyance the processing of a petition "where a concurrent unfair labor practice charge is filed by a party to the petition and the charge alleges conduct that, if proven, would interfere with employee free choice in an election, were one to be conducted."

---

[32] *See* footnote 7, *supra*.

*NLRB Casehandling Manual* § 11730.  In other words, the Board will refuse to conduct an election while union unfair labor practice charges against are pending.  The rationale is that the charges, if true, would destroy the "laboratory conditions" necessary to permit employees to cast their ballots freely and without restraint or coercion.  *See Master Slack Corp.*, 271 NLRB 78, 79 (1984).

This "blocking charge" practice is not governed by statute or even by formal rules or regulations.  76 *Fed Reg*. 36827.  Instead, its adoption and use lies within the Board's discretion to effectuate the policies of the Act.  *See American Metal Prods. Co.*, 139 NLRB 601, 604 (1962); *see also NLRB Casehandling Manual* § 11730 *et seq.*  Unfortunately, labor unions often take advantage of the Board's "blocking charge" policy in order to delay or frustrate employees' decertification or deauthorization efforts, or employers' RM petitions.  *See, e.g., Shaw's Supermarkets, Inc*., 350 NLRB 585, 589 (2007) (noting that with regard to decertification petitions, "in many cases, blocking charges are filed and delay the election until the charges are resolved"); *Levitz Furniture Company*, 333 NLRB 717, 732 (2001) (Hurtgen concurring) (stating that "[f]aced with an RM petition, unions can file charges to forstall [sic] or delay the election"). This is despite the fact that the Board's Casehandling Manual specifically states that the blocking charge policy "is not intended to be misused by a party as a tactic to delay the resolution of a question concerning representation raised by a petition.  Rather, the blocking charge policy is premised solely on the Agency's intention to protect the free choice of employees in the election process." *See* CHM § 11730.

Although the NPRM does not expressly blame employers for any alleged election delays, many union representatives raised such allegations during the Board's hearing on July 18 and July 19, 2011 and in the comments.  *See, e.g*., Elizabeth Bunn, Organizing Director of AFL-CIO,

July 19, pg. 290, 8-9. ("The truth is that employers are able to exercise too much control over the timing of the election"); Margaret McCann, AFSCME, July 18-19, pg. 166, 9-10 ("The Board processes as they exist today have become hijacked by the employers"); Mary Kay Henry, Comment of SEIU at 2 (Aug. 22, 2011) ("The current NLRB election system gives employers too many opportunities to hijack the election process, greatly delaying the election date and extending the time for the employer to comment ULPs and intimidate workers.").  However, because the blocking charge policy is inherently and specifically intended to delay representation elections, it is incumbent upon the Board to examine the extent to which its blocking charge policy creates "unnecessary barriers to the fair and expeditious resolution of questions concerning representation."  76 Fed Reg. at 36,812.  The Board still has not done so, despite the fact that the Board acknowledges the issue and has uniquely at its disposal all of the records to make such an analysis.  *See* 77 Fed. Reg. at 25565 (Member Hayes' dissent to 2011 NPRM).

This continued and protracted lack of analysis is unfortunate.  The Chamber previously conducted a non-exhaustive review of existing case data for one year.[33]  This review revealed that, of the 72 representation cases in which there were at least 100 days between the filing of the petition and the actual election, 31 of those cases – almost half – involved decertification, deauthorization or RM elections.  These types of elections, in contrast to RC elections, are likely to be accompanied by blocking charges.  Indeed, in 26 of these 31 cases, at least one unfair labor practice charge was filed by a union against an employer at some time between the filing of the petition and the election.

A closer analysis of this very limited data reveals many examples of cases in which union blocking charges were at least partly responsible for a delay in the scheduling of an election.  For

---

[33] To perform this analysis we downloaded, from www.data.gov, the 2009 CATS data for R cases. That data revealed 1145 separate election cases.

example, in *Pioneer Plastics* (1-RD-02134), employees filed a decertification petition on August 24, 2009.  The union filed an unfair labor practice just one day later, and the Board spent months investigating the charges.  On October 28, 2009, the Board approved the union's withdrawal of the charges.  The election was held 37 days later – 102 days after the filing of the decertification petition.  Thus, the union's blocking charges (which did not result in a complaint) played a significant role in delaying the employees' secret ballot election.

Similarly, in *Alan Ritchey* (19-UD-00605), employees filed a deauthorization election petition on November 23, 2009.  Unfair labor practices were filed against the employer just a few days later on December 4, 2009.  The Regional Director investigated the charges for about two months and dismissed the case on January 28, 2010.  The election was then held 34 days after dismissal of the unfair labor practice charges, which was 100 days after the petition was initially filed.  Additionally, in *Training & Rehabilitation Development Institute* (28-RD-0099), 133 days passed between employees filing of a decertification petition and the eventual election.  It is probable that unfair labor practices – which were filed four days after the decertification petition was filed – played a role in the delay.  Indeed, upon withdrawal of the unfair labor practice charges, the election was held within 41 days.

These examples suggest that the Board's election procedures will not meaningfully reduce delays for those cases that under the current system take the most  extended period of time.  What the Chamber (and other commenters) – as well as the dissenting Board members to both this Rule and the 2011 NPRM – are suggesting is that the Board should conduct a more thorough analysis of the actual causes of election delay so that those issues can be specifically and usefully addressed, instead of revamping the entire election system in a way that does not address the issues that the Board professes to be concerned about.

To press forward in this rulemaking, without truly investigating what is the likely cause of much if not most of any R-case delay, is simply bad policy – particularly when the Chamber, in its 2011 comments, already criticized the Board for its lack of analysis in this area. Accordingly, the Chamber again submits that while it believes blocking charges are the cause of much if not most of any significant election delay in representation cases, the Board should have focused on this and other identifiable delay factors rather that proceed with the broad brush approach it has initiated.  And once again, the Chamber submits that, rather than continue with the NPRM, the Board should withdraw it and start anew, focusing its study and resources on the real causes of such delay as there is, including blocking charges, in conjunction with a new, *advanced* notice of proposed rulemaking, following consultation with Board stake-holders.

**4. Electronic Signatures**:  The Board has asked the parties to address whether electronic signatures should be allowed to support a showing of interest.  It remains difficult to comment positively about this suggestion, given the lack of detail about just what is meant by the use electronic signatures.  Would the electronic signature consist of a simple (and anonymous) click in a "yes" or "accept" box on an electronic organizing card, or a more complex electronic "key" identifiable and useable only by the particular user, or some other type of electronic signature format? Would target employees likely have the necessary technological expertise, hardware and software? If all do not, would the showing of interest be an amalgam of electronic and physical signatures? If so, would that diminish rather than enhance efficiency? What types of controls would exist to ensure that a showing was based on real rather than fraudulent "signatures," such that the agency would utilize its resources to respond only to bona fide showings of interest?

Given these myriad unanswered questions, including how this would play out in *Gissel* cases (and there are probably many other questions), the Chamber would continue to oppose

allowing the electronic signatures unless and until the Board publishes a separate, specific and detailed proposal on them, including the circumstances under which any use of electronic signatures would be justified and details on how the integrity of electronic signatures would be ensured and insulated from fraud, intimidation and coercion.[34]  It is again strongly urged that if the Board does so, it should first publish an advanced notice of proposed rulemaking based on prior consultations with all stakeholders.

### Studies Relied on by Rule Supporters Suffer From Serious Flaws

Supporters of the Board's proposal have relied on numerous studies and reports that, unfortunately, suffer from very serious flaws.  It is important that the Board recognize these flaws before it considers relying on the conclusions that some have drawn from these studies.  Before reviewing the individual studies and reports, it is important to note that the arguments by rule supporters appear to be following a familiar script.  With private sector union density now below 7 percent, organized labor has pushed for policy changes that will make union organizing easier, regardless of whether American workers desire union representation or not.  A principal part of their campaign is demonizing employers as well as the National Labor Relations Act.

In support of their policy agenda, allies of organized labor frequently cite various studies to support the claim that employer coercion, flawed labor law, and flawed Board processes stifle a considerable but unrealized demand for union representation.  In this section of our comments we examine several of the studies most often relied upon to support the proposed rule and other policy changes organized labor seeks, such as effectively doing away with Board supervised

---

[34] *See* July 18-19 Transcript at 184, 361-362.

elections through the Employee Free Choice Act.  The conclusion that we draw is that these studies lack sufficient credibility and analytical rigor to justify any labor policy changes.[35]

### 1. Bronfenbrenner-Warren

Among the most frequently cited papers are those produced by Cornell professor Kate Bronfenbrenner, including the 2000 report *Uneasy Terrain:  The Impact of Capital Mobility on Workers, Wages, and Union Organizing*, the 2009 report *No Holds Barred-The Intensification of Employer Opposition to Organizing*, and the most recent report co-authored with Professor Dorian Warren, *The Empirical Case for Streamlining the NLRB Certification Process:  The Role of Date of Unfair Labor Practice Occurrence*.

*No Holds Barred* concludes that a "coercive and punitive climate for organizing" undermines employee free choice in choosing union representation and necessarily dictates "serious labor law reform."[36]  According to Bronfenbrenner:

> Our findings suggest that the aspirations for representation are being thwarted by a coercive and punitive climate for organizing that goes unrestrained due to a fundamentally flawed regulatory regime that neither protects [workers'] rights nor provides any disincentives for employers to continue disregarding the law.  Moreover, many of the employer tactics that create a punitive and coercive atmosphere are, in fact, legal.  Unless serious labor law reform with real penalties is enacted, only a fraction of the workers who seek representation under the National Labor Relations Act will be successful.  If recent trends continue, then there will no longer be a functioning legal mechanism to effectively protect the right of private-sector workers to organize and collectively bargain.[[37]]

Although *No Holds Barred* claims to be a "comprehensive analysis" based on "unique and highly credible information," the methodologies and analytical framework of

---

[35] For a more detailed analysis, see *Union Studies of Employer Coercion Lack Credibility and Integrity*, a white paper produced as part of the U.S. Chamber's series *Responding to Union Rhetoric: The Reality of the American Workplace*, published in 2009 during the debate over the Employee Free Choice Act and available at: http://www.uschamber.com/reports/responding-union-rhetoric-reality-american-workplace.

[36] Kate Bronfenbrenner, *No Holds Barred-The Intensification of Employer Opposition to Organizing*, May 20, 2009 at 1, Economic Policy Institute Briefing Paper #235, *available at* http://www.epi.org/publications/entry/bp235/.

[37] *Id.* at 3.

Bronfenbrenner's piece are inherently flawed.  For example, the primary source of the anecdotal "evidence" Bronfenbrenner used to support her conclusions comes from "in depth surveys with the lead organizers" involved in the organizing campaigns included in the "NLRB election sample" of approximately 1000 NLRB elections conducted between 1999 and 2003.[38]  Using the lead union organizers involved in these campaigns can hardly be considered using unbiased sources.  To the contrary, the lead organizers would have every incentive to exaggerate and falsify the data provided to Bronfenbrenner in order either to provide excuses for their failure to win the underlying election or to promote the goals of organized labor to secure labor law reforms designed to make organizing easier.  Yet, Bronfenbrenner fails to even consider the possible bias of lead union organizers as a primary source.

Although she relies without reservation on union organizers as a primary source, Bronfenbrenner abruptly dismisses employers as a countervailing source—claiming employers would likely falsify any information provided because "the overwhelming majority of employers are engaging in at least one or more illegal behaviors."[39]

According to Bronfenbrenner:

> Not only would it be next to impossible to get employers to complete surveys in which they honestly reported on illegal activity, but that kind of question would not be permitted by university institutional review boards since it might put the subjects at risk of legal action.[40]

Bronfenbrenner immediately ascribes dilatory motives to employers and conveniently dismisses any information employers could provide to contradict the presumptions and anecdotal evidence provided by the supposedly unbiased union organizers.  Such open and unfounded hostility and bias discredits any analysis and conclusions that flow from the data.

---

[38] *Id.* at tbl. 1.

[39] *Id.* at 5-6.

[40] *Id.* at 6.

Nevertheless, in response to critics who question the reliability of using union organizers as a data source, Bronfenbrenner claims the data they provide is supported by "NLRB decisions and transcripts, primary campaign documents, first contracts, and newspaper reports"—the likely sources of which are the very union organizers themselves.[41]  Such circular reasoning hardly rehabilitates her study's credibility.

The latest study, *The Empirical Case for Streamlining the NLRB Certification Process*, appears to suffer from the same flaws.  In addition to the flaws above, it is important to note that the study does not focus on actual unlawful conduct, but instead on allegations of unlawful conduct.  Perhaps to account for this, Bronfenbrenner and Warren attempt to classify "serious allegations won."  However, "won" appears to be defined to include not only cases where the Board or a court has ruled against the employer, but all settlements.  As the Board well knows, a settlement does not indicate an admission of guilt, as many employers decide to enter into settlement agreements not because they believe they have engaged in wrongdoing, but because they would prefer not to invest the time and resources in litigating the particular issue.  Given the very high number of Board cases that settle, this data appears to tell little.

## 2. Schmitt and Zipperer

Many of the prominent pro-union studies purporting to find widespread employer coercion are at direct odds with NLRB data.  One such study is *Dropping the Ax:  Illegal Firings During Union Election Campaigns, 1951-2007*, written by John Schmitt and Ben Zipperer.[42]  Like Bronfenbrenner, Schmitt and Zipperer conclude that nearly a quarter of union campaigns

---

[41] *Id.* at 5.

[42] John Schmitt & Ben Zipperer, *Dropping the Ax: Illegal Firings During Union Election Campaigns, 1951-2007*, Center for Economic Policy Research (2009), *available at* http://www.cepr.net/documents/publications/dropping-the-ax-update-2009-03.pdf.

include an illegal firing.[43]  Moreover, Schmitt and Zipperer conclude that individual pro-union

workers run a 1.4 to 1.8 percent risk of being unlawfully fired by their employers.[44]

     In examining these inflated claims, the devil is indeed in the details.  As discussed in an

analysis by David L. Christlieb and Allan G. King, published in June 2007, the startling

conclusions found in *Dropping the Ax* are drawn from a fundamentally flawed methodology.[45]

To calculate the "crude probability" that a pro-union employee will be illegally terminated

during a campaign, Schmitt and Zipperer use a complex mathematical formula:

> They begin with the total number of cases closed by the NLRB in a given
> year in which employees were offered reinstatement… and assume… that
> (1) every offer of reinstatement remedies an unlawful firing.  They next
> assume (2) that 51 percent of these cases arose during election campaigns
> and (3) that, on average, 2.2 workers were reinstated in each case closed
> by an offer of reinstatement.  Thus, they multiply these three numbers to
> estimate the total number of workers illegally fired in connection with a
> union election campaign in a given year.  Schmitt and Zipperer then divide
> this by the total number of workers who voted in favor of a union in a
> union election that year.[46]

     The most glaring flaw in the above methodology is the assumption that an offer of

reinstatement is tantamount to an admission by the employer of an unlawful termination.

According to the NLRB statistics reported for 2005 (the year analyzed in *Dropping the Ax*),

nearly 90 percent of the offers of reinstatement were settled with no determination by the Board,

or any judicial or administrative body, regarding the merits of the charged unfair labor practice.[47]

Schmitt and Zipperer simply ignore the (admittedly unknowable) number of settlements

---

[43] *Id.* at 1.

[44] *Id.*

[45] David L. Christlieb and Allan G. King, *The Perils of Union Activism Have Been Greatly Exaggerated*, Littler Mendelson (2007), *available at* http://www.littler.com/PressPublications/Documents/16586.pdf.

[46] *Id.* at 2.

[47] *See Seventieth Annual Report of the National Labor Relations Board*, tbl. 4–Remedial Actions Taken in Unfair Labor Practice Cases Closed, Fiscal Year 2005 (2005), *available at* http://www.nlrb.gov/sites/default/files/documents/119/nlrb2005.pdf.

prompted by an employer's desire to avoid legal expenses, reputational damage, or workplace unrest.  Furthermore, their methodology gives no weight to the non-admission clauses that are often part of informal settlements.  Had the authors only counted the reinstatement cases where a neutral found that an employer had made an illegal firing, the key statistic (the chance of a given union supporter being illegally terminated) drops to around one-tenth of the reported 1.4 – 1.8 percent statistic (itself not even an alarming level).

The second assumption on which *Dropping the Ax* rests, that 51 percent of reinstatements remedy unlawful firing occurring in the context of a union campaign, is also clearly flawed for several reasons.[48]  Relying on 52-year-old and 27-year-old samplings of NLRB adjudications, Schmitt and Zipperer develop the 51 percent statistic from cases that were adjudicated by the Board.  They then go on to apply that factor to every unfair labor practice charge, adjudicated or settled.

More telling is the fact that current NLRB statistics render the old and misapplied statistics used by Schmitt and Zipperer unnecessary.  The NLRB maintains a database called the Case Activity Tracking System (CATS) that records which unfair labor practice charges are associated with union election campaigns.  In 2005, CATS data showed that only 62 of the reinstatement cases were campaign-related.[49]  By comparison, Schmitt and Zipperer assumed that 521 of the same cases were campaign-related.[50]  Obviously, this disparity has a significant impact on the bottom line conclusions found in *Dropping the Ax*.  Had the authors chosen to plug the current and available NLRB data into their methodology, their conclusion that a given union

---

[48] *See* Schmitt and Zipperer, *supra* note 42, at 5.

[49] J. Justin Wilson, *An Analysis of Current NLRB Data on Unlawful Terminations During Union Organization Campaigns, 2007 to 2008*, Center for Union Facts (Feb. 26, 2009).

[50] *Id.*

supporter has a 1.4–1.8 percent chance of being terminated would have plummeted to 0.16–0.2 percent.

To complete the analysis, if voluntary settlements were excluded from the equation and the CATS statistics were used to replace the outdated and misapplied sampling of NLRB adjudications, *Dropping the Ax* would draw a very different conclusion, replacing 1.4–1.8 percent with a 0.13 percent probability that a pro-union worker will be terminated during a union campaign.

### 3. Union Attacks on Employer Consultants

The pro-union reform drumbeat has often focused on the supposed disparity between the pro-union workers attempting to secure union representation and management who hire consultants to assist them in responding to union organizing.[51]

Most critics of employers' use of consultants cite to the work of John Logan, currently affiliated with San Francisco State University and the University of California-Berkeley Labor Center and previous affiliated with the London School of Economics, who has written extensively on this issue.  Representative of his writings are two papers, *Consultants, lawyers, and the 'union free' movement in the USA since the 1970s*[52] and *The Union Avoidance Industry in the United States*.[53]  Logan's work describes the growth of the use of consultants by employers faced with organizing campaigns and describes numerous tactics that these consultants have reportedly used over the last four decades.

---

[51] For example, the AFL-CIO's Elizabeth Bunn, during the July 19 public meeting, referenced employers hiring "unscrupulous consultants." Transcript at p. 290. *See generally,* Gordon Lafer, *Neither Free Nor Fair: The Subversion of Democracy Under NLRB Elections,* American Rights at Work (2007), *available at* http://www.americanrightsatwork.org/dmdocuments/ARAWReports/NeitherFreeNorFair.pdf.

[52] John Logan, *Consultants, lawyers, and the 'union free' movement in the USA since the 1970s,* 33 INDUS. REL. J. 197 (2002), *available at* http://www.americanrightsatwork.org/dmdocuments/OtherResources/Logan-Consultants.pdf.

[53] John Logan, *The Union Avoidance Industry in the United States*, 44 BRIT. J. INDUS. REL. 651 (2006), *available at* http://www.americanrightsatwork.org/dmdocuments/OtherResources/JohnLogan12_2006UnionAvoidance.pdf.

To be sure, Logan describes some tactics that are illegal and reprehensible.  For example, he claims that "[s]ome consultants tell employers to fire a few union activists … and teach them how to make these terminations appear legitimate."[54]  However, many of the tactics Logan describes are perfectly legal and are tactics that most neutral observes would likely agree are perfectly legitimate.  For example, he describes as consultant "propaganda" information about what is in a union's constitution and information related to union dues requirements.[55]  Likewise, he is critical of employers informing employees about some of the basic legal consequences of unionization, such as surrendering the right to deal directly with management.[56]

The credibility of Logan's, and similar work, is significantly damaged by its failure to distinguish between legal and illegal conduct, perhaps because many within organized labor believe employers should have no role in union organizing campaigns[57] and that employer free speech should be abolished.[58]

### 4. The Claim of Unrealized Demand

One of the most common refrains repeated throughout the pro-"reform" studies is that an overwhelming number of American workers would join a union today, if not for significant employer coercion and intimidation and a desperately flawed NLRB election process that combine to preclude employees from exercising their rights and desire to join a labor union.[59]  This theory rests on two premises.  First, it assumes that a substantial percentage of nonunion

---

[54] Logan, *supra* note 52, at 207.

[55] *Id.* at 203.

[56] *Id.*

[57] *See, e.g.,* Craig Becker, *Democracy in the Workplace: Union Representation Elections and Federal Labor Law,* 77 MINN. L.REV. 495, 585-87 (1993).

[58] For example, the AFL-CIO's International Union Department included repeal of section 8(c) of the NLRA in its recommendations to the Commission on the Future of Worker-Management Relations. *See IUD Sets Bold Agenda for Workplace Rights: Economic Empowerment and 'Democracy on the Job'*, at 2 (1994), *available at* http://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?article=1412&context=key_workplace.

[59] *See, e.g.*, statement by Ross Eisenbrey at the July 18 meeting, transcript, p. 102.

workers would prefer to be represented by a union.  Second, it assumes that union density should necessarily be higher to reflect this unrealized demand.  As explained below, both of these premises are flawed.

The first fundamental premise is an alleged unrealized demand for unionization. According to the Bureau of Labor Statistics, in 2013 the union density in the private sector was 6.7 percent.[60]  Advocates of reform, however, argue that significantly more nonunion workers would prefer to be represented by a union.  As support for this premise, pro-"reform" advocates most frequently cite to polling data from Peter D. Hart and Associates.  For example, this data is central to the 2005 AFL-CIO Issue Brief *The Silent War:  The Assault on Workers' Freedom to Choose a Union and Bargain Collectively in the United States*.[61]  As characterized by the AFL-CIO, the Hart polling found that "53 percent of nonunion workers—in other words, 57 million workers—want a union in their workplace."[62]

However, Peter D. Hart and Associates are hardly the only pollsters examining employee attitudes toward organized labor.  When examining polling results conducted by organizations without such close ties to organized labor, it is clear that Hart's results are outliers.  According to a September 2006 random nationwide survey conducted by Zogby International,[63] when non-union members were asked to decide if they would vote for a union if an election were held at their workplace tomorrow, 40 percent stated they would definitely vote against a union and 18

---

[60] *Union Members Summary*, Bureau of Labor Statistics, U.S. Department of Labor (Jan. 24, 2014), *available at* http://www.bls.gov/news.release/union2.nr0.htm

[61] AFL-CIO Issue Brief, Sept. 2005, *available at* http://www.aflcio.org/joinaunion/how/upload/vatw_issuebrief.pdf

[62] *Id.* at 14 (citing Peter D. Hart Research Associates, Study No. 7518, AFL-CIO Union Message Survey, Feb. 2005 (unpublished)).

[63] *Employees' Perceptions of Labor Unions*, Zogby International (Sept. 2006), *available at* http://www.psrf.org/info/Nationwide_Attitudes_Toward_Unions_2006.pdf.

percent would probably vote against a union.[64]  Only 13 percent would definitely vote for a

union and only 22 percent would probably vote for a union.[65]  That is, 58 percent of respondents

expressed some level of opposition to having a union in their workplace, while only 35 percent

indicated some level of support for a union.

A July 2005 Zogby poll reached similar findings.[66]  In that poll, 38 percent stated they

would definitely vote against a union if an election were held at their workplace tomorrow and

18 percent would probably vote against a union, while only 16 percent of workers surveyed

would definitely join a union, and only 19 percent would probably join a union – a clear majority

of 56 percent opposed to having a union against only 35 percent wanting one.[67]

A March 2009 Rasmussen poll found that only nine percent of non-union workers would

like to join a union and that 81 percent would not.[68]  Finally, on the opposite end of the spectrum

from the Hart poll is a 2009 poll conducted by the Opinion Research Corporation for the Center

for Union Facts, which revealed that 82 percent of surveyed employees, who were not in a union

and did not have an immediate family member in a union, would not want their own job

unionized.[69]

These independent polling numbers are consistent with polling data regarding worker job

satisfaction.  Karlyn Bowman, a senior fellow at the American Enterprise Institute, annually

---

[64] *Id*. at 9.

[65] *Id.*

[66] *The Attitudes and Opinions of Unionized and Non-Unionized Workers Employed in Various Sectors of the Economy Toward Organized Labor*, Zogby International (Aug. 2005), *available at* http://www.psrf.org/info/Nationwide_Attitudes_Toward_Unions_2005.pdf.

[67] *Id*. at 6.

[68] *Just 9% of Non-Union Workers Want to Join Union*, Rasmussen Reports (March 16, 2009), *available at* http://www.rasmussenreports.com/public_content/business/jobs_employment/march_2009/just_9_of_non_union_ workers_want_to_join_union.

[69] *Americans Overwhelmingly Reject Unionization*, Opinion Research Corporation (Feb. 4, 2009), *available at* http://server1.laborpains.org/wp-content/uploads/2009/02/pensionunionfactspolltopline.pdf.

compiles a comprehensive report on workers' attitudes towards their employers, which tracks polling data from multiple sources.[70]  Five separate polls (Gallup 2008, National Opinion Research Center (NORC) 2006, CBS/NYT 2005, Harris 2002, and Center for Survey Research 2001) all revealed overall job satisfaction numbers ranging from 87 percent to 90 percent.[71]

In addition to the polls being remarkably consistent in their job satisfaction findings, the polls have reached consistent findings over time.  For instance, the Gallup poll first began its poll in 1989 and, at that time, found a job satisfaction number of 89 percent.[72]  The NORC poll began in 1972 and found a job satisfaction number of 86 percent.[73]

A 2008 Gallup Poll also found high satisfaction rates among workers as to specific key aspects of their jobs – relations with co-workers (96 percent), amount of required work (87 percent), flexibility of hours (87 percent), boss or immediate supervisor (79 percent), amount of vacation time (78 percent), money earned (73 percent), on-the-job stress (69 percent), chances of promotion (68 percent).[74]

In addition to relying selectively on polls that fit their needs, union advocates frequently draw unwarranted inferences from these polls regarding what the union density rate should be. A 2007 paper produced by American Rights at Work stated:

> [O]pinion polls have consistently shown that roughly one-third of nonunion workers wish they had a union in their workplace.  If creating a

---

[70] Karlyn Bowman, *The State of the American Worker* at 3, American Enterprise Institute (2008), *available at* http://www.aei.org/docLib/200408301_work14886.pdf. *See also*, U.S. Chamber of Commerce White Paper *The Truth about American Workers: They are Satisfied, Respected, and Benefiting from Productivity Gains* (2008), *available at* http://www.uschamber.com/assets/labor/unionrhetoric_workers.pdf (discussing Bowman's findings).

[71] *Id.* at 3-5.

[72] *Id*. at 3.

[73] *Id*. at 5.

[74] *Id*.; *see also* Lydia Saad, *U.S. Workers' Job Satisfaction is Relatively High*, The Gallup Poll (2008).

union simply followed the will of workers, an additional 40 million Americans would have union representation.[75]

In testimony during the Board's meeting in July 2011, the Economic Policy Institute's Ross Eisenbrey made a similar comment.  Mr. Eisenbrey stated:

> Union representation in the private sector has fallen from about 30 percent of workers in 1970 to 7 percent today.  This decline didn't reflect the preferences of the employees.  Polling over that time reveals that 30 to 50 percent of non-union workers wanted a union but didn't get one.[76]

Of course, even assuming these numbers are accurate, the flaw in their conclusion – that if one-third of non-union workers wish to join a union, this should equate to an increase of the union-density rate equal to one-third of the workforce – is obvious; it ignores the fact that under the NLRA, a majority of employees must vote in favor of unionization for a bargaining unit to be certified.

Therefore, if only one in three workers across the U.S. wish to join a union, the proposed bargaining unit would have to be comprised of a disproportionate number of pro-union workers for the union to be certified.  Further, not all of the non-unionized workers who may wish to join a union would be able to do so, because the majority of the workers at their workplace may not share their desire.  Accordingly, the fact that less than 7 percent of the American workforce is currently unionized is appropriate and consistent with other polling data that shows a strong majority of workers are not supportive of having a union.

### 5. National Employment Law Project

During testimony at the Board's July 2011 meeting, Christine Owens testified that "low wage workers experience high rates of workplace violations."  She further noted "among

---

[75] Lafer, *supra* note 51, at 39.

[76] July 18-19 Transcript at 102.

workers who did complain or try to form a union, 43 percent were subjected to retaliation."[77]
These comments appear to be based on the National Law Employment Project's 2009 report,
*Broken Laws, Unprotected Workers:  Violations of Employment Laws in Americas Cities*.[78]
However, because the report comingles retaliation under antidiscrimination and other
employment laws with anti-union retaliation, no conclusion may be drawn about employer
conduct during organizing campaigns.

In sum, the research and studies being used by supporters of the NPRM suffer from
serious methodological and other flaws.  There reports simply do not support the significant
changes in policy proposed here by the Board.

### Inadequate Regulatory Flexibility Act Analysis

The Board has asserted that the proposed rule, if promulgated, would not have a
significant economic impact on a substantial number of small entities.  In its analysis, the Board
first concludes that the rule would not affect a substantial number of small entities.  It also
concludes that the rule would not have a substantial economic impact on those small entities that
it does impact.  The Board's analysis is wrong on both counts and suffers because the
assumptions it has made appear to be arbitrary and not based on any empirical evidence, studies,
surveys or similar research.

### 1. The Rule Will Impact A Substantial Number of Small Entities

In concluding that the rule changes contemplated by the proposal would not impact a
substantial number of small entities, the Board concedes that "there are approximately six
million private employers in the United States, the vast majority of which are classified as small

---

[77] July 18-19 Transcript at 94-95.

[78] Available at: http://www.nelp.org/page/-/brokenlaws/BrokenLawsReport2009.pdf?nocdn=1.

entities" and that "nearly all those employers are subject to the Board's jurisdiction."[79] However, the Board then states that no significant number of small entities would be affected because the Board assumes that the only affected entities would be only those that are the subject of a petition for a representation election each year.  This is quite an assumption.

Clearly, many employers will familiarize themselves with the Board's new rules, should they be promulgated, regardless of whether they will be subject to a representation proceeding. Many employers take the time to train supervisors and staff on the law and how they should respond to situations that may arise.  While the limited time permitted to respond to the proposed rule changes has not permitted us to calculate a statistically valid survey, from surveying a handful of major law firms that provide seminars to clients regarding NLRA representation issues, it appears that in fact a majority of those that take time to attend these seminars and become educated about representation proceedings are unlikely to work at a facility that will be the subject of a representation proceeding in any particular year.

Indeed, if the proposal is adopted it is likely that even more employers would train their staff on NLRB processes regardless of union campaign activity because they would have less time to respond once they received a petition.  We do not know how many employers would undertake such efforts, but the Board has assumed that none would.  Indeed, the Board assumes that no employer would even read the rules unless it is subject to a petition (as no estimates are made for the time employers would need to read and familiarize themselves with the rules).

In order to properly satisfy the requirements of the Regulatory Flexibility Act, it is incumbent upon the Board to estimate the costs that the rule would have on employers even if

---

[79] 79 Fed. Reg. 7349-50.

they are not subject to a petition, including education and training costs.  The Board has not

undertaken any efforts to identify any such costs and has simply assumed they are nonexistent.

### 2. The Proposal Does Not Adequately Account for Costs Small Entities Would Bear

In addition to entirely ignoring the costs that the proposed rule would have on the

majority of employers in the United States, the Board significantly underestimates the costs that

the proposal would have on those employers that the Board acknowledges would be impacted.

Magically, the Board concludes such costs will be "de minimus" even though it has engaged in

absolutely no effort to calculate those costs.  For example, the Board observes that the proposed

rule would require the "mere" posting of paper copies of notices and "taking the few minutes to

electronically distribute electronic versions of those notices . . . ."[80]  These burden estimates

appear out of thin air.

This lack of consideration and study is simply not sufficient for conducting an analysis

under the Regulatory Flexibility Act.  Instead, it is incumbent upon the Board to develop data

regarding the actual time that an employer would consume understanding its legal obligations

and complying with them, including understanding when and where such notices must be posted,

the staff time spent organizing the materials and physically posting them, the average pay level

of the type of employees that would typically post such notices or supervise their placement, and

so forth.  The Board has made absolutely no effort to calculate actual burden estimates.

Perhaps most egregious are the Board's assumptions about the new Statement of

Position.  The Board dismissed the burdens imposed by this new requirement by (1) suggesting

employers might avoid costs by foregoing their right to a hearing and entering into an agreement

for a stipulated election, (2) stating that the form merely "reduces to writing the positions on

---

[80] 79 Fed. Reg. 7350.

several issues that it would need to formulate, in any event, to effectively prepare for a pre-election hearing," and (3) arguing that the additional information that is to be supplied should already be contained in employers' records.  Again, nowhere has the Board attempted to identify the burden costs to employers that would be imposed by these new mandates.

Further, the Regulatory Flexibility Act analysis totally ignores the new legal importance attached to the Statement of Position by the proposed rule.  The Board cannot now radically alter the legal significance of the initial positions taken by the employer (for example, by precluding the employer from raising issues not raised in the Statement of Position) and then assert that the new burdens are merely reducing current tasks to writing.  Such an analysis fails on its face.  It should be obvious that employers are likely to spend significantly more resources developing their Statement of Position under the new rules given the legal significance of that document.  In considering the burden hours the new mandate would impose, the Board must also consider costs incurred because the employer will need to take time away from other priorities in order to create the Statement of Position.  Again, the short time limits imposed by the Board for responding to its proposal have not permitted us to craft appropriate cost estimates, but if the Board is to complete a satisfactory analysis under the Regulatory Flexibility Act, then it must do so.

Finally, based on the compressed time frames, the possibility of issue preclusion, and the likelihood of additional litigation and other proceedings resulting from the proposed rules, the Board has failed to take into account the additional legal costs that will almost certainly be incurred by employers in order to protect their interests and achieve some modicum of due process through the courts, if not from the Board.

It is clear that the Board has failed to comply with the Regulatory Flexibility Act by its assumption that employers not subject to an election in any one year would bear absolutely no

costs and by dramatically underestimating costs for the employers that the Board acknowledges are affected.  Further, the fact that the Board did not include any actual burden estimates, and instead based its entire analysis on assumptions, means the analysis must fail.  It is incumbent upon the Board to complete an initial regulatory flexibility analysis and publish the analysis for notice and comment before it can proceed with the rulemaking.

## Conclusion

Once again, the Board's NPRM is unwarranted.  The Board has completely ignored over 60,000 comments in reproposing the 2011 NPRM.  It has been pursued through a flawed administrative process.  It proceeds not because of any evidence the current Board procedures are not working fairly and efficiently, but because union adherents and their allies in academia want it to proceed.  To the extent there is delay in a small minority of representation cases, the Board has neither identified its cause nor proposed a solution.  Instead, the Board has undertaken a wholesale revision of procedures which have served the Board and its stakeholders well.  The revision the Board has undertaken entails severe time limits and crabbed administrative processes, forfeitures and waivers for failure to adhere to them, limits on the review of administrative action, uncertainty on important substantive and procedural matters, and a likelihood of increased, not decreased, litigation and delay in the resolution of questions concerning representation.

The U.S. Chamber of Commerce objects to the proposed rules and submits that the NPRM should be withdrawn.

Respectfully submitted,

/s/ Randel K. Johnson                                      /s/ James Plunkett
Randel K. Johnson                                         James Plunkett
Senior Vice President                                     Director
Labor, Immigration & Employee Benefits                    Labor Law Policy

Of Counsel:

> Ronald Meisburg
> Daniel J. Davis
> **Proskauer Rose LLP**
> 1001 Pennsylvania Avenue, NW
> Suite 400 South
> Washington, DC 20004-2533