**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL LABOR RELATIONS BOARD, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 1:15-cv-00009-ABJ <br> Judge Amy Berman Jackson |

**DEFENDANT NATIONAL LABOR RELATIONS BOARD'S
PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT**

The Defendant, National Labor Relations Board (Board), hereby moves pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss portions of Plaintiffs' complaint. Specifically, the Board moves for dismissal of Plaintiffs' statutory and constitutional claims as to amendments 5, 7, 8, 9, 10, 15, and 17 contained in the Board rule at issue in this case. *See Representation—Case Procedures*, 79 Fed. Reg. 74308 (Dec. 15, 2014). The Board additionally moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. In support of this motion, the Board directs the Court's attention to the accompanying Memorandum.

Respectfully submitted,

/s/ Nancy E. Kessler Platt

DAWN L. GOLDSTEIN
KEVIN P. FLANAGAN
*Supervisory Attorneys*

PAUL A. THOMAS
MARISSA A. WAGNER
DAVID H. MORI
MICHAEL ELLEMENT
KEVIN J. HOBSON
KWAME SAMUDA
IGOR VOLYNETS
*Attorneys*

Dated: March 6, 2015

NANCY E. KESSLER PLATT
*Deputy Assistant General Counsel for Contempt, Compliance, and Special Litigation*

National Labor Relations Board
1099 14th Street, NW, Suite 10700
Washington, D.C. 20570
Phone: (202) 273-2937
Fax: (202) 273-4244
E-mail: Nancy.Platt@nlrb.gov
D.C. Bar No. 425995

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| NATIONAL LABOR RELATIONS BOARD, | ) ) |
| Defendant. | ) ) ) |

Case No. 1:15-cv-00009-ABJ
Judge Amy Berman Jackson

## NATIONAL LABOR RELATIONS BOARD'S MEMORANDUM OF POINTS AND AUTHORITIES (i) IN SUPPORT OF ITS PARTIAL MOTION TO DISMISS and CROSS-MOTION FOR SUMMARY JUDGMENT, and (ii) IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

DAWN L. GOLDSTEIN
KEVIN P. FLANAGAN
*Supervisory Attorneys*

PAUL A. THOMAS
MARISSA A. WAGNER
DAVID H. MORI
MICHAEL ELLEMENT
KEVIN J. HOBSON
KWAME SAMUDA
IGOR VOLYNETS
*Attorneys*

NANCY E. KESSLER PLATT
*Deputy Assistant General Counsel for Contempt, Compliance, and Special Litigation*

National Labor Relations Board
1099 14th Street, NW
Washington, D.C. 20570
Phone: (202) 273-2937
Fax: (202) 273-4244
E-mail: Nancy.Platt@nlrb.gov
D.C. Bar No. 425995

## TABLE OF CONTENTS

**Page**

I.      Introduction and Statement of the Case……………………………………………......1

II.     The Chamber's Challenges to Discretionary Rules Are Not Justiciable…........................4

III.    The Chamber's Statutory, Constitutional, and APA Challenges to the Rule Lack Merit...8

    A.      Standard of Review………………………..…………..............................…..8

        1.      The Board is entitled to extraordinary deference in crafting its
           own procedures……..…………………………….....………………….8

        2.      Lawful rules need only be rational and well-explained………………......9

    B.      All of the Rule's changes are reasonable and consistent with the
        NLRA, the Constitution, and the APA……………….…..…..……..…………..10

        1.      The Board's explicitly articulated goals are permissible and furthered by
           the Rule……………………….……………….….…………….……10

        2.      The amendments are consistent with Sections 3 and 9 and due process..13

           a.      The amendments provide for an appropriate hearing upon
             due notice…………………………..……………………………13

           b.      An "appropriate" pre-election hearing need not include
             evidence about inclusion or eligibility questions
             irrelevant to the statutory purpose of the pre-election
             hearing; and the right to Board review does not require
             the Board to permit irrelevant litigation…………………………16

           c.      The Chamber fails to show that the Rule's deferral of
             litigation that may be mooted is arbitrary or capricious…...……24

        3.      The Rule is consistent with the free speech protections of
           the Act and the First Amendment because employers will
           continue to have a meaningful opportunity to campaign………………..26

        4.      The amendments give effect to Section 3(b) of the NLRA by
           delegating to the Board's regional directors the tasks of
           determining whether a question of representation exists and
           whether the election results should be certified, subject to
           discretionary review by the Board……………………………………….30

    a.   Requiring regional directors to resolve pre- and post-
election matters subject to discretionary Board review
effectuates Section3(b)…...…………………………..….…………30

    b.   Contrary to the Chamber, making Board review of post-election
matters discretionary is not arbitrary and capricious……..……....33

5.    The Rule's voter list provisions are consistent with the NLRA
and strike a reasonable balance between privacy and furthering
the goals of the Act……………...………………………………………35

    a.   Expanding the voter list requirements is consistent with the
Act……………………………………………………….…….…36

    b.   The Board comprehensively explained that the expanded voter list
disclosure provisions strike a reasonable balance between privacy and
furthering the goals of the Act……………………….………....38

6.    The Chamber has waived a First Amendment challenge to
the Rule's new posting requirement, which in any event is
permissible government speech…………………………………………41

IV.    Even if All of the Chamber's Challenges Succeed, the Remainder of the Rule is
Severable…………………………………………………………….....…..….44

V.    Conclusion……………………………………………………………….………45

# TABLE OF AUTHORITIES

**CASES:**                                                                                                       **Page(s)**

*Abbott Laboratories v. Gardner*,
  387 U.S. 136 (1967) ............................................................................................ 7

*\*Action Alliance of Senior Citizens of Greater Phila. v. Heckler*,
  789 F.2d 931 (D.C. Cir. 1986) ........................................................................... 5

*AFL v. NLRB*,
  308 U.S. 401 (1940) ........................................................................................... 8

*Am. Hosp. Ass'n v. NLRB*,
  499 U.S. 606 (1991) ........................................................................................... 3

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*,
  724 F.3d 243 (D.C. Cir. 2013) ........................................................................... 9

*America West Airlines, Inc. v. NMB*,
  119 F.3d 772 (9th Cir. 1997) ............................................................................ 24

*In re Barr Labs., Inc.*,
  930 F.2d 72 (D.C. Cir. 1991) ............................................................................ 11

*Barre-National, Inc.*,
  316 NLRB 877 (1995) ................................................................................. 17, 20

*Bituma Corp. v. NLRB*,
  23 F.3d 1432 (8th Cir. 1994) ....................................................................... 16, 18

*\*Boire v. Greyhound Corp.*,
  376 U.S. 473 (1964) ............................................................................. 2, 7, 8, 11

*Cellco P'ship v. FCC*,
  700 F.3d 534 (D.C. Cir. 2012) ........................................................................... 5

*Chevron USA Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ................................................................................. 8, 9, 42

*Cleveland Bd. of Ed. v. Loudermill*,
  470 U.S. 532 (1985) .......................................................................................... 14

*Croft Metals, Inc.*,
   337 NLRB 688 (2002) ................................................................................ 16

*Davis County Solid Waste Management v. U.S. E.P.A.*,
   108 F.3d 1454 (D.C. Cir. 1997) .................................................................. 44

*Decker v. Nw. Envtl. Def. Ctr.*,
   133 S. Ct. 1326 (2013) ................................................................................ 11

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
   518 U.S. 727 (1996) .................................................................................... 37

*\*Excelsior Underwear, Inc.*,
   156 NLRB 1236 (1966) ............................................. 28, 35, 36, 37, 38, 39

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .................................................................................... 20

*Fin. Planning Ass'n v. SEC*,
   482 F.3d 481 (D.C. Cir. 2007) .................................................................... 44

*Firstar Bank, NA v. Faul*,
   253 F.3d 982 (7th Cir. 2001) ...................................................................... 23

*Humble Oil & Ref. Co.*,
   53 NLRB 116 (1943) ................................................................................... 23

*\*Inland Empire Dist. Council, Lumber & Sawmill Workers Union v. Millis*,
    325 U.S. 697 (1945) ........................................................................... 2, 13, 23

*Johanns v. Livestock Mktg. Ass'n*,
   544 U.S. 550 (2005) .................................................................................... 42

*Koretoff v. Vilsack*,
   707 F.3d 394 (D.C. Cir. 2013) .................................................................... 42

*Lake Butler Apparel Co. v. Sec'y of Labor*,
   519 F.2d 84 (5th Cir. 1975) ........................................................................ 43

*Lorillard v. Pons*,
   434 U.S. 575 (1978) .................................................................................... 23

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................................................ 4

*Magnesium Casting Co. v. NLRB,*
    401 U.S. 137 (1971) ........................................................................................... 31, 33

*MD/DC/DE Broadcasters Ass'n v. FCC,*
    236 F.3d 13 (D.C. Cir. 2001) ............................................................................ 44, 45

*Mike O'Connor Chevrolet-Buick-GMC Co.,*
    209 NLRB 701 (1974) ............................................................................................ 7

*Mills v. Alabama,*
    384 U.S. 214 (1966) .............................................................................................. 29

*Motor Vehicle Mfrs Ass'n of the U.S., Inc. v. State Farm Mutual Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................................. 9

*Myers v. Bethlehem Shipbuilding Corp.,*
    303 U.S. 41 (1938) .................................................................................................. 7

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engrs.,*
    417 F.3d 1272 (D.C. Cir. 2005) .............................................................................. 5

*Nat'l Ass'n of Mfrs. v. NLRB,*
    717 F.3d 947 (D.C. Cir. 2013) ........................................................................... 41, 42

*NLRB v. A.J. Tower Co.,*
    329 U.S. 324 (1946) ....................................................................................... 2, 8, 23

*NLRB v. Clark Distrib. Co.,* No. 90-5086, 1990 WL 163627, at *2 (6th Oct. 24, 1990)
    (unpublished per curiam decision) .......................................................................... 5

*NLRB v. Dickerson-Chapman, Inc.,*
    964 F.2d 493 (5th Cir. 1992) .................................................................................. 5

*NLRB v. Gissel Packing Co.,*
    395 U.S. 575 (1969) .............................................................................................. 27

*NLRB v. J. Weingarten, Inc.,*
    420 U.S. 251 (1975) .............................................................................................. 37

*NLRB v. S.W. Evans & Son,*
    181 F.2d 427 (3d Cir. 1950) ........................................................................ 20

*\*NLRB v. Wyman-Gordon Co.,*
    394 U.S. 759 (1969) ........................................................................... 35, 36

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) .............................................................................. 7

*Pacific Gas & Electric Co. v. Public Utilities Commission of California,*
    475 U.S. 1 (1986) ............................................................................... 42

*Pannier Corp. v. NLRB,*
    120 F.3d 603 (6th Cir. 1997) .................................................................... 41

*Peerless Plywood Co.,*
    107 NLRB 427 (1953) ........................................................................... 29

*Pleasant Grove City, Utah v. Summum,*
    555 U.S. 460 (2009) ............................................................................. 42

*\*Reno v. Flores,*
    507 U.S. 292 (1993) .............................................................................. 5

*Republic Steel Corp. v. NLRB,*
    311 U.S. 7 (1940) ................................................................................ 7

*Riley v. California,*
    134 S. Ct. 2473 (2014) .......................................................................... 37

*\*Rumsfeld v. Forum for Acad. & Institutional Rights,*
    547 U.S. 47 (2006) .............................................................................. 43

*Sebelius v. Auburn Reg'l Med. Ctr.,*
    133 S. Ct. 817 (2013) ............................................................................. 9

*Sprint Corp. v. FCC,*
    331 F.3d 952 (D.C. Cir. 2003) ................................................................... 5

*Transportation Enterprises, Inc. v. NLRB,*
    630 F.2d 421 (5th Cir. 1980) .................................................................... 34

*Union of Concerned Scientists v. NRC*,
    920 F.2d 50 (D.C. Cir. 1990) ...................................................................................... 8

*U.S. v. Maxwell*,
    254 F.3d 21 (1st Cir. 2001) ...................................................................................... 20

*Utica Mutual Ins. Co. v. Vincent*,
    375 F.2d 129 (2d Cir. 1967)...................................................................................... 23

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)...................................................................................... 29

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,,
    435 U.S. 519 (1978) ...................................................................................... 8

**STATUTES:**

5 U.S.C. § 554(a)(6) ................................................................................................. 2, 8

5 U.S.C. § 556(d) ......................................................................................................... 20

5 U.S.C. § 706(2) ........................................................................................................... 8

5 U.S.C. § 706(2)(A) ..................................................................................................... 4

5 U.S.C. § 706(2)(B) ..................................................................................................... 4

5 U.S.C. § 706(2)(C) ..................................................................................................... 4

29 U.S.C. § 153 ........................................................................................................... 13

*29 U.S.C. § 153(b) ......................................................... 1, 21, 30, 31, 32, 33, 35

29 U.S.C. § 156 .............................................................................................................. 3

29 U.S.C. § 157 .............................................................................................................. 1

29 U.S.C. § 158(b)(7)(C) ............................................................................................ 21

29 U.S.C. § 158(c).………………………………………………………..…..…..42

29 U.S.C. § 159 ................................................................................................... *passim*

29 U.S.C. § 159(b) ................................................................................................. 13, 24

29 U.S.C. § 159(c) ................................................................................................... 3, 20

*29 U.S.C. § 159(c)(1) ............................................................................................ 1,13

29 U.S.C. § 159(c)(1)(B) ............................................................................................ 15

29 U.S.C. § 159(c)(4) ................................................................................................... 1

29 U.S.C. § 160 .............................................................................................................. 1

Government Performance and Results Modernization Act of 2010 (GPRMA), Pub. L. No. 111-352, 124 Stat. 3866 ………………………………………………………………..11

## REGULATIONS:

29 C.F.R. § 101.23(b) ................................................................................................ 21

29 C.F.R. § 102.63(a)(2) (to be codified) ................................................................ 41

29 C.F.R. § 102.177 .................................................................................................. 39

29 C.F.R. § 103.30(a)(1) ........................................................................................... 18

*Representation-Case Procedures*,79 Fed. Reg. 74308  (December 15, 2014)……………………...1

79 Fed. Reg. 74308-10........................................................................................ passim

79 Fed. Reg. 74315 ................................................................................... 3, 10, 11, 12

76 Fed. Reg. 74316 ............................................................................................ 12, 29

79 Fed. Reg. 74317 ....................................................................... 10, 12, 26-27, 34

79 Fed. Reg. 74318 ........................................................................................... passim

79 Fed. Reg. 74319 .............................................................................................. 27, 29

79 Fed. Reg. 74322 ....................................................................................... 27, 28, 29

79 Fed. Reg. 74326 .................................................................................................. 30

79 Fed. Reg. 74334 .................................................................................................. 34

79 Fed. Reg. 74337 .............................................................................................. 36, 37

79 Fed. Reg. 74342 .................................................................................................. 40

79 Fed. Reg. 74344 .............................................................................................. 35, 38

79 Fed. Reg. 74346-47 ......................................................................................... 39, 40

79 Fed. Reg. 74358-60............................................................................................... 39

79 Fed. Reg. 74362-64 ............................................................................................... 15

79 Fed. Reg. 74363 ................................................................................................... 11

79 Fed. Reg. 74368 ................................................................................................ 16, 44

79 Fed. Reg. 74370-74 .................................................................................... 11, 15, 16, 44

79 Fed. Reg. 74379 .................................................................................................... 41

79 Fed. Reg. 74380-81 ................................................................................ 13, 14, 41, 42

79 Fed. Reg. 74383-89 ........................................................................................ passim

79 Fed Reg. 74391 ....................................................................... 14, 17, 18, 22, 25

79 Fed Reg. 74393-94 ........................................................................................ 15, 17

79 Fed Reg. 74398 ...................................................................................................... 15

79 Fed Reg. 74401-02 ................................................................................................ 15

79 Fed. Reg. 74410 ................................................................................................... 44

79 Fed. Reg. 74414 ................................................................................................... 44

79 Fed. Reg. 74421 ................................................................................................... 38

79 Fed. Reg. 74422 ............................................................................................... 6, 10

79 Fed Reg. 74424-25 ......................................................................................... 15, 16

79 Fed. Reg. 74426-28 ....................................................................................... passim

79 Fed. Reg. 74470 ................................................................................................... 38

79 Fed. Reg. 74480-81 ..................................................................................... 16, 22, 41

79 Fed. Reg. 74482 ................................................................................................... 14

79 Fed. Reg. 74484 ............................................................................................... 15, 22

79 Fed Reg . 74485 ................................................................................................... 14

**LEGISLATIVE HISTORY:**

NLRB, 2 *Legislative History of the National Labor Relations Act of 1935*…….……………….24

S. Rep. No. 79-752…………………………....…………………………………………………...2

S. Comm. on the Judiciary, 79th Cong., Comparative Print on Revision of S. 7,
    (Comm. Print 1945)……………………………………………………………………2

**OTHER MATERIALS:**

NLRB Representation Casehandling Manual, Section 11302.1 (1975)…………………………11

OMB Circular A-11 Part 6, Section 200.10……………………………….……………11, 13

## I.   Introduction and Statement of the Case

In enacting the National Labor Relations Act (NLRA or Act), Congress assigned the

National Labor Relations Board (NLRB, Board, or Agency) two principal responsibilities:

preventing unfair labor practices, 29 U.S.C. § 160, and resolving questions concerning

representation, *id.* § 159. This case is about a final rule that amends Board procedures for

processing representation case petitions. It issued December 15, 2014, and is scheduled to take

effect April 14, 2015. *Representation—Case Procedures*, 79 Fed. Reg. 74308 (hereinafter the

Rule or the amendments).

The NLRA grants employees the right "to bargain collectively through representatives of

their own choosing . . . and to . . . refrain from . . . such activit[y]." 29 U.S.C. § 157. Sometimes

employees and their employer voluntarily agree that an appropriate unit of employees should be

represented for purposes of collective bargaining (typically, by a labor union). But when they do

not agree, Section 9 of the Act, *id.* § 159, gives the Board authority to conduct a secret ballot

election and certify the results.[1]

Section 9 sets forth only the basic steps for resolving a question of representation. First, a

petition is filed with the Agency by an employee, a labor organization, or an employer "in

accordance with such regulations" as the Board may prescribe. *Id.* § 159(c)(1). Second, if there is

reasonable cause, an appropriate hearing is held on due notice to determine whether a question of

representation exists, unless the parties waive the hearing and agree to an election. *Id.*

§ 159(c)(1), (4). The hearing is conducted by a hearing officer, who shall not make any

recommendations regarding whether a question of representation exists. *Id.* § 159(c)(1). Third, if

---

[1] In accord with Section 3(b) of the Act, 29 U.S.C. § 153(b), the Board has delegated authority to decide representation cases to the Agency's regional directors, subject to discretionary Board review. *See* Regional Directors—Delegation of Authority, 29 Fed. Reg. 3911 (May 4, 1961).

there is such a question of representation, an election by secret ballot is conducted. *Id.* Fourth, the results of the election are certified. *Id.*

Aside from these general requirements, however, the statute says very little about representation case procedures. Instead, Section 9 grants the Board "a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330 (1946). The "broad" and "general" statutory requirements that "notice must be 'due' [and] the hearing 'appropriate'" reflect Congress's understanding that the Board has "great latitude concerning procedural details." *Inland Empire Dist. Council, Lumber & Sawmill Workers Union v. Millis*, 325 U.S. 697, 706 (1945).

Congress expressly exempted Section 9 proceedings from the provisions of the Administrative Procedure Act (APA) governing adjudications. *See* 5 U.S.C. § 554(a)(6). Congress did so because "these determinations rest so largely upon an election or the availability of an election," S. Rep. No. 79-752, at 16 (1945), and because of "the simplicity of the issues, the great number of cases, and the exceptional need for expedition," S. Comm. on the Judiciary, 79th Cong., Comparative Print on Revision of S. 7, at 7 (Comm. Print 1945).

Because Congress was concerned that elections be conducted expeditiously, unimpeded by delays that might interfere with employees' right to select a collective-bargaining representative, Congress also deferred judicial review of representation case decisions unless and until the Board enters an unfair labor practice order based on those decisions. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 477-79 (1964) (recognizing Congress's concern that unless an election can promptly be held to determine the choice of representation, the union runs the risk of impairment of strength by attrition and delay while the case is dragging on).

In Section 6 of the NLRA, 29 U.S.C. § 156, Congress granted the Board "'authority [. . .] to make, amend, and rescind . . . such rules and regulations as may be necessary to carry out the provisions of the Act.'" *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 609 (1991). In addition, Section 9(c) grants the Board authority to prescribe rules for processing representation petitions. The Board has amended its representation case procedures repeatedly over the years, usually without notice and comment. 79 Fed. Reg. 74310. However, this Rule follows comment periods totaling 141 days and 4 days of oral hearings with live questioning by Board members. *Id.* at 74310-14.

The Rule makes some 25 changes, summarized at 79 Fed. Reg. 74308-10. The Rule's provisions apply equally to initial organizing cases (when a union files a petition seeking to represent nonunion employees) and to decertification cases (when employees file a petition seeking to rid themselves of an unwanted incumbent union). These changes provide targeted solutions to discrete, specifically identified problems, enabling the Board to better fulfill its duty to protect employees' rights by fairly, accurately, and expeditiously resolving questions of representation. The changes also advance the goals of efficiency, transparency, uniformity, and adapting new technology to further the Act's purposes. *Id.* at 74315. As the Board noted, many of these changes are uncontroversial. See "Features of the Final Rule as to Which There Is No Substantive Disagreement" between the Board majority and dissent. *Id.* at 74430. Consistent with that fact, the complaint of plaintiffs Chamber of Commerce of the United States of America, Coalition for a Democratic Workplace, National Association of Manufacturers, National Retail Federation, and Society for Human Resource Management (Chamber) is a facial challenge to 10 out of the 25 changes enacted by the Rule. *See infra* note 49.

As discussed below, a substantial number of the Chamber's claims are not ripe for a pre-enforcement facial challenge and should therefore be dismissed—specifically, the claims that amendments (Am.) 5, 7, 8, 9, 10, 15, and 17 are "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), or "contrary to constitutional right," *id.* at § 706(2)(B). Further, even if the foregoing claims were ripe, they are insufficient as a matter of law, as are the Chamber's additional claims that the Rule's provisions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* at § 706(2)(A), and that amendment 4 is "contrary to constitutional right," *id.* at § 706(2)(B), because the Rule is fully consistent with the NLRA, the APA, and the Constitution. For these reasons, the Board's partial motion to dismiss and cross-motion for summary judgment should be granted, and the Chamber's motion for summary judgment denied.

## II.  The Chamber's Challenges to Discretionary Rules Are Not Justiciable.

In every case, the plaintiff bears the burden of proving federal subject-matter jurisdiction. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). To assert jurisdiction over a claim, federal courts must find as a threshold matter that the claim is ripe for judicial review. The Chamber cannot carry that burden with respect to its principal claims, which are that the Rule deprives employers of both a fair hearing on critical election issues (Motion for Summary Judgment (MSJ) 16-26) and an adequate opportunity to campaign (MSJ 26-31).[2]

Because this is a *facial* challenge to the Rule, not a challenge based upon its allegedly improper application to specific circumstances, the Chamber "must establish that *no set of circumstances* exists under which the regulation would be valid. That is true as to both []

---

[2] The Board does not dispute the ripeness of the Chamber's allegation that certain provisions of the Rule are arbitrary and capricious (MSJ 31-41). Although the Chamber's constitutional challenge to the Notice of Petition (Am. 4, MSJ 42-44), might also be ripe, the Chamber waived the issue by failing to fairly raise it during the rulemaking process. *See infra* Part III.B.6.

constitutional challenges, and [] statutory challenge[s]." *Reno v. Flores*, 507 U.S. 292, 301 (1993) (emphasis added, quotation and emendation omitted); s*ee also Cellco P'ship v. FCC*, 700 F.3d 534, 549 (D.C. Cir. 2012). Where the challenged portions of a rule are not fixed requirements but discretionary standards, "[t]o hold the provision invalid on its face, a court would have to conclude that the provision stands in conflict with the statute regardless of how the agency exercises its discretion." *Action Alliance of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 939-42 (D.C. Cir. 1986). "[W]here the agency retains substantial discretion to implement its decision, the decision is not ripe for judicial review until it has been implemented in particular circumstances." *Sprint Corp. v. FCC*, 331 F.3d 952, 956-57 (D.C. Cir. 2003).

The Chamber's statutory challenges are ill-suited for review at this time. In claiming that the Rule impairs the right to a pre-election hearing afforded by Section 9, the Chamber seeks to create the impression that the Rule contains rigid requirements that will necessarily deprive parties of the right to a hearing on essential issues (MSJ 16-26). If that were so, the Chamber's allegations would be presumptively ripe. *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engrs.*, 417 F.3d 1272, 1281-82 (D.C. Cir. 2005). But that is not so. The Chamber's facial challenge overlooks that the choice whether to decide all individual eligibility and unit inclusion issues prior to the election or to use the Board's challenged ballot procedure to resolve such issues afterwards, if necessary, has long been left to the sound discretion of the Agency's regional directors and the Board. *NLRB v. Dickerson-Chapman, Inc.*, 964 F.2d 493, 496-97, 500 (5th Cir. 1992); *NLRB v. Clark Distrib. Co.*, No. 90-5086, 1990 WL 163627, at *2 (6th Cir. Oct. 24, 1990) (unpublished per curiam decision). The same is true under the Rule, which merely affords the regional director additional discretion to allow or defer the taking of evidence at the

pre-election hearing concerning discrete individual eligibility and inclusion issues based on

whether the regional director is inclined (considering case processing efficiency) to decide or

defer those issues before the election.[3] As the Board observed, "regional directors [will] retain

discretion to apply those tools or to provide for litigation and resolution of discrete issues as the

regional directors deem appropriate." 79 Fed. Reg. 74388.

Such fact-bound, discretionary determinations are not grist for a facial challenge like the

Chamber's. The better course is to require an aggrieved party to bring an as-applied challenge in

a case where the litigation of a question is *actually* deferred until after the election, so the

reviewing court can (among other things) assess whether the Board's alleged error renders the

pre-election hearing "inappropriate."

Similarly unripe for facial challenge review is the Chamber's speculative claim (MSJ 26-

31) that the Rule so truncates the election process, parties are deprived of a reasonable

opportunity to campaign. The Rule contains no rigid time targets that would produce the alleged

harm. As the Board stated in the Rule:

> [W]e think that the regional directors should continue to hold elections as soon as
> practicable in the circumstances of each case. Where there is no need to wait, the
> election should proceed; where there is a need to wait, the election should not
> proceed.

79 Fed. Reg. 74422. The Rule makes various incremental changes, such as permitting regional

directors to dispense with unnecessary briefing (Am. 11) and ending a policy of automatically

staying all directed elections for 25 days in anticipation of requests for Board review of pre-

election decisions that are filed in only a small percentage of cases and granted in an even

smaller percentage (Am. 15). *Id.* at 74408 n.454. But the impact of those incremental changes on

---

[3] The requirement that parties provide a statement of issues before a pre-election hearing is
similarly subject to the regional director's discretionary interpretation of whether a "good cause"
exception has been met that would permit new issues to be raised at the hearing (Am. 7).

a representation campaign's length in a particular case is currently unknown and unknowable.[4] Absent factual development in a concrete case, the Chamber's allegations are not justiciable.

There is no hardship in delaying review of the Rule's discretionary provisions until there is an "as applied" challenge. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733-35 (1998). That is the normal way to secure review of the Board's election procedures. Unless and until a bargaining representative prevails in an election, is certified, and a Board order based on that certification is enforced by a court, the employer is under no legal obligation to bargain.[5]

Nor are employers required to assume onerous risks to secure as applied review. *Cf. Abbott Laboratories v. Gardner*, 387 U.S. 136, 152 (1967) (finding challenge ripe in large part because plaintiffs were faced with "dilemma" of either incurring substantial economic costs to comply with a labeling rule or risking massive criminal and civil penalties). If an employer's eventual challenge fails, the remedy is to order the employer to prospectively recognize and bargain with the union and, in the event the union challenges any changes made to employees' terms and conditions of employment following its election day victory, to restore the status quo ante and make employees whole for any losses suffered as a result of those changes. *See Mike O'Connor Chevrolet-Buick-GMC Co.,* 209 NLRB 701 (1974), *enf. denied on other grounds,* 512 F.2d 684 (8th Cir. 1975). No penalties accrue because Board orders are remedial, not punitive. *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 10-12 (1940).

---

[4] In fact, as discussed below, *see infra* Part III.B.3, the Rule expressly allows the regional director to consider the parties' desire to campaign in scheduling elections. *See* 79 Fed. Reg. 74318.

[5] *See, e.g.*, *Boire*, 376 U.S. at 477-79 (describing the statutory procedure for securing as-applied review); *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 48 (1938) ("No power to enforce an order is conferred upon the Board. To secure enforcement, the Board must apply to a Circuit Court of Appeals for its affirmance. And until the Board's order has been affirmed by the appropriate Circuit Court of Appeals, no penalty accrues for disobeying it.").

For these reasons, the Chamber's facial challenges to the Rule's discretionary provisions governing pre-election hearings and the length of pre-election procedures should be dismissed.

## III. The Chamber's Statutory, Constitutional, and APA Challenges to the Rule Lack Merit.

### A.  Standard of Review

#### 1.  The Board is entitled to extraordinary deference in crafting its own procedures.

This case is entirely about the Board's amendments to its election procedures. The initial question is whether these procedures directly conflict with statutory text speaking to the "precise question at issue," or with the Constitution. *Chevron USA Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984); *see* 5 U.S.C. § 706(2) (providing for review of action "not in accordance with law," "contrary to constitutional right," or "without observance of procedure required by law"). In answering this question, deference is especially high for all questions of agency procedure. The Supreme Court "has for more than [seven] decades emphasized that the formulation of procedures was basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) (citations omitted).

The deference owed to the Board's amendment of its election procedures is extraordinary. As noted in Part I, an unbroken line of Supreme Court precedent acknowledges the unique amount of control Congress has granted the Board over representation proceedings. *See, e.g., Boire*, 376 U.S. at 476-79 (1964); *A.J. Tower Co.*, 329 U.S. at 330-31; *AFL v. NLRB*, 308 U.S. 401, 405, 409-11 (1940); *see also* 5 U.S.C. § 554(a)(6) (exempting election cases from APA's adjudication limits); *cf. Union of Concerned Scientists v. NRC*, 920 F.2d 50, 54 (D.C. Cir. 1990) (where the process is uniquely discretionary, deference beyond *Chevron* is required).

8

## 2.   Lawful rules need only be rational and well-explained.

The Court may only set aside a rule in a limited set of circumstances, namely where the rule is "arbitrary, capricious, or manifestly contrary to the [law]." *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 826 (2013) (quoting *Chevron,* 467 U.S. at 844). "The arbitrary and capricious standard is highly deferential and presumes agency action to be valid." *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir. 2013) (quotation omitted).

Under this standard, "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983) (*State Farm*). Although an agency must provide its reasoning for adopting a rule, the court's review is limited to searching only for "a rational connection between the facts found and the choice made." *Id.* at 43 (quotation omitted). Consequently, "we do not look at the [agency's] decision as would a scientist, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." *Am. Trucking*, 724 F.3d at 249 (internal citations and quotations omitted).

An agency rule will be found arbitrary and capricious if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43 (citations and quotations omitted). The instant Rule suffers from none of these deficiencies.

**B. All of the Rule's Changes Are Reasonable and Consistent with the NLRA, the Constitution, and the APA.**

    **1. The Board's explicitly articulated goals are permissible and furthered by the Rule.**

Decades of experience under the current framework for administering representation elections led the Board to conclude that its procedures suffer from a variety of deficiencies and could be improved to better achieve the key congressional goal of resolving questions of representation expeditiously and fairly:

> For example, pre-election litigation has at times been disordered, hampered by surprise and frivolous disputes, and side-tracked by testimony about matters that need not be decided at that time. Additionally, the process for Board review of regional director actions has resulted in unnecessary delays. Moreover, some rules have become outdated as a result of changes in communications technology and practice.

79 Fed. Reg. 74308.

In arguing that the administrative record "demonstrates a gaping disconnect between the problem the Board purported to address and the solution it adopted" (MSJ 2), the Chamber utterly ignores that there is no "single problem" that the Rule is designed to fix. Rather, the Rule "address[es] discrete problems with targeted solutions." *Id.* at74315, 74422. Each of these changes serves a distinct set of purposes, including minimizing unnecessary barriers to the fair and expeditious resolution of questions concerning representation, eliminating unnecessary and duplicative litigation, providing for a more informed electorate and fair and accurate recording of votes, simplifying representation case procedures and rendering them more transparent and uniform across regions, reducing the cost of such proceedings to the public and the agency, and modernizing the Board's processes, with a particular emphasis on the effective use of new technology. *Id.* at 74315, 74317, 74422-23, 74428.

10

The legitimacy of these purposes is manifest. For example, efficiency and the adoption of best government practices are patently valid goals for any agency rulemaking.[6] In fact, many of the Rule's amendments are not wholesale changes, but rather codifications of the Agency's Representation Casehandling Manual's procedural and operational guidance, preexisting best practices among the Board's 26 regional offices, and recommendations of the Agency's Best Practices Committee. "Transparency allows the public to understand the process and uniformity allows the parties to form reasonable expectations. These two related principles also ensure that the protection of statutory rights does not vary arbitrarily from case to case or region to region." 79 Fed. Reg. 74315.[7]

Those amendments that are primarily concerned with increasing efficiency are aimed at eliminating not only unnecessary litigation (and its resultant costs to the parties and the Board), but also needless delay in resolving the question of whether employees wish to be represented. As noted, once a valid representation case petition has been filed, a central goal of the Act is to provide a prompt election to answer the question of representation. *See Boire*, 376 U.S. at 476-79.

---

[6] *See, e.g., In re Barr Labs., Inc.,* 930 F.2d 72, 76 (D.C. Cir. 1991) (suggesting rulemaking to improve FDA's efficiency in reviewing drug applications); *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1340 (2013) (Scalia, J., concurring in part and dissenting in part) ("Making regulatory programs effective is the purpose of rulemaking . . . .") (emphasis removed); *see also* Government Performance and Results Modernization Act of 2010 (GPRMA), Pub. L. No. 111-352, 124 Stat. 3866 (codified as amended in scattered sections of 5 U.S.C. and 31 U.S.C.); OMB Circular A-11 Part 6, Section 200.10 (instructing agencies to "[i]nstill a performance and efficiency culture that inspires continuous improvement, . . . focus on better outcomes and lower-cost ways to operate, . . . [and] search for increasingly effective practices") *available at* http://www.whitehouse.gov/sites/default/files/omb/assets/a11_current_year/s200.pdf.

[7] Such best practices codification includes scheduling the pre-election hearing about eight days after the notice of hearing issues, 79 Fed. Reg. 74309, 74353, 74373, setting the election date at "the earliest date practicable," *id.* at 74310 (citing longstanding Representation Casehandling Manual provision, Section 11302.1 (1975)), and requiring the parties to address themselves to the relevant issues, 79 Fed. Reg. 74363, 74309.

Although many of the amendments have little to do with the timing of procedures, the rule also specifically targets those cases where there has been greater delay in conducting the election. The Board found that much of this delay occurs in a narrow subset of cases—namely, those that are fully litigated. The time between the filing of a petition and the election date is almost twice as long in these litigated cases. 79 Fed. Reg. 74317 (in most years, median for all election cases is 38 days, but median for fully litigated cases is closer to 70 days). Thus, the Rule targets delay caused at many stages of fully litigated cases, and tailors solutions to address the specific issues at those different stages.

The Chamber argues (MSJ at 7, 32-33) that there is no need for the Rule because the Agency is meeting its time targets for conducting elections. But the Chamber's focus on speed ignores all the specific, articulated reasons underlying the various amendments. *Id.* at 74315-16.[8] In any event, the Board may legitimately strive to improve its processes even if the Agency is meeting its current time targets. As explained below, *see infra* note 38, the time targets have always been measured by what could be achieved under then-current conditions, taking into account structural barriers imposed by the former rules. *Id.* at 74316-17. "Therefore, meeting those benchmarks shows only that the regions are doing the best they can in spite of the rules, not that the rules are incapable of improvement." *Id.* Under the Chamber's reasoning, whenever the Agency met its then-applicable time targets in any given year, it should have left well enough alone and not engaged in any analysis to improve the process. This is the antithesis of good

---

[8] The Chamber's attempt to draw an analogy between this Rule and the FCC rule vacated in *Sorenson Communications Inc. v. FCC*, 755 F.3d 702 (D.C. Cir. 2014), is unavailing. (MSJ 32-33). The rule in *Sorenson* was designed to prevent fraud in a government program, *id.* at 704-05, even though there was neither "evidence of [existing] fraud" nor "anything in the record" showing how the rule would deter such fraud, *id.* at 707. Here, by contrast, the Board has identified a number of valid problems with its pre-amendment procedures and has fully justified the targeted solutions for those problems.

government. As noted above, *see supra* note 6, every federal agency must "continuous[ly] improve[], . . . focus on better outcomes and lower-cost ways to operate, . . . [and] search for increasingly effective practices." OMB Circular A-11 Part 6, Section 200.10.

### 2. The amendments are consistent with Sections 3 and 9 and due process.

#### a. The amendments provide for an appropriate hearing upon due notice.

Section 9 of the Act states that "[t]he Board shall decide in each case . . . the unit appropriate for the purposes of collective bargaining[.]" 29 U.S.C. § 159(b). It also states:

> [T]he Board shall investigate [representation] petition[s] and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for *an appropriate hearing upon due notice*. . . . If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof.

29 U.S.C. § 159(c) (emphasis added). Accordingly, the statutory purpose of the pre-election hearing is "to determine if there is a question of representation" in an appropriate unit. 79 Fed. Reg. 74380; *see also id.* at 74385 (discussing 29 U.S.C. § 159(c)(1)).

The Supreme Court early determined that Section 9's hearing requirements grant the Board broad discretion in choosing what procedure to use to decide whether a question of representation exists. *Inland Empire Dist. Council*, 325 U.S. at 706-10. As the Court explained, the phrase "appropriate hearing upon due notice" is very broad:

> Obviously great latitude concerning procedural details is contemplated. Requirements of formality and rigidity are altogether lacking. The notice must be "due," the hearing "appropriate." These requirements are related to the character of the proceeding of which the hearing is only a part. That proceeding is not technical. It is an "investigation," essentially informal, not adversary. The investigation is not required to take any particular form or [be] confined to the hearing. . . . We think no substantial question of due process is presented. The requirements imposed by that guaranty are not technical, nor is any particular form of procedure necessary.

*Id.*

The Rule is fully consistent with Section 9 and due process because it provides for an appropriate pre-election hearing upon due notice. *See Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985) (the essential principle of due process is "notice and [an] opportunity for *hearing appropriate to the nature of the case*" (emphasis added)). Consistent with the language of the statute, the Rule explicitly states that "[t]he purpose of a hearing conducted under Section 9(c) of the Act is to determine if a question of representation exists," Amended § 102.64(a), 79 Fed. Reg. 74482, and it explicitly grants parties the right to introduce evidence at the pre-election hearing which is "relevant to the existence of a question of representation," Amended § 102.66(a), *id.* at 74483. In addition, the Rule makes clear that unit appropriateness questions are relevant to the existence of a question of representation, and thus those issues can be litigated at a pre-election hearing, and will be decided by the regional director. Amended §§ 102.64(a), 102.67(a), 79 Fed. Reg. 74482, 74485. For these reasons, the amendments clarifying the purpose of the pre-election hearing, and the evidence that parties have a right to introduce at that hearing, are fully consistent with the statute.[9]

The other amendments governing procedural aspects of the pre-election hearing likewise are consistent with the Act and due process because they will result in making hearings more appropriate, not less. Specifically, the requirement that parties invoking their right to a pre-election hearing provide a timely statement of position on the issues they plan to raise at the hearing focuses all parties' attention on the issues in dispute. Not only does pre-hearing identification of the issues make the pre-election hearing more efficient but by bringing the party's concerns into the open, it facilitates the negotiation of election agreements which

---

[9] *See id.* at 74309 (Ams. 9, 10), 74380-81 (discussing the justification for explicitly construing the purpose of the hearing in accord with the statute), 74383-87, 74391 (discussing the justification for clarifying the evidence that parties have a right to introduce at the pre-election hearing).

eliminate the need for pre-election hearings altogether.[10] Similarly, the requirement that the

hearing open with a petitioner responding on the record to those issues raised by other parties in

their statements of position will clarify which issues remain in dispute so that the hearing may

focus on resolving contested relevant issues.[11] Finally, given Congress's exemption of the

Board's representation cases from formal APA requirements such as briefing, it is clearly

permissible—in addition to being more efficient—to give regional directors discretion to allow

post-hearing briefing only when they conclude that it would be helpful in determining whether a

question of representation exists.[12]

The hearing officer's role under the Rule is also fully consistent with the statute. The Act

provides that pre-election hearings "may be conducted by an officer or employee of the regional

office, who shall not make any recommendations with respect thereto." 29 U.S.C.

§ 159(c)(1)(B). Consistent with the statute, the amendments explicitly provide that the hearing

officer "shall make no recommendations." Amended § 102.66(i), 79 Fed. Reg. 74484.[13]

The pre-election hearing scheduling amendments provide that: except in cases presenting

unusually complex issues, the hearing should open 8 days after service of the notice of hearing; a

statement of position is due the day before the hearing; and parties may request postponements.

---

[10] *See id.* at 74309 (Am. 7), 74362-64, 74373 (Statement of Position form largely requires parties to do what they currently do to prepare for pre-election hearing), 74424 & n.516 (preclusion provides incentive to complete and serve the form).

[11] *See id.* at 74309 (Am. 8); 74393-94 (discussing the justification for requiring petitioners to respond to issues identified in other parties' statements of position).

[12] *See id.* at 74309 (Am. 11); 74401-02, 74426 (discussing the justification for making post-hearing briefing discretionary).

[13] *See also id.* at 74398 (amended § 102.66(c) makes clear "it is the regional director, not the hearing officer, who will determine the issues to be litigated and whether evidence described in an offer of proof will be admitted"); 74426 n.526 (rejecting contention that codification of hearing officer's pre-existing authority to request offers of proof violates the prohibition against allowing hearing officers to "make recommendations").

All are consistent with the due notice requirement.[14] In fact, the Rule does not require any party to prepare for a hearing in a shorter time than permitted under pre-existing Board law,[15] and the 8-day hearing time-frame largely codifies the existing best practice in the Board's regional offices. 79 Fed. Reg. 74309, 74370.[16]

> **b. An "appropriate" pre-election hearing need not include evidence about inclusion or eligibility questions irrelevant to the statutory purpose of the pre-election hearing; and the right to Board review does not require the Board to permit irrelevant litigation.**

The statute says nothing at all about a requirement to resolve all disputes concerning individuals' eligibility to vote or inclusion in an appropriate unit before an election. In fact, "deferring the question of voter eligibility until after an election is an accepted NLRB practice[.]" *See Bituma Corp. v. NLRB*, 23 F.3d 1432, 1436 (8th Cir. 1994); 79 Fed. Reg. 74386 & n.364, 74389-91 & n.386, 74413 (discussing cases and rejecting claims that settled practice of deferring resolution of such matters deprives employees' ability to make an informed choice in election, deprives employers of ability to campaign against union, or deters voting). Even the dissenting Board Members conceded that the Board need not resolve all individual eligibility or inclusion issues before conducting an election.[17] In short, by codifying regional director

---

[14] *See id.* at 74309 (Ams. 5, 7); Amended §§ 102.63(a)(1), (b), *id.* at 74480-81, 74371-73 (discussing due process cases).

[15] *See Croft Metals, Inc*., 337 NLRB 688, 688 (2002) ("By providing parties with at least 5 working days' notice, we make certain that parties to representation cases avoid the Hobson's choice of either proceeding unprepared on short notice or refusing to proceed at all.").

[16] *See also id.* at 74368, 74372-74 74424-25 (rejecting claim that employers generally need more time to prepare for hearing and to complete a Statement of Position, given that union will have previously identified in its petition its view of an appropriate unit and employers already know all requisite facts to take position on the unit before the petition is even filed).

[17] *Id.* at 74436 n.570 (dissent's concession that "under existing Board procedures, elections may take place while some questions remain unresolved, and some employees may cast votes that, if

discretion to defer deciding such matters until after the election, the Rule "involves no qualitative changes regarding the issues to be decided before the election." *Id.* at 74426.[18] Thus, both before and after the Rule, the decision whether eligibility issues need be decided prior to the election is a matter of the Agency's sound discretion.

However, even though prior to the Rule, the Board was not required to decide all eligibility or inclusion questions before the election, the Board interpreted its former rules and statement of procedures as *entitling* parties to present evidence regarding those matters at the pre-election hearing. 79 Fed. Reg. 74383-86 (discussing *Barre-National, Inc.*, 316 NLRB 877, 878 & n.9 (1995)). This made little sense. If a matter will not be decided in the direction of election, there is no reason to permit evidence to be introduced on the matter. "This is the very definition of irrelevant and unnecessary litigation." 79 Fed. Reg. 74426. Thus, the Board amended its rules and statements of procedures in this rulemaking to grant the regional director discretion to bar litigation of such matters at the pre-election hearing, and overruled *Barre* and cases resting solely upon its holding. *Id.* at 74386, 74426.[19]

---

challenged, are ruled upon in post-election proceedings"), 74445 ("although the Board has sometimes deferred making a *decision* on certain eligibility or inclusion issues . . . .").

[18] Accordingly, Amicus National Right to Work's (NRTW) arguments concerning what should be decided before an election are properly understood not as a challenge to the instant rulemaking, but instead as an attack on the pre-rulemaking practice of the Board. Indeed, NRTW's suggestion—that decisional deferrals of inclusion issues are brand new—additionally ignores that parties' practice of bringing inclusion issues to the Board post-election via the unit clarification procedure (if they were unable to resolve them at the bargaining table) predates, and remains unchanged by, the Rule. *See* 79 Fed. Reg. 74391, 74393 & n.398, 74413. Thus, NRTW is also wrong when it asserts (at p. 2) that under the Rule, the Board "will never decide" whether a challenged classification of employees should be included in the unit.

[19] *See id.* at 74309 (Am. 10); 74383-91 (discussing the justification for encouraging the deferral of pre-election litigation concerning individual eligibility or inclusion issues, which are not relevant to the statutory purpose of the pre-election hearing, and leaving discretion with regional directors as to whether such litigation should be allowed at the pre-election hearing). Of course, the Rule's grant of regional director discretion to bar such litigation and preservation of regional

17

Under the Rule, if a decision on individual eligibility is to be deferred, the regional director has discretion to direct the hearing officer to decline to take evidence on that question. Instead, through the use of the Board's challenged ballot procedure, that eligibility issue may be reserved for post-election decision making, if necessary. *See id.* at 74391 (citing *Bituma Corp.*, 23 F.3d at 1436 ("The NLRB's practice of deferring the eligibility decision saves agency resources for those cases in which eligibility actually becomes an issue.")). But if the regional director chooses to consider eligibility pre-election, the director will instruct the hearing officer to permit litigation of that issue. 79 Fed. Reg. 74388.[20]

For example, assume a union files a petition seeking to represent "all registered nurses employed by a hospital excluding supervisors," that there are approximately 100 such RNs, and that the employer concedes that a unit of all RNs is appropriate under the Board's rules (*see* 29 C.F.R. § 103.30(a)(1)), leaving as the sole issue the supervisory status of RN Smith. Under the Rule, the regional director would have discretion not to accept evidence on this issue. The employer would then be free to challenge RN Smith's ballot if she sought to vote and, if the challenged ballot was determinative of the election's outcome, the Board would then permit the parties to present evidence concerning RN Smith's supervisory status after the election. Alternatively, if the union lost, regardless of how RN Smith voted, the dispute would be moot because the employer will have no obligation to bargain with the union. Finally, if RN Smith did

---

director discretion to defer resolving such issues, does not mean that regional directors will exercise that discretion in any particular way in a given case. Thus, NRTW is simply wrong in contending (at 18 n.8) that the Rule precludes regional directors from deciding individual eligibility or inclusion issues, and for that reason too, its arguments are inappropriate as a facial challenge to the Rule.

[20] Accordingly, because it will be the regional director who decides whether or not to permit the litigation of individual eligibility or inclusion issues at the pre-election hearing, there is no merit to the Chamber's claim (MSJ 15) that the exclusion of evidence regarding such issues "prevents effective pre-election consideration of those issues by the regional director."

not attempt to vote or her ballot was not potentially outcome determinative, and the union won

the election, the employer could bring the dispute before the Board through a petition to clarify

the unit, if the parties are unable to resolve the issue through bargaining.

Accordingly, in order to fulfill his or her statutory duty as to the pre-election hearing, the

regional director need not determine if RN Smith is a supervisor. The petitioned-for unit of "all

registered nurses excluding supervisors" is an appropriate unit whether or not RN Smith is

included because she is an employee, or excluded because she is a supervisor. If the petition is

supported by a substantial number of employees who wish to be represented for collective

bargaining by the union and the Board has jurisdiction over the employer, then a question of

representation exists *regardless of whether RN Smith is a supervisor*, and the Board may conduct

an election to answer the question of representation, without first having to decide whether RN

Smith is in the unit.

The same is true with respect to disputes over inclusion of small numbers of employees

in an appropriate unit. It makes no difference whether the dispute is over RN Smith's supervisory

status or whether RN Smith's particular occupational classification should be in the unit. A

regional director can conclude that a unit of all RNs is appropriate without resolving the question

of whether a single classification occupied by an RN, but perhaps not requiring a nursing degree,

should be included in the unit.[21] Accordingly, if the regional director decides not to resolve the

issue before the election, there is no reason to permit the issue to be litigated at the pre-election

hearing.

The Rule's practical approach promotes the sound administration of Section 9. Among

other things, the Board reasonably concluded that permitting parties to litigate matters that are

---

[21] *See also* 79 Fed. Reg. 74380, 74384 (explaining individual eligibility and inclusion issues).

irrelevant to the pre-election hearing's statutory purpose frustrates the statutory goal of

expeditiously resolving questions of representation, frequently imposes unnecessary costs on the

parties and the Agency, and allows parties to use the threat of unnecessary litigation to extract

concessions concerning election details, such as the date, time, and type of election, as well as

the definition of the unit itself. *See id.* at 74383-91.

The Chamber argues (MSJ 1-2, 15-16, 23-25) that the Board does not have authority to

preclude parties at a pre-election hearing from litigating the eligibility of specific employees or

groups of employees to vote in the election. But it points to nothing in the statute giving parties

the right to litigate such matters at the pre-election hearing. Contrary to the Chamber, the Rule's

pre-election hearing changes do not run afoul of Section 9's requirements or constitutional due

process, because the amendments' effect is simply to permit exclusion of evidence irrelevant to

the statutory purpose of the pre-election hearing. Parties have no statutory or constitutional right

to introduce irrelevant evidence. *See* 5 U.S.C. § 556(d) ("[T]he agency as a matter of policy shall

provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence."); *U.S. v.

Maxwell*, 254 F.3d 21, 26 (1st Cir. 2001) (even criminal defendant does not have right to present

irrelevant evidence).[22]

---

[22] The Chamber mistakenly relies on *Barre*, 316 NLRB at 877, and *NLRB v. S.W. Evans & Son*, 181 F.2d 427 (3d Cir. 1950), in support of its claim that Section 9 grants parties the right to litigate all individual eligibility or inclusion issues at the pre-election hearing. (MSJ 20, 23-24). As the Board explained, the holdings in both cases were based *not* on the statute but on readings of the Board's then-current rules and statements of procedures, which have been changed. 79 Fed. Reg. 74385-86 & n.360. Even assuming that *Barre* did look to Section 9(c), the Board would not find its supposed Section 9 interpretation persuasive because *Barre* offered "nothing whatsoever to substantively support its supposed interpretation of the statute." *Id.* at 74386. Here, the Board fully explained why foreclosing irrelevant litigation is fully consistent with the statute. Accordingly, there is no merit to the Chamber's suggestion it is impermissible for the Board to overrule *Barre* and its progeny. *Cf. FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (explaining that an agency may overrule prior policy or unsound precedent, so long as it "display[s] awareness that it *is* changing position").

Unable to point to anything in Section 9 requiring the Board to permit litigation of all individual eligibility or inclusion issues at the pre-election hearing, the Chamber implausibly claims (MSJ 15, 18, 25) that parties cannot exercise their Section 3(b) right to seek Board review of the regional director's decision to defer deciding such issues, unless the record contains all evidence on those matters that the parties seek to introduce. That contention amounts to a claim that the right to Board review of a regional director's decision to bar irrelevant litigation requires parties be permitted as a matter of right to introduce all the irrelevant evidence they seek to adduce at the pre-election hearing. As shown, however, agencies may exclude irrelevant evidence and Section 3(b) of the Act clearly authorizes the Board to delegate to its regional directors its powers to provide for pre-election hearings and to direct elections.[23]

Contrary to the Chamber's claim, the Rule will permit the Board to meaningfully review a regional director's decision to bar litigation of such issues in a particular case. If an employer raises an individual eligibility or inclusion issue in its statement of position, it may explain on the record why it should be permitted to litigate that issue during the hearing and to make an offer of proof on the record.[24] If the regional director directs the hearing officer to bar the party from

---

[23] Because the Rule provides for appropriate pre-election hearings and the pre-election resolution of voting eligibility issues to the extent warranted, there is no justification for the Chamber's attempt (MSJ 19) to equate the Rule with the Board's procedures for conducting expedited elections when recognition picketing has occurred in violation of Section 8(b)(7)(C), 29 U.S.C. § 158(b)(7)(C). In those cases, the Board's rules authorize the regional director to dispense with a pre-election hearing and "fix[] the basis of eligibility of voters." *See* 29 C.F.R. § 101.23(b).

[24] NRTW's characterization of the Rule's preclusion provisions (at 5 n.2) is inaccurate. A party contesting the proposed unit's appropriateness in its statement of position may litigate that issue at the pre-election hearing, even if it does not raise an individual eligibility issue. And because disputes concerning individuals' eligibility to vote or inclusion in an appropriate unit are ordinarily not relevant to the statutory purpose of the pre-election hearing and can be resolved through the challenge procedure if necessary, the Rule provides that a party is *not* precluded from challenging the eligibility of any voter during the election, on the grounds that the party did not contest the voter's eligibility or inclusion at the pre-election hearing. *See id.* at 74400.

litigating the matter, that denial will likewise be on the record. The Rule gives the employer the right to request Board review of that denial and the decision and direction of election before or after the election (and to request a stay of the election and/or impoundment and segregation of some or all of the ballots). When the Board rules on the request for review, the record will contain the party's position, offer of proof, the ruling, and any legal argument made by the party in its request for review. And if the Board concludes that the regional director's denial was in error and the matter should be litigated, it may remand the case to the regional director with instructions to reopen the record and take the evidence. *See* Amended §§ 102.66-68, *id.* at 74384 n.356, 74388, 74391, 74484-86. In short, the right to Board review is preserved.[25]

Equally unavailing is the Chamber's (MSJ 19-23) reliance on the statute's legislative history to assert that parties have an absolute right to litigate all individual eligibility or inclusion issues at the pre-election hearing. For example, it engages in a lengthy discussion of legislative history about the hearing's timing. But the conclusion it reaches—that the Act requires a pre-election hearing absent stipulation—is set forth in the plain text of the Act itself. Nothing in the Rule is inconsistent with this history, because absent the parties entering into an election agreement, there *will* be a pre-election hearing. *See* Amended § 102.63(a), 79 Fed. Reg. 74480.[26]

---

[25] Of course, the Board can order a second election if necessary, just as it did under the old rules *See*, *e.g.*, 79 Fed. Reg. 74408. Moreover, if individuals are directed to vote subject to challenge because their eligibility has not been determined, their status will be determined after a post-election hearing, should the margin render their ballots determinative and the challenges raise substantial and material factual issues. And, as the Chamber appears to recognize (MSJ 38), if a party files an election objection with a sufficient offer of proof, and resolution of that objection turns on determining an individual's supervisory status, that issue will also be resolved after a post-election hearing. *See* Amended § 102.69(c)(1), (2), 79 Fed. Reg. 74487.

[26] *See also id.* at 74380 n.346, 74384-85 (evidence must be taken at the pre-election hearing on jurisdictional, election bar, labor organization, eligibility formula, and special-ballot-procedures-for-professional-employee issues raised by the parties in addition to unit appropriateness issues).

Contrary to the Chamber's suggestion (MSJ 21-22), Taft-Hartley's amendment of Section 9 in 1947 did not change the content of "an appropriate hearing," except to specify it should precede the election. As Judge Friendly explained, "[a]lthough under the [Taft-Hartley] amendment the hearing must invariably precede the election, neither the language of the statute nor the committee reports indicated that any change in its nature was intended." *Utica Mutual Ins. Co. v. Vincent*, 375 F.2d 129, 133-34 (2d Cir. 1967) (noting the continuing vitality of *Inland Empire*).[27] And the Supreme Court expressly held that the whole point of the term "an appropriate hearing" in the 1935 Act is to "confer[] broad discretion upon the Board as to the hearing [required]." *Inland Empire Dist. Council*, 325 U.S. at 708.

Moreover, the Supreme Court had upheld—in 1946, the year before the Taft-Hartley amendments were enacted, and before Congressman Barden and Senator Taft made the statements cited by the Chamber (MSJ 21-22)—the Board's challenged ballot procedure. *See A.J. Tower Co.,* 329 U.S. at 330–35. And the Board had deferred deciding individual eligibility or inclusion questions since the early days of the Act. *See, e.g.*, *Humble Oil & Ref. Co.*, 53 NLRB 116, 126 (1943). In 1947, Congress did not delete the word "appropriate," which clearly would have taken discretion away from the Board. Nor did it amend the Act to eliminate the challenged-ballot procedure, and require all voter-eligibility questions to be litigated and decided before the election. 79 Fed. Reg. 74386, 74425-26. Thus, individual legislators' statements about the meaning of a term *which their legislation did not change* cannot be used to compel the Board to permit litigation of issues the Board need not decide pre-election. *See id.* at 74386 n.363.

---

[27] *See Lorillard v. Pons*, 434 U.S. 575, 582 (1978) (selectively amending or incorporating only parts of a statute strengthens the presumption for those parts that are not changed); *Firstar Bank, NA v. Faul*, 253 F.3d 982, 988 (7th Cir. 2001) ("If a phrase or section of a law is clarified through judicial construction, and the law is amended but retains that same phrase or section, then Congress presumably intended for the language in the new law to have the same meaning as the old.").

Particularly in light of the Board's long established, court-approved challenged ballot procedure, the Chamber cannot credibly claim that legislative history from the 1935 Act supports the proposition the Board must determine all eligibility issues prior to an election (MSJ 21).[28] The Chamber overlooks that at the end of that debate, Congress *rejected* the language "eligibility to participate" in favor of the different "unit appropriate" language now found in 9(b). Thus, the final version enacted by Congress stated that the Board shall decide whether "the *unit appropriate* for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof," and made no mention whatsoever of voter eligibility.[29] 29 U.S.C. § 159(b).

### c.  The Chamber fails to show that the Rule's deferral of litigation that may be mooted is arbitrary or capricious.

The Chamber objects to the Rule's policy of avoiding the resolution of eligibility issues prior to the election that are reasonably reserved for decision after the election (assuming they are not mooted) on the ground that (1) deferral of supervisory status issues may create party

---

[28] Indeed, the Chamber implicitly concedes elsewhere in its brief (MSJ 18, 25) that the Board need not resolve all individual eligibility or inclusion issues before an election.

[29] The fact that the Senate Report cited by the Chamber, MSJ 21 describes the 9(b) language as "similar" to language amending the Railway Labor Act regarding an agency designating "who may participate in the election" ignores the fact that Congress chose not to use that language in the NLRA. And even under the RLA, elections are conducted before all eligibility issues are definitively resolved. *See America West Airlines, Inc. v. NMB*, 119 F.3d 772, 774 (9th Cir. 1997) (dismissed employees received "Challenged Ballots," pursuant to NMB's standard practice for individuals whose voter eligibility is at issue; these votes were to be counted only after NMB made a final decision on voter eligibility).

NRTW is similarly wrong to assert (at p. 11) that the final clause appended to the phrase in 9(b)—"or subdivision thereof"—signals congressional intent to require the Board to definitively determine all of the job classifications to be included in the appropriate unit before an election is held. Legislative history shows that the clause seized upon by NRTW was inserted not for the purpose it claims, but was an outgrowth of an amendment offered for the specific purpose of prohibiting multi-employer bargaining units. 2 NLRB, Legislative History of the National Labor Relations Act, 1935, at 3220, 3260, 3265-66 (1949). As previously noted, *supra* note 18, the real target of the NRTW's argument is not the Rule itself but the court-approved challenged ballot procedure that long pre-existed the Rule.

24

confusion as to which employees may be considered its agents and lead to conduct that may require rerunning the election, and (2) if the contours of the bargaining unit are later modified, employees will have been deprived of their right to make an informed choice in the election (MSJ 38-39). The Board reasonably found these objections unpersuasive.

Drawing on its expertise, the Board found that the first problem exists only at the margins, because in "virtually every case . . . the employer . . . has in its employ . . . supervisors whose status is not disputed and is indisputable." 79 Fed. Reg. 74389. The Board further explained that uncertainty as to supervisory status "exists under the current rules and cannot be fully eliminated" because: (a) parties were not guaranteed a pre-election decision as to supervisory status; (b) even if a regional director resolved a supervisory status question in the decision and direction of election, the parties would not have the benefit of that decision for much of the campaign; (c) any such decision was subject to a request for review by the Board, which rarely ruled on such requests until shortly before the election or even afterwards; and (d) any Board ruling was and is still subject to court of appeals review through the post-election test of certification process.[30] *Id.* Thus, the costs of uniformly allowing pre-election litigation of such issues cannot be justified by a party's desire to resolve supervisory issues, because the pre-rule status quo did not cure the problem of which the Chamber complains. *See id.* at 74391.

Nor have the amendments deprived employees of their right to an informed choice. As under the former rules, the regional director must determine the unit's scope and appropriateness

---

[30] The solution seemingly advocated by the Chamber—an absolute right to litigate supervisory status at the pre-election hearing—would not change the necessity to rerun certain elections. The Chamber's own case citations prove this point (MSJ 38 n.13) because those cases involved unlawful card solicitation which occurred *pre-petition*, and thus could not possibly have been cured by anything that happened at the hearing.

prior to the election. And, as the Board explained, just as before, employers will be required to post the Notice of Election describing the unit, enabling employees to

> assess the extent to which their interests may align from, or diverge from, other unit employees. Although the employees may not know whether particular individuals or groups ultimately will be deemed eligible or included, and therefore a part of the bargaining unit, that is also the case under the Board's current rules.

*Id.* at 73489. The Board further explained that the amendments address the concerns expressed in some court decisions (MSJ 39) regarding employees who may not have understood the size or character of the eventually determined unit. First, the Board "expect[s] regional directors to permit litigation of, and to resolve, [individual eligibility or inclusion] questions when they might significantly change the size or character of the unit." *Id.* at 74390. Second, the Rule avoids employees being misled about the unit

> by providing in amended § 102.67(b) that where the director does defer deciding such questions, the Notice of Election will inform employees prior to the election that the individuals in question 'are neither included in, nor excluded from, the bargaining unit, inasmuch as the regional director has permitted them to vote subject to challenge,' and that their unit placement 'will be resolved, if necessary, following the election.'

*Id.* Accordingly, employees "will cast their ballots understanding that the eligibility or inclusion of a small number of individuals in the unit has not yet been determined." *Id.* Thus, the Board's policy choices in this area are both rational and thoroughly explained.

> **3. The Rule is consistent with the free speech protections of the Act and the First Amendment because employers will continue to have a meaningful opportunity to campaign.**

The Board carefully considered and properly rejected arguments contending that the amendments violate the statutory and constitutional free speech rights of employers. The Board began by observing that "the amendments honor free speech rights; they do not in any manner alter existing regulation of parties' campaign conduct or restrict freedom of speech." *Id.* at

26

74317. Recognizing this, opponents of the Rule instead suggested that its elimination of unnecessary delay coupled with the absence of a rigid timeline for the conduct of elections "would leave employers with too little time to effectively inform their employees about the choice whether to be represented by a union." *Id.* at 74319.

The Board agreed that both the Act and the First Amendment guarantee "that all parties to a representation proceeding will have a meaningful opportunity" to engage in campaign speech. *Id.* at 74320; *see id.* at 74319 (citing First Amendment cases holding that speakers' rights include the "opportunity to win the[] attention" of willing listeners). But the Board declined "to create a procrustean timeline for election speech" because "every case will be different." *Id.* at 74323. Therefore, the Board closely examined whether "the amendments might reduce the time between the filing of the petition and the election so as to threaten" employers' communication rights. *Id.* at 74317. After conducting that inquiry, the Board concluded that the Rule will not infringe employers' speech interests because employers will continue to have "ample meaningful opportunities" for speech. *Id.* at 74319.

The Board gave three principal reasons for this conclusion. First, the Board described the reality—recognized long ago by the Supreme Court—that union organizing campaigns rarely catch employers by surprise. *Id.* at 74320 (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 603 (1969)). Consequently, many employers begin to engage in campaign speech well before a representation petition is filed. Second, "employers in nonunionized workplaces may and often do communicate their general views about unionization to both new hires and existing employees" through materials such as handbooks and orientation videos. *Id.* at 74321. Third, "and most significantly," *id.* at 74320, the Board examined employers' ability to rapidly disseminate their campaign message after a petition is filed. *Id.* at 74322-23. For example,

employers may repeatedly "compel [employee] attendance at meetings at which employees are often expressly urged to vote against representation." *Id.* at 74323. Thus, even "where employers wish to engage in an unusually high amount of communication, they can accomplish that in a short period of time because they control the quantum of work time which is used in conveying their message." *Id.* at 74322. Because the Rule does not alter existing workplace dynamics, the Board concluded that employers will continue to have significant meaningful opportunities for election speech.[31]

Like the opponents whose concerns the Board addressed in the Rule, the Chamber claims that the Rule will impermissibly "curtail[]" the opportunity for campaign speech guaranteed by the Act. (MSJ 28). But even if the Rule generally results in more expeditious elections, the Chamber fails to show why the "ample meaningful opportunities" for election-related speech relied upon by the Board are insufficient. In fact, the Chamber takes direct issue with only *one* of the three primary reasons the Board gave in support of its conclusion that the Rule does not impinge on employers' speech interests. Specifically, the Chamber makes the narrow claim that "[a]n employer's ability to make general, pre-petition observations about unions is no substitute for post-petition speech." (MSJ 28-29). But "a complete substitute is not necessary in this context; rather, the question is whether the overall speech opportunity in the campaign is meaningful. The opportunity to engage in general speech of this sort is undoubtedly relevant on

---

[31] The Board also noted three additional factors. First, most Board elections take place in small bargaining units, in which "effective communication with all voters can be accomplished in a short period of time." *Id.* at 74322. Second, under the Board's longstanding *Excelsior* rule, union petitioners receive a list of voters' names and addresses "a minimum of 10 days before the election, effectively allowing the [union] petitioner a minimum of 10 days" to expose voters to nonemployer campaign speech. *Id.* at 74323. "That analysis remains relevant in considering employers' opportunity to campaign." *Id.* at 74423 n.514. And third, "advances in communications technology" have made information transmission more effective and efficient. *Id.* at 74423; *see also id.* at 74323 (noting Board case where employer sent "Vote No" message to "mobile data units" in employees' trucks).

this question, and must be considered together with the opportunities for later, more specific campaign speech as part of the overall analysis." 79 Fed. Reg. 74322.

The Chamber distorts the Rule when it claims it requires "regional directors [to] schedule elections *as quickly as possible*, regardless of other statutory objectives and requirements." (MSJ 28). What the Rule actually says is that "the regional director will set the election for the earliest date practicable consistent with these rules," *id.* at 74310, after taking into account case-by-case variables such as the "size, geography and complexity," of the election, *id.* at 74323, as well as "other relevant factors," *id.* at 74324, including "the desires of the parties, which may include their opportunity for meaningful speech about the election," *id.* at 74318. Thus, contrary to the Chamber's claim, the Rule does not sacrifice the fulfillment of statutory directives or policies in the name of speed.[32]

Although the Chamber claims that the Act establishes a minimum permissible campaign period that applies in all cases, it fails to provide this Court with any reliable authority for arriving at that specific number. The NLRA itself specifies no minimum campaign period, so the Chamber has instead turned to a snippet of unenacted legislative history concerning a failed

---

[32] The Board emphatically rejects the Chamber's accusation that the Rule carries out an ulterior motive "to privilege some speech based on its content." (MSJ 28). As the Board expressly affirmed, "limiting debate is not a reason for any of the amendments." 79 Fed. Reg. 74316 n.25; *see also id.* at 74323 n.68 ("We—yet again—emphatically disclaim any such motivation [to neutralize employers' inherent campaign advantages].")." In addition, cases invalidating restrictions on certain forms of "political electioneering" (MSJ 28) are inapposite, first because setting an election date cannot be equated with restricting "electioneering." *See* 79 Fed. Reg. 74423 ("[W]henever a date for an election is fixed, a limit is necessarily placed on campaign speech."). And second, Board elections and political elections are not the same. *See id.* at 74319 n.45. Thus, even though a "state ban on election-day newspaper editorials" is invalid in the political election context (MSJ 28 (citing *Mills v. Alabama*, 384 U.S. 214 (1966)), the Board has long applied a rule prohibiting parties to an election from making certain captive audience speeches within the 24-hour period preceding an election, *see Peerless Plywood Co.*, 107 NLRB 427, 429 (1953); *see also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 778 n.3 (1976) (Stewart, J., concurring) (contrasting *Peerless Plywood* with *Mills*).

legislative proposal that arose during Congress' deliberation over the 1959 amendments to the Act. (MSJ 29-30). In that legislative history excerpt, then-Senator John F. Kennedy spoke in support of a proposed amendment that would have allowed the Board to reinstate the "pre-hearing election" procedure the Chamber decries at length, as long as the election occurred at least "30 days after the petition was filed." 79 Fed. Reg. 74326. The proposal did not make it into the final bill ultimately enacted into law. Thus, there is no merit to the Chamber's claim that Senator Kennedy's support of the failed proposal is evidence of congressional intent to establish a 30-day minimum campaign period. To state the obvious, a lone senator's unenacted views in support of a failed legislative proposal are not the law and may not be imputed to Congress as a whole. Nor, as the Board found, do Senator Kennedy's views bear on the meaning of the NLRA as originally adopted in 1935 or as subsequently amended in 1947. *Id.*

Contrary to the Chamber's suggestion (MSJ at 29-30), the Board's prior rules did not endorse the notion that the Act sets a "one-size-fits-all" minimum campaign period. Even if, as the Chamber claims, application of the Board's pre-amendment procedures resulted in a campaign period "of at least 39 days" in contested cases (MSJ at 30), this figure is not expressive of any Board policy that election campaigns should have a minimum length. The Chamber cites no evidence to the contrary.

**4.  The amendments give effect to Section 3(b) of the NLRA by delegating to the Board's regional directors the tasks of determining whether a question of representation exists and whether the election results should be certified, subject to discretionary review by the Board.**

**a.  Requiring regional directors to issue pre- and post-election decisions subject to discretionary Board review effectuates Section 3(b).**

Congress has expressly authorized the Board to delegate to its regional directors the power to process representation case petitions through certification, subject to certiorari type

review by the Board, which review was not intended to delay the conduct of the election. Thus,

Section 3(b) of the Act provides in relevant part:

> The Board is . . . authorized to delegate to its regional directors its powers under
> section 9 to determine the unit appropriate for the purpose of collective
> bargaining, to investigate and provide for hearings, and determine whether a
> question of representation exists, and to direct an election or take a secret ballot
> under subsection (c) or (e) of section 9 and certify the results thereof, except that
> upon the filing of a request therefor with the Board by any interested person, the
> Board may review any action of a regional director delegated to him . . . , but such
> review shall not, unless specifically ordered by the Board, operate as a stay of any
> action taken by the regional director.

29 U.S.C. § 153(b). This delegation was "'*designed to expedite final disposition of cases* by the

Board, by turning over part of its caseload to its regional directors for final determination.'"

*Magnesium Casting Co. v. NLRB*, 401 U.S. 137, 141 (1971) (emphasis added) (quoting 105

Cong. Rec. 19770 (1959)).

Amendments 12-15 and 24 give effect to Section 3(b) and will advance the goal of

expeditiously resolving questions of representation. First, the amendments fully implement

Section 3(b)'s grant of authority to the Board to delegate to its regional directors its powers to

determine whether a question of representation exists and to certify the results of an election

subject to discretionary Board review. In the pre-election stage, the amendments require the

regional director to decide whether a question of representation exists in every case that goes to a

pre-election hearing.[33] In the post-election stage, the amendments similarly require the regional

director to issue a decision in every case involving election objections and determinative

challenged ballots. 79 Fed. Reg. at 74310 (Am. 24). The efficiencies Congress sought to bring

about by enlarging regional directors' responsibilities are thus more likely to be achieved.

---

[33] *See* 79 Fed. Reg. 74309 (Am. 12), 74403 (explaining that when regional directors have
exercised their authority to transfer cases to the Board for decision it has led to extended delays
in the disposition of petitions).

Second, the amendments build upon the Board's experience in administering Section 3(b)'s discretionary review provisions to take better advantage of the efficiencies that the review provision allows. In the pre-election stage, the Board eliminated its previous requirement that parties request review of the regional director's decision and direction of election prior to the election--or be deemed to have waived their right to take issue with that decision. The Board concluded that its former rule required parties to engage in unnecessary litigation about matters that are often mooted by the results of the election. 79 Fed Reg at 74309 (Am. 13), 74408. In the post-election stage, the Board made certiorari-type review the normal method for securing Board review by creating a uniform procedure governing stipulated and directed-election cases, whereby parties may request Board review of the regional director's *post*-election determinations under the same discretionary standard that has long governed requests for review of the regional director's *pre*-election determinations.[34]

Third, the amendments carry out Section 3(b)'s instruction that Board "review shall not . . . operate as a stay" of any regional director action unless "specifically ordered" by the Board. The amendments eliminate the prior practice of automatically delaying elections for 25-30 days after issuance of the regional director's direction of election, eliminate ballot impoundment (a form of "stay") in cases where a request for review is pending or granted by the time of the election, and provide a procedure for parties to request stays of elections and or impoundment of

---

[34] *See* 79 Fed. Reg. 74310 (Am. 24), 74331-32 (noting that the amendment will make the process for obtaining Board review of regional directors' dispositions of *post*-election disputes parallel to the longstanding practice for obtaining Board review of regional directors' dispositions of *pre*-election disputes), 74413 (explaining that permitting the Board to deny review of regional directors' resolution of post-election disputes, i.e., when a party's request raises no compelling grounds for granting such review, will eliminate the most significant source of administrative delay in the finality of election results and thereby reduce the period of time between the tally of votes and certification of the results and thus the period during which employers are uncertain about their duty to bargain).

ballots.[35]

In short, Congress approved the Rule's approach when it amended the Act to authorize the Board to delegate its powers in representation cases to regional directors subject to discretionary Board review that would not delay the election. *See Magnesium Casting*, 401 U.S. at 142 ("Congress has made a clear choice; and the fact that the Board has only discretionary review of the determination of the regional director creates no possible infirmity within the range of our imagination.").

### b. Contrary to the Chamber, making Board review of post-election matters discretionary is not arbitrary and capricious.

The Chamber argues (MSJ 34-37) that it is arbitrary and capricious to make Board review of the regional director's post-election determinations (regarding determinative challenge ballots and election objections) discretionary because doing so because will supposedly: (1) decrease the number of stipulated election agreements (thereby increasing the number of pre-election hearings), and (2) increase the number petitions for review filed in the circuit courts of appeals.

The short answer is that, by enacting Section 3(b) of the Act, Congress has already authorized the Board to delegate to its regional directors the power to certify the results of elections subject only to discretionary Board review. It can hardly be considered arbitrary and capricious for the Board to do precisely what Congress has authorized it to do.

---

[35] *See id.* at 74309-10 (Ams. 14-15), 74409-10 (explaining that it made little sense to apply the 25-day waiting period—which by definition delays resolution of the question of representation— to all directed-election cases because requests for review were filed just in a small percentage of cases, were granted in an even smaller percentage, and if the Board had not yet ruled on the request at the time the election was scheduled to take place, as was not infrequently the case, the election went ahead anyway). The Chamber ignores both the statutory directive that review should not stay the regional director's actions unless the Board orders otherwise and the Rule's provision that parties may request stays of the election when it argues (MSJ 36) that the Rule fails to allow the Board sufficient time to consider a party's pre-election request for review.

In any event, there is no basis for the Chamber's parade of horribles. Put simply, under the Rule, insisting on a pre-election hearing does not put a party in a better position with respect to gaining Board or judicial review of post-election issues than if the party enters into a stipulated election agreement. As the Board explained, regardless of whether a party insists on a pre-election hearing or enters into stipulated election agreement, it will only be able to request Board review of the regional director's post election determinations, and the Board will grant such a request only when compelling reasons exist. 79 Fed. Reg. 74334; 74427.[36] And reviewing courts of appeals apply the same standard of review regardless of whether they are reviewing regional director determinations or determinations made by the Board itself.[37]

In short, there is no reason for a party to insist on a pre-election hearing rather than enter into a stipulated election agreement when there are no legitimate pre-election issues in dispute. To the contrary, as the Board explained, a party has ample reason to enter into a stipulated election agreement under the Rule, such as avoiding the expense of a hearing and obtaining certainty with respect to the unit and election details. 79 Fed. Reg. 74334.[38] Nor is there any

_____

[36] Thus, the Chamber is simply wrong in suggesting (MSJ 35) that the Board as much as acknowledged that employers will be more reluctant to enter into binding election agreements without the failsafe of mandatory post-election review.

[37] *See Trans. Enters., Inc. v. NLRB*, 630 F.2d 421, 426 (5th Cir. 1980) (declaring that regional director decisions which are not reviewed by the Board "are entitled to the same weight and deference as Board decisions, and will be given such.").

[38] Curiously, the Chamber complains that the Rule declined to provide new time targets for scheduling an election if an employer chooses to stipulate to an election. (MSJ 35). As the Board explained, time targets are set by the General Counsel based on his "experience administratively overseeing the regions." *Id.* at 74324. In this process, "the General Counsel sets benchmarks by trying to figure out what would be possible—in spite of structural delays identified under the [former] rules—if the regions did their very best work." *Id.* at 74317. Consequently, especially in view of the scope of the amendments, it is impossible to set new benchmarks until "sufficient experience is available to intelligently revise the current targets." *Id.* at 74324. The Board noted that it anticipates that revised time targets will be eventually published, and until that time, "[a]ny short term difficulties in reaching election agreements, should dissipate quickly, as they

reason for parties to file more petitions for review in the circuit courts of appeals than they did

under the prior rules, which, as the Board further explained, already provided for only

discretionary Board review of all pre-election issues. *Id.* at 74427.[39] Thus, the Chamber's

objections to the Board's full implementation of its Section 3(b) authority are unsupported.

### 5. The Rule's voter list provisions are consistent with the NLRA and strike a reasonable balance between privacy and furthering the goals of the Act.

The Rule provides that within two business days of the direction of an election,

employers must electronically transmit to the other parties (e.g., a petitioning union) and the

regional director a list of eligible voters, their home addresses, work locations, shifts, job

classifications and, if available to the employer, their personal e-mail addresses and home and

cellular telephone numbers.79 Fed. Reg. 74310 (Am. 20). Previously, employers were required

to produce to the regional director within seven days of the direction of an election a list of

names of eligible voters and their home addresses only. The regional director would then serve

the list on the parties. *See Excelsior Underwear, Inc*., 156 NLRB 1236, 1239-40 (1966); *see also*

*NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 767 (1969) (upholding *Excelsior* requirement).

Contrary to the Chamber's claims (MSJ 40-41), the Rule's disclosure provisions are not

arbitrary, and do not disregard privacy concerns. As shown below, these provisions are

consistent with the Act, and strike a reasonable balance between obtaining sufficient information

to satisfy the rationales for requiring a voter list and protecting the privacy interests of

employees.

---

have in the past when prior time targets have been adjusted." *Id.* The Chamber has produced no
evidence that these conclusions are not rational.

[39] Between FY 2008 and FY 2013, the number of test of certification cases filed each year in the
U.S. Circuit Courts of Appeals ranged from eight to eighteen. *Id.* at 74344 n.176.

### a. Expanding the voter list requirements is consistent with the Act.

The Act requires not only that employees have the opportunity to cast their ballots for or against union representation free from interference, restraint, or coercion violative of the Act, but also that they cast ballots free from other elements that prevent or impede a free and reasoned choice, including a lack of information:

> Among the factors that undoubtedly tend to impede such a choice is a lack of information with respect to one of the choices available. In other words, an employee who has had an effective opportunity to hear the arguments concerning representation is in a better position to make a more fully informed and reasonable choice.

*Excelsior,* 156 NLRB at 1240 (footnote omitted). The Board in *Excelsior* held, therefore, that access of all voters to campaign communications of nonemployer parties through the disclosure of voters' names and addresses was necessary to "maximize the likelihood that all voters will be exposed to the arguments for, as well as against, union representation." *Id.* at 1240-41.[40] The Supreme Court fully endorsed this rationale in *Wyman-Gordon Co.*: "The disclosure requirement furthers this objective [to ensure the fair and free choice of bargaining representatives] by encouraging an informed employee electorate and by allowing unions the right of access to employees that management already possesses." 394 U.S. at 767. This long-standing practice is challenged neither by the Chamber nor NRTW.

The Rule's expanded voter list provisions reflect the Board's conclusion that supplying nonemployer parties with additional contact information that facilitates the use of modern modes of communication in campaigns "better advances" *Excelsior*'s primary purpose of exposing employees to different viewpoints. 79 Fed. Reg. 74337, 74340 n.151. In 1966, cellular

---

[40] The Board additionally reasoned that disclosure of names and addresses will facilitate the public interest in the expeditious resolution of questions of representation by enabling parties on the ballot to avoid having to challenge voters based solely on lack of knowledge of the voter's identity. *Excelsior*, 156 NLRB at 1242-43.

telephones and e-mail – crucial tools of communication in today's world – did not exist. *Id.* at 74337, 74341. Although landline-based telephones were in use, no commercially viable home answering machine was yet on the market, rendering telephone numbers of limited utility. *Id.* at 74338. In more recent years, however, the development of voicemail, cell phones, and smart phones has allowed people to be reached wherever they may be (especially those without landlines). *Id.* at 74338-39.[41] Under the Rule, nonemployer parties can now take advantage of advances in technology by calling employees and communicating a message about a union campaign, rather than trying to schedule a face-to-face meeting at their homes, or more intrusively, showing up unannounced. *Id.* "[T]he use of telephones to convey information orally and via texting is an integral part of the communications evolution that has taken place in our country since *Excelsior* was decided." *Id.*

Similarly, by requiring personal email addresses, the Rule recognizes the communications revolution that has transformed our country. In 2010, 80 times more emails were being sent every day than letters through the mail. 79 Fed. Reg. 74337. And the transmission of email is virtually immediate, permitting nonemployer parties to timely communicate with eligible voters and employees to share such communications with each other, making it more likely that employees can make an informed choice in the election. *Id.* at 74338. Thus, the Rule carries out the Board's "responsibility to adapt the Act to changing patterns of industrial life." *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 266 (1975).[42] Accordingly, there is

---

[41] Indeed, the Supreme Court recently described cell phones as "a pervasive and insistent part of daily life." *Riley v. California*, 134 S. Ct. 2473, 2484 (2014).

[42] *See also Denver Area Educ. Telecomms. Consortium, Inc. v.* FCC, 518 U.S. 727, 802-03 (1996) (Kennedy, J., dissenting) ("To an increasing degree, the more significant interchanges of ideas and shaping of public consciousness occur in mass and electronic media.").

no merit to the Chamber's claim the Board has not adequately "explain[ed]" the reasons for this amendment. (MSJ 40).

> **b. The Board comprehensively explained that the expanded voter list disclosure provisions strike a reasonable balance between privacy and furthering the goals of the Act.**

The Rule seeks to safeguard employee privacy by restricting dissemination and use of the information only for "a representation proceeding, Board proceedings arising from it, and related matters." 79 Fed. Reg. 74344. Notably, the list will not be made publicly available, nor will it be required in every representation case. Rather, the list is required only upon satisfaction of the "showing of interest" requirement,[43] and after the employer admits that a "question of representation" exists by entering into an election agreement or a regional director directs an election after a hearing. Moreover, contrary to NRTW's claim (at 22), the Board left no "gaping hole" regarding restrictions on use of voters' contact information, as the Rule lists detailed circumstances describing when this information may be used.[44] At the same time, the Board explicitly cautioned that the information may not be sold to telemarketers, used in a political campaign, or to "harass, coerce, or rob employees." 79 Fed. Reg. 74358.

The Rule further seeks to deter and remedy any misuse of voter contact information. The Board noted that in *Excelsior*, 156 NLRB at 1244, it had reserved the right to provide remedies if voter contact information was misused. And "the rulemaking record shows not a single instance of voter list misuse dating back to the 1960s." 79 Fed. Reg. 74428. Based on that record, the Board chose to take the same approach as in *Excelsior*, noting that it will provide an "appropriate

---

[43] A petitioning party must provide evidence showing that the petition has the support of at least 30 percent of the bargaining unit before an election will be held. 79 Fed. Reg. 74421; *see also id.* at 74470.

[44] The examples include using the information to investigate eligibility, prepare for post-election hearings and unit clarification or unfair labor practice proceedings arising from the election, as well as for any rerun election may be held. 79 Fed. Reg. 74358.

remedy" for any such misuse, leaving the question of precise remedies "to case-by-case adjudication." 79 Fed. Reg. 74360, 74359. Although the Chamber and NRTW criticize that choice (MSJ 41; NRTW at 22), the Board's rationale was clearly spelled out. The Board further noted that Section 102.177 of its Rules and Regulations (29 C.F.R. § 102.177), provides for the discipline of attorneys and other representatives for misconduct "at any stage of any [Board] proceeding." 79 Fed. Reg. 74359 n.259. Accordingly, the Rule's case-by-case approach in remedying voter list misuse is reasonable, given the nearly 50-year absence of evidence of such misuse. 79 Fed. Reg. 74427-28.[45]

Finally, the exclusion of an opt-out provision in the Rule does not render the voter list provisions arbitrary (MSJ 40; NRTW at 21). *Excelsior* placed a high premium on the value of unsolicited communication from nonemployer parties during the election to ensure that "employees are able to hear all parties' views concerning an organizing campaign—even views to which they may not be predisposed at the campaign's inception." 79 Fed. Reg. 74346 (citing *Excelsior*, 156 NLRB at 1244). Clearly, this goal would be undermined by permitting employees

---

[45] The Chamber further criticizes the Board for "inexplicably" declining to put in place certain privacy protections, such as requiring unions to destroy personal contact information after a period of time (MSJ 41). Yet, the Board explained in detail its rejection of various remedies advocated by commenters. *See* 79 Fed. Reg. 74358-60. For example, the Board considered whether misuse of a voter list would be deemed an unfair labor practice or would always warrant setting aside the results of an election. 79 Fed. Reg. 74359. However, the Board rejected these proposed remedies, reasoning that not every instance of voter list misuse by a party would constitute a violation of the Act or necessarily justify setting aside election results. *Id.* The Board also rejected automatically barring labor organizations who misuse voter lists from engaging in future organization campaigns because such a remedy would interfere with the right of employee free choice. *Id.* As for the Chamber's destruction of information suggestion, "petitioners are currently entitled to retain the list indefinitely under *Excelsior*, and, as shown, there are certainly legitimate reasons why petitioners might use the list after the election." *Id.* at 74360.

to opt out of release of personal contact information or requiring nonemployer parties to include

an "unsubscribe" feature in their e-mails. 79 Fed. Reg. 74346-47.[46]

Contrary to the Chamber's assertions otherwise (MSJ 41), the Board undertook a

reasoned, careful weighing of the benefits of expanding the disclosure of voter contact

information against the risk of violating employees' privacy interests. As it explained:

> [E]ven assuming that the privacy, identity theft, and other risks may be greater
> than the Board has estimated—and, in particular, that adding personal email
> addresses and home and personal cell phone numbers to home addresses may, in
> combination, result in increased risks, especially as technology changes—
> nevertheless the Board's conclusion remains the same. These risks are worth
> taking and as a practical matter, must be taken, if communication about
> organizational issues is going to take place using tools of communication that are
> prevalent today.

79 Fed. Reg. 74342. The Board's thoughtful conclusions strike a prudent balance between

privacy and continued furtherance of the Act's goals; any claim of the Board's arbitrariness or

disregard of privacy concerns should be rejected.[47]

---

[46] The Board also noted that such provisions would likely prove administratively burdensome, delay the conduct of elections, and invite new areas of litigation. 79 Fed. Reg. 74347. As for an "unsubscribe" option in email communications, the Board concluded that this union-administered approach would risk undermining the privacy interests of employees in not having their sentiments regarding union representation revealed by their unsubscription. This option would also be of limited utility, given the short time period of the campaign and the possible applicability of other federal statutes. *Id.* Thus, the Board concluded, "the existing self help remedy available to anyone who objects to unwanted communications—ignoring calls or letters and deleting emails—seems for the time being to be a more cost-effective option." *Id.* at 74348.

[47] NRTW complains (at 22-23) about having to provide contact information for employees who ultimately may not be in the unit, given the Rule's deferral of eligibility issues. Even under the former rules, however, employers were required to provide names and addresses of individuals who may vote subject to a later eligibility determination. Thus, because the longstanding deferral of eligibility issues is valid, so too is the required disclosure of contact information. *See supra* note 18.

6. **The Chamber has waived a First Amendment challenge to the Rule's new posting requirement, which in any event is permissible government speech.**

The Rule requires an employer to post in conspicuous places a notice of the petition for election ("Petition Notice") that the regional director serves on the employer with the notice of hearing. *Id.* at 74379. The Petition Notice will be a revised version of current NLRB Form 5492, "specify[ing] that a petition has been filed, as well as the type of petition, the proposed unit, and the name of the petitioner; briefly describe the procedures that will follow, and[] . . . it will list employee rights and set forth in understandable terms the central rules governing campaign conduct." *Id.* The Rule requires employers to "maintain the posting until the petition is dismissed or withdrawn or the Notice of Petition for Election is replaced by the Notice of Election." *Id.*

Before the Rule, employers were only *requested* to post Form 5492. 79 Fed. Reg. 74380. By contrast, posting of the Notice of Election, which the Chamber does not challenge here, was mandatory. *See Pannier Corp., Graphics Div. v. NLRB*, 120 F.3d 603, 606-07 (6th Cir. 1997). Now, employers must post the Petition Notice, and later—in all cases that go to an election—the Notice of Election. Failure to post either notice is not an unfair labor practice, but "may be grounds for setting aside the election whenever proper and timely objections are filed." 79 Fed. Reg. at 74480 (to be codified at 29 CFR § 102.63(a)(2)).

During the rulemaking, "[f]ew objections were expressed as to the merit of the mandatory posting requirement." *Id.* at 74379. However, the Chamber's 2014 comment called the Board's attention to prior litigation invalidating the Board's August 2011 Notice Posting Rule, which attempted to establish a nationwide requirement that "nearly [all] 6 million" employers subject to the Act permanently post a generic notice of NLRA rights in the workplace. *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 949 (D.C. Cir. 2013) ("*NAM*"). The Chamber claimed that the D.C.

41

Circuit in *NAM* had "invalidated the [August 2011] rule because it impinged on employers' free speech rights embodied in Section 8(c)" and suggested that the Board "explain how its form does not create the same issues that resulted in invalidation of the Board's NLRA Rights Notice." (Dkt 17-7 at 20-21). The Board responded that the decision "does not affect the Board's rule requiring employers to post an election notice" so long as failure to post that notice does not constitute an unfair labor practice. 79 Fed. Reg. 74380 n.343 (quoting *NAM*, 717 F.3d at 959 n.19).

Consistent with this explanation, the Chamber does not now claim that the requirement to post the Petition Notice violates Section 8(c), 29 U.S.C § 158(c). Instead, the Chamber claims for the first time that this requirement violates the First Amendment. (Compl. ¶ 71; MSJ 42-44). However, this argument has been waived because it was not adequately raised by the Chamber during the rulemaking process. *See, e.g.*, *Koretoff v. Vilsack*, 707 F.3d 394, 397-98 (D.C. Cir. 2013) (*Chevron* deference requires the Court to ensure that challenges to an agency's statutory interpretation are raised first in the administrative forum).

But even if the Court were to excuse this waiver, the argument is unavailing. The Chamber claims the requirement to post the Petition Notice is compelled employer speech and cannot withstand strict scrutiny. (MSJ 42-44). But the Petition Notice is government speech and "not subject to scrutiny under the Free Speech Clause." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 464 (2009); *id.* at 467 ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."); *see also Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005).[48] The Petition Notice bears clear indicia of government speech.

---

[48] *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1, 16 (1986), upon which the Chamber relies (MSJ 42), actually supports the Board's position. In *Pacific Gas*, the Court struck down a requirement that a public utility distribute the speech of an

Form 5492, upon which the Petition Notice is modeled, states at the top in large typeface that it

is a notice from the "National Labor Relations Board." In addition, the very bottom of the notice

states in all capital letters "THIS IS AN OFFICIAL GOVERNMENT NOTICE AND MUST

NOT BE DEFACED BY ANYONE."

Since the Petition Notice is government speech, the proper approach in this case is to

analyze whether employers' hosting of the Board's speech interferes with their own. *See*

*Rumsfeld v. Forum for Acad. & Institutional Rights*, 547 U.S. 47, 63-65 (2006) (*FAIR*). In *FAIR*,

the Supreme Court held that the statutory requirement for law schools to host military recruiters

on campus did not violate the law schools' First Amendment rights, even if the law schools

disagreed with the military's message, because hosting the military did not "suggest[] that law

schools agree with any speech by [military] recruiters" or "restrict[]" what law schools "may say

about the military's policies." *Id.* at 65. Likewise, employers' posting of the Board's Petition

Notice does not "affect[]" the employers' speech, *see id.* at 63, because posting the notice does

not restrict employers from disseminating their own message. Further, there is nothing in the

Notice suggesting that employers agree with any message the Board is purportedly conveying.

Despite the Chamber's protestations to the contrary (MSJ 42-44), the Petition Notice is

not pro-union propaganda. It contains a plain recitation of employee rights under the Act, an

understandable list of objectionable conduct (by employers and unions) that may result in the

setting aside of an election, and a simple explanation of the proceeding's next steps. The posting

of a government notice informing individuals of their workplace rights does not violate the First

Amendment. *See Lake Butler Apparel Co. v. Sec'y of Labor*, 519 F.2d 84, 89 (5th Cir. 1975).

---

adverse third-party. But all Justices agreed that the utility could be required to disseminate the
government's own messages. *See* 475 U.S. at 15 n.12 (plurality opinion); *id.* at 23 n.2 (Marshall,
J., concurring); *id.* at 39 (Stevens, J., dissenting); *see id.* at 34 (Rehnquist, J., dissenting).

**IV. Even if All of the Chamber's Challenges Succeed, the Remainder of the Rule is Severable.**

Invalidation of any of the ten challenged provisions would not require the Court to invalidate any other portion of the Rule.[49] Generally "[w]hether the offending portion of a regulation is severable depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broadcasters Ass'n v. FCC,* 236 F.3d 13, 22 (D.C. Cir. 2001) ("*MD/DC/DE*").

Here, the Board sought to "provide targeted solutions to discrete, specifically identified problems" in each of the Rule's 25 amendments. 79 Fed. Reg. 74308. It explained the independent nature of each of the problems and specific measures taken to address those problems: "In accordance with the discrete character of the matters addressed by each of the amendments listed, the Board . . . would adopt each of these amendments individually, or in any combination, regardless of whether any of the other amendments were made." 79 Fed. Reg. 74308 n.6. The Board specifically explained that certain provisions should remain in effect even if others are struck.[50]

Thus, because the Rule's various parts are justified by different rationales and perform various functions, it logically follows that one mechanism could be severed without impairing the others.[51] In these circumstances, this Court's finding any of the 10 challenged provisions

---

[49] Although the Chamber broadly asserts that the entire Rule must be vacated (MSJ 44; Complaint at p.18), it has not made any allegations with respect to Amendments 1-3, 6, 11-12, 14, 16, 18-19, and 21-25, in its complaint or its motion for summary judgment.

[50] 79 Fed. Reg. 74368 n.292; 74371 n.303; 74373 n.319; 74410 n.457; and 74414 n.469.

[51] *Compare Davis Cnty. Solid Waste Mgmt v. EPA,* 108 F.3d 1454, 1459 (D.C. Cir. 1997) (where EPA standards operated "entirely independently of one another" the provision was found severable), *with Fin. Planning Ass'n v. SEC,* 482 F.3d 481, 493 (D.C. Cir. 2007) (no severability finding where agency not only did not contend rule was severable, but also the disputed

invalid would not prevent the remainder of the Rule from functioning sensibly. *See MD/DC/DE*, 236 F.3d at 23-24. Accordingly, even if the Chamber succeeds in *all* of its challenges, this Court should permit the 15 remaining provisions of the Rule to go into effect.

## V.  Conclusion

For the foregoing reasons, this Court should dismiss the Chamber's statutory and constitutional claims as to amendments 5, 7, 8, 9, 10, 15, and 17, grant summary judgment in favor of the Board, and deny the Chamber's motion for summary judgment.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td></td><td>/s/ Nancy E. Kessler Platt<br>NANCY E. KESSLER PLATT</td></tr>
<tr><td>DAWN L. GOLDSTEIN<br>KEVIN P. FLANAGAN<br>*Supervisory Attorneys*</td><td>*Deputy Assistant General Counsel for<br>Contempt, Compliance, and Special<br>    Litigation*</td></tr>
<tr><td>PAUL A. THOMAS<br>MARISSA A. WAGNER<br>DAVID H. MORI<br>MICHAEL ELLEMENT<br>KEVIN J. HOBSON<br>KWAME SAMUDA<br>IGOR VOLYNETS<br>*Attorneys*</td><td>National Labor Relations Board<br>1099 14th Street, NW, Suite 10700<br>Washington, D.C. 20570<br>Phone: (202) 273-2937<br>Fax: (202) 273-4244<br>E-mail: Nancy.Platt@nlrb.gov<br>D.C. Bar No. 425995</td></tr>
<tr><td></td><td>Dated:  March 6, 2015<br>Washington, D.C.</td></tr>
</table>

---

provisions were expressly described as related, and some of the disputed provisions were required to define terms used in the others).