**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:15-cv-00009-ABJ Judge Amy Berman Jackson |
| v. | ) ) | |
| NATIONAL LABOR RELATIONS BOARD, | ) ) ) | |
| Defendant. | ) ) ) | |

---

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Kathryn Comerford Todd (D.C. Bar No. 477745)
Tyler Green (D.C. Bar No. 982312)
Steven P. Lehotsky (D.C. Bar No. 992725)
Warren Postman (D.C. Bar No. 995083)
U.S. CHAMBER LITIGATION CENTER, INC.
1615 H Street, N.W.
Washington, D.C. 20062
202.463.5337

*Counsel for Plaintiff Chamber of Commerce
of the United States of America*

Linda Kelly (D.C. Bar No. 477635)
Patrick N. Forrest (D.C. Bar No. 489950)
MANUFACTURERS' CENTER FOR LEGAL ACTION
733 10th Street NW, Suite 700
Washington, D.C. 20001
202.637.3061

*Counsel for Plaintiff National Association of
Manufacturers*

Allyson N. Ho (D.C. Bar No. 477589)
Charles I. Cohen (D.C. Bar No. 284893)
Michael W. Steinberg (D.C. Bar No. 964502)
Jonathan C. Fritts (D.C. Bar No. 464011)
David R. Broderdorf (D.C. Bar No. 984847)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.739.3000

*Counsel for the Plaintiffs*

TABLE OF CONTENTS

**Page**

ARGUMENT ................................................................................................................... 2

I.      Plaintiffs' Pre-Implementation Challenge Is An Appropriate Vehicle For
        Judicial Review Of The Final Rule .......................................................................... 2

II.     The Final Rule Conflicts With The NLRA And Raises Serious
        Constitutional Questions ......................................................................................... 5

        A.      The Board's Broad Appeal To Deference Is Unfounded ......................... 5

        B.      The Hearing Provided By The Final Rule Is Not The
                "Appropriate" Hearing Required By § 9(c)(1) ......................................... 6

        C.      The Board's Unprecedented Attempt To Redefine Settled
                Procedures And Statutory Definitions Conflicts With §§ 9 And
                3(b) ........................................................................................................... 14

        D.      The Final Rule Conflicts With § 8(c) By Undermining Its Free-
                Speech Protections .................................................................................. 15

        E.      The Final Rule Is In Tension With § 8(b)(7)'s Narrow Exception
                For Expedited Elections In Limited, Specifically Enumerated
                Circumstances ......................................................................................... 18

III.    The Final Rule Is Arbitrary And Capricious In Violation Of The APA .............. 19

        A.      The Final Rule Irrationally Makes Radical Changes To All
                Representation Case Procedures Even Though The Board Admits
                That "Delay," In Its Estimation, Is Limited To The Narrower Set
                Of Litigated Cases .................................................................................. 20

        B.      The Board Fails To Adequately Address Evidence That The Final
                Rule Will Result In More Pre- And Post-Election Litigation And
                The Effective Transfer Of NLRB Election Disputes To The
                Federal Courts ........................................................................................ 23

        C.      The Board Has Not Provided A Reasoned Explanation For
                Reversing Its Interpretation Of The NLRA's Requirement For An
                "Appropriate" Pre-Election Hearing ...................................................... 25

        D.      The Intrusive And Unwarranted Disclosure To Unions Of
                Employees' Personal Phone And Email Addresses Is Not
                Rationally Reconciled With The Obvious Privacy Concerns And
                The Myriad Of Solutions Offered By The Commenters ........................ 26

IV.     The NLRB's New Notice Requirement Is Unconstitutionally Compelled
        Speech ..................................................................................................................... 27

        A.      The Compelled Speech Argument Is Not Waived ................................. 27

TABLE OF CONTENTS

B.     Ordering All Private-Sector Employers To Post A Notice
       Advancing An Effort They Do Not Support Unconstitutionally
       Compels Speech .................................................................................... 28

V.     Severability Cannot Salvage Parts Of The Final Rule ........................................ 29

CONCLUSION ................................................................................................................. 31

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AFL-CIO v. FEC*,
   333 F.3d 168 (D.C. Cir. 2003) ............................................................................................17

*Am. Petroleum Inst. v. Johnson*,
   541 F. Supp. 2d 165 (D.D.C. 2008) .......................................................................................4

*Arent v. Shalala*,
   70 F.3d 610 (D.C. Cir. 1995) ...............................................................................................19

*\*Barre-National, Inc.*,
   316 NLRB 877 (1995) .............................................................................................12, 14, 25

*Bell v. Hood*,
   327 U.S. 678 (1946) ..............................................................................................................28

*Boire v. Greyhound Corp.*,
   376 U.S. 473 (1964) ..............................................................................................................21

*Brown & Sharpe Mfg. Co.*,
   299 NLRB 586 (1990) ...........................................................................................................27

*Brusco Tug & Barge Co. v. NLRB*,
   247 F.3d 273 (D.C. Cir. 2001) .............................................................................................22

*Cablevision Sys. Corp. v. FCC*,
   649 F.3d 695 (D.C. Cir. 2011) ...............................................................................................3

*Chamber of Commerce v. Brown*,
   554 U.S. 60 (2008) ...........................................................................................................7, 17

*Chamber of Commerce v. NLRB*,
   721 F.3d 152 (4th Cir. 2013) ...........................................................................................1, 21

*ConAgra, Inc. v. NLRB*,
   117 F.3d 1435 (D.C. Cir. 1997) ...........................................................................................22

*Excelsior Underwear Inc.*,
   156 NLRB 1236 (1966) .........................................................................................................26

*FCC v. Fox Tele. Stations, Inc.*,
   556 U.S. 502 (2009) ..............................................................................................................25

TABLE OF AUTHORITIES

**Page(s)**

*Firstar Bank v. Faul,*
    253 F.3d 982 (7th Cir. 2001) ...................................................................9

*Harborside Healthcare, Inc.,*
    343 NLRB 906 (2004) ........................................................................24

*\*Inland Empire District Council v. Millis,*
    325 U.S. 697 (1945)...................................................................8, 9, 14

*Int'l Ass'n of Machinists,*
    189 NLRB 50 (1971) .........................................................................27

*Kohler Co.,*
    128 NLRB 1062 (1960) ......................................................................27

*Magnesium Casting Co. v. NLRB,*
    401 U.S. 137 (1971).............................................................................11

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)............................................................................27

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.,*
    512 U.S. 218 (1994)............................................................................12

*MD/DC/DE Broadcasters Ass'n v. FCC,*
    236 F.3d 13 (D.C. Cir. 2001) ............................................................30

*Mineral Policy Ctr. v. Norton,*
    292 F. Supp. 2d 30 (D.D.C. 2003)....................................................4

*Musgrave Mfg. Co.,*
    124 NLRB 258 (1959) ......................................................................15

*N. Manchester Foundry, Inc.,*
    328 NLRB 372 (1999) .................................................................12, 25

*Nat'l Ass'n of Mfrs. v. NLRB,*
    717 F.3d 947 (D.C. Cir. 2013)......................................................1, 21

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
    145 F.3d 1399 (D.C. Cir. 1998).........................................................3

## TABLE OF AUTHORITIES

**Page(s)**

*NLRB v. A. J. Tower Co.,*
329 U.S. 324 (1946) ............................................................................................5, 6

*NLRB v. Action Automotive, Inc.,*
469 U.S. 490 (1985) ...............................................................................................11

*NLRB v. Bell Aerospace Co. Div. of Textron Inc.*
416 U.S. 267 (1974) ...............................................................................................13

*NLRB v. Health Care & Ret. Corp. of Am.,*
511 U.S. 571 (1994) ...............................................................................................13

*NLRB v. Ky. River Cmty. Care, Inc.,*
532 U.S. 706 (2001) ...........................................................................................4, 11

*North Carolina v. EPA,*
531 F.3d 896 (D.C. Cir. 2008) ...............................................................................29

*Pleasant Grove City, Utah v. Summum,*
555 U.S. 460 (2009) ...............................................................................................28

*Ramaprakash v. FAA,*
346 F.3d 1121 (D.C. Cir. 2003) .............................................................................22

*Reno v. Flores,*
507 U.S. 292 (1993) .................................................................................................3

*Republican Nat'l Comm. v. FEC,*
76 F.3d 400 (D.C. Cir. 1996) .................................................................................19

*Robinson v. Shell Oil Co.,*
519 U.S. 337 (1997) .................................................................................................7

*Sims v. Apfel,*
530 U.S. 103 (2000) ...............................................................................................27

*SNE Enters.,*
348 NLRB 1041 (2006) ..........................................................................................24

*Sorenson Commc'ns Inc. v. FCC,*
755 F.3d 702 (D.C. Cir. 2014) ...............................................................................22

v

TABLE OF AUTHORITIES

**Page(s)**

*Sprint Corp. v. FCC*,
    331 F.3d 952 (D.C. Cir. 2003) ........................................................................3

*Sullivan v. Zebley*,
    493 U.S. 521 (1990) .......................................................................................4

*United States v. Home Concrete & Supply, LLC*,
    132 S. Ct. 1836 (2012) .................................................................................13

*United States v. Jackson*,
    390 U.S. 570 (1968) .....................................................................................30

*United States v. L. A. Tucker Truck Lines, Inc.*,
    344 U.S. 33 (1952) .......................................................................................28

*United States v. Salerno*,
    481 U.S. 739 (1987) ....................................................................................3, 4

*Utica Mut. Ins. Co. v. Vincent*,
    375 F.2d 129 (3d Cir. 1967) ........................................................................8, 9

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) .......................................................................................5

*Williams Gas Processing-Gulf Coast Co. v. FERC*,
    475 F.3d 319 (D.C. Cir. 2006) .....................................................................22

*Wooley v. Maynard*,
    430 U.S. 705 (1977) .....................................................................................28

*Yates v. United States*,
    135 S. Ct. 1074 (2015) ...................................................................................7

**STATUTES**

29 C.F.R. § 102.77 ..............................................................................................18

29 U.S.C. §§ 151-169 (National Labor Relations Act ("NLRA")) ..................... *passim*

**OTHER AUTHORITIES**

75 Fed. Reg. 80,410 (Dec. 22, 2010) ...................................................................21

TABLE OF AUTHORITIES

**Page(s)**

79 Fed. Reg. 7,318 (Feb. 6, 2014) ...............................................................................20

79 Fed. Reg. 74,308 (Dec. 15, 2014) .................................................................. *passim*

93 Cong. Rec. 6,858 (1947) .........................................................................................10

105 Cong. Rec. 16,629 (1959) .....................................................................................17

Final Report of 1994 Dunlop Commission on the Future of Worker-Management
    Relations (Dec. 1, 1994) ....................................................................................2

H.R. Rep. No. 86-741 (1959)........................................................................................17

NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of
    1959...........................................................................................................16, 17

NLRB, Summary of Operations, 2002-2012 Reports, http://www.nlrb.gov/reports-
    guidance/reports/summary-operations ..............................................................10

S. 1555, 86th Cong. Section 706 (as passed by the Senate on April 25, 1959)............16

Like any other federal agency, the National Labor Relations Board must operate within the authority vested in it by Congress and the limits imposed by the Constitution. As demonstrated in the Plaintiffs' memorandum in support of their motion for summary judgment, the Final Rule's comprehensive overhaul of union elections exceeds the Board's authority under the National Labor Relations Act (the "NLRA" or the "Act"), violates the Administrative Procedure Act, and offends the U.S. Constitution. In response, the Board takes the position that it is entitled to "unique" and "extraordinary" deference to establish virtually any election procedure it wants—subject only to narrow "as applied" challenges. The Board's position is both breathtakingly broad and plainly wrong. Courts have not hesitated to set aside the Board's rules where, as here, they exceed the Board's authority. *See, e.g.*, *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 961 (D.C. Cir. 2013); *Chamber of Commerce v. NLRB*, 721 F.3d 152, 164 (4th Cir. 2013).

In tandem with its claim to "extraordinary" deference, the Board attempts to downplay the Final Rule's significance by portraying it as an innocuous assortment of procedural changes intended to address "discrete problems" as part of an "incremental process" of regulatory reform. *See*, *e.g.*, NLRB Mem. at 10; *see also* Representation—Case Procedures, 79 Fed. Reg. 74,308, 74,316 n.30 (Dec. 15, 2014). But there can be no serious question that the Final Rule—which the two dissenting Board members aptly describe as the "Mount Everest" of regulations, *id.* at 74,430 (dissent), occupying 200 pages in the Federal Register—effects a radical and unprecedented restructuring of the union election process that will affect many private-sector employers in the United States. Under the guise of administrative "tweaking," the Board has undertaken to fundamentally alter the NLRA's election process in a way that upsets the balance Congress struck (and the Constitution requires) between employees' statutory right to vote for or

against union representation and an employer's right to engage in free speech and receive due process.

The Board provides no meaningful response to the argument that in dramatically shortening the period of time between the filing of an election petition and the election itself, the Final Rule undermines employers' ability to conduct lawful, effective dialogues with their employees on whether to select union representation, and employees' right to receive key information from all sides in making that important decision.  Employees will, in practice, be asked to "vote now, understand later."  *Id.*

The Final Rule is not only a transparent attempt to circumvent Congress in determining how, if at all, to reform the nation's labor laws, though.  It is also an attempt to put a thumb on the scale in favor of union representation.  The Board disclaims any such intention, *id.* at 74,326 n.83, but that is the inescapable result of the Final Rule.  The time when a union files its petition just happens to be the time, on average, when employees' support for unionization is typically at its highest.[1]  The Board's statutorily prescribed role is not to influence the outcome of representation elections this way; rather, is to safeguard the *process* by which employees can make the choice for themselves after having a reasonable opportunity to get information from all sides.  The Court should therefore grant summary judgment to Plaintiffs and set aside the Rule.

**ARGUMENT**

## I.  Plaintiffs' Pre-Implementation Challenge Is An Appropriate Vehicle For Judicial Review Of The Final Rule.

The Board's leading argument (NLRB Mem. at 4-8) is that portions of this case are not yet ripe for judicial review.  Respectfully, the Board is wrong.  D.C. Circuit precedent is clear

---

[1]    *See, e.g.*, Final Report of 1994 Dunlop Commission on the Future of Worker-Management Relations, pp. 39, 41 (Dec. 1, 1994) (noting the time between petition filing and the election date has been "considered problematic [by union advocates] because employee interest in collective representation can wane and dissipate simply by the passage of time" after the petition is filed).

that a pre-implementation challenge is appropriate where, as here, Plaintiffs challenge an agency's purely legal interpretation of a statute, not an exercise of its discretion. That rule makes sense, as resolving such challenges sooner rather than later conserves party and judicial resources alike, and provides much-needed clarity to both the regulator and the regulated parties.

The Board's argument for postponing judicial review of at least Plaintiffs' statutory claims until regional directors or hearing officers exercise discretion in specific election cases fundamentally misunderstands the nature of this case. It is not about whether regional directors or hearing officers have properly exercised their discretion. It is about whether the Final Rule comports with the Act and the Constitution. Those are purely legal questions that, under controlling D.C. Circuit precedent, are properly resolved through a facial challenge that explains the Board's lack of statutory authority to redefine the scope of the pre-election hearing and to truncate the § 8(c) free speech and § 9(b) "fullest freedom" rights in the Act. *See, e.g.*, *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 715 (D.C. Cir. 2011) (finding challenges to agency action ripe where "petitioners' challenges, including their APA claims, raise purely legal questions" separate from how the agency might exercise its discretion in the future).

In arguing otherwise, the Board invokes the "no set of circumstances" standard set out in *United States v. Salerno*, 481 U.S. 739, 745 (1987). NLRB Mem. at 5-6 (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993), & *Sprint Corp. v. FCC*, 331 F.3d 952, 956-67 (D.C. Cir. 2003)). But *Salerno* does not apply here. The D.C. Circuit has made clear that "[t]he Supreme Court has never adopted a 'no set of circumstances' test to assess the validity of a regulation challenged as facially incompatible with governing statutory law"—and as a result, both the D.C. Circuit and this Court have repeatedly declined to apply *Salerno* where, as here, the challenge is based on a conflict with governing statutory and constitutional law. *Nat'l Mining Ass'n v. U.S. Army Corps*

3

*of Eng'rs*, 145 F.3d 1399, 1407 (D.C. Cir. 1998) (declining to apply the *Salerno* standard to facial challenge to regulations and citing *Sullivan v. Zebley*, 493 U.S. 521 (1990), which "upheld a facial challenge under normal *Chevron* standards, despite the existence of clearly valid applications of the regulation"); *see also Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 39-40 (D.D.C. 2003) (rejecting request to apply the *Salerno* standard to facial challenge to regulations); *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 188 (D.D.C. 2008) ("[E]valuating facial challenges to regulations on statutory grounds under *Chevron* . . . seems especially sound when, as here, plaintiffs challenge a regulation that embodies an agency's interpretation of statutory language.").

Disregarding this controlling authority, the Board argues (NLRB Mem. at 7) that employers would suffer no hardship by relying on case-by-case "as applied" court challenges. That argument is not only immaterial, but also incorrect. As Plaintiffs have already shown, such a rule would indeed result in substantial hardship to employers. Pl. Mem. at 5, 33-37. Under the Final Rule, an employer denied the opportunity to litigate an issue, such as whether certain individuals are supervisors who should be excluded from the bargaining unit and ineligible to vote, at a pre-election hearing will face a burdensome and lengthy path to obtain judicial review: The employer must first seek Board review of the Regional Director's decision (which review is now discretionary under the Final Rule). Then, if Board review is denied, the employer must refuse to bargain with the union to trigger an unfair labor practice proceeding before the Board. Only after a final Board order is issued may the employer obtain judicial review of the Regional Director's decision in the representation election case. *See NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 709 (2001).

Contrary to the Board's assertion (NLRB Mem. at 7) that the risks and harms associated with waiting for "as applied" challenges are not onerous, then, the costs associated with litigating election cases are substantial for any employer—and may even be cost-prohibitive for smaller employers.  In addition, the election's ultimate resolution will be delayed while the litigation runs its course—all in direct contravention to the stated purpose of the Rule itself in "reducing the cost of such proceedings to the public and the agency."  *See* NLRB Mem. at 10; 79 Fed. Reg. at 74,413 ("[T]he amendments will significantly reduce the total amount of litigation . . . ."). There is no reason in law or logic to wait for those inevitable challenges when this challenge to the Board's authority is ripe for adjudication—and every reason to resolve this challenge now and conserve party and judicial resources alike.

## II.     The Final Rule Conflicts With The NLRA And Raises Serious Constitutional Questions.

### A.     The Board's Broad Appeal To Deference Is Unfounded.

The Board's leading and overarching argument in response to Plaintiffs' statutory challenge is that the Board is entitled to "extraordinary deference."  That argument is both telling and wrong.  The Board relies on cases holding simply that an agency has wide discretion to structure its internal procedures *where Congress has not addressed* how those proceedings should be structured.  That is, agencies have wide discretion "to employ procedures *beyond those required by the statute.*"  *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) (emphasis added).  In other words, whatever the Board's discretion to build upon representation procedures mandated by the statute, the Board has no discretion to reduce the procedures that Congress (or the Constitution for that matter) requires.

Indeed, the primary case on which the Board relies—*NLRB v. A. J. Tower Co.*, 329 U.S. 324 (1946)—highlights the Board's error on the deference point.  In *Tower*, the Supreme Court

deferred to the NLRB's procedures for resolving a voter's eligibility precisely *because* the employer had a legitimate opportunity to challenge the voter's eligibility before the election. *Id.* at 332-33. The Supreme Court found dispositive the fact that the employee was part of an agreed-upon election unit—unchallenged until afterward when the employer lost the election by a potential one-vote margin—and that the employer had consented to operate the election under the customary rule that there would be no post-election challenge. *Id.* at 333.

Because no judicial precedent supports the Board's claim to extraordinary deference with its Final Rule, this Court should refuse to rubberstamp the Final Rule without any meaningful review. When it comes to the definitions of statutory terms, even *Chevron* deference does not allow agencies to redefine terms from the meaning provided by Congress. The Board instead must answer on the merits for the rule's shortcomings.

**B.    The Hearing Provided By The Final Rule Is Not The "Appropriate" Hearing Required By § 9(c)(1).**

Section 9(c)(1) of the NLRA requires an "appropriate hearing" to occur before the Board holds a representation election. A hearing is "appropriate" under § 9(c)(1) only if it gives interested parties a full and adequate opportunity to present their evidence on all substantial issues—including important election issues of voter eligibility, inclusion, and supervisory status. *See* Pl. Mem. at 16-26. The election process established by the Final Rule contravenes this statutory requirement because it allows the Board to hold an election even when the parties have not been allowed to present such evidence. *See id.*

The Board disputes that conclusion. According to the Board, the Final Rule serves the purpose of holding elections as quickly as possible, *see* NLRB Mem. at 10, 20, a result it brings about primarily by postponing evidence-taking and decision-making on certain issues until after

the election (including on issues of voter eligibility and inclusion, such as supervisory status of potential bargaining unit members), 79 Fed. Reg. at 74,432 (dissent).

The Board's principal justification for its interpretation of § 9(c)(1)'s "appropriate hearing" requirement is that the Board is entitled to "extraordinary deference." NLRB Mem. at 8. But as explained above, *supra* at 5-6, the Board cites no authority supporting this claim to aggressive deference. And in any event, whether the Final Rule constitutes an interpretation of an "appropriate hearing" entitled to deference—"extraordinary" or otherwise—turns on whether the meaning of "appropriate hearing" is ambiguous. As Plaintiffs' memorandum in support of summary judgment establishes, it is not.

The "'plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.'" *Yates v. United States*, 135 S. Ct. 1074, 1081-82 (2015) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (alterations in original)). Here, those factors all confirm Plaintiffs' argument that an "appropriate hearing" must give all parties a chance *before* an election to present evidence on election issues of voter eligibility, inclusion, and supervisory status; speed itself is not the goal.

Congress has already balanced in other provisions of the NLRA the need for efficiency in representation elections with the need for a fair and just process, including due process and an electorate fully informed before the vote is held. Pl. Mem. at 5-8, 17-25. Congress made clear that there must be sufficient time for a full and informed debate to occur before the election. *See, e.g.*, *Chamber of Commerce v. Brown*, 554 U.S. 60, 67-68 (2008) (Congress adopted a "policy judgment, which suffuses the NLRA as a whole, as favoring uninhibited, robust, and wide-open debate in labor disputes" (internal quotation marks and citation omitted)). It is for this reason

that Congress safeguarded against "quickie" elections—*i.e.*, elections that would occur less than 30 days after a petition is filed.  *See, e.g.*, Pl. Mem. at 29-30 (summarizing Senator Kennedy's legislative statements that a 30-day period or more between the petition and election date creates a "safeguard against rushing employees into an election where they are unfamiliar with the issues" (internal quotation marks and citation omitted)).  Until now, the Board's own procedures, consistent with congressional intent, have required the interval between petition and election to be longer than 30 days (absent stipulation by the parties), thereby allowing for the robust" debate called for by Congress.  Pl. Mem. at 29-30.

Nothing in *Inland Empire District Council v. Millis*, 325 U.S. 697 (1945), is to the contrary.  Indeed, the Supreme Court's decision in *Inland Empire* further confirms that the statutory purpose of the "appropriate hearing" required in § 9(c) is to provide for a pre-election hearing in which interested parties shall have a "full and adequate opportunity" to present evidence on all issues pertaining to the election.  *Id.* at 708.  *Inland Empire* held that a defective pre-election hearing was cured when "the Board gave [that] full and adequate opportunity for hearing, *including the presentation of evidence*" on issues of voter eligibility and inclusion.  *Id.* at 703, 709 (emphasis added); *see also Utica Mut. Ins. Co. v. Vincent*, 375 F.2d 129, 133 (3d Cir. 1967) (citing *Inland Empire* for the proposition that at the election hearing, "the Board was required to hear relevant evidence proffered by interested parties").  Crucially, however, when the Supreme Court decided *Inland Empire*, nothing in the Act "purport[ed] to require a hearing before an election."  325 U.S. at 707.

In response to *Inland Empire*, Congress amended § 9(c) to require that the appropriate hearing occur before the election, absent agreement of the parties otherwise.  Pl. Mem. at 20-21. Congress did not remove or alter the term "appropriate hearing" as adopted in 1935, or indicate it

intended to change what *Inland Empire* had held was required for that hearing; rather, Congress merely required the hearing—the same one that the Supreme Court stated had a "statutory purpose" to allow for a full and adequate opportunity to litigate issues of voter eligibility and inclusion—be held *before* employees voted.  *See Utica Mut. Ins. Co.*, 375 F.2d at 133-34 ("Although under the amendment the hearing must invariably precede the election, neither the language of the statute nor the committee reports indicated that any change in its nature was intended.").  Indeed, as the Board concedes (NLRB Mem. at 23), "Taft-Hartley's amendment of section 9 in 1947 did not change the content of 'an appropriate hearing,' except to specify it should precede the election."

Because Congress altered only the timing of the hearing, but not its scope or content, Congress must be presumed to have understood and accepted the Supreme Court's decision in *Inland Empire* defining an "appropriate hearing" to require a "full and adequate" opportunity to present evidence on all issues pertaining to the election, including issues of voter eligibility and inclusion.  *See Firstar Bank v. Faul*, 253 F.3d 982, 988 (7th Cir. 2001) ("If a phrase or section of a law is clarified through judicial construction, and the law is amended but retains that same phrase or section, then Congress presumably intended for the language in the new law to have the same meaning as the old.").  Indeed, to argue otherwise, the Board must resort to omitting key language from the Supreme Court's opinion in that case.  *See* NLRB Mem. at 13 (quoting *Inland Empire* and leaving out the essential language:  "We think the statutory purpose . . . is to provide for a hearing in which interested parties shall have *full and adequate opportunity* to present their objections . . . ." (emphasis added)).

The legislative history confirms that Congress intended the scope of an "appropriate hearing" under § 9(c)(1) of the Act to be exactly as the Supreme Court described in *Inland*

*Empire*.  Senator Taft, the principal sponsor of the 1947 amendments, specifically stated that "[i]t is the function of hearings in representation cases to determine whether an election may be properly held at the time; *and if so, to decide questions of unit and eligibility to vote*."  79 Fed. Reg. at 74,386 n.363 (quoting 93 Cong. Rec. 6,858, 6,860 (1947) (emphasis added)); *see* Pl. Mem. at 21 (discussing additional legislative history).

Further, when Congress amended the Act in 1959 it once again made clear that the pre-election hearing, in its full scope, should be preserved without change.  Concerned about delays in holding elections caused by a backlog of cases at the Board, Congress adopted the language in § 3(b) that authorizes the Board to delegate its authority to regional directors, subject to the right to seek pre-election Board review of any action by the regional director and to seek a stay of the election.  Pl. Mem. 21-23.[2]  The delegation, authorized by Congress in 1959, was (1) intended as an *alternative* to scaling back the "appropriate" pre-election hearings, and (2) required the opportunity for parties to seek pre-election Board review of "any action" by regional directors (and the opportunity to seek a stay of the election pending such review).  *Id.*  For the Board to decide whether to review a decision of a regional director and stay the election, there must be an evidentiary record from a "full and adequate" hearing.  *Id.* at 25.  Thus, the full scope of the pre-election hearing, and the right to present evidence on all issues that could affect the election, is inextricably linked to the delegation of authority permitted by Congress in § 3(b).

The Final Rule, however, seeks to delegate to regional directors not only the ability to decide the composition of the bargaining unit in which the election will occur and determine the eligibility of voters in that unit, but also the authority to decide whether those issues will be

---

[2]    For instance, the median time from petition to the Board's *direction of an election* was 82 days in 1960, with even more time elapsing before the election occurred.  79 Fed. Reg. at 74,434 (dissent).  By contrast, under the election system uprooted by the Final Rule, elections occur within a median of 38 days from petition filing.  NLRB, Summary of Operations, 2002-2012 Reports, http://www.nlrb.gov/reports-guidance/reports/summary-operations (last visited Feb. 4, 2015).

litigated at all.  At the same time, the Board has sharply curtailed the opportunity for pre-election review of a regional director's decision and eliminated the right to post-election review—all in contravention of the Act and clear congressional intent.  79 Fed. Reg. at 74,331-34, 74,387, 74,391, 74,412-13.

Nor can the Board find any support in Supreme Court precedent for its position that the pre-election hearing may exclude questions related to unit determination and voter eligibility/inclusion issues.  To the contrary: in *Magnesium Casting Co. v. NLRB*, 401 U.S. 137 (1971), the Supreme Court confirmed that the pre-election hearing must include an opportunity to litigate issues of voter eligibility and inclusion.  *Magnesium Casting* arose from a factual dispute over the supervisory status of four employees ("assistant foremen") in a proposed production and maintenance bargaining unit, *id.* at 139-40—a dispute the Final Rule would characterize as one of "voter eligibility" that need not be litigated at the pre-election hearing. The Supreme Court, however, unambiguously classified this supervisory status dispute as one subject to the ordinary pre-election hearing process, and related to the delegation to regional directors, three times in its opinion.  *Id.* at 141-42.

In sum, the Board's current position on the scope of the hearing required by § 9(c)(1) cannot be reconciled with Supreme Court precedent holding that Congress has never divorced the resolution of "appropriate unit" issues at the pre-election hearing from voter eligibility and inclusion issues.  *See also Ky. River Cmty. Care, Inc.*, 532 U.S. at 709 (stating that resolving supervisory status of six employees, out of proposed unit of 110 employees, is one delegated to regional directors in order to "determine an appropriate bargaining unit"); *NLRB v. Action Automotive, Inc.*, 469 U.S. 490, 494-97 (1985) (repeatedly defining dispute over inclusion of several voters in an otherwise appropriate unit a "unit determination" matter).

The Final Rule is also contrary to the Board's own previous interpretation of the scope of an "appropriate hearing" under § 9(c)(1).  In *Barre-National, Inc.*, 316 NLRB 877 (1995), the Board declared that because the hearing officer refused to take evidence at the pre-election hearing on issues of supervisory status, "the preelection hearing held in this case did not meet the requirements of *the Act* and the Board's Rules and Statements of Procedures."  *Id.* at 878 (emphasis added); *see also N. Manchester Foundry, Inc.*, 328 NLRB 372 (1999) (citing *the Act* as the basis for the pre-election hearing including evidence on voter eligibility).  The Board's current insistence that *Barre-National* did not interpret the statute simply ignores the language of the opinion itself.  *See* NLRB Mem. at 17, 20 n.22; 79 Fed. Reg. at 74,385.  It is also contradicted by the Board's decision four years later in *North Manchester* that "[i]n *Barre-National*, the Board held that the preelection hearing *did not meet the requirements of the Act, or* of the Board's rules and Statements of Procedure."  328 NLRB at 372-73 (emphasis added).  Consequently, it is plain that the Board is now departing not only from the statute, but from its own previous understanding of the meaning of "appropriate hearing" under § 9(c)(1).

Against all this evidence, the Board argues (NLRB Mem. at 23) that the word "appropriate" in § 9(c)(1) is nevertheless ambiguous and that the Board has the authority to redefine it in the Final Rule.  But that assertion of "facial ambiguity" does not enable the Board to interpret § 9(c)(1) in a way that is contrary to congressional intent and decades of court and Board jurisprudence.  Indeed, the Supreme Court has repeatedly rejected the Board's very argument here: that a purported ambiguity in the statute gives the agency virtually unfettered license to resolve the purported ambiguity without meaningful judicial review.  *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225-29 (1994) (reaffirming that "an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the

12

statute can bear"); *see also United States v. Home Concrete & Supply, LLC*, 132 S. Ct. 1836, 1846 n.1 (2012) (Scalia, J., concurring in part and concurring in the judgment) ("It does not matter whether the word 'yellow' is ambiguous when the agency has interpreted it to mean 'purple.'").

Courts therefore have not hesitated to set aside the Board's statutory interpretations where, as here, they exceed the Board's authority and conflict with the NLRA.  For instance, in *NLRB v. Bell Aerospace Co. Division of Textron Inc.*, the Supreme Court disagreed with the Board's inclusion of "managerial employees" under the NLRA, even though the Act itself does not expressly exclude managerial employees from NLRA rights and protections.  416 U.S. 267 (1974).  The Court held that "the Board's early decisions, the purpose and legislative history of the Taft-Hartley Act of 1947, the Board's subsequent and consistent construction of the Act for more than two decades, and the decisions of the courts of appeals all point unmistakably to the conclusion that 'managerial employees' are not covered by the Act."  *Id.* at 289; *see also NLRB v. Health Care & Ret. Corp. of Am.*, 511 U.S. 571, 579 (1994) (chastising the Board for claiming that presumed ambiguity in statutory language allowed it to redefine the meaning of "supervisor" under the NLRA, because "[i]t should go without saying, moreover, that ambiguity in one portion of the statute does not give the Board license to distort other provisions of the statute. Yet that is what the Board seeks us to sanction in this case.").

Here, the Final Rule reverses 70 years of settled statutory interpretation by redefining the scope of the "appropriate hearing" to limit it to litigating whether the bargaining unit is appropriate, while excluding evidence as to whether certain individuals are included in that unit and eligible to vote.  The Board cannot, through rulemaking, override clear congressional intent, as confirmed by Supreme Court precedent, that defines the scope of an "appropriate" hearing to

provide the parties a "full and adequate opportunity to present their objections" to the election and the eligibility of voters in the election, *Inland Empire*, 325 U.S. at 708—especially where, as here, the constitutional avoidance canon strongly counsels against construing the Act as the Board has done, *see* Pl. Mem. at 16, 26, 31.

### C. The Board's Unprecedented Attempt To Redefine Settled Procedures And Statutory Definitions Conflicts With §§ 9 And 3(b).

As already demonstrated (Pl. Mem. at 23-26), the Board's own decision in *Barre-National* provides the correct interpretation of the Act.  In *Barre-National*, the Board declared that because the hearing officer refused to take evidence at the pre-election hearing on issues of supervisory status, "the preelection hearing held in this case did not meet the requirements of *the Act* and the Board's Rules and Statements of Procedures."  316 NLRB at 878 (emphasis added).  The Board responds (NLRB Mem. at 14) that "unit appropriateness questions are [still] relevant to the existence of a question of representation, and thus those issues can be litigated at a pre-election hearing, and will be decided by a regional director."  But the Board also now claims that the statute is silent on the supposedly distinct issue of "voter eligibility," which therefore, in the Board's view, grants the Board discretion to defer part of the pre-election hearing and block evidence-taking and decision-making on voter eligibility/inclusion matters until after the election has already occurred.  NLRB Mem. at 24.  The Board, as it recognized in *Barre-National*, has no power to categorically deem evidence concerning voter eligibility and inclusion to be "irrelevant" to the pre-election hearing.   That is just another way of impermissibly redefining the intended scope of the pre-election hearing.

In addition to conflicting with § 9(c)(1), the Board's effort to redefine the scope of the pre-election hearing runs counter to § 3(b).  Section 3(b) provides that "[t]he Board is also authorized to delegate to its regional directors its powers under Section 9 of this title to

determine the unit appropriate for the purpose of collective bargaining, to investigate and provide for hearings, and determine whether a question of representation exists, and to direct an election or take a secret ballot under subsection (c) or (e) of section 159 of this title and certify the results thereof."  29 U.S.C. § 153(b).  There is no distinction in § 3(b) between "appropriate unit" and "voter eligibility/inclusion" issues.  Indeed, before the 1961 delegation to the regional directors, the Board itself decided *all* issues related to unit appropriateness and voter eligibility, based on the evidence taken at the pre-election hearing.  *See, e.g.*, *Musgrave Mfg. Co.*, 124 NLRB 258 (1959).

Significantly, if voter eligibility and inclusion issues are indeed separate matters from "determin[ing] the unit appropriate" for bargaining, as the Final Rule would have it, then there is no statutory authority for the Board to delegate its powers under § 9 to decide voter eligibility/inclusion questions.  Section 3(b) permits the Board to delegate only the authority to determine "the unit appropriate for the purpose of collective bargaining" and to determine "whether a question of representation exists."  29 U.S.C. § 153(b).  None of the other bases for § 3(b) delegation would cover voter eligibility or inclusion disputes.  Consequently, if the Final Rule is upheld, then under § 3(b) the Board could not legally delegate its powers to decide voter eligibility questions, which "in each case" would then require resolution by the Board itself. 29 U.S.C. § 159(b).  This is yet another inconsistency in the Final Rule that underscores the conflict between the Rule and the legislative choices Congress made in the Act.

**D.    The Final Rule Conflicts With § 8(c) By Undermining Its Free-Speech Protections.**

The Final Rule also conflicts with § 8(c) and its policy of protecting free speech rights during a meaningful campaign period so that employees are fully informed of the issues before voting and can exercise the "fullest freedom," under § 9(b), in making their choice.  The Board

nonetheless insists (NLRB Mem. at 26-30) that employers will still have a "meaningful opportunity to campaign" even in elections held in as few as 14 days from the petition filing because Congress did not require any minimum time period, and employers still have a chance before or after the petition to communicate with employees.  But such a rushed, frenetic period is not meaningful because employers (1) will have less time to engage in speech designed to educate employees about the election and the collective bargaining process, if they choose union representation, (2) will not know which employees they should be communicating with, if the employer is not permitted to litigate questions of voter eligibility and inclusion before the election, and (3) will not know which individuals can speak on behalf of the employer (*i.e.*, who are supervisors or other agents of the employer).  The Board's contrary view is unsupported by the Act and its legislative history.

As already explained, the legislative history of the 1959 amendments, in which Congress rejected "quickie elections" in all cases except for the narrow grounds in § 8(b)(7), reinforces that the Final Rule conflicts with the congressional objective of ensuring sufficient time—at least 30 days according to former Senator John F. Kennedy—for a full and informed debate before employees cast their ballots.  *See* Pl. Mem. at 26-31.  In fact, the Senate adopted amendments to the NLRA that would have authorized pre-hearing elections in order to have expedited elections. S. 1555, 86th Cong. Section 706 (as passed by the Senate on April 25, 1959), *reprinted in* 1 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 581 (1974) (hereinafter "LMRDA Hist.").   Congress ultimately rejected that change.   The legislative history shows that legislators expressed concern that the Senate approach would allow the Board to pursue "quicky elections," though "[t]here is not any such thing as reinstating authority or procedure for a quicky election.  Some were disturbed over that and the possibility

of that is out." *See* 105 Cong. Rec. 16,629 (1959), *reprinted in* 2 LMRDA Hist. 1714, *describing* H.R. Rep. No. 86-741, at 1 (1959), *reprinted in* 1 LMRDA Hist. 934.

The Supreme Court has also explained, as mentioned, that § 8(c) is premised on the "policy judgment, which suffuses the NLRA as a whole, as favoring uninhibited, robust, and wide-open debate in labor disputes." *Brown*, 554 U.S. at 67-68 (internal quotation marks and citation omitted). Until now, the Board's own procedures, consistent with congressional intent, have required the interval between petition and election to be longer than 30 days (absent stipulation by the parties), thereby allowing for the robust debate called for by Congress. Pl. Mem. at 29-30. All this evidence, collectively, is far more than just a "lone senator's unenacted view" (NLRB Mem. at 30) on what Congress intended with respect to election timing under § 9. The Final Rule diminishes the time between the petition filing and election to the point that the opportunity for meaningful debate that Congress intended is lost.[3]

The "fullest freedom" of employees to exercise their representation rights includes opportunities for them to be fully apprised of the costs and benefits of a union election. Pl. Mem. at 15-16, 27-29. Section 9(b)'s guarantee of that freedom is reinforced by § 8(c), and employers are not the only ones negatively affected by the Final Rule's limitations on meaningful communication concerning the election. With the Board unable—or unwilling—to account for this shortcoming in the Final Rule, "serious constitutional difficulties" are evident and this Court must invalidate the Final Rule for that (unanswered) reason as well. *AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) ("[W]e do not accord the [agency] deference when its

---

[3]     Oddly, the Board appears to suggest that the Final Rule may not even result in faster elections, even though that is the central design of the Final Rule. NLRB Mem. at 28 (noting "even if the Rule generally results in more expeditious elections"). Despite repeated calls to tell the public what the new time target for elections will be under the Final Rule, the Board has punted the issue to the Board's General Counsel to determine outside this rulemaking procedure. NLRB Mem. at 34 n.38; *see also* NLRB Mem. at 6 ("The Rule contains no rigid time targets.").

regulations create 'serious constitutional difficulties.'" (citations omitted)).   Contrary to the Board's apparent position, the absence of an opportunity to speak is just as problematic as an outright limitation on an employer's words.   Again, the Board's argument proves too much. Without a limiting principle for the Board's determination of what is a "meaningful opportunity" to engage in election speech, this Board—or future Boards—may effectively eliminate free speech altogether.   Neither the statute nor the Constitution permits such a result.

### E.   The Final Rule Is In Tension With § 8(b)(7)'s Narrow Exception For Expedited Elections In Limited, Specifically Enumerated Circumstances.

The Board acknowledges (NLRB Mem. at 21 n.23) the inherent tension between the Final Rule and § 8(b)(7)(C), which was adopted in 1959 explicitly to authorize a form of expedited elections whereby the Board may bypass a pre-election hearing and "fix the basis of eligibility of voters" (alteration, internal quotation marks and citation omitted).   Specifically, regional directors may proceed to hold expedited elections in response to a § 8(b)(7) unfair labor practice charge, without a pre-election hearing, but the regional director *also retains discretion* to hold a hearing for any election "questions which cannot be decided without a hearing." 29 C.F.R. § 102.77(b).

Thus, the Final Rule is much more akin to the § 8(b)(7) process than the Board is willing to admit, in that the Board categorically deems evidence concerning voter eligibility and inclusion to be "irrelevant" to the pre-election hearing, and that admitting such evidence results in an "inappropriate hearing."   NLRB Mem. at 20-21; 79 Fed. Reg. at 74,399. Section 8(b)(7)(C) thus provides a stark reminder that Congress knew, and considered, how to "speed up" elections by removing or limiting pre-election hearings when it wanted to do so, but *did not* adopt that model for the majority of NLRB-conducted elections.   The Board's efforts in the Final Rule to effectively do so now should be rejected.

### III.   The Final Rule Is Arbitrary And Capricious In Violation Of The APA.

Aside from the conflicts with the governing statute identified above, the Final Rule suffers from the additional failing that the Board has failed to articulate any coherent rationale for the massive changes to its election process.

The Board does not, and cannot, dispute that it operates with the most efficient representation case procedures in its history, and has met or exceeded all of its operational goals in this area for many years.  Pl. Mem. at 7; 79 Fed. Reg. at 74,434 (dissent).  The best the Board can do is insist (NLRB Mem. at 10) that the Final Rule does not address just one problem, but it goes on to repeatedly note that eliminating "delay" is the central goal of the Final Rule.  *See* NLRB Mem. at 2, 11, 12; *see also* 79 Fed. Reg. at 74,316 ("[D]elay itself is the problem this rule addresses . . . .").  The Board's failure to explain why or how the "solution" of a comprehensive overhaul of election procedures in all cases can be reconciled with the "problem" of delay in only a few cases is the hallmark of arbitrary and capricious agency action.  It also highlights the agency's focus on the wrong factors in determining the appropriate action.  *See, e.g., Republican Nat'l Comm. v. FEC*, 76 F.3d 400, 407 (D.C. Cir. 1996) ("[A] permissible statutory construction under *Chevron* is not always reasonable under *State Farm*: 'we might determine that although not barred by statute, an agency's action is arbitrary and capricious because the agency has not considered certain relevant factors or articulated any rationale for its choice.'" (quoting *Arent v. Shalala*, 70 F.3d 610, 620 (D.C. Cir. 1995) (Wald, J., concurring in the judgment))).[4]

In addition, the Final Rule conflicts with the Board's own stated goal of "eliminating unnecessary and duplicative litigation," NLRB Mem. at 10, because—as already shown— litigation necessarily will increase.  Pl. Mem. at 33-40.  And the Board's decision in the Final

---

[4]   An agency cannot immunize arbitrary and capricious decisions by adopting them in a rule with other changes that some may deem "uncontroversial."  NLRB Mem. at 3.  The Board's argument on that issue is thus immaterial.

Rule to mandate that employers provide labor organizations with employees' personal phone numbers and email addresses is neither "consistent with the Act" nor "strike[s] a reasonable balance," NLRB Mem. at 35-40, given the recognized privacy concerns and the absence of any protection in the Final Rule as to those privacy concerns.

A.     **The Final Rule Irrationally Makes Radical Changes To All Representation Case Procedures Even Though The Board Admits That "Delay," In Its Estimation, Is Limited To The Narrower Set Of Litigated Cases.**

In response to Plaintiffs' argument that the Final Rule is invalid as a solution (expedited elections) in search of a problem (delay), the Board admits that "much of this delay occurs in a narrow subset of cases—namely, those that are fully litigated." NLRB Mem. at 12. Those cases, however, amount to about six percent of all Board representation cases under the established procedures and practices uprooted by the Final Rule. 79 Fed. Reg. at 74,375.[5] The Final Rule nevertheless exhibits a "relentless zeal for slashing time from every stage of current pre-election procedure" in all cases, not just the narrow subset of litigated cases, and "[t]he Final Rule does not even identify, much less eliminate, the reasons responsible for those few cases that have excessive delays." *Id.* at 74,431 (dissent).[6] The Board's refrain that the Final Rule is designed only to "simplify" or "modernize" procedures, for the sake of "best government practices," NLRB Mem. at 10-11, does nothing to explain the fundamental disconnect between the problem identified by the Board and the solution it adopted.

---

[5]     As the dissenters noted, the Final Rule would only affect a fraction of those cases. Of the six percent of cases that are fully litigated, only one-tenth of those cases involve delays that would be addressed by the Final Rule. Representation—Case Procedures, 79 Fed. Reg. 7,318, 7,349 (Feb. 6, 2014) (Members Miscimarra & Johnson, dissenting from Notice of Proposed Rulemaking). Thus, the Final Rule's sweeping and unprecedented changes would address delays that occur in only 0.6 percent of representation cases.

[6]     In fact, a cursory review of the "25" changes the Board outlines in the Final Rule leads to the conclusion that around 18 of them are designed, in whole or part, to reduce the time between the petition and election date in all cases—not just in litigated cases. 79 Fed. Reg. at 74,409-10. No wonder the dissenting Board members explained that "speed is the obvious dominant justification for most of the Final Rule's changes." *Id.* at 74,435 (dissent).

The only consistent "objective" underpinning for the collective reforms is, in the Board's own view, "the key congressional goal" of holding elections expeditiously.  NLRB Mem. at 10; *see also id.* at 20.  But nowhere in the NLRA or its legislative history has Congress provided that elections must occur as quickly as possible.  To the contrary, Congress has declined to do so.  And nothing in *Boire v. Greyhound Corp.*, 376 U.S. 473 (1964), suggests that Congress wanted elections to occur so quickly.  *Boire* supports only the proposition that Congress wanted to avoid *excessive* delays in conducting elections by preventing pre-election access to the federal judiciary.  *Id.* at 477-79 (explaining that interlocutory federal court review of certification proceedings in particular was disfavored by Congress because cases could drag on "through the courts" for long periods).  Consequently, *Boire* cannot bear the weight the Board places upon it.[7]

What is more, the Final Rule represents a complete change in the Board's position—without any reasoned explanation—on whether average private-sector employees are sufficiently familiar with the NLRA, representational rights, and collective bargaining, to make an informed decision during a truncated election process.  Only a few years ago, when the Board issued its notice posting obligation struck down in *National Ass'n of Manufacturers v. NLRB* and *Chamber of Commerce v. NLRB*, the Board's rationale for imposing the new notice obligation on all NLRA-covered employers (millions of private-sector businesses) was that the vast majority of "employees were not aware of their rights under the Act," 717 F.3d at 951, and that "'this ignorance stands as an obstacle to the effective exercise of such rights,'" 721 F.3d at 157 (quoting Proposed Rules Governing Notification of Employee Rights Under the National Labor

---

[7]       The Court also should reject the Board's red-herring argument that Plaintiffs' challenge somehow means that, given the Board's long-standing success at conducting timely and efficient elections, it may not strive to improve its processes even further.  NLRB Mem. at 12.  At no point in the comment period or this litigation have Plaintiffs argued that the Board lacks the legal authority to make procedural changes to the election procedures simply because current time targets are met.  Instead, Plaintiffs have consistently argued that the Final Rule is arbitrary in the breadth of its design and scope given the Board's overall success rate at conducting elections in a timely and efficient manner, especially given the competing statutory objectives and goals embodied in the NLRA.

Relations Act, 75 Fed. Reg. 80,410, 80,411 (Dec. 22, 2010)).   But now, with no reasoned explanation, the Board has adopted a Final Rule that will *reduce* the time for voter education. That is fundamentally inconsistent with the reasoned decisionmaking process required by the APA.   *See Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006) ("Reasoned decisionmaking necessarily requires consideration of relevant precedent."); *Brusco Tug & Barge Co. v. NLRB*, 247 F.3d 273, 278 (D.C. Cir. 2001) ("[I]t is 'axiomatic that [agency action] must either be consistent with prior [action] or offer a reasoned basis for its departure from precedent . . . .'" (quoting *ConAgra, Inc. v. NLRB*, 117 F.3d 1435, 1443 (D.C. Cir. 1997))).   An agency may switch course, to be sure, but a reasoned explanation is required. *Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003).

In the end, the Final Rule is hopelessly at odds with the objective data and evidence on the Board's long-standing success at conducting timely and efficient elections, with any "delay" limited to a small subset of cases.   The Final Rule greatly overshoots the narrow problems identified, and without any adequate explanation for doing so.   An apt regulatory analogy, as presented by the dissenting Board members, involves the U.S. Fish and Wildlife Service ("Service") being tasked with stopping the poaching of manatees.   If the Service adopted an approach analogous to that in the NLRB's Final Rule, the Service would deploy anti-poaching rangers in all 50 States, even though virtually all manatees live in Florida.   79 Fed. Reg. at 74,457 (dissent).   This makes no sense.   Before implementing regulatory reforms, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."   *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014) (internal quotation marks and citation omitted).   The Board failed to accomplish that with the Final Rule, and as a result it cannot stand.

**B.      The Board Fails To Adequately Address Evidence That The Final Rule Will Result In More Pre- And Post-Election Litigation And The Effective Transfer Of NLRB Election Disputes To The Federal Courts.**

Given the complexity of NLRB representation procedures, as well as the potential conflicts between interested parties, it is quite remarkable how *little* litigation results from the current procedures wholly displaced by the Final Rule. The vast majority of elections—90 percent—involve a pre-election agreement and no pre-election litigation. 79 Fed. Reg. at 74,375. It is based on this high rate of agreements that the Board has achieved, on a median basis, elections within 38 days of the petition filing. *Id.* at 74,434 (dissent). The Board's inability to reconcile the Final Rule's goal of reducing litigation, with the obvious evidence that the Final Rule will *increase* litigation from its present limited state, runs afoul of the APA's requirement of reasoned agency decisionmaking.

Plaintiffs' opening memorandum explained in detail (Pl. Mem. at 34-36) how the Final Rule will upset the existing incentives that drive the parties to reach negotiated settlements, thereby dispensing with any pre-election litigation altogether. Plaintiffs also explained (Pl. Mem. at 36-37) how the Final Rule will increase employers' need to resort to federal court litigation, after an election, in order to remedy problems created by the Final Rule. Yet neither the Final Rule nor the Board's response addresses this problem with any rational explanation, other than claiming that any "short term" increase in litigation should eventually resolve itself one way or the other. NLRB Mem. at 34 n.38. In the meantime, however long that takes, the federal courts can expect far more election-related litigation because employers aggrieved by the truncated timeline and diminished opportunities for Board review will have no other alternative.

The only evidence the Board puts forth about *reducing* litigation, which is an ostensible goal of the Final Rule, is that ignoring voter eligibility and inclusion issues before the election may result in "mooting" those issues, depending on how the election tally comes out. NLRB

Mem. at 24-26. That is a strange (if not irrational) argument.  Pl. Mem. at 38-40.  If anything, the

Board's previous "RN Smith" example is an admission that even a single voter eligibility issue,

in this example a supervisory issue, can result in tainting the entire election if both evidence-

taking on the supervisory status issue, and a decision by the regional director or Board, is

postponed until after the election.  NLRB Mem. at 18-19.  The supervisory status issue would

not become "moot," as the Board claims, even assuming the employee's vote would not alter the

vote tally.  Rather, the Board's inability to review evidence on the issue—or to decide—before

the election can place both the employer and union in a scenario where the activities of the

disputed individuals can trigger a re-run election.

If supervisory employees are permitted to vote in an election, the results of the election

may be tainted based on the supervisory employees' conduct either for or against the union.  *See*

*SNE Enters.*, 348 NLRB 1041, 1043-44 (2006) (setting aside election result even though

supervisors who engaged in pro-union conduct had been eligible voters in three prior Board

elections, stating that it does not matter "that the supervisors here engaged in the conduct prior to

the time when they were adjudicated to be supervisors"); *Harborside Healthcare, Inc.*, 343

NLRB 906, 911 (2004) ("The essential point . . . is that employees should be free from coercive

or interfering tactics by individuals who are supervisors, even if the employer or union believes

that the individual is not a supervisor.").  And a re-run election—involving weeks, months, or

even years of delay with corollary litigation before the Board and possibly the federal courts—

completely undermines the stated purpose of the Final Rule:   to reduce unnecessary

representation case litigation.[8]

---

[8]      And the Board's point that under the current rules, it is possible for supervisory status issues to taint the election results even if the pre-election hearing takes evidence on the issue or the regional director decides the issue before the election, misses the point.  NLRB Mem. at 25 n.30.  Plaintiffs' position is that under the Final Rule, it will become far more likely that supervisory status issues will be ignored before the election, and thus increase the

In the end, a Final Rule designed to reduce election-related litigation will do just the opposite.  Absent a sufficiently reasoned explanation for this overt conflict, which the Board has not provided, the Final Rule is arbitrary and capricious.

### C.      The Board Has Not Provided A Reasoned Explanation For Reversing Its Interpretation Of The NLRA'S Requirement For An "Appropriate" Pre-Election Hearing.

As argued above, the Board does not have authority to interpret the Act's requirement that there be an "appropriate" pre-election hearing in a way that is contrary to congressional intent—specifically that there be a pre-election hearing at which parties have an opportunity to present evidence on all issues affecting the election.  In re-interpreting this statutory requirement, the Board has denied that it is changing its prior interpretation of § 9(c)(1) of the NLRA.  NLRB Mem. at 17, 20.  This is simply not the case.  *See supra* at 11-12; *see also* Pl. Mem. at 24-25 (citing *Barre-National*, 316 NLRB at 877-78; *N. Manchester Foundry*, 328 NLRB at 372-73).

Even if the Board had authority to reinterpret the scope of an "appropriate" pre-election hearing—which it does not—the Board must, at a minimum, acknowledge that it is changing its interpretation and give a reasoned explanation for doing so.  *See FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 515 (2009) ("To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position.  An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books.").

The Board has not even attempted to carry this burden because it refuses even to acknowledge that it is changing its interpretation of the statute in the Final Rule.  NLRB Mem. at 20 n.22 (asserting that the Board's holding in *Barre-National* was "based not on the statute but

---

probability of more tainted elections and post-election litigation that will undermine the purported intention of the Final Rule to reduce litigation.

on readings of the Board's then-current rules and statements of procedures" (emphasis in original)).  The Board's alternative argument, tucked into the same footnote in its brief, is not sufficient to overcome its failure to acknowledge that it is changing its interpretation of § 9(c)(1) or to provide a reasoned basis for doing so.

> **D.  The Intrusive And Unwarranted Disclosure To Unions Of Employees' Personal Phone And Email Addresses Is Not Rationally Reconciled With The Obvious Privacy Concerns And The Myriad Of Solutions Offered By The Commenters.**

The Board begins its effort to justify the Final Rule's expansive new disclosure of employee personal data to labor unions, such as home and cell phone numbers, and email addresses, by citing the original *Excelsior* decision that adopted the "home address" disclosure requirement in NLRB-conducted elections.  NLRB Mem. at 36 (citing *Excelsior Underwear Inc.*, 156 NLRB 1236, 1240-41 (1966)).  In *Excelsior*, the Board explained that providing voter names and home addresses would "maximize the likelihood that all voters will be exposed to the arguments for, as well as against, union representation."  156 NLRB at 1240-41.  Relying on that quote only highlights the discrepancy that Final Rule overall will *reduce* the likelihood that employees will be exposed to arguments from both sides by rushing the pre-election period.

Even more stridently, while acknowledging (as it must) the privacy risks associated with the Final Rule's new disclosure requirements, the Board insists that "'[t]hese risks are worth taking'" to achieve the Final Rule's objectives.  NLRB Mem. at 40 (quoting 79 Fed. Reg. at 74,342).  The Board calls this a "thoughtful conclusion," and ultimately one that "strike[s] a prudent balance between privacy and continued furtherance of the Act's goals."  *Id.* at 40.  But the Board's rejection of all suggestions made by commenters to protect employees' privacy interests—including opt-out procedures, monitoring systems, or penalties for unlawful disclosure—demonstrates that there is no balance at all.

Moreover, the Board's assertion that the Final Rule has rationally "balanced" the competing privacy and campaign access concerns, despite the Board's wholesale rejection of every proposed privacy protection or penalties to deter violations, strains credulity. *See* NLRB Mem. at 38-40; Pl. Mem. at 41. The notion that unions have never abused access to employee home address information is belied by publicly available Board decisions.[9] The Court should reject the Board's attempt to impose new disclosure requirements—which carry an increased risk for abuse—in the absence of reasoned decision-making on both the consequences of this new disclosure, and the Board's wholesale rejection of *any* safeguards, protections, or penalties proposed by the commenters or dissenting Board members.

## IV.     The NLRB's New Notice Requirement Is Unconstitutionally Compelled Speech.

Forcing employers to engage in speech about a representation election, simply because some person or organization filed a petition with the federal government, offends the First Amendment and conflicts with Supreme Court precedent. Pl. Mem. at 42-44. Contrary to the Board's assertions in response, that argument has not been waived and is substantively meritorious besides.

### A.     The Compelled Speech Argument Is Not Waived.

The claim at issue here is a First Amendment violation, not a statutory violation. Such a claim cannot be waived by failing to mention the argument in comments to the Board. *Mathews v. Eldridge*, 424 U.S. 319, 329 n.10 (1976); *see also Sims v. Apfel*, 530 U.S. 103, 115 (2000) (Breyer, J., dissenting) (recognizing constitutional claims as an "established exception" to the ordinary waiver rule). The reason is simple. Because *Congress* has created the right to sue to

---

[9]     *See, e.g., Brown & Sharpe Mfg. Co.*, 299 NLRB 586, 590 (1990) (finding that union "harassed [employees] at their homes," in the context of other conduct including "threats of bodily harm, rock throwing, arson, detonating explosives, and assault"); *Kohler Co.*, 128 NLRB 1062, 1106 (1960) (finding that union demonstrated in front of employee homes with much shouting of insults, vile names and epithets); *Int'l Ass'n of Machinists*, 189 NLRB 50, 54 (1971) (finding that union went to employee homes and threatened to burn and fire-bomb them).

vindicate statutory rights through the APA, *Congress* can condition that right on exhaustion. *E.g.*, *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36-37 (1952).  But the First Amendment claim in this case arises directly under the Constitution, and could be brought independently of the APA.  *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution.")  Congress cannot impose statutory obstacles to raising this First Amendment claim any more than it could ban criticism of Congress and then require challenges to be brought in a special Article I court.

**B.      Ordering All Private-Sector Employers To Post A Notice Advancing An Effort They Do Not Support Unconstitutionally Compels Speech.**

The majority of the Board's argument on Plaintiffs' compelled speech claim turns on the Board's assertion that the posting at issue here is "government speech" because it contains a statement that the posting is a "government notice."  That argument dramatically extends the concept of government speech, however, and proves far too much.  Courts have held that the government may engage in viewpoint discrimination when the *government itself* is speaking, such as where it erects a monument on public land.  *E.g.*, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467-68 (2009).  But that hardly means that the government can conscript *a private party* into disseminating speech that it does not wish to convey, and then justify that compulsion by labeling the compelled private speech as government speech.  Such a rule would allow the government to compel individuals to engage in any form of speech, so long as the government labeled the speech as its own.  That is not the law.  *See Wooley v. Maynard*, 430 U.S. 705, 717 (1977) (holding individual may not be compelled to display "live free or die" message on license

plate simply because "[t]he State is seeking to communicate to others an official view as to proper appreciation of history, state pride, and individualism").[10]

## V.     Severability Cannot Salvage Parts Of The Final Rule.

As an alternative to vacatur of the Final Rule in its entirety, the Board argues that the Court should salvage the remaining pieces and allow a partial Final Rule to go into effect.  Yet because the entire Final Rule is infected by the conflicts with the NLRA and the U.S. Constitution, and is arbitrary and capricious, the Court should decline the Board's invitation and vacate the entire rule.

The vast majority of the Final Rule is aimed at slashing the time between the filing of the petition and the holding of an election.  In reality, the changes amount to a comprehensive effort by the Board to adopt a "quickie election" process, of the type rejected by Congress, even if some minor technical changes went along for the regulatory ride.  Even meeting the Board on its own terms, severability is not warranted because "there is 'substantial doubt' that the agency would have adopted the severed portion on its own."  *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (internal quotation marks and citation omitted).  The Board claims that each amendment stands on its own and that the regulation was providing "targeted *solutions* to discrete, specifically identified *problems*."  79 Fed. Reg. at 74,308 (emphases added).  But this explanation does not withstand scrutiny.

There was really only one problem in the Board's mind when it issued the Final Rule (both in 2011 and in 2014): the time period between petition filing and election.  For this reason, the dissenting Board members could not approve select changes under the Final Rule, even the

---

[10]     Nor can the required notice be saved by the Board's claim that "the Petition Notice is not pro-union propaganda," as that argument attacks a strawman.  Plaintiffs argued (Pl. Mem. at 42) that the notice "facilitates a union's organizing campaign."  The Board never disputes that assertion, or that many employers may not wish to use their speech to further such an endeavor.  If the First Amendment protects anything, it protects the right to choose whether to speak or not to speak about elections.

ones that the dissenters would have agreed to isolation.  *Id.* at 74,431 (dissent) ("[W]e unfortunately must dissent from the Final Rule including all its parts.  Its unwholesome ingredients are too numerous and inseparable from the whole, in our view, for any slice to be fit for consumption.").  Although the Board may have a legitimate interest in administrative efficiency and would, for example, have adopted the e-filing amendment on its own, it chose to lump all of the changes into one, massive Final Rule.  It is of no consequence that Plaintiffs have not challenged every isolated amendment specifically.  Under a severability analysis, the inquiry is only whether there is substantial doubt that the other provisions would have been adopted absent the offending ones.  Because that doubt exists, the entire Final Rule should be invalidated.

The Board points to a solitary footnote claiming that each of the amendments would have been adopted whether any of the others were made.  79 Fed. Reg. at 74,308 n.6.  But this boilerplate should not provide the Board with a free pass to implement select changes isolated from the whole of the Final Rule and its overriding purpose.  *See United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968) ("[T]he ultimate determination of severability will rarely turn on the presence or absence of such a [severability] clause.").  Courts routinely are asked to look beyond the language of a severability clause to the actual logic underlying the claim for parsing, or salvaging, parts of a larger statute or regulation.  *See MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22-23 (D.C. Cir. 2001).  Vague references to "specifically identified problems" that the Board intended to remedy are nothing more than platitudes that do not suffice for the reasoned explanation demanded of federal agencies.

Further, if there are select or isolated changes in the Final Rule that are lawful and without legitimate opposition, as the Board claims, then it would be easy enough for the Board to proceed to adopt those discrete changes after the Final Rule is vacated.

## CONCLUSION

For the foregoing reasons and those forth in Plaintiffs' memorandum in support of summary judgment, the Court should grant Plaintiffs' motion for summary judgment, hold that the Final Rule is unlawful, and set it aside, and should deny the Board's partial motion to dismiss and cross-motion for summary judgment.

Dated:  March 25, 2015

Kathryn Comerford Todd (D.C. Bar No. 477745)
Tyler Green (D.C. Bar No. 982312)
Steven P. Lehotsky (D.C. Bar No. 992725)
Warren Postman (D.C. Bar No. 995083)
U.S. CHAMBER LITIGATION CENTER, INC.
1615 H Street, N.W.
Washington, D.C. 20062
202.463.5337

*Counsel for Plaintiff Chamber of Commerce*
*of the United States of America*

Linda Kelly (D.C. Bar No. 477635)
Patrick N. Forrest (D.C. Bar No. 489950)
MANUFACTURERS' CENTER FOR LEGAL ACTION
733 10th Street, N.W., Suite 700
Washington, D.C. 20001
202.637.3061

*Counsel for Plaintiff National Association of*
*Manufacturers*

Respectfully submitted,

/s/ Allyson N. Ho
Allyson N. Ho (D.C. Bar No. 477589)
Charles I. Cohen (D.C. Bar No. 284893)
Michael W. Steinberg (D.C. Bar No. 964502)
Jonathan C. Fritts (D.C. Bar No. 464011)
David R. Broderdorf (D.C. Bar No. 984847)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202.739.3000

*Counsel for the Plaintiffs*