**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, et al., ) ) ) | |
| Plaintiffs, ) | |
| v. ) ) | Case No. 1:15-cv-00009-ABJ |
| NATIONAL LABOR RELATIONS BOARD, ) ) | Judge Amy Berman Jackson |
| Defendant. ) ) | |

**NATIONAL LABOR RELATIONS BOARD'S REPLY IN SUPPORT OF ITS PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT**

DAWN L. GOLDSTEIN
KEVIN P. FLANAGAN
*Supervisory Attorneys*

PAUL A. THOMAS
MARISSA A. WAGNER
DAVID H. MORI
MICHAEL ELLEMENT
KEVIN J. HOBSON
POLLY MISRA
KWAME SAMUDA
*Attorneys*

Dated: April 1, 2015
Washington, D.C.

NANCY E. KESSLER PLATT
*Deputy Assistant General Counsel for*
*Contempt, Compliance, and Special Litigation*

National Labor Relations Board
1099 14th Street, NW, Suite 10700
Washington, D.C. 20570
Phone: (202) 273-2937
Fax: (202) 273-4244
E-mail: Nancy.Platt@nlrb.gov
D.C. Bar No. 425995

# TABLE OF CONTENTS

Page

I.      The Chamber's "appropriate hearing" and "time compression" claims are not ripe...........1

II.     The Rule does not reflect "arbitrary" or capricious" decisionmaking.................................4

III.    Even if ripe, the Chamber's "appropriate hearing" arguments are meritless .....................7

IV.     Even if ripe, the Chamber's "time compression" arguments are meritless ......................14

V.      The Rule reasonably modernizes the procedures surrounding employer disclosure of
        employee information .......................................................................................................18

VI.     The Chamber's challenge to the Rule's new posting requirement cannot be raised here,
        and even if it could, the challenge lacks merit..............................................................20

VII.    Even if all of the Chamber's challenges succeed, the remainder of the rule is severable .22

VIII.   Conclusion ......................................................................................................................24

## TABLE OF AUTHORITIES

Other Authorities ................................................................................................. Page(s)

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin,* 429 F.3d. 1136 (D.C. Cir. 2005) .................................................................................................. 20

*AFL-CIO v. Chao,* 333 F.3d 168 (D.C. Cir. 2003) ........................................................ 18

*Altman v. SEC,* 666 F.3d 1322 (D.C. Cir. 2011).......................................................... 12

*Association of Private Sector Colleges and Universities v. Duncan,* 681 F.3d 427 (D.C. Cir. 2012) ................................................................................................................ 3

*Avocados Plus Inc. v. Veneman,* 370 F.3d 1243 (D.C. Cir. 2004) ................................. 21

*Barre-National, Inc.,* 316 NLRB 877 (1995)........................................................... 9, 10

*Bituma Corp. v. NLRB,* 23 F.3d 1432 (8th Cir. 1994) ................................................... 8

*\*Boire v. Greyhound Corp.,* 376 U.S. 473 (1964) ........................................................ 4

*Brown & Sharpe Mfg. Co.,* 299 NLRB 586 (1990) ..................................................... 18

*Cablevision Sys. Corp. v. FCC,* 649 F.3d 695 (D.C. Cir. 2011).................................... 2

*Catholic Soc. Serv. v. Shalala,* 12 F.3d 1123 (D.C. Cir. 1994).............................. 23, 24

*Cellco P'ship v. FCC,* 700 F.3d 534 (D.C. Cir. 2012).................................................. 3

*Excelsior Underwear, Inc.,* 156 NLRB 1236 (1966) ............................................ 6, 7, 19

*FCC v. Fox Television Stations, Inc.,* 556 U.S. 502 (2009) ......................................... 10

*Humble Oil & Ref. Co.,* 53 NLRB 116 (1943) ............................................................. 8

*\*Inland Empire District Council v. Millis,* 325 U.S. 697 (1945)................................7, 11

*Int'l Ass'n of Machinists (General Electric Co.),*189 NLRB 50 (1971)........................ 18

*Kohler Co.,* 128 NLRB 1062 (1960) .......................................................................... 18

*Koretoff v. Vilsack,* 707 F.3d 394 (D.C. Cir. 2013) ..................................................... 12

*Mathews v. Eldridge,* 424 U.S. 319 (1976)................................................................. 21

*MD/DC/DE Broadcasters Ass'n v. FCC,* 236 F.3d 13 (D.C. Cir. 2001) ....................... 23

## TABLE OF AUTHORITIES

**Other Authorities** ............................................................................................................**Page(s)**

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...................................................................................................................................... 19

*Myers v. Bethlehem Shipbldg. Corp.*, 303 U.S. 41 (1938) ........................................................ 4, 21

*Nat'l Ass'n of Mfrs. v. NLRB,* 846 F. Supp. 2d 34 (D.D.C. 2012) ......................................... 21, 22

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs Co.*, 145 F.3d 1399 (D.C. Cir. 1998) .............. 3

*NLRB v. A.J. Tower Co.,* 329 U.S. 324 (1946) ................................................................................ 8

*NLRB v. Contemporary Cars, Inc.,* 667 F.3d 1364 (11th Cir. 2012) ........................................... 20

*NLRB v. Sav-On Drugs, Inc.,* 728 F.2d 1254 (9th Cir. 1984) ...................................................... 16

*Northside Sanitary Landfill, Inc. v. Thomas,* 849 F.2d 151 (D.C. Cir. 1988) ........................... . 21

*\*Ohio Forestry Ass'n Inc. v. Sierra Club,* 523 U.S. 726 (1998) .................................................... 4

*Pannier Corp., Graphics Div. v. NLRB,* 120 F.3d 603 (6th Cir. 1997) ....................................... 21

*Perez v. Mortgage Bankers Ass'n,* 135 S. Ct. 1199 (2015) ........................................................... 5

*\*Reno v. Flores,* 507 U.S. 292 (1993).................................................................................... 2, 3, 15

*Republic Steel Corp. v. NLRB,* 311 U.S. 7 (1940)........................................................................ 19

*\*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,* 547 U.S. 47 (2006) .................. 21

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005)................................................................ 18

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011)........................................................................ 3

*Sims v. Apfel,* 530 U.S. 103 (2000) ............................................................................................... 20

*Sitka Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175 (D.C. Cir. 2000)........................................ 12

*Sossamon v. Texas*, 131 S. Ct. 1651 (2011).................................................................................... 7

*St. Anthony Hosp. Sys. v. NLRB*, 655 F.2d 1028 (10th Cir. 1981)................................................ 20

*United States v. Olano*, 507 U.S. 725 (1993) ............................................................................... 20

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519 (1978)...................................................................................................................................... 5, 19

## TABLE OF AUTHORITIES

**Other Authorities** ........................................................................................................**Page(s)**

*West v. Gibson*, 527 U.S. 212 (1999) ........................................................................ 7

*Wooley v. Maynard*, 430 U.S. 705 (1977) .............................................................. 22

*Yakus v. United States*, 321 U.S. 414 (1944) .......................................................... 20

**Statutes** ...................................................................................................................**Page(s)**

5 U.S.C. § 551(13) ..................................................................................................... 24

5 U.S.C. § 706(2)(C) .................................................................................................. 24

29 U.S.C. § 153(b) ......................................................................................... 1, 12, 13

29 U.S.C. § 158(b)(7)(C) ........................................................................................... 12

29 U.S.C. § 158(c) ............................................................................................... 1, 16

*29 U.S.C. § 159............................................................................................... passim

**Other Authorities** ..................................................................................................**Page(s)**

79 Fed. Reg. 74308 ..................................................................................................... 6

79 Fed. Reg. 74309 ..................................................................................................... 6

79 Fed. Reg. 74310 ..................................................................................................... 6

79 Fed. Reg. 74315 ..................................................................................................... 6

79 Fed. Reg. 74317-18 ........................................................................................ 6, 15

79 Fed. Reg. 74319-20 ............................................................................................. 17

79 Fed. Reg. 74322-24 ................................................................................... 6, 15, 17

79 Fed. Reg. 74334 ................................................................................................... 14

79 Fed. Reg. 74336 ................................................................................................... 19

79 Fed. Reg. 74337 ..................................................................................................... 6

79 Fed. Reg. 74340 ................................................................................................... 18

79 Fed. Reg. 74342 ................................................................................................... 18

## TABLE OF AUTHORITIES

**Other Authorities** ....................................................................................................**Page(s)**

79 Fed. Reg. 74347-48 ................................................................................................. 19

79 Fed. Reg. 74359 ...................................................................................................... 19

79 Fed. Reg. 74366-68 ............................................................................................. 6, 23

79 Fed. Reg. 74371 ...................................................................................................... 23

79 Fed. Reg. 74373 ...................................................................................................... 23

79 Fed. Reg. 74379 ................................................................................................... 6, 17

79 Fed. Reg. 74383-92 ........................................................................................... passim

79 Fed. Reg. 74399 .......................................................................................................11

79 Fed. Reg. 74410 ...................................................................................................... 23

79 Fed. Reg. 74414-15 ................................................................................................. 23

79 Fed. Reg. 74426-28 ............................................................................................. 6, 14

105 Cong. Rec. 18128 (1959) ...................................................................................... 17

The New Oxford American Dictionary (2d ed. 2005) .................................................. 7

Webster's Third New International Dictionary (1993) ................................................. 7

As the National Labor Relations Board (Board or Agency) has shown in its Memorandum in Support of Its Partial Motion to Dismiss and Cross-Motion for Summary Judgment (Bd. MSJ) [Dkt. 22], the Chamber's facial statutory challenges to the Board's representation case procedures rule (Rule) are not ripe. (Bd. MSJ 4-7). Even if they were ripe, they are without merit (*id.* at 13-30), as are the Chamber's further contentions that aspects of the Board's decisionmaking process were "arbitrary" or "capricious" under the Administrative Procedure Act (APA) (*id.* at 10-13, 24-26, 33-40). As shown below, the Chamber's Opposition and Reply (Opp.) [Dkt. 25] does not remedy these fundamental and ultimately dispositive flaws.

## I.      The Chamber's "appropriate hearing" and "time compression" claims are not ripe.

1.      The Chamber has failed to demonstrate the ripeness of its claims that the Rule conflicts with Sections 9, 3(b), and 8(c) of the National Labor Relations Act. Those claims are not yet appropriate for judicial review.[1]

The Chamber's arguments based on these three statutory sections rest solely on the theory that the Board's regional directors *might* hold a hearing that does not qualify as "appropriate" under Section 9, or so shorten the election period that the period does not comport with the generalized legislative policies of free debate which also led to the enactment of Section 8(c). With respect to "appropriate hearing," it argues that an "appropriate hearing" must contain elements such as "a 'full and adequate opportunity' to present evidence on all issues pertaining to the election." (Opp. 8). But even under this theory, a regional director must determine the point at which a "full and adequate opportunity" to litigate has been provided—clearly an exercise of

---

[1] As stated in our initial filing (Bd. MSJ 4 n.2), the Board does not dispute the ripeness of the Chamber's challenge to nondiscretionary portions of the rule, such as the requirement to include in the voter list any personal emails and phone numbers in the employer's possession (Amendment (Am.) 20), and the requirement to post a notice after a petition has been filed (Am. 4).

judgment the validity of which will turn on particular facts. As previously demonstrated, such

fact-bound questions are not a proper basis for a facial challenge. *See Cablevision Sys. Corp. v.*

*FCC*, 649 F.3d 695, 715 (D.C. Cir. 2011).

Similarly unripe is the Chamber's argument with respect to election timing, which also

rests entirely on hypotheticals, such as the notion that a regional director *might conceivably* set

an election for 14 days from the date the petition was filed. (Opp. 16). It is hardly appropriate to

presume, without evidence, that an agency will act at improper speed. *Cf. Reno v. Flores*, 507

U.S. 292, 309 (1993) ("[W]e will not assume, on this facial challenge, that an excessive delay [in

holding immigration detention hearings] will invariably ensue—particularly since there is no

evidence of such delay, even in isolated instances.") In any event, even the Chamber's 14-day

hypothetical is unsuitable for a facial challenge because whether that time period (or any other)

provides parties with an adequate opportunity to present their views depends on a host of

variables, including whether the parties have a pre-existing collective bargaining relationship,

how long the campaign had been going on before the filing of the petition, and whether the

bargaining unit is small or large.

In short, the Chamber's statutory challenges are unripe because whether the Rule violates

the Chamber's proffered construction of the NLRA in a particular case turns on how regional

directors might exercise their discretion in the future. Under the Rule, regional directors can

order questions of voter eligibility litigated after an election, if necessary—or not; they can set

the pre-election hearing for 8 days after the hearing notice—or later, and can grant

postponements; they can set the final date of the election to be less than 30 days from the date

the petition was filed—or more than 30 days from that date. In explaining the amendments, the

Board set *standards* for these exercises of discretion, but that does not make them any less discretionary.

There unquestionably exists a "set of circumstances" under which the Rule could be applied to produce an election that would be permissible, even under the Chamber's crabbed reading of the NLRA. Under *Flores*, that fact is fatal to the Chamber's facial challenge. 507 U.S. at 301. The Chamber, to be sure, disputes the applicability of *Flores* to regulatory challenges— but the one D.C. Circuit case it cites (Opp. 3-4), *National Mining Association v. U.S. Army Corps of Engineers* ("*NMA*"), has been abrogated. The *NMA* court stated, erroneously, that the "no set of circumstances" test had never been applied to facial challenges to agency regulations. 145 F.3d 1399, 1407–08 (D.C. Cir. 1998). But it overlooked *Flores* entirely. More recently, in *Sherley v. Sebelius*, a panel majority concluded that, notwithstanding *NMA*'s error, *Flores* "bound" its decision. 644 F.3d 388, 397 n.** (D.C. Cir. 2011). Two more cases since *Sherley* have applied the same *Flores* standard to regulatory challenges.[2] *Flores* conclusively establishes that immediate judicial review of the Chamber's three statutory challenges is premature.

2.      The Chamber fares no better with its contention that failure to immediately address its statutory challenges will cause hardship. (Opp. 4-5). It declares that the procedure for obtaining judicial review of Board election decisions is "burdensome and lengthy" and that the costs associated with refusing to exercise immediate review will be "substantial." The Chamber, as the party asserting the existence of federal subject-matter jurisdiction, has the burden to substantiate these claims, which should accordingly be dismissed as unsupported by a single citation to either the administrative record, or the record in this Court.

---

[2] *Cellco P'ship v. FCC*, 700 F.3d 534, 549 (D.C. Cir. 2012); *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012).

3

Even if those claims had evidentiary support, however, they would not constitute a

"hardship." In *Ohio Forestry Association, Inc. v. Sierra Club*, the Supreme Court expressly

rejected such a theory. 523 U.S. 726 (1998). There, the Sierra Club asserted that it should be

permitted to bring statutory challenges to a Department of Interior forestry plan because it would

be "easier, and certainly cheaper, to mount one legal challenge against the Plan now, than to

pursue many challenges to each site-specific logging decision." *Id.* at 734. The Court did not

disagree; rather, it held that litigation costs are simply not cognizable hardship for ripeness

purposes:

> [T]he Court has not considered this kind of litigation cost saving sufficient by itself to
> justify review in a case that would otherwise be unripe. The ripeness doctrine reflects a
> judgment that the disadvantages of a premature review that may prove too abstract or
> unnecessary ordinarily outweigh the additional costs of—even repetitive—post
> implementation litigation.

*Id.* at 735; *see also Myers v. Bethlehem Shipbldg. Corp.,* 303 U.S. 41, 51 (1938).

Much like the plan in *Ohio Forestry*, the challenged portions of the Rule simply establish

general principles of future agency action. If and when the Rule's provisions have a "causal role"

in final Board action in a particular case, then—and only then—do they potentially inflict an

injury warranting review. 523 U.S. at 734. The procedure for obtaining review of Board election

cases may seem circuitous but, as the Supreme Court has recognized, Congress deliberately

prescribed that course to avoid unwarranted delay in the holding of elections that it saw as

prejudicial to the right of employees to choose a union to represent them. *Boire v. Greyhound

Corp.*, 376 U.S. 473, 477-79 (1964).

## II.      The Rule does not reflect "arbitrary" or "capricious" decisionmaking.

The Chamber accuses the Board of asking this Court to apply an inappropriate level of

deference in review of the Rule, but just this month, the Supreme Court reiterated "the very basic

tenet of administrative law that agencies should be free to fashion their own rules of procedure."

*Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1207 (2015) (internal quotation marks omitted) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, Inc.* 435 U.S. 519, 544 (1978)). The Chamber's reminder that this deference is not unlimited, and must account for statutory and constitutional limitations (Opp. 5-6), has never been contested by the Board.

    While the Chamber denies that it is claiming that the Board may not seek to improve the efficiency of its representation-case processes, the Chamber nonetheless continues to argue that the Board's decision to make various improvements at a variety of stages must be "arbitrary in the breadth of its design and scope given the Board's overall success rate at conducting elections in a timely and efficient manner." (Opp. 21 n.7). The logical flaws in that argument were previously analyzed. (Bd. MSJ 10-13). The Board noted among other things that many of the amendments have little to do with the timing of procedures and that government-wide rules instruct agencies to continuously improve their processes.

    The Chamber now adds to its attack the claim that, because the Rule is not targeted exclusively to cases where delay exists but has general application to all stages and types of Board representation proceedings, the Rule's approach is like solving a problem limited to protecting Florida manatees by dispatching anti-poaching rangers in all fifty states. (Opp. 22). Missing in the Chamber's analogy is any recognition that the Rule reflects decades of Board experience in administering Section 9 in a wide variety of circumstances and draws on the best practices of the Board's regional offices to provide targeted solutions to a series of discrete problems, not just delay as the Chamber insists.

    As previously explained (Bd. MSJ 10), the Rule seeks to minimize unnecessary barriers to the fair and expeditious resolution of questions concerning representation, to eliminate unnecessary and duplicative litigation, to provide for a more informed electorate, to simplify

representation case procedures and to render them more transparent and uniform across regions, to reduce the cost of such proceedings to the public and the agency, and to modernize the Board's processes, particularly by more effectively using new technology. 79 Fed. Reg. 74315, 74317, 74422-23, 74428. Among other things, the Board found that pre-election litigation has often been disordered, because it has been "hampered by surprise and frivolous disputes, and side-tracked by testimony about matters that need not be decided." *Id.* at 74308. The Board noted that some of its rules have become outdated as a result of changes in communications technology and practice. *Id.* The Board further noted that unnecessary delays had resulted from its own policy of automatically staying elections for 25 days in anticipation of requests for review of regional directors' actions that were filed in only a small fraction of cases and were rarely granted. *Id.* at 74308, 74309-10. The Board also found the absence of the information now required by the Statement of Position form had hindered resolution of disputes over the contours of an appropriate unit and the eligibility of voters. *Id.* at 74366-67. And the Board explained that it saw many opportunities to streamline the election process at various stages.

Thus, nothing in the four corners of the Rule indicates that the Board's goals were anything but the ones contained therein. The Chamber's assertion that the Board is restricted to only dealing with issues in one stage of election proceedings makes no sense in light of the Agency's responsibility to find better, more efficient ways to carry out its statutory missions.[3]

---

[3] Contrary to the Chamber's assertion (Opp. 21), the Rule furthers the Agency's continuing goal to ensure that more employees gain knowledge about their rights under the Act, the general purposes of the Act, and the Board's processes. Employees who are the subject of an election petition will now have timely access to a notice explaining their NLRA rights and "set[ting] forth in understandable terms the central rules governing campaign conduct." (Am. 4; 79 Fed. Reg. 74379). And by updating the *Excelsior* requirements to provide the ability to contact voters by the means of communication in use today, the Rule ensures that employees will continue to have an "effective opportunity to hear the arguments concerning representation," and put them "in a better position to make a more fully informed and reasonable choice." 79 Fed. Reg. 74337

**III.    Even if ripe, the Chamber's "appropriate hearing" arguments are meritless.**

1.    Just as in its opening pleading, the Chamber continues to be unable to point to anything in the statute giving parties an absolute right to litigate, at the pre-election hearing, the eligibility of specific employees or groups of employees to vote in an election. This is unsurprising given that the statute's terminology—"an appropriate hearing"—is inherently ambiguous. Dictionary definitions of the term "appropriate" include such broad descriptions as "specially suitable," "fit," or "proper," *Webster's Third New International Dictionary* 106 (1993) (capitalization omitted), or "suitable or proper in the circumstances," *The New Oxford American Dictionary* 76 (2d ed. 2005). In non-NLRA cases, the Supreme Court has recognized that "the word 'appropriate' is inherently context-dependent," *Sossamon v. Texas*, 131 S. Ct. 1651, 1659 (2011), and that the term "appropriate" is flexible and depends on statutory context, *West v. Gibson*, 527 U.S. 212, 217-18 (1999). These interpretations of appropriateness are completely consistent with the Court's pronouncement in *Inland Empire District, Lumber Workers v. Millis*, that in choosing that terminology in Section 9, Congress intended to "confer[] broad discretion upon the Board as to the hearing." 325 U.S. 697, 708 (1945). The Chamber fails to show that the Rule's interpretation of an appropriate hearing is contrary to the statute.

Conspicuously absent from the Chamber's attempted reinterpretation of caselaw relevant to defining what constitutes an "appropriate hearing" (Opp. 6-14), is any mention of the Board's long-standing challenged-ballot procedure. This procedure allows the Board and its regional directors to defer deciding questions of individual eligibility or inclusion until after an election has been held, instead allowing the voters in question to cast "challenged ballots" that are

---

(quoting *Excelsior Underwear, Inc.*, 156 NLRB 1236, 1240 (1966)). Moreover, as explained below at Section IV, the Agency will continue to ensure that all parties to a representation proceeding have a meaningful opportunity to engage in campaign speech.

segregated, pending any need to resolve their status in order to certify the results of an election.

As previously explained, "deferring the question of voter eligibility until after an election is an

accepted NLRB practice," (Bd. MSJ 16 (quoting *Bituma Corp. v. NLRB*, 23 F.3d 1432, 1436 (8th

Cir. 1994)), and the Board has made such decisional deferrals while allowing the individuals in

question to vote under challenge since the early days of the Act. (*Id.* at 23 (citing *Humble Oil &

Ref. Co.*, 53 NLRB 116, 126 (1943)).[4] The Chamber cannot and does not claim that the Board

must forswear use of the challenged-ballot procedure, and instead decide every possible

individual eligibility or inclusion issue raised before the election. Indeed, as previously noted (*id.*

at 25 n.28), the Chamber has already implicitly conceded that the regional director and the Board

need not resolve all individual eligibility or inclusion issues before an election.[5]

Having effectively conceded the propriety of the challenged-ballot procedure as a means

of deciding only those deferred eligibility and inclusion issues that would be determinative of an

election's outcome, the Chamber is left with no convincing basis for continuing to insist that the

Board and its regional directors lack all discretion to limit taking evidence at the pre-election

---

[4] The Chamber mischaracterizes the Supreme Court's holding in *NLRB v. A.J. Tower Co.*, 329
U.S. 324 (1946), as "defer[ring] to the NLRB's procedures for resolving a voter's eligibility
precisely *because* the employer had a legitimate opportunity to challenge the voter's eligibility
before the election." (Opp. 5-6 (citing 329 U.S. at 332-33)). In that pre-Taft-Hartley era case, no
pre-election hearing was required, nor did one occur, pursuant to the parties' election
stipulation. *See id.* at 326-27. The Board found the employer responsible for failing to exercise
its responsibility to challenge the voter at the polls, instead attempting to do so through post-
election objections. *Id.* at 329-30. The Court upheld the Board's challenged ballot procedure,
which "gives a desirable and necessary finality to elections yet affords all interested parties a
reasonable period in which to challenge the eligibility of any voter." *Id.* at 332-33. Thus, *A.J.
Tower* fully supports the Rule's appropriate hearing changes, as well as the principle that
Congress granted the Board "a wide degree of discretion in establishing the procedure and
safeguards necessary to insure the fair and free choice of bargaining representatives by
employees." *Id.* at 330.

[5] (*See* Ch. MSJ 18 ("Even if the regional director decides to defer a decision on voter eligibility
issues until after the election . . ." ); 25 ("The Board cannot . . . effectively decide whether issues
of voter eligibility require pre-election resolution . . .")).

hearing on individual eligibility or inclusion issues. In its opening pleading, the Chamber argued that the Board could not effectively review actions of its regional directors without a full evidentiary record. (Ch. MSJ 25.) But the Board fully rebutted that argument, explaining among other things that for any eligibility issues deferred against an employer's wishes, the record would contain the employer's Statement of Position, its argument at the hearing, an offer of proof, and the regional director's denial. (Bd. MSJ 21-22). The Chamber offers nothing new to contest that rebuttal, but simply repeats that there is a need for a record in view of Congress's 1959 authorization of the Board to delegate election functions to its regional directors. (Opp. 10.)[6]

In the end, the Chamber is left in the untenable position of arguing that parties have an absolute right to present evidence on individual eligibility and inclusion issues pre-election even though a decision concerning such issues can unquestionably be deferred until after the election, and may never need to be decided at all. This argument essentially mirrors the holding in *Barre-National, Inc.*, 316 NLRB 877 (1995),[7] and thus makes little sense, as the Rule explained in overruling *Barre*:

> The Board has concluded that it serves no statutory or administrative purpose to require the hearing officer to permit pre-election litigation of issues that both the regional director and the Board are entitled to, and often do, defer deciding until after the election and that are often rendered moot by the election results. It serves no purpose to require the hearing officer at a pre-election hearing to permit parties to present evidence that relates to matters that need not be addressed in order for

---

[6] Even here, however, while the Chamber argues that the 1959 delegation authority was "intended as an alternative to scaling back the 'appropriate' pre-election hearings" (Opp. 10), the Chamber does not assert that Congress intended to outlaw the Board's use of the challenged-ballot procedure, which—as demonstrated by the caselaw cited in the Rule—has continued to be utilized by the Board over the following decades. *See* 79 Fed. Reg. 74386 n.364; 74390 n.386.

[7] *See id.* at 878 n.9 (Even the *Barre* Board noted that "our ruling concerns only the entitlement to a pre-election hearing, which is a matter distinct from any claim of entitlement to a final agency decision on any issue raised in such a hearing.").

the hearing to fulfill its statutory function of creating a record upon which the regional director can determine if a question of representation exists. In other words, it is administratively irrational to require the hearing officer to permit the introduction of irrelevant evidence. The final rule eliminates such wholly unnecessary litigation that serves as a barrier to the expeditious resolution of questions of representation.

79 Fed. Reg. 74385-86.[8] In addition, as previously noted (Bd. MSJ 19-20), the Board reasonably concluded that permitting parties to litigate matters that are irrelevant to the pre-election hearing's statutory purpose frequently imposes unnecessary costs on the parties and the Agency. It allows parties to use the threat of unnecessary litigation to extract concessions concerning election details (such as date, time, and place) and the definition of the unit itself. 79 Fed. Reg. 74383-91.

Refusing to acknowledge the reasonableness of the Board's position, the Chamber would have this Court hold that Congress unmistakably required the Board to permit parties to present evidence relevant only to a question of voter eligibility prior to an election no matter how small a percentage of the total number of potential voters is at issue. Thus, for example, under the Chamber's reasoning, parties should retain an absolute right to present evidence concerning the eligibility of a single employee even if the concededly appropriate unit in question contained 1,000 or more employees.

---

[8] The Chamber argues that the Board has failed to acknowledge in the Rule that it is changing its position regarding the requirements of the pre-election hearing. (Opp. 25 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009))). To the contrary, as the Board explained, "In our considered view, Section 9 does not give parties a right to litigate questions of individual eligibility or inclusion at the pre-election hearing if the regional director will not decide those questions prior to the election. For these reasons, the Board hereby overrules *Barre-National*, together with cases resting solely upon its holding." 79 Fed. Reg. 74386. The Board's forthright statements more than satisfy *Fox*'s requirement that an agency "display awareness that it is changing position." 556 U.S. at 515 (emphasis removed).

It is impossible to square the Chamber's extreme position with the "great latitude concerning procedural details" that the Supreme Court noted was to be accorded the Board given the ambiguity in the statute's terminology of "an appropriate hearing upon due notice." *Inland Empire*, 325 U.S. at 706.[9] "Although the hearing should provide parties 'a full and adequate opportunity to present their objections,' nothing in *Inland Empire* suggests that the Board must give a hearing to matters which will not be decided." 79 Fed. Reg. 74386. To the contrary, the Rule explains that "a hearing where irrelevant evidence must be introduced is an inappropriate hearing." *Id.* at 74399.

As noted above, the Rule allows a pre-election opportunity for parties to make a record concerning individual eligibility or inclusion issues sufficient for the regional director to decide the appropriateness of either litigating and deciding those issues prior to the election or of deferring them for possible resolution after the election, should it prove necessary to decide some or all of the issues in order to certify the choice of a majority of the voters.[10] And if the number of challenged ballots is sufficient to affect the outcome shown in the initial tally of ballots, then the Rule provides parties an opportunity for a post-election hearing before the results of the election are certified. This is all that the statute requires.

---

[9] Contrary to the Chamber's argument (Opp. 8-9), while the Court in *Inland* interpreted the statutory language "appropriate hearing upon due notice" as according the Board broad discretion, it reached no holding on what issues had to be litigated at the hearing, much less what issues had to be litigated pre-election.

[10] Moreover, the Rule contains a clear explanation for the process through which regional directors will exercise their discretion to decide whether to allow litigation at the pre-election hearing. 79 Fed. Reg. 74426, 74391-92.

Thus, as shown, the Chamber's position is devoid of a statutory basis, or a coherent rationale for mandating pre-election litigation of individual eligibility or inclusion issues that need not be decided to determine whether a question of representation exists.[11]

2.      The Chamber argues for the first time that the Rule's distinction between "appropriate unit" issues and "voter eligibility/inclusion" issues is somehow contrary to Section 3(b) of the Act. (Opp. 14-15). Because this argument was not adequately made to the Board during the rulemaking process, it has been waived. (Bd. MSJ 42) (citing *Koretoff v. Vilsack*, 707 F.3d 394, 397-98 (D.C. Cir. 2013)).[12] However, even if the Court were to excuse the Chamber's failure to previously raise this argument, it is simply unavailing.

Section 3(b) permits the Board "to delegate to its regional directors its powers under Section 9 to determine the unit appropriate for the purposes of collective bargaining, to investigate and provide for hearings, … and to direct an election or take a secret ballot … and certify the results thereof." 29 U.S.C. § 153(b). The Chamber now finds significant the fact that this provision contains no express language authorizing the Board to delegate voter

---

[11] Contrary to the Chamber's claim (Opp. 18), the Rule's authorizing the deferral of litigation concerning individual eligibility and inclusion issues does not make it "akin" to Section 8(b)(7)(C)'s authorizing regional directors to dispense with pre-election hearings altogether when a union is picketing an employer for recognition. (*See* Bd. MSJ 21 n.23). Outside of the 8(b)(7)(C) context, and consistent with Section 9 of the statute, pre-election hearings will continue to be mandatory under the Rule where parties do not enter into election agreements. Indeed as previously noted, evidence will continue to be taken at pre-election hearings concerning jurisdictional, election bar, labor organization, eligibility formula, and special-ballot-procedures-for-professional-employee issues raised by the parties in addition to unit appropriateness issues. (*Id.* at 22 n.26).

[12] As a separate reason for waiver, the law in this circuit requires litigants to raise all arguments in their original motion or risk forfeiture. *See, e.g., Altman v. SEC,* 666 F.3d 1322, 1329 (D.C. Cir. 2011) (the court generally does not entertain arguments raised for the first time in a reply brief); *Sitka Sound Seafoods, Inc. v. NLRB,* 206 F.3d 1175, 1181 (D.C. Cir. 2000) (same). Despite having ample opportunity to raise this Section 3(b) argument in its motion for summary judgment, the Chamber failed to do so.

eligibility/inclusion determinations. In light of this omission, the Chamber contends that Section 3(b)'s reference to unit appropriateness must necessarily include voter eligibility disputes because otherwise there would be no statutory authority for regional directors to decide such matters. (Opp. 15) ("None of the bases for § 3(b) delegation would cover voter eligibility or inclusion disputes.").

Contrary to the Chamber's assertions, however, Section 3(b) does contain language reflecting the Board's ability to delegate voter eligibility determinations. In particular, Section 3(b) also confers on the Board the right to delegate its authority "to direct an election or take a secret ballot … and *certify the results thereof*." 29 U.S.C. § 153(b) (emphasis added). Certification of election results is the final step in a representation proceeding and can only be performed once objections and potentially determinative challenges have been resolved. Thus, Section 3(b)'s permitted delegation of the Board's certification function logically includes the power to decide outstanding election disputes, including any eligibility issues raised by determinative challenged ballots or objections. This interpretation is consistent with the Board's position that Section 3(b) authorizes it to fully delegate its representation case powers to regional directors (subject only to discretionary Board review), and the legislative considerations underlying that provision. (Bd. MSJ 30-32). It also avoids the peculiar result presented by the Chamber's alternative reading of the statute whereby Section 3(b) could be construed as requiring the Board itself to decide all eligibility/inclusion disputes before the election. (Opp. 15). Accordingly, there is no merit to the argument that the Rule's distinction between "appropriate unit" and "voter eligibility/inclusion" issues has redefined the scope of pre-election hearings in a manner contrary to Section 3(b) of the Act.

3.      The Chamber repeats its charge that the Rule will have the effect of increasing pre-election litigation, and decreasing the number of election agreements, leading to more federal court litigation. The Chamber again provides no evidence that this will occur—instead insisting the result is "obvious." (Opp. 23). The Court should not accept this bald contention. Parties who are able to resolve all litigable issues prior to a pre-election hearing will enter into election agreements just as they always have; and parties who cannot come to an agreement, based on their assessments of the risks, costs, and benefits at stake, will choose to litigate those issues. *See* 79 Fed. Reg. 74334. And, as noted earlier (Bd. MSJ 34), the Rule gives parties no additional reason to file more petitions for review in the circuit courts of appeals than they did under the prior rules, which already provided for only discretionary Board review of all pre-election issues. *Id.* at 74427.

## IV.     Even if ripe, the Chamber's "time compression" arguments are meritless.

As the Board has shown, employers will continue to have ample meaningful opportunities to express their views on unions even if the Rule generally results in more expeditious elections. The Rule explains in detail the multiple considerations supporting the Board's conclusion. (*See* Bd. MSJ 27-28 & n.31). In its Motion for Summary Judgment, the Chamber challenged just one of those considerations (Ch. MSJ 28-29 (claiming that general pre-petition speech about unions is no substitute for post-petition speech)). The Board explained why the Chamber's contention, on its own, did not answer the question of whether meaningful opportunities for speech would still exist (Bd. MSJ 28-29 (explaining why "a complete substitute is not necessary in this context")). Now, in its Opposition and Reply, the Chamber takes a second bite at the apple and claims that the Rule will deprive employers of meaningful opportunities for campaign speech because (1) there will be "less time" for such speech, (2) employers will not be

14

certain which employees are in the electorate, and (3) employers will not be certain which individuals are supervisors through whom the employer may propagate its campaign message. (Opp. 16). As before, the Chamber's arguments are unavailing.

The Chamber's first enumerated reason is no reason at all. It simply restates the premise of the Board's meaningful opportunity analysis—that the Rule, as implemented, will generally produce more expeditious elections. *See* 79 Fed. Reg. 74317 (explaining that the Board "carefully considered [and, for reasons given in the Rule, ultimately rejected] the possibility that the amendments might reduce the time between the filing of the petition and the election so as to threaten the communication, association, and deliberation needed by employees in order to truly exercise freedom of choice"). The fact that elections may occur more quickly under the Rule than under extant procedures does not answer whether the opportunities for campaign-related speech in a particular case were nonetheless meaningful.[13]

The Chamber's second and third reasons similarly lack merit. In essence, the Chamber claims that uncertainty about the status of particular individuals precludes meaningful opportunities for campaign speech. But this argument proves too much. As the Board explained, the same uncertainty cited by the Chamber "exists under the current rules and cannot be fully eliminated." 79 Fed. Reg. 74389. Because organizing campaigns begin prior to the hearing, both

---

[13] The Chamber questions whether employers would have a meaningful opportunity to campaign if an election is "held in as few as 14 days from the petition filing." (Opp. 16). The Chamber's resort to a far-fetched hypothetical only highlights its failure to show, as it must to prevail in this facial challenge, "that no set of circumstances exist under which the [regulation] would be valid." *Flores*, 507 U.S. at 301 (quotation omitted and alteration in original). In any event, a fortnight election is unlikely to occur unless the parties so stipulate. Under the Rule, "it takes at least 8 days to begin the hearing," then "[a]t least 1 day is required for the hearing," and after that, "a decision and direction of election must be drafted and issued." 79 Fed. Reg. 74324. Once all of those events have occurred, "the voter list must be produced and the Notice of the Election posted for 3 days." *Id.* at 74324. For these reasons, the Chamber's hypothetical runs contrary to "[t]he practicalities of a regional director's conducting a directed election." *Id.*

employers and unions of necessity must make decisions about supervisory status and other eligibility issues on their own. And even if a regional director were to resolve all eligibility and inclusion issues prior to an election, the regional director's decision concerning eligibility would not bring finality because it would still be subject to post-election reversal by the Board or a reviewing court. Furthermore, if the regional director's determination were later overturned, neither the employer nor the union could interpose good faith reliance on the regional director's resolution as a defense to unfair labor practice charges or election objections. *See NLRB v. Sav-On Drugs, Inc.*, 728 F.2d 1254, 1255-58 (9th Cir. 1984) (en banc) (affirming the Board's conclusion that an employer violated the Act by discharging individuals whom the regional director determined in a representation proceeding were supervisors, when, after the discharges, the Board reversed the regional director's determination on review). In short, no matter when the eligibility issue is heard, the employer and the union act at their own peril whenever they insist on involving disputed individuals in their campaigns. This uncertainty is an unavoidable consequence of the statutory scheme, not a deficiency of the Rule.

In any event, the Chamber overstates its case. It is not an unfair labor practice to express noncoercive partisan "views, argument, or opinion," *see* 29 U.S.C. § 158(c), so an employer that wants to "educate employees about the election and the collective bargaining process" (Opp. 16), but is unsure about the status of certain workers can safely err on the side of over-inclusiveness. In addition, "in virtually every case, even where there is uncertainty concerning the supervisory status of one or more individual employees, the employer nevertheless has in its employ managers and supervisors whose status is not disputed and is undisputable." 79 Fed. Reg. 74389. The Chamber does not and cannot dispute these principles.

The Board has also explained that nothing in the Act establishes an across-the-board minimum permissible campaign period. (Bd. MSJ 27, 29). While the Chamber maintains that Congress intended "the interval between petition and election to be longer than 30 days" in contested cases (Opp. 17), it lacks any textual support for its claim. Instead, the Chamber merely repeats its flawed argument regarding an inapposite legislative proposal rejected by Congress during its deliberations over the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"). (Opp. 16-17).[14] The same argument deserves the same answer: failed legislative proposals are not the law and do not provide reliable evidence regarding the meaning of prior enactments. (*See* Bd. MSJ 29-30).

Finally, the Rule recognizes the statutory policy in favor of free debate and its bearing on the opportunity for employees to make a free and informed choice regarding union representation. 79 Fed. Reg. 74319-20. But since the Rule does not eliminate meaningful opportunities for campaign speech, employees will continue to have "sufficient time to receive and evaluate" whatever campaign messages the parties wish to communicate. *Id.* at 74324. Moreover, the Rule's requirement that a Notice of Petition for Election be posted promotes employee free choice by timely informing employees of the "rights and protective requirements imposed by the NLRA." *Id.* at 74379. Notwithstanding the Chamber's opposition to the posting requirement, *see infra* Section VI, the Rule is not susceptible to the Chamber's criticism that it

---

[14] As the Board has previously discussed, the version of the LMRDA ultimately enacted into law omitted a provision—championed by then-Senator John F. Kennedy—that would have authorized the Board to return to its pre-Taft-Hartley Act practice of dispensing with pre-election hearings in certain cases. (*See* Bd. MSJ 30). When House Education and Labor Committee Chairman Graham Barden declared that the LMRDA did not "*reinstat[e]* authority or procedure for a quicky election," he was referring to this previously-proscribed procedure and was not implying that representation campaigns should have a minimum length. 105 Cong. Rec. 18128 (1959) (statement of Rep. Barden) (emphasis added); Administrative Record NLRB 168390. The Chamber errs in suggesting otherwise. (Opp. 16-17).

fails to account for employees' interest in receiving election-related information from others.

(Opp. 17).[15]

## V.     The Rule reasonably modernizes the procedures surrounding employer disclosure of employee information.

The Chamber objects to the Rule's updating the existing requirement that names and

home addresses of bargaining unit employees be disclosed prior to the election to include, where

available, personal e-mail addresses and home and cellular telephone numbers. If employers

have such additional contact information on file, it is because they recognize, as the Rule does,

that this is how people communicate today, notwithstanding the known risks. Contrary to the

Chamber's claim (Opp. 26), the Board reasonably determined that these risks are worth taking in

election cases to better ensure that employees have the information they need to make a free

choice in the election.[16] In particular, the Board reasonably relied on the nearly 50-year absence

of evidence of misuse of the list of voter names and addresses provided under the prior rules. 79

Fed. Reg. 74342. Although the Chamber claims that the Board ignored contrary evidence, the

Chamber relies on examples of abuse unrelated to the Board election process[17] and overlooks the

---

[15] The Chamber casually asserts that "'serious constitutional difficulties' are evident" in the Board's defense of the Rule. (Opp. 17) (quoting *AFL-CIO v. Chao*, 333 F.3d 168, 175 (D.C. Cir. 2003)). However, the Chamber made no effort to explain its legal theory in its Motion for Summary Judgment (Ch. MSJ 31), and it similarly fails to do so in its Opposition. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).

[16] In addition, as noted (Bd. MSJ 36 n.40), this information also enables the parties on the ballot to avoid having to challenge voters based solely on lack of knowledge as to the voter's identity. 79 Fed. Reg. 74340.

[17] The cases cited by the Chamber (Opp. 27 n.9), *Brown & Sharpe Mfg. Co.*, 299 NLRB 586 (1990); *Kohler Co.*, 128 NLRB 1062 (1960); and *International Association of Machinists* (*General Electric Co.*), 189 NLRB 50 (1971), concern threats and harassment of employees at their homes during a strike against an already-unionized employer. *Kohler* is particularly

Board's reasoned judgment that unions seeking to win support in a secret ballot election have a practical incentive to avoid conduct that would alienate potential voters. *Id.* at 74336. In any event, if misuse should occur in the future, the Board stands ready to fashion appropriate remedies, using its authority to rule on election objections or unfair labor practice charges, and to discipline the parties before it. *Id.* at 74359. Finally, the Board fully assessed, and then properly rejected, establishing procedures for employees to opt out of having their information disclosed (*see* Bd. MSJ 39, 40 n.46; 79 Fed. Reg. 74347-48), monetary penalties for a union's misuse of contact information, and "monitoring systems."[18] The Board's detailed explanations of its policy choices are all that is required to demonstrate "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (quotation omitted).[19]

---

inapposite, as it predates the requirement imposed in *Excelsior Underwear, Inc.*, 156 NLRB 1236, 1239-40 (1966), that employers must produce a list of voter names and addresses to nonemployer parties prior to an election.

[18] The Board has no statutory authority to impose monetary penalties. *See Republic Steel Corp. v. NLRB*, 311 U.S. 7, 10-12 (1940); 79 Fed. Reg. 74359 n.260. And assuming "monitoring systems" (Opp. 26) refers to the Chamber's prior suggestion that a petitioning union could communicate with employees through a campaign website or a Board-hosted communications portal, the Board thoroughly explained its rejection of that comment. The Board found that implementing such systems would delay elections, require all employees to have Internet access, and demand a level of technological sophistication (*i.e.*, the ability to create and monitor Web sites) unrealistic for many petitioners – particularly low wage workers and small union locals or individual employees seeking to oust an incumbent union. 79 Fed Reg. 74347 n.189. The Board also expressed doubt that it would have the resources to effectively implement its own protected communications portal. *Id.* at 74348.

[19] The Chamber's assertion that the Final Rule will reduce the exposure of employees to the campaign speech of employers and unions is incorrect, for the reasons fully explained in Section IV. (*See also* Bd. MSJ 26-30).

**VI.    The Chamber's challenge to the Rule's new posting requirement cannot be raised here, and even if it could, the challenge lacks merit.**

1.       The Board has shown -- and the Chamber does not contest -- that when the Chamber submitted its comments during the rulemaking period, it never claimed that the First Amendment precluded the Board from requiring employers to post a Notice of Petition for Election ("Petition Notice") during the initial stages of a pending representation case. Under well-established precedent, the Chamber's failure to exhaust the issue means that it may not raise this argument in a pre-enforcement rulemaking challenge. *See Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d. 1136, 1148-50 (D.C. Cir. 2005) (rejecting argument that "it is inappropriate [under *Sims v. Apfel*, 530 U.S. 103 (2000),] to apply the general principles of issue waiver to administrative rulemaking").

Nevertheless, the Chamber broadly contends that litigants cannot be held accountable for their failure to adequately raise constitutional arguments during administrative proceedings. But that is not the law. *See, e.g.*, *NLRB v. Contemporary Cars, Inc.*, 667 F.3d 1364, 1368 (11th Cir. 2012) (following the established principle that "due process objections" may be waived if "not raised before the Board"); *St. Anthony Hosp. Sys. v. NLRB*, 655 F.2d 1028, 1030 (10th Cir. 1981) (declining to entertain a First Amendment challenge that was not timely raised before the Board); *see generally United States v. Olano*, 507 U.S. 725, 731 (1993) ("'No procedural principle is more familiar . . . than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'") (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944)). The Chamber cites no case recognizing a "constitutional argument exception" to the general principle that parties to a pre-enforcement review proceeding cannot litigate matters that

were not fairly raised during the rulemaking.[20] In fact, at least one case strongly suggests that constitutional claims do *not* merit an automatic exemption from exhaustion requirements, where, as here, exhaustion is not a predicate to the court's own exercise of jurisdiction. *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247-48, 1250-51 (D.C. Cir. 2004).

Nor will a present denial of review to the Chamber's facial constitutional challenge preclude future judicial review in an as-applied challenge. As the Supreme Court declared long ago, upon judicial review of an unfair labor practice order "*all questions of constitutional right* or statutory authority[] are open to examination by the court." *Myers*, 303 U.S. at 49 (emphasis added); *see also Pannier Corp., Graphics Div. v. NLRB*, 120 F.3d 603 (6th Cir. 1997) (reviewing as-applied challenge to Board's notice of election requirement after issuance of unfair labor practice order).

2.      In any event, the Chamber's First Amendment attack on the Petition Notice fails on the merits. Informational notices of employee rights like the Petition Notice are government speech and are to be evaluated under the framework established by *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ("*FAIR*").[21] As applied here, *FAIR*

---

[20] *Mathews v. Eldridge*, 424 U.S. 319 (1976), upon which the Chamber relies (Opp. 27), is inapposite because the plaintiff there had no meaningful remedy to exhaust. *See id.* at 330 ("It is unrealistic to expect that the Secretary [of Health, Education, and Welfare] would consider substantial changes . . . at the behest of a single aid recipient raising a constitutional challenge in an adjudicatory context."). In rulemaking, however, it is incumbent upon an agency to respond to significant comments, even if raised by a single entity. *Northside Sanitary Landfill, Inc. v. Thomas*, 849 F.2d 1516, 1520 (D.C. Cir. 1988). Here, the Chamber denied the Board that opportunity regarding its constitutional challenge.

[21] Indeed, this Court applied the *FAIR* framework in rejecting a First Amendment challenge to a previous Board rule requiring employers to post an informational notice of workplace rights. *See Nat'l Ass'n of Mfrs v. NLRB*, 846 F. Supp. 2d 34, 58-61 (D.D.C. 2012) (Jackson, J.) ("*NAM*"), *aff'd in part and rev'd in part on other grounds*, 717 F.3d 947 (D.C. Cir. 2013).

permits the Board to require employers to post the Petition Notice because hosting the Board's speech does not interfere with employers' own speech. (*See* Bd. MSJ 43).

The Chamber does not squarely address the Board's reliance on *FAIR*. Instead, the Chamber claims that the Petition Notice unconstitutionally compels speech an employer "does not wish to convey," likening it to the unconstitutional requirement that motorists display a state motto printed on their license plates, even if the motto contradicts their religious beliefs. (Opp. 28-29 (citing *Wooley v. Maynard*, 430 U.S. 705, 717 (1977)). But the Chamber fails to appreciate that the motto at issue in *Wooley*—"Live Free or Die"—"interfered with the desired religious message of the complaining speaker, a Jehovah's Witness." *NAM*, 846 F. Supp. 2d at 59; *see Wooley*, 430 U.S. at 717 n.15 (explaining that an automobile is "readily associated with its operator"). *Wooley* is therefore an example of hosted government speech that fails the *FAIR* test. Here, by contrast, the Petition Notice does not suggest that employers agree with any message the Board is purportedly conveying. In addition, the Rule does not restrict employers from disseminating their own message. Therefore, the Petition Notice requirement is fully consistent with First Amendment principles.[22]

## VII. Even if all of the Chamber's challenges succeed, the remainder of the Rule is severable.

The Chamber argues that because the challenged provisions are part of "one, massive Final Rule," striking down those provisions should require vacating the entire Rule. After all, according to the Chamber, "it would be easy enough for the Board to proceed to adopt those

---

[22] The Chamber claims that the notice "facilitates a union's organizing campaign." (Opp. 29 n.10). But the Chamber cannot sustain the negative gloss it puts on the poster. By informing employees of their rights, Board procedure, and prohibited employer and union conduct, the Petition Notice facilitates simply the *exercise* of employee free choice, whether for or against union representation, should an election occur. The Petition Notice does not, in any meaningful sense, advance a union organizing effort, as the Chamber's argument heading asserts. (Opp. 28).

discrete changes after the Final Rule is vacated." (Opp. 30). But the Chamber's argument turns this Circuit's severability analysis on its head. This is because "courts may 'set aside' only the part of a rule found to be invalid—for that is the only 'agency action' that exceeds statutory authority. It would, therefore, exceed the statutory scope of review for a court to set aside an entire rule where only a part is invalid, and where the remaining portion may sensibly be given independent life." *Catholic Soc. Serv. v. Shalala*, 12 F.3d 1123, 1128 (D.C. Cir. 1994).

As the Board has explained (Bd. MSJ 44), the test for severability is two-fold, centering on "the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001). Although the Chamber purports to know what was "in the Board's mind when it issued the Final Rule," (Opp. 29), the only record evidence of that intent is the Rule itself. There, rather than including mere "boilerplate" (Opp. 30), the Board carefully considered and explained its reasoning for the severability of specifically enumerated provisions.[23] Moreover, the Board forthrightly explained the two provisions that are interdependent.[24]

---

[23] 79 Fed. Reg. 74368 n.292 (explaining that even without the threat of preclusion from failing to complete the Statement of Position, it would still be an "improvement over the status quo" because some employers would complete it and the form would guide hearing preparation); 74371 n.303 (hearing opening baseline of eight days from service of the notice of petition is an "independent improvement over the current regional variation in scheduling hearings"); 74373 n.319 (even if the pre-election hearing is held later than eight days from service of the notice of petition, "the timely sharing of the information contained in the Statement of Position form should encourage the timely entrance into election agreements and narrow the scope of the pre-election hearing in the event parties are unable to enter into such agreements, thereby contributing to the Board's goal of expeditiously resolving questions concerning representation"); and 74410 n.457 ("the Board would adopt the proposal to eliminate the 25-day waiting period even if the Board did not make any change to the request-for-review procedure").

[24] 79 Fed. Reg. 74414 n.469 ("Admittedly, our decision to require that post-election hearings be scheduled to open 21 days from the tally (and 14 days from the filing of objections) depends, in part, on the implementation of the new requirement that parties filing objections simultaneously file their offers of proof supporting those objections with the regional director.").

As for whether the remainder of the Rule could function sensibly if portions of it were struck down, the Chamber falls back on its argument that the Board's specific rationales for its many representation case improvements are invalid. (Opp. 29-30). But, as explained in Section II, these rationales are indeed valid. In fact, the Chamber acknowledges that "the Board may have a legitimate interest in administrative efficiency and would, for example, have adopted the e-filing requirement on its own." (Opp. 30). Thus, the Chamber has provided no reason to believe that the Rule's fifteen unchallenged provisions could not function sensibly on their own. Accordingly, if any portion of the Rule is legally infirm, this Court must fulfill its APA obligation to "set aside" only the "part of an agency rule" that is "found to be in excess of statutory . . . authority," *Catholic Soc. Serv.*, 12 F.3d at 1128 (quoting 5 U.S.C. §§ 551(13) and 706(2)(C)), rather than accept the Chamber's blithe suggestion that the mere length of the Rule requires it to be struck down in its entirety (Opp. 30).

## VIII.   Conclusion

For these reasons, and for those previously given, the Chamber's NLRA-based challenges to the Rule should be dismissed as unripe, the Chamber's remaining challenges should be denied, and summary judgment on those claims should be entered in favor of the Board.

Respectfully submitted,

/s/ Nancy E. Kessler Platt
NANCY E. KESSLER PLATT
*Deputy Assistant General Counsel for*
*Contempt, Compliance, and Special*
*   Litigation*

DAWN L. GOLDSTEIN
KEVIN P. FLANAGAN
*Supervisory Attorneys*

PAUL A. THOMAS                          National Labor Relations Board
MARISSA A. WAGNER                       1099 14th Street, NW, Suite 10700
DAVID H. MORI                           Washington, D.C. 20570
MICHAEL ELLEMENT                        Phone: (202) 273-2937
KEVIN J. HOBSON                         Fax: (202) 273-4244
POLLY MISRA                             E-mail: Nancy.Platt@nlrb.gov
KWAME SAMUDA                            D.C. Bar No. 425995
*Attorneys*

Dated:  April 1, 2015
Washington, D.C.