**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
                                         )
CHAMBER OF COMMERCE                       )
OF THE UNITED STATES                      )
OF AMERICA, et al.,                       )
                                         )
                  Plaintiffs,            )
                                         )
        v.                               )        Civil Action No. 15-0009 (ABJ)
                                         )
NATIONAL LABOR                           )
RELATIONS BOARD,                         )
                                         )
                  Defendant.             )
                                         )
```

**MEMORANDUM OPINION**

Plaintiffs the Chamber of Commerce of the United States of America, the Coalition for a Democratic Workplace, the National Association of Manufacturers, the National Retail Federation, and the Society for Human Resource Management ("the Chamber plaintiffs") have brought this action challenging a new set of regulations promulgated by the National Labor Relations Board ("NLRB" or "the Board") to govern union elections. They claim that the rule, entitled "Representation – Case Procedures," 79 Fed. Reg. 74,308 (Dec. 15, 2014) ("the Final Rule"), exceeds the Board's statutory authority under the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151–169. They also contend that the Final Rule is arbitrary and capricious and should be set aside under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and that it violates employers' First and Fifth Amendment rights. Compl. [Dkt. # 1] ("Chamber Compl."). In a separate action, Baker DC, LLC ("Baker") and three of its employees (collectively, "the Baker plaintiffs") also challenged the Final Rule on similar grounds, Am. Compl., *Baker DC, LLC v. NLRB*, No. 15-0571 (ABJ) [Dkt. # 12] ("Baker Am. Compl."), and the Court consolidated the two

cases.  Order (Apr. 22, 2015) [Dkt. # 31] ("Consolidation Order").  After considering the points and authorities set forth in the briefs submitted by both sides and the arguments presented at the hearing, the Court will uphold the Final Rule.

Plaintiffs mount a broad attack on the rule as a whole, claiming that it "makes sweeping changes to the election process" and that it "sharply curtails" employers' statutory, due process, and constitutional rights.  Pls.' Mot. for Summ. J. & Mem. in Supp. [Dkt. # 17] ("Chamber Mot.") at 1–3; *see also* Baker Am. Compl. ¶¶ 4–5, 11.  But these dramatic pronouncements are predicated on mischaracterizations of what the Final Rule actually provides and the disregard of provisions that contradict plaintiffs' narrative.  And the claims that the regulation contravenes the NLRA are largely based upon statutory language or legislative history that has been excerpted or paraphrased in a misleading fashion.  Ultimately, the statutory and constitutional challenges do not withstand close inspection, and what is left is a significant policy disagreement with the outcome of a lengthy rulemaking process.  This is apparent from the Chamber plaintiffs' heavy reliance upon the dissent to the Final Rule published by two members of the Board.  *See* 79 Fed. Reg. at 74,430–60 (dissent).

Plaintiffs' policy objections may very well be sincere and legitimately based, but in the end, this case comes down to a disagreement with choices made by the agency entrusted by Congress with broad discretion to implement the provisions of the NLRA and to craft appropriate procedures.  Given the level of deference that applies in an APA case, particularly in the labor context, and for the additional reasons set forth in more detail below, the Court does not find grounds to overturn the Final Rule.[1]  The Board's motion for summary judgment will be granted.

---

1        A parallel challenge to the Final Rule in the United States District Court for the Western District of Texas has been also resolved in the Board's favor.  *Associated Builders & Contractors of Tex., Inc. v. NLRB*, No. 1-15-CV-026 RP, 2015 WL 3609116 (W.D. Tex. June 1, 2015).

## BACKGROUND

### I.      Factual and Procedural Background

The Chamber plaintiffs are organizations and associations that "collectively represent millions of employers and human resource professionals in companies covered by the NLRA and subject to the Final Rule."  Chamber Compl. ¶¶ 11–16.  They bring this action challenging the Final Rule on behalf of their members.  *Id.* ¶¶ 11–15.  The Chamber plaintiffs filed a motion for summary judgment, and the Board filed a combined partial motion to dismiss pursuant to Rule 12(b)(1) and cross-motion for summary judgment, and those motions have been fully briefed. Chamber Mot.; Def.'s Partial Mot. to Dismiss & Cross-Mot. for Summ. J. [Dkt. # 22] ("Board Mot."); Pls.' Mem. in Opp. to Board Mot. & in Further Supp. of Chamber Mot. [Dkt. # 25] ("Chamber Reply"); Def.'s Reply in Supp. of Board Mot. [Dkt. # 27] ("Board Reply").  The Court also received an amicus brief in support of the Chamber plaintiffs.  Amicus Brief of the Nat'l Right to Work Legal Def. & Educ. Found., Inc., in Supp. of Pls. [Dkt. # 19] ("Amicus Brief").

The Baker plaintiffs are a District of Columbia employer and three of its employees.  Baker Am. Compl. ¶¶ 9–10.  After the United Construction Workers Local Union No. 202-Metropolitan Regional Council of Carpenters ("UCW") filed a petition with the Board seeking to represent Baker's employees for collective bargaining purposes, Baker filed a separate action with this Court on April 17, 2015, challenging the application of the Final Rule to Baker and its employees on many of the same grounds as the Chamber plaintiffs.  Compl., *Baker DC, LLC v. NLRB*, No. 15-0571 (ABJ) [Dkt. # 1] ("Baker Compl.").  That same day, Baker filed a motion for a temporary restraining order seeking to enjoin the enforcement of the Final Rule.  Pl.'s Mot. for TRO, *Baker DC, LLC v. NLRB*, No. 15-0571 (ABJ) [Dkt. # 3] ("Baker TRO Mot."); Pl.'s Mem. in Supp. of Baker TRO Mot., *Baker DC, LLC v. NLRB*, No. 15-0571 (ABJ) [Dkt. # 3-1] ("Baker TRO Mem.").

Baker filed an amended complaint, adding three of its employees as plaintiffs, on April 21, 2015. Baker Am. Compl. After finding that the Baker plaintiffs had failed to show that they would suffer irreparable harm if they were subjected to the regulatory regime implemented by the Final Rule pending resolution of the case on the merits, the Court denied the motion for injunctive relief and consolidated the Baker action with the Chamber plaintiffs' case. *Baker DC, LLC v. NLRB*, No. 15-0571 (ABJ), 2015 WL 1941516 (D.D.C. Apr. 22, 2015); Consolidation Order.

After the consolidation, the Baker plaintiffs joined the Chamber plaintiffs' motion for summary judgment and filed a supplemental opposition to the Board's motion, Opp. of Baker Pls. to Board Mot. [Dkt. # 32] ("Baker Opp."), to which the Board replied. Def.'s Reply to Baker Opp. [Dkt. # 33] ("Board 2d Reply"). All parties were heard at a hearing on the summary judgment motions on May 15, 2015. *See* Tr. of Hr'g (May 15, 2015) [Dkt. # 38] ("Hr'g Tr."). The Baker plaintiffs also filed a supplemental brief at the Court's direction. Supplemental Post-Hr'g Br. of Baker Pls. in Resp. to Ct.'s Req. [Dkt. # 37] ("Baker Br."). In joining the Chamber plaintiffs' challenge to the Final Rule, the Baker plaintiffs also rely on the arguments advanced in Baker's motion for a temporary restraining order. *See* Baker Opp. at 1.

## II.    Statutory Background

The National Labor Relations Act is the federal statute that regulates private sector labor-employer relations in the United States. 29 U.S.C. §§ 151–169. It was first passed by Congress in 1935, Pub. L. No. 74-198, 49 Stat. 449 (1935), and it has since been amended several times. *See, e.g.*, Labor Management Relations (Taft-Hartley) Act, Pub. L. No. 80-101, 61 Stat. 136 (1947); Labor-Management Reporting and Disclosure (Landrum-Griffin) Act, Pub. L. No. 86-257, 73 Stat. 519 (1959); Act of July 26, 1974, Pub. L. No. 93-360, 88 Stat. 395 (1974).

The Act begins with a declaration of national policy:

> It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

29 U.S.C. § 151. This statement is followed by a number of substantive provisions, including several that are relevant to this case.

Sections 153 through 156 establish the National Labor Relations Board. *Id.* §§ 153–156. Section 156 provides the Board with "authority from time to time to make, amend, and rescind . . . such rules and regulations as may be necessary to carry out the provisions" of the NLRA. *Id.* § 156. Section 157 is a declaration of the rights that employees "shall have," including "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively . . . [and] to refrain from any or all of such activities." *Id.* § 157. Section 158(a) defines unfair labor practices for both employers and labor organizations, and, in particular, it provides: "[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." *Id.* § 158(a)(1). Section 158(c) protects parties' free speech, and it provides that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." *Id.* § 158(c).

Section 159(b) states that it is the Board's duty to determine the appropriate unit for the purposes of collective bargaining, "in order to assure to employees the fullest freedom in

5

exercising the rights" guaranteed by the NLRA. *Id.* § 159(b). Accordingly, when employees and their employer are unable to agree on whether the employees should be represented by a labor union, section 159(c) sets out the procedures for resolving that issue. *Id.* § 159(c). First, an employee, union, or employer files a petition for an election through one of the Board's regional offices. *Id.* § 159(c)(1). Second, if there is reasonable cause to believe that a "question of representation"[2] exists, the Board will "provide for an appropriate hearing upon due notice," which the Court will refer to as the "pre-election hearing." *Id.* The pre-election hearing may be conducted by an officer or employee of one of the Board's regional offices, called the hearing officer. *Id.* If it is determined that a question of representation does exist, the Board directs an election by secret ballot, and it certifies the results of that election. *Id.*

Section 153 of the NLRA allows the Board to delegate its section 159 authority to its regional directors, permitting them "to determine the unit appropriate for the purpose of collective bargaining, to investigate and provide for hearings, and determine whether a question of representation exists, and to direct an election or take a secret ballot . . . and certify the results thereof." *Id.* § 153(b). While a hearing officer may conduct the pre-election hearing, he may not make "any recommendations with respect thereto," as decisions regarding elections are reserved for the regional directors and the Board. *See id.* § 159(c)(1). "[U]pon the filing of a request [for review] with the Board by any interested person, the Board may review any action of a regional director delegated to him," but review by the Board does not operate as a stay of the regional director's action. *Id.* § 153(b).

---

2       Under the Final Rule, "[a] question of representation exists if a proper petition has been filed concerning a unit appropriate for the purpose of collective bargaining or concerning a unit in which an individual or labor organization has been certified or is being currently recognized by the employer as the bargaining representative." 29 C.F.R. § 102.64(a).

### III.   Regulatory Background

After announcing the proposed rule and subjecting it to a notice and comment period,[3] the

Board published the Final Rule in the Federal Register on December 15, 2014.  79 Fed. Reg. at

74,308, 74,311.  Two Board members dissented.  *Id.* at 74,430–60 (dissent).  As was announced

in December, the Final Rule went into effect on April 14, 2015.  *See id.* at 74,308.  It implemented

twenty-five changes to the procedures governing the election of union representatives for

collective bargaining purposes.  *Id.* at 74,308–10 (summarizing amendments).  Those changes are

codified within 29 C.F.R. Parts 101, 102, and 103.

Although the Chamber plaintiffs seek to have the entire Final Rule invalidated, *see*

Chamber Mot. at 44,[4] they have raised specific objections to only some of the changes

implemented by the Final Rule.  *See* Chamber Mot. at 10.  The Baker plaintiffs object to the same

provisions.  Baker Am. Compl. ¶ 4.  Those provisions are:

- The requirement that, "[w]ithin 2 business days after service of the notice of hearing, the employer . . . post the [Board's] Notice of Petition for Election in conspicuous places, including all places where notices to employees are customarily posted, and shall also distribute it electronically if the employer customarily communicates with its employees electronically."  29 C.F.R. § 102.63(a)(2).

---

3      In 2011, the Board issued a final rule enacting similar changes to the representation election process, and it was also subject to a notice and comment period.  79 Fed. Reg. at 74,311; *see also* Representation – Case Procedures, 76 Fed. Reg. 80,138 (Dec. 22, 2011).  After the Chamber of Commerce and the Coalition for a Democratic Workplace challenged that rule, it was invalidated on the sole ground that the Board acted in the absence of a quorum.  *Chamber of Commerce v. NLRB*, 879 F. Supp. 2d 18, 20–21 (D.D.C. 2012).  The court in that case stated that it "does not reach – and expresses no opinion on – Plaintiffs' other procedural and substantive challenges to the rule."  *Id.* at 30.

4      It is not entirely clear whether the Baker plaintiffs seek to have the entire Final Rule set aside or just the provisions they have challenged.  *Compare* Baker Am. Compl. at 11 (asking that the Court "[v]acate and set aside the new Rule") *with* Baker Opp. at 2 ("The challenged provisions of the new Rule should therefore be set aside.").  But, because they "agree with and incorporate by reference" the Chamber plaintiffs' pleadings, Baker Opp. at 1, which ask this Court to invalidate the entire Final Rule, the Court will presume that the Baker plaintiffs seek the same relief.

- The requirement that the employer file a written "Statement of Position" before the pre-election hearing is scheduled to begin, detailing its position on a range of issues, or risk waiving its ability to litigate those issues at the pre-election hearing.  *Id.* §§ 102.63(b)(1)(i), 102.66(d).

- The provision clarifying that the purpose of the pre-election hearing "is to determine if a question of representation exists," and permitting regional directors to decline to take evidence on or litigate "individuals' eligibility to vote or inclusion in an appropriate unit."  *Id.* § 102.64(a).

- The provision stating that, once the pre-election hearing has been held and a direction of election issued by the regional director, "[t]he regional director shall schedule the election for the earliest date practicable consistent with these rules."  *Id.* § 102.67(b).

- The requirement that the employer, within two business days after the direction of election, provide a "voter list" to the regional director and the parties to the election proceeding, containing "the full names, work locations, shifts, job classifications, and contact information (including home addresses, available personal email addresses, and available home and personal cellular ('cell') telephone numbers) of all eligible voters."  *Id.* § 102.67(*l*).

- The elimination of parties' ability to stipulate to mandatory post-election Board review through a stipulated election agreement.  *Id.* at 101.28; 102.62(b).[5]

Plaintiffs contend that certain of these provisions violate the NLRA or the Constitution, and that several are the result of arbitrary and capricious rulemaking.  Each challenged provision and the specific grounds for plaintiffs' objections are discussed in greater detail below.

---

[5]    At the summary judgment hearing, the Court asked the parties to identify the specific changes enacted by the Final Rule to which they objected.  Hr'g Tr. 6:14–18.  Counsel for the Chamber plaintiffs stated that they challenge amendments four, five, seven, eight, nine, ten, thirteen, fifteen, seventeen, and twenty of the Final Rule.  *See id.* 11:18–12:15, discussing 79 Fed. Reg. at 74,308–10.  Those amendments deal with the requirement that employers post the Board's Notice of Petition for Election; the timing, scope, and purpose of the pre-election hearing; the requirement that employers file a pre-hearing statement of their position on a range of issues; the elimination of the presumptive pre-election waiting period; the requirement that employers disclose employees' personal contact information; and the elimination of parties' ability to stipulate to mandatory Board review of post-election disputes.  Counsel for the Baker plaintiffs stated that they challenge the same amendments.  *See id.* 16:15–19.

**STANDARD OF REVIEW**

**I.      Motion to Dismiss**

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'"  *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## II.     Summary Judgment

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases involving review of agency action under the APA, Rule 56 does not apply due to the limited role of a court in reviewing the administrative record. *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011).

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedure required by law." *Id.* § 706(2)(D). However, the scope of review is narrow. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency's decision is presumed to be valid, *see Am. Radio Relay League, Inc. v. FCC*, 617 F.2d 875, 879 (D.C. Cir. 1980), and a court must not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43.

When a plaintiff challenges an agency's authority to act, a court analyzes the agency's interpretation of the authorizing statute using the two-step procedure set forth in *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984). First, the court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. Courts "use 'traditional tools of statutory construction' to determine whether Congress has unambiguously expressed its intent," *Serono Labs., Inc., v. Shalala*, 158 F.3d 1313, 1319 (D.C.

Cir. 1998), quoting *Chevron*, 467 U.S. at 843 n.9, including the statute's text, structure, purpose, and legislative history. *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997).

If the court concludes that the statute is either silent or ambiguous, the second step of the review process is to determine whether the interpretation proffered by the agency is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Once a reviewing court reaches the second step, it must accord "considerable weight" to an executive agency's construction of a statutory scheme it has been "entrusted to administer." *Id.* at 844. Indeed, "under *Chevron*, courts are bound to uphold an agency interpretation as long as it is reasonable – regardless whether there may be other reasonable, or even more reasonable, views." *Serono Labs.*, 158 F.3d at 1321.

If an agency's construction of the applicable statute satisfies *Chevron*, the court is still bound to ensure that the challenged action is not otherwise arbitrary and capricious. *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007). Agency action will be upheld if the agency involved "has considered the relevant factors and articulated a 'rational connection between the facts found and the choice made.'" *Id.*, quoting *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000). The review is "[h]ighly deferential" and it "presumes the validity of agency action." *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000). The agency may rely on comments submitted during the notice and comment period as justification for the rule, so long as the submissions are examined critically. *See Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1125 (D.C. Cir. 1984). But it "need not – indeed cannot – base its every action upon empirical data; depending upon the nature of the problem, an agency may be 'entitled to conduct . . . a general analysis based on informed conjecture.'" *Chamber of Commerce v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005), quoting *Melcher v. FCC*, 134 F.3d 1143, 1158 (D.C. Cir. 1998).

ANALYSIS

I.      **The Nature and Justiciability of the Challenges to the Final Rule**

        A.      **The Facial Challenge to the Final Rule**

        The Court must first address the Board's contention that those provisions of the Final Rule

that provide regional directors with a measure of discretion, such as those concerning the scope of

the pre-election hearing and the length of the campaigning period, are "not ripe for a pre-

enforcement facial challenge," and that plaintiffs' challenges to those provisions should be

dismissed.[6]  Board Mot. at 4; *see also* Board Reply at 1–3; Board 2d Reply at 1–4.  According to

the Board, because the Final Rule grants regional directors the discretion to determine whether

individual voter eligibility and inclusion issues will be litigated at the pre-election hearing, and

because it "contains no rigid time targets" for the length of representation election proceedings,

plaintiffs' facial challenge is "ill-suited for review at this time."  Board Mot. at 5–6.  In support of

this argument, the Board relies on *Reno v. Flores*, 507 U.S. 292 (1993), which held that a party

bringing a facial challenge to a regulation must prove that "no set of circumstances exists under

which the regulation would be valid."  Board Mot. at 4–5, quoting *Flores*, 507 U.S. at 301.

        The Chamber plaintiffs submit that because they "challenge an agency's purely legal

interpretation of a statute, not an exercise of discretion," their "pre-implementation challenge" to

the discretionary aspects of the Final Rule is ripe.  Chamber Reply at 2–3.  In other words, because

the Final Rule has gone into effect, their attacks on its facial validity are justiciable, even as to the

discretionary provisions.  Hr'g Tr. 21:19–22:18.  The Court agrees with this contention; as the

D.C. Circuit has observed, "a purely legal claim in the context of a facial challenge . . . is

---

6       The Board does not dispute the ripeness of plaintiffs' facial challenge to the non-discretionary portions of the Final Rule.  Board Mot. at 4 n.2; *see also* Board Reply at 1 n.1.

presumptively reviewable," especially where it is a claim "that an agency's action is arbitrary and capricious or contrary to law." *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 215 (D.C. Cir. 2007), quoting *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005). Indeed, this interpretation is consistent with *Flores*, which set out the no set of circumstances test as the standard for consideration of a facial challenge on its merits. *See* 507 U.S. at 301.

The Chamber plaintiffs maintain, though, that the no set of circumstances test should not apply. They state that "[t]he D.C. Circuit has made clear that '[t]he Supreme Court has never adopted a no set of circumstances test to assess the validity of a regulation challenged as facially incompatible with governing statutory law.'" Chamber Reply at 3–4, quoting *Nat'l Mining Assoc. v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1407 (D.C. Cir. 1998). But the Court of Appeals subsequently clarified that observation, and it has stated that the *National Mining Association* decision "was made in the mistaken belief" that the Supreme Court had never before applied the "no set of circumstances" test to a facial statutory challenge, when in fact it "had done just that several years earlier in *Flores*." *Sherley v. Sebelius*, 644 F.3d 388, 397 n.** (D.C. Cir. 2011); *see also Amfac Resorts, LLC v. Dep't of Interior*, 282 F.3d 818, 826 (D.C. Cir. 2002) (stating that the *National Mining Association* decision "apparently overlooked" the Supreme Court's ruling in *Flores*), *vacated in part on other grounds sub nom. Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003). Recognizing that it was "bound . . . by a higher authority," the *Sherley* Court followed *Flores* in applying the no set of circumstances test to a facial challenge to

agency regulations, despite the conflicting panel decision in *National Mining Association*.   644

F.3d at 397 n.**.[7]

In *Flores*, a class of juvenile aliens challenged a final rule implemented by the Immigration

and Naturalization Service ("INS").   507 U.S. at 299–300.   The situation was similar to the one

facing this Court:

> [T]his is a facial challenge to INS regulation 242.24.   Respondents do not
> challenge its application in a particular instance; it had not yet been applied
> in a particular instance – because it was not yet in existence – when their
> suit was brought . . . and it had been in effect only a week when the District
> Court issued the judgment invalidating it.   We have before us no findings
> of fact, indeed no record, concerning the INS's interpretation of the
> regulation or the history of its enforcement.   We have only the regulation
> itself and the statement of basis and purpose that accompanied its
> promulgation.

*Id.* at 300–01.   Under the circumstances, the Court held that "[t]o prevail in such a facial

challenge," the respondents "must establish that no set of circumstances exists under which the

[regulation] would be valid."   *Id.* at 301, quoting *United States v. Salerno*, 481 U.S. 739, 745

(1987).   This test applied to "both the constitutional challenges, and the statutory challenge."   *Id.*,

citing *Schall v. Martin*, 467 U.S. 253, 268 n.18 (1984), and *INS v. Nat'l Ctr. for Immigrants'*

*Rights, Inc.*, 502 U.S. 183, 188 (1991).

---

7       Several panels of the D.C. Circuit have applied the *Flores* no set of circumstances test to
facial challenges to agency actions and regulations.   *See, e.g.*, *Ass'n of Private Sector Colls. &
Univs. v. Duncan*, 681 F.3d 427, 433–34, 442 (D.C. Cir. 2012) (applying test to facial challenge
to Department of Education regulations that increased requirements for schools to qualify for
federal funds under Title IV of the Higher Education Act of 1965); *Air Transp. Ass'n of Am., Inc.
v. Dep't of Transp.*, 613 F.3d 206, 208, 213 (D.C. Cir. 2010) (applying test to amendments to
Department of Transportation Policy Regarding Airport Rates and Charges); *see also Owner-
Operator Indep. Drivers Ass'n, Inc. v. Pena*, 996 F.2d 338, 339 (D.C. Cir. 1993) ("[I]f we had
jurisdiction we would have to decide whether 'the Pilot Program' – whatever that might
comprehend – was incapable of being administered in a constitutional fashion."), *citing Flores*,
507 U.S. at 301.

Given the procedural posture of this case, the Court will adopt the approach taken by the D.C. Circuit panel in *Sherley* and follow *Flores* here. *Accord Associated Builders & Contractors of Tex., Inc. v. NLRB*, No. 1-15-CV-026 RP, 2015 WL 3609116, at *4 (W.D. Tex. June 1, 2015). (applying no set of circumstances test in parallel challenge to the Final Rule). Applying that precedent, the Court finds that the facial challenge to the discretionary provisions of the Final Rule is ripe for consideration, and the Board's partial motion to dismiss will be denied. To succeed on their motion for summary judgment, plaintiffs must show that there is no set of circumstances under which the Final Rule could be applied consistently with the NLRA or the Constitution.[8]

---

8   The Court acknowledges that two courts in this District, after carefully reviewing the relevant precedent, observed that "there is a good deal of confusion in this Circuit and elsewhere as to when courts should apply *Reno v. Flores* . . . rather than *Chevron*, when plaintiffs challenge regulations on their face." *Am. Petroleum Inst. v. Johnson* (*API*), 541 F. Supp. 2d 165, 188 (D.D.C. 2008) (noting that the *Chevron* approach "seem[ed] especially sound," but deciding case on procedural grounds under the APA); *see also Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 38–40 (D.D.C. 2003) (noting that "confusion in this Circuit remains" regarding the application of the *Flores* test to facial challenges to agency regulations, and analyzing the challenge in that case under *Chevron*). But these cases are not "controlling authority," as the Chamber plaintiffs describe them, *see* Chamber Reply at 4, and the courts in the *API* and *Mineral Policy* cases did not have the benefit of several subsequent decisions issued by panels of the D.C. Circuit embracing the *Flores* approach in reviewing agency regulations. *See supra* note 7.

In addition, the reasoning underlying the decision to apply *Chevron* rather than *Flores* in those cases is distinguishable from the situation faced by the Court here. In the *API* case, the question presented was one of pure statutory interpretation: the agency had undertaken to define a statutory term in its new regulations. 541 F. Supp. 2d at 187–89. And the *Mineral Policy* case also involved a question of statutory interpretation, and the court noted that *Chevron* was "adequately deferential" to the decisions of the agency, and found that the regulation did not pass muster under *Chevron* in any event. 292 F. Supp. 2d at 38–40. Here, in contrast, plaintiffs are challenging a procedural regime that involves considerable discretion and for which there is no history of enforcement. This differentiates the Final Rule from the sort of regulations to which other courts in this District have applied *Chevron* rather than *Flores*, and it presents the very situation that led the Supreme Court in *Flores* to apply the no set of circumstances test.

B.     The Baker Plaintiffs' As-Applied Challenge

Baker filed its initial complaint on April 17, 2015, three days after the Final Rule went into effect and before proceedings under the Final Rule had begun.  But while this action has been pending, the Baker plaintiffs have proffered evidence along the way, alerting the Court about how the Final Rule is being applied in the ongoing election proceeding at the company.  *See, e.g.*, Baker Opp. at 1–2 ("appris[ing] the Court of events that have transpired in the related Board representation proceeding since the filing of the [UCW] petition").[9]  The Baker plaintiffs contend that, in light of the application of the Final Rule to the ongoing election proceeding, the Board can no longer contend that the consolidated legal challenge is not ripe for review.  *Id.* at 5.

As discussed above, the Court agrees that plaintiffs' facial challenge to the Final Rule is justiciable at this time, even absent any specific developments in the Baker election proceeding.  But to the extent that the Baker plaintiffs seek to recharacterize their complaint as including an as-applied challenge, *see* Baker Br. at 1 ("Baker's Complaint states both a facial and as-applied challenge to the [Final] Rule."), that challenge would not be ripe.  Essentially, the Baker plaintiffs are asking this Court to hit a moving target – to take notice of, and rule on, the propriety of the regional director's decisions in their representation case as it unfolds and before it is complete.  The very nature of this request makes it clear that any as-applied claims are not justiciable until the entire election process and the subsequent Board review has come to its conclusion.

At the outset, the Court questions whether Baker's original or amended complaint can even be construed as asserting an as-applied challenge.  The original complaint was filed on April 17,

---

9       Specifically, Baker has informed the Court that it was compelled to post the Board's Notice of Petition for Election, file a Statement of Position, and disclose employee names and information, and that it was prevented from litigating individual voter eligibility and inclusion issues at the pre-election hearing.  *See* Baker Br. at 2.

2015, just three days after the Final Rule went into effect and well before any of its provisions had been applied to Baker. *See* Baker Compl. And the amended complaint is identical in every material respect to the original complaint. *Compare* Baker Compl. *with* Baker Am. Compl. Both complaints allege only that the Final Rule on its face is contrary to the NLRA, the APA, and the Constitution, and that it is arbitrary and capricious – not because of how it has been or will be applied to Baker or its employees, but because of the way it was written. *See* Baker Compl. ¶¶ 12– 38; Baker Am. Compl. ¶¶ 12–38.[10] Ripeness is to be determined at the time the complaint is filed. *See, e.g.*, *Ctr. for Sci. in Pub. Interest v. FDA*, No. Civ. A. 03-1962 (RBW), 2004 WL 2218658, at *3 (D.D.C. Sept. 17, 2004) ("When a court reviews claims for ripeness or standing to pursue a claim, such review is conducted based on the facts that existed at the time the complaint was filed."). Therefore, since the Baker plaintiffs' complaint and amended complaint were filed before the Final Rule was fully applied to Baker, the Court could find on this ground alone that they do not state an as-applied challenge.

Further, even if the Court generously construed the Baker complaints to include such a challenge, it would not be ripe. The Baker plaintiffs assert that their extrinsic evidence "show[s] as a matter of public record and undisputed facts that the allegations of the Complaint regarding the [Final] Rule's adverse impact on the Baker plaintiffs were true." Baker Br. at 2; *see also id.* at 3 ("Baker's supplemental information merely establishes that a number of these identified adverse impacts have in fact occurred."). But these assertions of ongoing or imminent injury-in-fact go to

---

10     In fact, large portions of the substantive allegations of the Baker plaintiffs' complaints were copied nearly verbatim from the Chamber plaintiffs' complaint. *Compare* Baker Am. Compl. ¶¶ 19–23, 25–26, 28–38 *with* Chamber Compl. ¶¶ 65–70, 72, 76–86. And the Chamber plaintiffs specifically acknowledged that they presented only a facial challenge. Chamber Reply at 3 (stating that the Chamber plaintiffs' challenge presents "purely legal questions that . . . are properly resolved through a facial challenge"). This casts further doubt on whether the Baker plaintiffs' complaint states an as-applied challenge.

the Baker plaintiffs' standing to bring these challenges – which has not been contested – and they do not establish the ripeness of any as-applied challenge as a prudential matter.

"The fundamental purpose of the ripeness doctrine is 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Sprint Corp. v. FCC*, 331 F.3d 952, 957 (D.C. Cir. 2003), quoting *Nat'l Park Hospitality*, 538 U.S. at 807–08.  While the constitutional aspect of ripeness may involve the same impending injury-in-fact requirement that is necessary for standing, the prudential aspect of ripeness requires more:  a court must "balance[] 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427–28 (D.C. Cir. 1996), quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), and citing *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 81–82 (1978). The fitness of an issue for judicial decision depends on whether there are "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985) (citations omitted).

Here, to the extent the Baker plaintiffs wish to reformulate their claim as an as-applied challenge, they are asking the Court to engage in precisely the sort of premature analysis of an unfinished administrative process that the ripeness doctrine is designed to prevent.  There are many points in the representation election proceeding at which the Baker plaintiffs' objections to the discretionary decisions made under the Final Rule could be rendered moot:  UCW could lose the election, the number of challenged voters could be too small to affect the results, or the Board could grant a request to review the regional director's decision and overturn it.  There has yet to

be a formal, final outcome, and these potential future events weigh against a finding that an as-applied challenge is ripe.[11]

Furthermore, once the process is complete, this would not be the forum in which the Baker plaintiffs could obtain review in any event.  Even if Baker loses at each of these administrative stages, it can refuse to bargain with UCW, thereby triggering an unfair labor practice hearing, and it can seek review of the result of that hearing before the D.C. Circuit pursuant to 29 U.S.C. § 160(f).  Through that provision, "Congress declared that the person aggrieved by a Board representation decision is *obliged* to precipitate an unfair labor practice proceeding as a means of securing review in the appellate courts."  *Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1311 (D.C. Cir. 1984) (emphasis added) (citation omitted); *see also id.* at 1310 ("The cases are legion holding that, as a general rule, Board orders emanating from representation proceedings are not directly reviewable in court.").  The Baker plaintiffs insist that they are "not actually asking [the Court] to enjoin the representation proceeding that's ongoing," and that they are only asking the Court "to enjoin, to vacate" the Final Rule.  Hr'g Tr. 69:1–5; *see also* Baker Opp. at 5 n.3 ("Plaintiffs are not seeking to enjoin an ongoing representation proceeding; they are seeking to set aside an unlawful Rule.").  If that is so, then the facial challenge, which is the only aspect of the Baker plaintiffs' complaint that is ripe, should suffice to serve that purpose.

As for the Baker plaintiffs' APA challenge, the Court cannot consider evidence of what is transpiring in the ongoing representation case proceedings, because its review of the Board's action under the APA is limited to the administrative record that was before the agency at the time

---

11      As for the non-discretionary aspects of the Final Rule, like the requirements that employers post the Board's Notice of Petition for Election and disclose employee names and personal contact information, those objections are still preserved, and they will be addressed in this Court's ruling on plaintiffs' facial challenges.

it made its decision.  *See* 5 U.S.C. § 706; *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C.

Cir. 1996); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("In applying [the abuse

of discretion] standard, the focal point for judicial review should be the administrative record

already in existence, not some new record made initially in the reviewing court.").  Thus, how the

Final Rule has been applied to Baker and its employees since it went into effect is not properly

part of any challenge under the APA,[12] and what is pending before the Court is the consolidation

of plaintiffs' facial attack on the Final Rule, to be analyzed under the *Flores* test.

## II.    The Individual Challenges to the Final Rule

In examining each of plaintiffs' challenges to the Final Rule, the Court cannot help but

notice that the complaints are largely conclusory and argumentative.[13]  They rely heavily on the

repetition of disparaging labels, referring to the Final Rule as the "'ambush' or 'quickie' election

rule" that compels employees to "'vote now, understand later.'"  Chamber Mot. at 1, quoting 79

Fed. Reg. at 74,430 (dissent).  This tendency to speak in broad terms continued well into the

---

12      The Baker plaintiffs contend that the ongoing proceedings are properly considered as part of their APA challenge because the ripeness of their claims would not otherwise be "self-evident" from the administrative record.  Baker Br. at 5.  But here again, they confuse ripeness with standing in asserting that "it is no longer speculative" that the harms they have predicted will materialize as a result of the Final Rule.  *Id.*  The Baker plaintiffs also claim that their extra-record information may be considered as background material.  *Id.* at 6, citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).  But, as the Baker plaintiffs recognize, the *Esch* case has been severely limited by the D.C. Circuit to circumstances which are entirely absent here.  *See Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("*Esch* has been given a limited interpretation since it was decided, and at most it may be invoked to challenge gross procedural deficiencies – such as where the administrative record itself is so deficient as to preclude effective review."), citing *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010).

13      The Court observes that there is little about the Chamber plaintiffs' press release of a complaint that resembles the "short and plain statement" of facts called by for Federal Rule of Civil Procedure 8.  Indeed, much of what can only be characterized as argument is repeated – almost verbatim – in the Chamber plaintiffs' memorandum in support of their motion for summary judgment.  *Compare* Chamber Compl. ¶¶ 1–4, 11–17, 28–29, 32, 37, 39–49, 51 *with* Chamber Mot. at 1, 3–5, 7–11.

parties' lengthy, but often nebulous, memoranda.  Faced with this lack of specificity, the Court struggled at oral argument to get counsel to identify which provisions of the Final Rule violated which provisions of the NLRA or the Constitution and how.  Counsel resisted being pinned down, insisting that the analysis should be conducted at the 30,000 foot level.  This may be because when one descends to the level of the particular, the provisions at issue are not quite as described.  On its face, the Final Rule does not necessarily lead to the outcomes to which plaintiffs object, because it accords the Board's regional directors considerable discretion to apply its provisions in a manner that is appropriate to individual circumstances.

Plaintiffs fended off the Court's attempts to zero in on specific regulatory language, maintaining that it is the entire Final Rule – the combination of the requirement to submit an early Statement of Position, the claimed elimination of the pre-election hearing on voter eligibility issues, the shortening of the presumptive minimum time period between the petition and the election, and the denial of an opportunity to agree to stipulate to full Board review – that violates the statutory regime as a whole.  But this attempt to look at the regulatory changes in the aggregate fails if the component parts have been inaccurately portrayed, or if they each pass muster under the applicable statutory and constitutional provisions.  So the Court must proceed to examine each of the challenged regulations individually, notwithstanding plaintiffs' disinclination to do so.

The motions present no genuine issues of material fact, and so the case may be properly decided on summary judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The questions presented are:  (1) whether the challenged portions of the Final Rule violate the NLRA; (2) whether those provisions violate the First and Fifth Amendments of the Constitution of the United States; and (3) whether the decision to implement the Final Rule was arbitrary and capricious under the APA.  The Court undertakes this

review bound by the long line of Supreme Court precedent which emphasizes that "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330 (1946). "The control of the election proceedings, and the determination of the steps necessary to conduct that election fairly were matters which Congress entrusted to the Board alone." *NLRB v. Waterman S.S. Corp.*, 309 U.S. 206, 226 (1940). It is with this direction in mind that the Court reviews each of the challenged provisions of the Final Rule.

### A.    The Posting Requirement

The Final Rule provides that "[w]ithin 2 business days after service of the notice of hearing, the employer shall post the [Board's] Notice of Petition for Election in conspicuous places, including all places where notices to employees are customarily posted, and shall also distribute it electronically if the employer customarily communicates with its employees electronically." 29 C.F.R. § 102.63(a)(2) ("the Posting Requirement"). Under the prior regulations, the posting of such a notice was voluntary, and the notice was less detailed. 79 Fed. Reg. at 74,309.

As an exhibit to its motion for a TRO, Baker submitted a copy of the notice it was required to post, making it part of the record in this case. *See* Ex. 1 to Baker TRO Mot., *Baker DC, LLC v. NLRB*, No. 15-0571 (ABJ) [Dkt. # 3-2] at 11–12. The notice is emblazoned with the text "National Labor Relations Board" at the top and bottom, and that text is bracketed by two NLRB seals. *Id.* The phrase "THIS IS AN OFFICIAL GOVERNMENT NOTICE" is printed in bold-face, capital letters at the bottom of the second page. *Id.* at 12.

The notice informs employees that a petition has been filed by UCW, which is "seeking an election to become certified as the representative" of Baker's employees. *Id.* at 11. It also states that, under "Federal Law," employees have certain rights:

- To self-organiz[e]

- To form, join, or assist labor organizations

- To bargain collectively through representatives of [their] own choosing

- To act together for the purposes of collective bargaining or other mutual aid or protection

- To refuse to do any or all of these things unless the union and employer, in a state where such agreements are permitted, enter into a lawful union-security agreement requiring employees to pay periodic dues and initiation fees. Nonmembers who inform the union that they object to the use of their payments for nonrepresentational purposes may be required to pay only their share of the union's costs of representational activities (such as collective bargaining, contract administration, and grievance adjustments).

*Id.*

The notice outlines the procedure for processing the petition for election. *Id.* It states that the NLRB's goal is to apply rules "that are intended to keep its elections fair and honest and that result in a free choice," and it sets forth examples of conduct that would interfere with employees' rights and may result in setting aside the election. *Id.* at 12. The notice additionally informs the reader that "every effort will be made to protect your right to a free choice under the law," and that "[t]he NLRB as an agency of the United States Government does not endorse any choice in the election." *Id.* Finally, the notice directs employees to "go to www.nlrb.gov or contact the NRLB" to obtain "additional information about the processing of petitions." *Id.*

The Final Rule provides that an employer's failure to post or distribute the Notice of Petition for Election may be grounds for setting aside the election if proper and timely objections are filed. 29 C.F.R. § 102.63(a)(2).

Both sets of plaintiffs challenge the Posting Requirement on the grounds that it impermissibly compels employers to engage in speech about unionization, even before the Board

has determined whether a petition is valid and will result in an election.  Chamber Mot. at 42–44; Baker TRO Mem. at 5–7.  The Chamber plaintiffs argue that the Final Rule violates the First Amendment, Chamber Mot. at 42–44, and the Baker plaintiffs claim that it contravenes the NLRA and the First Amendment.  Baker TRO Mem. at 5–7; Baker Am. Compl. ¶¶ 23–24.

### 1.    The Posting Requirement does not violate section 8(c) of the NLRA.

Section 8(c) of the NLRA provides:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of [the Act], if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c).

The Baker plaintiffs cite *National Association of Manufacturers v. NLRB* (*NAM*), 717 F.3d 947, 955 (D.C. Cir. 2013), *overruled in part by American Meat Institute v. Department of Agriculture*, 760 F.3d 18, 22–23 (D.C. Cir. 2014), in support of their claim that the Posting Requirement is contrary to section 8(c).  Baker Am. Compl. ¶ 24; *see also* Baker TRO Mem. at 5–6.  But as this Court has already indicated in its Memorandum Opinion denying Baker's motion for a TRO, that case is distinguishable, and it does not stand for the proposition that a requirement to post an election notice – or any NLRB-issued poster – contravenes the statute.  *See Baker*, 2015 WL 1941516, at *4–*5.

In the *NAM* case, the trade association challenged a Board rule which would have required all employers to post a general notice informing employees of their rights under the NLRA.  717 F.3d at 949–50.  The rule included three possible sanctions for the failure to comply:  it declared that an employer's failure to post the notice would constitute an unfair labor practice; it permitted the Board to "suspend the running of the six-month limitations period for filing any unfair-labor-

practice charge" for a failure to post; and it authorized the Board to consider an employer's failure

to post "as evidence of unlawful motive in a case in which motive is an issue." *Id.* at 950–51.

Because the posting rule made an employer's failure to post the Board's notice an unfair

labor practice, and because it deemed such a failure to be evidence of unlawful motive in other

cases, the D.C. Circuit found, as the District Court did below, that the enforcement provisions of

the posting rule violated the guarantee in section 8(c) that "[t]he expressing of any views,

argument, or opinion, or the dissemination thereof . . . shall not constitute or be evidence of an

unfair labor practice." *NAM*, 717 F.3d at 951, 954, 959; 29 U.S.C. § 158(c).  Since the means for

enforcing the Board's posting requirement were invalid, and the Court concluded that the

enforcement provisions could not be severed from the posting rule itself, it struck down the entire

rule.  *NAM*, 717 F.3d at 963–64.  Significantly, the Court did not decide "whether, as plaintiffs

also contend, the Board lacked the regulatory authority to issue . . . the requirement that employers

post the notice" under the NLRA or the Constitution.  *Id.* at 963.  So the *NAM* case does not support

the Baker plaintiffs' argument that the Posting Requirement as contrary to section 8(c).

If anything, the case is contrary to the Baker plaintiffs' position, because the D.C. Circuit

specifically distinguished the general employee rights notice involved in that case, which carried

with it the unfair labor practice penalty, from the then-existing NLRB election notice posting

requirement, which made the failure to post "a basis for setting aside the election."  *Id.* at 959 n.19

("Our conclusion here does not affect the Board's rule requiring employers to post an election

notice . . . . Because the failure to post the required election notice does not constitute an unfair

labor practice but may be a basis for setting aside the election, the rule does not implicate § 8(c)."),

citing 29 C.F.R. § 103.20(d) (2013).  Like the election notice posting requirement deemed to be

lawful by the D.C. Circuit, the Final Rule provides only that an employer's "failure properly to

post or distribute the Notice of Petition for Election may be grounds for setting aside the election."

29 C.F.R. § 102.63(a)(2).  So the Court finds that the Posting Requirement "does not implicate

§ 8(c)," *see NAM*, 717 F.3d at 959 n.19, and the Baker plaintiff's section 8(c) challenge to the

Posting Requirement fails.

## 2.     The Posting Requirement does not violate the First Amendment.

Both sets of plaintiffs also complain that the Posting Requirement compels employers to

speak and forces them "to disseminate a message the employer may not support or agree with,"

and that it therefore violates employers' free speech rights.  Chamber Mot. at 42; *see also* Baker

TRO Mem. at 5 ("The [Final] Rule . . . runs afoul of the First Amendment's prohibition against

compelled speech by impermissibly co-opting employers to deliver the government's own

preferred message.").  The Board takes the position that the notice is government speech which is

not subject to scrutiny under the free speech clause, and that since the Posting Requirement does

not interfere with employer speech, it does not violate the First Amendment.  Board Mot. at 42–

43.[14]

In the *NAM* case, this Court held that the requirement to post the NLRB notice of employee

rights did not violate the Constitution.  *Nat'l Ass'n of Mfrs. v. NLRB*, 846 F. Supp. 2d 34, 58–61

(D.D.C. 2012), *aff'd in part, rev'd in part on other grounds*, 717 F.3d 947.  And another judge in

this District recently addressed a similar First Amendment challenge to a Board posting rule, and

it found that the requirement to post a notice of employee rights "does not unconstitutionally

---

14      The Board also contends that the Chamber plaintiffs waived their First Amendment
argument because "it was not adequately raised by the Chamber during the rulemaking process."
Board Mot. at 42.  But since the Baker plaintiffs challenge the Final Rule on the same grounds,
and the Board has conceded that the consolidation of the two cases effectively moots their waiver
argument, *see* Hr'g Tr. 118:5–19, the Court need not decide the waiver issue, and it will proceed
to the merits of the First Amendment claim.

compel speech." *Nat'l Ass'n of Mfrs. v. Perez*, No. 1:13-cv-01998 (APM), 2015 WL 2148230, at

*5 (D.D.C. May 7, 2015).  The Court agrees with the thorough analysis in that case.

First, the Court finds that the Notice of Petition for Election is government speech.  The

NLRB has effective control and final approval authority over the poster's content, which are two

factors that signal government speech.  *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460,

473 (2009) (finding government speech where "the City has 'effectively controlled' the messages

sent" by monuments displayed in a city park "by exercising 'final approval authority' over their

selection"), quoting *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560–61 (2005); *see also*

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2249–51 (2015) (applying

"direct control" and "final authority" factors in finding that a license plate is government speech).

And the notice clearly indicates that the government, and not the employer, is the speaker:  it

displays the NLRB seal on all four corners, it is labeled "National Labor Relations Board" at the

top and bottom, and it announces, "THIS IS AN OFFICIAL GOVERNMENT NOTICE."  With

these identifiers, "there is little chance that observers will fail to appreciate the identity of the

speaker." *Summum*, 555 U.S. at 471.

It is true, though, that "the First Amendment does not 'le[ave] it open to public authorities

to compel [a person] to utter' a message with which he does not agree." *Johanns*, 544 U.S. at 557,

quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943).  For that reason, the

Supreme Court has held that threatening schoolchildren with expulsion for refusing to recite the

Pledge of Allegiance, *Barnette*, 319 U.S. 624, or fining and jailing a Jehovah's Witness for refusing

to display the state motto "Live Free or Die," *Wooley v. Maynard*, 430 U.S. 705 (1977), violates

the First Amendment.

But a review of the case law indicates that the Posting Requirement is not unconstitutional, even if the employers dispute the content of its message. In *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.* (*FAIR*), 547 U.S. 47 (2006), the Supreme Court found that the Solomon Amendment, which required universities to permit military recruiters to recruit on campus at the risk of losing their federal funding, did not abridge the schools' free speech rights. *Id.* at 70. The Court distinguished its prior government speech cases, noting that "[t]he compelled-speech violation in each of our prior cases . . . resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." *Id.* at 63. In other words, in those cases, the government's required speech "interfered with the [speaker's] ability to communicate its own message." *Id.* at 64, citing *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 8–9, 16–18 (holding that ordering a utility company to mail a third-party newsletter along with its own newsletter interfered with the utility's ability to communicate its own message), and *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256–58 (1974) (noting that "the compelled printing of a reply . . . tak[es] up space that could be devoted to other material the newspaper may have preferred to print," and alters the message the paper wished to express). The Court concluded that, because "nothing in the Solomon Amendment restricts what the law schools may say about the military's policies," and because students "can appreciate the difference between speech a school sponsors and speech the school permits because legally required to do so," there was no First Amendment violation. *Id.* at 65, 70.

Here, the Final Rule requires employers to display the NLRB's message, but it does not dictate "what they may or may not say" about the notice, the petition, or the representation election

process.  *See id.* at 60.[15]  As the *Perez* court put it, an employer "is required to host government speech" as a part of the representation election process, but it is not required to engage in speech itself.  2015 WL 2148230, at *6.  If an employer chooses not to post the notice, it risks the potential consequence that its failure to comply "may be grounds for setting aside the election whenever proper and timely objections are filed."  29 C.F.R. § 102.63(a)(2).[16]  In providing employers with that choice, the Final Rule recognizes that "an employer's right to silence is sharply constrained in the labor context, and leaves it subject to a variety of burdens to post notices of rights and risks." *NAM*, 717 F.3d at 959, quoting *UAW-Labor Emp't & Training Corp. v. Chao*, 325 F.3d 360, 365 (D.C. Cir. 2003).

Nothing in the Final Rule constrains an employer from expressing its own position about the election.  And nothing about the poster, which outlines the Board's election procedures and accurately sets forth employees' statutory rights to be free from coercion from either side, undermines or dilutes an employer's ability to convey its own pre-election message to counteract what it sees as disagreeable government speech.  *See FAIR*, 547 U.S. at 65; *NAM*, 717 F.3d at 958

---

15      The *Perez* court observed that requiring employers to post a government notice is "simply not the same as forcing a student to pledge allegiance, or forcing a Jehovah's Witness to display the motto 'Live Free or Die,' and it trivializes the freedom protected in *Barnette* and *Wooley* to suggest that it is."  2015 WL 2148230, at *6, quoting *FAIR*, 547 U.S. at 62.

16      For that reason, as discussed above, the D.C. Circuit's decision in *NAM* does not control the result here.  While the Court of Appeals in that case examined at length the parallels between an employer's free speech rights under section 8(c) and the First Amendment in reaching its conclusion, *NAM*, 717 F.3d at 954–59, it did not base its ruling on First Amendment grounds, and it instead invalidated the posting requirement solely because it was not severable from its penalty provisions.  *Id.* at 963; *see also Perez*, 2015 WL 2148230, at *5 (noting that the *NAM* case "does not carry the constitutional weight that Plaintiffs ascribe to it" and that the case "did not announce a First Amendment holding").

n.15 ("We suppose an employer could post a statement next to the poster pointing out its compulsory nature.").

The Baker plaintiffs argue that the Notice of Petition for Election "is controversial, one-sided and in some respects untrue" because it "improperly conditions the right of employees under Section 7 to refrain from any and all [representation] activities," and because it asserts that the Board's rules are designed to keep elections fair and honest, and to provide employees with a free choice – a message with which Baker apparently disagrees. Baker TRO Mem. at 5 & n.2. But it is well settled that the government may "make content-based choices" in its speech, and that it is permitted to "regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995).

Both sets of plaintiffs rely heavily on *Wooley*, but that case is distinguishable. In *Wooley*, the Supreme Court held that New Hampshire could not require Jehovah's Witnesses to display the state motto, "Live Free or Die," on their license plates, because the appellants had the right to "decline to foster" speech to which they had moral, ethical, religious, and political objections. 430 U.S. at 707, 713–14. The Court took note of the fact that the state statute mandated "dissemination of an ideological message by displaying it on [a person's] private property in a manner and for the express purpose that it be observed and read by the public." *Id.* at 713, 720 n.15. But here, the Final Rule requires an employer to display the Notice of Petition for Election to a limited audience for a limited period of time, and it is plain from the poster that the company is simply transmitting a message from the NLRB. Therefore, the Court finds that the Posting Requirement does not violate the NLRA or the First Amendment, and it will uphold that aspect of the Final Rule.

30

B.      The Scope of the Pre-Election Hearing

In the Final Rule, the Board addressed the conduct of the pre-election hearing, and it emphasized at the start of the provision that "[t]he purpose of a hearing conducted under Section 9(c) of the Act is to determine if a question of representation exists."  29 C.F.R. § 102.64(a).  In accordance with that understanding, the new provision permits hearing officers and regional directors to decline to hear evidence on other issues – in particular, the eligibility of individual employees to vote – that do not bear directly on that question.  Specifically, the new regulation states that "[d]isputes concerning individuals' eligibility to vote or inclusion in an appropriate unit ordinarily need not be litigated or resolved before an election is conducted."  *Id.*  The regulation mandates, though, that "it shall be the duty of the hearing officer to inquire fully into all matters and issues necessary to obtain a full and complete record upon which the Board or the regional director may discharge their duties under Section 9(c) of the Act."  *Id.* § 102.64(b).  And in a subsequent section, the Final Rule further provides that no party shall be precluded, "on the grounds that a voter's eligibility or inclusion was not contested at the pre-election hearing, from challenging the eligibility of any voter during the election."  *Id.* § 102.66(d).

The regulations that immediately preceded those enacted by the Final Rule "did not expressly state the purpose of the hearing," 79 Fed. Reg. at 74,309, and provided any party with the right "to introduce into the record documentary and other evidence" on any issue.  29 C.F.R. § 102.66(a) (2014); *see also* 79 Fed. Reg. at 74,309 (stating that the prior rules "required . . . litigation of any voter eligibility issues that any party wished to litigate, even if the regional director was not going to be deciding that question, and even if the particular voter eligibility question was not necessary to resolving the existence of a question of representation").

Both sets of plaintiffs object to the new provision on the grounds that it "severely restricts the scope of the pre-election hearing required by the NLRA."  Chamber Mot. at 16; *see also* Baker

Am. Compl. ¶¶ 18–22.  They allege that "[t]he Final Rule violates the Act's requirement of an 'appropriate' pre-election hearing by restricting the employer's ability to present evidence and litigate issues of voter eligibility or inclusion in the putative bargaining unit," and that it "deprives employers of due process in NLRB representation case proceedings, in violation of the Fifth Amendment, by preventing employers from litigating issues of voter eligibility and inclusion at the pre-election hearing."  Chamber Compl. ¶¶ 65, 72; *see also* Baker Am. Compl. ¶¶ 19, 22.

These claims fail because the Final Rule on its face does not "prevent" or "restrict" the presentation of such evidence at a pre-election hearing.  The regulation simply indicates that consideration of these issues will "ordinarily" be deferred until after the election, 29 C.F.R. § 102.64(a), when it will be clear whether or not the challenged voters could affect the outcome. In other words, the regulation articulates an expectation that litigation on these topics will be deferred, but it does not eliminate the possibility that a hearing officer could address these issues at an early stage, and it accords the regional director the discretion to authorize a hearing on the record in advance of an election in an appropriate case.  *See* 79 Fed. Reg. at 74,390 (stating that the Board "expect[s] regional directors to permit litigation of, and to resolve, [individual eligibility or inclusion] questions when they might significantly change the size or character of the unit").

> **1.**   **Granting regional directors the discretion to decline to hear evidence on individual voter eligibility and inclusion issues does not violate the NLRA.**

Notwithstanding the language of the complaints, plaintiffs indicated at oral argument that the real gravamen of their concern is not that they are being denied the right to present this evidence at all, but that section 9(c) of the NLRA requires that evidence about the composition of the unit *must* be presented at a pre-election hearing.  In other words, plaintiffs maintain that the Board did not have the authority to make this decision discretionary:

> [T]he Final Rule improperly limits pre-election hearings by allowing hearing officers to exclude evidence regarding fundamental issues affecting the election, such as whether certain employees or groups of employees are eligible to vote in the election . . . . This contradicts the fundamental understanding – recognized by the Supreme Court, Congress, and the Board itself – that Congress required an "appropriate hearing" to give interested parties a full and adequate opportunity to present their evidence on *all* substantial issues.

Chamber Mot. at 15–16; *see also* Baker Am. Compl. ¶¶ 15, 18–19; Amicus Brief at 5–9.

Here again, plaintiffs overstate the terms of the Final Rule, which provides that ordinarily, disputes concerning "*individuals'*" eligibility or inclusion will be deferred, and does not speak to the inclusion of groups of employees. 29 C.F.R. § 102.64(a). But more important, the text of the statute does not support plaintiffs' contention that the NLRA requires that all voter eligibility issues be heard and resolved in advance of the election.

In their complaint, the Chambers plaintiffs allege:

> Section 9(c) of the NLRA provides that, when a petition for a representation election is filed, the Board must investigate that petition and "shall provide for an appropriate hearing upon due notice" before the election is held.

Chamber Compl. ¶ 64.

The Baker plaintiffs similarly allege:

> Section 9(c)(1) of the Act, enacted as one of the Taft-Hartley amendments of 1947, requires that the Board conduct an "appropriate hearing" with regard to all "questions concerning representation." As was made clear by Senator Robert Taft, chief sponsor of the Taft-Hartley Act, Congress intended by this language to require the Board to hold such hearings in order to "decide questions of unit and eligibility to vote."

Baker Am. Compl. ¶ 15, quoting 93 Cong. Rec. 6,858, 6,860 (1947).

It is telling that both sets of plaintiffs have chosen to paraphrase section 9(c), because a reading of the text itself immediately reveals the problem with plaintiffs' statutory argument.

Section 9(c) of the NLRA provides:

> Whenever a petition shall have been filed . . . the Board shall investigate such petition and *if it has reasonable cause to believe that a question of representation affecting commerce exists* shall provide for an appropriate hearing upon due notice. . . . *If the Board finds upon the record of such hearing that such a question of representation exists*, it shall direct an election . . . .
>
> *In determining whether or not a question of representation affecting commerce exists*, the same regulations and rules of decision shall apply irrespective of the identity of the persons filing the petition . . . .

29 U.S.C. §§ 159(c)(1)–(2) (emphasis added).

According to the Chamber plaintiffs, "[a] hearing is 'appropriate' under § 9(c)(1) only if it gives interested parties a full and adequate opportunity to present their evidence on all substantial issues – including important election issues of voter eligibility, inclusion, and supervisory status." Chamber Reply at 6; *see also* Chamber Mot. at 6 ("The hearing provides an opportunity for the parties to present evidence on issues that will affect the election, such as whether the employees are covered by the NLRA, whether the collective bargaining unit defined in the petition is an appropriate one, and whether certain individuals . . . would be eligible to vote . . . .").[17]  But the statute does not call for a hearing on all issues affecting the election, or even all substantial issues affecting the election.  It clearly specifies that the purpose of the section 9(c) hearing is to determine whether a question of representation exists.  This is a yes or no question that is distinct from the question of which individuals will vote in the ensuing election, so plaintiffs' claim that the Final Rule contravenes the Act cannot be based on the text of the statute.

---

[17]   For that proposition, plaintiffs cite the prior version of the regulations revised by the Final Rule.  Chamber Mot. at 6, citing 29 C.F.R. §§ 102.64(a), 102.66(a) (2014).  But those sections do not explicitly provide plaintiffs with the purported rights they identify.  *See* 29 C.F.R. § 102.64(a) (2014) (articulating the duties and responsibilities of the hearing officer in conducting the hearing, including "inquir[ing] fully into all matters and issues necessary to obtain a full and complete record"); *id.* § 102.66(a) (2014) (providing that "any party and the hearing officer shall have power to call, examine, and cross-examine witnesses and to introduce into the record documentary and other evidence").

Plaintiffs gloss over the plain language of section 9, and they point instead to its legislative history. Putting aside the question of whether that step is necessary in the absence of ambiguity, *see Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994) (stating that a court need "not resort to legislative history to cloud a statutory text that is clear"), the effort is ultimately unpersuasive, since it is also incomplete and misleading. The Chamber plaintiffs assert that "[t]he purpose of pre-election hearings, as reflected in the legislative history of the 1947 amendments, is to collect evidence concerning all of the issues relevant to the election – including the eligibility of employees to vote in the election." Chamber Mot. at 21. In support of that contention, they set out this quotation, without an ellipsis:

> "Obviously, ***there can be no choice of representatives and no bargaining unless units for such purposes are first determined***. And employees themselves cannot choose these units, because ***the units must be determined before it can be known what employees are eligible to participate in a choice of any kind.***
>
> This provision is similar to section 2 of 1934 amendments to the Railway Labor Act (48 Stat. 1185), which states that – In the conduct of any election for the purpose herein indicated the Board shall designate ***who may participate in the election*** and establish the rules to govern the election."

*Id.*, quoting S. Rep. No. 74-573, at 14 (1935), *reprinted in* 2 NLRB, Legislative History of the NLRA 1935, at 2313 (1949) (emphasis added in plaintiffs' memorandum).

But the Chamber plaintiffs have omitted the first sentence of that excerpt, which makes it plain that Congress was talking about section 9(b) – the provision of the NLRA that grants the Board authority to decide the appropriate collective bargaining unit – and not section 9(c):

> Section 9(b) empowers the National Labor Relations Board to decide whether the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plaint unit, or other unit. Obviously, there can be no choice of representatives and no bargaining unless units for such purposes are first determined. And employees themselves cannot choose these units . . . .

S. Rep. No. 74-573, at 14.   The next sentence of the report after the language quoted by the Chamber plaintiffs does address section 9(c), but it observes only that the provision empowers the Board to conduct an investigation to determine collective bargaining representatives, and that "[i]n any such investigation, an appropriate hearing must be held."   *Id.*   So this snippet of legislative history sheds no light on the intended scope of the pre-election hearing under section 9(c).

Both sets of plaintiffs also point to a statement by Senator Taft in the Congressional Record:  "[i]t is the function of hearings in representation cases to determine whether an election may be properly held at the time; *and if so, to decide questions of unit and eligibility to vote.*"   Chamber Reply at 10, quoting 79 Fed. Reg. at 74,386 n.363; *see also* Baker Am. Compl. ¶ 15.   But this single sentence by Senator Taft cannot bear the weight that plaintiffs would have it carry.   It does not detail his position on the scope of the pre-election hearing as clearly as plaintiffs suggest, but even if it was his preference or intention that all issues be resolved in advance, "[t]he 'remarks of [a] single legislator, even the sponsor, are not controlling in analyzing legislative history,'" *Pac. Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1264 (D.C. Cir. 1980), quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979), especially where that statement did not find its way into the statutory text or even a committee report.

Furthermore, that remark cannot alter the clear language in the statute identifying the purpose of the hearing, especially given the context of the Senator's comments:  they were contained in a supplementary analysis produced after the Act had already passed and they were directed at a provision authorizing pre-hearing elections – in Taft's words, "a device of holding the election first and then providing the hearing to which the parties were entitled by law" – which was ultimately omitted from the Act.   93 Cong. Rec. 6,860 (1947); *see also* 79 Fed. Reg. at 74,386

n.363.  Senator Taft's lone comment is therefore not dispositive of the meaning of an "appropriate

hearing" as guaranteed by section 9(c).  *Accord Associated Builders*, 2015 WL 3609116, at *7.

As they marshal these and other excerpts of legislative history, the Chamber plaintiffs

emphasize the importance of defining the bargaining unit before an election, *see, e.g.*, Chamber

Mot. at 21, but they consistently blur the distinction between the determination of the appropriate

bargaining unit and challenges to individual voters.[18]  It is true that it can be necessary in some

cases to hear evidence on the scope and composition of the unit in order to determine whether a

question of representation exists, but the Final Rule did not ban the introduction of any evidence

ever on the question of what groups of employees might be included:  it states only that questions

concerning *individual* eligibility will *ordinarily* be deferred.[19]

The Chamber plaintiffs' citation of Supreme Court authority does little more to advance

their argument.  They reiterate that section 9(c) calls for an "appropriate hearing," and then they

purport to quote *Inland Empire District Council v. Millis*, 325 U.S. 697 (1945):

> Congress provided that an "appropriate hearing" must include the "full and
> adequate opportunity" to present evidence on *all* issues related to the

---

18      The Chamber plaintiffs complain that "[b]y authorizing regional directors and hearing
officers to reject evidence on the scope of the bargaining unit for voter eligibility and inclusion
purposes, the Final Rule makes the taking of evidence useless for all of the decision-making
required under §§ 3 and 9."  Chamber Mot. at 23.  But the provision at issue does not address the
exclusion of evidence on the scope of the bargaining unit – only "[d]isputes concerning
individuals' eligibility to vote or inclusion in an appropriate unit."  29 C.F.R. § 102.64(a).  And
the Final Rule does not, as the Chamber plaintiffs claim, "suggest[] that evidence pertaining to
voter eligibility should be excluded from the pre-election hearing even if the relevant issues affect
a substantial portion of the bargaining unit."  Chambers Mot. at 23, citing 29 C.F.R. § 102.64(a).

19      The Chamber plaintiffs maintain that the scope of the pre-election hearing should not be
limited because "the pre-election hearing record provides the sole basis" for a series of key
decisions, including "[w]hether particular individuals are eligible to vote."  Chamber Mot. at 18,
citing 29 U.S.C. §§ 153(b), 159(c)(1).  But the statute does not lend support to this argument either,
and the Chamber plaintiffs ignore the fact that the regulations in the Final Rule specifically provide
for a full hearing on eligibility and inclusion issues at a later point.  *See* 29 C.F.R. § 102.69.

> election and disputed by the parties:  "We think the statutory purpose . . . is
> to provide for a hearing in which interested parties shall have full and
> adequate opportunity to present their objections."

Chamber Mot. at 23 (emphasis in original), quoting *Inland Empire*, 325 U.S. at 708.  But this

edited reference to the opinion completely distorts the *Inland Empire* holding, which was that there

must be a hearing at some point, and not that it must necessarily occur before the election.  What

the Court said was:

> In view of the preliminary and factual function of an election, we cannot
> agree with petitioners' view that only a hearing prior to an election can be
> "appropriate" within the section's meaning. . . .
>
> Petitioners' argument does not in terms undertake to rewrite the statute.  But
> the effect would be to make it read as if the words "appropriate * * * in any
> such investigation" were replaced with the words "hearing prior to any
> election."  Neither the language of the section nor the legislative history
> discloses an intent to give the word "appropriate" such an effect.  We think
> the statutory purpose *rather* is to provide for hearing in which interested
> parties shall have full and adequate opportunity to present their objections
> *before the Board concludes its investigation and makes its effective
> determination by the order of certification.*

325 U.S. at 707–08 (emphasis added).  And the Court reiterated the "broad discretion" conferred

by Congress upon the Board "as to the hearing which [section] 9(c) required before certification."

*Id.* at 708.  Like the legislative history, then, the Supreme Court precedent provided by plaintiffs

underscores the importance of affording parties a full opportunity to present evidence on a range

of substantial issues, but it does not specify that the evidence must be heard on every issue before

an election can proceed.  Indeed, it says precisely the opposite.

Therefore, the Court finds that this aspect of the Final Rule does not violate section 9(c) of

the NLRA.

2.    **Granting regional directors the discretion to decline to hear evidence on individual voter eligibility and inclusion issues is not arbitrary and capricious.**

Both sets of plaintiffs also rely upon the Board's prior opinions in *Barre-National, Inc.*, 316 N.L.R.B. 877 (1995), and *North Manchester Foundry, Inc.*, 328 N.L.R.B. 372 (1999), asserting that in those opinions, "the Board recognized that § 9(c) provides a *statutory* right to introduce evidence on issues of voter eligibility and inclusion at the pre-election hearing." Chamber Mot. at 24; *see also* Baker Opp. at 6. This overstates the holding of both cases somewhat, and in any event, the Board's departure from its previous precedent does not, standing alone, render the Final Rule arbitrary and capricious.

In *Barre-National*, pursuant to the regional director's instructions, the hearing officer ruled that the supervisory status of a number of employees – who made up approximately eight to nine percent of the unit – would not be resolved at the pre-election hearing, and he ordered that they be permitted to vote subject to challenge. 316 N.L.R.B. at 877–78. The employer instructed those individuals not to vote in the election on the grounds that they were supervisors. *Id.* at 878. By the time the matter was decided by the Board, the employer had eliminated all but one of the earlier contested positions, the election had been held, and the result had been impounded. *Id.* at 877. The Board found, "[u]nder all the circumstances, the preelection hearing held in this case did not meet the requirements of the Act and Board's Rules and Statements of Procedure," *id.* at 878, but it did not specifically address the question of whether the hearing would have been mandated by the statute alone. Given the posture of the case and the nature of the employer's arguments, it did not void the election, but remanded the matter back to the regional director to open and count the ballots and take appropriate action thereafter as part of the election objection process. *Id.* at 877, 879. The Board also took pains to point out: "[t]his conclusion is based on the facts of this case.

We do not express a view as to whether a different result would be warranted if one or more of those facts were different." *Id.* at 878 n.9.  The Board went on:  "[w]e note that reviewing courts have held that there is no general requirement that the Board decide all voter eligibility issues prior to an election, although in some circumstances the size and character of the group of individuals whose status is left unresolved may be deemed a basis for invalidating the election." *Id.*

Similarly, in *North Manchester*, the hearing officer declined to take evidence on whether a particular group of employees should be included in the unit, and the regional director denied the request to reopen the record given the small number of employees involved and the fact that the employer would have the ability to challenge their status after the election if the votes turned out to be determinative.  328 N.L.R.B. at 372.  The employer filed a timely request for review of the regional director's decision.  *Id.*  Applying *Barre-National*, the Board ruled that "the hearing officer did not provide the employer with a sufficient opportunity to present its evidence at the preelection hearing, as required under the Section 9(c) of the Act and the Board's Rules and Regulations," and it required that the hearing be reopened for that purpose.  *Id.* at 372–73.

The Board did not specifically state in either opinion that its determination was mandated by the language of the statute alone.  Plaintiffs are correct, though, when they point out that the Final Rule marks a departure from the approach the Board called for in those cases.  But as the Sixth Circuit explained in *Kindred Nursing Centers East, LLC v. NLRB*,  727 F.3d 552 (6th Cir. 2013), that does not necessarily render the Final Rule unlawful under the APA:

> Following the United States Supreme Court, we have held that [i]t is within the Board's purview . . . to develop standards for ascertaining whether one unit is more appropriate than another.  It follows, then, that it is within the Board's purview to choose to follow one of its precedents or reject another. An agency may depart from its precedents, and provided that the departure from precedent is explained, our review is limited to whether the rationale is so unreasonable as to be arbitrary and capricious.  An administrative

> agency may reexamine its prior decisions and may depart from its
> precedents provided the departure is explicitly and rationally justified.

*Id.* at 560 (internal citations omitted).

Here, the Board directly addressed *Barre-National* and *North Manchester* in its discussion of this provision in the Final Rule, it explained and justified any change in its approach, and it explicitly overruled those holdings. 79 Fed. Reg. at 74,385–86 (finding that *Barre-National* "cannot be read to rest on a construction of the [NLRA]," that its statutory analysis "is essentially non-existent," and that its end result "is not administratively rational" and is contrary to legislative history). Moreover, the decisions in *Barre-National* and *North Manchester* that it was error for the regional director to fail to take up voter inclusion issues at the pre-election stage were based on the specific circumstances presented in those cases, and there is nothing in the Final Rule that would bar a regional director from following that guidance in any particular instance in the future, or that would preclude the Board from granting an employer's request for review and finding that a particular regional director abused his discretion in a particular instance in the future.[20]

Accordingly, the Court finds that this aspect of the Final Rule is not arbitrary and capricious.[21]

---

[20]    The Baker plaintiffs also reference *Barre-National*, where the Board acknowledged the employer's concern that the unsettled status of a group of supervisors could sow unnecessary confusion into the pre-election period or limit their opportunity to participate. Baker Opp. at 6; *see also* Amicus Brief at 11–12. These are legitimate concerns that may militate in favor of an evidentiary hearing in some particular cases in advance of the election. But the Court does not sit as a policy-making member of the NLRB, and it cannot hold, given the deference required, that the majority of the Board did not have the discretion to make the call it made as to how hearings should proceed in the ordinary case. Baker has the opportunity to seek Board review of the regional director's decision in its election proceeding under section 3(b) of the NLRA, 29 U.S.C. § 153(b), and depending on the outcome of that request, it can also refuse to bargain with UCW and obtain review of the entire proceeding in the D.C. Circuit. *Id.* § 160(f).

[21]    In addition to objecting to the Final Rule on the grounds that it reflects a departure from the Board's prior holdings, both sets of plaintiffs attack this aspect of the Final Rule as part of their broader arbitrary and capricious challenges. *See* Chamber Mot. at 31–34; Baker Am. Compl. ¶¶ 27–32, 36. These arguments are addressed below.

> **3.    Granting regional directors the discretion to decline to hear evidence on individual voter eligibility and inclusion issues does not violate the Fifth Amendment.**

Plaintiffs also allege that permitting regional directors to exclude individual voter eligibility and inclusion evidence at the pre-election hearing violates an employer's Fifth Amendment due process rights, because it denies the employer "the opportunity to be heard at a meaningful time and in a meaningful manner."  Chamber Mot. at 25, quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *see also* Baker Am. Compl. ¶¶ 22.  While that general proposition of law is undisputed, plaintiffs have neglected to mention the other aspect of a due process claim:  the deprivation of a liberty or property interest.  *See, e.g.*, *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009) ("A procedural due process violation occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections."); *see also Mathews*, 424 U.S. at 333 ("[S]ome form of hearing is required before an individual is finally deprived *of a property interest*.") (emphasis added).  And as their counsel conceded during oral argument, the Chamber plaintiffs were unable to direct the Court to any case that identifies a due process interest in what takes place during a representation election proceeding.  Hr'g Tr. 13:17–20 ("The Court:  I know what [*Mathews v. Eldridge*] says, but is there a case in your brief that ties due process to these proceedings?  Ms. Ho:  No, Your Honor.").

Essentially, the Chamber plaintiffs are asserting that they have a due process right to be afforded due process.  *Id.* 13:24–14:3 ("I think . . . the liberty or process interest at stake is how *Mathews* describes it, is the interest in fair – in fair and meaningful proceedings.  In other words, to a meaningful opportunity to be heard on an issue.").  This is a circular argument which carries no weight.  Moreover, as counsel for the Chamber recognized, what process is due depends upon the nature of the interest at stake.  *Id.* 14:7–12 ("I think a meaningful opportunity to be heard,

obviously that doesn't – that doesn't mean you have a right to stand up in court and say anything you want.  And I think we certainly acknowledge, as the case law has held, that the due process clause is, of course, quite context specific . . . .").

In any event, as the Supreme Court observed in *Inland Empire*, "[t]he demands of due process do not require a hearing, at the initial stage or at any particular point or at more than one point in an administrative proceeding so long as the requisite hearing is held before the final order becomes effective."  325 U.S. at 710, quoting *Opp Cotton Mills, Inc. v. Adm'r of Wage & Hour Div. of Dep't of Labor*, 312 U.S. 126, 152–53 (1941).  Because parties retain the right to petition the Board for review, both pre- and post-election, and because they can refuse to bargain and obtain a hearing on their claims before a federal court of appeals, the Court does not find that the Final Rule violates parties' due process rights to an "appropriate hearing."

### C.      The Statement of Position Requirement

The Final Rule requires that an employer file a written Statement of Position one day before the pre-election hearing.  29 C.F.R. § 102.63.  The Statement of Position must:

> state whether the employer agrees that the Board has jurisdiction over it and provide the requested information concerning the employer's relation to interstate commerce;
>
> state whether the employer agrees that the proposed unit is appropriate, and, if the employer does not so agree, state the basis for its contention that the proposed unit is inappropriate, and state the classifications, locations, or other employee groupings that must be added to or excluded from the proposed unit to make it an appropriate unit;
>
> identify any individuals whose eligibility to vote the employer intends to contest at the pre-election hearing and the basis of each such contention;
>
> raise any election bar;
>
> state the length of the payroll period for employees in the proposed unit and the most recent payroll period ending date;

> state the employer's position concerning the type, date(s), time(s), and location(s) of the election and the eligibility period; and

> describe all other issues the employer intends to raise at the hearing.

*Id.* § 102.63(b)(1)(i).  The Statement of Position must also "include a list of the full names, work locations, shifts, and job classifications of all individuals in the proposed unit," as well as any individuals the employer wishes to add to or exclude from the proposed unit.   *Id.* § 102.63(b)(1)(iii).

The Final Rule provides that "[a] party shall be precluded from raising any issue . . . that the party failed to raise in its timely Statement of Position," *id.* § 102.66(d), but "[t]he regional director may permit the Statement of Position to be amended in a timely manner for good cause." *Id.* § 102.66(b).

The Final Rule explains that "[p]rior practice requested parties to state positions and provide a list of employees and job classifications before the hearing, but did not require production of such information prior to the hearing."  79 Fed. Reg. at 74,309.  In addition, "[p]rior best practices required parties to take positions on the issues orally at the hearing," but the approach was not uniform, and parties were permitted at times "to remain silent on their position or to take shifting positions during the hearing."  *Id.*

The Baker plaintiffs allege that the requirement "that Baker file a written Statement of Position on each and every potential [sic] that could arise during a hearing, at a time when no pre-hearing discovery is permissible, upon penalty of precluding Baker from presenting evidence on unit and voter eligibility issues as expressly permitted by the Act, violates Section 9 and Congressional intent."   Baker Am. Compl. ¶ 19; *see also* Baker TRO Mem. at 7–9.  They also object that they are required to "disclose to the petitioning union the names and work locations of employees inside and outside the petitioned for unit, again upon penalty of precluding Baker from

exercising its statutory right to submit evidence on all issues." Baker TRO Mem. at 7. Because

they assert that Baker is "entitled . . . under the statute " to "contest numerous aspects of [UCW's]

petition, including voter eligibility issues" at the hearing, the Baker plaintiffs contend that the

preclusive aspect of this provision "unlawfully prevents Baker from exercising its statutory and

due process rights." *Id.*[22]

### 1.     The Statement of Position Requirement does not violate the NLRA.

Although it is not entirely clear from their pleadings, the Baker plaintiffs appear to be

arguing that the Statement of Position Requirement, which could limit an employer's ability to

litigate certain issues at the pre-election hearing if those issues were not raised in the Statement of

Position, violates the section 9(c) requirement that there be an "appropriate" pre-election hearing.

*See* Baker Am. Compl. ¶¶ 4, 11, 19 (stating only that the Statement of Position Requirement

"violates Section 9"); Baker TRO Mem. at 7 (stating that Statement of Position Requirement

"preclud[es] Baker from exercising its statutory right to submit evidence on all issues" and citing

29 U.S.C. § 159(c)(1)). But as discussed in detail above, section 9(c) of the NLRA does not

guarantee an employer the right to present or litigate individual voter eligibility and inclusion

issues at the pre-election hearing, as the Baker plaintiffs claim. Rather, it provides that parties to

a representation proceeding are entitled to "an appropriate hearing upon due notice" that addresses

whether a "question of representation exists." 29 U.S.C. § 159(c). So the possibility that the

---

[22]     At the hearing, the Chamber plaintiffs' counsel stated that they also challenge the Statement of Position Requirement "as arbitrary and capricious," "with respect to . . . due process . . . and also to the extent that it truncates the fullest freedom guaranteed by Section 8" of the NLRA. Hr'g Tr. 9:6–15. But other than as part of the claim that the entire Final Rule is arbitrary and capricious, Chamber Compl. ¶¶ 76–86, the Chamber plaintiffs do not offer a specific basis for attacking the Statement of Position Requirement anywhere in their pleadings. During the hearing, counsel directed the Court to pages fifteen through twenty-five of their memorandum, Hr'g Tr. 9:20–24, but the Statement of Position Requirement is not mentioned on those pages, as that portion of the brief addresses only the scope of the pre-election hearing.

preclusive aspect of the requirement that an employer file a Statement of Position might operate to streamline the pre-election hearing in this manner does not violate section 9(c) of the NLRA.

Plaintiffs also allege that the issue preclusion embodied in this regulation is "contrary to the [NLRA's] goal of ensuring employees 'the fullest freedom in exercising the rights guaranteed'" by the Act.  Baker TRO Mem. at 7, quoting 29 U.S.C. § 159(b); *see also* Hr'g Tr. 9:6–15 (stating that the Chamber plaintiffs object to the Statement of Position Requirement "to the extent that it truncates the fullest freedom guaranteed by Section 8" of the NLRA).  The parties provide no additional argument on this point, *see* Baker TRO Mem. at 7–9; Baker Am. Compl. ¶¶ 18–22, and they do not articulate how section 9(b) is implicated here or how a requirement governing the evidence an employ*er* may present at the pre-election hearing would curtail employ*ees*' rights. *See* 29 U.S.C. § 159(b) (stating that the Board shall decide the appropriate unit for collective bargaining purposes "in order to assure to employees the fullest freedom in exercising the rights guaranteed" by the NLRA).  But the Final Rule specifically includes an exception to the preclusion aspect of the Final Rule for individual voter eligibility and inclusion evidence in any event:

> A party shall be precluded from raising any issue . . . that the party failed to raise in its timely Statement of Position . . . except that no party shall be precluded from contesting or presenting evidence relevant to the Board's statutory jurisdiction to process the petition.  *Nor shall any party be precluded, on the grounds that a voter's eligibility or inclusion was not contested at the pre-election hearing, from challenging the eligibility of any voter during the election.*

29 C.F.R. § 102.66(d) (emphasis added).  So even if an employer failed – or refused – to include the required information in its Statement of Position, and was therefore precluded from raising or litigating individual voter eligibility and inclusion issues at the pre-election hearing, the employer would still be able to raise and litigate those issues later and protect its employees' rights.

Baker also objects to the requirement that it must list the names and work assignments of the employees in the proposed unit in its Statement of Position, arguing that "[n]othing in the Act

authorizes the Board to require" such a disclosure.  Baker Am. Compl. ¶ 16.  While it may be true that nothing in the statute explicitly directs the Board to require such disclosures, nothing in the statute prohibits it, either.  *See Serono Labs.*, 158 F.3d at 1319 (D.C. Cir. 1998).[23]  And in enacting the NLRA, Congress plainly accorded the Board "a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees."  *A.J. Tower*, 329 U.S. at 330.  So, the Court finds that the Board did not exceed its statutory authority by requiring these disclosures, and that the Statement of Position Requirement withstands plaintiffs' challenge under the NLRA.

> **2.     The Statement of Position Requirement does not violate the Fifth Amendment.**

Plaintiffs also argue that "the burdensome requirement of the Statement of Position violates Baker's due process rights by not providing it sufficient time to respond to [UCW's] petition."  Baker TRO Mem. at 7–8, citing *Mathews*, 424 U.S. at 333; Hr'g Tr. at 9:25–10:11 (stating that the Chamber plaintiffs challenge the same requirement "to the extent that it provides less time to prepare for the hearing," because "it raises due process concerns").

The general proposition in *Mathews v. Eldridge* – that due process requires "the opportunity to be heard 'at a meaningful time and in a meaningful manner,'" 424 U.S. at 333, quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) – is undisputed.  But as with their argument regarding the scope of the pre-election hearing, plaintiffs have failed to identify – either in their pleadings or during the hearing – precisely what liberty or property interest could be infringed by

---

23     The Court in *Serono Laboratories* was also persuaded by the fact that the statute, as it does in this case, provided for a "broad grant of discretion to the agency."  158 F.3d at 1319.

the Statement of Position Requirement.  *See* Hr'g Tr. 12:16–15:2; 129:10–131:23.  Without that information, the Court cannot assess what appears to be a half-hearted due process claim.[24]

In any event, the new regulations accord regional directors the discretion to grant an extension to an employer who needs additional time to file and serve its Statement of Position. *See* 29 C.F.R. § 102.63(b)(1) ("The regional director may postpone the time for filing and serving the Statement of Position for up to 2 business days upon request of a party showing special circumstances. . . . [and] may postpone the time for filing and serving the Statement of Position for more than 2 business days upon request of a party showing extraordinary circumstances."). Indeed, Baker itself sought and was granted a seven-day extension to file and serve the Statement of Position in its representation proceeding.  Hr'g Tr. 125:25–126:9 (admitting that Baker was given an extension for the "[s]tatement of position and the hearing"); *see also* Board's Opp. to Baker TRO Mot. as to Irreparable Harm, *Baker DC, LLC v. NLRB*, No. 15-0571 (ABJ), [Dkt. # 8] at 3 (stating that Baker requested, and received, a seven-day postponement of the pre-election hearing, "as well as the due date for filing a statement of position").  Given this built-in flexibility, plaintiffs cannot show that an employer will necessarily be deprived of its due process rights in every set of circumstances, so the attempt to mount a facial challenge to the Statement of Position Requirement on Fifth Amendment grounds fails.

### D.    The Elimination of the Presumptive Pre-Election Waiting Period

The prior version of the regulations stated that the regional director "will normally not schedule an election until a date between the 25th and 30th days after the date of the decision, to

---

24      The Court also notes that it is somewhat contradictory for plaintiffs to claim that it is too "burdensome" to be asked to marshal their arguments so early and list them in the Statement of Position, Baker TRO Mem. at 7; Hr'g Tr. 9:25–10:11, and to simultaneously insist that they should be permitted to present and litigate every issue at the earliest possible stage.  Baker TRO Mem. at 7–9; Baker Am. Compl. ¶¶ 15–16, 18–22; Chamber Mot. at 15–26.

permit the Board to rule on any request for review which may be filed."  29 C.F.R. § 101.21(d) (2014).  Under the Final Rule, "[e]lections will no longer be automatically stayed in anticipation of requests for review," 79 Fed. Reg. at 74,309, and instead, "[t]he regional director shall schedule the election for the earliest date practicable" consistent with the NLRA and the relevant regulations.  29 C.F.R. § 102.67(b).

> **1.   The elimination of the presumptive pre-election waiting period does not violate the NLRA or the First Amendment.**

Both sets of plaintiffs contend that the Final Rule's elimination of the "normal" pre-election waiting period and its instruction to hold elections on "the earliest date practicable" violate the NLRA and the First Amendment by "impermissibly curtail[ing] an employer's right to communicate with its employees."  Chamber Compl. ¶ 70; Baker Am. Compl. ¶ 26; *see also* Chamber Mot. at 26–31.  The Chamber plaintiffs argue that section 9(b) of the Act, which directs the Board to "assure to employees the fullest freedom" in exercising their rights under the Act, and the free speech protections afforded by section 8(c), combine together to guarantee employers the right to "sufficient time to engage in free speech *before* an election."  Chamber Mot. at 27.

The Court acknowledges that section 8(c) of the NLRA reflects a "policy judgment, which suffuses the NLRA as a whole, as 'favoring uninhibited, robust, and wide open debate in labor disputes.'"  *Chamber of Commerce v. Brown*, 554 U.S. 60, 67–68 (2008), quoting *Letter Carriers v. Austin*, 418 U.S. 264, 272–73 (1974).  But plaintiffs have failed to show that the Final Rule inhibits this debate in any meaningful way, and they certainly have not shown that there is "no set of circumstances" in which this aspect of the Final Rule can be enforced consistently with the NLRA or the First Amendment.  That is because the regional director retains discretion in determining when the election will be held, and in doing so, he is directed "to consider, among other factors, the desires of the parties, which may include their opportunity for meaningful speech

about the election." 79 Fed. Reg. at 74,318.  As the District Court in Texas observed in its opinion upholding the Final Rule, this discretion makes it "virtually impossible" for plaintiffs to demonstrate that the elimination of the pre-election waiting period violates the NLRA or the First Amendment, or otherwise exceeds the Board's authority under its authorizing statute.  *Associated Builders*, 2015 WL 3609116, at *12.

Furthermore, this aspect of the Final Rule does not specifically burden *employer* speech, because all parties to the election proceeding are constrained by the same timeframe in disseminating their views to employees.  As the Board observed, employers likely have an advantage in communicating with their employees during a shortened election period, in that they "can compel employees to attend meetings on working time at the employer's convenience," including meetings at which employees "are often expressly urged to vote against representation." 79 Fed. Reg. at 74,322–23.  By contrast, a union's "organizers normally have no right of access to plant premises" and do not have the same captive audience that an employer may have.  *Id.* at 74,337.[25]

The Chamber plaintiffs also contend that the legislative history of the Act – specifically, comments by then-Senator John F. Kennedy – makes clear "that Congress believed that at least 30 days between petition and election was necessary to adequately assure employees the statutorily guaranteed 'fullest freedom' in choosing whether to be represented by a union."  Chamber Mot. at 29, citing 105 Cong. Rec. 5,361 (1959), *reprinted in* 2 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 1024 (1974) ("LMRDA Hist.") ("[T]his

---

[25]    The Court also agrees with the Texas court's observation that it is "somewhat ironic that [p]laintiffs both oppose disclosure of cell phone numbers and email addresses, methods of communication which would certainly accelerate the process of providing information [to employees], yet complain that the [Final] Rule fails to provide adequate time for dissemination of information." *Associated Builders*, 2015 WL 3609116, at *12 n.10.

provision would permit a representation election 30 days after a petition is filed . . . if there are no substantial issues of fact or law which require a hearing . . . . The 30 day waiting period is an additional safeguard against rushing employees into an election where they are unfamiliar with the issues."); *see also* Chamber Mot. at 29, citing 105 Cong. Rec. 5,770 (1959), *reprinted in* 2 LMRDA Hist. at 1085 ("[T]here should be at least a 30-day interval between the request for an election and the holding of the election.").[26]

But plaintiffs do not – and cannot – point to language in the NLRA which provides a right to a waiting period of some specified length prior to an election, because there is no such language in the statute. *Accord Associated Builders*, 2015 WL 3609116, at *12. Where, as here, the statute is unambiguous on its face, a court need "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf*, 510 U.S. at 147–48; *see also Ala. Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979) (noting that, despite "some indication in the legislative history [of the Clean Air Act] to suggest that at least one Senator intended" to limit a statutory definition, "the language of the statute clearly did not enact such limit into law" and that the Court was "constrained here to follow the clear language") (footnotes omitted). Furthermore, as stated above, "[t]he 'remarks of the single legislator . . . are not controlling in analyzing legislative history.'" *Pac. Legal Found.*, 636 F.2d at 1264, quoting *Chrysler Corp.*, 441 U.S. at 311.

In any event, as with plaintiffs' citation to legislative history with regard to the appropriate hearing requirement, their reliance on Senator Kennedy's comments is misplaced. Senator Kennedy made his comments when Congress was considering a proposal to reinstate the pre-

---

26      It appears to the Court that these citations to Senator Kennedy's comments are contained in the daily edition of the Congressional Record. For the permanent edition of the Congressional Record containing Senator Kennedy's comments, see 105 Cong. Rec. 5,984 (1959) and 105 Cong. Rec. 6,434 (1959).

hearing election procedure. This proposal would have permitted an election to take place before any hearing at all, and the Senator made his comments about the need for a waiting period in that context. The proposal was ultimately rejected by Congress, *see* 79 Fed. Reg. at 74,326, and Senator Kennedy's comments are therefore entitled to little weight in this Court's analysis of the Final Rule. *See, e.g.*, *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994) ("[F]ailed legislative proposals are 'a particularly dangerous ground on which to rest an interpretation of a prior statute.'"), quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990).

Finally, the Court agrees with the Board that because the Final Rule "does not in any way permit the Board to use speech or its dissemination as evidence of an unfair labor practice, the literal language of [s]ection 8(c) is not implicated." 79 Fed. Reg. at 74,319, citing *NAM*, 717 F.3d at 956, 959 n.19 (invalidating employee rights posting rule which permitted Board to consider failure to post notice as unfair labor practice, but noting that similar rule which lacked such a penalty "does not implicate § 8(c)"). For all these reasons, the Court finds that this aspect of the Final Rule survives plaintiffs' statutory and constitutional challenges.

> **2.** **The elimination of the presumptive pre-election waiting period is not arbitrary and capricious.**

For similar reasons, to the extent that plaintiffs attempt to argue that this particular aspect of the Final Rule is arbitrary and capricious, *see* Chamber Compl. ¶¶ 79–81; Baker Am. Compl. ¶¶ 30–32, that challenge also fails. The discretion afforded to the regional director in setting the election date effectively precludes a finding that the Board acted arbitrarily or capriciously in the context of a facial challenge. *See, e.g.*, *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 619 (1991) ("The fact that petitioner can point to a hypothetical case in which the rule might lead to an arbitrary result does not render the rule 'arbitrary or capricious.'").

### E.      The Employee Information Disclosure Requirement

Plaintiffs also attack the Final Rule's requirement that employers disclose employees' personal contact information in a voter list.   The NLRB first required employers to disclose employee contact information in its 1966 decision in *Excelsior*:

> [W]ithin 7 days . . . after the Regional Director or the Board has directed an election . . . the employer must file with the Regional Director an election eligibility list, containing the names and addresses of all the eligible voters. The Regional Director, in turn, shall make this information available to all parties in the case.

156 N.L.R.B. at 1239–40.   In that case, the Board found that "a lack of information with respect to one of the choices available" in a representation election impeded employees' exercise of free choice in those elections under section 9(b) of the NLRA, and it determined that "by providing all parties with employees' names and addresses, we maximize the likelihood that all the voters will be exposed to the arguments for, as well as against, union representation."  *Id.* at 1240–41.  The Supreme Court later endorsed this rationale.  *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 767 (1969) ("The disclosure requirement furthers this objective [to ensure the fair and free choice of bargaining representatives] by encouraging an informed employee electorate and by allowing unions the right of access to employees that management already possesses.").

The Final Rule expands *Excelsior*, requiring employers to produce a voter list containing "the full names, work locations, shifts, job classifications, and contact information (including home addresses, available personal email addresses, and available home and personal cellular ('cell') telephone numbers) of all eligible voters" within two business days of a direction of election. 29 C.F.R. § 102.67(*l*) ("the Employee Information Disclosure Requirement").  The Baker plaintiffs contend that this requirement is contrary to the NLRA, and both sets of plaintiffs claim that it is arbitrary and capricious.  Chamber Mot. at 40–41; Baker TRO Mem. at 9–11; *see also* Amicus Brief at 21–24.

53

### 1.   The Employee Information Disclosure Requirement does not violate the NLRA.

The Baker plaintiffs do not identify a specific provision of the NLRA that the Employee Information Disclosure Requirement allegedly violates.  Instead, they seek to invalidate this requirement on the sole grounds that "[n]othing in the Act authorizes the Board to require employers to disclose the personal and private phone numbers and personal email addresses of their employees." Baker Am. Compl. ¶ 17.  But, again, the fact that the NLRA does not specifically authorize the Board to mandate these disclosures does not mean that the statute prohibits it.  *See Serono Labs.*, 158 F.3d at 1319.  Without more, the Court does not find that the Employee Information Disclosure Requirement violates any provision of the NLRA.

The Baker plaintiffs also argue that this requirement runs counter to "privacy statutes . . . in which Congress has expressed its intent to increase employee privacy and not decrease it."  Hr'g Tr. 18:5–8; *see also* Baker TRO Mem. at 10–11 (discussing the Privacy Act, the privacy exemption to the Freedom of Information Act, the Telemarketing and Consumer Fraud and Abuse Protection Act, and the Controlling the Assault of Non-Solicited Pornography and Marketing Act).  They assert generally that the requirement "conflicts with Congressional intent to protect worker privacy against further intrusion," and that it is "the Board's obligation to accommodate its rules to the competing interests of other federal laws."  Baker TRO Mem. at 11.  But they do not elaborate upon or provide authorities in support of this contention.

Regardless, as the court observed in the Western District of Texas litigation, not one of the statutes the Baker plaintiffs cite restricts the disclosure of employee information by employers or to unions:  the Privacy Act and FOIA relate to the disclosure of information maintained by federal agencies, and the other two statutes restrict the conduct of telemarketers and other non-solicited communications. *Associated Builders*, 2015 WL 3609116, at *9 n.6.  And the Board specifically

considered these concerns in promulgating the Final Rule, noting that "to the extent that any such laws are found applicable to the nonemployer parties' use of the contact information, those parties would be required to conform their conduct" to those statutes.   79 Fed. Reg. at 74,346, 74,352. So, this aspect of the Baker plaintiffs' challenge to the Employee Information Disclosure Requirement is also unavailing.

> **2.     The Employee Information Disclosure Requirement is not arbitrary and capricious.**

Both sets of plaintiffs argue that the Employee Information Disclosure Requirement is arbitrary and capricious because it disregards employees' substantial privacy concerns, fails to provide an opt-out mechanism, and lacks a meaningful penalty for misuse of the voter list. Chamber Compl. ¶ 82; Chamber Mot. at 40–41; Baker Am. Compl. ¶ 33; Baker TRO Mem. at 9–11; *see also* Amicus Brief at 21.   The Board counters that the Final Rule's expansion of the voter list requirement is consistent with the purpose of the NLRA and that it simply modernizes the existing requirement to disclose employees' home addresses in a way that reflects "the communications revolution that has transformed our country."   Board Mot. at 35–37.

The Final Rule requires employers to supply "available" personal email addresses and "available" home and personal cell phone numbers, 29 C.F.R. § 102.62(d),[27] with the goal of advancing the two interests articulated by the Board in *Excelsior*:

> (1) Ensuring the fair and free choice of bargaining representatives by maximizing the likelihood that all the voters will be exposed to the

---

[27]     Importantly, the disclosure requirement does not appear to require employers to track down employee contact information they do not already have in their possession, as it mandates the production only of "*available* personal email addresses, and *available* home and personal cellular ('cell') telephone numbers."   29 C.F.R. § 102.67(*l*) (emphasis added); *see also* 79 Fed. Reg. at 74,338 n.146 ("[I]f the employer does not maintain those [personal email] addresses and numbers, it does not need to ask its employees for them.").   In addition, the Final Rule "does not require employers to furnish the other parties or the regional director with the work email addresses and work phone numbers of the eligible voters."   79 Fed. Reg. at 74,335.

> nonemployer party arguments concerning representation; and
> (2) facilitating the public interest in the expeditious resolution of questions
> of representation by enabling the parties on the ballot to avoid having to
> challenge voters based solely on lack of knowledge as to the voter's identity.

79 Fed. Reg. at 74,335, citing *Excelsior*, 156 N.L.R.B. at 1240–41, 1242–42, 1246.  The Court

must accord the agency the deference to which it is entitled, but it also must determine whether

the Board considered the relevant factors when seeking to further these goals, and whether it

articulated a rational connection between the facts it found and the choices it made.  *Clean Air

Agencies*, 489 F.3d at 1228.

> a.    **The Board's conclusion that the Employee Information
> Disclosure Requirement ensures fair and free employee choice
> was not arbitrary and capricious.**

The Board first found that the Employee Information Disclosure Requirement would

further *Excelsior*'s goal of "ensuring the fair and free choice of bargaining representatives by

maximizing the likelihood that all the voters will be exposed to the nonemployer party arguments

concerning representation."  79 Fed. Reg. at 74,335.  It determined that "the provision of only a

physical home address no longer serves the primary purpose of the *Excelsior* list," and that the

disclosure of home and cellular telephone numbers and personal email addresses was warranted,

based on the following factors:

- The "revolution in communications technology," which has resulted in a
  shift away from the U.S. mail system and face-to-face communication, in
  favor of mass and electronic media, including cellular phones and email;

- The increased speed with which communications can occur via email and
  cellular phones, as opposed to traditional mail or face-to-face
  communications;

- The recognition that home and cellular phones have become a "universal
  point of contact" for a large majority of Americans; and

- The fact that employers increasingly communicate with their employees via
  email about representation elections.

*Id.* at 74,336–41.

The Board engaged in a review of statistics and studies showing that the most common methods of communication have changed drastically since *Excelsior*, shifting away from face-to-face and traditional mail communications and toward cellular phones and email. *See id.* at 74,335–40. For example, the Board cited a Census Bureau study showing that, whereas only 78% of households possessed a telephone in 1960, 97.6% of households had at least one phone as of the year 2000. *Id.* at 74,338–39. In addition, the Board noted that while "door to door solicitation is nearly extinct, and first class mail is at its lowest volume in 25 years," "39.6 billion emails were being sent every day" as of 2010, and that while cellular phones were "a non-existent technology at the time of *Excelsior*," 90% of American adults owned one as of 2014. *Id.* at 74,337, 74,339.

The Board also specifically considered the comments it received that took the position that "because the Board chose not to mandate disclosure of phone numbers in [*Excelsior*], at a time when at least basic telephone technology existed, then it should not do so today." *Id.* at 74,338. In response, the Board observed that home telephones in 1966 lacked voicemail or answering machine technology and therefore did not necessarily facilitate communication with potential voters, but cellular and home telephones today can receive and store voicemails and text messages and are therefore more useful and dependable tools for communication. *Id.* It also noted that home phone ownership has increased significantly, and that cellular phones and the advances in text messaging technology had increased the value of phones as a communication tool, and it concluded: "the changes in phone ownership and use make personal phones a universal point of contact today in a way that was unimaginable" when *Excelsior* was decided. *Id.* Therefore, the Board found that the precedent it set in *Excelsior* did not preclude it from expanding the requirement in the Final Rule. *Id.*

The Board's analysis reflects consideration of the relevant issues, and there is a rational connection between its discussion of the increased use of digital communications technology in lieu of face-to-face communication and the U.S. mail and the regulation that was promulgated.  As the Supreme Court has observed, "[t]he responsibility to adapt the [NLRA] to changing patterns of industrial life" has been entrusted to the Board, *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266 (1975), and its decision to do so in this case was not arbitrary and capricious.

> b.    **The Board's conclusion that the Employee Information Disclosure Requirement facilitates the public interest was not arbitrary and capricious.**

The Board also found that the expanded disclosure regime would further *Excelsior*'s second goal of "facilitating the public interest in the expeditious resolution of questions of representation by enabling the parties on the ballot to avoid having to challenge voters based solely on lack of knowledge as to the voter's identity."  79 Fed. Reg. at 74,335.  The Board noted that "in many cases at least some of the names on the employer's list of eligible voters are unknown to the other parties," which might force a union to challenge those unknown voters, delaying the results of an election.  *Id.* at 74,340.  The Board found that the new requirement would help the parties "investigate the identity of any unknown employees on the employer's voter list in a more timely manner, thereby helping to decrease the chances that the [party] will have to challenge voters based solely on the ignorance of their identities."  *Id.*

While the Board did not provide statistical support for its determination that the disclosure rule would facilitate the resolution of questions of representation on a more timely basis, this finding is "of a judgmental or predictive nature," and "a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency." *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 813–14 (1978), quoting *FPC v. Transcon.*

*Gas Pipe Line Corp.*, 365 U.S. 1, 29 (1961).  And plaintiffs did not challenge the validity of this stated rationale, or the Board's finding that the disclosure requirement would further that goal. Thus, the Court does not find this aspect of the Final Rule to be arbitrary and capricious.

> **c.**    **The Board did not act arbitrarily or capriciously by failing to consider commenters' objections in adopting the Employee Information Disclosure Requirement.**

Plaintiffs do not attack the underlying justification for the original *Excelsior* requirement and they do not question the connection between the facts the Board lays out in support of the Final Rule and the Employee Information Disclosure Requirement.  But, they claim that the disclosure requirement is arbitrary and capricious because it disregards employees' substantial privacy concerns, it lacks an opt-out mechanism, and it does not contain a meaningful penalty for misuse of the voter list.  Chamber Compl. ¶ 82; Chamber Mot. at 40–41; Baker Am. Compl. ¶ 33; Baker TRO Mem. at 9–11.

> **i.**    **Employee Privacy Concerns**

Plaintiffs contend in their memoranda that the Board "brushed aside all concerns for employee privacy and security," Baker TRO Mem. at 10, that it "concluded, without adequate justification and concern for employee rights" that the risks to employee privacy were worth taking, Chamber Compl. ¶ 82, and that it acted "without any reasoning or analysis."  Chamber Mot. at 41.  But these conclusory allegations are belied by the text of the Final Rule, which indicates that the Board engaged in a lengthy and thorough analysis of the privacy risks and other concerns raised by the commenters before reaching its conclusion that the Employee Information Disclosure Requirement was warranted.  79 Fed. Reg. at 74,341–52.

The Board specifically weighed "employee privacy concerns" against the "public interests in the fair and free choice of bargaining representatives and in the expeditious resolution of

questions of representation" in finding that the expanded requirement was justified.  *Id.* at 74,341.

It recognized "that advances in technology since *Excelsior* have created a heightened risk of

unauthorized dissemination of personal information," and that there is increased public concern

about privacy issues "due to incidents of identity theft, government surveillance and hacking of

retailers' electronic databases." *Id.* at 74,342.  But it found that the privacy risks associated with

the use of cell phones and email "are part of our daily life," and that "[t]hese risks are worth taking

and as a practical matter, must be taken, if communication about organizational issues is going to

take place using tools of communication that are prevalent today." *Id.*

The Board acknowledged that "'[employees] have [a] nontrivial privacy interest in

nondisclosure' of home address information," and that "some employees will consider disclosure

of the additional contact information . . . to invade their privacy, even if they are never contacted."

*Id.*, quoting *Dep't of Def. v. FLRA*, 510 U.S. 487, 501 (1994).  But it noted that the risk that an

employee's privacy rights would be infringed "should be more pronounced surrounding an

employee's home address – long disclosable under *Excelsior* – than for the additional contact

information (phone numbers and email addresses)" mandated under the Final Rule.  *Id.* at 74,343.

The Court agrees with the Board's observation that, in contrast to the home addresses, which "may

lead to face-to-face contact" at an employee's home, "disclosure of employee phone numbers and

email addresses may simply lead to phone calls or email messages, which are more easily ignored."

*Id.*; *see also Associated Builders*, 2015 WL 3609116, at *11 ("Virtual contact can be readily

ignored.  And virtual contact information can be and is routinely changed, unlike a physical home

address.").  And the Board reiterated that the Final Rule requires only the disclosure of *available*

employee contact information, so if an employee has not shared a personal email address or cell

phone number with his or her employer, the employer will not be able to disclose it to the other parties.  79 Fed. Reg. at 74,343 n.169.

Finally, the Board noted that the information to be disclosed "is limited in scope" and does not reveal any sensitive information "about the employees' politics, their religion, their associations, or even their position regarding the labor organization in question."  *Id.* at 74,343–44.  It pointed out that "the voter list information will be provided to a limited set of recipients," and "will not be made available to the public at large."  *Id.* at 74,344.  Ultimately, the Board found that "the substantial public interests – in fair and free elections and in the speedy resolution of questions of representation – served by the voter list amendments outweigh the employees' acknowledged privacy interest in the information that will be disclosed."  *Id.* at 74,343.  Given the Board's consideration of the comments it received raising employees' privacy concerns, its reasoned analysis as to why the expanded disclosure requirement was necessary, and the deferential standard that must be applied, the Court does not find that the Board acted arbitrarily and capriciously in enacting the Final Rule despite its implications for employee privacy.

### ii.      Opt-out Mechanism

Plaintiffs also contend that the failure to incorporate an opt-out provision in the Final Rule, which would permit an employee to choose not to receive union communications via email or telephone, was arbitrary and capricious.  Chamber Mot. at 40; Baker TRO Mem. at 9–11.

The Board considered commenters' suggestions on this point, and it determined that "it would hardly be consistent with the policy underlying *Excelsior* – ensuring that employees receive sufficient information from the nonemployer party to make an educated decision – to begin allowing employees to opt in or opt out of such disclosures."  79 Fed. Reg. at 74,347.  It also found that including an opt-out mechanism in the Final Rule could "impose significant administrative

burdens on the government and the parties," that it could "invite new areas of litigation resulting in additional costs to the parties and the Board," and that it would delay the election "if extra time were allotted between an election's direction and its conduct for communication with the subject employees concerning their ability to opt in or out" of the union's communications. *Id.* For those reasons, the Board found that "attempting to craft a universally applicable opt-out requirement unique to Board elections would have highly uncertain benefits at a cost of generating new election disputes and possible conflicts with other Federal regulation of the same subject matter." *Id.* at 74,348. Instead, it determined that "the existing self help remedy available to anyone who objects to unwanted communications – ignoring calls or letters and deleting emails – seems for the time being to be a more cost-effective option." *Id.*

Plaintiffs do not challenge the Board's findings on this issue, and they do not identify evidence on this point that the Board failed to consider. They simply disagree with the choice the Board made, and that is not enough to mount a successful APA challenge. Because the Board's decision not to include an opt-out provision in the Final Rule bears a rational connection to the facts it found and the factors it considered, the Court finds that it was not arbitrary and capricious.

### iii.    Penalty for Misuse

Finally, plaintiffs contend that Final Rule is arbitrary and capricious because the Board "declin[ed] to announce penalties for misusing the [voter list]," which could lead to the abuse of employees' personal contact information. Chamber Mot. at 41; *see also* Baker TRO Mem. at 12; Amicus Brief at 22. But the Final Rule does prohibit abuse: it mandates that parties "shall not use the [voter] list for purposes other than the representation proceeding, Board proceedings arising from it, and related matters." 29 C.F.R. § 102.67(*l*). The Board addressed some of the commenters' concerns that the prohibition was not explicit enough, observing that "it goes without

saying that nonemployer parties would run afoul of the restriction if, for example, they sold the list to telemarketers, gave it to a political campaign or used the list to harass, coerce, or rob employees." 79 Fed. Reg. at 74,358.  The Board added that "if the disclosure of the additional contact information does subject employees to harm, the Board 'shall provide an appropriate remedy,'" *id.* at 74,342, quoting *Excelsior*, 156 N.L.R.B. at 1244, and that leaving the "question of remedies to case-by-case adjudication," as the Board did in *Excelsior*, was the best approach. *Id.* at 74,359.

The Board also addressed commenters' objections that the disclosure of employees' personal phone and email information "could lead to harassment and coercion" in the absence of an explicit penalty provision.  *Id.* at 74,341–42.  Similar concerns were raised at the time of *Excelsior*, and the Board stated that no instances of abuse specifically linked to the *Excelsior* list had been reported in the nearly fifty years since *Excelsior* was decided.[28]  *Id.*  The Board found that a union seeking to obtain employees' votes in its favor was highly unlikely to engage in coercive behavior, as doing so would greatly decrease the union's chance of receiving that employee's vote.  *Id.*  Further, it reviewed statistics showing that "out of 24,681 representation elections conducted between fiscal years 2000 and 2010, employers filed objections involving

---

28    The Chamber plaintiffs argue that "[t]he notion that unions have never abused access to employee home address information is belied by publicly available Board decisions."  Chamber Reply at 27 & n.9, citing *Brown & Sharpe Mfg. Co.*, 299 N.L.R.B. 586, 590 (1990); *Kohler Co.*, 128 N.L.R.B.1062, 1106 (1960); *Int'l Ass'n of Machinists*, 189 N.L.R.B. 50, 54 (1971).  But these same cases were raised and considered during the rulemaking process, and as the Board observed, those cases "are not linked to misuse of *Excelsior* list information, but, rather, include the entire range of coercive union conduct, including when that union is already acting as an employees' bargaining representative." 79 Fed. Reg. at 74,342.  And while such decisions indicate that some misuse of employee contact information has potentially occurred, they show that the Board "has and will continue to address those situations." *Associated Builders*, 2015 WL 3609116, at *10. The Court is therefore not persuaded that these isolated cases show that the expanded *Excelsior* list information is likely to be abused, and it does not find that the Final Rule is arbitrary and capricious on that basis.

allegations of union threats and/or violence in 469 cases," of which only 16 resulted in an election being set aside on that basis. *Id.* at 74,342 n.162. The Board observed that nothing in its database indicated that any of these 16 cases involved the misuse of *Excelsior* information, and that "a record of union coercion sufficient to set aside an election in 0.065% of elections over a recent 10-year span simply does not demonstrate that union coercion and intimidation in the context of an organization campaign is rampant." *Id.* (internal quotation marks omitted). The Board found that the commenters presented only "the mere potential for misuse of the voter list information," and it concluded that it would "not make policy based on mere speculation." *Id.* at 74,342.

In *Wyman-Gordon*, the Supreme Court stated that it is for the Board and not for the Court to weigh the interest in an informed employee electorate against "the asserted interest of employees in avoiding the problems that union solicitation may present." 394 U.S. at 767. Because the Board did just that in reaching its conclusion that the risks to employees' privacy interests "are worth taking" to ensure that "communication about organizational issues is going to take place using tools of communication that are prevalent today," 79 Fed. Reg. at 74,342, the Court will not substitute its judgment for the Board's. Therefore, the Court finds that the Employee Information Disclosure Requirement does not violate the APA.

### F. The Elimination of the Parties' Ability to Stipulate to Mandatory Post-Election Board Review Through a Stipulated Election Agreement

Under the prior regulations, all pre-election review and some post-election review by the Board was discretionary, but the parties could agree in a stipulated election agreement[29] to make

---

29      A stipulated election agreement is an agreement between the parties to a representation proceeding, made with the approval of the regional director, waiving the parties' right to a pre-election hearing and providing specific procedures for an election held pursuant to the agreement. *See* 29 C.F.R. § 102.62(b).

Board review of post-election disputes mandatory.  79 Fed. Reg. at 74,331–32; *see also* 29 C.F.R. §§ 102.62(b); 102.69(c)(2) (2014).

The Final Rule eliminates the parties' ability to stipulate that post-election disputes will be resolved by the Board.  79 Fed. Reg. at 74,331.  Instead, "the regional director will resolve any post-election disputes subject to discretionary Board review."  *Id.*  And the Final Rule provides that "[t]he Board will grant a request for review only where compelling reasons exist therefor," such as:  where a petitioning party has shown that (1) "a substantial question of law or policy is raised;" (2) "the regional director's decision on a substantial factual issue is clearly erroneous;" (3) "the conduct of any hearing or any ruling made in connection with the proceeding has resulted in prejudicial error;" or (4) "there are compelling reasons for reconsideration of an important Board rule or policy."  29 C.F.R. § 102.67(d).[30]

Both the Chamber plaintiffs and the Baker plaintiffs assert that the Final Rule's "elimination of mandatory Board review of post-election disputes, during a period of dramatically

---

30    The presentation of this issue is yet another example of plaintiffs' blatant mischaracterization of the regulations under review.  The Chamber plaintiffs allege that "the Final Rule . . . eliminates mandatory Board review of post-election disputes, making such review discretionary only."  Chamber Compl. ¶ 18.  And the Baker plaintiffs complain that it "eliminates employers' automatic right to post-election Board review (post-election review would now be discretionary)."  Baker Am. Compl. ¶ 4(g).  But there was no "mandatory" or "automatic" Board review before – there was only the option that the employer and union could agree to mandatory review, as part of a broader stipulation waiving the pre-election hearing altogether.  *See* 29 C.F.R. § 102.62(b) (2014).  Otherwise, Board review was *already* discretionary.  And plaintiffs do not stop there:  in paragraph 72 of their complaint, the Chamber plaintiffs also allege that the Final Rule "deprives employers of due process in NLRB representation case proceedings, in violation of the Fifth Amendment, by preventing employers from litigating issues of voter eligibility and inclusion at the pre-election hearing, and then denying the employer the right to seek any Board review of those issues, whether pre- or post-election, by making all Board review discretionary."  Chamber Compl. ¶ 72.  Paragraph 22 of the Baker amended complaint is identical.  Baker Am. Compl. ¶ 22.  But the Board did not "make" something that was already discretionary discretionary, and even if it eliminated the one mechanism under which it could become mandatory, "making Board review discretionary" is not the same thing as "denying the employer the right to seek any Board review."  The right to seek Board review remains as it was.

reduced case loads, is arbitrary and capricious given the Board's statutory obligation to oversee the election process."   Chamber Compl. ¶ 83; Baker Am. Compl. ¶¶ 34–35.   The Chamber plaintiffs warn that "without the failsafe of mandatory post-election review, employers will be more reluctant to enter into binding election agreements," Chamber Mot. at 35, and they contend that the Final Rule "will result in more, not less, litigation overall, including more litigation in federal court," Chamber Compl. ¶ 84; Baker Am Compl. ¶ 36, because it "will force more employers to turn to the federal courts for the review that is denied by the Board."   Chamber Mot. at 36.   But the only support plaintiffs marshal for these predictions is the dissenting opinion to the Final Rule.   *See id.*, citing 79 Fed. Reg. at 74,451 (dissent).   Plaintiffs point to no authority that demands that every agency action be unanimous, and the fact that individual Board members were outvoted on a matter of policy does not mean that the Board overlooked "evidence" in the record.

Upon review of the Final Rule as a whole, the Court finds that the Board gave substantial consideration to this and other issues in deciding to eliminate parties' ability to stipulate to mandatory Board review, and that its analysis evidences a rational connection between the facts the Board found and the choice it made.

The Board determined that it was appropriate to eliminate the parties' ability to stipulate to mandatory Board review based on the following findings:

- All pre-election review and most post-election review, absent a stipulated election agreement, was already discretionary, and the Final Rule would standardize the process for requesting review across all stages of the election;

- The Board has affirmed "the vast majority of post-election decisions" made by regional directors, in light of the "highly deferential standard that the Board employs" in reviewing such decisions; and

- A discretionary review system will provide a full opportunity to raise contested issues, while conserving Board resources and promoting efficiency by eliminating the unnecessary review of meritless disputes.

79 Fed. Reg. at 74,331–32.

Plaintiffs maintain that the Final Rule contravenes the Board's "statutory obligation to oversee the election process," Chamber Compl. ¶ 83; Baker Am. Compl. ¶¶ 34–35, but the Board found it was not "abdicating its statutory responsibility and function," because section 153 of the NLRA expressly provides for the delegation of the Board's authority to its regional directors.  79 Fed. Reg. at 74,332, quoting 29 U.S.C. § 153(b).  Further, because the rules had long provided that pre-election disputes were subject only to discretionary review, and that decision had been upheld by the Supreme Court, the Board found that it was "clearly permit[ted] . . . to adopt the final rule's amendments concerning post-election review."  *Id.* at 74,332–33, citing *Magnesium Casting Co. v. NLRB*, 401 U.S. 137, 141–42 (1971) (rejecting employer's contention that "plenary review by the Board of the regional director's unit determination is necessary at some point" and holding that "the fact that the Board has only discretionary review of the determination of the regional director creates no possible infirmity within the range of our imagination").  These findings are consistent with the statute and controlling authority.

Plaintiffs expressed concern that "employers will be more reluctant to enter into binding election agreements" if they cannot stipulate to mandatory post-election Board review, and that litigation will increase as a result.  Chamber Mot. at 35; *see also* Chamber Compl. ¶ 84; Baker Am. Compl. ¶ 36.  But the Board considered these arguments, and it predicted that the calculus of whether to litigate pre-election issues or enter into an election agreement would remain the same under the Final Rule as it did under the prior regime:  parties will weigh "the likelihood of success, the importance of the issue, and the cost of litigation."  79 Fed. Reg. at 74,334.  Because pre-election agreements enable parties "to avoid[] the time, expense and risk associated with a pre-election hearing" and provide "certainty with respect to the unit description and the election date,"

the Board concluded that "parties will continue to have ample reason to enter into stipulated election agreements" under the Final Rule.  *Id.*

The Board also found that it was "at best, highly speculative" that employers will refuse to bargain in order to obtain judicial review of regional directors' decisions, resulting in an increase in federal court litigation.  *Id.*  It observed that the Final Rule "merely applies precisely the same standard to post-election review" as was already in place for pre-election review, and that there was no such influx of federal court litigation despite the fact that all pre-election review is, and long has been, discretionary.  *Id.* at 74,427.

While plaintiffs may believe that the Board's analysis of this issue is not sufficiently sensitive to their concerns, they do not point to any evidence, let alone any evidence that was before the Board during the rulemaking process, that contradicts the Board's findings or that should have led the Board to a different conclusion.  Accordingly, given the Board's consideration of plaintiffs' concerns during the rulemaking process, the rational connection between the Board's findings and its decision, and the deferential standard of review, the Court finds that the Board's decision to eliminate the parties' ability to stipulate to mandatory Board review of post-election disputes was not arbitrary and capricious.[31]

---

31      Both complaints include a conclusory allegation that this aspect of the Final Rule infringes employers' due process rights.  *See* Chamber Compl. ¶ 72 ("The Final Rule also deprives employers of due process . . . by preventing employers from litigating issues of voter eligibility and inclusion at the pre-election hearing, and then denying the employer the right to seek any Board review of those issues, whether pre- or post-election, by making all Board review discretionary."); *see also* Baker Am. Compl. ¶ 22.  But plaintiffs take this issue no further in their summary judgment memoranda, and the Supreme Court has already recognized the Board's authority to prescribe discretionary review.  *See Magnesium Casting Co.*, 401 U.S. at 141–42.  So plaintiffs challenge to this aspect of the Final Rule on Fifth Amendment grounds also fails.

### III.     The Challenge to the Entire Final Rule as Arbitrary and Capricious

Finally, both sets of plaintiffs contend that the Final Rule – when reviewed as a single comprehensive rule change and not as the set of its component parts – must be invalidated because it is arbitrary and capricious.  Chamber Compl. ¶¶ 76–86; Chamber Mot. at 31–39; Baker Am. Compl. ¶¶ 28–38.  Indeed, counsel for the Chamber plaintiffs stated that their "primary position" is that the entire Final Rule "fail[s] . . . under the arbitrary and capriciousness inquiry, in that . . . the rule as a whole is a vastly overbroad solution to a very narrow problem."  Hr'g Tr. 7:21–25.

Plaintiffs complain that "[t]he Final Rule promotes speed in holding elections at the expense of all other statutory goals and requirements."  Chamber Compl. ¶ 81; Baker Am. Compl. ¶ 32.  The Chamber plaintiffs tell the Court that "[t]he Final Rule is overly broad in changing election procedures in a manner impacting all cases" and in "seek[ing] to arbitrarily expedite the election process, even though . . . the Board already conducts elections below its established time targets in more than 90 percent of cases."  Chamber Compl. ¶¶ 78–79; *see also* Chamber Mot. at 32.  The Baker plaintiffs agree that the Final Rule is not "necessary," in light of the speed with which the vast majority of elections were already being resolved prior to the Final Rule.  Baker Am. Compl. ¶¶ 29–30; Hr'g Tr. at 73:5–19.

But this argument presupposes that the lone goal of the Final Rule was speedier elections, and that is not the case.  Many of the Final Rule's provisions, including the Posting Requirement, the Employee Information Disclosure Requirement, and the sections providing for electronic transmission and filing of elections materials, do not relate to the length of the election cycle.  And the Board found that the Final Rule was necessary to further a variety of permissible goals and interests beyond speed:

> Especially as to contested cases, current procedures result in duplicative, unnecessary and costly litigation.  Simplifying, streamlining and, in some

> cases, bolstering these procedures will reduce unnecessary barriers to the fair and expeditious resolution of representation disputes and result in more fair and accurate elections.  The rule also codifies best practices to ensure that our procedures are more transparent and uniform across regions. Changes to the representation case procedures are also necessary to update and modernize the Board's processes in order to gain the advantages of and make effective use of new technology, especially affecting communications and document retrieval and transmission.  These changes will enhance the ability of the Board to fulfill its statutory mission.

79 Fed. Reg. at 74,315.

Expedition is a valid concern, well within the Board's purview, but the Final Rule makes clear that it was aimed not only at increasing the speed and efficiency with which representation elections are carried out, but that it was also designed to increase transparency and uniformity, to ensure more fair and accurate voting, and to adapt the Board's rules to modern technology.  *Id.* These goals all further the Board's mandate to "adopt policies and promulgate rules and regulations in order that employees' votes may be recorded accurately, efficiently and speedily." *A.J. Tower*, 329 U.S. at 331.  There is nothing improper about an agency attempting to improve its regulatory scheme, even if its processes have been working relatively effectively.  *Accord Associated Builders*, 2015 WL 3609116, at *17.  So while some of the changes may have the effect of expediting the elections timeline, those provisions accord the regional directors considerable discretion to adapt to specific circumstances, and they have been individually upheld by this Court, as discussed above, in part because there were other permissible objectives underlying the decision to adopt the Final Rule as a whole that were entirely unrelated to speed.  The Court therefore rejects plaintiffs' contention that the Board acted arbitrarily by expediting elections "at the expense of all other statutory goals and requirements."  *See* Chamber Compl. ¶ 81; Baker Am. Compl. ¶ 32.

The Chamber plaintiffs also assert that "the Board cannot create a rule to 'defeat a bogeyman'" – here, unnecessary delays in representation elections – "whose existence was never

verified.'"  Chamber Mot. at 32–33, quoting *Sorenson Commc'ns, Inc. v. FCC*, 755 F.3d 702, 710 (D.C. Cir. 2014).  In the *Sorenson* case, the D.C. Circuit found that an FCC rule which imposed sales charges on phones manufactured for the hearing impaired, in order to deter fraudulent use of that equipment, was arbitrary and capricious because the agency had "offer[ed] no evidence suggesting there is fraud to deter."  755 F.3d at 707, 709–10.  Here, the Board has offered evidence to support the need for the Final Rule – it considered not only the fact that some elections were being unnecessarily delayed in fully-litigated cases, 79 Fed. Reg. at 74,317–18, but also that "some rules have become outdated as a result of changes in communications technology and practice," that its election processes had not been updated despite those changes, and that best practices were not being implemented uniformly across its regions.  *Id.* at 74,308, 74,315–16.  Accordingly, unlike in *Sorenson*, the Board has offered grounds to show that the issues targeted by the Final Rule were sufficiently tangible to warrant action, and the Court cannot find that the Board acted arbitrarily or capriciously in reaching that determination.

## CONCLUSION

The NLRA declares it to be "the policy of the United States" to facilitate the free flow of commerce "by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."  29 U.S.C. § 151.  And in enacting that statute, Congress authorized the Board "to make, amend, and rescind . . . such rules and regulations as may be necessary to carry out the provisions" of the NLRA.  *Id.* § 156.  Plaintiffs complain that "[t]he hundreds of pages in the Board's Final Rule contain remarkably little logic or sound explanation for the sweeping changes made by the Final Rule," Chamber Mot. at 31, but in reality,

the Board engaged in a comprehensive analysis of a multitude of issues relating to the need for

and the propriety of the Final Rule, and it directly addressed the commenters' many concerns,

including a number of the arguments plaintiffs raised here.  Since plaintiffs have not shown that

the Final Rule contravenes either the NLRA or the Constitution, or that the Final Rule is arbitrary

and capricious or an abuse of Board discretion, plaintiffs' motion for summary judgment will be

denied, and the Board's motion for summary judgment will be granted.

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  July 29, 2015